UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

U.S. COURT OF APPEALS
RECEIVED
JUN 1 0 2005
NEW ORLEANS, LA.

UNITED STATES OF AMERICA,          )
    Plaintiff-Appellee          )
                   )
                   )
v.          )          NO. 04-70050
                   )
                   )
ORLANDO CORDIA HALL,          )
    Defendant-Appellant          )

U.S. COURT OF APPEALS
FILED
JUN 1 0 2005
CHARLES R. FULBRUGE III
CLERK

**APPELLANT'S MOTION FOR LEAVE TO FILE APPLICATION FOR CERTIFICATE OF APPEALABILITY IN EXCESS OF PRESUMPTIVE LIMITS SET BY FED. R. APP. P. 32(a)(7)(B) OR, IN THE ALTERNATIVE, FOR AN ADDITIONAL THIRTY <u>DAYS IN WHICH TO FILE THE COA APPLICATION</u>**

TO THE HONORABLE JUDGES OF THE COURT OF APPEALS:

Defendant-Appellant, Orlando Hall, ("Mr. Hall"), by and through undersigned counsel, respectfully moves the Court, pursuant to 5th Cir. R. 32.4 and 26.2 and F.R.A.P. 2 and 26(b), for leave to file an application for certificate of appealability ("COA application") in excess of the word limit established by F.R.A.P. 32(a)(7)(B). In the event the Court denies the motion, Mr. Hall respectfully requests that the Court grant him an additional thirty days in which to edit the COA application to comply with the Court's word limits and file the application. In support of his motion, Mr. Hall would respectfully show the Court as follows:

1. In November 1995, Mr. Hall was convicted and sentenced to death under the

1

Federal Death Penalty Act of 1994, 18 U.S.C. § 3591 *et seq.*, following a jury trial conducted in the Northern District of Texas. This Court affirmed the conviction and death sentence. United States v. Hall, 152 F.3d 381 (5th Cir. 1988), *cert. denied*, 526 U.S. 1117 (1999).

2. Mr. Hall subsequently filed a timely motion to vacate the judgment and for a new trial pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure ("2255 Motion"). Following proceedings in the District Court, including two permitted amendments of the 2255 Motion, the District Court denied relief on August 24, 2004. The District Court thereafter denied Mr. Hall's post-judgment motions and his application for a certificate of appealability. Mr. Hall's COA application in this Court was originally due on ***. This Court granted an extension of time to June 17, 2005.

3. In the 2255 Motion, Mr. Hall raised twelve claims for relief,[1] including an

---

[1] Hall's 2255 Motion raised the following twelve claims for relief:

1. The conviction and death sentence violate the Fifth Amendment under Ring v. Arizona, 536 U.S. 584 (2002);

2. Hall was denied effective assistance of counsel, in violation of the Sixth Amendment;

3. The introduction of extraneous evidence or information into the jury's punishment-phase deliberations violated Hall's rights under the Fifth, Sixth and Eighth Amendments;

4. A juror's *ex parte* contact with one or more members of Lisa Rene's family violated Hall's rights under the Fifth, Sixth and Eighth Amendments;

(continued...)

omnibus claim that trial counsel provided ineffective assistance with respect to the penalty phase of the trial. The ineffective assistance claim alone raised sixteen distinct ways in which counsels' performance was deficient and takes up about two-thirds of the Second Amended 2255 Motion.[2]

---

[1](...continued)

5. An unacceptable risk exists that at least one juror was overwhelmed by emotion and voted for death based on her sympathy for Lisa Rene and her family, rather than basing her verdict on the evidence, in violation of Hall's rights under the Fifth, Sixth and Eighth Amendments and 18 U.S.C. § 3595;

6. The Government failed to disclose exculpatory and mitigating information concerning witness Larry Nichols, in violation of the Fifth and Sixth Amendments;

7. The Government failed to correct false testimony by its witness Larry Nichols, in violation of the Fifth, Sixth and Eighth Amendments;

8. The Government used jail inmate Larry Nichols to elicit information from Hall, in violation of the Sixth Amendment;

9. Hall's Fifth, Sixth and Eighth Amendment rights were violated when the Government proffered an FBI 302 containing false information to deter the defense from calling a witness who would have dynamited the credibility of star witness Larry Nichols;

10. The Government interfered with Hall's right to counsel, in violation of the Fifth and Sixth amendments by promoting the false accusations of Larry Nichols;

11. The federal death penalty, as administered by the Government, violates the Fifth and Eighth Amendments; and

12. Hall's death sentence is based on materially false or inaccurate information, in violation of the Eighth Amendment.

[2] Mr. Hall alleged that trial counsels' performance was deficient in that they

1. failed to conduct a timely investigation;

2. unreasonably chose to focus on the mitigating factor of equally culpable co-defendants without conducting an adequate investigation into other available mitigating evidence;

(continued...)

4. Given the complexity of the claims raised and their largely fact-intensive nature, the pleadings in this case are voluminous. The Second Amended 2255 Motion is 198-pages long (in 12-point font) and includes 614 pages of exhibits. The Government's response is 108-pages long and includes 133 pages of exhibits. Mr.

---

[2](...continued)

3.      failed to prepare their witnesses adequately;

4.      failed to introduce documentary evidence in their possession to corroborate witness testimony;

5.      failed to call available witnesses who attended the trial;

6.      failed to discover and present other available mitigating evidence;

7.      failed to develop favorable testimony from Government witnesses;

8.      failed to conduct an effective cross-examination of the Government's key penalty phase witness, Larry Nichols;

9.      failed to present effectively evidence of Mr. Hall's prior successful adjustment to incarceration;

10.     failed to request a continuance or to re-interview an anticipated defense witness who unexpectedly appeared to have changed his story;

11.     failed to make a closing argument in the guilt phase of trial (which prejudiced the penalty phase);

12.     failed to make an effective argument that Mr. Hall should be allowed to make a statement in allocution;

13.     made uninformed and unreasonable decisions regarding their choice of experts;

14.     failed to set forth adequate grounds for their motions for continuance;

15.     failed to make a persuasive closing argument that Mr. Hall's life should be spared; and

16.     failed to conduct an adequate *voir dire*.

Hall's Reply is 141-pages long (in 12-point font) and includes 204 pages of exhibits.

5. Mr. Hall's draft COA application (attached hereto) is correspondingly lengthy – 107 pages long and just under 30250 words. Although counsel have done their best to condense and streamline the presentation of the issues, the limits imposed by F.R.A.P. 32(a)(7)(B) do not provide sufficient space to adequately brief the issues we feel must be raised on Mr. Hall's behalf due to the extremely serious nature of the case and the fact-intensive inquiry that governs Mr. Hall's ineffective assistance of counsel, and juror and Government misconduct claims. And, as with the pleadings below, the bulk of Mr. Hall's current draft of the COA application (approximately 80 out of 106 pages) is devoted to the ineffective assistance of counsel claim.

6. F.R.A.P. 32(a)(7)(B) limits a principal brief (or COA application) to 14,000 (substantive) words unless the Court permits the filing of a longer brief. This Court, like others around the country, has often extended the otherwise applicable limits of Rule 32(a)(7)(B) in capital cases, both on direct appeal in federal capital cases and in habeas corpus proceedings. For example, in State v. Fields, No. 04-50393, by Order dated 4/8/05, this Court granted the federal capital appellant leave to file an over-length brief of 39,643 words. In the state habeas case of Miller-El v. Cockrell, No. 00-01784, by Order dated 1/18/01, this Court granted the § 2254 appellant 28,000 words for his opening brief in support of a COA application. See also State v. Bernard, 00-50523 (appellant granted 26,000 words for opening brief); State v.

Vialva, No. 00-50525 (appellant granted 120 pages for opening brief). The same is true elsewhere. For example, in United States v. Gabrion, No. 02-1386, the Sixth Circuit on 6/17/04 granted the appellant permission to file an opening brief of 39,000 words. In United States v. Tipton, No. 03-27, the Fourth Circuit on 1/12/04 granted the appellant permission to file an opening brief of 40,000 words. In United States v. Paul, No. 98-3497, the Eighth Circuit on 8/5/99 granted the appellant permission to file an opening brief of 40,000 words. In United States v. Lee, No. 02-2389, the Eighth Circuit on 9/22/03 granted the appellant permission to file a brief of 34,669 words. In United States v. Allen, No. 98-2549, the Eighth Circuit on 11/18/99 granted the Government permission to file a brief of 30,297 words.

7. In light of the fact that this Court and others around the country have authorized the filing of briefs comparable in length to Mr. Hall's, we respectfully submit that the additional length we request (30,250 words) is reasonable, given the fact-intensive and complex nature of the issues raised in this case and the fact that Mr. Hall faces the death penalty.

## **Request for Alternative Relief**

8. In the event this Court denies our request to file a COA application that is 30,250 words in length, Mr. Hall respectfully requests that the Court grant him an additional thirty (30) days, *i.e.* until July 17, 2005, in which to file his COA application, for the reasons set forth below.

9. As demonstrated by the draft 2255 Motion attached hereto, undersigned counsel have been diligently working on the 2255 application. Nonetheless, in addition to the conflicting obligations in other matters that routinely occur in both attorneys' law practices, two events of some magnitude of have prevented counsel from devoting as much time as would otherwise have been available. Lead counsel, Mr. Owen, was married on June 4, 2005, and has had several pre-wedding obligations and post-wedding obligations to attend to. He will be out of town from June 10 through June 12 and will be on his honeymoon overseas from June 15 to July 7, 2005. His ability to work on editing the COA application to comply with whatever word-limits the Court imposes is further curtailed by his academic obligations, as he must complete the grading of his students' papers before his departure overseas.

10. Ms. Widder's father suffered a massive heart attack and was hospitalized for over two weeks at the beginning of May 2005. Ms. Widder was unexpectedly required to spend May 2 - 9, 2005, in the Washington, D.C. area, where her parents reside, in order to attend to this family emergency. She returned to the D.C. area from May 26 - 30, 2005. This unexpected travel severely limited the amount of time that Ms. Widder had available to work on the COA application in this case.[3]

11. For these reasons, undersigned counsel is not in a position to undertake the time-intensive labor that would be required to cut the length of the current draft of the

---

[3] Ms. Widder's father is scheduled for surgery on June 15, 2005, and she anticipates returning to the D.C. area soon thereafter.

7

COA application by the current deadline of June 17, 2005. Extending the due date by an additional thirty days will enable Mr. Owen adequate time after he returns from his honeymoon to be part of the editing process.

12. Undersigned counsel, Marcia Widder, has spoken with the Government's attorney, Delonia Watson, who indicated that the Government takes no position on this motion.

## CONCLUSION

For the foregoing reasons, Mr. Hall respectfully requests that the Court grant him leave to file an extra-length COA application containing 30250 words. In the alternative, in the event the Court does not authorize the filing of the proposed COA application, Mr. Hall respectfully requests that the Court afford him an additional thirty days from the current due date, *i.e.* until July 17, 2005, in order to make whatever amendments the Court directs.

Respectfully submitted,

ROBERT C. OWEN
Texas Bar No. 15371950
Owen & Rountree, LLP
510 S. Congress Ave., Ste. 308
Austin, Texas 78704
Tel. 512-804-2661
Fax 512-804-2685

MARCIA A. WIDDER
Louisiana Bar No. 23367
Capital Appeals Project
636 Baronne Street
New Orleans, LA 70113
Tel. 504-529-5955
Fax 504-558-0378

Counsel for Orlando Hall

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA, )
     Plaintiff-Appellee )
 )
v. ) NO. 04-70050
 )
ORLANDO CORDIA HALL, )
     Defendant-Appellant )

## APPLICATION FOR CERTIFICATE OF APPEALABILITY

Defendant-Appellant, Orlando Hall, hereby moves this Court to grant a Certificate of Appealability ("COA") to address the following issues, which are debatable among jurists of reason:

1. Whether the District Court erred in limiting the evidentiary hearing to Hall's juror misconduct claims (Claims III-V from Hall's Second Amended Petition) and otherwise denying Hall an evidentiary hearing.

2. Whether the District Court erred in denying Hall all requested discovery.

3. Whether the District Court erred in denying Hall funds for adequate investigation and expert assistance.

4. Whether the District Court erred in denying each of Hall's claims on the merits.

5. Whether the District Court would reasonably be expected to have substantial difficulty on remand in viewing Hall's claims anew, such that reassignment to another

1

judge is necessary to preserve both the appearance and the substance of fairness in

further proceedings.

## JURISDICTION

The District Court had jurisdiction under 28 U.S.C. § 2241. It entered judgment August 24, 2004. R. 206.[1] It denied Hall's timely filed *** (59(e) motion)) on ****. Notice of Appeal was timely filed on ****. ROA. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253, and 18 U.S.C. § 3595.

## STATEMENT OF THE CASE

On November 4, 1994, a six-count superseding indictment was returned, charging Bruce Webster, Orlando Hall ("Hall"), Demetrius Hall, Steven Beckley and Marvin Holloway with kidnapping resulting in death, in violation of 18 U.S.C. §§ 1201(a)(1) and 2 (Count 1), and various noncapital charges. R. 1:37-45. On February 23, 1995, the Government gave notice it would seek the death penalty against Hall under the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591 *et seq.* ("FDPA").[2] R. 1:82-87.

On March 9, 1995, Hall's attorneys, Michael Heiskell and Mark Daniel, withdrew. On March 31, 1995, Michael Ware and Jeffrey Kearney were appointed

---

[1] We cite the Record on Appeal from the District Court's denial of Hall's 2255 Motion as "ROA. [Vol. #]:[Page #]," the record of the initial appeal in this Court following Hall's conviction and death sentence as "R. [Vol. #]:[Page #]," and Record Excerpts as "R.E. [page #].

[2] Webster was convicted and sentenced to death in a separate trial. The government did not seek the death penalty against the remaining defendants.

as Hall's counsel.  On August 10, 1995, the District Court denied the first of Hall's motions for continuance.  <u>See</u> R. XXX.  Subsequent requests for continuance made orally during the trial were also denied.  R. XXX.  Time records reflect that the defense team did not undertake meaningful work on the case – in particular penalty-phase preparation – until ****.  ROA XXX.

On October 31, 1995, a jury convicted Hall on counts 1, 2, 3 and 6.  R. 6:1332-33.  From November 1-3, 1995, the same jury heard testimony and argument in the penalty phase and, on November 6, 1995, returned a verdict of death on Count 1.  <u>See</u> Special Findings Form, R. 6:1377-1389.  This Court affirmed.  <u>United States v. Hall</u>, 152 F. 3d 381 (5th Cir. 1998), <i>cert. denied</i>, 526 U.S. 1117 (1999).

Hall timely moved to vacate judgment and for a new trial pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure on May 16, 2000. [***CHECK DATE].  The motion was amended pursuant to the Court's **** [date] scheduling order on ****.  <i>See</i> D.E. ## ***.  With the District Court's permission, Hall filed a second amended motion (the "2255 Motion") on September ***, 2002, to raise a claim based on the intervening decision in <u>Ring v. Arizona</u>, 536 U.S. 584 (2002).[3]  D.E. # ***.

---

[3] Hall's 2255 Motion raised the following twelve claims for relief:

1.   The conviction and death sentence violate the Fifth Amendment under <u>Ring v. Arizona</u>, 536 U.S. 584 (2002);

2.   Hall was denied effective assistance of counsel, in violation of the Sixth
(continued...)

Prior to adjudicating the 2255 Motion, the trial court denied Hall's several motions for discovery. <u>See</u> **** . It also severely curtailed funding in this case. It limited investigative spending to $******, D.E. ***, despite Hall's articulated need for additional investigation. It denied Hall's motions for funds to

---

[3](...continued)
      Amendment;

3.      The introduction of extraneous evidence or information into the jury's punishment-phase deliberations violated Hall's rights under the Fifth, Sixth and Eighth Amendments;

4.      A juror's *ex parte* contact with one or more members of Lisa Rene's family violated Hall's rights under the Fifth, Sixth and Eighth Amendments;

5.      An unacceptable risk exists that at least one juror was overwhelmed by emotion and voted for death based on her sympathy for Lisa Rene and her family, rather than basing her verdict on the evidence, in violation of Hall's rights under the Fifth, Sixth and Eighth Amendments and 18 U.S.C. § 3595;

6.      The Government failed to disclose exculpatory and mitigating information concerning witness Larry Nichols, in violation of the Fifth and Sixth Amendments;

7.      The Government failed to correct false testimony by its witness Larry Nichols, in violation of the Fifth, Sixth and Eighth Amendments;

8.      The Government used jail inmate Larry Nichols to elicit information from Hall, in violation of the Sixth Amendment;

9.      Hall's Fifth, Sixth and Eighth Amendment rights were violated when the Government proffered an FBI 302 containing false information to deter the defense from calling a witness who would have dynamited the credibility of star witness Larry Nichols;

10.      The Government interfered with Hall's right to counsel, in violation of the Fifth and Sixth amendments by promoting the false accusations of Larry Nichols;

11.      The federal death penalty, as administered by the Government, violates the Fifth and Eighth Amendments; and

12.      Hall's death sentence is based on materially false or inaccurate information, in violation of the Eighth Amendment.

retain Jill Miller, M.S.S.W., to conduct a mitigation investigation and evaluate the penalty phase investigation conducted by trial counsel;[4] for funds for a neuropsychological evaluation[5]; and to cover the expenses of Hall's attorney expert, Michael E. Tigar, who donated his time *gratis*.[6]

The District Court, moreover, conducted a hearing in this matter, but limited that hearing to Claims III - V that one or more jurors were improperly influenced by contact with the victim's mother and/or communications with third parties. *See* ROA XXX. The District Court denied a hearing on Hall's other claims.

On August 24, 2004, the District Court entered judgment denying relief on all claims. See Opinion and Order, R.E. XXX. It thereafter denied Hall's post-judgment motion and denied COA. ROA XXXX.

## B.   STATEMENT OF THE FACTS

Guilt/Innocence Phase: Hall and his co-defendants were alleged to have kidnapped, raped and murdered Lisa Rene after the victim's brothers stole money from them in a drug deal. The facts of the crime are described in this Court's prior decision. *See* Hall, supra, 152 F. 3d at 389-90. The evidence against Hall consisted

---

[4] Ms. Miller ultimately provided expert services at a sharply reduced rate – which has been paid out of the pockets of undersigned counsel. She has provided four declarations, see ROA XXX, two of which appear in Hall's Record Excerpts at XXX.

[5] Neuropsychologist Michael Gelbort, Ph.D., evaluated Mr. Hall without charge and set forth his findings in a declaration. See ROA XXX.

[6] Mr. Tigar's two declarations setting forth his expert opinion about trial counsels' performance in this matter are included in the Record Excerpts at XXX.

primarily of his inculpatory statement (in which he admitted involvement in the kidnapping and murder of Lisa Rene) and the testimony of co-defendants Demetrius Hall, Beckley and Holloway, each of whom testified pursuant to favorable agreements with the Government.

Penalty Phase: At punishment, the government introduced additional evidence and/or argument in support of the mental state elements required by 18 U.S.C. § 3591(a) and six aggravating factors.[7] The Government's key witness in aggravation was Larry Nichols, an inmate at the Mansfield Correctional Center, who testified regarding conversations he claimed to have had with Hall while they were incarcerated pending Hall's trial.[8] Nichols claimed, inter alia, that Hall threatened his co-defendant Beckley, discussed physically abusing women, and disclosed a plan to escape by taking his lawyers, a prison guard or the judge hostage, using a "shank" or homemade knife. R. 31:215-35. Following Nichols' initial report, prison officials located two shanks in an empty cell accessible to every inmate in the cell block; the weapons were never linked to Hall. R. 32:18-19, 27, 102.

---

[7] The government sought to prove the following statutory aggravating factors: (1) that the death occurred during a kidnapping, 18 U.S.C. § 3592(c)(1); (2) that Hall committed the offense in an especially heinous, cruel, or depraved manner, id. at § 3592(c)(6); (3) that Hall committed the killing after substantial planning and premeditation to cause the victim's death, id. at § 3592(c); and (4) that the victim was particularly vulnerable due to her age, id. at § 3592(c)(11). The government additionally presented two nonstatutory aggravating factors: (1) that Hall constituted a future danger to the lives and safety of other persons and (2) "the effect of the instant offense on Lisa Rene's family."

[8] When Nichols was sentenced, the prosecution lauded his "very substantial assistance" against Hall, saying his testimony was "pivotal" and "certainly aided the jury in its decision of returning a sentence of death." ROA XXX. [[App to Reply at 1-2]].

The defense presented eight witnesses, only two of whom, Hall's mother Betty and sister Cassandra Ross, mentioned Hall's upbringing and character. Their direct testimony occupied just seventeen pages of the transcript. R. 32:***.

The District Court charged the jury on the following mitigating factors: (1) equally culpable co-defendants would not be punished by death, 18 U.S.C. § 3592(a)(4); (2) Hall's age at the time of the offense; (3) the "circumstances surrounding defendant's upbringing;" (4) Hall's acceptance of responsibility; (5) Hall's remorse; and (6) any other aspect of Hall's character or background which calls for a sentence less than death. After deliberating, the jury returned a death sentence. See Special Findings Form, R. 6:1377-89. It unanimously found two of the required mental state elements.[9] The jury also found the statutory aggravating factors that the death occurred during the commission of a kidnapping and that the killing was especially heinous, cruel or depraved; and the nonstatutory aggravating factors of future dangerousness and the "effect" on the victim's family.

As to mitigating factors, nine jurors found that one or more equally culpable defendants would not receive the death penalty; the mitigating factors of the defendant's age, upbringing, and "any other aspect of Hall's character or background

---

[9] The jury found that Hall "intentionally engaged in conduct intending that Lisa Rene would be killed or that lethal force be employed against Lisa Rene, and the death of Lisa Rene resulted," and that "Hall intentionally engaged in conduct which he knew would create a grave risk of death to Lisa Rene, and such conduct resulted in the death of Lisa Rene." R. 6:1378. The jury did *not* find that Hall "intentionally killed Lisa Rene" or that he "intentionally inflicted serious bodily injury which resulted in the death of Lisa Rene." R. 6:1377.

. . . " received the support of one juror. No juror found acceptance of responsibility or remorse. *See* id.

## STANDARD OF REVIEW

The District Court held no evidentiary hearing in connection with most of Hall's claims for relief. The hearing it held was limited to a single issue – a claim of extraneous influence on the jury – and a single witness (one juror). Denial of a hearing on Hall's remaining claims was error unless Hall's motion itself, and the files and records of the case, conclusively show he is entitled to no relief. United States v. Martinez, 181 F.3d 627, 628 (5th Cir. 1999).

The District Court's blanket denial of discovery is reviewed for abuse of discretion. East v. Scott, 55 F.3d 996, 1001 (5th Cir. 1995). Its rulings denying Hall's claims for relief, which resolved either purely legal issues or mixed questions of fact and law, are reviewed *de novo*. Garcia v. Dretke, 388 F.3d 496, 500 (5th Cir. 2004). Hall is entitled to appeal the District Court's judgment if he makes a "substantial showing of the denial of a constitutional right" in the proceedings underlying his conviction and sentence. 28 U.S.C. § 2253(c)(2). Hall need only show that reasonable jurists could find the District Court's assessment of his claims debatable. Tennard v. Dretke, 542 U.S. ___, 124 S. Ct. 2562, 2565 (2004). "A reviewing court should authorize an appeal to consider the merits of a condemned prisoner's initial habeas petition unless his claims are squarely foreclosed by statute, rule, or

8

authoritative court decision, or [lack] any factual basis in the record." <u>Barefoot v. Estelle</u>, 463 U.S. 880, 894 (1983) (internal citation omitted).

This Court should not reserve a COA only for a claim upon which it would grant relief. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 331 (2003) ("[A] COA ruling is not the occasion for a ruling on the merits ...."). Any other standard would undermine the function of the COA – to eliminate groundless appeals while permitting review of potentially meritorious claims.[10] <u>Id</u>. It would also collapse the vital distinction between the "threshold" COA inquiry and the searching examination of the merits that should follow a COA grant. <u>Id</u>. at 338 (petitioner need not "prove, before issuance of a COA, that some jurists would grant [relief]," because "a claim can be debatable even though every jurist of reason might agree, after ... full consideration, that [he] will not prevail."[11]

At the COA stage, this Court "limit[s] its examination to a threshold inquiry into the underlying merit of [the] claims." <u>Cardenas v. Dretke</u>, 405 F.3d 244, 248 (5th Cir. 2005) (citing <u>Miller-El</u>, 537 U.S. at 327). It does not fully consider "the factual or legal bases adduced in support of the claims," and Hall need not show that his

---

[10] *See, e.g.,* <u>Reid v. Angelone</u>, 369 F.3d 363, 369 (4th Cir. 2004) (purpose of COA requirement is to "winnow out frivolous appeals"); <u>Jefferson v. Welborn</u>, 222 F.3d 286, 289 (7th Cir. 2000) (COA should issue unless claims are "utterly without merit").

[11] Illustrating the "threshold" character of the COA inquiry, numerous federal appellate courts have granted COA in cases where they ultimately denied relief, demonstrating that the showing one must make to warrant a full hearing on appeal is less than that necessary to prevail. *See, e.g.,* <u>Rowsey v. Lee</u>, 327 F.3d 335, 343 (4th Cir. 2003); <u>Mackey v. Dutton</u>, 217 F.3d 399, 406 (6th Cir. 2000); <u>Franklin v. Hightower</u>, 215 F.3d 1196, 1199 (11th Cir. 2000); <u>Tillman v. Cook</u>, 215 F.3d 1116, 1120 (10th Cir. 2000).

appeal will succeed in order to be entitled to a COA. Id. "The question is the debatability of the underlying constitutional claim[s], not the resolution of that debate." Id. (citation omitted). According to the Supreme Court, a COA should issue if Hall can summon "any evidence" that he is entitled to relief. Miller-El, 537 U.S. at 340. Respecting the District Court's procedural rulings, a COA should issue if "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Finally, the severity and finality of Hall's sentence are appropriate considerations in deciding whether to grant COA. Barefoot, supra, 463 U.S., at 893; Ogan v. Cockrell, 297 F.3d 349, 355 (5th Cir. 2002). Because this is a capital case, any doubts about whether to issue a COA must be resolved in Hall's favor. Miller v. Dretke, 404 F.3d 908, 913 (5th Cir. 2005).

## ARGUMENT

**I. The District Court Abused its Discretion in Denying Hall an Evidentiary Hearing on Each of His Claims**

The District Court erred in denying a hearing on each of Hall's claims other than Claims III-V (alleging that Hall's death sentence was the product of extraneous influences on the jury).[12] As set forth in detail in the sections of this Application addressing the merits of Hall's several claims, Hall has raised colorable claims for relief which could not properly be decided without an evidentiary hearing, as the

---

[12] As set forth infra, the hearing that was conducted was neither fair nor complete due to the District Court's denial of Hall's several motions for discovery on the jury misconduct claims.

record evidence establishes factual disputes as to each of Hall's claims.

28 U.S.C. § 2255 provides in pertinent part:

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court *shall* . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

(Emphasis supplied). A § 2255 motion "can be denied without a hearing only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief." United States v. Bartholomew, 974 F.2d 39, 41 (5th Cir. 1992). As this Court explained in Friedman v. United States, 588 F.2d 1010 (5th Cir. 1979), determining whether to conduct a hearing on a § 2255 motion requires the District Court to assess (1) whether the record *conclusively* negates the factual predicates asserted in support of the motion and, if not, (2) whether the petitioner would be entitled to relief if his factual allegations are true. Id. at 1015.

"[A] Section 2255 petitioner's burden 'for establishing an entitlement to an evidentiary hearing is relatively light." Smith v. United States, 348 F.2d 545, 551 (6th Cir. 2003) (quoting Turner v. United States, 183 F.3d 474, 477 (6th Cir. 1999)); *see also* United States v. Rodrigues, 347 F.3d 818, 824 (9th Cir. 2003) ("Section 2255 imposes a fairly lenient burden on the petition" to obtain a hearing). "If he would be entitled to relief, then the district court must conduct a hearing to ascertain the validity of the movant's factual assertions." United States v. Alanis, 88 Fed. Appx. 15, 19 (5th Cir. 2004) (*per curiam*) (citing Friedman, supra) (Exhibit "A" hereto). *See, e.g., id.*

11

at 19-20 (noting that discrepancies between affidavit and trial testimony established that "further factual development is required to determine who is telling the truth" and citing cases for proposition that "contested fact issues in § 2255 cases cannot be resolved on the basis of affidavits" and "'if the record contains an evidentiary conflict on a material issue of fact, a judge must hold an evidentiary hearing to decide who is telling the truth.'") (quoting respectively Friedman, supra, 588 F.2d at 1015, and Taylor v. United States, 287 F.3d 658, 660 (7th Cir. 2002)).

Moreover, "[c]ontested factual issues [in a § 2255 case] ordinarily may not be decided on affidavits alone, unless the affidavits are supported by other evidence in the record." United States v. Hughes, 635 F.2d 449, 451 (5th Cir. Unit B 1981) (quoted in United States v. McMillen, 96 Fed. Appx. 219, 221 (5th Cir. 2004) (Exhibit "B" hereto)). *See also* United States v. Stokes, 112 Fed. Appx. 905, 906 (4th Cir. 2004) ("the conflicing statements in the affidavits submitted by Stokes and [trial] counsel create a factual dispute requiring an evidentiary hearing. Resolution of this credibility dispute cannot be made on affidavits alone.") (Exhibit "C" hereto); United States v. Arguellas, 78 Fed. Appx. 984, 986-87 (5th Cir. 2003) (acknowledging that paper hearings may be conducted, but holding that "where the record does not conclusively negate a prisoner's entitlement to relief, contested issues may not be decided on affidavits alone.") (citing Owens v. United States, 551 F.2d 1053, 1054 (5th Cir. 1977) (Exhibit "D" hereto); Koskela v. United States, 235 F.3d 1148, 1149 (8th

Cir. 2001) ("Because the record before the District Court contained sharply conflicting evidence, the Court abused its discretion in finding a hearing unnecessary.").

Here (as explained in greater detail in the merits section of this Application), Hall has submitted extensive evidence in the form of declarations by lay witnesses and experts, providing substantial factual support for his claims, particularly his claim of ineffective assistance of counsel. The Government has submitted affidavits disputing some (but not all) of the facts in Hall's proffered evidence. Not only does the existence of factual disputes regarding all of Hall's claims necessitate a hearing for their resolution, but many of the allegations in the Government's proffered evidence are actually undermined by the record.[13]

In light of Hall's colorable claims for relief and the numerous disputed issues of fact before it, the District Court abused its discretion in failing to conduct an evidentiary hearing on all of Hall's claims.[14] *See, e.g.*, McMillen, *supra*, 96 Fed.

---

[13] For instance, the Government has submitted an affidavit from Hall's trial attorney, Michael Ware. Ware declares *inter alia* that he made a tactical decision not to call Rev. D.L. Hegler as a mitigation witness based on a memorandum he received October 22, 1995, indicating that Hegler had made "many damaging statements" about Hall in an interview. *See* ROA XXX. As Hall pointed out in his Reply, however, Ware's own notes from trial demonstrate Ware's intent to call Rev. Hegler as a witness and telephone records corroborate Rev. Hegler's statement that trial counsel summoned him to appear at trial, only to fail to use him for reasons that were not explained. *See* ROA XXX. Even where trial counsels' declarations are not affirmatively disproven by the record, the District Court should not have accepted counsels' version of events wholesale. As the Second Circuit has noted, "in the context of ineffective assistance claims, attorney affidavits cannot be said to be completely unbiased – attorneys understandably have an interest in maintaining their reputations and avoiding civil liability." United States v. Levy, 377 F.3d 259, 265 (2nd Cir. 2004).

[14] Moreover, the District Court "abused its discretion in its selective consideration of the record and its failure even to draw upon existing parts of the record to support its conclusions." Pham v. United States, 317 F.3d 178, 184 (2nd Cir. 2003).

(continued...)

Appx. 219 (remanding for evidentiary hearing to address ineffective assistance of counsel claim); <u>Alanis</u>, *supra*, 888 Fed. Appx. 15 (same); <u>Arguellas</u>, *supra*, 78 Fed. Appx. 984 (same); *see also* <u>Bruce v. United States</u>, 256 F.3d 592 (7th Cir. 2001) (district court abused its discretion in denying hearing on ineffective assistance claim).

## II. The District Court Erred In Denying All Requested Discovery

Throughout the proceedings below, Hall moved for discovery necessary to develop the facts supporting his claims. *See, e.g.*, ROA XXX (requests for discovery related to claim of false testimony by Larry Nichols and other prosecutorial misconduct claims), ROA XXX - X (requests for discovery related to juror misconduct claim), ROA XXX-XXX (requests for discovery related to claim that federal death penalty is racially discriminatory); ROA XXX (again seeking disclosure related to claims involving Nichols and the discriminatory application of the federal death penalty); ROA XXX. The District Court denied every request *in toto*.[16]

Reasonable jurists could disagree with the District Court's view that no discovery whatsoever was warranted on any of the claims in this factually complex case. Discovery in a § 2255 proceeding is appropriate where "good cause" is shown. "Good cause" is established "where specific allegations before the court show reason

---

[14](...continued)

[16] The District Court even denied Hall's several requests to subpoena videotapes from local television news stations of post-trial interviews of jurors, despite allegations that one of Hall's jurors told an interviewer that, during a weekend break during penalty phase deliberations, she had attended a birthday party at which she placed a candle on the cake in Lisa Rene's memory and she and the other guests prayed for Lisa Rene and juror Jacqueline Holmes testimony that several jurors were interviewed by the media after trial. *See infra* at XXX.

to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." Bracy v. Gramley, 520 U.S. 899, 908-909 (1997). This Court has interpreted this standard to require that the petitioner first set out specific factual allegations supporting his claims, Ward v. Whitley, 21 F.3d 1355, 1367 (5th Cir. 1994), and that he have some reason to believe the requested information exists. Kirkpatrick v. Whitley, 992 F.2d 491, 496 (5th Cir. 1993). A petitioner who has (1) made specific allegations warranting relief, (2) shown why the requested information is essential to the development of his claims, and (3) demonstrated that the requested information is likely to be in the hands of the party from whom discovery is sought and cannot be obtained through other means, has established "good cause" for discovery. Murphy v. Johnson, 205 F.3d 809, 813-814 (5th Cir. 2000); *see also, e.g.,* East v. Scott, 55 F.3d 996 (5th Cir. 1995) (a "blanket denial of discovery is an abuse of discretion if discovery is indispensable to a fair, rounded, development of the material facts") (internal quotation marks omitted).

Hall made specific allegations of fact – supported, in many instances, by sworn affidavits of witnesses with personal knowledge of the relevant events – that buttressed his constitutional claims for relief. Further, he explained why the information sought through discovery was essential to the full development of the underlying material facts, and that the information was likely in the hands of the parties from whom it was sought. Because reasonable jurists could disagree about

whether *some* discovery was necessary in the specific circumstances of this case to permit "fair, rounded development of the material facts," the Court should grant COA with respect to the District Court's orders denying discovery. The Court should also grant COA with respect to the District Court's blanket denial of discovery because of the close relationship that question bears to the issue whether the District Court erred by not permitting other essential fact-development procedures (*e.g.*, an evidentiary hearing).

### III. The District Court Erred in Denying Hall Adequate Funds to Develop Supporting Evidence

In orders entered April 17, 2002, and May 7, 2002, the District Court denied requests for funds sought for the purpose of fully developing and presenting the available evidence in support of Hall's claims for relief. Because reasonable jurists could disagree with these rulings, a COA should issue with respect to these orders.

First, the District Court based its decision to deny funds on its view that any additional witnesses or evidence would be cumulative of the evidence already presented at trial or offered along with Hall's original § 2255 Motion. ROA XXX-XXX. It specifically stated that the evidence accompanying Hall's original 2255 Motion established only that Hall's mother "was an abused wife" and that Hall "himself was abused by his parents." ROA XXX.

As Hall has set forth elsewhere in this application, reasonable jurists could disagree with the District Court's characterization of Hall's additional evidence as

"cumulative."[17] Moreover, as Hall has pointed out, his jury never heard additional mitigating evidence unrelated to the deprivations he suffered as a child. [[CITE TO FACT SECTION IN COA APP]]. None of this evidence was cumulative of evidence submitted with Mr. Hall's original § 2255 motion or at trial. Because the District Court's denial of funds rested on a fundamental mischaracterization of the record, reasonable jurists could dispute the correctness of those rulings.

Reasonable jurists could also disagree with the District Court's apparent view that approximately 257.6 hours of post-conviction investigation (the amount Hall's post-conviction counsel had performed by the time of their request for funds, *see* ROA XXX), was sufficient. Other reasonable jurists have approved significantly higher totals as reasonably necessary for post-conviction investigation in capital cases. *See, e.g.,* Olive v. Maas, 811 So. 2d 644 (Fla. 2002) (approving minimum of 375 hours of investigation).[18] Studies of the number of hours which counsel typically must spend on such tasks likewise support the reasonableness of Hall's request and, hence, the debatability of the District Court's rulings.[19] Where, as here, a dispute exists over

---

[17] *See, e.g.,* Jermyn v. Horn, 266 F.3d 257, 304-308 (3rd Cir. 2001) (finding Strickland prejudice where the testimony of the witnesses who actually testified could have been supplemented with "first-hand accounts of instances of mental and physical abuse" suffered by Jermyn, as well as corroborating documentary evidence); Collier v. Turpin, 177 F.3d 1184, 1200-1201 (11th Cir. 1999) (error to treat evidence as "cumulative" where it fully fleshed out the "hollow shell" of defendant's life story offered at trial).

[18] State post-conviction review is the appropriate analogue to Hall's § 2255 motion, because both proceedings represent the first opportunity to develop extra-record facts.

[19] *See, e.g.,* TIME AND EXPENSE ANALYSIS OF POST-CONVICTION CAPITAL CASES IN FLORIDA (1998 report prepared for the Florida Supreme Court and the Florida Legislature, finding that, on average, 3,300 lawyer hours were typically required for effective representation in a capital post-

(continued...)

how much investigation *trial counsel* performed prior to trial,[20] reasonable jurists would find it debatable whether denying funds for a thorough post-conviction investigation was appropriate.

Reasonable jurists could also disagree with the District Court's order denying funds, given traditional interpretations of the standard for granting indigent defendants access to reasonably necessary services. 21 U.S.C. § 848(q) mandates the provision of "investigative, expert, or other reasonably necessary services" to an indigent death-sentenced prisoner.[21] "Reasonable necessity" is shown if the services relate to developing *colorable* claims for relief. *See, e.g., Wright v. Angelone*, 151 F.3d 151, 163 (4th Cir. 1998) ("[A]n expert should be appointed 'when a substantial question

---

[19](...continued)
conviction case).

[20] Hall's case was defended "on the cheap" at trial. According to the authoritative 1998 report of the Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION ("FDPR"), the average total cost per representation for attorney and non-attorney defense services in federal capital trials through 1997 was $269,139, of which $53,143 was for non-attorney compensation. FDPR at 22. Total attorney compensation in Hall's case equaled about $139,800, and the Court authorized payment for about $25,000 in defense investigative and expert fees. The FDPR also reports that the average amount of time spent by defense counsel in cases that went to trial was 1,889 hours (409 hours in-court and 1,480 hours out-of-court). FDPR, Chart C-7 ("Average Number of Attorney Hours Billed in Capital and Non-Capital Homicide Cases"). Hall's trial counsel, by contrast, performed a total of approximately 1,106 hours (about 229 hours in-court and 877 hours out-of-court).

[21] Subsection 10(B) provides that expenditures for such services shall not exceed $7,500 "unless ... services of an unusual character or duration [are necessary], and ... the excess payment is approved by the chief judge of the circuit." The FDPR notes that figures much higher than $7500 are "well within the normal range for a federal death penalty case," and formally recommends that "the statutory threshold for review of payments for services other than counsel should be modified from $7500 *per representation* to $7500 *per service provider*." FDPR, at vi; *see also id.* at A-4. The Judicial Conference of the United States adopted the FDPR on September 15, 1998.

exists over an issue requiring expert testimony ... and the defendant's position cannot be fully developed without professional assistance.").[22]  Because reasonable jurists would, at a minimum, agree that Hall's claim of ineffective assistance of counsel is "colorable," a COA should issue with respect to the District Court's denial of funds to develop the facts supporting that claim.[23]

## IV.   The District Court Erred in Denying Hall's Claims on the Merits

The District Court denied each of Hall's claim on the merits.  As discussed in detail below, the court's rejection of Hall's claims rests on both faulty legal analysis and erroneous findings of fact based on an undeveloped record.  Reasonable jurists could accordingly disagree with the District Court's dismissal of the 2255 Motion.

### A.   Reasonable jurists could disagree with the District Court's conclusion that Hall received effective representation (Claim II)

The centerpiece of Hall's 2255 Motion is his claim that trial counsel provided ineffective assistance of counsel with respect to the penalty phase of his trial.  In order to prove this claim, Hall must show (1) that counsels' performance fell below an objective standard of reasonableness and (2) that counsels' errors "prejudiced" Hall's defense by depriving him of a fair sentencing hearing, *i.e.* a proceeding whose result

---

[22] *See also, e.g.,* Cardwell v. Netherland, 971 F. Supp. 997, 1008 (E.D. Va. 1997) (finding "a complete expert report" necessary for petitioner to prove prejudice, since "it is impossible to evaluate whether [he] was prejudiced by a failure to present ... expert testimony until the substance of that testimony is known").

[23] Cases interpreting the Criminal Justice Act similarly emphasize that such services should not depend on the *court's* impression of their usefulness, but on whether *defense counsel* might reasonably think them necessary. *See, e.g.,* United States v. Theriault, 440 F.2d 713, 717 (5th Cir. 1971) (Wisdom, J., concurring); United States v. Sanchez, 912 F.2d 18, 21-22 (2nd Cir. 1990).

is reliable. *See, e.g.,* <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003); <u>Williams v. Taylor</u>, 529 U.S. 362 (2000); <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

**Factual overview:** Without the benefit of discovery or adequate investigative and expert funding, Hall developed an extensive record below showing the inadequacies of trial counsel's penalty phase defense. Counsels' deficiencies are highlighted by contrasting the penalty phase defense actually presented with the one that properly performing counsel could have developed.

The defense called eight witnesses at punishment. Six testified about bad qualities of co-defendants Webster and Beckley, and Hall's lack of disciplinary problems at Mansfield Jail before Larry Nichols came forward with allegations that Hall planned a shank-wielding escape.[24] Only two, Hall's mother Betty and sister Cassandra Ross, described Hall's upbringing and character.

In eleven pages of direct testimony, Betty Hall explained that she had been divorced for about nine years, identified five of her six children; said that her ex-husband A.J. was the father of all the children but Pamela, the oldest; and stated that she had worked at ConAgra Poultry Company in El Dorado, Arkansas, for the past

---

[24] An FBI agent testified that Beckley admitted raping Lisa Rene twice, and a detective told how Beckley "used the 'F' word" in describing the rapes. R. 18:53-54, 60. A Pine Bluff (AR) policeman recalled arresting Webster and described Webster's dominant personality and violent tendencies. <u>Id.</u> at 79-86. An Arkansas state trooper described an assault committed by Webster and another man. <u>Id.</u> at 92-95. Mansfield operations manager Gary Cardinale described "shakedowns" there, and conceded that he had no problems with Hall before Nichols' allegations surfaced. <u>Id.</u> at 98-102. A Kroger Company "loss prevention" specialist testified that Kroger fired Beckley for dishonesty. <u>Id.</u> at 106-08. The direct examinations of these six witnesses occupy about 25 pages of the record.

thirty-one years and was then a payroll supervisor. R. 18:111-112. Mrs. Hall briefly attested to her ex-husband's abusive behavior, beginning about three years into their marriage and continuing until she left with the children when Hall was in his mid-teens.[25] Id. at 113-17. According to his mother, Hall divided his time between her and her ex-husband after they separated, went to prison for drugs at about age twenty, and was later paroled. Id. at 117-18. She agreed that Hall was a good father to his children. She described how she had testified against the death penalty for her own brother's killer nine years earlier. Id. at 119-20. Asked by defense counsel what she was "asking this jury to do," she said she was asking them not to take her child's life because it would not bring the victim back and was wrong. The court sustained the prosecutor's objection to this testimony. Id. at 121. Mrs. Hall concluded by discussing the Bible. Id.[26]

Cassandra Ross, whose testimony on direct occupies just over six pages, identified herself as Hall's older sister, briefly described A.J.'s physical abuse of Betty (which was ongoing when Ross moved out at eighteen), the children's futile attempts

_____

[25] Betty Hall described her relationship with A.J. as "bad, a lot of abusive, a lot of fighting, a lot of beating;" testified that A.J. beat her with weapons like a gun butt, boards, and his fists; and told how anything might set him off. She also testified that the Hall children tried unsuccessfully to intervene. Id. at 114-16.

[26] On cross-examination, the government elicited that Betty and A.J. did their best to raise their children, ensuring they were sheltered and fed and went to school and church, that Hall had gone through the eleventh grade but quit for some reason, that Hall then worked at the poultry plant for less than a year before being arrested on drug charges and that, although A.J. beat Betty for years, he did not abuse the Hall children, including Orlando. R. 32:122-35. There was no re-direct.

to intervene, how her mother left A.J. when Hall was about fifteen and how Hall shuttled between his parents thereafter. She told how Hall lived briefly with her and her husband in Texas, but returned to Arkansas at his mother's request. Ross also testified that Hall's four children loved him. She tried to say Hall was remorseful for Lisa Rene's murder, but the Government's objection was sustained. She concluded by calling Hall a caring and a loving father, stating she was shocked to learn of his involvement in the crime, and asking the jury to sentence him to life imprisonment because he was remorseful and taking his life was just as wrong as his taking a life. R. 32:136-43.[27]

The Government did not dispute this brief testimony that Hall was raised in a turbulent environment. Nonetheless, only one juror found the "circumstances surrounding [Hall's] upbringing" mitigating. R. 6:1382. On appeal, Hall argued that the other jurors' failure to find this factor was clearly erroneous. This Court disagreed, concluding the evidence presented by defense counsel was insubstantial and extensively undermined on cross-examination:

> ... Hall offered only [two] family members .... [Their testimony] indicated that Hall was not himself the object of his father's abuse and that, throughout his childhood, Hall attended school and church and was properly housed, fed, and clothed.

---

[27] On cross, the Government elicited Ross' testimony that the violence in her family left her especially sensitive to women being abused by men; that the Hall children were not physically abused; that her parents made sure she was fed and sheltered, went to church and school and knew the difference between right and wrong; that she did the same for Hall when he lived with her; and that although she and Hall grew up in the same house, she had no criminal history. R.32:142-48. The defense attempted re-direct but rested after a flurry of sustained objections. Id. at 148-50.

Hall, *supra*, 152 F.3d at 413.

Had trial counsel complied with the prevailing standard of practice by undertaking a timely and comprehensive investigation into available mitigating evidence, however, jurors would have heard a far more compelling account of Hall's traumatized youth, including the fact that Hall was – contrary to the depiction at punishment – himself a target of A.J. Hall's physical abuse; that Hall suffers from neuropsychological deficits that undermine his judgment; that Hall not only had positive personality traits but had, on one occasion, saved the life of his nephew; that Hall had been a "model prisoner" everywhere he had ever been confined; and that Hall's original involvement in the illegal drug economy could be explained in part by the environment of his hometown of El Dorado, Arkansas and his sudden responsibility, as a teenager, to look after his younger brothers when his parents separated and his mother abandoned the children. Post-conviction investigation reveals a wealth of mitigating information about Hall which the jury never heard and which reasonably effective counsel would have developed and presented, both to humanize Hall and to provide essential context for his involvement in the kidnapping and murder of Lisa Rene.

***Hall grew up in a home marked by violence directed at his mother, himself and his siblings.*** Had counsel performed effectively, they could have given jurors a glimpse into the horror that Hall and his siblings experienced growing up in a home

defined by constant physical and mental torment. The extent to which A.J. Hall terrorized his entire family was not brought out at trial. In contrast to the summary description of his assaults on Betty, jurors would have learned how explosive and arbitrary those attacks were – how they could be triggered by trivial perceived slights, innocent comments, or indeed by nothing at all. *See, e.g.*, ROA XXX, XXX, XXX, XXX, XXX, XXX. The beatings left Betty physically and psychologically debilitated, causing permanent black rings around her eyes and scar tissue on her head and nose, destroying her lovely singing voice, eating away at her self-esteem and leaving her depressed, withdrawn and unavailable to the Hall children. *Id.* at XXX, XXX, XXX, XXX, XXX, XXX. After the beatings, A.J. often forced himself on Betty sexually – rapes the Hall children could hear throughout their small family home. ROA XXX, XXX. The Hall children were constantly exposed to this violence and shaken by their own futile efforts to stop it. ROA XXX, XXX, XXX, XXX, XXX, XXX.

Contrary to the picture presented at trial, the violence in the Hall home was not directed solely at Betty. The Hall boys, especially, were administered brutal beatings by both parents with switches and belts. ROA XXX. A.J.'s beatings were harsh; he would sometimes warn the object of his wrath, "I brought you into this world; I can take you out." ROA XXX. Long and arbitrary delays between the alleged transgressions and the punishments inflicted left the children waiting in terror for the attacks to come. ROA XXX. As a child, Hall would wet the bed from fear as he lay

awake waiting for a beating. ROA XXX.[28]

*Hall suffers from neuropsychological deficits that undermine his ability to make rational decisions.* Defense counsel initially planned to have Hall evaluated by a neuropsychologist, but dropped the ball when the neuropsychologist they had retained, Dr. Randy Price, became unavailable. Had counsel followed through, the jury would have learned that Hall suffers from neuropsychological impairments (with accompanying learning disabilities) which diminish his ability to make rational, informed decisions, especially when under stress.[29] ROA XXX , XXX. "Had counsel developed this evidence, it could have supported an effective argument that [Hall's] participation in the events that led to Lisa Rene's death, and his failure to take actions to resist or stop that sequence of events, was influenced by his neurocognitive impairments, which undermined his judgment, problem-solving and decision-making ability." ROA XXX.

*Despite his turbulent upbringing and neuropsychological impairments, Hall has numerous positive attributes.* Jurors learned little about Hall's positive traits.

---

[28] As one expert opined, "[The] degree of violence in Orlando's home and its corrosive effect upon him and his family ... was not adequately or even accurately brought out [at] trial. ... Orlando was himself a victim of serious physical abuse as a child at the hands of both ... parents [and witnessed] much more extensive and traumatic abuse of his mother [and] siblings than the trial testimony indicated. Orlando and his siblings all ... exhibit symptoms consistent with [having been] exposed to family violence from a young age." ROA XXX.

[29] The deficits found by the neuropsychologist who examined Hall during post-conviction proceedings are corroborated by historical evidence showing that Hall had difficulties in school from an early age and may suffer from Attention Deficit Disorder. See, e.g., ROA XXX, XXX, XXX, XXX. Several of Hall's own children exhibit similar learning disabilities. See, e.g., ROA XXX , XXX.

Numerous witnesses, however, describe him as a warm and generous person, who cares for his family and feels responsible for taking care of them, and who loves his children. *See, e.g.*, ROA XXX, XX, XXX, XXX, XXX, XXX, XXX, XXX. Hall, moreover, heroically saved the live of his three-year-old nephew, Syroid, when he leapt from a second-floor balcony to rescue the child from drowning in a motel swimming pool. *See, e.g.*, ROA XXX, XXX, XXX. Hall also felt deep remorse for his involvement in Lisa Rene's death.[30] *See, e.g.*, ROA XXX, XXX, XXX.

Jurors also did not learn of Hall's exemplary conduct during previous incarcerations.[31] According to prison records maintained by the Arkansas Department of Corrections, Hall quickly reached "C-2-trusty" status – indicating that he was a Class I (highest level) inmate and occupied a trusted status. ROA XXX. The records further show that, at the time of his parole, he had not committed a single disciplinary infraction during his period of incarceration, a fact proving him to be, in the words of a corrections expert, an "ideal inmate." ROA XXX. See generally ROA XXX. Hall's positive adjustment to incarceration and good conduct in prison are further demonstrated by the observations of some of the individuals who supervised him in

---

[30] Not a single juror found that Hall had accepted responsibility for his crime or had remorse for his actions. *See* Special Findings Form. R. 6:1382.

[31] Trial counsel made a weak effort to elicit such testimony from Betty Hall. She was not qualified to speak on this topic and the prosecutor's objection to counsel's leading question was sustained. R. 18:118.

both the Arkansas and federal prisons. <u>See</u> XXX, XXX, XXX.[32]

***Hall's entry into the illegal drug trade was in large measure prompted by the dire circumstances in which he was placed by his mother's abandonment of the youngest Hall children and the limited opportunities for gainful employment available to young African American men in El Dorado, Arkansas.*** Contrary to the picture the prosecutor painted at trial, that Hall's parents always provided for his basic necessities, <u>see, e.g.</u>, R. 18:XXX, Hall was left to care for his two younger brothers when their mother separated from A.J. Hall and "went buck wild," leaving the boys for a man with whom she started living in another town. ROA XXX. "There were times when the electricity was turned off and there was no food in the house." ROA XXX; <u>see also</u> ROA XXX , XXX, XXX, XXX. Hall, left to care for his younger brothers, sought to make ends meet by working at the Sav-Mor grocery store and Con Agra Poultry Plant, but was ultimately lured into the illegal drug trade. <u>See, e.g.</u>, ROA XXX, XXX, XXX, XXX, XXX, XXX. As explained by Rev. D.L. Hegler, an individual who was summoned to trial by Hall's attorneys, but never called to the stand, drug trafficking has a strong allure to young black men in El Dorado because they are raised in a state of hopelessness, where there are few role models and extremely limited economic prospects. ROA XXX. Without condoning the illegal

---

[32] Evidence of Hall's exemplary behavior in prison would not only have provided positive mitigation, but would have constituted a strong rebuttal to the Government's argument that Hall constituted a future danger and would have undermined the credibility of Nichols' testimony that Hall planned a violent escape.

activities of young black men engaged in illegal drug trafficking, Rev. Hegler notes that "it is unrealistic to condemn the drug trade without recognizing that the young people who get drawn into it, like Orlando Hall, are not totally responsibility for their own involvement. Their decisions are influenced by the lack of opportunities available to young African-Americans to build meaningful lives and futures in El Dorado, and by the absence of positive parental role models and daily adult supervision to provide discipline and structure during their most vulnerable years." ROA XXX. See also ROA XXX , XXX. Several people, moreover, could have testified that, at the time of Lisa Rene's kidnapping and murder, Hall wanted to get out of the drug trade and was taking steps to do so. *See, e.g.,* ROA XXX , XXX, XXX.

**Overview of the District Court's decision:** The District Court's analysis of Hall's ineffective assistance claim is marred by two fundamental legal errors: (1) its failure to consider counsels' performance in light of the prevailing professional norms at the time of trial; and (2) its failure to consider the *cumulative* impact of counsels' errors and omissions in assessing prejudice. These errors, combined with the District Court's selective – and often incorrect – consideration of the record, render its rejection of Hall's ineffective assistance claim debatable and require issuance of a COA.

Wiggins, *supra,* commands an objective review of trial counsels' performance

under prevailing professional norms, in the context of counsels' perspective at the time of trial. The District Court had before it extensive evidence, proffered by Hall, establishing the relevant prevailing professional norms for defending capital cases in 1994-1995. ROA XXX, XXX, XXX.[33] Although the Government presented no contrary evidence, the District Court neither acknowledged Hall's expert testimony nor confronted its implications for Hall's claims. Indeed, nowhere does the District Court's opinion identify what duties the prevailing professional norms in 1994-1995 *actually imposed* on Hall's trial counsel, or assess counsels' performance against those standards.

The absence of such essential context renders meaningless the District Court's characterization of trial counsels' acts and omissions as "strategic." As detailed below, the District Court's conclusions in every particular are debatable by reasonable jurists because trial counsels' errors and omissions were objectively unreasonable when measured against the prevailing professional norms for defending capital cases in 1994-1995 – as set out in, *e.g.*, the ABA Guidelines and Hall's extensive

---

[33] Hall submitted declarations from three highly qualified experts: Michael Tigar, a well-known criminal defense attorney who spearheaded the successful defense of Terry Nichols in the federal Oklahoma City bombing trial; Jill Miller, M.S.S.W., a mitigation specialist with extensive experience, who has worked on more than ninety (90) capital murder cases at both the state and federal level and regularly trains attorneys on the subject; and Kevin McNally, one of the Federal Resource Counsel, who provided expert assistance to trial counsel in this case. Their declarations set forth the standard of practice at the time of Hall's trial and explain how trial counsels' performance fell below that standard. In addition to the specific opinions set forth by Hall's experts, the prevailing professional norms are set out in treatises and other documents, such as the AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES ("ABA Guidelines"). We cite the ABA Guidelines as published at 31 HOFSTRA L. REV. 913 (2003).

evidentiary submissions.

The District Court's finding of "no prejudice" is likewise debatable because the court failed to apply the Supreme Court's clear teaching about <u>Strickland</u>'s prejudice inquiry. The District Court assessed in a piecemeal fashion the likely impact of each item of mitigating evidence trial counsel failed to develop or present. *See infra.* Under <u>Strickland</u>, however, the "prejudice" inquiry does not focus on whether any particular piece of evidence or mistake by counsel would have "tipped the scales," but whether the *cumulative* effect of *all* the mitigating evidence (both presented at trial and developed in habeas proceedings), in light of any other errors or omissions by counsel, undermines confidence in the sentencing verdict. <u>Williams v. Taylor</u>, 529 U.S 362, 397-398 (2000) (reviewing court assessing prejudice must consider mitigating evidence cumulatively); <u>Wiggins</u>, 539 U.S. at 534 ("In assessing prejudice, we re-weigh the evidence in aggravation against the *totality* of the available mitigating evidence") (emphasis added); <u>Moore v. Johnson</u>, 194 F.3d 586, 619 (5th Cir. 1999) (considering "the cumulative errors of counsel").[34]

These errors, in general, mar the District Court's analysis of Hall's several

---

[34] *See also, e.g.,* <u>Cargle v. Mullin</u>, 317 F.3d 1196, 1212 (10th Cir. 2003) (court must consider "the prejudice flowing from all of counsel's deficient performance – as <u>Strickland</u> directs"); <u>Hough v. Anderson</u>, 272 F.3d 878, 891 (7th Cir. 2002) ("Although a specific error, standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may [also] be sufficient"). The District Court's prejudice analysis also ignored <u>Williams</u>' holding that counsel's failure to present evidence relevant to the defendant's moral culpability can be prejudicial under <u>Strickland</u> even where presenting it would have entailed highlighting some less sympathetic aspects of his background and character (*e.g.,* his prior criminal activity or potential dangerousness). *See* <u>Williams</u>, 529 U.S., at 396.

ineffective assistance claims. We now turn to examine the particulars of each claim.

1.    *Trial counsels' inadequate investigation*

Trial counsel did not begin to investigate mitigation until approximately two weeks before trial began, despite having been appointed more than six months earlier. The District Court found that counsel nonetheless performed "a substantial amount of investigation into mitigating evidence prior to trial." [DCT 24] It based this conclusion on three grounds: (1) that trial counsel obtained from Hall's *prior* counsel "a nineteen-page questionnaire ... in which Hall answered numerous questions about his social, vocational, scholastic, and medical history," plus notes of prior counsels' interviews with a few witnesses during a trip to Hall's hometown of El Dorado, Arkansas, ROA XXX; (2) that trial counsel Ware spoke to Hall's mother and one sister on at least one occasion before their investigator, Tena Francis, began her work, ROA XXX; and (3) the investigation conducted by Francis between mid-September 1995 and the sentencing verdict six weeks later – although Francis, then and now, considered the investigation grossly incomplete. *See* ROA XXX.

The District Court's conclusion that trial counsel conducted a "substantial" investigation into available mitigating evidence is debatable for several reasons: First, the relevant question under <u>Strickland</u> is not whether defense counsel did a "substantial" amount of investigation, but whether defense counsels' investigation – in scope and timing – conformed to the prevailing standard of practice as reflected in,

*e.g.*, the ABA Guidelines.[35] Second, and equally important, the District Court's conclusion that trial counsel performed "substantial" investigation into available mitigating evidence is debatable because it is clearly erroneous as a factual matter. These are discussed in turn.

***Scope and timing of the investigation.*** Wiggins holds that counsel's penalty phase investigation "should comprise efforts to discover *all reasonably available mitigating evidence* and *evidence to rebut any aggravating evidence* that may be introduced by the prosecutor." Wiggins, *supra*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added)). The Guidelines emphasize that counsel must seek out "anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant," as a result of which "penalty phase preparation requires extensive and generally unparalleled investigation into [the defendant's] personal and family history." 31 HOFSTRA L. REV. at 1022.[36]

_____

[35] *See* Wiggins, 539 U.S., at 524 ("Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA) – standards to which we long have referred as 'guides to determining what is reasonable.'") (citing Strickland, 466 U.S., at 690-691); see, e.g., Hamblin v. Mitchell, 354 F.3d 482, 486, 487 (6th Cir. 2003); Canaan v. McBride, 395 F.3d 376, 384 (7th Cir. 2005); Allen v. Woodford, 395 F.3d 979, 1001 (9th Cir. 2005).

[36] In the court below, Hall proffered extensive additional expert opinion about precisely what such an "extensive and ... unparalleled investigation" requires, *i.e.*, "the most extensive background investigation imaginable," "completed in a timely manner," using "the assistance of such persons, appropriately qualified by training and experience, as might be necessary to accomplish this task." ROA XXX (emphasis added). The prevailing standard of practice required counsel or their agent to search widely to find and interview *all* potential witnesses, obtain and examine *all* relevant documents and other tangible evidence, and visit locations associated with the events of the client's life. ROA XXX.

(continued...)

Regarding timing, the Guidelines direct that "[i]nvestigation and planning for both phases *must begin immediately upon counsel's entry into the case.*" 31 HOFSTRA L. REV. at 925 (emphasis added). Counsel must "*promptly* obtain the investigative resources necessary to prepare for both phases, including at minimum the assistance of a professional investigator *and a mitigation specialist ....*" Id. (emphasis added). *See also, e.g.,* id. at 1023 ("The mitigation investigation should begin as quickly as possible, because it may affect ... decisions about the need for expert evaluations ...., motion practice, and plea negotiations"); id. (investigation should begin "immediately upon counsel's entry into the case"). Hall's expert evidence in the court below explained *why* the standard of practice required trial counsel to undertake the necessary mitigation investigation promptly after entering the case rather than waiting until jury selection was underway. As legal expert Michael Tigar explained:

> [A]cquiring a full understanding and appreciation of the events of the client's life requires counsel or their investigator to ask the client and important people in his life to talk about events and memories that are profoundly painful and difficult to recall. This takes time and cannot necessarily be compressed into a short period, even one in which counsel or the investigator spends substantial time with the client or witness. Developing the case for life requires counsel or her investigator to form relationships of trust with the most important individuals who will become penalty-phase witnesses for the defense. Such relationships may take repeated visits and long hours of conversation [to] develop. ...

---

[36](...continued)

The Guidelines illustrate the sheer breadth of the mitigation investigation required by the prevailing standard of practice, which obliges counsel to explore, *inter alia*, the client's medical history, family and social history, educational history, military service, employment and training history, prior juvenile and adult correctional experience. *See* 31 HOFSTRA L. REV. at 1022-23. Though all these areas will not apply in every case, they illustrate the range and depth of the necessary investigation.

These tasks all demand substantial, *unpressured* time. They cannot be effectively pursued mid-trial.

ROA XXX (emphasis in original). Jill Miller, M.S.S.W. provided a more detailed account of why substantial time must be allotted to conduct the social history investigation:

> A properly conducted social history investigation . . . inevitably involves eliciting personal information from the client and others, particularly information of a private and sensitive nature. . . . [D]enial, repression, shame, and a sense of privacy all inhibit the ability to fully disclose critically important information. Where present, these factors increase the amount of time necessary to complete the investigation, since the mitigation specialist cannot obtain such sensitive information without building a relationship of genuine trust with the persons who are providing information. Building such a relationship takes time; for example, where a source is also a victim of trauma, it may be necessary to conduct repeated interviews of the source, or even involve a consulting or treating expert to assist the source, in order that information about traumatic experiences may be obtained without overwhelming or retraumatizing the subject. These time demands cannot be artificially compressed ... . Consequently, it is essential that the investigation be undertaken as early as possible in the history of the case.

ROA XXX.[37]

Nowhere in its opinion does the District Court offer any reason not to credit the opinions of Hall's extensively qualified capital defense experts regarding the gross deficiencies of trial counsels' penalty-phase preparation. Nor does the District Court

---

[37] The Guidelines make the same point. *See* 31 HOFSTRA L. REV. at 1024-25 (cautioning that corroborating information from multiple sources and overcoming barriers to obtaining intimate personal information are "time-consuming task[s]"). *See also* ROA XXX (Jill Miller, M.S.S.W.) ("By 1995, the prevailing national standard for defending capital cases demanded that counsel be aware of these fundamental principles of human behavior [*i.e.*, that building trusting relationships with potential witnesses was a necessary condition of obtaining information about intimate subjects] and allocate time and effort in the preparation of the defense accordingly ....").

acknowledge the detailed instruction provided by the Guidelines, measured against which trial counsels' performance in this case was plainly sub-standard. Instead, the District Court simply ignores that mountain of evidence altogether, focusing on the handful of things trial counsel *did* rather than the many lines of necessary inquiry they ignored. *See* ROA XXX.

Given the unanimous expert opinion condemning trial counsels' deficient investigation and preparation, reasonable jurists could disagree with the District Court and conclude that it was unreasonable for Hall's trial attorneys, appointed in March, to wait until September—with trial just two weeks away—to initiate their mitigation investigation. Reasonable jurists could also disagree with the District Court and conclude that trial counsels' hasty and superficial investigation in October predictably failed to develop all available mitigating evidence, because trial counsels' unreasonable delay precluded the type of relationship-building that is indispensable to developing such evidence, given the short time remaining before the penalty phase. Further, reasonable jurists could disagree with the District Court and conclude that six weeks of diligent work by mitigation specialist Tena Francis (starting two weeks before jury selection began, and continuing through trial up to the sentencing verdict) could not repair the damage Hall's penalty-phase defense had already sustained as a result of trial counsels' indifference to these obligations during the months from March to

September.[38]

***The record belies the District Court's finding that the mitigation investigation was adequate.*** The District Court's conclusion that trial counsel performed "substantial" investigation into available mitigating evidence is debatable because it is clearly erroneous as a factual matter.[39]

**The questionnaire does not support the District Court's conclusions.** The District Court excused trial counsels' failure to conduct a timely and thorough investigation into potential mitigating factors because they obtained from prior counsels' file "a nineteen-page questionnaire entitled 'Client Background Information,'" completed by Hall. ROA XXX. Far from justifying counsels' inaction, however, the record demonstrates that Hall's actual responses to the questionnaire would have spurred reasonably competent counsel to conduct *more*, not less, investigation.

The District Court's reliance on the questionnaire to justify counsels' failure to

---

[38] One measure of the inadequacy of trial counsel' mitigation investigation is the amount of time they and their investigator spent on that task prior to trial. Evidence before the District Court indicated that the time actually spent on factual investigation by all three members of Hall's defense team (trial counsel Ware and Kearney and their investigator LaRue) prior to the beginning of trial in October 1995 was significantly below what the prevailing standard of practice required. *See* ROA XXX. Indeed, during the first *four months* of that period, Hall's *entire defense team* collectively performed *fewer than sixty (60) hours* of out-of-court work on his case (*i.e.,* all hours out-of-court other than those spent on "legal research and writing"). ROA XXX. Given the October 2 trial date, this four-month interval represented *two-thirds* of the total time available for pre-trial investigation and preparation, and counsel fell below the prevailing standard of practice in wasting it.

[39] The record is not fully developed because Hall was wrongly denied an evidentiary hearing on this claim in the court below. Even so, the evidence before the District Court flatly precludes describing trial counsels' investigation as "substantial."

undertake a timely investigation is misplaced for several reasons. First, as a factual matter, the record contains substantial grounds to question whether trial counsel ever *read* the questionnaire, much less relied on it in making tactical decisions. Neither counsels' mitigation investigator Tena Francis nor Federal Death Penalty Resource Counsel attorney Kevin McNally, who consulted with trial counsel prior to trial, was ever made aware of the existence of this form. Nor did either Francis or McNally ever hear trial counsel say, as asserted in Ware's affidavit in the court below, that its contents foreclosed any potential areas for investigation.[40] The record thus strongly suggests that trial counsels' claim to have relied heavily on this questionnaire in making investigative decisions prior to trial is of recent vintage.[41]

Second, undisputed evidence before the District Court established that reliance on such a self-reporting questionnaire as a basis for ruling out potential areas of investigation *itself* fell below the prevailing standard of practice. As Jill Miller explained: "According to the generally accepted view of appropriately qualified specialists in capital defense in 1994-1995, it was unacceptable to rely on such a form as the primary means for obtaining sensitive and personal information from the

---

[40] *See* ROA XXX (Francis's sworn declaration that, *inter alia*, she was unaware of the existence of the questionnaire until Ware's post-conviction affidavit, Ware never mentioned it or showed her a copy while she was working on Hall's case, and the questionnaire was not among the documents to which Ware directed her attention when she first joined the defense team); ROA XXX (McNally's sworn declaration that Ware never told him about any such questionnaire and, if he had, McNally would have vigorously discouraged any reliance on it).

[41] The District Court's refusal to order an evidentiary hearing protected trial counsel from being confronted with such evidence and unfairly prevented Hall from testing the credibility of trial counsels' claims.

client," because it was highly probable that "the client [would] be unable to fully disclose all relevant information by filling in answers to such a list of questions;" this view is "reflected in all specialized capital defense training materials, etc., from the same period." ROA XXX. *See also* ROA XXX (Kevin McNally observing that "I have never heard of a lawyer using an interview form as a substitute for personal interviews with the client.").[42]

Third, the nature and content of the questionnaire would have alerted reasonably competent counsel that it was not intended to be a "self-reporting" instrument. *See* ROA XXX (Miller decl). It consistently refers to the client in the third person (*e.g.*, "Has the client ever received medication for a mental illness or disorder?"). Id. It employs specialized vocabulary drawn from social work and mental health services that no client would comprehend (*e.g.*, "toxemia;" "culture-appropriate discipline;" "aberrant sexual modeling;" "manipulation of parental authority to the benefit or detriment of other siblings;" "neuropsychological;" "Magnetic Resonance Imagery;" "avocational pursuits;" "olfactory;" "déjà vu;"

---

[42] *See also* <u>Carter v. Bell</u>, 218 F.3d 581, 596 (6th Cir. 2000) (trial counsel ineffective in failing to investigate and present evidence of petitioner's childhood abuse, noting "the sole source of mitigating factors cannot properly be that information which defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility."); <u>Thomas v. Lockhart</u>, 738 F.2d 304, 308 (8th Cir. 1984) (counsel's investigation deficient where limited to review of medical report and interviews with defendant); <u>Mason v. Mitchell</u>, 320 F.3d 604, 620 (6th Cir. 2003) ("We have . . . emphasized the importance of an independent investigation: The sole source of mitigating factors cannot properly be that information which [a] defendant may volunteer; counsel must make some effort at *independent* investigation in order to make a reasoned, informed decision as to their utility") (citation and internal quotation marks omitted; emphasis added).

"macropsia;" "micropsia"). Id. It "employs 'loaded' language which reduces the likelihood of obtaining accurate and detailed responses about intimate matters [or] suggests a 'socially acceptable' answer." Id. The form also presumes detailed knowledge by the client of events associated with his own birth and infancy, which there is no reason to assume he would possess. Id. The form is manifestly "a template for a mitigation specialist or investigator – not a 'self-reporting' instrument to be given to the client for him to complete. Any attorney or non-attorney expert with appropriate training and experience would have recognized it as such in 1995, and would not have used the form [as] Hall's attorneys apparently did." Id. *See also generally* ROA XXX (Tena Francis) (same).

Thus, the evidence before the District Court established that if trial counsel actually relied at all on Hall's written responses to the questionnaire items, such reliance was objectively unreasonable. Reasonable jurists could dispute the District Court's unexplained decision to credit trial counsel's claim in the face of this extensive and unrebutted evidence to the contrary.

Moreover, Hall's responses – far from justifying inaction – actually should have prompted a far-reaching investigation, because they contained readily recognizable "red flags." Hall's answers are "semi-literate" and "show a lack of academic achievement [and] poverty of expression." ROA XXX (Michael E. Tigar). Competent trial counsel would have recognized they "would face serious problems

communicating with [Hall] about complex ideas, including [both] the events of the crime [and] the nature of [his] emotional responses to the other people and experiences in his life." Id. To a reasonably effective lawyer, Hall's responses "should have sent up warning signals; they dictated a thorough investigation, assisted by appropriately qualified experts." Id.

Hall's responses contained many such "red flags."[43] He misspelled many simple words and misunderstood questions or answered them partially or incoherently. He also gave answers that were inconsistent with other available information (e.g., documentary evidence like his school records), and identified events (like his parents' divorce) that should have triggered further inquiry.[44] See ROA XXX (detailed description by Jill Miller, M.S.S.W., of the "red flags" in Hall's responses to the questionnaire items).

**Prior counsels' investigation does not support the District Court's conclusions.** The District Court implies that Hall's prior counsel conducted a substantial investigation and that trial counsel were entitled, legally and factually, to rely on its fruits. *See* ROA XXX. Both implications are mistaken.

First, as with trial counsels' claim to have relied heavily on Hall's responses to

---

[43] Indeed, their unexamined presence is another reason to suspect counsel were essentially ignorant the questionnaire existed until they needed to account for having failed to conduct any meaningful mitigation investigation.

[44] *See, e.g.*, Stewart v. Gramley, 74 F.3d 132, 135 (7th Cir. 1996); Smith v. Stewart, 140 F.3d 1263, 1269 (9th Cir. 1998); Douglas v. Woodford, 316 F.3d 1079, 1086 (9th Cir. 2003); *In re* Lucas, 94 P.3d 477, 504-05 (Cal. 2004).

the questionnaire, there remains a serious unresolved factual dispute whether, in fact, trial counsels' efforts were informed by prior counsels' work. Counsel never told his own belatedly retained mitigation investigator, Tena Francis, that Hall's original attorneys had conducted any mitigation investigation whatsoever. ROA XXX . They did not share with Francis any notes from that "investigation," any impressions gained from discussions with prior counsel, or any way in which their own judgments about what should be investigated were informed by prior counsels' work. Id. Reasonable jurists certainly could disagree with the District Court's conclusions in light of its failure to resolve this important factual dispute.

Second, *no* reasonable attorney would have relied on the results of prior counsels' investigation because prior counsel had withdrawn from the case due to a conflict of interest. The Government claimed in early March 1995 to have learned that Hall was planning to escape by taking one of his attorneys hostage. The District Court allowed Hall's original attorneys to withdraw after they advised that they could no longer advocate for Hall due to the evident conflict. In the court below, Hall presented expert opinion to show that, under such circumstances, no reasonable successor attorney could responsibly rely upon prior counsels' assessment of Hall's case. *See* ROA XXX (Michael Tigar explaining that prior counsels' opinions were compromised by the actual conflict of interest arising from Larry Nichols' allegations that Hall planned to take his lawyers hostage and prior counsels' hasty withdrawal

from the case such that trial counsel could not reasonably rely on the opinions of their predecessors).

Most important, the "investigation" conducted by prior counsel before they withdrew was superficial and incomplete. Prior counsels' contact with prospective mitigation witnesses, as reflected in their time records, was necessarily very brief. *See* ROA XXX (describing records). The short meetings prior counsel had with witnesses in Texas were "too brief to have permitted a meaningful assessment of whether the witness(es) might ultimately provide important information, or what kind of impression they might make on a jury," and the notes from those meetings indicate that the subjects discussed had little or nothing to do with potential avenues of mitigation. ROA XXX.

Reasonable jurists could also dispute the District Court's conclusion that any meaningful investigation was accomplished during prior counsels' single trip to Hall's hometown of El Dorado. *See* ROA XXX. Once counsels' travel time is subtracted, the total amount of time that might actually have been spent investigating during that trip was just *four hours*. *See* ROA XXX. Capital defense expert Michael E. Tigar reviewed prior counsels' interview notes from this trip and found that they reflect only "initial, brief contact[s]" of a "superficial nature and limited extent." ROA XXX. Accordingly, "it was objectively unreasonable for [trial counsel] to rely on any impressions formed by [prior counsel] in the course of those interviews rather than

conducting [their own] thorough investigation into [Hall's] background ...." Id.[45]

Equally important, "[n]o attorney adhering to the prevailing national standard of practice for defending capital cases in 1994-1995 would have expected an initial conversation with a prospective mitigation witness to reveal all the relevant information that witness might possess," especially when the witness was a member of the defendant's immediate family. Id.[46] Prior counsels' preliminary investigation provides no basis to justify trial counsels' decision to neglect the investigation of mitigating evidence for the first five and a half months after they entered the case. To the extent that trial counsel forewent necessary investigation in reliance on their predecessors' work, that decision was objectively unreasonable. *See, e.g.*, Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002) (trial counsel was ineffective in ruling out potential mental health defenses by relying on preliminary interview by psychiatrist retained by prior counsel); Ragsdale v. State, 798 So.2d 713 (Fla. 2001) (counsel ineffective for relying entirely on discovery performed by prior counsel).

---

[45] In addition, reasonable trial counsel would not have relied on these interviews because prior counsel conducted them alone. "Such one-on-one conversations may be important in building relationships" but "cannot suffice for purposes of preparing for litigation" because "witnesses may become unavailable, or their accounts may change between the interview and the time of trial." ROA XXX [[Tigar dec in App to reply at ¶ 15]]. Indeed, the absence of a third party from these initial interviews strongly suggests that prior counsel did not intend for them to have been his only contact with these witnesses. Id.

[46] Ware's claim to have gleaned meaningful insights from prior counsels' impressions about the potential for further investigation founders on Ware's own time records. ROA XX [[App to Reply at 100-111, Ware Voucher 1]]. If prior counsel had managed to complete a thorough mitigation investigation, they could not have communicated its results to Ware in the brief conversations Ware reported; and if prior counsel did not complete such an inquiry (the conclusion supported by their own time records), then Ware was not entitled to foreshorten his own efforts in reliance on prior counsels'. *See* ROA XXX [[Tigar Dec., App. to Reply at 34-53, at ¶ 14.]].

Perhaps recognizing that trial counsels' investigation was deficient under prevailing standards of practice, the District Court finds it necessary to add that "this Court would have been unwilling at the time of trial to authorize an unlimited amount of funds [for] further investigation." ROA XXX. For several reasons, reasonable jurists could debate whether this comment renders trial counsels' deficient performance irrelevant. First, the District Court's observation misunderstands Hall's argument. Hall is not saying that the District Court should have been prepared to grant "unlimited" funds, but that trial counsel needlessly squandered one of the most valuable resources it had available, namely, *time* to conduct the necessary investigation called for by the prevailing standard of practice. A few additional trips to El Dorado by counsel or their investigator would not have required "unlimited funds." The evidence successfully developed in these post-conviction proceedings shows how much more could have been accomplished if trial counsel had, as required by the standard of practice, begun their investigation in *March*, when they could count on a minimum of seven months before trial, instead of waiting until *mid-September*, when only two weeks remained before jury selection.

Second, relying on this speculative comment by the District Court to find "no prejudice" from counsels' deficient performance would violate <u>Strickland</u>, which forbids assessing prejudice by reference to a particular decision-maker's idiosyncratic view of the facts. <u>Strickland</u>, 466 U.S. at 695 ("The assessment of prejudice should

proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker."); *see also id.* at 700 (characterizing as "irrelevant to the prejudice inquiry" state trial judge's testimony about how his view of the case might have been affected if counsel had performed differently); *see also, e.g.*, Smith v. Freeman, 892 F.2d 331, 336 n.9 (3rd Cir. 1989) (judge's post-conviction finding that new evidence would not have changed his original conclusion about the defendant's mental state and competency is not controlling). Instead, this Court must assume that if trial counsel had made a showing that additional funds for investigation were reasonably necessary under the prevailing standard of practice, the District Court would have made those resources available, as required by due process and federal statute. Ake v. Oklahoma, 470 U.S. 68 (1985); 21 U.S.C. § 848.

2. **Trial counsels' unreasonable decision to focus on the mitigating factor of "equally culpable co-defendants" to the exclusion of other, more persuasive mitigation**

Hall challenged trial counsels' choice – made *before* they had conducted a thorough investigation into all potentially available mitigating circumstances – to emphasize at the penalty phase the statutory mitigating circumstance that "equally culpable co-defendants" would not face the death penalty. ROA XXX. The District Court found that trial counsels' decision was "strategic" because of the alleged

hostility of "North Texas jurors" to "excuse defenses" in cases with "particularly gruesome" facts. ROA XXX.[47] The District Court also opined that other statutory mitigators were "not available" to Hall and noted that trial counsel also offered evidence of some other non-statutory mitigating circumstances including Hall's age and remorse for the crime, and the circumstances of his upbringing. *Id.*

Each of these conclusions is debatable among reasonable jurists. First, as noted above, trial counsel made this choice to emphasize the "equally culpable co-defendants" factor *without having performed the necessary investigation beforehand.* The ABA Guidelines expressly forbid putting the cart before the horse in this manner. *See* 31 HOFSTRA L. REV. at 1021 (counsel "cannot make informed decisions ... unless counsel has *first* conducted a thorough investigation.") (emphasis added). Both the Supreme Court and this Court have endorsed this precondition for crediting counsels' decisions as "strategic." Wiggins, 539 U.S. at 527; Lewis v. Dretke, 355 F.3d at 368 ("It is axiomatic – particularly since Wiggins – that such a decision [not to present particular mitigating evidence] cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting ... from an investigation that is ... adequate for that purpose.").

Second, there exists an unresolved dispute of fact about whether trial counsels' actions in this regard were, in fact, based on any such assessment of the jurors' likely

---

[47] In its opinion, the District Court did not mention that, during *voir dire*, it expressed the view that at least "in the abstract," "equally culpable defendants would strike some people as not a very strong mitigating factor." R. 19:59.

preferences. Trial counsel called Hall's mother and his sister as penalty-phase witnesses, and the primary subject of their testimony was the turbulence in the Hall home. To that end, trial counsel repeatedly characterized the home environment or the actions of Hall's father as "abuse" or "abusive." *See, e.g.*, R. 18:113 (twice), 18:113-114, 18:114 (twice), 18:115, 18:116. Trial counsel used the same language in examining Hall's sister Cassandra Ross. *See* R. 18:138 (three times).

Thus, trial counsel presented *precisely* the type of mitigating evidence which, in retrospect, they claim not to have expected would move "conservative North Texas jurors" to leniency. Their actions at trial strongly suggest that trial counsel realized, sometime after Tena Francis' investigation began to bear some early fruit, that they should supplement their pre-investigation mitigation theory (*i.e.*, that "equally culpable co-defendants would not receive death") with information about Hall's background. The problem was that trial counsel had waited *too late* to conduct the type of exhaustive investigation required by the prevailing standard of practice that would have enabled counsel to present this evidence thoroughly and persuasively at trial. In short, the problem confronting trial counsel was not conservative North Texas jurors, but counsels' own objectively unreasonable failure to have conducted a timely and complete investigation into potential mitigating evidence.[48]

---

[48] Had the District Court allowed a hearing, Hall would have proven that in the years since Hall's trial, Ware has, in fact, relied on precisely this type of mitigating evidence to persuade conservative North Texas jurors in other capital cases, sometimes successfully. *See* Vaughn, "Man Who Killed Pool Hall Manager Given Life Sentence: Attorneys Argued He Didn't Deserve To Die Because Of Mitigating Circumstances," FORT WORTH STAR-TELEGRAM, December 12, 2000

(continued...)

Third, reasonable jurists could disagree with the District Court's statement that trial counsels' uninformed choice to emphasize the "equally culpable co-defendants" factor was reasonable because no other statutory mitigating factors were available. Had trial counsel conducted an appropriate investigation, they would have discovered Hall's neuropsychological impairment, *see* ROA XXX, which would have supported the statutory mitigating factor of impaired capacity under 18 U.S.C. § 3592(a)(1).

Finally, counsels' unreasonable choice to emphasize the "equally culpable co-defendants" factor cannot be excused on the basis that counsel may have presented, in however incompetent and haphazard a fashion, some other facets of a reasonable case in mitigation (*e.g.*, Hall's remorse for the crime). Indeed, our point is precisely that had counsel conducted a *thorough* investigation aimed at identifying and developing *all* available mitigating evidence, they would have uncovered a story much more powerful, persuasive, and extensive than the anemic account they presented at the punishment phase.[49]

---

[48](...continued)
(recounting how Ware presented mitigating evidence that the defendant's "mother was a drug addict who was in and out of prison," that "his father was never around," that he was "raised on the streets" in a neighborhood "so dangerous" that even his probation officer would not visit his home, and that he had "a very dysfunctional family life.").

[49] Curiously, the District Court singles out Hall's remorse and the circumstances of his background as additional non-statutory mitigating factors presented by trial counsel. ROA XXX. The fact that no jurors found Hall's remorse as a mitigating factor, and only one juror found his background to be mitigating, strongly suggests that trial counsel did not present persuasive evidence to establish those facts. Indeed, this Court has already acknowledged that given the thin evidence counsel offered about Hall's background, it was reasonable for jurors not to find that the circumstances of his upbringing constituted a mitigating factor, since counsel "offered only the testimony of two of his family members, which the jury was free to believe or disbelieve." Hall,

(continued...)

### 3. Counsels' failure to prepare their witnesses adequately

Hall challenged trial counsels' inadequate preparation of the witnesses who did testify at penalty.[50] *See* ROA XXX. As a result of trial counsels' unreasonable delay in beginning the mitigation investigation, they ultimately were able to elicit from Betty Hall and Cassandra Ross, the only family members called to testify, generic and unmoving descriptions of the violence between Hall's parents which failed to convey the true randomness and brutality of A.J. Hall's repeated episodes of wife beating. Worse, trial counsel elicited from these witnesses *inaccurate* testimony that the children in the family (including Hall) had not been the targets of physical abuse, whereas evidence initially communicated to trial counsel by Tena Francis prior to the punishment phase and only fully developed during these proceedings reveals that the Hall children (particularly the boys) were the targets of excessively harsh beatings, with belts and switches, by both parents. The jury did not hear how these traumatic

---

[49](...continued)
*supra*, 152 F.3d at 413. Moreover, this Court observed that that testimony "indicated that Hall was not himself the object of his father's abuse and that, throughout his childhood, Hall attended school and church and was properly housed, fed, and clothed." Id. The fully developed evidence now reveals that those inferences were mistaken – Hall *was* a target of physical abuse, and *did* suffer material deprivation, in part because his mother effectively abandoned the children to their own devices during Hall's teenage years. ROA XXX, XXX, XXX. There is every reason to believe that had counsel properly developed and presented the complete story of Hall's troubled upbringing, the jury would have reached a different verdict, both as to the existence of this mitigating factor and as to the ultimate sentence. *See, e.g.*, Hooper v. Mullin, 314 F.3d 1162, 1171 (10th Cir. 2002) (counsel ineffective where they "specifically chose to present [certain] mitigating evidence," but presented that evidence "without any further investigation, in an unprepared and ill-informed manner.").

[50] Hall's claim that counsel failed to prepare these witnesses is corroborated by, *e.g.*, Ware's note reminding himself to "Talk to Betty over telephone / use Tena's notes," ROA XXX, substantiating Tena Francis' recollection that Ware attempted to "prepare" Betty Hall by having a phone conversation with her the night before her testimony. *See* ROA XXX.

events, repeated throughout Hall's childhood, affected his development. (*E.g.* the jury did not hear that Hall, as a young boy, would lie in the bed he shared with his brothers Tracy and Demetrius so terrified of an anticipated beating that he would wet the bed in anxiety – an act that ensured a brutal beating would follow. *See* ROA XXX.

Reasonable jurists could disagree with the District Court's ruling, first, because it apparently rests on Ware's claim that he was never made aware of any "indications of severe physical abuse" in Hall's background. *See* ROA XXX. Ware claimed that Hall's mother and sister Cassandra had "indicated that corporeal [sic] punishment had been used in the household [but] denied it [had been] inappropriate." ROA XXX. This observation is superficially consistent with the testimony at the penalty phase. *See* R. 18:129-130, 143.

Reasonable jurists could dispute this finding, however, because Ware's own investigation and his examination of the witnesses reflected an underlying error which reasonably effective capital defense counsel in 1995 would have known to avoid: *characterizing* the experience of potential witnesses instead of simply uncovering the facts. Here, Ware invited the witnesses to describe the "corporal punishment" in the Hall home as "appropriate," rather than asking them what types of punishment were inflicted, under what circumstances, by which parent, using what means, etc. The latter approach is not simply a matter of personal preference, but was *required by the then-existing standard of practice.* ROA XXX. Had counsel not performed

deficiently in this regard, they would have learned that, although the Hall children perceived their treatment as "normal discipline," the treatment itself in fact qualified as abuse. Id. (the physical punishment imposed on the Hall children was abusive because it "produce[d] physical injury, [wa]s unpredictable, [wa]s inflicted in response to behavior the child physically [could not] control, and reflect[ed] the mood or condition of the person inflicting it rather than the severity of the child's misbehavior.").

A reasonable jurist could also disagree with the District Court's conclusion because the record refutes Ware's claim that he was unaware of any evidence that the Hall children had been physically mistreated. Tena Francis' interviews uncovered such evidence, and she communicated that information to Ware on October 6, 1995. *See* ROA XXX (memorandum from Tena Francis: "The *initial* investigation has led to information that serious domestic violence existed in the family. *The violence between Mr. Hall's parents often extended to the children.*") (emphases added).[51]

Similarly, the District Court may have credited the Government's claim that trial counsel "were never told" that at one point Hall's parents "abandoned him and his two younger brothers." *See* ROA XXX. A reasonable jurist could disagree with this claim, which is belied by the evidence. On October 25, 1995, Tena Francis submitted to Ware a memorandum that communicated precisely those facts:

---

[51] Francis also advised Ware that fully developing this critically important mitigating information would necessarily take additional time, and explained why. Id.

51

> In 1989, Betty [Hall] left A.J. [Hall] and filed for divorce. She moved into a house in El Dorado with Orlando, Tracy, and Demetrius. Later, though, she moved in with a boyfriend [who lived] about thirty minutes from El Dorado. *Orlando, Tracy, and maybe Demetrius were left to live in Betty's house for a time.* Eventually, they went to live with their father. Although Betty [claims to have continued to live with her sons from time to time], other family members tell a different story. *According to Cassandra, she would call her mother's house from Texas and find the boys living there with no electricity. She does not know how they fended for themselves in reference to food and other essentials. Orlando would have been seventeen at this time; his younger brothers were fifteen and thirteen. According to his sister, Cassandra, Orlando took the grocery store job in order to help pay for necessities and feed his siblings.*

ROA XXX (emphasis supplied). Because trial counsel had waited too late to begin their investigation, and thus were receiving these memoranda in the middle of trial, it is no surprise they never acquired a complete grasp of the information Ms. Francis was developing.

The District Court concluded that Hall's sister and mother "testified to much of what is contained in [their post-conviction affidavits]." ROA XXX. It further found that the type of cross-examination to which they were subjected was "to be expected and would have occurred no matter how many times the women met with defense counsel." Id. at XXX. It summed up its ruling thus: "Hall's mother and sister gave substantial testimony about Hall's upbringing, and Hall has not shown that his trial counsel were ineffective for failing to elicit further, similar testimony from them or for failing to question them in a more effective manner." Id.

This finding is debatable among reasonable jurists. First, the District Court

does not dispute the witnesses' statements that they were not prepared by trial counsel for their testimony or that they had minimal substantive contact with trial counsel. ROA XXX [Betty + Cassandra affs]. These statements make clear that trial counsels' performance in this regard was deficient.

Moreover, reasonable jurists could find that the District Court, in describing Hall's claim as a complaint that trial counsel did not present "enough evidence of a certain type," ROA XXX, fundamentally mischaracterized the issue. Hall's argument is that if trial counsel had developed and prepared the penalty-phase witnesses as required by the prevailing standard of practice, there would have been not just "more" evidence but substantively *different* testimony (including, *e.g.,* the fact that Hall himself was physically mistreated as a child). That missing testimony was indispensable to the jury's assessment of Hall's personal culpability, not least because its absence permitted the prosecution to minimize the significance of the "turbulent background" testimony generally by arguing that whatever else may have happened, Hall was not a target of any abuse and had his material needs met. We now know that was false. The jury's sentence thus rested on a mistaken view of the facts which could have been prevented had counsel performed consistent with the prevailing standard of practice by presenting not just "more" evidence, but *more and different* evidence.

The District Court's conclusion is also debatable among reasonable jurists because it acknowledges that the lines of questioning pursued by the prosecution in

cross-examining Betty Hall and Cassandra Ross were predictable ("to be expected"), but fails to recognize the significance of that fact, *i.e., the prevailing standard of practice **required** trial counsel to anticipate those areas of cross-examination and prepare their witnesses accordingly.* *See* ROA XXX. As above, trial counsels' deficient performance in this regard resulted in the jury's hearing a *distorted* version of the facts (*e.g.*, that "all of the children were fed [and] clothed," when in fact during Hall's teens he and the younger children were abandoned to fend for themselves – a fact that helps provide a mitigating explanation for his original entry into the illegal drug economy).

4.  **Counsels' failure to develop and present testimony from available witnesses**

Hall challenged trial counsels' failure to develop and present testimony from other family members, including his father, brothers, and sister Pam. ROA XXX. The District Court found this decision was "strategic," apparently based on Ware's affidavit (in which Ware claimed that Hall's father was "absolutely opposed" to testifying and would not have made an effective witness because Betty Hall was accusing him of domestic violence; that Hall's brothers were themselves criminals; and that Pam was "very angry at the time at Hall for lying to her [and for] involving [his younger brother] Demetrius [in] the crime." ROA XXX.

Reasonable jurists could debate the correctness of the District Court's ruling because it again excuses as a "strategic" decision an outcome that was itself dictated

by trial counsels' deficient performance. Hall proffered evidence that, had defense counsel undertaken a timely and thorough mitigation investigation, they could have overcome the barriers to developing A.J. Hall and Pam Palmer as witnesses. ROA XXX, XXX, XXX.

Indeed, the District Court acknowledges this evidence but fails to appreciate its significance. *See* ROA XXX (conceding that Hall proffered declarations showing that "A.J. could have testified about the problems in his marriage and his own bad behavior, and Tracy, Scotty, and Pamela could have testified about their upbringing and how they were disciplined harshly by their father, witnessed the abuse of their mother, and were exposed to drug dealing and other criminal behavior while growing up."). These declarations prove that extensive additional mitigating evidence was available, had defense counsel only conformed to the prevailing standard of practice. Here, as elsewhere, the law forbids crediting as "strategy" the *post hoc* rationalizations of a lawyer who never performed in the first place an investigation sufficient to identify all potentially available mitigating evidence. Reasonable jurists could conclude that trial counsels' claimed "choices" were in fact forced by their own deficient performance.

**5. Counsels' failure to discover and present other mitigation witness and documentary evidence**

Hall also challenged counsels' failure to develop and present other readily available mitigating evidence. ROA XXX. The District Court concluded that much

of this testimony, which would have elaborated on the painful details of the violent and unhappy marriage of Betty and A.J. Hall, was "cumulative" to the testimony of Betty Hall and Cassandra Ross; it found that other evidence (*e.g.*, evidence about A.J. Hall's own upbringing) was "of little, if any, assistance to the jury in reaching its decision;" and that evidence about "Hall's general good character" was "so attenuated that there is no reasonable probability that the outcome would have been affected by such testimony." ROA XXX.

Notably, the District Court does not dispute that trial counsel, as a result of their deficient investigation, never became aware of the existence of any of this evidence. Thus, its ruling on this aspect of Hall's claim rests solely on its conclusion that Hall suffered no prejudice. That is a ruling with which reasonable jurists could disagree, for the reasons that follow.

***The evidence is not merely "cumulative."*** The testimony of additional witnesses who could have described the violent and deprived circumstances of Mr. Hall's upbringing in ample detail is not merely "cumulative" of the meager evidence actually presented at trial. Numerous reasonable jurists have rejected the view that additional mitigating evidence should be dismissed as "cumulative" where it provides a richer and thus more compelling version of events and circumstances that were presented in bare-bones form at trial. This Court, in Lewis v. Dretke, 355 F.3d 364, 368 (5th Cir. 2003) found counsel ineffective for, *inter alia*, presenting only "skeletal

testimony concerning the abuse [inflicted on the defendant]," which was "wholly inadequate to present to the jury a true picture of [his] tortured childhood." Similarly, in <u>Jermyn v. Horn</u>, 266 F.3d 257 (3rd Cir. 2001), the Third Circuit found "objectively unreasonable" the Pennsylvania Supreme Court's conclusion that Jermyn had not proven prejudice under <u>Strickland</u> because the kernels of his mitigation were presented at trial. <u>Id</u>. at 304. The additional mitigating evidence presented by Jermyn in post-conviction proceedings included "first-hand accounts of instances of mental and physical abuse" suffered by Jermyn, documentary evidence that would have corroborated that testimony, and expert testimony "explaining how [his] development was thwarted by the [abuse] he suffered as a child." <u>Id</u>. at 306-308. As the thrid Circuit explained, such evidence was not simply "cumulative" of the evidence presented at trial as "it would have provided the jury with an entirely different view of Jermyn's life and childhood ...." <u>Id.</u> at 311. As the court concluded:

> [The state court's] conclusion that Jermyn had not been prejudiced by counsel's omissions appears to have been based in part on the fact that Jermyn's counsel had put **some** mitigating evidence before the jury, even though the jury did not hear the substance of what was uncovered [in post-conviction] . . . . *but the fact that counsel presented some mitigating evidence of a different nature and quality seems largely beside the point, given the significance of the evidence that was omitted and the reasonable likelihood that the totality of available mitigating evidence ... might have led to a different result.*

<u>Id.</u> at 310-11 (emphases supplied).

The Eleventh Circuit reached a similar conclusion in <u>Collier v. Turpin</u>, 177 F.3d

57

1184 (11th Cir. 1999). The federal district court had denied relief, concluding that trial counsel "could not be faulted for failing to pursue *additional anecdotal evidence* of Collier's personal history, diabetic condition, or circumstances leading up to the crimes." Id. at 1197 (emphasis added). The Eleventh Circuit reversed, holding that counsel were ineffective for failing to elicit more testimony about Collier's upbringing and his mental and physical ailments *from the witnesses actually called* (without reaching the issue whether counsel were also ineffective for failing to pursue other potentially available evidence). Id. at 1199, n. 19. The court noted that trial counsel had conducted "minimal" examination of their own witnesses and elicited "very little relevant evidence about Collier's character." Id. at 1200-01. This evidence, the court concluded, "presented no more than a hollow shell of the testimony necessary for a 'particularized consideration of relevant aspects of the character and record of [a] convicted defendant before the imposition upon him a sentence of death.'" Id. at 1201-02 (quoting Woodson v. North Carolina, 428 U.S. 280, 303 (1976)). Trial counsel's presentation "tended to give the impression that the witnesses knew little or nothing about Collier," id. at 1202, when they could have testified *inter alia* to his deprived childhood, gentle disposition, strong work ethic, devotion as a husband and father, and heroic effort to save the life of a motorist trapped in a car in creek.[52]

---

[52] *See also, e.g.,* Mayfield v. Woodford, 270 F.3d 915, 929 (9th Cir. 2001) (*en banc*) (unanimously finding trial counsel ineffective for failing adequately to investigate and present other available mitigating evidence even though "the mitigating evidence presented at trial was substantial" and the facts of the case were highly aggravating); Hutchison v. State, 150 S.W.3d 292, 304-08 (Mo. 2004) (rejecting trial court's conclusion that additional mitigating evidence trial

(continued...)

In addition, the fact that only one juror found Hall's upbringing to be mitigating, *see* Special Findings Form, R. 1382, counsels against dismissing as cumulative the significance of additional evidence detailing the privations of his youth. *See, e.g.*, Hall v. Washington, 106 F.3d 742, 752 (7th Cir. 1997) (where trial judge originally found no mitigating factors present, it is "logically impossible" for new mitigating evidence to be "cumulative").

The evidence in question would have contributed dramatically to a more fully developed picture of Hall's positive human qualities or his past suffering. The cases cited *supra* demonstrate that reasonable jurists could dispute the District Court's dispositive characterization of the evidence as "cumulative."

***The evidence was relevant.*** In apparently concluding that the evidence about A.J. Hall's own upbringing was irrelevant, the District Court ignored both well-settled law and well-understood dynamics of family development. Such evidence is relevant because it tends to prove a fact which could be of consequence to the litigation, *i.e.*, that A.J. Hall mistreated his own children in part as a consequence of cruelty he suffered at his own parents' hands. *See* Tennard v. Dretke, 124 S. Ct. 2562 (2004) (enforcing broad definition of constitutionally relevant mitigating evidence). As a factual matter, the evidence was essential to corroborate the allegation that Hall was

---

[52](...continued)
counsel should have presented was "cumulative," because that evidence "could have demonstrated ... the problems Hutchison had growing up ... far more effectively than the rudimentary information actually presented during the penalty phase").

physically mistreated as a child. The Guidelines expressly recognize the necessity of trial counsels' investigating not simply the facts of the client's life, but the lives of his parents and other close relatives: "Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children. *A multigenerational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction….*" 31 HOFSTRA L. REV. at 1025 (emphasis added); *see also* id. at 1061 ("[A]n understanding of the client's extended, multi-generational history is often needed for an understanding of his functioning …"). The Guidelines impose this duty because experience has taught that jurors find evidence of family dysfunction more persuasively mitigating if such dysfunction is shown to have persisted over time.

***Good character evidence is strongly mitigating.*** Evidence about Hall's positive character traits and acts of kindness – and particularly his heroic rescue of his three-year-old nephew Syroid, *see* ROA XXX – is hardly "attenuated" with respect to the central question of whether his life should be spared. Syroid had fallen into a motel swimming pool and would have drowned had Mr. Hall not leapt from a second-story balcony to save him.[53] This evidence is powerful proof of the value of Hall's life. *See, e.g.,* <u>Hall v. Washington</u>, 106 F.3d 742, 752 (7th Cir. 1997) (competent

---

[53] Information in trial counsels' possession pointed to this evidence. Hall's parole records reflect that he called to "check in" with his parole officer and during the call "said his nephew almost drowned over the weekend but they were able to revive him and he will be okay." ROA XXX.

counsel would have discovered and presented evidence of defendant's life-saving actions).[54] Evidence of positive character traits is universally recognized as mitigating, as the Guidelines point out, because it can "humanize the client by ... providing examples of his capacity to behave in a caring, positive way, such as ... trying to be a good parent and provider." 31 HOFSTRA L. REV. at 1062. Contrary to the District Court's apparent view, such evidence is not offered "as counterweight to the gravity of the crime," but instead "to show that the person who committed the crime is a flawed but real individual rather than a generic evildoer, someone for whom one could reasonably see a constricted but worthwhile future." Id. Further, it was essential for Hall's counsel to develop and present such evidence because so much of the prosecution's case for death rested on the contrary inference – that Hall was a depraved person with no redeeming qualities (as illustrated by, e.g., its evidence that he had sex with a girlfriend shortly after the crime and bragged coarsely to other jail inmates about raping the victim). See ABA Guidelines, 31 HOFSTRA L. REV. at 1064 (defense counsel must "thoroughly investigate to determine whether [the prosecution's aggravating] evidence can be excluded, rebutted, or undercut").[55]

---

[54] See also, e.g., Douglas v. Woodford, 316 F.3d 1079, 1086 (9th Cir. 2003) (counsel should have presented defendant's efforts as a Marine to help rescue two drowning sailors); Collier v. Turpin, 177 F.3d 1184, 1200 n. 20 (11th Cir. 1999) (counsel should have presented defendant's attempt to save life of motorist trapped in submerged car); Schofield v. Gulley, __ S.E.2d __, Nos. 205A0594, S05X0595, 2005 Ga. LEXIS 405 (Ga. 6/6/05) (vacating death sentence – despite "extremely heinous" crime – because trial counsel presented weak testimony about defendant's having saved the lives of two people, rather than available persuasive evidence about the same events).

[55] The District Court's citation to Carter v. Johnson, 131 F.3d 452 (5th Cir. 1997), ROA at

(continued...)

***The District Court failed to consider the cumulative effect of the evidence.***

Finally, reasonable jurists could dispute the District Court's analysis because, contrary to well-settled law, the District Court failed to consider whether *all* the mitigating evidence trial counsel never developed or presented, *considered cumulatively*, could have resulted in a different sentence. Instead, the District Court considered the weight of each item of evidence in isolation from the rest, an approach emphatically rejected by the Supreme Court in <u>Williams</u> and <u>Wiggins</u>.

**#      Counsels' failure to present evidence of Hall's prior successful adjustment to incarceration**

Hall challenged trial counsels' failure to investigate, present and argue available, affirmative evidence of Mr. Hall's prior successful adjustment to incarcerations in Arkansas and elsewhere. ROA XXX. The District Court found that Ware did elicit one witness' admission that Hall had "no record of disciplinary problems" while jailed awaiting trial, and made a reasonable "strategic" choice to do no more because he "had been informed that Hall [had] continued his drug dealing ... while in prison in Arkansas" and the prosecution "had rebuttal expert witnesses ready to testify about prison conditions." ROA XXX. The District Court's conclusions are debatable among reasonable jurists for the following reasons.

---

[55](...continued)
XXX is inapposite because the mitigating testimony Carter's lawyers failed to present was actually that he had a *"reputation* as a good and peaceful person." Here, by contrast, what trial counsels' deficient performance cost the defense was individualized anecdotal testimony about specific acts of kindness and heroism by Hall, not anemic "reputation" testimony.

First, there remains an unresolved dispute of fact about the credibility of Ware's claims regarding why he did not more fully develop evidence of Hall's successful prior adjustment to prison. The District Court's suggestion that Ware wanted to avoid close scrutiny of Hall's behavior in prison in Arkansas, ROA XXX, is belied by trial counsels' file and his direct examination of Hall's mother.

Counsels' file contains a note dated 11/1/95 (the first day of the punishment phase), listing the names of anticipated witnesses. One is "Baker," formerly Hall's parole officer in Arkansas, who testified for the Government at penalty. R. 31:205-07. Next to Baker's name, counsel wrote "Act 814." ROA XXX. "Act 814" was the Arkansas statute under which Hall obtained early release. ROA XXX. It allowed the discharge on work-release status of inmates who had used their time in custody "productively and positively" and who had given no "reason to be concerned about [their] behavior." Id. This reference to Act 814 in trial counsels' own notes calls into question Ware's claim that he was "hesitant" about focusing attention on Hall's good conduct in prison and so made a "strategic" choice to downplay it.

Ware's claim is also inconsistent with his examination of Hall's mother Betty at punishment, during which Ware attempted to elicit testimony that Hall "got along okay in the penitentiary." *See* R. 18:118-19. At Ware's urging, Betty Hall testified that Hall "had very good behavior" in prison. Id. If Ware really feared opening the door to contrary evidence about Hall's conduct while in custody (*e.g.*, the claim that

63

Hall supposedly continued to deal drugs from prison), he would not have labored to get this answer from Betty Hall. Ware's half-hearted attempt to introduce through an unqualified witness information which he belatedly recognized as important – but had never bothered to investigate or develop properly – is simply more proof of his deficient performance. Because the District Court denied a hearing, Hall has not yet had an opportunity to confront Ware with these inconsistencies.

Second, the District Court again failed to assess trial counsels' performance in light of the prevailing standard of practice, which obliged trial counsel to conduct a full investigation into Hall's prior behavior in custody *before* deciding about what to present. Reasonably competent capital defense counsel in 1995 would have recognized the importance of showing jurors that a defendant had lived peacefully and productively in a prison environment. ROA XXX; *see also* ABA Guidelines, 31 HOFSTRA L. REV. at 1023 (counsel's duty to investigate client's "prior juvenile and adult correctional experience"), 1062 ("Evidence that the client has adapted well to prison and has had few disciplinary problems can allay jurors' fears and reinforce other positive mitigating evidence"). Measured against this standard, counsels' investigation was deficient; having not performed an appropriate investigation, counsel are not entitled to have their actions, haphazardly chosen mid-trial, labeled as "strategic."

The District Court's conclusion is also debatable because it ignored counsels'

64

deficient performance with respect to the documentary evidence itself. The prosecution offered a few pages from Hall's Arkansas penitentiary records, *see* Government Exhibit 100, and Ware briefly referred to those records in arguing that, had Hall been violent in prison, the prosecution would have said so. Supp. R. Vol. 20-A at 54. But trial counsel failed to provide jurors any real guidance in understanding these documents. ROA XXX ("[I]t was not reasonable for defense counsel to count on the jurors to be able to understand the full mitigating significance of the [DOC] records without testimony from defense witnesses.").[56]

Moreover, Ware's argument mistakenly suggested to the jurors that the only significance of Hall's prison record was the *absence* of evidence that he had misbehaved. *See* Supp. R. Vol. 20-A at 54. Hall's prison records, however, did more than simply permit a negative inference of "no bad conduct" – they affirmatively established that Hall had spent his time in prison constructively and productively. For example, the records show that Hall was assigned as a "C-2 trusty" during his prior incarceration. ROA XXX. A qualified witness could have explained to the jury that this classification meant Hall was in the category of offenders receiving the most good-time credit, and represented significant confidence on the prison's part in Hall's

---

[56] *See also, e.g.,* Jermyn v. Horn, 266 F.3d 257, 311 (3rd Cir 2001) (trial counsel performed deficiently by offering "lengthy V.A. records," in which "most of the entries were handwritten and difficult to decipher," without "highlight[ing] the fact that the records contained other mitigation evidence [in addition to the handful of specific items counsel identified in argument]"); Turpin v. Lipham, 510 S.E.2d 32, 42 (Ga. 1998) (counsel ineffective for not presenting testimony to help jury understand medical records; deficient simply to argue that jurors should "read and utilize the records," because they cannot be expected "to digest and understand the records by themselves").

good behavior because "C-2" trusties were allowed outside the prison walls with an escort. Id. In addition, such a witness could have testified that Hall achieved this trusty status more quickly than other inmates, and that Hall's record of **zero** disciplinary infractions – to which trial counsel did not even specifically direct the jury's attention – indicated he was "an ideal inmate." Id.[57]

Trial counsel unreasonable failed to take advantage of other important opportunities offered by Hall's DOC records. The records show, for example, that on several occasions Hall made urgent requests to telephone home and check on his family when other family members underwent unexpected health crises. ROA XXX, XXX. This information would have corroborated other evidence that Hall was capable of generosity and compassion. Id.

In addition, trial counsel performed deficiently in relying on documents alone where live witnesses could have corroborated them and strengthened the defense case. ROA XXX. Strongly favorable testimony from actual guards, officers, or correctional personnel who had observed Mr. Hall as a prisoner, in different facilities and under varying circumstances at different times, was available from witnesses like police officer Cleo Jamerson, formerly a deputy sheriff in Mr. Hall's hometown, and Keith Hill, an Arkansas correctional officer for fourteen years. See ROA XXX, XXX. They

---

[57] As noted, Hall's records establish that he was returned to the community on work-release status under "Act 814." *Id.* A qualified witness could have emphasized to the jury that offenders were carefully scrutinized for release under "Act 814" and that no inmate obtained it unless his behavior was viewed as above reproach. *Id.*

describe Hall as a "model inmate" and provide great detail about his positive, non-violent conduct and constructive attitude while incarcerated. Id.[58]

Counsels' failure to investigate, develop, and present such witnesses, in addition to Hall's prison records themselves, was deficient and prejudicial. *See, e.g.,* Williams v. Taylor, 529 U.S. 362, 395 (2000) (counsel ineffective for failing to present, *inter alia*, favorable prison records and "the testimony of prison officials" describing Williams as non-violent); Moore v. Johnson, 194 F.3d 586, 614 (5th Cir. 1999) (counsel ineffective for not presenting evidence to help jurors interpret and understand defendant's penitentiary records), 618 (counsel ineffective for "failing to capitalize on the opportunity to argue Moore's early release from prison as a factor mitigating against an affirmative response on the special issue of future dangerousness").[59]

Reasonable jurists could also conclude, contrary to the District Court's view, that trial counsel – knowing the prosecution intended to press for a death sentence based on Hall's alleged "future dangerousness" – had a case-specific duty to combat that inference. *See* ROA XXX ("Knowing that future dangerousness would form an

---

[58] As noted, Hall's records establish that he was returned to the community on work-release status under "Act 814." Id. A qualified witness could have emphasized to the jury that offenders were carefully scrutinized for release under "Act 814" and that no inmate obtained it unless his behavior was viewed as above reproach. Id.

[59] *See also, e.g.,* Horton v. Zant, 941 F.2d 1449, 1463 (11th Cir. 1991) (petitioner prejudiced by counsel's failure to present evidence he had, *inter alia*, "successfully adjusted to previous stays in prison"); *Ex parte* Land, 775 So.2d 847, 854 (Ala. 2000) ("trial counsel may be found ineffective for failing to present evidence of adjustment to incarceration ....").

important part of the Government's case for the death penalty, counsel were under a special obligation to develop and present available evidence [that] Hall had been a 'model prisoner' in the past."). The District Court's view is also at odds with the Supreme Court's recognition in Skipper that evidence of a defendant's successful adjustment to prison can powerfully rebut a prosecutorial claim of future dangerousness. *See* Skipper v. South Carolina, 476 U.S. 1 (1986); *see also* Moore v. Johnson, 194 F.3d 586, 614, 618 (5th Cir. 1999) (same).[60]

Moreover, trial counsel knew that the prosecution would present specific allegations from jail inmate Larry Nichols that Hall had plotted to escape by taking his attorneys hostage with a homemade knife. Counsel belittled Nichols' "cock and bull story," Supp. R. Vol. 20-A at 53, but had little contrary evidence to which they could point. In failing to investigate and present available Skipper evidence, counsel unreasonably abandoned a valuable weapon that would have persuaded the jury to reject Nichols' testimony. ROA XXX ("Reasonably effective counsel, anticipating this evidence from the Government, would have developed and presented the readily available "Skipper evidence" in order to bolster their argument [that] Hall's prior history was reason to disbelieve the Government's allegations."); ROA XXX (same); ABA Guidelines, 31 HOFSTRA L. REV. at 1062 (counsel should pursue "[e]vidence

---

[60] The prosecution argued that Hall would be a "future danger" while in prison because he "had nothing to lose," suggesting that his prior good behavior was solely aimed at earning release. R. 20A:94-95. The prevailing standard of practice required defense counsel to respond by presenting as much evidence as possible to support the inference that Hall's peaceful and positive adjustment to prison life in the past was not conditioned on his prospects for release, but reflected his normally compliant character in that setting.

that the client has adapted well to prison and has had few disciplinary problems," which "can allay jurors' fears and reinforce other positive mitigating evidence").

Finally, the District Court's prejudice analysis was contrary to <u>Strickland,</u> as it plainly assessed the weight of this mitigating evidence in isolation from the remainder of the case in mitigation. *See* ROA XXX (no showing of "how further testimony *on this subject* would have resulted in a life sentence") (emphasis added). <u>Williams</u> and <u>Wiggins</u> require consideration of the *cumulative* impact of *all* mitigating evidence.

**#      Counsels' failure to corroborate the presented testimony with documentary proof**

Hall also challenged trial counsels' failure to offer certain documents during the punishment phase to corroborate the scant testimony elicited from Betty Hall and Cassandra Ross concerning A.J. Hall's abuse of his wife and Hall's love and affection for his children. ROA XXX, XXX, XXX. The District Court concluded that this documentary evidence was merely cumulative of the testimony itself on those subjects and thus Hall was not prejudiced. ROA XXX. Reasonable jurists could disagree, as courts have held that documentary evidence corroborating important mitigating testimony is not merely "cumulative." *See, e.g.* <u>Hart v. Gomez,</u> 174 F.3d 1067, 1070-71 (9th Cir. 1999) (trial counsel should have presented documents to corroborate witness's testimony that she accompanied defendant to ranch on weekends victim claimed to have been assaulted); <u>Cunningham v. Zant,</u> 928 F.2ed 1006, 1018 (11th Cir. 1991) (counsel had duty to introduce defendant's medical records to substantiate

existence and effects of head injury); *see also* ABA Guidelines 31 HOFSTRA L. REV. at 1024-25 (stressing importance of locating records and documents to "corroborat[e] witnesses' recollections" and thereby "ensure the reliability [and] persuasiveness of the evidence"). Moreover, Hall's correspondence with, and poem written for, his daughter are not "cumulative" of anything presented at trial, and would tend independently to prove Hall's loving relationship with his children, his continuing efforts to be a positive influence in their lives, and the potential impact of his execution on them.[61]

# # Counsels' failure to call witnesses who were available at trial

Hall challenged counsels' failure to call other readily available mitigation witnesses, including Rev. Donnell Hegler. ROA XXX. The District Court concluded that trial counsel "exercised reasonable trial strategy" in not calling, *e.g.*, Rev. Hegler, because Ware had received a memorandum from Tena Francis on October 22, 1995, indicating that Hegler might also possess some damaging information about Hall. ROA XXX.

Reasonable jurists could conclude that the District Court's analysis does not withstand scrutiny. First, as noted with respect to several of Ware's claims of trial "strategy," there remains an unresolved factual dispute about whether Ware's

---

[61] The District Court's citation of <u>Brown v. Cain</u>, 104 F.3d 744, 751 (5th Cir. 1997), is inapposite. <u>Brown</u> was decided under the AEDPA, which imposes an additional layer of deference to the state court's conclusion that counsel provided effective assistance. More important, <u>Brown</u> predates <u>Williams</u> and <u>Wiggins</u>, which emphasize the importance of documentary evidence in corroborating and enriching mitigating evidence about the defendant's life. *See* ABA Guidelines, 31 HOFSTRA L. REV. at 1024 n.214 (citing <u>Wiggins</u>), 1025 n.215 (citing <u>Williams</u>).

affidavit, untested by confrontation or cross-examination, should be credited. Ware says he decided not to call Rev. Hegler as a mitigation witness based on Tena Francis's report (dated October 22) about her October 9 interview with him. If that were true, there would be no reason for Rev. Hegler's name to appear in counsels' notes and other documents, nor for them to have had contact with him, after approximately October 22.

But Rev. Hegler's name appears on numerous notes in counsels' file memorializing the planned defense case at punishment – all created *after* October 22. *See, e.g.,* ROA XXX (notes dated 10/27/95 include "Rev. Hegler" in list of anticipated witnesses for "punishment case"); ROA XXX (notes from first day of penalty phase, listing "Rev. Hegler" among anticipated defense witnesses); ROA XXX (notes from 11/1/95, listing "Rev. Hegler" among elements of defense case). In addition, trial counsels' outline for examining Hall as a penalty-phase witness contain the phrase "(Rev. Hegler)" next to the question "What was it like growing up – violence of father toward mother." *See* ROA XXX. Finally, Rev. Hegler's sworn statement that he was told to come to court in Fort Worth so he could testify at punishment, *see* ROA XXX, is corroborated by telephone records showing that on November 1, 1995, at 6:02 p.m., a call was placed from Ware's office to Rev. Hegler in El Dorado. ROA XXX. These documents collectively demonstrate that long after trial counsel received the October 22 report, they still planned to call Rev. Hegler as a mitigation witness.

In light of this record, reasonable jurists could dispute the District Court's decision to credit trial counsels' claim, untested by cross-examination, that they made a "strategic" decision not to call Rev. Hegler based on information in the report they received October 22. Such jurists could conclude instead that these documents reflect the overall picture that emerges from the time records and other notes of trial counsel, the impressions of Ms. Francis in her contemporaneously created memos, and Ms. Francis and Mr. McNally's declarations in the court below: that the lack of timely investigation and preparation led to a chaotic, ill-planned punishment-phase presentation that trial counsel aborted without even calling the witnesses – like Rev. Hegler – who were present at court and willing, however unprepared, to testify in support of a life sentence.

Reasonable jurists would also dispute whether the October 22 memo alone could reasonably support a decision not to have Rev. Hegler testify. Many of the statements attributed to Rev. Hegler relate to matters that were going to be before the jury at punishment anyway, such as Hall's prior criminal history (*e.g.*, of dealing drugs and having other people do so with/for him) and other unadjudicated crimes. Had such facts even come into evidence through Rev. Hegler, reasonably effective defense counsel would have placed them in a mitigating context through Hegler's testimony itself (*e.g.,* his compelling description of the hopelessness that pervaded the entire community of young African-American men, that links the "poverty, drug trade,

and racism in El Dorado," *see* ROA XXX). The negative features of Rev. Hegler's descriptions of Hall – *e.g.*, his view that Hall "did not apply himself" or "believed that he could beat the system" – apply to many teenagers or young adults raised in similarly destructive surroundings. Reasonably effective defense counsel would have encouraged the jury to view those facts through the prism of Hall's incomplete psychological, moral, and emotional development.[62]

Finally, the District Court's opinion that the potentially damaging parts of Rev. Hegler's testimony justified dismissing him as a potential witness is debatable because it is directly at odds with the Supreme Court's recognition in *Williams* that evidence can be mitigating (and material) on balance even when it contains specific items of unfavorable information that highlight, *e.g.*, the defendant's other criminal behavior or potential dangerousness. *See* <u>Williams</u>, CITE. Reasonably effective counsel would have accorded these statements minimal weight in weighing them against the voluminous, powerful, and non-cumulative mitigating information Rev. Hegler would have presented. *See* ROA XXX. The overriding point, as throughout this case, is that trial counsel waited too late to conduct their mitigation investigation and thus never fully developed the available witnesses to the point at which they could make any genuinely "strategic" judgment about calling them.

---

[62] Some of the statements attributed to Hegler represent matters outside his personal knowledge ("Hegler suspected [Hall] was not above having someone commit violent acts on his behalf") which there is no reason to imagine the prosecution would (indeed, could) have elicited from him in any event.

**#**      **Counsels' failure to counter the testimony of the Government's key witness, Larry Nichols, through effective cross-examination and the development of impeaching evidence**

Hall challenged trial counsels' failure effectively to meet the prosecution's claims, presented through jailhouse witness Larry Nichols, that Hall had planned a knife-wielding, hostage-taking escape. *See* ROA XXX. The District Court found counsels' cross-examination of Nichols adequate because, it claimed, under cross-examination Nichols "admitted much" of his prior testimony. ROA XXX. The court credited counsels' claim that he decided not to "pin Nichols down" on other matters because the jury "knew Nichols was self-motivated [and] lying," and to avoid "destroy[ing] the mood and tempo" of the examination and alienating the jury by "beating a dead horse." Id. Reasonable jurists could disagree with these findings, for the reasons set forth below.

First, the District Court once again found counsels' performance tolerable based on what they *did* (here, elicit a few admissions by Nichols of his own prior crimes and his awareness that he could benefit from testifying against Hall), rather than measuring counsels' performance against *the prevailing standard of practice.* Given the importance of Nichols to the prosecution's case, the prevailing standard of practice required trial counsel to spare no effort in discrediting Nichols, which in the circumstances of this case meant actually impeaching Nichols on every relevant point with his prior sworn testimony rather than permitting his denials to stand

unchallenged. ROA XXX.

Significantly, while Nichols may have admitted the nature and extent of some of his own crimes, he repeatedly *denied* being knowledgeable about how to reduce his sentence by cooperating with the prosecution, a matter of much greater importance for purposes of undermining his credibility at Hall's trial. Trial counsel broached the subject, asking Nichols whether other jail inmates had "helped" Nichols to "know how to take certain steps to help [himself] in the legal system." R. 31:257. Nichols denied it. Id. Counsel twice repeated the same inquiry, and Nichols repeated his denials. R. 31:257. Counsel moved on without impeaching Nichols on this point, despite having copious proof that Nichols was lying.[63] The record squarely refutes any suggestion that Nichols "admitted" the important fact that after his arrest, he was exploring how to obtain leniency by cooperating.

Indeed, the record as a whole does not support the District Court's characterization of counsels' cross-examination of Nichols. For example, counsel pressed Nichols about whether he had "used some of that money [from the robberies he committed] to buy some drugs for resale." R. 31:252. Nichols denied it. Counsel asked twice more, and Nichols denied it twice more. Id. Counsel then moved on to

---

[63] Counsel had transcripts of Nichols' prior testimony for the Government at the trial of his co-defendants, in which he admitted explicitly that in asking one of his co-defendants to sign a false affidavit exculpating Nichols, he had been following guidance from other prisoners at Mansfield. ROA XXX-XX Indeed, in his Dallas testimony Nichols substantially admitted *seven different times* that he had gotten advice from fellow jail inmates about how to reduce his own exposure ("get out of this jam"). *See* ROA XXX.

a different subject without impeaching Nichols with readily available proof to the contrary.[64]

More generally, at Hall's trial Nichols worked to paint himself as a wayward youth who had gotten mixed up in a couple of robberies as the getaway driver and was now going straight. *See, e.g.*, R. 31 at 243 (Nichols claiming he never went inside any of the robbery locations and only participated in two robberies). Consistent with this self-portrayal, Nichols also implied he had owned or possessed only two firearms. R. 31:257. Reasonably competent counsel would have dynamited these false impressions with Nichols' own sworn testimony.[65]

Reasonable jurists could also disagree with the District Court and conclude that trial counsel performed deficiently in not informing the jury that Nichols' trial testimony greatly embellished the version he originally told federal agents on March 7, 1995. ROA XXX. Nichols' trial testimony went far beyond what he said in that

---

[64] Nichols had previously testified that "after every robbery," he purchased and re-sold illegal drugs with his part of the proceeds. ROA XXX.

[65] According to Nichols' testimony in Dallas, (1) prior to committing the robberies, Nichols made his living "selling dope," ROA XXX; (2) after participating in the Louisiana robberies, Nichols and his cohorts went to Florida intending to rob a bank there, but the plan went awry, ROA XXX; (3) Nichols stole two Jet Ski watercraft and took them across state lines to sell them, ROA XXX; (4) Nichols defrauded merchants by passing fraudulent checks, including writing a fraudulent check for $1700 to purchase a car, and charges were not pursued because he agreed to cooperate against his co-defendants, ROA XXX; (5) Nichols owned or possessed no fewer than five firearms at various times: a .44 caliber Beretta, a 9 mm Ruger, a .380 caliber Taurus, a 12-gauge Mossberg shotgun, and a 9 mm Glock, ROA XXX; (6) Nichols acquired the Glock by trading illegal drugs for it, ROA XXX; and (7) Nichols had used aliases and had bought a gun under a false name. ROA XXX. Competent counsel would have used Nichols' own testimony to reveal him as a manipulative and deceptive offender with a varied criminal history and a sophisticated appreciation of how to turn the system to his own advantage.

interview, as reflected in the relevant FBI-302.[66] According to that FBI-302, however, Nichols advised on March 7 that he had provided in that interview "all the information he could furnish." Counsel should have cross-examined Nichols to highlight how Nichols had embroidered his allegations against Hall and, if necessary, should have called the agents to confirm that on March 7 Nichols had claimed to know nothing more.

For all these reasons, reasonable jurists could find that in this case reasonably effective counsel would not have failed to impeach Nichols on all these points. *See, e.g.,* Tucker v. Prelesnik, 181 F.3d 747, 757 (11th Cir. 1999) (counsel was ineffective in failing to impeach victim with medical records reflecting his faulty memory of the crime); Driscoll v. Delo, 71 F.3d 701, 711 (8th Cir. 1995) (counsel ineffective in failing to impeach the testimony of an important State witness using witness' prior inconsistent statements); Smith v. Wainwright, 799 F.2d 1442 (11th Cir. 1986) (counsel ineffective for failing to use prior inconsistent statements to impeach State's witness whose credibility was essential to State's case); Sparman v. Edwards, 26 F.Supp.2d 450 (E.D. N.Y. 1997) (counsel ineffective for failing, *inter alia*, to cross-examine child sex abuse victims with prior inconsistent statements), *aff'd* 154 F.3d 51 (2nd Cir. 1998).

---

[66] In that interview, Nichols failed to mention, *inter alia*, (1) two of the three "shanks" he later described in his trial testimony; (2) any statements by Hall about stabbing the trial judge; or (3) the claim that Hall bragged of using "100 rubbers" in sexually assaulting the victim. Because Nichols was already in protective custody and segregated from Hall by March 7, Nichols could not have claimed that the embellishments came from other, subsequent conversations with Hall.

By crediting trial counsel's affidavit, the District Court implies that Nichols' credibility was significantly damaged on cross-examination. ROA XXX (trial counsel "effective impeached Nichols … about his self-interested motivation"). Reasonable jurists would doubt this conclusion, given the prosecution's statements in Nichols' case lauding him for providing "very substantial assistance" against Hall, saying his testimony was "pivotal" and "certainly aided the jury in its decision of returning a sentence of death." ROA XXX. Moreover, the prosecution admitted in the court below that "Nichols was clearly an important witness during the penalty phase of the trial," ROA XXX, an admission amply supported by the jury's unanimous finding of the non-statutory "future dangerousness" aggravating factor (in the absence of any other evidence that Hall was dangerous *in custody*).[67]

#       **Counsels' failure to investigate Nichols' allegations**

Hall challenged trial counsels' failure to investigate Nichols' "escape plot" story by interviewing other inmates who had been jailed with Hall and Nichols. ROA XXX. The District Court found no prejudice because, "even had these inmates been located, their testimony would [not] have so effectively impeached Nichols' testimony that Hall would not have received the death penalty." Reasonable jurists could dispute

---

[67] Beyond alleging that Hall was prepared to stab the judge or his own lawyer in order to escape, Nichols also painted a tremendously damaging portrait of Hall as boastful, unrepentant, and cruelly coarse toward the victim and other women, and homicidal toward one of his co-defendants. According to Nichols, Hall bragged that he "used 100 rubbers" in raping Lisa Rene, and was "macho and proud about it." R. 31: 219-22. According to Nichols, Hall also expressed his intent to kill codefendant Beckley, whom Hall called a "bitch;" Hall likewise referred to the mother of one of his children as a "bitch," and talked about "beating up on" other girls. R. 31:222-23.

this conclusion, first, because it repeats the District Court's error of isolating the effect of counsels' error rather than considering the cumulative impact of all such errors and omissions (such as counsels' failure to present evidence about Hall's successful prior adjustment to prison, which in conjunction with the testimony of these inmates would have thoroughly discredited Nichols' "escape plan" claim). *See supra.* Second, this view simply does not give appropriate weight to the additional evidence trial counsel failed to develop, which was substantial. Contrary to the District Court's view, it is irrelevant that none of these inmates could have testified about "what Hall might or might not have said [to] Nichols." ROA XXX. Their testimony that Nichols was looking for a way to reduce his own sentence and that Hall was quiet and remorseful, rather than boastful, would have left the jury skeptical of Nichols' account. *See* ROA XXX, XXX.

#      **Counsels' failure to make a guilt phase closing argument**

Hall challenged trial counsels' failure to make a closing argument at guilt. ROA XXX. The District Court found that trial counsel were aware of the rationale for "bridging" the guilt and punishment phases, but made an informed decision to forego closing argument in favor of giving an opening at penalty. ROA XXX. The District Court's conclusion is debatable among reasonable jurists because it fails to acknowledge that counsels' decision to give no closing argument was inconsistent with prevailing professional norms, under which it was objectively unreasonable to

forfeit an opportunity to press what would ultimately be the defense theory at punishment. ROA XXX. As discussed *supra*, the District Court's analysis is also flawed because it fails to consider the effect of this omission cumulatively with other errors of counsel in assessing prejudice.

### \# Counsels' failure to effectively urge the District Court to exercise its discretion to permit Hall to make a brief statement in allocution.

Hall challenged trial counsels' failure to make a persuasive argument in favor of their motion to permit Hall to make a brief statement in allocution. ROA XXX. The District Court found no prejudice, saying it would have refused the request no matter what trial counsel had argued or what supporting authority they had provided, and noted, "more importantly," that there is no constitutional or statutory *right* to allocute. ROA XXX.

Reasonable jurists could disagree with the District Court's finding, first, because it is squarely inconsistent with the record. This Court must take the record at face value and assume that the District Court was not simply trying to entrap Hall's trial counsel into wasting their time on useless research by pretending to be open-minded on the allocution issue when in fact it had already firmly decided how it would rule.[68] *See* R. 32:50 (District Court asking trial counsel for state cases permitting allocution).

---

[68] Notably, Ware claimed in his post-trial affidavit that the defense never actually wanted to have Hall allocute. *See* ROA XXX. This assertion, like much in Ware's affidavit, is conclusively refuted by all other available evidence. Id.

Second, the District Court's emphasis on this Court's disposition of Hall's direct appeal misinterprets Hall's claim here, which is independent of the existence of any enforceable "right" to allocution. Hall's point is that federal courts in capital trials around the country have *exercised their discretion* to permit allocution and, if trial counsel had performed according to the prevailing standard of practice, they might well have persuaded a fair-minded judge to do the same, particularly since Hall's proposed statement in allocution was simply a brief expression of remorse and request for forgiveness. Here, as above, this Court cannot find "no prejudice" based on the District Court's subjective speculation about how it would actually have ruled if counsel had performed properly, but must assume the court would have "reasonably, conscientiously, and impartially" exercised its discretion regarding the request. Strickland, 466 U.S. at 695.[69]

### #    Counsels' failure to secure the assistance of appropriate experts

Hall challenged trial counsels' failure to provide effective assistance with respect to the selection and use of experts at punishment. ROA XXX. The District Court appears to have concluded that counsel performed adequately because they "did

---

[69] Hall's expression of remorse, in conjunction with the other mitigating evidence which reasonably effective counsel would have developed and presented (including specifically other evidence of Hall's remorse and the fact that he voluntarily surrendered to authorities and confessed his involvement) could have persuaded the jury to impose life. *See* ROA XXX; *see also, e.g.,* Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 CORNELL L. REV. 1557, 1584 (September 1998) at 1584 (many jurors who vote for life credit defendant's expression of remorse); Eisenberg, Garvey, and Wells, *But Was He Sorry? The Role of Remorse in Capital Sentencing*, 83 CORNELL L. REV. 1599 (September 1998) (jurors' perception that defendant is remorseful increases likelihood of a life sentence).

in fact *hire* a neuropsychologist," ROA XXX (emphasis added), and because they "were able to utilize" their mitigation specialist in conducting some limited investigation. Id. The court also appears to attribute the absence of *any* expert testimony for the defense to trial counsels' decision to forego presenting the testimony of their psychiatrist, Dr. Clayton. Id. It further held that no prejudice resulted because defense counsel were not allowed "inexhaustible [funds] with which to hire experts" and "it is highly doubtful [this] Court would have entertained a request to hire a social worker to testify about Hall's upbringing after having already given … funds with which to hire both a psychologist and a psychiatrist." ROA XXX-XXX. Finally, the District Court dismissed the evidence of Hall's neuropsychological impairment because he does not suffer a "mental disorder" and is not "mentally retarded." ROA XXX. For the reasons that follow, reasonable jurists could dispute each of these findings.

First, the District Court's reliance on the fact that trial counsel "did in fact hire" the correct type of expert is mystifying, since counsel unreasonably *failed to have that expert actually evaluate Hall.* ROA XXX, XXX. Hall proffered expert opinion that counsels' failure to follow through and actually obtain the necessary evaluation fell below the prevailing standard of practice in 1995. ROA XXX (Ware "performed deficiently in regard to Dr. Price" when he "failed to maintain appropriately regular and substantial contact" with Price; had Ware done so, he "would have learned [that]

for whatever reason, Dr. Price had not moved ahead on the work counsel were relying on him to perform," and secured the assistance of "another appropriately qualified expert who *had* actually evaluated Mr. Hall"). The District Court's view that counsel provides effective assistance simply by "hiring" an expert, without overseeing the expert's performance thereafter, is insupportable. Id. (counsel have a duty to "monitor the performance of their experts").[70]

Once again, the District Court failed to assess trial counsels' performance in terms of the prevailing standard of practice – which required counsel to complete a comprehensive social history investigation *before making any* decisions about what experts, or what kind of experts, to seek. *See* ROA XXX, XXX, XXX; *see also, e.g.,* ABA Guidelines, 31 HOFSTRA L. REV. at 1023 (thorough investigation must precede choice of experts). Given that fact, counsels' decision to seek funds for a psychiatrist was unreasonable because counsel at that time had no way to exercise informed judgment about what kind of expert they needed (*e.g.*, a forensic social worker as opposed to a psychiatrist).[71]

The District Court apparently concluded that defense counsel would have had

---

[70] Trial counsels' decision to retain a neuropsychologist moots the Government's argument in the court below that nothing would have alerted reasonable counsel to the need for such an evaluation. In any event, the proof to the contrary is overwhelming. *See* ROA XXX\-XXX.

[71] It appears counsel wanted a psychiatrist in part because they believed that a psychiatrist could conduct the necessary mitigation investigation, but then waited until the eve of trial (September 23) to have their psychiatrist Dr. Clayton actually begin work on the case by interviewing Hall. Both aspects of this approach (choosing an expert without appropriate qualifications and waiting until the last minute to attempt to investigate) fell below the prevailing standard of practice.

Dr. Clayton "testify generally about the effect [Hall's] upbringing had on his behavior," but for its ruling that presenting such testimony would trigger an examination of Hall by a government expert. *See* ROA XXX. That conclusion, first, is not supported by anything in trial counsels' affidavits.[72] Second, reasonably effective capital defense counsel in 1995 would have realized that they did not face such a Hobson's choice (*i.e.*, no expert testimony at all versus expert testimony only at the price of letting the Government's experts examine Hall). An expert could have explained in general terms the impact domestic violence has on a young boy's development, the risk factors for adult criminality created by the type of environment in which Hall was raised, and the reasons why one or more of a defendant's siblings may have developed into more successful adults despite being raised in the same environment. See ROA XXX. Such testimony could have been presented on the basis of general information about the dynamics of Hall's family and the community of El Dorado, *without any need for the expert to conduct a formal evaluation of Hall.* ROA XXX. The use of such experts, sometimes called "teaching witnesses," as mitigation witnesses in capital sentencing hearings was well-established nationally by 1994-1995, and counsel thereby could have avoided the perceived problems associated with Dr. Clayton's testimony while providing indispensable mitigating context for the facts

---

[72] Moreover, Dr. Clayton's post-trial proffer shows that her testimony would have focused on Hall's remorse and his lack of future dangerousness, rather than his background. Contrary to the District Court's characterization, Dr. Clayton's proposed testimony was hardly "the [same] type of evidence," ROA XXX as Hall presented in the present proceeding from Jill Miller, M.S.S.W.

of Hall's life history. Reasonably competent counsel would have at least explored such an option. Hall's trial counsel failed to do so.

In short, trial counsel selected Dr. Clayton to provide a service (developing mitigating evidence) with respect to which she was untrained and inexperienced. They then had Dr. Clayton interview Hall without the benefit of any meaningful background information about him.[73] They then failed to recognize, once the Court effectively ruled they could not call Dr. Clayton to testify without exposing Hall to an examination by Government experts, that they had alternatives – other than simply abandoning any hope of presenting expert testimony—that would have helped the jury appreciate the significance of important features of Hall's background and development. This is not a story of "strategic" judgment, but of counsels' uninformed and haphazard reaction to their own failure to follow prevailing standards of practice.

Similarly, the statement that "inexhaustible" funds were not available to pay for additional expert assistance, ROA XXX, misses the point. Trial counsel would not have needed "inexhaustible funds" if they had approached preparing for the sentencing phase according to prevailing standards of practice, which required counsel to investigate first and choose experts later. Had counsel followed prevailing standards from the outset, it is likely they would never have sought funds for a

---

[73] Although Tena Francis attempted to provide Dr. Clayton with the information she was developing about Hall's background, as a practical matter investigation had barely begun when Dr. Clayton interviewed Hall on September 23 (eight days after Francis' first met with Ware). In addition, although Francis repeatedly pressed Ware to have Dr. Clayton interview other members of Hall's family, counsel failed to arrange such an opportunity until two days before the beginning of the punishment phase.

psychiatrist, which moots the District Court's speculative budgetary concerns.[74]

Reasonable jurists could also dispute the District Court's finding of "no prejudice." First, the District Court places unwarranted weight on the absence of evidence that Hall has a "mental disorder" or is "mentally retarded." ROA XXX. Courts have widely recognized the mitigating significance of precisely the type of neuropsychological impairment that Hall suffers. *See, e.g.*, Collier v. Turpin, 177 F.3d 1184, 1196 (11th Cir. 1999) (counsel ineffective for not presenting expert testimony about defendant's "diffuse organic brain damage."); People v. Ruiz, 686 N.E.2d 574, 580 (Ill. 1997) (counsel ineffective for not presenting expert evidence that defendant "had cognitive dysfunction, dysfunction in the left central hemisphere of the brain, diffuse misfunction of the frontal lobe and several other problems 'peppered throughout the brain.'"); *cf.* ABA Guidelines, 31 HOFSTRA L. REV. 1061 ("neurology and psychology ... often have important implications for understanding clients' behavior").

The District Court unfairly minimized the significance of this evidence, conceding only that Hall "has a lesser ability to exercise judgment and to anticipate the consequences of his actions and would ... benefit from supervision." ROA XXX. Reasonable jurists, however, could regard it as a key part of a fully developed case in mitigation, which cumulatively could have persuaded a reasonable juror that a life

---

[74] Strickland in any event precludes this Court from relying on the District Court's speculation that it would have denied appropriately supported requests for reasonably necessary funds. *See supra.*

sentence was appropriate. The District Court treated Hall's impairment as immaterial because it does not rise to the level of a condition that would exempt him from liability or punishment altogether, like certain "mental disorder[s]" or "mental retardation." ROA XXX. Reasonable jurists, however, could find that Hall's impairment *diminishes his moral culpability* because it makes him less responsible for his actions than an adult with a normally functioning brain. *See, e.g.,* Bigby v. Dretke, 402 F.3d 551, 571 (5th Cir. 2005), (defendant's impairment can affect "the jury's perception of [his] moral responsibility for his crimes," particularly if his condition "ma[kes] it difficult for him to avoid criminal behavior"). In combination with the wealth of other mitigating evidence about Hall's background and character that trial counsel never developed or presented, the evidence of his neuropsychological impairment is likely to have produced a different verdict at punishment.[75]

*A COA should issue on Hall's ineffective assistance claim.* Overall, the District Court's analysis of Hall's claim that trial counsel were ineffective is subject to debate among reasonable jurists because the District Court repeatedly credited counsels' version of factual matters that remain hotly disputed, that have never been

---

[75] Hall also challenged trial counsels' failure to argue for a necessary continuance, deficient *voir dire* and closing arguments at penalty, and failure to elicit mitigating evidence from certain prosecution witnesses. *See* ROA XXX. The District Court's resolution of those issues is flawed by the same pervasive errors that characterize its treatment of the issues already discussed, *i.e.*, a failure to assess what duties the prevailing standard of practice placed on counsel and to measure counsels' performance against that standard, and a failure to conduct a cumulative, rather than piecemeal, assessment of the resulting prejudice. All those other aspects of counsels' deficient performance deserve plenary examination through the granting of a COA on Hall's claim of ineffective assistance of counsel.

subject to adversarial testing and that, often, are flatly contradicted by counsels' own contemporaneous records. Further, the District Court labeled counsels' decisions "strategic" despite a wealth of evidence demonstrating that counsel did not comply with the prevailing standard of practice by laying the necessary groundwork for exercising informed judgment about such decisions. Moreover, the District Court's opinion is pervaded by ruminations about how it would have responded if trial counsel had taken certain actions (*e.g.*, asked for more funds or time to complete the mitigation investigation, responded to the court's request for legal authority regarding allocution, etc.). Such speculation cannot foreclose Hall's claim. Strickland requires this Court to assume that the District Court was open to persuasion on all such questions, not least because that is what the record actually reflects.

Second, the District Court's focus on the aggravated facts of the crime appears to have convinced it that a death sentence was inevitable because the crime was "abhorrent." That focus blinded the District Court to seeing the powerful cumulative case in mitigation trial counsel would have assembled had they complied with prevailing professional norms. Its conclusion of "no prejudice" erroneously rests on a piecemeal, rather than a cumulative, assessment of the likely effect of counsels' errors and omissions. Moreover, the District Court ignored the fact that the Supreme Court has found Strickland prejudice from counsels' failure to present mitigating evidence even in cases involving highly aggravated murders and highly dangerous

88

defendants. *See, e.g.,* <u>Williams</u>. The District Court's "no prejudice" holding ignores

what is now a settled recognition that mitigation can persuade at least one juror not

to impose death even in the "worst" cases.[76] The District Court itself acknowledges

that the length of penalty-phase jury deliberations was significant, ROA XXX,

showing that the prosecution did not have an open-and-shut case for death even given

the weak case in mitigation trial counsel actually presented. Finally, the District

Court's "no prejudice" assessment was unfairly premature because Hall has never

been given a hearing at which to present the fully developed version of his case in

mitigation. For all these reasons, a COA must issue.

**B.** **Reasonable jurists could disagree with the limitations the District Court imposed on Hall's development of relevant facts with respect to his claims of extraneous influence on the jury (Claims III-V)**

---

[76] *See, e.g.,* Gates, "Laurel Man Gets Life In Prison In Federal Death Penalty Case," (Jackson, MS) CLARION LEDGER, February 11, 2005 (federal capital defendant sentenced to life imprisonment for his role in double homicide in which victims' bodies were burned and their hands cut off to avoid identification of remains; defendant "had been a good person and family man before his 17-year addiction to crack cocaine"); Libow, "Killer Spared Death Penalty," HARTFORD COURANT, July 7, 2004 (hired hitman given life sentence in federal capital prosecution for contract killing of rival drug dealer; defendant was "a model prisoner and [had] forged a positive relationship with his son"); Casale, "Jury Spares Simmons," (Harrisonburg, VA) DAILY NEWS – RECORD, February 17, 2005 (federal defendant given life sentence for double murder of two college students; mitigating evidence "focused on ... his good behavior during incarceration")); Touhy, "Tension Thick As Killer Learns His Fate," HARTFORD COURANT, October 27, 2004 (federal capital defendant sentenced to life; although jury rejected proposed mitigating factors related to defendant's mental condition, "several jurors ... were clearly moved – at least two to tears – by a videotaped interview of [his] two sons and a stepson, ages 6 to 10"); Associated Press, "Two Killers Avoid Uncommon Penalty: Death," May 5, 2005 (federal capital defendant sentenced to life for his role in murder of security guard during armored truck robbery; evidence described his "troubled childhood," including that his "father was an alcoholic who beat his wife and children"); Gibson, "Death Penalty Rejected In Drug Gang Murders," BALTIMORE SUN, April 29, 2004 (two federal capital defendants sentenced to life for "a string of brutal homicides," including a witness killing; jurors "heard mitigating evidence that spotlighted the cycle of poverty, neglect, violence and addiction that over the last four decades eroded Baltimore's inner city").

Hall seeks a COA on the unreasonable blanket limitations on fact development imposed by the District Court with respect to Claims III-V in Hall's second amended 2255 motion. A summary of the facts underlying Claims III-V follows. *See also* ROA XXX.

After closing argument at punishment, the Court addressed the jurors. Supp. R. (Trial Transcript Vol. 20-A) at 98. It explained that it wanted them to begin deliberations – late on a Friday afternoon – because of concern that they were vulnerable to "too much publicity" and "too many temptations ... to talk to people around you." Id. The jury retired at 4:55 p.m. and deliberated until about 11:15 p.m., when they were discharged for the weekend. Still afraid that the temptation to talk might be overpowering, the Court instructed the jurors to "avoid any media coverage and discussing the case with anyone." R. 34:4. It emphasized that doing so would be "violating the Court's orders and the law." Supp. R. Vol. 20-A: 111-112 (emphases added).

The jury resumed deliberations on Monday, November 6, at 9:00 a.m., and returned the death verdict around 1:30 p.m. Shortly thereafter, probably that evening, Hall's sister Cassandra Ross viewed a television newscast during which a female juror was interviewed. *See* ROA XXX. As Ross recalled it, the juror stated that, during the weekend, the juror had attended a birthday party at which she had put a candle on the birthday cake to honor Lisa Rene's memory, and she and other guests prayed for Lisa

Rene. Id. Ross communicated this information to trial counsel, as documented by a contemporaneous note in counsel's file. *See* ROA XXX. Another note in counsel's file reflects that Hall also advised trial counsel that he had heard the same juror interviewed on the radio after the verdict, to the same effect. ROA XXX. This second note also reflects counsel's notation that he should "get tape of program" and "file motion to interview jurors! [sic]". Id.

Based on this information, Hall alleged that one or more jurors had likely been exposed to extraneous information or influence. *See* ROA XXX. He diligently requested leave to conduct relevant discovery (*e.g.*, authority to subpoena relevant videotapes of post-trial interviews from area television stations, and permission to contact and interview jurors). Every request was denied. *See* ROA XXX, XXX.

In 2001, penalty-phase jury foreperson Jacquelyn Holmes, using an assumed name, initiated an exchange of letters with Hall.[77] In one letter, Holmes stated that she had "met Lisa Rene's mother in the hallway of the courthouse" during trial. ROA XXX. In his second amended §2255 motion, Hall expanded his claim to include these new allegations. ROA XXX.

In response, the District Court ultimately ordered a hearing, at which juror Holmes testified that (1) her claim, in her letter to Hall, that she had met Lisa Rene's mother in the courthouse was false, (2) she was not at a birthday party during the

---

[77] Their correspondence is described at ROA XXX [[2nd amend pet, relevant pages, plus exhibits 44-48]].

weekend break, and (3) no one during deliberations had mentioned anything about praying for Lisa Rene. ROA XXX, XXX. Juror Holmes did confirm that "several" members of the jury had been interviewed for television after the verdict, and that she personally was asked "how [she] felt about … giving the death penalty to someone." ROA XXX. The District Court did not permit any discovery prior to the hearing, nor authorize Hall to contact any jurors, including Holmes. After the hearing, in light of Holmes' admission that she and other jurors had been interviewed for television after the verdict, Hall renewed his request to be allowed to subpoena the local news videotapes of these post-verdict interviews. ROA XXX. The District Court denied the motion. ROA XXX.

The District Court's approach to resolving this claim – conducting a single-witness evidentiary hearing with no discovery and no opportunity for Hall to develop the facts in support of his claim, including evidence that might impeach the one juror who testified – is debatable among reasonable jurists. The District Court recognized that the record as a whole raised a substantial concern that one of the jurors might have been influenced in her deliberations by the act of praying for Lisa Rene and/or talking about the case with other persons unknown during the weekend break, or by another juror's account of such events, and also that juror Holmes might well have had personal contact with Lisa Rene's mother. *See generally* ROA XXX, XXX.

Once the District Court recognized the substantial nature of these allegations,

however, it was obliged to authorize such fact-development procedures as might be necessary to fully resolve the questions raised. *See* Bracy v. Gramley, 520 U.S. 899, 908-909 (1997); Harris v. Nelson, 394 U.S. 286, 298 (1969) (petitioner is "entitled to careful consideration and plenary processing of [his claims,] including full opportunity for presentation of the relevant facts"); Murphy v. Johnson, 205 F.3d 809, 813-814 (5th Cir. 2000) (where specific allegations show "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he [is] entitled to relief, it is the *duty* of the courts to provide the necessary facilities and procedures for an adequate inquiry") (internal quotation marks omitted; citation omitted; emphasis added). The procedure the District Court chose – a single-witness evidentiary hearing, with no discovery before or after the hearing, and no opportunity for Hall to speak with any jurors other than his in-court examination of juror Holmes – was inadequate to that purpose.

The District Court appears to have assumed that Holmes must have been the juror whose interview Hall's sister Ross saw on television and that, as a result, any additional fact development would be futile. Reasonable jurists could dispute that conclusion on several grounds. First, Holmes' own testimony is that "several" jurors were interviewed on television; thus, the juror who claimed to have participated in prayers for Lisa Rene during the weekend (and who was seen making that statement on television by Hall's sister Ross) simply may have been someone else. Second, the

videotape of Holmes' own televised interview may well impeach her testimony at the hearing. Holmes admitted being interviewed on camera and that her interview was aired, and that she was asked how the jurors felt about their death verdict – all facts consistent with her being the juror Hall's sister Ross saw on television. In addition, Holmes admitted that she corresponded with Hall under a false name and made false statements in that correspondence for the purpose of manipulating Hall. These circumstances, taken as a whole, make it at least possible that Holmes was not fully candid in her testimony. That possibility could be confirmed or disproved by the simple step of permitting Hall to subpoena the videotapes from the local television stations.[78] Reasonable jurists could disagree with the District Court's decision to refuse Hall any reasonable fact-development procedure other than a single-witness hearing with no fair opportunity to prepare to meet Holmes' testimony or offer other proof of his claim. Accordingly, COA should be granted on whether the District Court improperly limited the scope of the hearing on this claim, and improperly refused to permit necessary development of the facts through discovery.[79]

---

[78] Because the videotaped interview in question necessarily was broadcast over the airwaves – Hall's sister could not have seen it otherwise – it is not even necessary for the stations to make their "raw footage" available. Instead, Hall seeks only what could have been obtained in 1995 by using a VCR and taping the actual news broadcasts as they aired. Such a subpoena imposes an insignificant burden on the television stations in question.

[79] The District Court's failure to afford reasonable fact-development procedures was also harmful because Hall alleged the same facts (concerning likely extraneous influence on the jury) as part of his claim of ineffective assistance of counsel. *See* ROA XXX, XXX. Hall's attorney expert opined that "reasonably effective counsel would have viewed these [circumstances] as raising a distinct concern that outside influences ... affected the [jury]," id., and that trial counsel "performed deficiently in not including these allegations in Hall's motion for new trial and in not seeking to
(continued...)

**C.** **Reasonable jurists could debate whether the District Court correctly concluded that the Indictment Clause claim under <u>Ring v. Arizona</u> does not apply retroactively**

Hall argued that the grand jury should have made findings necessary to expose him to a death sentence. ROA XXX. The District Court held that any rule requiring such findings would not apply retroactively to Hall, and that the absence of such findings was harmless. Reasonable jurists could dispute both findings.

The District Court concluded that the grand jury necessarily would have authorized a capital prosecution against Hall because the petit jury ultimately found each submitted aggravating circumstance beyond a reasonable doubt. *See* ROA XXX. But the Framers intended the grand jury to serve as an *independent* check on the government, a protection with special importance in capital cases because of broad prosecutorial discretion to seek the death penalty.[80] <u>McCleskey v. Kemp</u>, 481 U.S. 279, 313 (1987). The Supreme Court recognized this fact in <u>Vasquez v. Hillery</u>, 474 U.S. 254, 263 (1986), observing that the grand jury determines not only the existence of probable cause, but whether to charge a greater or lesser offense, one or multiple

---

[79](...continued)
acquire proof of the alleged interview by means of subpoena." <u>Id</u>. Denying Hall the opportunity to subpoena the news videotape in post-conviction proceedings made it impossible for him to substantiate this part of his ineffectiveness claim.

[80] The grand jury, "a constitutional fixture in its own right," "belongs to no branch of [the] Government" and instead "serv[es] as a kind of buffer or referee between the Government and the people." <u>United States v. Williams</u>, 504 U.S. 36, 47 (1992). Unlike petit jurors, grand jurors do not undergo any process designed to "qualify" them *vis-à-vis* their ability to follow the law, but instead speak as the voice of the community with respect to the appropriateness of a given charge on a given set of facts. Given the grand jury's singular status, the question whether that body or the Executive should control the decision to expose a defendant to a potential death sentence merits a COA.

counts, "and perhaps most significant of all, a capital offense or a noncapital offense – all on [the] same facts," and need not "indict in every case where a conviction can be obtained".

Given <u>Vasquez</u>, a COA should issue to address whether the Fifth Amendment requires that grand jurors allege the facts which, if proven, will justify a death sentence, and what should follow in cases where this protection was absent. The grand jury's exercise of its discretion to charge a capital versus a noncapital offense necessarily affects the defendant's "substantial rights," because it determines the degree of punishment to which trial will expose him. Thus, the question whether the failure of the indictment to allege "aggravating factors" is structural error also warrants a COA.[81]

The District Court's conclusion that Hall's claim was barred by non-retroactivity principles under <u>Schriro v. Summerlin</u>, 124 S.Ct. 2519 (2004), a case addressing the *Sixth* Amendment right to trial by jury, is debatable because Hall's claim rests on the *Fifth* Amendment. Before Hall's case became final, the Supreme Court held that the indictment must allege any fact that functions as an element by elevating the available punishment – the rule Hall seeks to have applied here. *See* <u>Jones v. United States</u>, 526 U.S. 227 (1999).

**D.    Reasonable jurists could debate whether the District Court properly**

---

[81] This Court has held that omitting such findings can be harmless. <u>United States v. Robinson</u>, 367 F.3d 278 (5th Cir. 2004). Hall respectfully disagrees and seeks a COA to preserve this issue for further review.

**resolved Hall's claims of prosecutorial misconduct (Claims \*\*\*\*)**

Hall's claims of prosecutorial misconduct (*e.g.*, the Government's presentation of false testimony by Larry Nichols, *see* ROA XXX, its surreptitious violation of Hall's right to counsel, ROA at XXX, and its failure to disclose Nichols' full criminal history, ROA at XXX, are factually supported and not precluded by existing law, and thus meet the COA standard under <u>Miller-El</u> and <u>Barefoot</u>. Because no discovery or evidentiary hearing was permitted on these issues, the factual record is not fully developed. Accordingly, Hall can do no more here than review the allegations and supporting evidence in his second amended petition, and explain why the Government's response does not foreclose relief.

First, Hall alleged that during his testimony at Hall's trial, Nichols made statements that were directly contradicted by his earlier sworn testimony in his own case. ROA XXX. At Hall's trial, Nichols repeatedly denied that "some inmates [at] Mansfield" had shown him how "to help [himself] in the legal system." R. 31:257. In his earlier sworn testimony, Nichols said exactly the opposite – that in trying to get a co-defendant to sign a false affidavit exonerating him, he was following the advice of other prisoners at Mansfield. ROA XXX. In fact, in his earlier testimony Nichols repeated substantially that admission *seven different times*. *See* ROA XXX, XXX, XXX, XXX, XXX, XXX, XXX. At Hall's trial, Nichols also repeatedly denied having bought drugs with the proceeds from the robberies in which he participated.

R. 31:252. In Dallas, Nichols had testified that *"after every robbery,"* he did just that.

ROA XXX-XXX. Hall alleged that the prosecutors in his trial had either actual or constructive knowledge that Nichols' testimony on these points was false.[82]

Hall further alleged that the Government did not disclose the full extent of Nichols' prior criminal activity. Testifying in his own case, Nichols admitted to drug trafficking; stealing personal watercraft; illegally acquiring weapons; transporting stolen goods, including vehicles, across state lines; fencing stolen goods; check fraud; armed robbery and bank robbery. Nichols was debriefed by Government agents and obliged to advise them of all prior criminal activity. There is no record the Government ever disclosed what Nichols revealed in that debriefing, although any incidents were relevant to Nichols' bias and motive even if no convictions resulted. *See generally* ROA XXX-XXX.[83]

The FBI-302 recounting the February 28, 1995 conversation between Nichols and FBI agent Grovner refers to Nichols as "LARRY DONNEL NICHOLS (protect)."

---

[82] The record before the District Court thus showed direct conflicts between Nichols' testimony in his own trial and his testimony in Hall's. Nichols' cavalier attitude toward the witness' oath, standing alone, justified granting at least some discovery concerning, *e.g.,* the full nature and extent of the criminal conduct Nichols admitted to the Government in debriefing, whether Nichols failed the polygraph his plea agreement obliged him to take, and whether Nichols was ever polygraphed specifically regarding his allegations against Hall. A blanket denial of discovery was plainly inappropriate where Nichols indisputably changed his story under oath from one trial to the next.

[83] Hall also alleged that when Nichols' co-defendant Miller attempted to cooperate in hopes of reducing his own sentence, and was debriefed by federal agents, he revealed additional impeaching information about Nichols (including additional criminal activity) which the Government concealed from Hall. See ROA XXX.

ROA XXX. In the District Court, Hall alleged that the reference to "(protect)" indicated Nichols was *already* in protective custody before he became an informant against Hall, contrary to the impression Nichols conveyed in his testimony, and that the Government never disclosed this fact or its implications.[84] *See* ROA XXX.

Reasonable jurists could conclude that the Government's failure to correct Nichols' false testimony at the penalty phase of Hall's trial, and the materially false impression Nichols' testimony left with the jury, violated due process. Mooney v. Holohan, 294 U.S. 103 (1935); Napue v. Illinois, 360 U.S. at 264 (1959); Alcorta v. Texas, 355 U.S. 28 (1957); *see also, e.g.*, Hayes v. Brown, 399 F.3d 972, 978-981 (9th Cir. 2005) (*en banc*) (prosecution violates due process when, although not soliciting false evidence, it permits false testimony to go uncorrected once it appears).[85] Further, reasonable jurists could conclude that Nichols' false denials of impeaching facts were material, because the substance of Nichols' claims about Hall probably persuaded the jury to impose death. United States v. Agurs, 427 U.S. 97, 103 (1976); *see also* ROA

---

[84] *See, e.g.*, R. 31: 236-237 (Nichols says he was placed in protective custody after meeting with prosecutors on March 6, 1995). Notably, in answering Hall's 2255 Motion, the Government conspicuously *did not dispute* this inference (that Nichols was already in protective custody before he testified he was), but simply argued that the inference was "insufficient" to prove Hall's constitutional claim. ROA XXX. Denied discovery, however, Hall could not bring fully to light the facts surrounding Nichols' relationship with the Government.

[85] This Court has indicated the Government need not correct false testimony elicited by defense counsel on cross-examination. United States v. O'Keefe, 128 F.3d 885, 894 (5th Cir. 1997). Any such holding conflicts with the holdings of other Circuits, such as United States v. Bantowski, 865 F.2d 129, 133-134 (7th Cir. 1989), and Hayes, *supra*, as well as with the Supreme Court's decision in Giglio v. United States, 405 U.S. 150, 151-52 (1972) (finding constitutional error where perjury was elicited on cross-examination by defense counsel). At a minimum, because reasonable jurists could disagree about the appropriate legal test, a COA should issue.

XXX (Government concedes "Nichols was clearly an important witness" at punishment).

Hall also alleged that Nichols, directed or encouraged by Government agents, elicited information from Hall outside the presence of counsel. ROA XXX. *See, e.g.,* Massiah v. United States, 377 U.S. 201 (1964); Maine v. Moulton, 474 U.S. 159, 176 (1985). Discovery or a hearing could have resolved whether Nichols, *e.g.,* had contact with the Government between his original 2/28/95 conversation with FBI agent Grovner and his subsequent debriefing on 3/5/95. The Government offered no explanation for the week-long delay between the original meeting and the subsequent debriefing, but simply denied having communicated in any way to Nichols that he should obtain additional information from Hall. ROA XXX, XXX.

In short, Hall presented evidence that Nichols lied in either his own trial or Hall's, and identified circumstances giving reason to believe that the true extent of Nichols' criminal history was never disclosed and that Nichols was encouraged to elicit information from Hall in jail between 2/28/95 and 3/5/95. The District Court discounted the significance of Nichols' false testimony and refused even limited discovery that could have corroborated the inferences about Nichols' prior crimes and active interrogation of Hall. Because reasonable jurists could dispute the District Court's resolution of these issues, a COA should issue.

> **E.** **Reasonable jurists could disagree that the District Court properly disposed of Hall's claim that the federal death penalty is**

**administered in a racially discriminatory fashion (Claim \*\*)**

In the 2255 Motion, Hall challenged the administration of the federal death penalty as racially discriminatory.[86] In support, he offered statistics maintained by the Federal Death Penalty Resource Counsel (FDPRC) as a part of its mandate to facilitate the effective defense of federal capital cases. These statistics demonstrate that the authorization process by which the Department of Justice selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the defendant's race, in violation of equal protection and the Eighth Amendment – showing that, despite the fact that whites are arrested for homicide in roughly the same numbers as blacks, they occupy only twenty percent of those condemned to die under federal law, while blacks account for sixty percent of federal death row. *See* ROA XXX.

In denying Hall's request for discovery on this issue, the District Court conceded that Hall's evidence arguably tended to prove that "similarly situated white federal defendants have not been subject to the death penalty while black defendants

---

[86] Prior to trial, Mr. Hall had filed a "Motion to Dismiss the Government's Request for the Death Penalty Because of Racial Discrimination in Capital Charging by the Government and Request for Discovery of Information Pertaining to the Government's Capital Charging for Purposes of an Evidentiary Hearing." Docket No. 187; R. 1:225-30. The Government opposed the motion, arguing in part that "no one has actually been prosecuted under the newly enacted Federal Death Penalty Act. Moreover, the number of federal prosecutions, including the drug-related death penalty cases, is so small as to make any such argument speculative." R. 4:831. This Court denied the motion on September 7, 1995, "for the reasons urged in the government's response to the motion." R. 4:932. Evidence unavailable at the time of trial now demonstrates the stark racial disparities at work in the federal death penalty.

have." ROA XXX. However, it denied discovery because it found Hall had presented

"no evidence, direct or circumstantial," of the other element of his equal protection

claim, *i.e.,* that prosecutors acted with "discriminatory intent when [they] have asked

[or obtained] for permission to seek the death penalty against African-American

individuals ...." <u>Id</u>.

Hall later unsuccessfully renewed his request for discovery, proffering

additional data regarding all potential federal capital prosecutions in the four federal

Districts in Texas, which showed, *inter alia*, that the defendants in all but one of the

federal capital cases that had proceeded to trial in Texas prior to April 2003 were

African-American or Hispanic. *See* ROA XXX [[Appendix A to second motion for

discovery]]; *see also* ROA XXX [[Kevin McNally affidavit submitted as

Supplemental Appendix to Second Motion for Discovery, filed appx May 7, 2003]].

All seven persons actually sentenced to death in such trials were likewise African-

American or Hispanic (six were African-American). In 2000, African-Americans

made up 11.5% of Texas' population.[87] This evidence strengthened the inference of

discriminatory intent by showing that "similarly situated defendants of a different race

[than Hall] were not so prosecuted."[88] *See* ROA XXX; *see also* ROA XXX.

The current statistics regarding the application of the federal death penalty

---

[87] As of this date, ten people have been sentenced to death by federal juries in Texas; eight African Americans, one Hispanic and one Caucasian. <u>See</u> *Federal Death Row Prisoners* at http://www.deathpenaltyinfo.org/article.php?scid=29&did=193.

[88] This is how the Government described Hall's burden. *See* ROA XXX.

constitute new evidence that warrants revisiting this claim. It is no longer possible to dismiss this claim on the basis that the "small" number of cases renders statistical disparities inconsequential. Although a racially disproportionate pattern of capital charging, standing alone, is insufficient to demonstrate purposeful discrimination on the basis of race, <u>McCleskey v. Kemp</u>, 482 U.S. 920 (1987), the numbers here warranted discovery concerning the Government's authorization process and plea bargaining decisions. *See* <u>East v. Scott</u>, 55 F.3d 996, 1001-02 (5th Cir. 1995) (district court must order discovery in habeas proceeding if such discovery is essential to the full development and fair consideration of the material facts of the petitioner's claims for relief). Moreover, at least with respect to the authorization process, this case is materially distinguishable from <u>McCleskey</u>. There, the analysis of prosecutorial decisions to seek the death penalty surveyed the decisions not of a single governmental body, as is the case here, but of the multiple prosecuting authorities in the State of Georgia. This distinction alone renders the numbers revealed by Hall's proffered statistics all the more probative of discrimination. On this basis, reasonable jurists could conclude that the District Court erred in denying this claim without providing Hall the opportunity to develop and prove his case. A COA accordingly should issue.

**F.     The death sentence rests on materially inaccurate information**

Hall alleged in the District Court that his death sentence violated the Eighth

Amendment because it was based on materially false or inaccurate information. ROA XXX; *see, e.g.,* <u>Townsend v. Burke</u>, 334 U.S. 736 (1948) (due process violated where "materially untrue" allegations form any part of the basis for the sentence); <u>United States v. Tucker</u>, 404 U.S. 443 (1972) (same); <u>Roussell v. Jeane</u>, 842 F.2d 1512, 1524 (5th Cir. 1988) (same). Hall's death sentence rests on, *inter alia*, false testimony from Larry Nichols and mistaken assumptions about Hall's own background (*e.g.*, that he was not himself a victim of childhood physical abuse or material deprivation). *See supra*. Reasonable jurists could dispute the District Court's rejection of this claim, because it wrongly concluded Nichols' falsehoods were immaterial and failed to address the Eighth Amendment implications of trial counsels' materially inaccurate and grossly undeveloped mitigation presentation. Thus, a COA should issue.

## V. Reasonable jurists could debate whether the trial judge could reasonably be expected to have substantial difficulty in viewing Hall's claims impartially on remand.

A COA should issue to address whether this case should be reassigned on remand for further proceedings.[89] This Circuit employs two tests to determine whether to assign a different judge on remand. <u>Benchmark Electronics, Inc. v. J.M. Huber Corp.</u> 343 F.3d 719, 731 (5th Cir. 2003) (citing <u>In re DaimlerChrysler Corp.</u>, 294 F.3d 697, 700-01 (5th Cir. 2002)). The first weighs three factors: (1) whether the

---

[89] In our view, this question – whether this Court should direct that a different judge be assigned on remand – should not require a COA. It implicates neither Hall's constitutional rights at trial nor the course of the § 2255 proceedings below. We include it here only to foreclose any claim by the Government that Hall has waived the argument. If the Court concurs that possible reassignment becomes relevant only once an appeal on the merits has been authorized, it should defer resolution of this issue.

original judge would reasonably be expected to have substantial difficulty putting aside previously expressed views or findings determined to be erroneous, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. The second test permits reassignment "when the facts might reasonably cause an objective observer to question [the judge's] impartiality." Daimler Chrysler, 294 F.3d at 701 (citation and internal quotation marks omitted).

Under either test, a reasonable case can be made for reassignment here. The District Court plainly will face "substantial difficulty putting aside [its] previously expressed views or findings" regarding, *e.g.*, trial counsels' performance and the absence of any conceivable prejudice to Hall from counsels' mistakes. As Hall has detailed elsewhere in this Application, the District Court credited factual claims by trial counsel even when those claims were patently incredible in light of the record as a whole. The court below strongly expressed the view that counsels' every act and omission was "strategic" and deliberate – a conclusion it felt was so self-evident that *no presentation of evidence* was necessary to confirm it. "The appearance of justice" will be gravely undermined if the same judge on remand must address Hall's challenges to counsels' deficient performance – a question the District Court has effectively pre-judged, such that "the facts might reasonably cause an objective

observer to question his impartiality."

In much the same fashion, the District Court's fixed views about the case disable it from assessing the prejudice that flowed from counsels' deficient performance. The trial court has convinced itself that a death sentence was inevitable, given the aggravated facts of the crime. That focus blinded the District Court to Hall's powerful cumulative case in mitigation. An objective observer could reasonably question the District Court's impartiality, given that the trial judge has committed himself so strongly to this view of the evidence. Indeed, the same inference arises from the District Court's refusal to grant a COA on Hall's claim of ineffective assistance of counsel despite the extensive evidence supporting it. That refusal communicates to the public that the District Court has rejected even the *possibility* that mitigating evidence, competently developed and presented, could have persuaded a single juror that life imprisonment was the appropriate sentence.[90]

For all these reasons, reasonable jurists could dispute whether this Court should exercise its authority to reassign this case on remand, and a COA should issue.

## CONCLUSION

For the foregoing reasons, Orlando Hall respectfully requests that a COA issue on all the claims addressed above.

---

[90] Indeed, the District Court's wholesale denial of any meaningful opportunity for Hall to develop supporting evidence – little funding, no discovery whatsoever, and no evidentiary hearing on the bulk of his claims for relief – likewise suggests the District Court may resist taking a fresh view of the case on remand.

Respectfully submitted,

_____

ROBERT C. OWEN
Texas Bar No. 15371950
Owen & Rountree, LLP
510 S. Congress Ave., Ste. 308
Austin, Texas 78704
Tel. 512-804-2661
Fax 512-804-2685

MARCIA A. WIDDER
Louisiana Bar No. 23367
636 Baronne St.
New Orleans, LA 70113
Tel. 504-558-9867
Fax. 504-558-0378

Counsel for Orlando Hall

107

# CERTIFICATE OF SERVICE

This certifies that a true and correct copy of the foregoing motion has been served on counsel for the Government by placing the same into the United States Mail, first-class postage prepaid, addressed to:

> AUSA Delonia Watson
> Office of the U.S. Attorney
> 801 Cherry Street, Suite 1700
> Fort Worth, TX 76102

this _____ day of June, 2005

_____
Marcia A. Widder

## CERTIFICATE OF SERVICE

This certifies that a true and correct copy of the foregoing motion has been

served on counsel for the Government by placing the same into the United States

Mail, first-class postage prepaid, addressed to:

> AUSA Delonia Watson
> Office of the U.S. Attorney
> 801 Cherry Street, Suite 1700
> Fort Worth, TX  76102

this 10th day of June, 2005

Marcia A. Widder