**04-70050**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

NO. 04-70050

ORLANDO CORDIA HALL,
          Defendant-Appellant

VERSUS

UNITED STATES OF AMERICA,
          Plaintiff-Appellee,

U.S. COURT OF APPEALS
**FILED**

JUN 1 7 2005

CHARLES R. FULBRUGE III
CLERK

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

RECORD EXCEPTS FILED
IN CONNECTION WITH APPLICATION
FOR CERTIFICATE OF APPEALABILITY

ROBERT C. OWEN
Texas Bar No. 15371950
Owen & Rountree, LLP
P.O. Box 40428
Austin, Texas 78704
Tel. 512-804-2661
Fax 512-804-2685

MARCIA A. WIDDER
Louisiana Bar No. 23367
Capital Appeals Project
636 Baronne Street
New Orleans, LA 70113
Tel. 504-529-5955
Fax. 504-558-0378

ATTORNEYS FOR DEFENDANT-APPELLANT,
ORLANDO CORDIA HALL

# TABLE OF CONTENTS

| Tab No. | Description | Page |
|---------|-------------|------|
| 1 | Docket Entries | 1 |
| 2 | Memorandum Opinion and Order Denying Amended Motion to Vacate Conviction and Sentence | 67 |
| 3 | Final Judgment | 156 |
| 4 | Order Denying Motion to Alter and Amend Judgment | 157 |
| 5 | Notice of Appeal | 158 |
| 6 | Declaration of Michael E. Tigar, dated May 11, 2000 (Exhibit 12 to Second Amended 2255 Motion) | 160 |
| 7 | Declaration of Jill Miller, dated June 12, 2002 (Exhibit 14 to Second Amended 2255 Motion) | 183 |
| 8 | Declaration of Michael E. Tigar, dated February 26, 2003 (Appendix to Reply Brief, at 34-53) | 209 |
| 9 | Declaration of Jill Miller, dated February 18, 2003 (Appendix to Reply Brief, at 22-33) | 229 |

1

*Criminal Case Papers*
*2255 Exhibits*

APPEAL, CLOSED, DPALL

**U.S. District Court**
**Northern District of Texas (Fort Worth)**
**CRIMINAL DOCKET FOR CASE #: 4:94-cr-00121-2**

Case title: USA v. Holloway
Magistrate judge case number:  4:94-mj-00165

Date Filed: 11/04/1994

---

Assigned to: Judge Terry R Means

### Defendant

**Orlando Cordia Hall** (2)
*TERMINATED: 02/21/1996*
*also known as*
Lan

represented by **Marcia A Widder**
Law Office of Marcia A Widder
636 Baronne Street
New Orleans, LA 70113
504/558-9867
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Robert C Owen**
Owen & Rountree
PO Box 40428
Austin, TX 78704
512/804-2661
Fax: 512/804-2685 FAX
Email: robowen@earthlink.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Jeff A Kearney**
Kearney Law Firm
505 Main St
Suite 220
Fort Worth, TX 76102
817/336-5600
Fax: 817/336-5610 FAX
Email: jkearney@kearneylawfirm.com
*TERMINATED: 03/07/1996*
*Designation: CJA Appointment*

**Mark G Daniel**
Evans Gandy Daniel & Moore

66

(1)

3/4/2005 12:13 PM

115 W Second St
Suite 202
Fort Worth, TX 76102
817/332-3822
Fax: 817/332-2763 FAX
Email: markdaniel@egdmlaw.com
*TERMINATED: 03/09/1995*
*Designation: CJA Appointment*

**Michael P Heiskell**
Johnson Vaughn & Heiskell
600 Texas St
2nd Floor
Fort Worth, TX 76102
817/877-5321
Fax: 817/870-1861 FAX
Email:
mheiskell@johnson-vaughn-heiskell.com

*TERMINATED: 03/09/1995*
*Designation: CJA Appointment*

**Michael Logan Ware**
Law Office of Michael Logan Ware
111 N Houston
Suite 210
Fort Worth, TX 76102
817/338-4100
Fax: 817/332-2416 FAX
Email: michaelloganware@sbcglobal.net
*TERMINATED: 03/07/1996*
*Designation: CJA Appointment*

**R Neal Walker**
210 Baronne Street
Suite 1343
New Orleans, LA 70112
504/522-0578
*TERMINATED: 02/21/1996*
*Designation: Retained*

**Pending Counts**                          **Disposition**

None

**Highest Offense Level (Opening)**

None

$2$

## Terminated Counts

## Disposition

Dft found guilty after jury verdict on counts 1,2,3 and 6 of six count SS Indi...Judgment of Court that dft is sentenced to death on Count 1...dft committed to BOP for term of Life on Count 2, 60 months on count 3 and shall run concurrently with life sentence imposed on count 2, and dft is to serve 60 months on count 6 which shall run consecutively to sentences imposed on counts 2 and 3...If dft is ever released from prison, he shall be on supervised release for term of 5 yrs on counts 2 and 3 years on counts 3 and 6 with 7 Special conditions...No fine/restitution and MSA for counts 1,2,3 and 6

18:1201(a)(1),(c)
KIDNAPPING-CONSPIRACY TO
COMMIT KIDNAPPING and
AID/ABET
(1)

18:1201(a)(1),(c)
KIDNAPPING-CONSPIRACY TO
COMMIT KIDNAPPING and
AID/ABET
(2)

Dft found guilty after jury verdict on counts 1,2,3 and 6 of six count SS Indi...Judgment of Court that dft is sentenced to death on Count 1...dft committed to BOP for term of Life on Count 2, 60 months on count 3 and shall run concurrently with life sentence imposed on count 2, and dft is to serve 60 months on count 6 which shall run consecutively to sentences imposed on counts 2 and 3...If dft is ever released from prison, he shall be on supervised release for term of 5 yrs on counts 2 and 3 years on counts 3 and 6 with 7 Special conditions...No fine/restitution and MSA for counts 1,2,3 and 6

18:1952 INTERSTATE TRAVEL IN
AID OF A RACKETEERING
ENTERPRISE
(3)

18:1952 INTERSTATE TRAVEL IN
AID OF A RACKETEERING
ENTERPRISE
(4)

Dismissed per government

18:924(c) CARRYING A FIREARM
DURING AND IN RELATION TO A
CRIME OF VIOLENCE

Dft found guilty after jury verdict on counts 1,2,3 and 6 of six count SS Indi...Judgment of Court that dft is

(6)

sentenced to death on Count 1...dft committed to BOP for term of Life on Count 2, 60 months on count 3 and shall run concurrently with life sentence imposed on count 2, and dft is to serve 60 months on count 6 which shall run consecutively to sentences imposed on counts 2 and 3...If dft is ever released from prison, he shall be on supervised release for term of 5 yrs on counts 2 and 3 y ears on counts 3 and 6 with 7 Special conditions...No fine/restitution and MSA for counts 1,2,3 and 6

## Highest Offense Level (Terminated)

Felony

| Complaints | Disposition |
| --- | --- |
| None | |

## Plaintiff

USA                    represented by **Delonia A Watson**
US Attorney's Office
Burnett Plaza
801 Cherry St
Suite 1700
Fort Worth, TX 76102-6882
817/252-5249
Fax: 817/978-6381 FAX
Email: delonia.watson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Paul D Macaluso**
US Attorney's Office
Department of Justice
1100 Commerce St
3rd Floor
Dallas, TX 75242-1699
214/659-8647
Fax: 214/767-4104 FAX
Email: paul.macaluso@usdoj.gov
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Richard B Roper, III**
US Attorney's Office
Burnett Plaza
801 Cherry St
Suite 1700
Fort Worth, TX 76102-6882
817/252-5225
Fax: 817/978-6381 FAX
Email: richard.roper@usdoj.gov
*LEAD ATTORNEY*
*Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/26/1994 | 1 | COMPLAINT as to Bruce Carneil Webster, Orlando Cordia Hall, Steven Christopher Beckley, Demetrius Kenyon Hall (4pgs) (wrb) (Entered: 11/25/1994) |
| 10/26/1994 | 4 | ARREST WARRANT issued as to Orlando Cordia Hall (wrb) (Entered: 11/25/1994) |
| 10/26/1994 | 8 | Govt MOTION as to Orlando Cordia Hall for writ of habeas corpus Ad Prosequendum (1pg) (wrb) (Entered: 11/25/1994) |
| 10/26/1994 | 12 | ORDER as to Orlando Cordia Hall granting [8-1] motion for writ of habeas corpus Ad Prosequendum as to Orlando Cordia Hall (2)...directing S/A FBI to have deft before court on 10-28-94 at 9am. cc: all Page(s): 2 ( Signed by Magistrate Judge Alex H. McGlinchey ) (wrb) (Entered: 11/25/1994) |
| 10/27/1994 | 16 | WRIT of Habeas Corpus ad Prosequendum issued as to Orlando Cordia Hall for 10-28-94. cmrr Z096211359 (wrb) (Entered: 11/25/1994) |
| 10/28/1994 | 19 | CJA 23 FINANCIAL AFFIDAVIT by Orlando Cordia Hall (wrb) (Entered: 11/25/1994) |
| 10/28/1994 | 22 | ORDER FIXING DATES as to Orlando Cordia Hall cc: all Page(s): 1 ( Signed by Magistrate Judge Alex H. McGlinchey ) (wrb) (Entered: 11/25/1994) |
| 10/28/1994 | 26 | Govt's MOTION as to Orlando Cordia Hall for pretrial detention (3pgs) (wrb) (Entered: 11/25/1994) |
| 10/28/1994 | 30 | ORDER OF TEMPORARY DETENTION PENDING HEARING PURSUANT TO BAIL REFORM ACT as to Orlando Cordia Hall granting [26-1] motion for pretrial detention as to Orlando Cordia Hall (2) cc: all Page(s): 1 ( Signed by Magistrate Judge Alex H. McGlinchey (wrb) (Entered: 11/25/1994) |

| | | | |
|---|---|---|---|
| 10/28/1994 | 34 | Minute entry as to Orlando Cordia Hall : ; Court Reporter: Tape 4492; INITIAL APPEARANCE..AUSA Roper present...deft present w/o cnsl...deft requests court appt cnsl and is sworn as to Fin Aff...court will apptd Mark Daniel - deft surrendered on state charges on 9-30-94 but produced on WOHCAP from Sheriff, Tarrant Co to USM on 10-28-94; govt's motion for detention entered - PH & DH set for 10-31-94 at 1pm; Order Fixing Dates entered - Order of Temp Detention entered - deft remanded to custody of S/A of FBI for delivery to USM. (wrb) (Entered: 11/25/1994) | |
| 10/28/1994 | | Initial appearance as to Orlando Cordia Hall held ; Preliminary Examination set for 1:00 10/31/94 for Orlando Cordia Hall ; Detention Hearing set for 1:00 10/31/94 for Orlando Cordia Hall (Defendant informed of rights.) (wrb) (Entered: 11/25/1994) | |
| 10/28/1994 | | Detention hearing as to Orlando Cordia Hall set for 1:00 10/31/94 for Orlando Cordia Hall (wrb) (Entered: 11/25/1994) | |
| 10/28/1994 | | Preliminary Examination as to Orlando Cordia Hall set for 1:00 10/31/94 for Orlando Cordia Hall (wrb) (Entered: 11/25/1994) | |
| 10/28/1994 | 38 | CJA 30-DEATH PENALTY APPOINTMENT VOUCHER as to Orlando Cordia Hall : Appointment of Attorney Mark Gant Daniel Voucher # D03413 ; Attorney notified and Appointment Packet mailed. cc: all Page(s): 1 ( Signed by Magistrate Judge Alex H. McGlinchey ) (wrb) (Entered: 11/25/1994) | |
| 10/31/1994 | 42 | Minute entry as to Orlando Cordia Hall : ; Court Reporter: Tape 4493; PRELIM AND DETN HRG; AUSA Roper and Appt atty Mark Daniel present...hearing contd. on 11-2-94 at 1pm...deft remanded to custody. (wrb) (Entered: 11/25/1994) | |
| 10/31/1994 | | APPEARANCE Through Counsel by Orlando Cordia Hall (wrb) (Entered: 11/25/1994) | |
| 10/31/1994 | | Preliminary Examination as to Orlando Cordia Hall reset for 1:00 11/2/94 for Orlando Cordia Hall (wrb) (Entered: 11/25/1994) | |
| 10/31/1994 | | Detention hearing as to Orlando Cordia Hall reset for 1:00 11/2/94 for Orlando Cordia Hall (wrb) (Entered: 11/25/1994) | |
| 10/31/1994 | | Received greenn card addressed to Sheriff, Tarrant Co, cmrr Z096211359; signed by agent on 10-29-94 as to Orlando Cordia Hall (wrb) (Entered: 11/28/1994) | |
| 11/02/1994 | 45 | ORDER as to Orlando Cordia Hall granting [44-1] motion to quash Subpoena Issued to S/A Garrett Floyd as to Orlando Cordia Hall (2)...the subpoena issued to Floyd, dated 11/1/94 is quashed and he is under no duty to comply with the subpoena cc: all Page(s): 1 ( Signed by Magistrate Judge Alex H. McGlinchey ) (wrb) (Entered: 11/28/1994) | |
| 11/02/1994 | 46 | Government's Exhibit list as to Bruce Carneil Webster, Orlando Cordia Hall, Steven Christopher Beckley, Demetrius Kenyon Hall (2pgs) (wrb) (Entered: | |

 

| | | | |
|---|---|---|---|
| | | | 11/28/1994) |
| 11/02/1994 | | 49 | Minute entry as to Orlando Cordia Hall : ; Court Reporter: Debbie Roberts/Tape 4493; PREL AND DETN HRG...AUSA Roper and Apptd-atty Daniel present...Govt's motion to quash GRANTED...court requests that FBI Floyd be present for PH & DH hrg at 3pm...Govt's Exhs 1-4 admitted and SEALED...Witness S/A FBI Floyd testifies..S/A FBI Ken Bersano testifies...court recesses until 12pm 11-3-94..deft remanded to custody. (wrb) (Entered: 11/28/1994) |
| 11/02/1994 | | | Preliminary Examination as to Orlando Cordia Hall held (wrb) (Entered: 11/28/1994) |
| 11/02/1994 | | | Detention hearing as to Orlando Cordia Hall held (wrb) (Entered: 11/28/1994) |
| 11/03/1994 | | 53 | Minute entry as to Orlando Cordia Hall : ; Court Reporter: Tape 4494,4495; PREL AND DETN HRG contd...Order of Detention Will be entered..deft remanded to USM. (wrb) (Entered: 11/28/1994) |
| 11/03/1994 | | | Preliminary Examination as to Orlando Cordia Hall held (wrb) (Entered: 11/28/1994) |
| 11/03/1994 | | | Detention hearing as to Orlando Cordia Hall held (wrb) (Entered: 11/28/1994) |
| 11/07/1994 | | 57 | ORDER OF DETENTION PENDING TRIAL as to Orlando Cordia Hall cc: all Page(s): 3 ( Signed by Magistrate Judge Alex H. McGlinchey ) (wrb) (Entered: 11/28/1994) |
| 11/22/1994 | | 15 | SUPERSEDING INDICTMENT as to Marvin T Holloway (5) count(s) 1s-2s, 3s-5s , and Bruce Carneil Webster (1) count(s) 1-2, 4, 5, 6, Orlando Cordia Hall (2) count(s) 1-2, 3, 4, 6, Steven Christopher Beckley (3) count(s) 1-2, 6, Demetrius Kenyon Hall (4) count(s) 1-2, 6 ; supersedes indictment filed on 11/4/94 [ 9pages ] (wrb) (Entered: 11/28/1994) |
| 11/28/1994 | | 17 | Minute entry as to Orlando Cordia Hall : ; Court Reporter: Debbie Roberts...ARRAIGNMENT...AUSA Roper and apptd atty Mark Daniel present...Held on counts 1,2,3,4,5,6 of the six-count Superseding Indictment...deft enters plea of NOT GUILTY...trial set for Jan 3, 1995 at 2pm...pretrial motions due Dec 13, 1995...deft contd. in custody. (wrb) (Entered: 12/12/1994) |
| 11/28/1994 | | | Arraignment as to Orlando Cordia Hall held (wrb) (Entered: 12/12/1994) |
| 11/28/1994 | | | PLEA of Not Guilty by Orlando Cordia Hall (2) count(s) 1-2, 3, 4, 6 ; Court accepts plea. (wrb) (Entered: 12/12/1994) |
| 11/28/1994 | | | Jury trial as to Orlando Cordia Hall set at 2:00 1/3/95 (wrb) (Entered: 12/12/1994) |
| 11/29/1994 | | 22 | DEFT'S MOTION by Orlando Cordia Hall to Order Deft's Ex Parte Motion for Deft's Counsel to Obtain Investigative Services on Behalf of Deft be Filed |

| | | | |
|---|---|---|---|
| | | | Under Seal (2PG) (wrb) (Entered: 12/12/1994) |
| 11/29/1994 | | 23 | PRETRIAL SCHEDULING ORDER as to Orlando Cordia Hall, Steven Christopher Beckley, Demetrius Kenyon Hall setting Jury Trial for 2:00 1/3/95 for Orlando Cordia Hall, for Steven Christopher Beckley, for Demetrius Kenyon Hall ; Pretrial Materials 4:30 12/13/94 cc: all Page(s): 9 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 12/12/1994) |
| 12/08/1994 | | 26 | MOTION by Orlando Cordia Hall for continuance (2pgs) (wrb) (Entered: 12/19/1994) |
| 12/08/1994 | | 27 | MOTION by Orlando Cordia Hall to extend time for filing of Pretrial Motions (3pgs) (wrb) (Entered: 12/19/1994) |
| 12/16/1994 | | 38 | GOVT'S COMBINED RESPONSE to Bruce Carneil Webster, Orlando Cordia Hall, Steven Christopher Beckley, Demetrius Kenyon Hall, Marvin T Holloway re [36-1] motion FOR CONTINUANCE, [32-1] motion FOR CONTINUANCE OF TRIAL SETTING, [31-1] motion FOR EXTENSION OF TIME IN WHICH TO FILE PRETRIAL MOTIONS, [30-1] motion FOR CONTINUANCE, [29-1] motion TO ADOPT CO-DEFENDANTS' MOTIONS AND MEMORANDUM OF LAW, [28-1] motion FOR EXTENTION OF TIME TO FILE PRETRIAL MOTIONS, [27-1] motion to extend time for filing of Pretrial Motions, [26-1] motion for continuance (3pgs) (wrb) (Entered: 12/22/1994) |
| 01/04/1995 | | 39 | ORDER SETTING STATUS CONFERENCE as to Bruce Carneil Webster, Orlando Cordia Hall, Steven Christopher Beckley, Demetrius Kenyon Hall, Marvin T Holloway, set status conference for 10:00 1/6/95 ...Pending before the court are several motions for continuance..the motions for continuance will be granted, and the COurt plans to reschedule the trial to 2pm Mon JUL 17, 1995. Before an order is issued granting the motions and rescheduling the trial date as proposed, however, the Court would like to discuss this matter with the attorneys. Furthermore, the COurt would like information from the govt's atty regarding whether the govt has decided the defts for which the death penalty will be sought, and, if no such decision has been made, when it can be expected. A status conference will be held in chambers Friday, Jan 6, 1995 to discuss these matters. cc: all Page(s): 2 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 01/06/1995) |
| 01/06/1995 | | 40 | Minute entry as to Bruce Carneil Webster, Orlando Cordia Hall, Steven Christopher Beckley, Demetrius Kenyon Hall, Marvin T Holloway : ; Court Reporter: Ana Warren; STATUS CONFERENCE...AUSA Roper, Macaluso, Watson and attorneys Daniel, Gallagher, Medlin, Moore and Sweeney present...Status conference held regarding possible July 17, 1995 trial date. Govt indicated that a final decision regarding whether and as to which defts the death penalty might be sought has not yet been made. Nevertheless, Court will proceed to appoint second attorneys for penalty would likely be sought. Discussed possibility of severance and individual voir dire depending upon govt's decision regarding seeking of death penalty. Order to follow... (wrb) (Entered: 01/09/1995) |

| | | | |
|---|---|---|---|
| — | 01/06/1995 | | Status conference as to Bruce Carneil Webster, Orlando Cordia Hall, Steven Christopher Beckley, Demetrius Kenyon Hall, Marvin T Holloway held (wrb) (Entered: 01/09/1995) |
| — | 01/06/1995 | 42 | CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT APPOINTED COUNSEL as to Orlando Cordia Hall : Appointment of Attorney Michael P Heiskell Voucher # 24000 ; Attorney notified and Appointment Packet mailed. cc: all Page(s): 1 ( Signed by Magistrate Judge Alex H. McGlinchey ) (wrb) (Entered: 01/09/1995) |
| — | 01/10/1995 | 45 | SEALED EX PARTE ORDER as to Orlando Cordia Hall (1pg) (wrb) (Entered: 01/17/1995) |
| — | 01/10/1995 | 47 | ORDER GRANTING MOTIONS FOR CONTINUANCE AND SETTING DEADLINE FOR NOTIFICATION FROM UNITED STATES REGARDING INTENTION TO PURSUE DEATH PENALTY as to Bruce Carneil Webster, Orlando Cordia Hall, Steven Christopher Beckley, Demetrius Kenyon Hall, Marvin T Holloway granting [37-1] motion TO EXTEND TIME FOR FILING MOTIONS as to Bruce Carneil Webster (1), granting [36-1] motion FOR CONTINUANCE as to Bruce Carneil Webster (1), granting [34-1] motion TO EXTEND TIME FOR FILING MOTIONS as to Steven Christopher Beckley (3), granting [33-1] motion FOR CONTINUANCE as to Steven Christopher Beckley (3), granting [32-1] motion FOR CONTINUANCE OF TRIAL SETTING as to Demetrius Kenyon Hall (4), granting [31-1] motion FOR EXTENSION OF TIME IN WHICH TO FILE PRETRIAL MOTIONS as to Demetrius Kenyon Hall (4), granting [30-1] motion FOR CONTINUANCE as to Marvin T Holloway (5), granting [28-1] motion FOR EXTENTION OF TIME TO FILE PRETRIAL MOTIONS as to Marvin T Holloway (5), granting [27-1] motion to extend for filing of Pretrial Motions as to Orlando Cordia Hall (2), granting [26-1] motion for continuance as to Orlando Cordia Hall (2), ter terminated deadlines , Motion hearing cc: all Page(s): 3 (Excerpted text from order as follows:......After careful consideration of the foregoing motions, the indictment and record..., and the potention punishment that may be sought by the govt, the Court finds, pursuant to 18 USC 3161(h)(8)(B)(ii), that this case is sufficiently complex, due to the number of defts, the nature of the prosecution, and the existence of novel questions of law, that it is unreasonable to expect adequate preparation for pretrial proceedings and for the trial itself within the time limits established by the Speedy Trial Act..., that the ends of justice served by granting a continuance outweigh the best interest of the public and the deft in a speedy trial...Consequently, the Court finds that this cause should be continued from its current trial-setting of Jan 3, 1995, and that all parties should have additional time to prepare and file pretrial motions. However, because possible severances and the time necessary for pretrial preparation and trial will be partially dependent upon the govt's decision regarding whether and against which defts it will seek the death penalty, the Court will withhold resetting this cause for trial on a date certain pending the govt's decision. Therefore ORDERED, motions granted. Trial Continued. Deadline for filing pretrial motions EXTENDED, pending |



| | | | |
|---|---|---|---|
| | | | further order. Further ORDERED..the govt shall notify the Court, in writing, regarding whether it intends to prusue the death penalty against the defts and, if so, against which defts, nlt 4:30pm Thu, Feb 9, 1995.( Signed by Judge Terry R. Means ) (wrb) (Entered: 01/17/1995) |
| 01/10/1995 | | 44 | Unsealed per 8/3/00 Order (#980)...EX PARTE MOTION as to defendant Orlando Cordia Hall to obtain investigative services on behalf of defendant (3) (dld) Modified on 08/09/2000 (Entered: 08/09/2000) |
| 01/17/1995 | | 49 | Unsealed per 8/3/00 Order (#980)....ORDER as to Orlando Cordia Hall granting [44-1] Exparte Motion to obtain investiative services as to Orlando Cordia Hall (2) cc: 1/17/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) Modified on 08/09/2000 (Entered: 08/09/2000) |
| 01/27/1995 | | 50 | REQUEST ( MOTION ) by Orlando Cordia Hall FOR TRAVEL AUTHORIZATION (2pgs) (wrb) (Entered: 01/27/1995) |
| 01/31/1995 | | 51 | ORDER GRANTING REQUEST FOR TRAVEL AUTHORIZATION as to Orlando Cordia Hall granting [50-1] motion FOR TRAVEL AUTHORIZATION..court hereby authorizes payment of the expenses for attys Daniel and Heiskell to travel to and from Washington, DX on Feb 2, 1995 in order to attend meeting. cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 01/31/1995) |
| 01/31/1995 | | 55 | TRAVEL AUTHORIZAION by Orlando Cordia Hall (1pg) (wrb) (Entered: 02/02/1995) |
| 02/06/1995 | | 56 | GOVT'S MOTION AND BRIEF as to Bruce Carneil Webster, Orlando Cordia Hall, Steven Christopher Beckley, Demetrius Kenyon Hall, Marvin T Holloway FOR EXTENSION OF TIME TO FILE NOTICE OF INTENT TO SEEK THE DEATH PENALTY (4pgs) (wrb) (Entered: 02/06/1995) |
| 02/08/1995 | | 58 | ORDER as to Bruce Carneil Webster, Orlando Cordia Hall, Steven Christopher Beckley, Demetrius Kenyon Hall, Marvin T Holloway granting [56-1] motion FOR EXTENSION OF TIME TO FILE NOTICE OF INTENT TO SEEK THE DEATH PENALTY as to Bruce Carneil Webster (1), Orlando Cordia Hall (2), Steven Christopher Beckley (3), Demetrius Kenyon Hall (4), Marvin T Holloway (5), Response to motion due 4:30 on Feb 23, 1995. No further extensions of this deadline will be granted. cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 02/08/1995) |
| 02/22/1995 | | 63 | TRANSCRIPT (Initial Appearance)(taken by Ana Warren)(49pgs) filed in case as to Bruce Carneil Webster, Orlando Cordia Hall, Steven Christopher Beckley, Demetrius Kenyon Hall for dates of Oct 28, 1994 (wrb) (Entered: 03/03/1995) |
| 02/22/1995 | | 64 | TRANSCRIPT (Initial Appearances Contd)(taken by Ana Warren)(31pgs) filed in case as to Bruce Carneil Webster, Orlando Cordia Hall, Steven Christopher Beckley, Demetrius Kenyon Hall for dates of Oct 31, 1994 (wrb) (Entered: 03/03/1995) |



| | | | |
|---|---|---|---|
| 02/22/1995 | | 65 | TRANSCRIPT(Detention Hearing)(taken by Ana Warren)(26pgs) filed in case as to Bruce Carneil Webster, Orlando Cordia Hall, Steven Christopher Beckley, Demetrius Kenyon Hall for dates of Nov 3, 1994 (wrb) (Entered: 03/03/1995) |
| 02/22/1995 | | 66 | TRANSCRIPT filed (Detention Hearing)(taken by Ana Warren)(192 pgs) in case as to Bruce Carneil Webster, Orlando Cordia Hall, Steven Christopher Beckley, Demetrius Kenyon Hall for dates of Nov 2, 1994 (wrb) Modified on 03/03/1995 (Entered: 03/03/1995) |
| 02/23/1995 | | 60 | NOTICE of Intent to Seek The Death Penalty by USA as to Orlando Cordia Hall (6pgs) (wrb) (Entered: 03/02/1995) |
| 03/08/1995 | | 71 | SEALED DOCUMENT( Motion W/Draw) as to Orlando Cordia Hall (wrb) (Entered: 03/10/1995) |
| 03/08/1995 | | 72 | SEALED ORDER as to Orlando Cordia Hall cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 03/10/1995) |
| 03/09/1995 | | 73 | SEALED Minute entry as to Orlando Cordia Hall : ; Held before Judge Terry R. Means...no Court Reporter present (wrb) Modified on 10/23/1995 (Entered: 03/10/1995) |
| 03/09/1995 | | 74 | ORDER GRANTING MOTION TO WITHDRAW as to Orlando Cordia Hall ...Pending before the court is the motion to withdraw filed in the case by deft Orlando Cordia Hall's attorneys, Mark Daniel and Michael P. Keishell, on March 8, 1995. An in camera hearing was held regarding this motion this same day. After careful consideration, the court finds that the motion to withdraw should be granted. Attorneys Daniel and Heiskell should be withdrawn as attys of record, and they shall have no further obligations regarding this matter save and except for assiting successor counsel in taking over representation of deft. It is further ordered that this cause is hereby referred to US Mag Judge Alex H McGlinchey for appointment of new counsel for deft Orlando Cordia Hall.cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 03/20/1995) |
| 03/09/1995 | | 75 | CJA 21 as to Bruce Carneil Webster, Orlando Cordia Hall Authorization to Pay American Express $ 1560.00 for Expert Services Voucher # 0108889 cc: all Page(s): 3 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 03/20/1995) |
| 03/15/1995 | | 76 | AMENDED SCHEDULING ORDER FOR CRIMINAL TRIAL AND PRETRIAL ORDER as to Bruce Carneil Webster, Orlando Cordia Hall, Demetrius Kenyon Hall, Marvin T Holloway setting Jury Trial for 2:00 7/17/95 for Bruce Carneil Webster, for Orlando Cordia Hall, for Demetrius Kenyon Hall, for Marvin T Holloway ; Discovery cutoff 4:30 5/1/95 ; Pretrial Conference for 9:00 7/11/95 for Bruce Carneil Webster, for Orlando Cordia Hall, for Demetrius Kenyon Hall, for Marvin T Holloway ; Motion Filing deadline on 4:30 5/15/95 ; cc: all Page(s): 10 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 03/27/1995) |

| | | | |
|---|---|---|---|
| 03/21/1995 | 77 | Minute entry as to Orlando Cordia Hall :Atty Appt Hearing ; Held before Judge Terry R. Means Court Reporter: Ana Warren ...AUSA Roper and Jeff Kearney and Mike Ware present...Kearney and Ware to be appointed as defts' attys...Ware will handle appeal, if any...CJA 30 to follow. (wrb) (Entered: 03/29/1995) | |
| 03/21/1995 | 78 | CJA 30 as to Orlando Cordia Hall : Appointment of Attorney Michael Logan Ware Voucher # 24004 ; Attorney notified and Appointment Packet mailed. cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 03/29/1995) | |
| 03/21/1995 | 79 | CJA 30 as to Orlando Cordia Hall : Appointment of Attorney Jeffrey Allen Kearney Voucher # D24003 ; Attorney notified and Appointment Packet mailed. cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 03/29/1995) | |
| 04/05/1995 | 81 | MOTION by Orlando Cordia Hall to extend deadline for filing motion for individual voir dire of jurors and motion for juror questionnaire (3pgs) (wrb) (Entered: 04/11/1995) | |
| 04/05/1995 | 82 | AGREED MOTION by Orlando Cordia Hall for severance, new pretrial order and Brief (4pgs) (wrb) (Entered: 04/11/1995) | |
| 04/06/1995 | 83 | ORDER as to Orlando Cordia Hall granting [82-1] motion for severance, new pretrial order as to Orlando Cordia Hall (2), granting [81-1] motion to extend deadline for filing motion for individual voir dire of jurors and motion for juror questionnaire as to Orlando Cordia Hall (2) cc: all Page(s): 2 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 04/11/1995) | |
| 04/06/1995 | 84 | SECOND AMENDED SCHEDULING ORDER FOR CRIMINAL TRIAL AND PRETRIAL ORDER as to Orlando Cordia Hall setting Jury Trial for 2:00 10/2/95 for Orlando Cordia Hall ; Pretrial Conference for 11:00 9/25/95 for Orlando Cordia Hall ; cc: all Page(s): 9pgs ( Signed by Judge Terry R. Means ) (wrb) (Entered: 04/11/1995) | |
| 04/10/1995 | 88 | CJA 24 as to Orlando Cordia Hall Authorization to Pay Ana Warren $ 222.75 for Transcript Voucher # 7750741796 cc: all Page(s): 2 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 04/13/1995) | |
| 04/10/1995 | 92 | Govt's MOTION And Brief as to Bruce Carneil Webster, Orlando Cordia Hall, Demetrius Kenyon Marvin T Holloway Requesting That Voir Dire Be Conducted Individually as To Each Member of The Jury Panel (5pgs) (wrb) (Entered: 04/13/1995) | |
| 04/10/1995 | 93 | Govt's MOTION And Brief as to Bruce Carneil Webster, Orlando Cordia Hall, Demetrius Kenyon Marvin T Holloway Requesting That The Attached Questionnaire Be Distributed To The Jury Panel (15+pgs) (wrb) (Entered: 04/13/1995) | |
| 04/11/1995 | 94 | MOTION By Deft's Former Counsel by Orlando Cordia Hall To Order CJA Form 30 Be Filed Under Seal (3pgs) (wrb) (Entered: 04/13/1995) | |

(12)

| | | | |
|---|---|---|---|
| — | 04/12/1995 | 95 | ORDER as to Orlando Cordia Hall granting [94-1] motion To Order CJA Form 30 Be Filed Under Seal as to Orlando Cordia Hall (2)...The deft's former cnsl be permitted to submit their CJA Form 30 under seal and that such form remain under seal until further order of this Court. cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 04/13/1995) |
| — | 04/13/1995 | 99 | Govt's RESPONSE to Orlando Cordia Hall re [94-1] motion To Order CJA Form 30 Be Filed Under Seal (2pgs) (wrb) (Entered: 04/14/1995) |
| — | 04/28/1995 | 114 | CJA 24 as to Orlando Cordia Hall Authorization to Pay Deborah Roberts $ 78.75 for Transcript Voucher # 7750742192 cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (pdm) (Entered: 05/01/1995) |
| — | 05/01/1995 | 115 | Supplemental NOTICE of Intent to Offer Expert Testimony by USA as to Bruce Carneil Webster, Orlando Cordia Hall, Demetrius Kenyon Hall (2) (pdm) (Entered: 05/01/1995) |
| — | 05/01/1995 | 116 | NOTICE of Intent to Offer Expert Testimony by USA as to Bruce Carneil Webster, Orlando Cordia Hall, Demetrius Kenyon Hall (5) (pdm) (Entered: 05/01/1995) |
| — | 05/01/1995 | 113 | MOTION by USA as to Bruce Carneil Webster, Orlando Cordia Hall, Demetrius Kenyon Hall SEALED MOTION (pdm) (Entered: 05/04/1995) |
| — | 05/04/1995 | 120 | SEALED ORDER as to Bruce Carneil Webster, Orlando Cordia Hall, Demetrius Kenyon Hall granting in part, denying in part [113-1] motion SEALED MOTION as to Bruce Carneil Webster (1), Orlando Cordia Hall (2), Demetrius Kenyon Hall (4) usaty Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 05/05/1995) |
| — | 05/09/1995 | 121 | MOTION by Orlando Cordia Hall to extend deadline for filing motion for individual voir dire of jurors motion for juror questionnaire, expert witnesses, and pre-trial motions (4 pg) (bam) (Entered: 05/11/1995) |
| — | 05/11/1995 | | ORDER as to Orlando Cordia Hall granting [121-1] motion to extend deadline for filing motion for individual voir dire of jurors motion for juror questionnaire, expert witnesses, and pre-trial motions as to Orlando Cordia Hall (2), and reset scheduling order deadlines: pretrial Motion Filing including motions for individual voir dire of jurors and motions requesting the use of a juror questionnaire to 4:30 6/12/95 ; Pretrial Materials (written designation of expert witnesses) 4:30 6/12/95 cc: all - 5/12/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 05/24/1995) |
| — | 05/12/1995 | 123 | SECOND SUPPLEMENTAL NOTICE of Intent To Offer Expert Testimony by USA as to Bruce Carneil Webster, Orlando Cordia Hall, Demetrius Kenyon Hall (3 pgs) (bam) (Entered: 05/16/1995) |
| — | 05/12/1995 | 124 | ORDER as to Orlando Cordia Hall, reset scheduling order deadlines: Pretrial Conference for 9:00 9/26/95 for Orlando Cordia Hall ; cc: all - 5/12/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 05/16/1995) |

(13)

| 06/02/1995 | 168 | ORDER SETTING STATUS CONFERENCES as to Orlando Cordia Hall, and reset status conference for (1) 6/9/95, at 3:00 p.m.; (2) 7/14/95, at 9:30 a.m.; (3) 8/4/95, at 9:30 a.m.; and 9/8/95, at 9:30 a.m. for Orlando Cordia Hall...Counsel for both sides to be present. Arguement on pending moitons will not be entertained at conferences unless solicited by the Court cc: all - 6/2/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 06/03/1995) |
|---|---|---|
| 06/09/1995 | 172 | Minute entry as to Orlando Cordia Hall : ; Held before Judge Terry R. Means Court Reporter: Ana Warren ; STATUS CONF- AUSA Roper and Watson and attys Jeff Kearney and Mike Ware present for deft - judge indicated that any motion for ex of pretrial mots deadline filed by deft req. extension until end of June would be favorably considered. Govt made all disc. available by May 1 deadline; deft attys will examine next week. Parties and court agreed that during jury selection, cause challenges will be taken as ea juror is individually voir dired (if ind. voir dire is allowed). Peremptories will be taken as to the whole panel at the conclusion of indiv. voir dire. (wrb) (Entered: 06/14/1995) |
| 06/09/1995 | | Status conference as to Orlando Cordia Hall held (wrb) (Entered: 06/14/1995) |
| 06/12/1995 | 170 | MOTION by Orlando Cordia Hall to extend deadline for filing motionfor individual voir dire of jurors, motion for juror questionnaire, expert witnesses, and pre-trial motions (4 pages) (bam) (Entered: 06/13/1995) |
| 06/13/1995 | 171 | ORDER as to Orlando Cordia Hall granting [170-1] motion to extend deadline for filing motionfor individual voir dire of jurors, motion for juror questionnaire, expert witnesses, and pre-trial motions as to Orlando Cordia Hall (2), reset scheduling order deadlines: Pretrial Materials 4:30 6/30/95 cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 06/14/1995) |
| 06/28/1995 | 173 | Unsealed per 8/3/00 Order (#980)....CJA 30 as to Orlando Cordia Hall Authorization to Pay Michael Heiskell $ 5,075.16 Voucher # D024000 cc: 6/28/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 06/28/1995 | 174 | Unsealed per 8/3/00 Order (#980)....CJA 30 as to Orlando Cordia Hall Authorization to Pay Michael Heiskell $ 14,465.08 Voucher # D03413 cc: 6/28/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 06/30/1995 | 175 | MOTION with Memorandum in Support by Orlando Cordia Hall TO PROHIBIT CONSIDERATION OF MISCONDUCT NOT RESULTING IN CONVICTION DURING THE AGGRAVATION/MITIGATION PHASE OF THE SENTENCING HEARING (4 pages) (bam) (Entered: 07/03/1995) |
| 06/30/1995 | 176 | MOTION by Orlando Cordia Hall TO PRECLUDE THE PROSECUTION FROM "DEATH QUALIFYING" THE POTENTIAL JURY (4) (bam) (Entered: 07/03/1995) |

| | | | |
|---|---|---|---|
| — | 06/30/1995 _184_ | 177 | MOTION by Orlando Cordia Hall in limine as to statements by alleged co-conspirators and brief in support (4 pages) (bam) Modified on 07/03/1995 (Entered: 07/03/1995) |
| — — | 06/30/1995 _188_ | 178 | MOTION by Orlando Cordia Hall to compel prosecution to disclose any non-statutory aggravating factor it will present at the sentencing hearing (3 pages) (bam) (Entered: 07/03/1995) |
| — | 06/30/1995 _191_ | 179 | MOTION with Memorandum in Support by Orlando Cordia Hall to strike [60-1] notice of intent to seek the death penalty , and/or request to compel the government to give specific information as to aggravating factors on which they intend to rely (4 pages) (bam) (Entered: 07/03/1995) |
| — — | 06/30/1995 _196_ | 180 | MOTION by Orlando Cordia Hall for Disclosure of Exculpatory Evidence , and Notice to the Government of Specific Exculpatory Evidence Requested (8 pages) (bam) (Entered: 07/03/1995) |
| — | 06/30/1995 _204_ | 181 | MOTION with Memorandum in Support by Orlando Cordia Hall to dismiss Count 1 of the Indictment , and to strike Surplusage (4 pages) (bam) (Entered: 07/03/1995) |
| — | 06/30/1995 _208_ | 182 | MOTION with Memorandum in Support by Orlando Cordia Hall to reduce out-of-court statement's of co-conspirators to writing , and/or for limine order (3 pages) (bam) (Entered: 07/03/1995) |
| — | 06/30/1995 _211_ | 183 | MOTION with Memorandum in Support by Orlando Cordia Hall requesting the court to order the filing of a bill of particulars (4 pages) (bam) (Entered: 07/03/1995) |
| — — | 06/30/1995 _215_ | 184 | MOTION with Memorandum in Support by Orlando Cordia Hall to reduce defendant's oral statements to writing and/or for limine order (3 pages) (bam) (Entered: 07/03/1995) |
| — | 06/30/1995 _218_ | 185 | MOTION with Memorandum in Support by Orlando Cordia Hall for extension of time in which to designate experts (3 pages) (bam) (Entered: 07/03/1995) |
| — | 06/30/1995 _221_ | 186 | MOTION by Orlando Cordia Hall in limine as to defendant's statements (4 pages) (bam) (Entered: 07/03/1995) |
| — | 06/30/1995 _225_ | 187 | MOTION by Orlando Cordia Hall to dismiss government's request for the death penalty because of racial discrimination in capital charging by the government , and request for discovery of information pertaining to the government's capital charging for purposes of an evidentiary hearing (6 pages) (bam) (Entered: 07/03/1995) |
| — | 06/30/1995 _231_ | 188 | MOTION with Memorandum in Support by Orlando Cordia Hall to suppress , and for Evidentiary Hearing regarding admissibility-constitutionality of defendant's alleged incriminating statements (4 pages) (bam) (Entered: 07/03/1995) |
| — | 06/30/1995 _235_ | 189 | MOTION with Memorandum in Support by Orlando Cordia Hall to declare the death penalty statute unconstitutional (22 pages) (bam) (Entered: |

| | | | |
|---|---|---|---|
| | | | 07/03/1995) |
| 06/30/1995 | | 190 | MOTION by Orlando Cordia Hall Requesting use of Juror Questionnaire (3 pages) (bam) (Entered: 07/03/1995) |
| 06/30/1995 | | 191 | MOTION with Memorandum in Support by Orlando Cordia Hall in limine in regard to extraneous offenses or misconduct not charged in the indictment, request for notice (4 pages) (bam) (Entered: 07/03/1995) |
| 06/30/1995 | | 192 | Request for Notice of Evidence to be offered pursuant to Rule 404(B) Fed. R. Evid. by Orlando Cordia Hall (3 pages) (bam) (Entered: 07/03/1995) |
| 06/30/1995 | | 193 | MOTION with Memorandum in Support by Orlando Cordia Hall for individual voir dire (6 pages) (bam) (Entered: 07/03/1995) |
| 06/30/1995 | | 194 | REQUESTED JURY QUESTIONNAIRE by Orlando Cordia Hall (20 pages) (bam) (Entered: 07/03/1995) |
| 06/30/1995 | | 195 | MOTION by Orlando Cordia Hall for discovery and a bill of particulars as to aggravation (3 pages) (bam) (Entered: 07/03/1995) |
| 06/30/1995 | | 196 | MOTION with Memorandum in Support by Orlando Cordia Hall for notice by the government pursuant to rule 12(d)(2) of its intention to use specific evidence arguably subject to suppression (5 pages) (bam) (Entered: 07/03/1995) |
| 06/30/1995 | | 197 | Unsealed per 8/3/00 Order (#980)...EX PARTE MOTION as to defendant Orlando Cordia Hall for appointment of mitigation specialist (4 pg) (dld) Modified on 08/09/2000 (Entered: 08/09/2000) |
| 06/30/1995 | | 198 | Unsealed per 8/3/00 Order (#980)...EX PARTE MOTION as to defendant Orlando Cordia Hall for jury selection expert and Brief (2 pg) (dld) (Entered: 08/09/2000) |
| 06/30/1995 | | 199 | Unsealed per 8/3/00 Order (#980)....EX PARTE MOTION as to defendant Orlando Cordia Hall for appointment of certain experts (11 pg) (dld) (Entered: 08/09/2000) |
| 07/10/1995 | | 200 | Unsealed per Order 8/3/00 (#980)...EXPARTE ORDER as to Orlando Cordia Hall exparte hearing on motion for appointmenbt of certain experts, motion for appointment of mitigation specialist, and motion for jury selection expert shall be held at concusion of status conference herein scheduled for 9:30 a.m. on July 14, 1995; cc: 7/10/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 07/12/1995 | | 201 | RESPONSE by USA as to Orlando Cordia Hall re [196-1] motion for notice by the government pursuant to rule 12(d)(2) of its intention to use specific evidence arguably subject to suppression (5 pages) (bam) (Entered: 07/13/1995) |
| 07/12/1995 | | 202 | RESPONSE by USA as to Orlando Cordia Hall re [195-1] motion for discovery and a bill of particulars as to aggravation (5 pages) (bam) (Entered: 07/13/1995) |

| 07/12/1995 | 203 | RESPONSE by USA as to Orlando Cordia Hall re [193-1] motion for individual voir dire (5 pages) (bam) (Entered: 07/13/1995) |
| 07/12/1995 | 204 | RESPONSE by USA as to Orlando Cordia Hall re [186-1] motion in limine as to defendant's statements (3 pages) (bam) (Entered: 07/13/1995) |
| 07/12/1995 | 205 | RESPONSE by USA as to Orlando Cordia Hall re [185-1] motion for extension of time in which to designate experts (3 pages) (bam) (Entered: 07/13/1995) |
| 07/12/1995 | 206 | RESPONSE by USA as to Orlando Cordia Hall re [176-1] motion TO PRECLUDE THE PROSECUTION FROM "DEATH QUALIFYING" THE POTENTIAL JURY (5 pages) (bam) (Entered: 07/13/1995) |
| 07/12/1995 | 207 | RESPONSE by USA as to Orlando Cordia Hall to [192-1] request for notice of evidence to be offered pursuant to Fed. R. Crim.P. 404(b) (3 pages) (bam) (Entered: 07/13/1995) |
| 07/12/1995 | 208 | MOTION with Memorandum in Support by USA as to Orlando Cordia Hall for extension of time to file responses to pretrial motions filed by the dft Orlando Cordia Hall (4 pages) (bam) (Entered: 07/13/1995) |
| 07/14/1995 | 216 | Minute entry as to Orlando Cordia Hall :R. Roper - AUSA and J. Kearney, M. Ware- retd counsel present for status confer held off record...plf's atty advised he may be filing motion requesting 30 continuance...govt suggests that a Jackson v. Denno hearing will be necessary regarding various stmts allegedly made by dft...govt believes it may need to designate additional experts after it learns who dft will be designating. Court's proposed juror questionnaire was approved by dft...govt has some requested additions, which will be made in writing...lead counsel for both parties have conflict with next status conf set for 8/4/95...court permitted co-counsel to attend in their place...(2) ex-parte hrg re: dft's request for expert: other assistance held after conclusion of stat conf (one the record)...Dft's exhibits 1-3 admitted exparte ; Held before Judge Terry R. Means (bam) (Entered: 07/20/1995) |
| 07/17/1995 | 211 | ORDER as to Orlando Cordia Hall granting [208-1] motion for extension of time to file responses to various pretrial motions filed by the dft Orlando Cordia Hall as to Orlando Cordia Hall (2), and Response to motion granted until 4:30p.m. on 7/19/95 cc: all - 7/17/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 07/17/1995) |
| 07/18/1995 | 212 | REPLY by Orlando Cordia Hall to response to [196-1] motion for notice by the government pursuant to rule 12(d)(2) of its intention to use specific evidence arguably subject to suppression (2 pages) (bam) (Entered: 07/19/1995) |
| 07/18/1995 | 213 | REPLY by Orlando Cordia Hall to response to [176-1] motion TO PRECLUDE THE PROSECUTION FROM "DEATH QUALIFYING" THE POTENTIAL JURY (3 pages) (bam) (Entered: 07/19/1995) |
| 07/18/1995 | 214 | REPLY by Orlando Cordia Hall to response to [195-1] motion for discovery and a bill of particulars as to aggravation (3 pages) (bam) (Entered: |

| | | | |
|---|---|---|---|
| | | | 07/19/1995) |
| 07/19/1995 344 | | 220 | RESPONSE by USA as to Orlando Cordia Hall re [191-1] motion in limine in regard to extraneous offenses or misconduct not charged in the indictment, request for notice (4 pages) (bam) (Entered: 07/21/1995) |
| 07/19/1995 348 | | 221 | RESPONSE by USA as to Orlando Cordia Hall re [189-1] motion to declare the death penalty statute unconstitutional (15+) (bam) (Entered: 07/21/1995) |
| 07/19/1995 380 | | 222 | RESPONSE by USA as to Orlando Cordia Hall re [188-1] motion to suppress, [188-2] motion for Evidentiary Hearing regarding admissibility-constitutionality of defendant's alleged incriminating statements (5 pages) (bam) (Entered: 07/21/1995) |
| 07/19/1995 385 | | 223 | RESPONSE by USA as to Orlando Cordia Hall re [186-1] motion in limine as to defendant's statements (5 pages) (bam) (Entered: 07/21/1995) |
| 07/19/1995 390 | | 224 | RESPONSE by USA as to Orlando Cordia Hall re [184-1] motion to reduce defendant's oral statements to writing and/or for limine order (4 pages) (bam) (Entered: 07/21/1995) |
| 07/19/1995 394 | | 225 | RESPONSE by USA as to Orlando Cordia Hall re [183-1] motion requesting the court to order the filing of a bill of particulars (12 pages) (bam) (Entered: 07/21/1995) |
| 07/19/1995 406 | | 226 | RESPONSE by USA as to Orlando Cordia Hall re [182-1] motion to reduce out-of-court statement's of co-conspirators to writing (3 pages) (bam) (Entered: 07/21/1995) |
| 07/19/1995 409 | | 227 | RESPONSE by USA as to Orlando Cordia Hall re [181-1] motion to dismiss Count 1 of the Indictment, [181-2] motion to strike Surplusage (9 pages) (bam) (Entered: 07/21/1995) |
| 07/19/1995 418 | | 228 | RESPONSE by USA as to Orlando Cordia Hall re [180-1] motion for Disclosure of Exculpatory Evidence, [180-2] motion Notice to the Government of Specific Exculpatory Evidence Requested (4 pages) (bam) (Entered: 07/21/1995) |
| 07/19/1995 422 | | 229 | RESPONSE by USA as to Orlando Cordia Hall re [179-1] motion to strike [60-1] notice of intent to seek the death penalty, [179-2] motion request to compel the government to give specific information as to aggravating factors on which they intend to rely (7 pages) (bam) (Entered: 07/21/1995) |
| 07/19/1995 429 | | 230 | RESPONSE by USA as to Orlando Cordia Hall re [175-1] motion TO PROHIBIT CONSIDERATION OF MISCONDUCT NOT RESULTING IN CONVICTION DURING THE AGGRAVATION/MITIGATION PHASE OF THE SENTENCING HEARING (6 pages) (bam) (Entered: 07/21/1995) |
| 07/19/1995 435 | | 231 | RESPONSE by USA as to Orlando Cordia Hall re [178-1] motion to compel prosecution to disclose any non-statutory aggravating factor it will present at the sentencing hearing (3 pages) (bam) (Entered: 07/21/1995) |

(18)

| | | | |
|---|---|---|---|
| 07/19/1995 | 232 | MOTION with Memorandum in Support by USA as to Orlando Cordia Hall in limine (4 pages) (bam) (Entered: 07/21/1995) |
| 07/19/1995 | 219 | ORDER as to Orlando Cordia Hall granting [190-1] motion Requesting use of Juror Questionnaire as to Orlando Cordia Hall (2), granting 4/10/95 Motion and Brief requesting that attached questionnaire be distributed to the Jury Panel and Court has made modifications, any objections, modifications, or proposed additions to questionnaire be made in writing by 4:30p.m. on 8/2/95...Counsel ORDERED to confer in an attempt to reach agrement regarding description of case to be provided to prospective jury members prior to distribution of jury questionnaire. Original and copy of agreed description to be filed no later than 8/2/95 at 4:30p.m. cc: all - 7/19/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 08/25/1995) |
| 07/20/1995 | 235 | ORDER as to Orlando Cordia Hall granting [185-1] motion for extension of time in which to designate experts as to Orlando Cordia Hall (2), and filing deadline for written designation of expert witnesses is 4:30 8/2/95 cc: all - 7/20/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 07/21/1995) |
| 07/20/1995 | 236 | Unsealed per 8/3/00 Order (#980)...ORDER as to Orlando Cordia Hall granting [199-1] Exparte Motion as to Orlando Cordia Hall (2), denying [198-1] Exparte Motion as to Orlando Cordia Hall (2), mooting [197-1] Exparte Motion as to Orlando Cordia Hall (2) cc: 7/20/95 Page(s): 3 ( Signed by Judge Terry R. Means ) (dld) Modified on 08/09/2000 (Entered: 08/09/2000) |
| 07/21/1995 | 237 | MOTION with Memorandum in Support by Orlando Cordia Hall to extend time to file replies to gvts responses to pretrial motions filed by dft O. Hall (5 pages) (bam) (Entered: 07/21/1995) |
| 07/21/1995 | 238 | ORDER as to Orlando Cordia Hall granting [237-1] motion to extend time to file replies to gvts responses to pretrial motions filed by dft O. Hall as to Orlando Cordia Hall (2), and Reply to Response to Motions granted until 8/1/95 cc: all - 7/21/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 07/25/1995) |
| 07/25/1995 | 239 | ORDER as to Orlando Cordia Hall granting [188-2] motion for Evidentiary Hearing regarding admissibility-constitutionality of defendant's alleged incriminating statements as to Orlando Cordia Hall (2), and set evidentiary hearing for 9:00 9/1/95 for Orlando Cordia Hall cc: all - 7/25/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 07/26/1995) |
| 07/27/1995 | 240 | ORDER as to Orlando Cordia Hall partially granting [196-1] motion for notice by the government pursuant to rule 12(d)(2) of its intention to use specific evidence arguably subject to suppression as to Orlando Cordia Hall (2) cc: all - 7/27/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 07/27/1995) |
| 07/27/1995 | 241 | ORDER as to Orlando Cordia Hall granting [192-1] Request for Notice of Evidence to be offered pursuant to Rule 404(b) FRE. No later than 4:30 p.m. |

|  |  |  | on 10th govmt working day prior to trial, govmt shall file and serve on dft's counsel written notice of the general nature of evidence it items to introduce at trial... also granting [191-1] motion in limine in regard to extraneous offenses or misconduct not charged in the indictment, request for notice as to Orlando Cordia Hall (2) cc: all - 7/27/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 07/27/1995) |
|---|---|---|---|
| 08/01/1995 | 245 |  | ***SEALED PER ORDER FILED 10/2/95***RESPONSE by Orlando Cordia Hall to [232-1] motion in limine (11 pages) (bam) Modified on 10/02/1995 (Entered: 08/02/1995) |
| 08/01/1995 | 246 |  | REPLY by Orlando Cordia Hall to response to [181-1] motion to dismiss Count 1 of the Indictment (4 pages) (bam) (Entered: 08/02/1995) |
| 08/01/1995 | 247 |  | REPLY by Orlando Cordia Hall to response to [180-1] motion for Disclosure of Exculpatory Evidence (3 pages) (bam) (Entered: 08/02/1995) |
| 08/01/1995 | 248 |  | REPLY by Orlando Cordia Hall to response to [179-1] motion to strike [60-1] notice of intent to seek the death penalty, [179-2] motion request to compel the government to give specific information as to aggravating factors on which they intend to rely (3 pages) (bam) (Entered: 08/02/1995) |
| 08/02/1995 | 251 |  | NOTICE of of Intent of Offer Expert Testimony by Orlando Cordia Hall (2) (pdm) (Entered: 08/03/1995) |
| 08/02/1995 | 252 |  | First MOTION by Orlando Cordia Hall to continue trial date and Waiver of Speedy Trial (7) (pdm) (Entered: 08/03/1995) |
| 08/02/1995 | 253 |  | Joint Submission of Agreed Description of Case by Orlando Cordia Hall, USA (3) (pdm) (Entered: 08/03/1995) |
| 08/02/1995 | 254 |  | Requested Modifications & Objections to Court's Proposed Jury Questionnaire by USA as to Orlando Cordia Hall (7) (pdm) (Entered: 08/03/1995) |
| 08/03/1995 | 255 |  | UPDATE ADDRESS OF MICHAEL LOGAN WARE by Orlando Cordia Hall (1 page) (bam) (Entered: 08/09/1995) |
| 08/03/1995 | 257 |  | ORDER Resetting Status Conference and cancelling 8/4/95 conference due to conflict in Court's schedule as to Orlando Cordia Hall, and reset status conference for 2:00 8/11/95 for Orlando Cordia Hall cc: all - 8/3/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 08/09/1995) |
| 08/04/1995 | 258 |  | RESPONSE by USA as to Orlando Cordia Hall re [252-1] motion to continue trial date (2 pages) (bam) (Entered: 08/09/1995) |
| 08/10/1995 | 261 |  | ORDER as to Orlando Cordia Hall denying [252-1] motion to continue trial date as to Orlando Cordia Hall (2) cc: all - 8/10/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 08/12/1995) |
| 08/11/1995 | 262 |  | Minute entry as to Orlando Cordia Hall : R. Roper and C. Curtis-plf's atty, J. Kearney and M. Ware-AUSA present for status conference held via telephone conference call ; Held before Judge Terry R. Means...Dft may be reqsting |

| | | |
|---|---|---|
| | | additional expert witnesses, and gov't may need to designate more experts depending on whether dft designates mroe. Judge told dft to act quickly, as the closer it gets to trial, the less inclined he will be to grant extension of deadline. Dft wants notice from gvt as to what evidence they will attempt to introduce during the punishment phase. Gvt indicated they could probably work this out among themselves. Judge told dft to file motion by 9/5/95 at 4:30p.m. if they can't get it resolved (1 page) (bam) (Entered: 08/12/1995) |
| 08/15/1995 | 265 | ORDER as to Orlando Cordia Hall, set motion filing deadline for 4:30 9/5/95, setting out in detail substance of notice from govt he seeks as to evidence govt intends to introduce at punishment phase or trial...Counsel for parties to resolve this notice issue among themselves prior to that date cc: all - 8/15/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 08/17/1995) |
| 08/16/1995 | 264 | ORDER SETTING HEARING ON ADMISSIBILITY OF CERTAIN EVIDENCE IN POSSIBLE PUNISHMENT PHASE OF TRIAL as to Orlando Cordia Hall, and set miscellaneous hearing at 2:00 p.m. on 8/31/95, regarding admissibility during punishment phase, of the trial of evidence regarding reason why dfts previous counsel requested and were permitted to withdraw from representing dft cc: all - 8/16/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 08/17/1995) |
| 08/25/1995 | 266 | MOTION with Memorandum in Support by USA as to Orlando Cordia Hall to disclose portion of ex parte, in camera hearing (6 pages) (bam) (Entered: 08/28/1995) |
| 08/28/1995 | 267 | MOTION with Memorandum in Support by Orlando Cordia Hall for subpoenas by dft unable to pay (6 pages) (bam) (Entered: 08/29/1995) |
| 08/28/1995 | 268 | SUPPLEMENTAL NOTICE of Intent to Offer Expert Testimony by Orlando Cordia Hall (2 pages) (bam) (Entered: 08/29/1995) |
| 08/29/1995 | 269 | ORDER TO FILE SUPPLEMENT IN SUPPORT OF MOTION FOR SUBPOENAS as to Orlando Cordia Hall...dft to file supplement to motion, and set supplement motion filing deadline for 12:00 8/30/95 cc: all - 8/29/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 08/31/1995) |
| 08/29/1995 | 270 | ORDER as to Orlando Cordia Hall denying [266-1] motion to disclose portion of ex parte, in camera hearing as to Orlando Cordia Hall (2) cc: all - 8/29/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 08/31/1995) |
| 08/30/1995 | 276 | (SEALED) AMENDED EX PARTE MOTION by Orlando Cordia Hall For Subpoenas (9pgs) (wrb) (Entered: 09/01/1995) |
| 08/31/1995 | 271 | Govt's Witness list as to Orlando Cordia Hall (3pgs) (wrb) (Entered: 09/01/1995) |
| 08/31/1995 | 272 | Govt's Exhibit List As To Suppression Hearing as to Orlando Cordia Hall (2pgs) (wrb) (Entered: 09/01/1995) |

21

| 08/31/1995 | 277 | ORDER as to Orlando Cordia Hall GRANTING [276-1] AMENDED MOTION FOR SUBPOENAS, as to Orlando Cordia Hall (2),RENDERING ORIGINAL [267-1] MOTION FOR SUBPOENAS MOOT AND SEALING AMENDED MOTION FOR SUBPOENAS (With Special Instructions to the Clerk of the Court) cc: atty Page(s): 2 ( Signed by Judge R. Means ) (wrb) (Entered: 09/01/1995) |
|---|---|---|
| 08/31/1995 | 278 | Minute entry as to Orlando Cordia Hall :O. Hall-dft, R.Roper, C. Curtis, P. Macaluso-AUSA, J. Kearney, M. Ware-aptd attys present for Hearing; Held before Judge Terry R. Means Court Reporter: Debbie Roberts...hearing regarding admissibility of certain punishment phase evidence held...arguments of counsel heard; tentative ruling made, but dft may still object to the evidence at trial (1 page) (bam) Modified on 09/08/1995 (Entered: 09/08/1995) |
| 09/01/1995 | 279 | Minute entry as to Orlando Cordia Hall : O. Hall-dft, R. Roper, P. Macaluso, and C. Curtis-AUSA, and J. Kearney, M. Ware-apt attys present for hearing on motions; Held before Judge Terry R. Means Court Reporter: Deborah Roberts...dft O. Hall's motion to suppress dft statements taken nder advisement...dft post hearing brief due 4:30 on 9/8/95, Govts responsive brief due 4:30 on 9/13/95, Govts exhibits 1-S through 11-S admitted...dfts exhibits 1 & 2 admitted...court's exhibit 1 marked (docs submitted by govt in camera) (1 page) (bam) (Entered: 09/08/1995) |
| 09/01/1995 | | ORAL ORDER as to Orlando Cordia Hall [188-1] motion to suppress taken under advisement as to Orlando Cordia Hall (2) cc: Page(s): 1 ( Entered by Judge Terry R. Means ) (bam) (Entered: 09/08/1995) |
| 09/05/1995 | 280 | ORDER as to Orlando Cordia Hall, and set filing of posthearing brief by dft deadline for 4:30 9/8/95, and govt shall have until 4:30 on 9/13/95 to file a response cc: all - 9/5/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/08/1995) |
| 09/05/1995 | 281 | MOTION with Memorandum in Support by Orlando Cordia Hall setting out form and substance of notice he seeks (3 pages) (bam) (Entered: 09/08/1995) |
| 09/06/1995 | 282 | ORDER RULING ON OBJECTIONS TO JUROR QUESTIONNAIRE as to Orlando Cordia Hall...Court's ruling as follows: (1) govts objections/mod contained in pars I through VI, IX, and XI through XVII of 8/2 filing are sustained...(2) govts objections/modifications contained in paragraphs VII, X, and XVIII of its 8/2 filing are overruled...(3) govts objection contained in paragraph VIII of 8/2/95 filing are overruled, except "African-American descent" to be changed to "another race," such that the question will read: "have you, a family member, or close friend ever had a bad experience with a person of another race?" Copy of final juror questionnaire, with modifications approved in this order... cc: all - 9/6/95 Page(s): 26 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/08/1995) |
| 09/06/1995 | 284 | Third Supplemental NOTICE of Intent To Offer Expert Testimony by USA as to Orlando Cordia Hall (2 pages) (bam) (Entered: 09/08/1995) |

| 09/07/1995 | 285 | MOTION by Orlando Cordia Hall to suppress lineup, photospread and other pre-trial and trial identification evidence (5 pages) (bam) (Entered: 09/08/1995) |
|---|---|---|
| 09/07/1995 | 287 | ***VACATED PER ORDER FILED 9/19/95***ORDER as to Orlando Cordia Hall denying [285-1] motion to suppress lineup, photospread and other pre-trial and trial identification evidence as to Orlando Cordia Hall (2)...motion is untimely, and dft has presented the Court with no reasons justifying additional extension of deadline... cc: all - 9/7/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) Modified on 09/21/1995 (Entered: 09/08/1995) |
| 09/07/1995 | 286 | Unsealed per 8/3/00 Order (#980)...EX PARTE MOTION as to defendant Orlando Cordia Hall and MEMORANDUM for appointment of mitigation specialist (10 pg) (dld) (Entered: 08/09/2000) |
| 09/08/1995 | 290 | BRIEF by Orlando Cordia Hall in support of [285-1] motion to suppress (13pgs) (wrb) (Entered: 09/12/1995) |
| 09/08/1995 | 291 | MOTION by USA as to Orlando Cordia Hall for writ of habeas corpus Ad Testificandum (1pg) (wrb) (Entered: 09/12/1995) |
| 09/08/1995 | 297 | Minute entry as to Orlando Cordia Hall :STATUS CONFERENCE ; Held before Judge Terry R. Means in chambers - AUSA Roper and attys Kearney and Ware present. (wrb) (Entered: 09/14/1995) |
| 09/08/1995 | | Status conference as to Orlando Cordia Hall held (wrb) (Entered: 09/14/1995) |
| 09/11/1995 | 292 | ORDER as to Orlando Cordia Hall granting [291-1] motion for writ of habeas corpus Ad Testificandum as to Orlando Cordia Hall (2)-to have Michael Davis-TDC #709510 before the court on Oct 10, 1995 at 9am. cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 09/12/1995) |
| 09/11/1995 | 293 | WRIT of Habeas Corpus ad Testificandum issued for Michael Omore Davis for Oct 10, 1995 in case as to Orlando Cordia Hall (2pgs) (wrb) (Entered: 09/12/1995) |
| 09/11/1995 | 294 | RETURN OF SERVICE ON A SUBPOENA IN A CRIMINAL CASE by Orlando Cordia Hall addressed to Judge Ingrid Stromberg (1pg) (wrb) (Entered: 09/12/1995) |
| 09/11/1995 | 295 | RETURN OF SERVICE ON A SUBPOENA IN A CRIMINAL CASE by Orlando Cordia Hall addressed to Detective John Stanton (1pg) (wrb) (Entered: 09/12/1995) |
| 09/11/1995 | 296 | RETURN OF SERVICE ON A SUBPOENA IN A CRIMINAL CASE by Orlando Cordia Hall addressed to Detective Jim Ford (1pg) (wrb) (Entered: 09/12/1995) |
| 09/11/1995 | 299 | RETURN OF SERVICE on a subpoena in a criminal case addressed to Special Agent Garrett O. Floyd by Orlando Cordia Hall (wrb) (Entered: 09/14/1995) |

| | | | |
|---|---|---|---|
| 09/11/1995 | 300 | RETURN OF SERVICE on a subpoena in a criminal case addressed to Melanie Ebel, Custodian, Jail Records City of Arlington by Orlando Cordia Hall (wrb) (Entered: 09/14/1995) |
| 09/12/1995 | 302 | MOTION AND BRIEF by Orlando Cordia Hall for reconsideration of Motion to Suppress Lineup, Photospread and Other Pretrial and Trial Identification Evidence and for Leave to File Motion to Suppress Jail Statements (4pgs) (wrb) (Entered: 09/18/1995) |
| 09/12/1995 | 303 | ORDER SEALING EXHIBITS ADMITTED AT SUPPRESSION HEARING as to Orlando Cordia Hall..On Sept 1, 1995, a hearing was held re deft Hall's M/to Suppress. After consideration of the exhibits admitted at the hearing, the Court finds that they should be and are hereby SEALED pending further order of the Court. cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 09/18/1995) |
| 09/12/1995 | 301 | Unsealed per 8/3/00 Order (#980)...EXPARTE ORDER as to Orlando Cordia Hall granting [286-1] amended motion for appointment of mitigation specialist as to Orlando Cordia Hall (2) cc: 9/12/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 09/13/1995 | 304 | Brief in RESPONSE by USA as to Orlando Cordia Hall re Bried in Support of [285-1] motion to suppress lineup, photospread and other pre-trial and trial identification evidence (15+ pages) (bam) (Entered: 09/20/1995) |
| 09/14/1995 | 305 | ORDER PROHIBITING PROVISION OF CASE-RELATED STATEMENTS AND/OR INFORMATION TO MEDIA as to Orlando Cordia Hall, counsel to inform clients, their reps, potential witnesses not to make any extrajudicial statements or interviews relating to this case, nor authorize any interview relating to this case, or provide info to any member of the media that might divulge matters that could prejudice dft or govt cc: all - 9/14/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/20/1995) |
| 09/14/1995 | 306 | RESPONSE by USA as to Orlando Cordia Hall re [281-1] motion setting out form and substance of notice he seeks (3 pages) (bam) (Entered: 09/20/1995) |
| 09/15/1995 | 307 | ORDER AUTHORIZING INTERIM PAYMENTS FOR SERVICES OTHER THAN COUNSEL as to Bruce Carneil Webster, Orlando Cordia Hall, and procedures for interim pymts to apply during the period of time in which svcs are provided: 1) Submission of Vouchers (CJA Form 31); 2) Reimbursable Expenses (SEE ORDER FOR SPECIFICS)...dft counsel is directed to transmit copy of this order, within 5 govt working days of receipt of same, to any person previously appointed to assist them, and provide copy of this order to anyone hereafter appointed to assist them as soon as possible after receipt of the order of appointment cc: all - 9/15/95 Page(s): 4 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/20/1995) |
| 09/15/1995 | 308 | ORDER AUTHORIZING INTERIM PAYMENTS FOR REPRESENTATION OF COUNSEL as to Bruce Carneil Webster, Orlando Cordia Hall, due to length and hardship on defense counsel, following |

(24)

| | | | |
|---|---|---|---|
| | | | procedures for interim pymts shall apply for interim pymts: 1 Submission of Vounchers (CJA Form 30); 2) Reimbursable Expenses; (SEE ORDER FOR SPECIFIC DETAILS) cc: all - 9/15/95 Page(s): 5 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/20/1995) |
| 09/15/1995 | | 309 | ORDER as to Bruce Carneil Webster, Orlando Cordia Hall, Demetrius Kenyon Hall, Marvin T Holloway PARTIALLY granting [92-1] motion Requesting That Voir Dire Be Conducted Individually as To Each Member of The Jury Panel as to Bruce Carneil Webster (1) (follows oral order [188-1] motion to suppress taken under advisement as to Orlando Cordia Hall (2) entered 9/1/95 )...ORDERED that at trials of dft Bruce Webster and Orlando Hall, govt and defense have 30 minutes of individual voir dire with each jury member...for dft Webster's trial, individual voir dire will commence at 2:00p.m. on 3/4/96...for dft Hall's trial, individual voir dire will commence at 2:00 p.m. on 10/2/95... cc: all - 9/15/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/20/1995) |
| 09/15/1995 | | 310 | ORDER GRANTING DFT'S MOTION FOR INDIVIDUAL VOIR DIRE as to Orlando Cordia Hall granting [193-1] motion for individual voir dire as to Orlando Cordia Hall (2)...govt and defense to have 30 minutes for each jury panel member and to commence at 2:00p.m. on 10/2/95... cc: all - 9/15/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/20/1995) |
| 09/15/1995 | | 311 | REPLACEMENT VOUCHER D24004 CJA 30 appointing Michael Logan Ware by Orlando Cordia Hall (1 page) (bam) (Entered: 09/20/1995) |
| 09/18/1995 | | 312 | Witness list by Orlando Cordia Hall (15 pages) (bam) (Entered: 09/20/1995) |
| 09/18/1995 | | 313 | Exhibit list by Orlando Cordia Hall (10 pages) (bam) (Entered: 09/20/1995) |
| 09/18/1995 | | 314 | MOTION with Memorandum in Support by Orlando Cordia Hall to extend time in which to file witness and exhibit list , or in alternative for supplementing witness and exhibit list (4 pages) (bam) (Entered: 09/20/1995) |
| 09/18/1995 | | 316 | Exhibit list by USA as to Orlando Cordia Hall (15+pages) (bam) (Entered: 09/20/1995) |
| 09/18/1995 | | 317 | Witness list by USA as to Orlando Cordia Hall (15+ pages) (bam) (Entered: 09/20/1995) |
| 09/18/1995 | | 318 | Proposed Jury Instructions and Verdict Form for the Guilt/Innocence Phase of the Trial by USA as to Orlando Cordia Hall (15+ pages) (bam) (Entered: 09/20/1995) |
| 09/18/1995 | | 319 | Proposed Penalty Phase Jury Instructions by USA as to Orlando Cordia Hall (15+ pages) (bam) (Entered: 09/20/1995) |
| 09/18/1995 | | 320 | Proposed Penalty Phase Special Findings Forms and Verdict Forms (Jury Instructions) by USA as to Orlando Cordia Hall (14 Pages) (bam) (Entered: 09/20/1995) |
| 09/18/1995 | | 315 | SEALED DOCUMENT as to Orlando Cordia Hall (bam) (Entered: 10/23/1995) |

| | | |
|---|---|---|
| 09/19/1995 | 322 | ORDER as to Orlando Cordia Hall denying [179-1] motion to strike [60-1] notice of intent to seek the death penalty as to Orlando Cordia Hall (2)...dft's alternative request to compel govt to give specific info is partially granted in that no later than 4:30 p.m. on 9/20/95, govt to file written notice with Clerk informing dft of general nature of any evidence the govt expects to introduce at punishment phase of trial..., PARTIALLY granting [281-1] motion setting out form and substance of notice he seeks as to Orlando Cordia Hall (2)in that govt give notice required by preceding paragraph... cc: all - 9/19/95 Page(s): 3 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/20/1995) |
| 09/19/1995 | 323 | ORDER as to Orlando Cordia Hall denying [181-1] motion to dismiss Count 1 of the Indictment as to Orlando Cordia Hall (2), denying [181-2] motion to strike Surplusage as to Orlando Cordia Hall (2) cc: all - 9/19/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/21/1995) |
| 09/19/1995 | 324 | ORDER as to Orlando Cordia Hall denying [183-1] motion requesting the court to order the filing of a bill of particulars as to Orlando Cordia Hall (2) cc: all - 9/19/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/21/1995) |
| 09/19/1995 | 325 | ORDER GRANTING MOTION FOR RECONSIDERATION OF MOTION TO SUPPRESS LINEUP, PHOTOSPREAD, AND OTHRE IDENTIFICATION EVIDENCE AND FOR LEAVE TO FILE MOTIONTO SUPPRESS JAIL STATEMENTS AND EXPEDITING GOVERNMENT'S RESPONSE TO BOTH MOTIONS... as to Orlando Cordia Hall granting [302-1] motion for reconsideration of Motion to Suppress Lineup, Photospread and Other Pretrial and Trial Identification Evidence and for Leave to File Motion to Suppress Jail Statements as to Orlando Cordia Hall (2), and ORDERED denying motion to suppress as untimely, filed 9/7/95 is VACATED, and motion to Suppress Lineup, Photospread, and other pre-trial and trial identification evidence on 9/7/95 is deemed properly filed...govt to file response to motion no later than 4:30p.m. on 9/25/95...ORDERED that Clerk file dft's motion and brief to suppress purported jail stmts...govt to file response to motion no later than 4:30p.m. on 9/25/95 cc: all - 9/19/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/21/1995) |
| 09/19/1995 | 326 | MOTION with Memorandum in Support by Orlando Cordia Hall to suppress purported jail statements (3 pages) (bam) Modified on 10/06/1995 (Entered: 09/21/1995) |
| 09/20/1995 | 327 | RESPONSE by USA as to Orlando Cordia Hall re [187-1] motion to dismiss government's request for the death penalty because of racial discrimination in capital charging by the government AND request for discovery of information pertaining to the govts capital charging for purposes of an evidentiary hearing (10 pages) (bam) (Entered: 09/21/1995) |
| 09/20/1995 | 328 | ORDER as to Orlando Cordia Hall granting [314-1] motion to extend time in which to file witness and exhibit list as to Orlando Cordia Hall (2), and set amended motion filing deadline for amended witness and exhibit lists, which superseded lists filed on 9/18/95, for 9/18/95 cc: all - 9/20/95 Page(s): 1 ( |

| | | | Signed by Judge Terry R. Means ) (bam) (Entered: 09/21/1995) |
|---|---|---|---|
| 09/20/1995 | 329 | | ORDER PARTIALLY GRANTING MOTION FOR DISCOVERY AND FOR A BILL OF PARTICULARS AS TO AGGRAVATION... as to Orlando Cordia Hall granting in part, denying in part [195-1] motion for discovery and a bill of particulars as to aggravation as to Orlando Cordia Hall (2)...Motion for Discovery is partially granted in that govt shall provide discovery requested...motion is denied to extent it requests a bill of particulars as to aggravation... cc: all - 9/20/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/21/1995) |
| 09/20/1995 | 330 | | ORDER DENYING MOTION FOR DISCLOSURE OF EXCULPATORY EVIDENCE... as to Orlando Cordia Hall denying [180-1] motion for Disclosure of Exculpatory Evidence as to Orlando Cordia Hall (2) cc: all - 9/20/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/21/1995) |
| 09/20/1995 | 331 | | ORDER RENDERING MOTION TO COMPEL MOOT... as to Orlando Cordia Hall mooting [178-1] motion to compel prosecution to disclose any non-statutory aggravating factor it will present at the sentencing hearing as to Orlando Cordia Hall (2) cc: all - 9/20/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/21/1995) |
| 09/20/1995 | 332 | | NOTICE of Final Version of Juror Questionnaire signed by Judge Terry Means as to Orlando Cordia Hall...Court has added question #124 which asks the jury panel if they know/heard of any of the potential witnesses...Court has also added Asst US Atty Chris Curtis's name to question #110 and Court modified the language of letter "m" on page 29 (bam) (Entered: 09/21/1995) |
| 09/20/1995 | 333 | | ***STRICKEN PER ORDER FILED 9/22/95***RESPONSE by USA as to Orlando Cordia Hall re [186-1] motion in limine as to defendant's statements (5 pages) (bam) Modified on 09/26/1995 (Entered: 09/21/1995) |
| 09/20/1995 | 335 | | MOTION by USA as to Orlando Cordia Hall for leave to file Response to Motion to Dismiss the Govt's Request for the Death Penalty because of racial discrimination in capital charging by the govt and request for discovery of information pertaining to the govt's capital charging for purposes of an evidentiary hearing and to file response to dft's motion in limine as to co-conspirator statements (4 pages) (bam) (Entered: 09/21/1995) |
| 09/20/1995 | 334 | | SEALED DOCUMENT as to Orlando Cordia Hall (bam) (Entered: 10/23/1995) |
| 09/22/1995 | 336 | | Minute entry as to Orlando Cordia Hall : O. Hall-dft, R. Roper-AUSA, and M. Ware-appt atty present; Held before Judge Terry R. Means Court Reporter: Debbie Roberts...9:00 - 10:00 Jury Impanelment - distributionof Jury Questionnaire; 1:00 - 2:00 Jury Impanelment - distribution of Jury Questionnaire; 3:00 - 4:00 Jury Impanelment - distribution of Jury Questionnaire (1 page) (bam) (Entered: 09/26/1995) |
| 09/22/1995 | 337 | | MOTION with Memorandum in Support by Orlando Cordia Hall to suppress purported jail statements (3 pages) (bam) (Entered: 09/26/1995) |

| 09/22/1995 | 338 | Reuqest for copies of Exhibits of the Suppression Hearing held on 9/1/95 by Orlando Cordia Hall (2 pages) (bam) (Entered: 09/26/1995) |
|---|---|---|
| 09/22/1995 | 339 | MOTION by Orlando Cordia Hall dft's co-counsel to order CJA Form 30 be filed under seal (3 pages) (bam) (Entered: 09/26/1995) |
| 09/22/1995 | 340 | MOTION by Orlando Cordia Hall dft's co-counsel to order CJA Form 31 be filed under seal (3 pages) (bam) (Entered: 09/26/1995) |
| 09/22/1995 | 341 | ORDER as to Orlando Cordia Hall partially granting [232-1] motion in limine as to Orlando Cordia Hall...dft, his counsel, agents, and witnesses shall not testify about, refer to, mention, or allude to matters without first obtaining a ruling outside of the hearing of the jury (SEE ORDER FOR SPECIFICS) (2) cc: all - 9/22/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/26/1995) |
| 09/22/1995 | 342 | ORDER as to Orlando Cordia Hall partially granting [335-1] motion for leave to file Response to Motion to Dismiss the Govt's Request for the Death Penalty because of racial discrimination in capital charging by the govt and request for discovery of information pertaining to the govt's capital charging for purposes of an evidentiary hearing and to file response to dft's motion in limine as to co-conspirator statements as to Orlando Cordia Hall (2) striking [333-1] motion response as to Orlando Cordia Hall since identical response was timely filed on 7/19/95 (2) cc: all - 9/22/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/26/1995) |
| 09/22/1995 | 343 | ORDER as to Orlando Cordia Hall denying [176-1] motion TO PRECLUDE THE PROSECUTION FROM "DEATH QUALIFYING" THE POTENTIAL JURY as to Orlando Cordia Hall (2) cc: all - 9/22/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/26/1995) |
| 09/22/1995 | 344 | ORDER as to Orlando Cordia Hall denying [175-1] motion TO PROHIBIT CONSIDERATION OF MISCONDUCT NOT RESULTING IN CONVICTION DURING THE AGGRAVATION/MITIGATION PHASE OF THE SENTENCING HEARING as to Orlando Cordia Hall (2) cc: all - 9/22/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/26/1995) |
| 09/22/1995 | 345 | ORDER as to Orlando Cordia Hall denying [184-1] motion to reduce defendant's oral statements to writing and/or for limine order as to Orlando Cordia Hall (2), granting [186-1] motion in limine as to defendant's statements as to Orlando Cordia Hall (2)...counsel for govt, agents, witnesses shall not testify about, refer to, mention, or allude to any oral or written stmt made by dft O. Hall to any law enforcement officer without first obtaining a ruling outside of the hearing of the jury that such evidence is admissible... cc: all - 9/22/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/27/1995) |
| 09/22/1995 | 346 | ORDER as to Orlando Cordia Hall denying [182-1] motion to reduce out-of-court statement's of co-conspirators to writing as to Orlando Cordia Hall (2), denying [182-2] motion for limine order as to Orlando Cordia Hall |

| | | | |
|---|---|---|---|
| | | | (2), denying [177-1] motion in limine as to statements by alleged co-conspirators and brief in support as to Orlando Cordia Hall (2) cc: all - 9/22/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/27/1995) |
| 09/25/1995 | 347 | | RESPONSE by USA as to Orlando Cordia Hall re [337-1] motion to suppress purported jail statements (4 pages) (bam) (Entered: 09/27/1995) |
| 09/25/1995 | 348 | | RESPONSE by USA as to Orlando Cordia Hall re [285-1] motion to suppress lineup, photospread and other pre-trial and trial identification evidence (6 pages) (bam) (Entered: 09/27/1995) |
| 09/25/1995 | 349 | | MOTION with Memorandum in Support by Orlando Cordia Hall for extension of time in which to file dft's objections, proposed additions, or proposed substitutions to the govt's proposed jury instructions and verdict forms for the guilt/innocence phase and punishment phase of the trial (4 pages) (bam) (Entered: 09/27/1995) |
| 09/25/1995 | 350 | | ORDER as to Orlando Cordia Hall granting [339-1] motion dft's co-counsel to order CJA Form 30 be filed under seal as to Orlando Cordia Hall (2) cc: all - 9/25/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/27/1995) |
| 09/25/1995 | 351 | | ORDER as to Orlando Cordia Hall granting [340-1] motion dft's co-counsel to order CJA Form 31 be filed under seal as to Orlando Cordia Hall (2) cc: all - 9/25/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/27/1995) |
| 09/26/1995 | 352 | | Minute entry as to Orlando Cordia Hall :O. Hall-dft, R. Roper, C. Curtis, D. Watson, P. Mecaluso-AUSA, M. Ware, J. Kearney-apptd atty present for pretrial conference held in courtroom on record; Held before Judge Terry R. Means Court Reporter: Debbie Roberts (1 page) (bam) (Entered: 09/27/1995) |
| 09/26/1995 | 353 | | ORDER as to Orlando Cordia Hall granting [349-1] motion for extension of time in which to file dft's objections, proposed additions, or proposed substitutions to the govt's proposed jury instructions and verdict forms for the guilt/innocence phase and punishment phase of the trial as to Orlando Cordia Hall (2)...ORDERED that deadline set for 9/26/96 for filing objections, proposed, additions, or substitutions to govt's jury charges and verdict forms... cc: all - 9/26/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/27/1995) |
| 09/26/1995 | 354 | | MOTION by Orlando Cordia Hall for production of pre-sentence reports on separately convicted co-dfts and other related individuals (3 pages) (bam) (Entered: 09/27/1995) |
| 09/27/1995 | 355 | | RESPONSE by USA as to Orlando Cordia Hall re [354-1] motion for production of pre-sentence reports on separately convicted co-dfts and other related individuals (2 pages) (bam) (Entered: 09/27/1995) |
| 09/27/1995 | 356 | | ORDER as to Orlando Cordia Hall denying [354-1] motion for production of pre-sentence reports on separately convicted co-dfts and other related |

| | | |
|---|---|---|
| | | individuals as to Orlando Cordia Hall (2) cc: all - 9/27/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/27/1995) |
| 09/27/1995 | 357 | ORDER as to Orlando Cordia Hall denying [187-1] motion to dismiss government's request for the death penalty because of racial discrimination in capital charging by the government as to Orlando Cordia Hall (2), denying [187-2] motion request for discovery of information pertaining to the government's capital charging for purposes of an evidentiary hearing as to Orlando Cordia Hall (2) cc: all - 9/27/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/27/1995) |
| 09/27/1995 | 358 | ORDER as to Orlando Cordia Hall granting [338-1] request for copies of exhibits of the suppression hearing held on 9/1/95 as to Orlando Cordia Hall (2)...copies of def exhibits one & two are available for dft's counsel at Court's chambers... cc: all - 9/27/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/27/1995) |
| 09/27/1995 | 359 | Objections, Additions, and Substitutions to the Government's Proposed Penalty Phase Jury Instructions by Orlando Cordia Hall (6 pages) (bam) (Entered: 09/28/1995) |
| 09/27/1995 | 360 | Objections, Proposed Additions, and Substitutions to the Government's Proposed Penalty Phase Special Findings Forms and Verdict Forms by Orlando Cordia Hall (5 pages) (bam) (Entered: 09/28/1995) |
| 09/27/1995 | 361 | Proposed Jury Instructions for the Guilt/Innocence Phase of the Trial by Orlando Cordia Hall (11 pages) (bam) (Entered: 09/28/1995) |
| 09/29/1995 | 363 | MOTION by Orlando Cordia Hall for reconsideration of [356-1] order regarding motion for production of pre-sentence reports on separately convicted co-dfts and other related individuals (6 pages) (bam) (Entered: 09/29/1995) |
| 09/29/1995 | 365 | ORDER DENYING MOTION TO SUPPRESS LINEUP, PHOTOSPREAD, AND OTHER PRETRIAL AND TRIAL IDENTIFICATION EVIDENCE AND REQUIRING IN CAMERA SUBMISSION BY GOVERNMENT as to Orlando Cordia Hall, ORDERED that dft's motion to suppress lineup, photospread and other pre-trial and trial identification evidence is denied...ORDERED that gvt submit photospreads used in pretrial id procedures and phots taken, of the corporeal lineups involving dft to Court in camera no later than 12:00 noon on 10/2/95...each item to contain exhibit label numbered with govt's filed exhibit list. Court will review exhibits, determine whether they appear to be impermissibly suggestive and, if so, if suggestive nature created substantial risk of misidentification, and return them tocounsel for govt prior to trial...Clerk to transmit copy of order by fax to counsel cc: all - 9/29/95 Page(s): 5 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/02/1995) |
| 09/29/1995 | 366 | ORDER DENYING MOTIONTO SUPPRESS JAIL STATEMENTS as to Orlando Cordia Hall denying [326-1] motion to suppress purported jail statements as to Orlando Cordia Hall (2)...ORDRED that clerk fax copy of |

| | | | |
|---|---|---|---|
| | | | this order to counsel cc: all - 9/29/95 Page(s): 3 ( Signed by Judge Terry R. Means ) (bam) Modified on 10/02/1995 (Entered: 10/02/1995) |
| 09/29/1995 | | 367 | Witness list by Orlando Cordia Hall (15+ pages) (bam) Modified on 10/02/1995 (Entered: 10/02/1995) |
| 09/29/1995 | | 368 | Exhibit list by Orlando Cordia Hall (2 pages) (bam) (Entered: 10/02/1995) |
| 09/29/1995 | | 369 | Second Supplemental NOTICE of Of Intent To Offer Expert Testimony by Orlando Cordia Hall (3 pages) (bam) (Entered: 10/02/1995) |
| 10/02/1995 | | 370 | MOTION with Memorandum in Support by USA as to Orlando Cordia Hall to seal documents (3 pages) (bam) (Entered: 10/02/1995) |
| 10/02/1995 | | 371 | ORDER REGARDING IN CAMERA SUBMISSION OF PHOTOSPREAD AND PHOTOGRAPHS OF PHYSICAL LINEUP as to Orlando Cordia Hall, after carefule review of the photos, Court finds no suggestiveness...assuming other conditions of admissibility are met, these photos and identification testimony from witnesses who viewed, prior to trial, either photospread or physical lineup depicted in the photo will be admitted...copies of pictures submitted for Court's in camera review will be Court's exhibit #3 cc: all - 10/2/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/02/1995) |
| 10/02/1995 | | 372 | ORDER as to Orlando Cordia Hall granting [370-1] motion to seal 8/1/95, response documents as to Orlando Cordia Hall (2) cc: in court Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/02/1995) |
| 10/02/1995 | | 373 | ORDER as to Orlando Cordia Hall granting [363-1] motion for reconsideration of [356-1] order regarding motion for production of pre-sentence reports on separately convicted co-dfts and other related individuals as to Orlando Cordia Hall (2), vacating [356-1] order as to Orlando Cordia Hall (2), granting dft's motion for Production of Pre-Sentence Reports on separately convice co-dfts and other related individuals, and US Probation is hereby ORDERED to submit to Court in camera, no later than 4:30p.m., on 10/6/95, any presentence reports, notes, and/or other memorandum prepared by probation officers while gathering info during presentence investigation process regarding: (1) Steven Beckley, (2) Demetrius Hall, (3) Marvin Holloway, (4) Stanfield Vitalis, (5) Neil Nick Rene...ORDERED that clerk transmit copy of this order to Van Smith cc: all - 10/4/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/04/1995) |
| 10/02/1995 | | 374 | Minute entry as to Orlando Cordia Hall :O. Hall-dft, R. Roper, D. Watson, P. Macaluso-AUSA, and J. Kearney, M. Ware, K. McNally-dft's atty present for Voir Dire; Held before Judge Terry R. Means Court Reporter: Debbie Roberts...Preliminary matters (outside of presence of panel members) oral motion from dft for continuance...originals of Jury Questionnaires marked as Court's Exhibit #2 and sealed...copies of photospread and copy of photo of physical lineup submitted to Court in camera by govt will be marked as Court's Exhibit #3 (not sealed)...Dfts 9/29/95 second supplemental notice of |

| | | | |
|---|---|---|---|
| | | | intent to offer expert trestimony will be allowed, although untimely, per agrmt of govt...dfts oral motion for continuance denied...dfts request of Mike Ware will be allowed to come and go during voir dire so to continue defense preparations for trial...govts request to use charts setting forth law applicable to case during voir dire denied (1 page) (bam) (Entered: 10/04/1995) |
| 10/02/1995 | | | MOTION in open court by Orlando Cordia Hall to continue (bam) (Entered: 10/04/1995) |
| 10/02/1995 | | | ORAL ORDER as to Orlando Cordia Hall denying [0-0] oral motion to continue as to Orlando Cordia Hall (2) cc: Page(s): 0 ( Entered by Judge Terry R. Means ) (bam) (Entered: 10/04/1995) |
| 10/02/1995 | | | Voir dire begun as to Orlando Cordia Hall (2) count(s) 1-2, 3, 4, 6 (1 page) (bam) (Entered: 10/05/1995) |
| 10/03/1995 | 375 | | Minute entry as to Orlando Cordia Hall : O. Hall-dft, R. Roper, C. Curtis, D. Watson, P. Macaluso-AUSA, J. Kearney, M. Ware-dft atty present for 2nd day of voir dire; Held before Judge Terry R. Means Court Reporter: Debbie Roberts...DEFT'S challenge for cause as to panel #1 granted; to panel #2 denied;to Panel #7 denied; to Panel #11 granted; to Panel #12 taken under advisement....GOVT'S challenge for cause as to Panel #3 granted; to Panel #6 granted; to Panel #9 granted;...Panel #8 excused per Judge, with agreement of parties (1 page) (bam) Modified on 10/06/1995 (Entered: 10/05/1995) |
| 10/04/1995 | 376 | | Minute entry as to Orlando Cordia Hall : O. Hall-dft, R. Roper, C. Curtis, D. Watson, P. Macaluso-AUSA, J. Kearney-dft atty present for day 3 of voir dire; Held before Judge Terry R. Means Court Reporter: Debbie Roberts...dft's challenger for cause as to Panel #13, #14, #16 granted...dft's challenge for cause for Panel #17 denied...Panel Member #21 stricken (bam) (Entered: 10/06/1995) |
| 10/05/1995 | 377 | | Minute entry as to Orlando Cordia Hall : O. Hall-dft, R. Roper, D. Watson, P. Macaluso-AUSA, J. Kearney-dft atty present for Day 4 of Voir Dire; Held before Judge Terry R. Means Court Reporter: Debbie Roberts Dft's challenge for cause as to Panel Member #5, and #29 granted; Panel Member #26 excused, Dft challenge for cause to Panel Member #30 denied, Govt previously made request to reinstate Panel Mbr #1 denied...Recessed until 10/10/95 at 9:00a.m. (1 page) (bam) (Entered: 10/12/1995) |
| 10/06/1995 | 378 | | MOTION by USA as to Orlando Cordia Hall for leave to file Amended Witness and Exhibit Lists (4 pages) (bam) (Entered: 10/12/1995) |
| 10/10/1995 | 379 | | Minute entry as to Orlando Cordia Hall :O. Hall-dft,Roper-AUSA, Kearney-dft atty present for 5th day of Voir Dire; Held before Judge Terry R. Means Court Reporter: Debbie Roberts Dfts/govt challenge for cause as to Panel Members #12,22,32 are granted, Dft/Govt challenge for cause as to Panel Members #33 and #35 denied (1 page) (bam) Modified on 10/12/1995 (Entered: 10/12/1995) |

(32)

| | | | |
|---|---|---|---|
| 10/11/1995 | 380 | Minute entry as to Orlando Cordia Hall : O. Hall-dft, Roper, Macaluso and Watson-AUSA, Kearney, Ware-dft atty present for 6th day of Voir Dire; Held before Judge Terry R. Means Court Reporter: Debbie Roberts Panel Member #39 excused; Dft challenge for cause to Panel Member #37, 45 and 47 denied; Dft challenger for cuase to Panel Member #46 granted (1 page) (bam) Modified on 10/12/1995 (Entered: 10/12/1995) | |
| 10/11/1995 | 381 | ORDER MODIFYING PARAGRAPH 21 OF AMENDED SCHEDULING ORDER FOR CRIMINAL TRIAL AND PRETRIAL ORDER as to Orlando Cordia Hall, Par 21 to read: 2 alternate jurors shall be chosen upon exercise of 1 peremptory challenge by Dft and 1 peremptory challgenge by govt against potential alternate jurors cc: all - 10/11/95 Page(s): 1 ( Signed by Judge Terry R. Means )(bam) Modified on 10/12/1995 (Entered: 10/12/1995) | |
| 10/11/1995 | 382 | ORDER MODIFYING PARAGRAPH 19 OF 2ND AMENDED SCHEDULING ORDER as to Orlando Cordia Hall, to read: 2 alternate jurors shall be chose upon exercise of 1 peremptory challenge by dft and 1 peremptory challenge by govt against potential alternate jurors cc: all - 10/11/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/12/1995) | |
| 10/11/1995 | 383 | ORDER as to Orlando Cordia Hall granting [378-1] motion for leave to file Amended Witness and Exhibit Lists as to Orlando Cordia Hall (2), and set filing deadline for witness and exhibit lists for 4:30 10/13/95 cc: all - 10/11/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/12/1995) | |
| 10/11/1995 | 454 | Unsealed per 8/3/00 Order (#980)...CJA 30 as to Orlando Cordia Hall Authorization to Pay Michael Logan Ware $ 20,773.50 Replacement Voucher # D24004 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) | |
| 10/11/1995 | 455 | Unsealed per 8/3/00 Order (#980)....CJA 30 as to Orlando Cordia Hall Authorization to Pay Michael Logan Ware $ 15,873.70 Voucher # D24004 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) | |
| 10/12/1995 | 385 | Minute entry as to Orlando Cordia Hall :O. Hall-dft, Roper, Macaluso, Watson, Curtis - AUSA, Kearney, Ware-dft atty present for 7th day of Voir Dire; Held before Judge Terry R. Means Court Reporter: Debbie Roberts Govt challenge for cause to Panel Mbr #40 denied, and grnated to Panel Mbr #49...Dft challenge to Panel Mbr #48 denied and Panel Mbr #57 granted...Panel Mbr #55 and $56 excused (1 page) (bam) (Entered: 10/13/1995) | |
| 10/12/1995 | 386 | MOTION by USA as to Orlando Cordia Hall for Mental Health Examination of Dft Orlanda Cordia Hall (9) (bam) (Entered: 10/13/1995) | |
| 10/12/1995 | 387 | MOTION by USA as to Orlando Cordia Hall for leave to file Fourth Supplemental Notice of Intent to Offer Expert Testimony (4 pages) (bam) (Entered: 10/13/1995) | |

| 10/12/1995 | 384 | Unsealed per 8/3/00 Order (#980)...EX PARTE MOTION as to defendant Orlando Cordia Hall for additional services required of mitigation specialist (6 pg) (dld) (Entered: 08/09/2000) |
| 10/13/1995 1033 | 389 | MOTION with Memorandum in Support by Orlando Cordia Hall for leave to file Supplemental Proposed Penalty Phase Jury Instructions and Verdict Forms (15+ pages) (bam) (Entered: 10/13/1995) |
| 10/13/1995 1084 | 390 | Minute entry as to Orlando Cordia Hall : O. Hall-dft, Roper-AUSA, Kearney-retd atty present for Day 8 of Voir Dire ; Held before Judge Terry R. Means Court Reporter: Debbie Roberts...Govt challenge for cause granted for Panel Members #60, 63, and denied for Members #64, 67, Dft chall granted for Panel Members #66,70, and denid for members #68, Panel Members #62 and 69 stricken (1 page) (bam) (Entered: 10/16/1995) |
| 10/13/1995 1085 | 391 | ORDER as to Orlando Cordia Hall granting [387-1] motion for leave to file Fourth Supplemental Notice of Intent to Offer Expert Testimony as to Orlando Cordia Hall (2), and set filing deadline for 4:30 10/19/95 cc: all - 10/13/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/16/1995) |
| 10/13/1995 1086 | 392 | AMENDED Witness list by USA as to Orlando Cordia Hall (15+) (bam) (Entered: 10/16/1995) |
| 10/13/1995 1111 | 393 | First AMENDED Exhibit list by USA as to Orlando Cordia Hall (15+) (bam) (Entered: 10/16/1995) |
| 10/13/1995 | 388 | Unsealed per 8/3/00 Order (#980)...ORDER as to Orlando Cordia Hall granting [384-1] exparte motion for additional services required of mitigation specialist as to Orlando Cordia Hall (2) cc: 10/13/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 10/16/1995 1140 | 394 | RESPONSE by Orlando Cordia Hall in opposition to [386-1] motion for Mental Health Examination of Dft Orlanda Cordia Hall (12 pages) (bam) (Entered: 10/17/1995) |
| 10/16/1995 1152 | 395 | ORDER as to Orlando Cordia Hall granting [389-1] motion for leave to file Supplemental Proposed Penalty Phase Jury Instructions and Verdict Forms as to Orlando Cordia Hall (2), and set filing deadline for 4:30 10/20/95 cc: all - 10/16/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/17/1995) |
| 10/17/1995 1153 | 396 | Minute entry as to Orlando Cordia Hall :O. Hall-dft, R. Roper, C. Curtis, D. Watson, P. Macaluso-AUSA, J. Kearney, M. Ware-deft atty present for 9th day of voir dire... Terry R. Means Court Reporter: Debbie Roberts...Pan. Mbr #114 execused; Pan Mbr #51,53,73,74,76,78 stricken for cause, Govt challenge for Pan Mbr #75,77 denied (1 page) (bam) (Entered: 10/18/1995) |
| 10/17/1995 1154 | 397 | MOTION by Orlando Cordia Hall for leave to file First Supplemental Witness List (6 pages) (bam) (Entered: 10/18/1995) |

(34)

| | | |
|---|---|---|
| 10/17/1995 | 398 | ORDER as to Orlando Cordia Hall granting [397-1] motion for leave to file First Supplemental Witness List as to Orlando Cordia Hall (2), and set filing deadline for 4:30 10/23/95 cc: all - 10/18/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/18/1995) |
| 10/18/1995 | 399 | MOTION and brief by Orlando Cordia Hall for continuance (6 pages) (bam) (Entered: 10/19/1995) |
| 10/18/1995 | 400 | MOTION by Orlando Cordia Hall for leave to file First Supplemental Exhibit List (7 pages) (bam) (Entered: 10/19/1995) |
| 10/18/1995 | 401 | Proposed Verdict Forms by Orlando Cordia Hall (14 pages) (bam) (Entered: 10/19/1995) |
| 10/18/1995 | 402 | Supplemental Proposed Requested Penalty Phase Instructions by Orlando Cordia Hall (15+ pages) (bam) (Entered: 10/19/1995) |
| 10/18/1995 | 403 | Minute entry as to Orlando Cordia Hall : O. Hall-dft; R. Roper, C. Curtis, D. Watson, P. Macaliso-AUSA; J. Kearney, M. Ware-retd cnsl present for 10th day of Voir Dire; Held before Judge Terry R. Means Court Reporter: Debbie Robertsi...Panel Mbrs #84,88,90,92 stricken for cause and Pan. Mbrs #102 excused by agreement (1 page) (bam) (Entered: 10/19/1995) |
| 10/18/1995 | 404 | MOTION by Orlando Cordia Hall SEALED MOTION (8 pages) (bam) (Entered: 10/19/1995) |
| 10/19/1995 | 405 | ORDER as to Orlando Cordia Hall granting [404-1] motion SEALED MOTION as to Orlando Cordia Hall (2) cc: all - 10/19/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/19/1995) |
| 10/19/1995 | 406 | ORDER as to Orlando Cordia Hall partially granting dft [400-1] motion for leave to file First Supplemental Exhibit List as to Orlando Cordia Hall (2),...PARTIALLY GRANTED dft to supplement list of exhibits bur rather than file supplemental list, dft shall file a second amended exhibit list that lists ALL exhibits to be introduced at trial and set filing deadline for Amended Exhibit List for 4:30 10/23/95 cc: all - 10/19/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/19/1995) |
| 10/19/1995 | 407 | ORDER as to Orlando Cordia Hall denying [399-1] motion for continuance as to Orlando Cordia Hall (2) cc: all - 10/19/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/19/1995) |
| 10/19/1995 | 409 | FOURTH SUPPLEMENTAL NOTICE of of Intent to Offer Expert Testimony by USA as to Orlando Cordia Hall (3 pages) (bam) (Entered: 10/23/1995) |
| 10/19/1995 | 410 | ORDER as to Orlando Cordia Hall granting in part, denying in part [386-1] motion for Mental Health Examination of Dft Orlanda Cordia Hall as to Orlando Cordia Hall (2)...GRANTING in part, if dft persists to present expert testimony from mental health experts at penalty phase, then dft shall submit to an exam by a mental health expert chosen by the govt, and exam shall occur on 10/23/95...motion is DENIED to extent that disclosure of reports is |

(35)

| | | | |
|---|---|---|---|
| | | | required as a matter of fundamental fairness when the govt is being permitted to conduct its own exam... cc: all 10/19/95 Page(s): 4 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/23/1995) |
| 10/19/1995 | | 412 | Minute entry as to Orlando Cordia Hall : O. Hall-dft, R. Roper, C. Curtis, D. Watson, P. Macaluso-AUSA, J. Kearney, M. Ware all present for Day #11 of Voir Dire; Held before Judge Terry R. Means Court Reporter: Debbie Roberts...Panel Mbrs #97 and 98 stricken for cause (1 page) (bam) (Entered: 10/25/1995) |
| 10/20/1995 | | 408 | MOTION by USA as to Orlando Cordia Hall SEALED MOTION (2 pages) (bam) (Entered: 10/20/1995) |
| 10/20/1995 | | 411 | SEALED DOCUMENT as to Orlando Cordia Hall (15+ pages) (bam) (Entered: 10/23/1995) |
| 10/20/1995 | | 413 | Minute entry as to Orlando Cordia Hall : O. Hall-dft, R. Roper, C. Curtis, D. Watson, P. Macaluso-AUSA, J. Kearney, M. Ware-retd atty present; Held before Judge Terry R. Means Court Reporter: Debbie Roberts...Dft's motion to seal govts 404b mtn and separate summary of punishment phase evidence...peremptory challenges taken up; court delivered final list of qualified jurors reflecting the peremptories exercised by both parties to counsel, which list also reflected remaining jurors (12 jurors, 4 alternates)...Objections to peremptory challgs. including objections based on Batson, taken up and all overruled...govt and dft permitted to file trial briefs under seal...dft asserts 5th amd rights and will not submit to mental health exam by govts expert...court allows dfts to present mental health experts testimony by proffer outside of jury...courts exhibits 4 & 5 admitted for purposes of appeal (1 page) (bam) (Entered: 10/25/1995) |
| 10/20/1995 | | 414 | Judge's Voir Dire Worksheet as to Orlando Cordia Hall (12 pages) (bam) (Entered: 10/25/1995) |
| 10/20/1995 | | 415 | Government's Strike List by USA as to Orlando Cordia Hall (3 pages) (bam) (Entered: 10/25/1995) |
| 10/20/1995 | | 416 | Defense Strike List by Orlando Cordia Hall (3 pages) (bam) (Entered: 10/25/1995) |
| 10/20/1995 | | 417 | Master Strike List of Qualified Jurors (for peremptory Challenges) as to Orlando Cordia Hall (3 pages) (bam) (Entered: 10/25/1995) |
| 10/20/1995 | | 452 | Unsealed per 8/3/00 Order (#980)...CJA 31 Authorization to Pay Michael Logan Ware $ 4,019.95 Voucher # D11814 cc: 10/20/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 10/23/1995 | | 418 | Jury roll as to Orlando Cordia Hall . (1 page) (bam) (Entered: 10/25/1995) |
| 10/23/1995 | | 419 | ORDER as to Orlando Cordia Hall, sealed cc: all - 10/23/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/25/1995) |
| 10/23/1995 | | 420 | MOTION by Orlando Cordia Hall SEALED MOTION (6 pages) (bam) (Entered: 10/25/1995) |

| 10/23/1995 | 421 | MOTION with Memorandum in Support by Orlando Cordia Hall for writ of habeas corpus Ad Testificandum (2 pages) (bam) (Entered: 10/25/1995) |
|---|---|---|
| 10/23/1995 | 422 | MOTION by Orlando Cordia Hall for opening statement (2 pages) (bam) (Entered: 10/25/1995) |
| 10/23/1995 | 423 | Second Amended Exhibit list by Orlando Cordia Hall (5 pages) (bam) (Entered: 10/25/1995) |
| 10/23/1995 | 424 | First Supplemental Witness list by Orlando Cordia Hall (3 pages) (bam) (Entered: 10/25/1995) |
| 10/23/1995 | 425 | ORDER as to Orlando Cordia Hall, sealing govt's Notice of Intent to Offer Evidence filed 9/18/95; and govt's Notice of General Nature of Evidence the govt Intends to Introduce at Punishment Phase filed 9/20/95; govt's Trial Memorandum filed 10/20/95 cc: all - 10/23/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/25/1995) |
| 10/24/1995 | 426 | Minute entry as to Orlando Cordia Hall : O. Hall-dft; R. Roper, C. Curtis, D. Watson, P. Macaluso-AUSA; J. Kearney, M. Ware-dft atty present for 13th day of trial; Held before Judge Terry R. Means Court Reporter: Debbie Roberts...govt reviewed 404(b) evidence for opening stmt in court...additional questioning of juror #1 who was excused over dft's objection, and alternate #1 move to jurory #1 spot...The rule was invoked and possible witnesses were excluded from courtroom (1 page) (bam) (Entered: 10/25/1995) |
| 10/24/1995 | 427 | ORDER as to Orlando Cordia Hall denying [189-1] motion to declare the death penalty statute unconstitutional as to Orlando Cordia Hall (2) cc: all - 10/24/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/25/1995) |
| 10/24/1995 | 428 | ORDER as to Orlando Cordia Hall granting [421-1] motion for writ of habeas corpus Ad Testificandum as to Orlando Cordia Hall (2)...ORDERED that Alonzo Airy, presently in FCI to be brought before Court on 10/31/95 at 9:00a.m. cc: all - 10/24/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/25/1995) |
| 10/24/1995 | 429 | WRIT of Habeas Corpus ad Testificandum issued for Alonzo Airy for 10/31/95 at 9:00 a.m. in case as to Orlando Cordia Hall (2 pages) (bam) (Entered: 10/25/1995) |
| 10/24/1995 | 430 | ORDER as to Orlando Cordia Hall granting [422-1] motion for opening statement as to Orlando Cordia Hall (2)...both parties will be permitted to make a brief opening stmt at commencement of punishment phse, if any, which stmts will be deducted from each parties' total trial time... cc: all - 10/24/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/25/1995) |
| 10/24/1995 | 431 | SEALED ORDER as to Orlando Cordia Hall granting [420-1] motion SEALED MOTION as to Orlando Cordia Hall (2) cc: all - 10/24/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/25/1995) |

| 10/25/1995 | 432 | MOTION by Orlando Cordia Hall to unseal records (3 pages) (bam) (Entered: 10/25/1995) |
|---|---|---|
| 10/25/1995 | 433 | MOTION by Orlando Cordia Hall SEALED MOTION (5 pages) (bam) (Entered: 10/25/1995) |
| 10/25/1995 | 434 | Minute entry as to Orlando Cordia Hall : O. Hall - R. Roper, C. Curtis, D. Watson, P. Macaluso-AUSA and J. Kearney, M. Ware-appt atty present for 14th day of trial; Held before Judge Terry R. Means Court Reporter: Debbie Roberts...plf's evidence presented...Court recessed until 9:00 a.m. on 10/26/95 (1 page) (bam) (Entered: 10/30/1995) |
| 10/26/1995 | 435 | Minute entry as to Orlando Cordia Hall : O. Hall-dft, R. Roper,etc-AUSa, and J. Kearney, M. Ware-appt atty present for 15th day of trial; Held before Judge Terry R. Means Court Reporter: Debbie Roberts...Plf's evidence presented...court recessed until 10/27/95 at 9:00 a.m. (1 page) (bam) (Entered: 10/30/1995) |
| 10/26/1995 | 439 | Return of Service regarding subpoena to Kirk Meehan by Orlando Cordia Hall...return unexecuted on 10/24/95 (2 pages) (bam) (Entered: 11/02/1995) |
| 10/26/1995 | 453 | Unsealed per 8/3/00 Order...CJA 31 Authorization to Pay Michael Logan Ware $ 1,822.00 Voucher # D11815 cc: 10/26/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 10/27/1995 | 436 | SEALED ORDER as to Orlando Cordia Hall granting [433-1] motion SEALED MOTION as to Orlando Cordia Hall (2) cc: all - 10/28/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/30/1995) |
| 10/27/1995 | 437 | ORDER as to Orlando Cordia Hall denying [432-1] motion to unseal records as to Orlando Cordia Hall (2) cc: all - 10/27/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 10/30/1995) |
| 10/27/1995 | 438 | Minute entry as to Orlando Cordia Hall :O. Hall-dft, R. Roper,etc-AUSA, J. Kearney, M. Ware-appt atty present for 16th day of trial; Held before Judge Terry R. Means Court Reporter: Debbie Roberts Juror #5 late and arrived at 10; 15, court and attys waited for him on bench...during interim, certain objections to exhibits were taken and overruled by court (on record)...court recessed until 9:00 a.m. on10/31/95 (1 page) (bam) (Entered: 10/30/1995) |
| 10/27/1995 | 456 | CJA 31 Authorization to Pay L Michael Connelley $ 3706.88 Voucher # D11804 cc: all - 10/27/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 11/22/1995) |
| 10/27/1995 | 456 | CJA 31 Authorization to Pay L.M. Connelley & Assoc. $ 3706.88 Voucher # D11804 cc: all - 10/27/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 11/28/1995) |
| 10/30/1995 | 440 | Agreed and Contested Proposed Jury Instructions and Verdict Form for the Guilt/Innocense Phas of the Trial by USA as to Orlando Cordia Hall (23 pages) (bam) (Entered: 11/02/1995) |

(38)

| 10/30/1995 | 441 | TRANSCRIPT filed in case as to Orlando Cordia Hall for dates of 9/22/95, 9:00 a.m., regarding Questionnaire Impanelment of Veniremen, by Deborah Roberts-court reporter (15++ pages) (bam) (Entered: 11/02/1995) |
|---|---|---|
| 10/30/1995 | 442 | TRANSCRIPT filed in case as to Orlando Cordia Hall for dates of 9/1/95, at6 9:15 a.m., regarding Suppression Hearing, Deborah Roberts-court reporter (15++ pages) (bam) (Entered: 11/02/1995) |
| 10/31/1995 | 443 | SEALED DOCUMENTS as to Orlando Cordia Hall (4 pages) (bam) (Entered: 11/02/1995) |
| 10/31/1995 1310 | 444 | Court's charge to jury (21 pages) (bam) (Entered: 11/02/1995) |
| 10/31/1995 1331 | 445 | Jury notes filed as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/02/1995) |
| 10/31/1995 1332 | 446 | JURY VERDICT of Guilty on Orlando Cordia Hall (2) count(s) 1-2, 3, 6 (2 pages) (bam) (Entered: 11/02/1995) |
| 10/31/1995 1334 | 447 | Minute entry as to Orlando Cordia Hall : O.Hall-dft, R. Roper, etc-AUSA, and J. Kearney, M. Ware-dft atty present for 17th day of trial; Held before Judge Terry R. Means Court Reporter: Debbie Roberts Objections to charge taken before jury brought into court---dft waived presentation of closing argument...jury retired to deliverate...court heard dft's objections to govts exhibit #36 after watching exh #36 - objections overruled...court recessed until 9:00a.m. on 11/1/95 (1 page) (bam) (Entered: 11/02/1995) |
| 11/01/1995 1335 | 448 | MOTION by Orlando Cordia Hall for leave to file Second Supplemental Witness List (6 pages) (bam) (Entered: 11/02/1995) |
| 11/01/1995 1341 | 449 | MOTION by Orlando Cordia Hall for leave to file Third Amended Exhibit List (8 pages) (bam) (Entered: 11/02/1995) |
| 11/01/1995 1349 | 450 | Minute entry as to Orlando Cordia Hall : O. Hall-dft, R. Roper-AUSA, etc, J. Kearney, M. Ware-dft atty present for 18th day of trial; Held before Judge Terry R. Means Court Reporter: Debbie Roberts...opening remarks by plf and dft began regarding sentencing and plf's evidence presented...recessed until 9:00 a.m. on 11/2/95 (1 page) (bam) (Entered: 11/03/1995) |
| 11/02/1995 1350 | 451 | Minute entry as to Orlando Cordia Hall : O. Hall-dft, R. Roper, etc-AUSA, and J. Kearney and M. Ware present for 19th day of trial; Held before Judge Terry R. Means Court Reporter: Debbie Roberts...Plf's and dft's evidence present regarding sentencing...testimony concluded...court recessed until 11/3/95 at 9:00 a.m. (1 page) (bam) (Entered: 11/03/1995) |
| 11/03/1995 1351 | 457 | Minute entry as to Orlando Cordia Hall : O. Hall-dft, R. Roper,etc-AUSA, and J. Kearney, M. Ware present for 20th day of trial; Held before Judge Terry R. Means Court Reporter: Debbie Roberts Charge of court read, closing arguments presented by plf and dft...exhibits marked...3 juror notes and 2 answered in writing and one answered in court (note requesting adjournment until Monday)...Recessed until 9:00 a.m. on 11/5/95 (1 page) (bam) (Entered: 11/13/1995) |

39

| 11/03/1995 | 458 | Court's Punishment Phase charge to jury (16 pages) (bam) (Entered: 11/13/1995) |
| 11/03/1995 | 459 | Jury notes filed as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/13/1995) |
| 11/03/1995 | 460 | Answer to Second Note From the Jury as to Orlando Cordia Hall (2 pages) (bam) (Entered: 11/13/1995) |
| 11/03/1995 | 461 | Jury notes filed as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/13/1995) |
| 11/03/1995 | 462 | Answer to First Note From the Jury as to Orlando Cordia Hall (2 pages) (bam) (Entered: 11/13/1995) |
| 11/03/1995 | 463 | Jury notes filed as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/13/1995) |
| 11/06/1995 | 464 | Receipt Into Custody of Clerk of Exhibits as to Orlando Cordia Hall...All gov't exhibits to be photographed and were taken by D. Watson on 11/6/95 and to be returned no later than 12/31/95 (1 page) (bam) (Entered: 11/13/1995) |
| 11/06/1995 | 465 | Minute entry as to Orlando Cordia Hall : O. Hall-dft, R. Roper, etc-AUSA, and J. Kearney, M. Ware -dft's atty present; Held before Judge Terry R. Means Court Reporter: Ana Warren Dft's hall's oral motion for mistrial denied...dft hall's oral motion for cout to view video in camera granted...jury verdict for sentencing returned at 1:30p.m....Sentencing set for 2/12/96...Order for PSI, Disclosure Date and Setting Sentencing to be hear...PSI due on 12/31/96...PSI Referral Form to kearney and Ware...Request for Jury to be polled granted...dft granted 30 days to file any motions...dft's custody continued (1 page) (bam) (Entered: 11/13/1995) |
| 11/06/1995 | | Sentencing set for 2/12/96 for Orlando Cordia Hall Orlando Cordia Hall (2) count(s) 1-2, 3, 4, 6 (bam) (Entered: 11/13/1995) |
| 11/06/1995 | 466 | Special Findings Form (Sentencing Verdict) as to Orlando Cordia Hall (13 pages) (bam) (Entered: 11/13/1995) |
| 11/06/1995 | 467 | SEALED DOCUMENT as to Orlando Cordia Hall (4 pages) (bam) (Entered: 11/13/1995) |
| 11/06/1995 | 468 | ORDER as to Orlando Cordia Hall granting [448-1] motion for leave to file Second Supplemental Witness List as to Orlando Cordia Hall (2) cc: all - 11/6/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 11/13/1995) |
| 11/06/1995 | 469 | ORDER as to Orlando Cordia Hall granting [449-1] motion for leave to file Third Amended Exhibit List as to Orlando Cordia Hall (2) cc: all - 11/6/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 11/13/1995) |
| 11/06/1995 | 470 | Unsealed per Order 8/3/00 (#980)...EX PARTE MOTION as to defendant Orlando Cordia Hall for additional services required of forensic pathologist (4 |

| | | |
|---|---|---|
| | | pg) (dld) (Entered: 08/09/2000) |
| 11/07/1995 | 471 | Unsealed per 8/3/00 Order (#980)...ORDER as to Orlando Cordia Hall granting [470-1] exparte motion for additional services required of forensic pathologist as to Orlando Cordia Hall (2) Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 11/08/1995　1392 | 472 | SCHEDULING ORDER FOR SENTENCING UNDER LOCAL RULE 10.9 (GUIDELINES SENTENCING) as to Orlando Cordia Hall PSI due by noon on 4:30 1/2/96 for Orlando Cordia Hall ; Objections to PSI due by noon on 4:30 1/16/96 for Orlando Cordia Hall ; PSI Addendum due by 4:30 1/30/96 for Orlando Cordia Hall ; Objections to PSI Addendum due by 4:30 2/6/96 for Orlando Cordia Hall ; Sentencing set for 9:30 2/12/96 for Orlando Cordia Hall ; cc: all - 11/8/95 Page(s): 4 ( Signed by Judge Terry R. Means ) (bam) (Entered: 11/13/1995) |
| 11/09/1995　1396 | 474 | ORDER SETTING DATE FOR PROFFER AND SETTING DEADLINE FOR POSTTRIAL MOTIONS as to Orlando Cordia Hall, Court finds proofer be made at 11:00a.m. on 11/21/95 , and reset posttrial motions under FRCrP 29, 33, and 34 filing deadline for 4:30 12/6/95 cc: all - 11/9/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 11/13/1995) |
| 11/14/1995　1397 | 476 | Proof of Svc for Subpoena to Jessica Luneau by Orlando Cordia Hall (3 pages) (bam) (Entered: 11/17/1995) |
| 11/14/1995　1399 | 477 | Proof of Service for Subpoena to Betty mcCarty re. Orlando Cordia Hall (3 pages) (bam) (Entered: 11/17/1995) |
| 11/14/1995　1401 | 478 | Return of service for Subpoena issued to A.J. Hall re. Orlando Cordia Hall as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/17/1995) |
| 11/14/1995　1402 | 479 | Proof of Service for Subpoena to Betty Hall re. Orlando Cordia Hall (1 page) (bam) (Entered: 11/17/1995) |
| 11/14/1995　1403 | 480 | Proof of Service for Subpoena issued to Mark A. Jessie re. Orlando Cordia Hall (1 page) (bam) (Entered: 11/17/1995) |
| 11/14/1995　1404 | 481 | Proof of Service for Subpoena issued re. Orlando Cordia Hall (bam) (Entered: 11/17/1995) |
| 11/14/1995　1405 | 482 | Return of Service for subpoena for Bill McCarty re. Orlando Cordia Hall (2 pages) (bam) (Entered: 11/20/1995) |
| 11/14/1995　1407 | 483 | Return of service to Marion Luneau as to Orlando Cordia Hall (2 pages) (bam) (Entered: 11/20/1995) |
| 11/14/1995　1409 | 484 | Return of service for subpoena issued to James Bennett as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/20/1995) |
| 11/14/1995　1410 | 485 | Return of Service of Subpoena issued to Greg Barber as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/20/1995) |
| 11/14/1995　1411 | 486 | Return of Service of subpoena issued to Willie Ray Norful re Orlando Cordia Hall (1 page) (bam) (Entered: 11/20/1995) |

| 11/14/1995 | 487 | Return of Service of Subpoena issued to Teresa Norful as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/20/1995) |
| 11/14/1995 | 488 | Return of Service of Subpoena issued to Detective R. Pritzen as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/20/1995) |
| 11/14/1995 | 489 | Return of Service of Subpoena issued to Sylvia Johnson Henry as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/20/1995) |
| 11/14/1995 | 490 | Return of service for subpoena issued to Maxie Thomas as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/20/1995) |
| 11/14/1995 | 491 | Return of Service of Subpoena issued to Detective John T. Stanton as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/20/1995) |
| 11/14/1995 | 492 | Return of Service of Supoena issued to Det Jim Ford as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/20/1995) |
| 11/14/1995 | 493 | Return of service of Subpoena issued to Garrett Floyd as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/20/1995) |
| 11/14/1995 | 494 | Return of Service Subpoena issued to Ken Bersano re, Orlando Cordia Hall (1 page) (bam) (Entered: 11/20/1995) |
| 11/14/1995 | 495 | Return of Service of Subpoena issued to Bob Oakley as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/20/1995) |
| 11/14/1995 | 496 | Return of Service of Subpoena issued to Special Agent Andrew Farrell as to Orlando Cordia Hall (1 page) (bam) (Entered: 11/20/1995) |
| 11/15/1995 | 497 | Update address of Michael Logan Ware by Orlando Cordia Hall (1 page) (bam) (Entered: 11/20/1995) |
| 11/16/1995 | 498 | CJA 24 as to Orlando Cordia Hall Authorization to Pay Deborah M. Roberts $ 768.00 for Transcript Voucher # 7760246199 cc: all - 11/16/95 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 11/20/1995) |
| 11/21/1995 | 499 | Minute entry as to Orlando Cordia Hall :O.Hall-dft, R. Roper, D. Watson-AUSA, M. Ware-appt atty present for dfts proffer of medical expert proceedings; Held before Judge Terry R. Means Court Reporter: Ana Warren...Testimony taken from Dr. Lisa Clayton (1 page) (bam) (Entered: 11/28/1995) |
| 11/29/1995 | 500 | TRANSCRIPT filed in case as to Orlando Cordia Hall for dates of 11/3/95...Transcript of Trial, Punishment Phase Charge Conference in Chambers, Debbie Roberts-Court Reporter...(81 pages) (bam) Modified on 03/05/1996 (Entered: 11/30/1995) |
| 11/30/1995 | 501 | MEMORANDUM OPINION AND ORDER DENYING MOTION TO SUPPRESS DFT'S STATEMENTS as to Orlando Cordia Hall denying [188-1] motion to suppress as to Orlando Cordia Hall (2) cc: all - 11/30/95 Page(s): 14 ( Signed by Judge Terry R. Means ) (bam) (Entered: 11/30/1995) |

(42)

| 12/01/1995 | 503 | Unsealed per 8/3/00 Order (#980)...CJA 30 as to Orlando Cordia Hall Authorization to Pay Michael Logan Ware $ 39,853.77 Voucher # D24004 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 12/04/1995 | 502 | Unsealed per 8/3/00 Order (#980)...EX PARTE MOTION as to defendant Orlando Cordia Hall for additional services required of mitigation specialist (8 pg) (dld) (Entered: 08/09/2000) |
| 12/06/1995 1440 | 504 | MOTION with Memorandum in Support by Orlando Cordia Hall for new trial (5 pages) (bam) (Entered: 12/11/1995) |
| 12/06/1995 1445 | 505 | Statement of Allocation by Orlando Cordia Hall (3 pages) (bam) (Entered: 12/11/1995) |
| 12/06/1995 1448 | 506 | MOTION with Memorandum in Support by Orlando Cordia Hall in Arrest of Judgment (3 pages) (bam) (Entered: 12/11/1995) |
| 12/06/1995 1451 | 507 | MOTION with Memorandum in Support by Orlando Cordia Hall for imposition of a life sentence notwithstanding the verdict , or in the alternative for new trial (5 pages) (bam) (Entered: 12/11/1995) |
| 12/08/1995 1456 | 510 | ORDER as to Orlando Cordia Hall denying [504-1] motion for new trial as to Orlando Cordia Hall (2) cc: 12/8/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 12/11/1995) |
| 12/08/1995 1457 | 511 | ORDER as to Orlando Cordia Hall denying [506-1] motion in Arrest of Judgment as to Orlando Cordia Hall (2) cc: 12/8/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 12/11/1995) |
| 12/08/1995 1458 | 512 | ORDER as to Orlando Cordia Hall denying [507-1] motion for imposition of a life sentence notwithstanding the verdict as to Orlando Cordia Hall (2), denying [507-2] motion for new trial as to Orlando Cordia Hall (2) cc: 12/8/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 12/11/1995) |
| 12/13/1995 | 516 | Unsealed per 8/3/00 Order (#980)...CJA 31 Authorization to Pay Michale Logan Ware $ 4,736.36 Voucher # D11814 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 12/13/1995 | 517 | Unsealed per 8/3/00 Order (#980)...CJA 31 Authorization to Pay Michael Logan Ware $ 4,950.74 Voucher # D11815 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 12/14/1995 1455 | 518 | CJA 20 as to Orlando Cordia Hall Authorization to Pay Mcihael Ware $ 243.00 Voucher # 196966 cc: 12/14/95 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 12/20/1995) |
| 12/14/1995 | 515 | Unsealed per 8/3/00 Order (#980)...EXPARTE ORDER as to Orlando Cordia Hall denying [502-1] Motion for additional services as to Orlando Cordia Hall (2) Page(s): 2 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |

(43)

| 01/17/1996 | 538 | Unsealed per 8/3/00 Order (#980)...CJA 31 Authorization to Pay Michael Logan Ware $ 2,200.00 Voucher # D11816 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| --- | --- | --- |
| 01/17/1996 | 539 | Unsealed per 8/3/00 Order (#980)...CJA 31 Authorization to Pay Michael Logan Ware $ 1,100.00 Voucher # D11816 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 01/17/1996 | 540 | Unsealed per 8/3/00 Order (#980)...CJA 31 Authorization to Pay Michael Logan Ware $ 1140.45 Voucher # D11815 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 01/17/1996 | 541 | Unsealed per 8/3/00 Order (#980)...CJA 31 Authorization to Pay Michael Logan Ware $ 3562.50 Voucher # D11826 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 01/25/1996 | 537 | WRIT of Habeas Corpus ad Prosequendum executed as to Orlando Cordia Hall on 12/5/95 directing Michael Omore David, held in Southern District of Tx be brought on 10/10/95 to northern District of Tx as a witness (3pgs) (bam) (Entered: 01/27/1996) |
| 02/06/1996 | 547 | TRANSCRIPT filed in case as to Orlando Cordia Hall for dates of 10/24/95, Trial - Volume 13...Debbie Roberts-Court Reporter (255pgs) (bam) (Entered: 02/06/1996) |
| 02/06/1996 | 548 | TRANSCRIPT filed in case as to Orlando Cordia Hall for dates of 10/25/95, Trial - Volume 14...Debbie Roberts-Court Reporter (216 pgs) (bam) (Entered: 02/06/1996) |
| 02/06/1996 | 549 | TRANSCRIPT filed in case as to Orlando Cordia Hall for dates of 10/26/95, Trial - Volume 15...Debbie Roberts-Court Reporter...(207pgs) (bam) (Entered: 02/06/1996) |
| 02/06/1996 | 550 | TRANSCRIPT filed in case as to Orlando Cordia Hall for dates of 10/27/95, Trial - Volume 16...Debbie Roberts-Court Reporter...(163pgs) (bam) (Entered: 02/06/1996) |
| 02/09/1996 | 603 | Unsealed per 8/3/00 Order (#980)...CJA 30 as to Orlando Cordia Hall Authorization to Pay Michael Logan Ware $ 4158.14 Voucher # D24004 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 02/09/1996 | 604 | Unsealed per 8/3/00 Order (#980)...CJA 30 as to Orlando Cordia Hall Authorization to Pay Michael Logan Ware $ 2851.65 Voucher # D24004 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 02/12/1996 | 557 | Minute entry as to Orlando Cordia Hall :O.C. Hall-dft, Roper-AUSA, and M. Ware-appt atty present for Sentencing; Held before Judge Terry R. Means Court Reporter: Ana Warren...Dft found guilty on 11/6/95 to counts 1,2,3,4 &6 of 6 count SS Indictment and commited to BOP for Count 1: until appeal is final, Court imposes death penalty; Count 2: Life; Count 3: 60 months; Count 6: 60 months and to run consecutively w/counts 2 and 3...Dft on Supervised Release for Count 2: 5 years; Count 3: 3 years; Count 6: 3 years |

| | | | |
|---|---|---|---|
| | | | and all to run concurrently...Govt dismissed Count 4, Court amended Judgment...No Fine/Restitution and $200 MSA...dft's custody continued (1pg) (bam) Modified on 02/14/1996 (Entered: 02/14/1996) |
| 02/12/1996 | | 558 | NOTICE of Right to appeal Conviction and Sentence re. Orlando Cordia Hall (1pg) (bam) (Entered: 02/14/1996) |
| 02/12/1996 | | | DISMISSAL of Count(s) on Government Motion as to Orlando Cordia Hall Counts Dismissed: Orlando Cordia Hall (2) count(s) 4 (bam) (Entered: 02/14/1996) |
| 02/12/1996 | | | Sentencing held Orlando Cordia Hall (2) count(s) 1-2, 3, 6 (dld) (Entered: 02/14/1996) |
| 02/13/1996 | | 567 | NOTICE OF APPEAL (2 pgs)(Doc #567-A) by Orlando Cordia Hall (2) count(s) 1-2, 3, 6...from conviction and sentence...no fee due, counsel appointed...co-defts were not tried with this deft...hearings and trials held...TO mailed...Cy to Judge, USMS, PT & Prob & Attys (dld) Modified on 02/28/1996 (Entered: 02/14/1996) |
| 02/14/1996 | | | Notice of appeal and certified copy of docket and CJAs' as to Orlando Cordia Hall to USCA: [567-1] appeal (dld) (Entered: 02/14/1996) |
| 02/21/1996 | | 593 | JUDGMENT Orlando Cordia Hall (2) count(s) 1,2, 3 , 6 . Dft found guilty after jury verdict on counts 1,2,3 and 6 of six count SS Indi...Judgment of Court that dft is sentenced to death on Count 1...dft committed to BOP for term of Life on Count 2, 60 months on count 3 and shall run concurrently with life sentence imposed on count 2, and dft is to serve 60 months on count 6 which shall run consecutively to sentences imposed on counts 2 and 3...If dft is ever released from prison, he shall be on supervised release for term of 5 yrs on counts 2 and 3 years on counts 3 and 6 with 7 Special conditions...No fine/restitution and $200 MSA for counts 1,2,3 and 6 ( Signed by Judge Terry R. Means ) (4pgs) (bam) (Entered: 02/26/1996) |
| 02/29/1996 | | | USCA Case Number as to Orlando Cordia Hall Re: [567-1] appeal USCA NUMBER: 96-10178 (dld) (Entered: 02/29/1996) |
| 03/05/1996 | | 628 | ***UNSEALED PER ORDER FILED 3/7/96...Neal Walker substituted as appeal atty for Jeff Kearney... MOTION by Orlando Cordia Hall SEALED MOTION (12pgs) (bam) Modified on 03/08/1996 (Entered: 03/06/1996) |
| 03/07/1996 | | 633 | ORDER as to Orlando Cordia Hall granting [628-1] SEALED MOTION as to Orlando Cordia Hall (2), and 3/5/96 motion shall be unsealed...Neal Walker is substituted as cnsl for Jeff Kearney for appeal cc: 3/7/96 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 03/08/1996) |
| 03/12/1996 | | 644 | Transcript requested in appeal as to Orlando Cordia Hall ...for dates of 8/31/95; 9/22/95; 9/26/95, 10/2/95 through 10/5/95; 10/10/95 through 10/13/95; 10/17/95 through 10/20/95; 10/24/95; 10/25/95; 10/26/95, 10/27/95; 11/1/95 through 11/3/95 [567-1] appeal Transcript due 4/11/96 for Orlando Cordia Hall (1pg) (bam) (Entered: 03/25/1996) |

| 03/12/1996 | 59 | Arrest WARRANT Returned Unexecuted as to Orlando Cordia Hall 10/28/94 WHCAP from Tarrant County Jail (2pg) (dld) (Entered: 09/25/1996) |
| 03/13/1996 | 647 | Transcript requested in appeal as to Orlando Cordia Hall [567-1] appeal by atty Michael Ware for following dates; 1/6/95;3/21/95; 6/9/95; 7/14/95; 8/14/95; 11/6/95; 11/21/95; 2/12/96. Transcript due 4/12/96 for Orlando Cordia Hall (wrb) (Entered: 03/14/1996) |
| 03/29/1996 | 665 | CJA 31 Authorization to Pay L.M. Connelley $ 4783.81 Voucher # D11804 cc: 3/29/96 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 04/01/1996) |
| 03/29/1996 | 672 | Unsealed per 8/3/00 Order (#980)...CJA 30 as to Orlando Cordia Hall Authorization to Pay Michael Logan Ware $ 525.00 Voucher # D24004 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 08/09/2000) |
| 05/20/1996 | 682 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of 3/21/95 Appeal record due on 6/4/96 for Orlando Cordia Hall ....transcripts of proceedings of appearance with counsel (4) (dll) (Entered: 05/23/1996) |
| 05/20/1996 | 683 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of July 14, 1995 Appeal record due on 6/4/96 for Orlando Cordia Hall ...ex parte hearing regarding experts...(17) (dll) (Entered: 05/23/1996) |
| 05/20/1996 | 684 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of 11.6.95 Appeal record due on 6/4/96 for Orlando Cordia Hall ....transcript of trial ...Vol. VI...(11) (dll) (Entered: 05/23/1996) |
| 05/20/1996 | 685 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of 11.21.95 Appeal record due on 6/4/96 for Orlando Cordia Hall ....hearing on medical experts offer of proof...(22) (dll) (Entered: 05/23/1996) |
| 05/20/1996 | 686 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of 2.12.96 Appeal record due on 6/4/96 for Orlando Cordia Hall ...sentencing (10) (dll) (Entered: 05/23/1996) |
| 05/21/1996 | 680 | TRANSCRIPT filed in case as to Orlando Cordia Hall for dates of 11/1/95, Punishment Phase-Vol 17...Court Reporter: Deborah Roberts...270 pages (bam) (Entered: 05/22/1996) |
| 05/21/1996 | 681 | TRANSCRIPT filed in case as to Orlando Cordia Hall for dates of 11/2/95, for Punishment Phase, Volume 18...Court Reporter: Deborah Roberts...153 pages (bam) (Entered: 05/22/1996) |
| 05/30/1996 | 693 | CJA 24 as to Orlando Cordia Hall Authorization to Pay Deborah Roberts $ 1269.00 for Transcript Voucher # 206134 cc: 5/30/96 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 06/04/1996) |
| 06/07/1996 | 727 | Court's charge to jury (18pgs) (bam) (Entered: 06/11/1996) |
| 06/10/1996 | 728 | CJA 24 as to Orlando Cordia Hall Authorization to Pay Ana Warren $ 189.00 for Transcript Voucher # 7760950346 cc: all Page(s): 2 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 06/11/1996) |

(46)

| 06/19/1996 | 744 | Punishment Phase Charge of the Court (22pgs) (bam) (Entered: 06/21/1996) |
|---|---|---|
| 07/15/1996 | 760 | CJA 31 Authorization to Pay L. Michael Connelley (Larry Moore-atty) $ 5616.71 Voucher 11804 cc: 7/15/96 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 07/17/1996) |
| 07/26/1996 | 763 | CJA 30 as to Orlando Cordia Hall Authorization to Pay Jeff Kearney $ 56380.98 Voucher # D024003 cc: Page(s): 1 ( Signed by Judge Terry R. Means ) (rjf) (Entered: 07/29/1996) |
| 08/16/1996 | 765 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of Oct 2, 1996 Appeal record due on 9/3/96 for Orlando Cordia Hall (15+) (dll) (Entered: 08/19/1996) |
| 08/16/1996 | 766 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of Oct 3, 1995 Appeal record due on 9/3/96 for Orlando Cordia Hall (15+) (dll) (Entered: 08/19/1996) |
| 08/16/1996 | 767 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of Oct 4, 1995 Appeal record due on 9/3/96 for Orlando Cordia Hall (15+) (dll) (Entered: 08/19/1996) |
| 08/16/1996 | 768 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of oct 5, 1996 vol 4 of trial Appeal record due on 9/3/96 for Orlando Cordia Hall (15+) (dll) (Entered: 08/19/1996) |
| 08/16/1996 | 769 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of Oct 10, 1996 vol #5 Appeal record due on 9/3/96 for Orlando Cordia Hall (15+) (dll) (Entered: 08/19/1996) |
| 08/16/1996 | 770 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of Oct 11, 1996 Vol. #6 Appeal record due on 9/3/96 for Orlando Cordia Hall (15+) (dll) (Entered: 08/19/1996) |
| 08/16/1996 | 771 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of Oct 12, 1996 Vol. 7 Appeal record due on 9/3/96 for Orlando Cordia Hall (15+) (dll) (Entered: 08/19/1996) |
| 08/16/1996 | 772 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of Oct 13, 1996 Vol. 8 Appeal record due on 9/3/96 for Orlando Cordia Hall (15+) (dll) (Entered: 08/19/1996) |
| 08/16/1996 | 773 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of Oct 17, 1996 Appeal record due on 9/3/96 for Orlando Cordia Hall (15+) (dll) (Entered: 08/19/1996) |
| 08/16/1996 | 774 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of Oct 18, 1995 Vol. 10 Appeal record due on 9/3/96 for Orlando Cordia Hall (15+) (dll) (Entered: 08/19/1996) |
| 08/16/1996 | 776 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of Oct 20, 1996 vol 12 trial tran Appeal record due on 9/3/96 for Orlando Cordia Hall (15+) (dll) (Entered: 08/20/1996) |



| | 08/16/1996 | 777 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of Oct 31, 1995 vol 17 of trial Appeal record due on 9/3/96 for Orlando Cordia Hall (15+) (dll) (Entered: 08/20/1996) |
|---|---|---|---|
| | 08/16/1996 | 778 | TRANSCRIPT filed as to Orlando Cordia Hall Re: [567-1] appeal for dates of Oct 19, 1996 Vol 11 trial tran Appeal record due on 9/3/96 for Orlando Cordia Hall (15+) (dll) (Entered: 08/20/1996) |
| | 09/03/1996 | 789 | CJA 24 as to Orlando Cordia Hall Authorization to Pay Deborah Roberts $ 7727.12 for Transcript Voucher # 7761152078 cc: all Page(s): 2 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 09/05/1996) |
| | 09/25/1996 | | Certified and transmitted record on appeal to U.S. Court of Appeals as to Orlando Cordia Hall : [807-1] appeal, [567-1] appeal :6 vols. case papers, 1 sealed envelope cont. PSI, 51 sealed envelopes cont. sealed documents, 31 vols. transcripts & 2 boxes of exhibits (pdm) Modified on 09/26/1996 (Entered: 09/25/1996) |
| | 03/03/1997 | | Received letter from USCA Re: that the court reporters is granted an extension until March 28, 1997 for filing transcripts (dll) (Entered: 03/04/1997) |
| | 03/13/1997 | 864 | CJA 31 Authorization to Pay Larry Moore $ 1294.83 Voucher # D011860 cc: Page(s): 1 ( Signed by Judge Terry R. Means ) (rjf) (Entered: 03/13/1997) |
| | 04/25/1997 1494 | 890 | ORDER OF USCA (certified copy) re: Orlando Cordia Hall Re: [567-1] appeal...ORDERED that motion of appellant for extension of 90, or to an including 7/25/97, w/in which to file his brief is granted...ORDERED that motion of Appellant to appt Marcia A. Widder as co-counsel is granted...(1Pg) (bam) (Entered: 04/28/1997) |
| | 05/07/1997 | 891 | TRANSCRIPT Volume 20-A (113 pgs) filed as to Orlando Cordia Hall Re: [567-1] appeal for Excerpt of Proceedings Punishment Phase Jury Charge and Closing Arguments held on Sept 1, 1995...Supplemental Appeal record due on 5/22/97 for Orlando Cordia Hall (dld) (Entered: 05/07/1997) |
| | 05/07/1997 | | Transmitted Supplemental Record on Appeal: as to Orlando Cordia Hall [567-1] appeal consisting of a certified copy of the docket, 1 transcript marked "F-2" and 1 box of exhibits marked "court's Exhibits" along with a transmittal letter (dld) (Entered: 05/07/1997) |
| | 05/14/1997 1495 | 893 | Order unfiling Pleading Re: Motion to Inspect, Examine, Photograph and Copy Trial Exhibits, filed by movants Pearl, Nicholson, and Agnes Rene...Deficiency: Complete Cert Svc (does not reflect that copy of motion was mailed to dfts cnsl; cert of conf; Brief, and Case is on appeal to 5th Cir, and exhibits from trial have been sent to them. This, motion should be filed w/5th Circuit ( signed by TRM) cc: 5/14/97 Page(s): 2 (bam) (Entered: 05/14/1997) |
| | 05/22/1997 | | Transmitted Supplemental Record on Appeal: as to Orlando Cordia Hall [567-1] appeal re: USCA# 96-10178 consisting of court's exhibits 1 thru 4 along with a transmittal letter (dld) (Entered: 05/22/1997) |

(48)

| | 06/17/1997 | 894 | MOTION with Memorandum in Support by USA as to Orlando Cordia Hall to supplement records pursuant to Rule 10(e) (3pgs) (bam) (Entered: 06/17/1997) |
|---|---|---|---|
| | 06/18/1997 | 896 | OPINION OF USCA (certified copy) in accordance with USCA judgment re: appeal on M.T. Holloway...district court's decisiion affirmed (3pgs) (bam) (Entered: 06/18/1997) |
| | 06/19/1997 | 897 | ORDER as to Orlando Cordia Hall granting [894-1] motion to supplement records pursuant to Rule 10(e) as to Orlando Cordia Hall (2)...Govt agents to present to dist clrk w/in a reasonable time, govts exh 36, videotape of grave site introduced into evidence during the trail, and such videotape be certified as part of appellate record and be transmitted to Court of Appeals-5th Circuit... cc: 6/19/97 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 06/19/1997) |
| | 09/12/1997 | 899 | MOTION by USA as to Orlando Cordia Hall to amend [897-1] order to supplement record (3pgs) (bam) (Entered: 09/15/1997) |
| | 09/16/1997 | 900 | ORDER as to Orlando Cordia Hall granting [899-1] motion to amend [897-1] order to supplement record as to Orlando Cordia Hall (2)...ORDERED that the duplicate copy provided by the govt to the district clerks of govt's exhibit 36, the videotape of the grave site introduced into evidence during the trial, be certified as a part of the appellate record and be transmitted to the Court of Appeal for 5th Circuit... cc: 9/16/97 Page(s): 1 ( Signed by Judge Terry R. Means ) (bam) (Entered: 09/16/1997) |
| | 09/16/1997 | | Received Government's Exhibit 36, videotape of the grave site (dld) (Entered: 09/16/1997) |
| | 09/16/1997 | | Transmitted Supplemental Record on Appeal: as to Orlando Cordia Hall [807-1] appeal re: 96-10178...consisting of a cert cy of docket entries and Govt's Exhibit 36, videotape of grave site along with a transmittal letter (dld) (Entered: 09/16/1997) |
| | 10/24/1997 | | Received letter from USCA #96-11177 as to Marvin Holloway (1 pg) Re: Supreme Court denial of cert, no further order forthcoming (csw) (Entered: 10/27/1997) |
| | 11/05/1997 | 902 | OPINION OF USCA (certified copy) (1 pg) USCA #96-11178 as to Demetrius Kenyon Hall in accordance with USCA judgment re: Court-appointed counsel for Demetrius Kenyon Hall has filed a brief as required. Our independent review of the brief and record discloses no nonfrivolous issue. Accordingly, counsel is excused from further responsibilities herein and the APPEAL IS DISMISSED. Hall's request for a copy of the record and an extension of time in which to identify non frivolous issues for appeal is DENIED. Copy to Judge. (csw) (Entered: 11/06/1997) |
| | 10/13/1998 | 909 | JUDGMENT OF USCA (certified copy) USCA #96-10178 as to Orlando Cordia Hall Re: [567-1] appeal affirming judgment/order Orlando Cordia Hall (2) count(s) 1, 2, 3, 6 Issued as mandate 10/9/98. Copy to Judge, USM, |

| | | | |
|---|---|---|---|
| | | | AUSA, PT, Prob. (1) (csw) (Entered: 10/14/1998) |
| 10/13/1998 1504 | | 910 | OPINION OF USCA (certified copy) USCA #96-10178 as to Orlando Cordia Hall in accordance with USCA judgment re: Affirmed. Copy to Judge. (15+) (csw) (Entered: 10/14/1998) |
| 10/13/1998 | | | Record on appeal to be returned as to Orlando Cordia Hall per USCA5...USCA #96-10178 (csw) (Entered: 10/14/1998) |
| 11/04/1998 | | | Record on Appeal as to Orlando Cordia Hall returned from U.S. Court of Appeals: [567-1] appeal USCA #96-10178...consisting of 6 vol case papers, 31 transcripts marked C,D,E,F,E1,F1,G1,H1,M1,N1,O1,P1,Q1,R1,S1,T1,U1,V1,W1,X1,Y1, Z 1,A2,B2,C2,D2,E2,F2,OO,PP,UU, 3 supp vol case papers, 54 sealed doc labeled AA,BB,CC,DD,EE,FF,GG,HH,II,JJ,KK,LL,MM,NN,QQ,RR,SS,TT,VV,WW , ZZ,XX,YY,A1,B1#49, B1#539, C1,D1,I1,J1,K1,A,B,G,H,I,IA,J,K,L,M,N,O,P,Q,R,S,T,U,V,W,X,Y , Z, 1 PSI under seal returned to Prob, 3 boxes juror information sheets, 1 box court exhibits sealed, 1 gov exhibit marked 57 & 58B, 1 folder court exhibits sealed, 1 govt exhibit video tape, 3 binders (photos) govt exhibits. All exhibits, juror information sheets, and sealed docs placed in sealed exhibit room. (csw) Modified on 11/05/1998 (Entered: 11/05/1998) |
| 11/09/1998 | | 911 | SEALED DOCUMENT placed in sealed area. (bam) (Entered: 11/09/1998) |
| 11/10/1998 1607 | | 912 | Order unfiling Pleading Re: ExParte application Under 21 Under 21 USC Sect 848(q)(4)(B) for appoint of counsel for proceeding...Deficiency: Motion to file under seal and ex-parte must be submitted first ( signed by TRM) cc: 11/10/98 Page(s): 2 (bam) (Entered: 11/10/1998) |
| 11/30/1998 1609 | | 913 | Application under 21 USC Sect 848(q)(4)(B) for Appointment of Counsel for Proceeding Pursuant to 28 USC Sect 2255 by Orlando Cordia Hall (15+pgs) (bam) (Entered: 12/01/1998) |
| 12/04/1998 | | | Text not available. (Entered: 12/04/1998) |
| 12/04/1998 1626 | | 914 | ORDER as to Orlando Cordia Hall denying [913-1] Application for Appointment of Counsel as to Orlando Cordia Hall (2) cc: 12/7/98 Page(s): 2 ( Signed by Judge Terry R. Means ) (bam) (Entered: 12/07/1998) |
| 02/12/1999 Not Aff'd | | 916 | OPINION OF USCA (certified copy) USCA #96-11224 as to Bruce Carneil Webster in accordance with USCA judgment re: Affirmed. Copy to Judge. (15+) (csw) Modified on 02/16/1999 (Entered: 02/16/1999) |
| 05/18/1999 1628 | | 917 | Renewed Application Under 21 USC 848(q)(4)(B) for Appt. of Counsel for proceeding Pursuant to 28 USC 2255 by Orlando Cordia Hall (6) (pdm) (Entered: 05/19/1999) |
| 05/18/1999 1633 | | 918 | Statement of Willingness to Be Apptd. As Counsel for Proceeding Pursuant to 28 USC 2255 by Orlando Cordia Hall (11) (pdm) (Entered: 05/19/1999) |

| | | |
|---|---|---|
| 05/20/1999<br><br>1644 | 919 | ORDER as to Orlando Cordia Hall for appointment of counsel for Orlando hall...appointing Robert C Owen and Marcia A Widder ...for the purpose of preparing, filing and litigating a motion for relief under 28 USC 2255...the hourly rate for atty compensation will be $125.00 per hour and interim payments are authorized in accordance with the Guide to Judiciary Policies and Procedures. cc: 5.21.99 Page(s): 1 ( Signed by Judge Terry R. Means ) (mjw) (Entered: 05/21/1999) |
| 06/09/1999 | | Mailed Voucher #D03430 to Robert C. Owen, 510 S. Congress Ave., #308, Austin, TX 78704 (CJA-30) and Voucher #D03431 to Marcia A. Widder, 636 Baronne St., New Orleans, LA 70113 (CJA-30). (rjf) (Entered: 06/09/1999) |
| 06/17/1999 | | Received letter from USCA Re: #96-10178, SC# 98-7510 Orlando Cordia Hall, aka Lan; petition for certiorari is denied (dld) (Entered: 06/17/1999) |
| 08/18/1999 | 920 | EX PARTE DOCUMENT as to defendant Orlando Cordia Hall (dld) (Entered: 08/19/1999) |
| 08/30/1999<br><br>1646 | 921 | RESPONSE by USA as to Orlando Cordia Hall motion for leave to file application for funds for necessary investigation ex parte and under seal and brief in support (5 pgs) (bam) (Entered: 08/31/1999) |
| 09/10/1999<br><br>1650 | 922 | Defendant's Replyt Brief by Orlando Cordia Hall in support of [920-1] Motion for Leave to File Application for Funds for Necessary Investigation Ex Parte and Under Seal (5pgs) (wrb) (Entered: 09/10/1999) |
| 09/24/1999 | 923 | CJA 21 as to Orlando Cordia Hall Authorization to Pay Marcia A. Widder $ 41.50 for Expert Services Voucher # 0149031 cc: all Page(s): 6 () Signed by Hon. Carolyn Dineen King, Chief Judge USCA5 (pdm) (Entered: 09/24/1999) |
| 10/21/1999 | | Received letter from USCA #96-11224 Re: Bruce Carneil Webster...Supreme Court denial of cert, no further order forthcoming (csw) (Entered: 10/21/1999) |
| 10/27/1999<br><br>1655 | 924 | ORDER OF REFERENCE: as to Orlando Cordia Hall...motion and application to the US Mag Judge for findings and recommendation ( Signed by Judge Terry R. Means ) cc: 10/27/99 Page(s): 1 (bam) (Entered: 10/28/1999) |
| 10/29/1999<br><br>1657 | 925 | ORDER OF REFERENCE: as to Orlando Cordia Hall...AMENDED to reflect dfts motion for leave to file application for funds for necessary investigation Ex Parte and Under Seal and brief are referred to US Mag Paul Stickney in Dallas division for hearing if necessary and final disposition ( Signed by Judge Terry R. Means ) cc: 10/29/99 Page(s): 1 (bam) (Entered: 10/29/1999) |
| 11/04/1999 | 927 | Minute entry as to Orlando Cordia Hall : ; Held before Magistrate Judge Paul D. Stickney Court Reporter: ECR TELEPHONE CONF CONT FROM 11/1/99; conference concludes. (wrb) (Entered: 11/05/1999) |
| 11/04/1999 | | Tele-conference as to Orlando Cordia Hall held (wrb) (Entered: 11/05/1999) |

| 11/29/1999 | 929 | SEALED ORDER as to Orlando Cordia Hall cc: ( Signed by Magistrate Judge Paul D. Stickney ) (dld) (Entered: 11/30/1999) |
| 12/13/1999 | 931 | ORDER OF REFERENCE: as to Orlando Cordia Hall...referring to Mag Paul Stickney, all budgeting and review of requests for compensation by attys, investigators, experts, and others providing services ( Signed by Judge Terry R. Means ) cc: 12/14/99 Page(s): 1 (bam) (Entered: 12/14/1999) |
| 12/15/1999 | 932 | SEALED ORDER re payment as to Orlando Cordia Hall cc: daty only Page(s): 7 Signed by Magistrate Judge Paul D. Stickney ) (wrb) (Entered: 12/16/1999) |
| 12/29/1999 | 933 | SEALED DOCUMENT placed in sealed area. (pdm) (Entered: 12/30/1999) |
| 02/11/2000 | 934 | SEALED DOCUMENT placed in sealed area. (fba) (Entered: 02/15/2000) |
| 02/15/2000 | 935 | SEALED DOCUMENT placed in sealed area as to Orlando Cordia Hall. (fba) (Entered: 02/16/2000) |
| 02/15/2000 | 936 | SEALED DOCUMENT placed in sealed area as to Orlando Cordia Hall. (fba) (Entered: 02/16/2000) |
| 02/15/2000 | 937 | SEALED DOCUMENT placed in sealed area as to Orlando Cordia Hall. (fba) (Entered: 02/16/2000) |
| 02/28/2000 | 938 | SEALED DOCUMENT placed in sealed area. (fba) (Entered: 02/29/2000) |
| 03/16/2000 | 941 | SEALED DOCUMENT placed in sealed area. (fba) (Entered: 03/16/2000) |
| 03/31/2000 | 946 | SEALED ORDER as to Orlando Cordia Hall cc: daty Page(s): 2 ( Signed by Magistrate Judge Paul D. Stickney ) (fba) (Entered: 04/03/2000) |
| 04/19/2000 | 951 | SEALED DOCUMENT placed in sealed area as to Orlando Hall. (mjw) (Entered: 04/19/2000) |
| 04/20/2000 | 952 | ORDER DENYING SECOND APPLICATION FOR LEAVE OF COURT TO CONDUCT CERTAIN INVESTIGATION as to Orlando Cordia Hall...SEE ORDER FOR SPECIFICS.... cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (fba) (Entered: 04/21/2000) |
| 04/26/2000 | 953 | MOTION with Memorandum in Support by Orlando Cordia Hall for leave of court to interview jurors (13pgs) (fba) (Entered: 04/26/2000) |
| 05/02/2000 | 956 | RESPONSE by USA as to Orlando Cordia Hall in opposition to [953-1] motion for leave of court to interview jurors (10pgs) (fba) (Entered: 05/03/2000) |
| 05/04/2000 | 957 | ORDER as to Orlando Cordia Hall denying [953-1] motion for leave of court to interview jurors as to Orlando Cordia Hall (2)....SEE ORDER FOR SPECIFICS... cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (fba) (Entered: 05/04/2000) |
| 05/16/2000 | 958 | MOTION by Orlando Cordia Hall to vacate under 28 U.S.C. 2255 (25+) **4:00-CV-422-Y** (geb) (Entered: 05/18/2000) |

| 05/22/2000 | 959 | ORDER AND INSTRUCTIONS TO PARTIES as to Orlando Cordia Hall ......the United States Attorney shall, within 60 days from the date of this order, file an answer complying with the provision of Rule 5 of the Rules Governing 2255 Cases in the United States District Courts; in the event Respondent moves to dismiss a delayed or successive motion under Rule 9, Movant shall file a response to said Rule 9 motion within a period of 20 days from date of service of Respondent's motion; respondent shall file a brief in response to the motion within sixty days of the date of this order; movant may file a reply brief to the response brief within thirty days of the filing of the response brief....SEE ORDER FOR FURTHER SPECIFICS....cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (Z190108101) (fba) Modified on 05/23/2000 (Entered: 05/23/2000) |
| --- | --- | --- |
| 05/23/2000 | 960 | MOTION with Memorandum in Support by Orlando Cordia Hall for scheduling order (12pgs) (fba) (Entered: 05/23/2000) |
| 05/23/2000 | 961 | MOTION with Memorandum in Support by Orlando Cordia Hall for leave to file Work-Product Addendum to motion for scheduling order Ex Parte and Under Seal (4pgs) (fba) (Entered: 05/23/2000) |
| 05/24/2000 | 962 | MOTION with Memorandum in Support by Orlando Cordia Hall for reconsideration of [959-1] order and instructions to parties (4pgs) (fba) (Entered: 05/24/2000) |
| 05/24/2000 | 963 | ORDER MODIFYING MAY 22, 2000 ORDER AND INSTRUCTIONS TO PARTIES as to Orlando Cordia Hall.....the deadlines established in the May 22 order should be and are hereby STAYED pending ruling on Defendant's may 23 motions....SEE ORDER FOR SPECIFICS.... cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (fba) (Entered: 05/24/2000) |
| 05/25/2000 | 964 | ORDER RENDERING MOTION MOOT as to Orlando Cordia Hall mooting [962-1] motion for reconsideration of [959-1] order and instructions to parties as to Orlando Cordia Hall (2) cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (fba) (Entered: 05/25/2000) |
| 05/25/2000 | 965 | CERTIFIED MAIL executed as to Orlando Cordia Hall 5/24/00 received by Erin Christensen-Civil Process Clerk, U.S. Attorney Fort Worth Division [959-1] order (1pg) (fba) (Entered: 05/25/2000) |
| 06/09/2000 | 966 | SEALED DOCUMENT placed in sealed area. (Orlando C. Hall) (fba) (Entered: 06/09/2000) |
| 06/09/2000 | 967 | SEALED DOCUMENT placed in sealed area. (Orlando C. Hall) (fba) (Entered: 06/09/2000) |
| 06/14/2000 | 968 | SEALED DOCUMENT placed in sealed area. (Orlando C. Hall) (fba) (Entered: 06/15/2000) |
| 06/19/2000 | 970 | SEALED DOCUMENT placed in sealed area. as to Orlando Cordia Hall (fba) (Entered: 06/19/2000) |

53

| 06/19/2000 | 969 | ORDER GRANTING LEAVE TO FILE "WORK PRODUCT ADDENDUM TO MOTION FOR SCHEDULING ORDER" EX PARTE AND UNDER SEAL as to Orlando Cordia Hall....the clerk shall file-stamp said document and place it under seal in an envelope clearly marked, "SEALED PLEADING - ACCESS BY COURT ORDER ONLY"; the clerk shall not permit any person, other than the Court or Defendant's counsel, to examine such document, unless otherwise provided by Order of this Court. cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (fba) (Entered: 06/21/2000) |
|---|---|---|
| 06/22/2000 | 971 | ORDER as to Orlando Cordia Hall granting [960-1] motion for scheduling order as to Orlando Cordia Hall (2).....defendant file any motion for leave to conduct discovery within thirty days after entry of this order; defendant file any amended motion to vacate under 28 U.S.C. 2255 no later than sixty days after the court rules on defendant's motion for leave to conduct discovery; the government file the responsive pleading and brief required by the May 22, 2000 Order and Instructions to parties within ninety days after defendant files his amended 2255 motion; defendant's reply brief shall be filed no later than forty-five days after the filing of the government's response. cc: all Page(s): 2 ( Signed by Judge Terry R. Means ) (fba) (Entered: 06/22/2000) |
| 07/24/2000 | 974 | UNFILED PER 8/7/00 ORDER (Doc # 983).....MOTION with Memorandum in Support by Orlando Cordia Hall for leave to conduct discovery (15+pgs) (fba) Modified on 02/12/2002 (Entered: 07/24/2000) |
| 07/24/2000 | 975 | UNOPPOSED MOTION with Memorandum in Support by Orlando Cordia Hall to unseal CJA Vouchers and supporting documents submitted by the defense in connection with the pretrial and trial proceedings in United States v. Hall (5pgs) (fba) (Entered: 07/24/2000) |
| 07/24/2000 | 976 | MOTION by Orlando Cordia Hall for leave to file Reply to the Government's Response to Defendant's Motion For Leave To Conduct Discovery and Brief in Support (3pgs) (fba) (Entered: 07/24/2000) |
| 07/31/2000 | 978 | MOTION by USA as to Orlando Cordia Hall to extend time in which to file its response to petitioner's motion for leave to conduct discovery (3pgs) (fba) (Entered: 08/01/2000) |
| 08/01/2000 | 979 | ORDER as to Orlando Cordia Hall granting [978-1] motion to extend time in which to file its response to petitioner's motion for leave to conduct discovery as to Orlando Cordia Hall (2)....government's response is not due no later than Response to motion reset to 9/1/00 for Orlando Cordia Hall for [974-1] motion for leave to conduct discovery cc: al Page(s): 1 ( Signed by Judge Terry R. Means ) (fba) (Entered: 08/01/2000) |
| 08/03/2000 | 980 | ORDER as to Orlando Cordia Hall granting [975-1] motion to unseal CJA Vouchers and supporting documents submitted by the defense in connection with the pretrial and trial proceedings in United States v. Hall as to Orlando Cordia Hall (2) cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (fba) (Entered: 08/03/2000) |

57   3/4/2005 12:13 PM

| 08/03/2000 | 981 | UNOPPOSED MOTION by USA as to Orlando Cordia Hall for release of the record (3pgs) (fba) (Entered: 08/03/2000) |
|---|---|---|
| 08/07/2000 | 982 | ORDER RENDERING MOTION MOOT as to Orlando Cordia Hall mooting [976-1] motion for leave to file Reply to the Government's Response to Defendant's Motion For Leave To Conduct Discovery and Brief in Support as to Orlando Cordia Hall (2).....SEE ORDER FOR SPECIFICS... cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (fba) (Entered: 08/08/2000) |
| 08/07/2000 | 983 | ORDER as to Orlando Cordia Hall unfiling [974-1] motion for leave to conduct discovery as to Orlando Cordia Hall (2) due to the following deficiency: The motion must include documentary or non-documentary evidence in a separate appendix. Copies to counsel: 08/08/00 Page(s) 2 ( Signed by Judge Terry R. Means ) (fba) (Entered: 08/08/2000) |
| 08/08/2000 | 984 | ORDER as to Orlando Cordia Hall granting [981-1] motion for release of the record as to Orlando Cordia Hall (2)....The Clerk of the Court is directed to release the appellate record in the above-styled case to counsel for the Government. cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (fba) (Entered: 08/08/2000) |
| 08/09/2000 | 985 | Clerk's NOTICE of unsealing documents (1 pg); Per 8/3/00 order and Court's verbal instructions the following documents reflecting docket item numbers have been unsealed: 44,49,173,174,197,198,199,200,236,286,301,384,388,452,453,4 5 4,455,470,471,502,503,515,516,517,538,539,540,541,603,604, and 672; Voucher (dkt item # 763) was not sealed but copy of said voucher with its attachments are included with these documents (dld) Modified on 08/11/2000 (Entered: 08/11/2000) |
| 08/15/2000 | 986 | MOTION by Orlando Cordia Hall for leave to conduct discovery and Brief in Support (4:00-cv-422-Y)(15+pgs) (wrb) (Entered: 08/16/2000) |
| 08/15/2000 | 987 | APPENDIX TO MOTION FOR LEAVE TO CONDUCT DISCVOERY AND BRIEF IN SUPPORT by Orlando Cordia Hall (4:00-cv-422-Y)(15+pgs) (wrb) (Entered: 08/16/2000) |
| 08/16/2000 | 988 | SEALED ORDER as to Orlando Cordia Hall cc: Page(s): 2 ( Signed by Magistrate Judge Paul D. Stickney ) (fba) (Entered: 08/17/2000) |
| 09/01/2000 | 989 | GOVT'S RESPONSE IN OPPOSITION by USA as to Orlando Cordia Hall re [986-1] motion for leave to conduct discovery (15+pg) (mjw) (Entered: 09/05/2000) |
| 09/15/2000 | 992 | UNOPPOSED MOTION with Memorandum in Support by Orlando Cordia Hall for leave to file Reply Brief in Excess of Ten Pages (4pgs) (fba) (Entered: 09/18/2000) |
| 09/15/2000 | 993 | REPLY by Orlando Cordia Hall to response to [986-1] motion for leave to conduct discovery (15+pgs) (fba) (Entered: 09/18/2000) |

 

| 09/15/2000 | 994 | APPENDIX to Reply To Government's Response in Opposition To Motion For Leave To conduct discovery by Orlando Cordia Hall as to Orlando Cordia Hall (3pgs) (fba) (Entered: 09/18/2000) |
|---|---|---|
| 09/18/2000 | 995 | ORDER as to Orlando Cordia Hall granting [992-1] motion for leave to file Reply Brief in Excess of Ten Pages as to Orlando Cordia Hall (2)....defendant's reply, which was filed on September 15, shall be deemed properly filed. cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (fba) (Entered: 09/18/2000) |
| 10/06/2000 | 1000 | CERTIFIED MAIL executed as to USA 10/5/00 addressed to Richard Roper-Ausa, signed by Sonja B. Deesre [999-1] order (1pg) (fba) (Entered: 10/10/2000) |
| 10/27/2000 | 1002 | SEALED DOCUMENT placed in sealed area. (fba) (Entered: 10/27/2000) |
| 11/01/2000 | 1003 | SEALED ORDER (fba) (Entered: 11/02/2000) |
| 11/09/2000 | 1004 | ORDER REQUIRING RETURN OF RECORD as to Orlando Cordia Hall ....the goverment shall return the record to the clerk ofthis Court no later than November 28, 2000..cc: 11/09/00 Page(s): 1 ( Signed by Judge Terry R. Means ) (fba) (Entered: 11/09/2000) |
| 11/16/2000 | 1005 | MOTION by Orlando Cordia Hall for leave to file Defendant's Objections to November 1, 2000 Sealed Order (9pgs) (fba) (Entered: 11/16/2000) |
| 11/29/2000 | 1010 | RESPONSE by USA as to Orlando Cordia Hall in opposition to [1005-1] motion for leave to file Defendant's Objections to November 1, 2000 Sealed Order (4pgs) (fba) (Entered: 11/30/2000) |
| 12/05/2000 | 1011 | REPLY by Orlando Cordia Hall to response to [1005-1] motion for leave to file Defendant's Objections to November 1, 2000 Sealed Order (6pgs) (fba) (Entered: 12/06/2000) |
| 12/05/2000 | 1012 | Appendix in support to Defendant's Rply to Government's Opposition to Defendant's Motion for Leave to File by Orlando Cordia Hall (6pgs) (fba) (Entered: 12/06/2000) |
| 12/19/2000 | 1015 | CJA 31 Authorization to Pay J.Neal Hartley $ 2500.00 Voucher # D53183 cc: 12/20/00 Page(s): 1 ( Signed by Magistrate Judge Paul D. Stickney ) (fba) (Entered: 12/20/2000) |
| 01/22/2001 | 1018 | CJA 31 Authorization to Pay J.Neil Hartley $ 1103.42 Voucher # 01022000002 cc: 01/22/01 Page(s): 1 ( Signed by Magistrate Judge Paul D. Stickney ) (fba) (Entered: 01/22/2001) |
| 02/06/2001 | 1020 | ORDER as to Orlando Cordia Hall denying [1005-1] motion for leave to file Defendant's Objections to November 1, 2000 Sealed Order as to Orlando Cordia Hall (2).....The clerk of the Court shall return the original of Defendant's Objections, which was submitted with the Motion for Leave, to Defendant's counsel of record; further Ordered that if Defendant decides to hereafter file his objections as a matter of public record, he shall deliver to the undersigned's chambers copies of the applications for funds presented to |

| | | | |
|---|---|---|---|
| | | | Magistrate Judge Stickney that are at issue in Defendant's objections....SEE ORDER FOR SPECIFICS... cc: 02/07/01 Page(s): 3 ( Signed by Judge Terry R. Means ) (fba) (Entered: 02/07/2001) |
| 02/14/2001 | 1021 | | OBJECTIONS by Orlando Cordia Hall to November 1, 2000 [1003-1] Sealed order (15+pgs) (fba) (Entered: 02/15/2001) |
| 02/14/2001 | 1022 | | APPENDICES TO OBJECTIONS TO NOVEMBER 1, 2000 SEALED ORDER by Orlando Cordia Hall (11pgs) (fba) (Entered: 02/15/2001) |
| 03/14/2001 | 1024 | | SEALED EXPARTE DOCUMENT placed in sealed area. (fba) (Entered: 03/14/2001) |
| 03/15/2001 | 1025 | | SEALED EX PARTE DOCUMENT placed in sealed area. (fba) (Entered: 03/15/2001) |
| 03/21/2001 | 1026 | | SEALED EXPARTE DOCUMENT placed in sealed area. (fba) (Entered: 03/22/2001) |
| 05/08/2001 | 1029 | | SEALED ORDER Regarding Attorney's Fees (fba) (Entered: 07/20/2001) |
| 05/24/2001 | 1032 | | SUPPLEMENTAL DOCUMENT to [986-1] motion for leave to conduct discovery by defendant Orlando Cordia Hall (4 pg) (dld) (Entered: 05/25/2001) |
| 06/12/2001 | 1033 | | RESPONSE by USA as to Orlando Cordia Hall in opposition to [1032-1] supplemental document(s) (4 pg) (dld) (Entered: 06/12/2001) |
| 06/12/2001 | 1034 | | SEALED EX PARTE DOCUMENT placed in sealed area. (fba) (Entered: 06/13/2001) |
| 06/12/2001 | 1035 | | SEALED DOCUMENT placed in sealed area. (fba) (Entered: 06/13/2001) |
| 09/04/2001 | 1045 | | CJA 30 as to Orlando Cordia Hall Authorization to Pay Marcia A. Widder $ 31559.74 Voucher # 010904000006 cc: 09/04/01 Page(s): 1 ( Signed by Judge Terry R. Means ) (fba) (Entered: 09/04/2001) |
| 09/04/2001 | 1046 | | CJA 30 as to Orlando Cordia Hall Authorization to Pay Robert Owen $ 37162.33 Voucher # 010904000007 cc: 09/04/01 Page(s): 1 ( Signed by Judge Terry R. Means ) (fba) (Entered: 09/04/2001) |
| 10/01/2001 | 1047 | | CJA 31 Authorization to Pay Joseph D. Ward $ 5000.00 Voucher # 011001000009 cc: 10/01/01 Page(s): 1 ( Signed by Judge Terry R. Means ) (fba) (Entered: 10/01/2001) |
| 04/17/2002 | 1048 | | MEMORANDUM OPINION AND ORDER DENYING PETITIONER'S OBJECTIONS TO THE DENIAL OF ADDITIONAL INVESTIGATIVE FUNDS AND DENYING PETITIONER'S MOTIONS FOR DISCOVERY as to Orlando Cordia Hall denying [986-1] motion for leave to conduct discovery as to Orlando Cordia Hall (2) cc: all Page(s): 36 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 04/18/2002) |
| 05/01/2002 | 1049 | | MOTION with Memorandum in Support by Orlando Cordia Hall for reconsideration, to clarify and/or amend court's [1048-1] order To Include |

| | | | |
|---|---|---|---|
| | | | Determination prescribed by 28 USC 1292 (b) (15+ pages) (4:00CV422Y) (csw) Modified on 05/01/2002 (Entered: 05/01/2002) |
| 05/01/2002 | 1050 | | Emergency MOTION with Memorandum in Support by Orlando Cordia Hall for stay of Scheduling Order during pendency of Motion to Reconsider, Clarify and/or Amend Order of 4/17/02, to include determination prescribed by 28 USC 1292(b) and any subsequent appeal pursuant to 28 USC 1292(b) , to expedite consideration of this motion (4:00CV422Y) (4 pgs) (csw) (Entered: 05/01/2002) |
| 05/01/2002 | 1051 | | Appendix with Memorandum in Support by Orlando Cordia Hall of Dft's Motion to Reconsider, Clarify, and/or Amend Court's Order of April 17, 2002, To Include Determination Prescribed by 28 USC 1292(b) ( 4:00CV422Y) (15+ pgs) (csw) (Entered: 05/01/2002) |
| 05/07/2002 | 1052 | | ORDER as to Orlando Cordia Hall denying [1050-1] motion for stay of Scheduling Order during pendency of Motion to Reconsider, Clarify and/or Amend Order of 4/17/02, to include determination prescribed by 28 USC 1292(b) and any subsequent appeal pursuant to 28 USC 1292(b) as to Orlando Cordia Hall (2), denying [1050-2] motion to expedite consideration of this motion as to Orlando Cordia Hall (2) cc: all Page(s): (Civil No. 4:00-cv-422-Y) 2 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 05/08/2002) |
| 05/07/2002 | 1053 | | ORDER as to Orlando Cordia Hall granting in part, denying in part [1049-1] motion for reconsideration, to clarify and/or amend court's [1048-1] order To Include Determination prescribed by 28 USC 1292 (b) as to Orlando Cordia Hall (2) ...Hall's motion to clarify is granted to the extent that Hall's habeas counsel may submit CJS vouchers to the court detailing what work has been conducted in this case to date for which cnsl has not been compensated, and the court will make a determination at that time re: compensation. Hall's m/to amd this Court's order to enter a finding under 28 USC 1292(b) so that habeas cnsl may appeal the court's order is DENIED (Civil No. 4:00-cv-422-Y)cc: all Page(s): 2 ( Signed by Judge Terry R. Means ) (wrb) Modified on 05/08/2002 (Entered: 05/08/2002) |
| 05/22/2002 | 1054 | | ORDER OF USCA (certified copy) USCA #02-10585 re: Orlando Cordia Hall Re: Ordered that the petition for writ of mandamus is Denied. Further ordered that the petition for writ of prohibition is Denied. Further ordered that the alternative petition for permission to appeal is denied. Further ordered that petitioner's motion for stay of DC proceedings pending a ruling on the petition for writ of mandamus and prohibition is Denied. Further ordered that petitioner's motion for leave to proceed in forma pauperis is Granted but with reluctance. Copy to Judge. (1 pg) (csw) (Entered: 05/22/2002) |
| 05/23/2002 | 1055 | | Defendant's RENEWED MOTION with Memorandum in Support by Orlando Cordia Hall for leave to contact jurors -immediate action requested ((Civil No. 4:00-cv-422-Y)(11pg) (wrb) (Entered: 05/23/2002) |
| 05/23/2002 | 1056 | | Defendant's MOTION with Memorandum in Support by Orlando Cordia Hall to shorten time for government's response to renewed motion for leave to |

| | | |
|---|---|---|
| | | contact jurors -immediate action requested (Civil No. 4:00-cv-422-Y)(4pg) (wrb) (Entered: 05/23/2002) |
| 05/23/2002 | 1057 | APPENDICES to Defendant's Renewed Motion for Leave to Contact Jurors and Brief in Support by Orlando Cordia Hall (Civil No. 4:00-cv-422-Y)(15+pgs) (wrb) (Entered: 05/23/2002) |
| 06/03/2002 | 1058 | ORDER as to Orlando Cordia Hall denying [1056-1] motion to shorten time for government's response to renewed motion for leave to contact jurors as to Orlando Cordia Hall (2), denying [1055-1] motion for leave to contact jurors as to Orlando Cordia Hall (2) (Civil No. 4:00-cv-422-Y) cc: all Page(s): 2 ( Signed by Judge Terry R. Means ) (wrb) Modified on 06/03/2002 (Entered: 06/03/2002) |
| 06/03/2002 | 1059 | Government's RESPONSE to Orlando Cordia Hall re [1056-1] motion to shorten time for government's response to renewed motion for leave to contact jurors (10pg)(Civil No. 4:00-cv-422-Y) (wrb) (Entered: 06/04/2002) |
| 06/14/2002 | 1060 | Amended MOTION by Orlando Cordia Hall to vacate under 28 U.S.C. 2255 (15+) (dld) (Entered: 06/17/2002) |
| 06/14/2002 | 1061 | EXHIBITS Vol I (1-30) by Orlando Cordia Hall in support of [1060-1] motion to vacate under 28 U.S.C. 2255 (15+) (dld) (Entered: 06/17/2002) |
| 06/14/2002 | 1062 | EXHIBITS Vol 2 (31 - 50) by Orlando Cordia Hall in support of [1060-1] motion to vacate under 28 U.S.C. 2255 15+ (dld) (Entered: 06/17/2002) |
| 08/30/2002 | 1065 | MOTION by USA as to Orlando Cordia Hall to extend time to file its response to Petitioner's amended motion for relief under 28:2255 and Rule 33 of the Federal Rules of Criminal Procedure (4)**4:00-CV-422-Y** (geb) (Entered: 09/03/2002) |
| 09/09/2002 | 1066 | ORDER as to Orlando Cordia Hall granting [1065-1] motion to extend time to file its response to Petitioner's amended motion for relief under 28:2255 and Rule 33 of the Federal Rules of Criminal Procedure as to Orlando Cordia Hall (2) cc: all (Civil No. 4:00-cv-422-Y); response must be filed with the court nlt Oct 16, 2002 and any reply to this response must be filed by petitioner nlt 45 days after the govt's response is filed. Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 09/10/2002) |
| 09/18/2002 | 1067 | Defendant's MOTION and Brief In Support by Orlando Cordia Hall for leave to file second amended [1060-1] petition (Civil No. 4:00-cv-422-Y)(8pg) (wrb) (Entered: 09/19/2002) |
| 09/18/2002 | 1069 | SECOND AMENDED MOTION by Orlando Cordia Hall to vacate under 28 U.S.C. 2255 , for new trial pursuant to 28 USC 2255 and Rule 33 of the FRCrim Proc (15+pgs) (Civil No. 4:00-cv-422-Y) (wrb) Modified on 09/26/2002 (Entered: 09/26/2002) |
| 09/18/2002 | 1070 | Exhibits (Vol 1)(1-30) to Second Amended Motion of Hall to Vacate Conviction and Sentence by Orlando Cordia Hall (Civil No. 4:00-cv-422-Y) (wrb) (Entered: 09/26/2002) |

| 09/18/2002 | 1071 | Exhibits (Vol 2) (31-50) to amended motion to vacate by Orlando Cordia Hall (Civil No. 4:00-cv-422-Y) (wrb) (Entered: 09/26/2002) |
|---|---|---|
| 09/25/2002 | 1068 | ORDER as to Orlando Cordia Hall granting [1067-1] motion for leave to file second amended [1060-1] petition as to Orlando Cordia Hall (2) ..clerk directed to file petitioner's second amended petition for writ as of Sep 18, 2002; any further request to amend the petition will be looked on with disfavor by this court. cc: all Civil No. 4:00-cv-422-Y Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 09/26/2002) |
| 09/30/2002 | 1072 | Second MOTION by USA as to Orlando Cordia Hall to extend time to file response to Petitioner's Amended Motion for Relief Under 28:2255 and Rule 33 of the Federal Rules of Criminal Procedure **4:00-CV-422-Y** (4) (geb) (Entered: 10/01/2002) |
| 10/10/2002 | 1073 | Unopposed MOTION with Memorandum in Support by Orlando Cordia Hall to extend time to file response to government's motion for mental health examination of defendant (4) (geb) (Entered: 10/10/2002) |
| 10/15/2002 | 1074 | ORDER as to Orlando Cordia Hall granting [1073-1] motion to extend time to file response to government's motion for mental health examination of defendant as to Orlando Cordia Hall (2) Response to motion due on or before Oct 24, 2002 cc: 10.16.02 Page(s): 1 ( Signed by Judge Terry R. Means ) (4:00-CV-422-Y) (mjw) Modified on 10/16/2002 (Entered: 10/16/2002) |
| 10/18/2002 | 1075 | ORDER as to Orlando Cordia Hall granting [1072-1] motion to extend time to file response to Petitioner's Amended Motion for Relief Under 28:2255 and Rule 33 of the Federal Rules of Criminal Procedure as to Orlando Cordia Hall (2)(Civil No. 4:94-cr-121-Y)...any response shall be filed with the court nlt Dec 2, 2002, and any reply to this response shall be filed by petitioner nlt 45 days after the govt's response is filed; no further motions for extensions of time will be entertained by this court absent extraordinary circumstances. cc: all Page(s): 2 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 10/18/2002) |
| 10/24/2002 | 1076 | RESPONSE (Opposition) by Orlando Cordia Hall to Govt's motion to compel Mr. Hall to submit to "Medical/Mental Health Examinations" (16) (pdm) (Entered: 10/24/2002) |
| 10/24/2002 | 1076 | MOTION with Memorandum in Support by Orlando Cordia Hall for Compensation for Deft's Own Expert , and for Funds for Full Exam by deft's own Expert , and to impose Necessary Limitations on any Court-Ordered Exam (16) (pdm) (Entered: 10/24/2002) |
| 10/24/2002 | 1077 | Appendix to Deft's Opposition to Govt's Mot. to Compel Mr. Hall to Submit to Medical/Mental Health Examinations and Motion for Compensation for Deft's Own Expert and for Funds for Full Exam and to impose necessary Limitations, etc., by Orlando Cordia Hall (5) (pdm) (Entered: 10/24/2002) |
| 11/01/2002 | 1078 | Government's Unopposed MOTION as to Orlando Cordia Hall for leave to file A Response to "Defendant's Opposition to Government's Motion to |



| | | Compel Mr. Hall to Submit to 'Medical/Mental Health Examinations' and Motion for Compensation for Defendant's Own Expert and for Funds For A full Examination by Defendant's Own Expert and to Impose Necessary Limitations on Any Court-Ordered Examination (3pg) (wrb) (Entered: 11/04/2002) |
|---|---|---|
| 11/01/2002 | 1081 | Government's REPLY to Orlando Cordia Hall to response to [1076-1] motion for Compensation for Deft's Own Expert, [1076-2] motion for Funds for Full Exam by deft's own Expert, [1076-3] motion to impose Necessary Limitations on any Court-Ordered Exam and Brief in Support (13pg) (wrb) Modified on 11/13/2002 (Entered: 11/13/2002) |
| 11/12/2002 | 1079 | MOTION with Memorandum in Support by Orlando Cordia Hall for protective order to protect attorney-client privilege (10 pg) RE: 4:00cv422-Y (dld) (Entered: 11/12/2002) |
| 11/12/2002 | 1080 | ORDER as to Orlando Cordia Hall granting [1078-1] motion for leave to file A Response to "Defendant's Opposition to Government's Motion to Compel Mr. Hall to Submit to 'Medical/Mental Health Examinations' and Motion for Compensation for Defendant's Own Expert and for Funds For A full Examination by Defendant's Own Expert and to Impose Necessary Limitations on Any Court-Ordered Examination as to Orlando Cordia Hall (2) ..clerk directed to file respondent's response to petitioner's opposition to a compelled mental health examination as of Nov 1, 2002. cc: all Page(s): 1 (Civil No. 4:00-cv-422-y) ( Signed by Judge Terry R. Means ) (wrb) Modified on 11/13/2002 (Entered: 11/13/2002) |
| 11/13/2002 | 1082 | RESPONSE in Opposition by USA as to Orlando Cordia Hall re [1079-1] motion for protective order to protect attorney-client privilege (6) (geb) (Entered: 11/14/2002) |
| 11/14/2002 | 1084 | Defendant's Unopposed MOTION by Orlando Cordia Hall for leave to file Reply in Support of Motion for protective order and reply in support of motion for protective order (5pg) (wrb) (Entered: 11/15/2002) |
| 11/19/2002 | 1085 | Unopposed MOTION of attorney witnesses Jeff Kearney and Michael Ware by Orlando Cordia Hall for leave to file and to extend time for government's deadline for filing response to allow attorney witnesses adequate time to prepare written response (17) (geb) (Entered: 11/20/2002) |
| 11/19/2002 | 1086 | Government's RESPONSE by USA as to Orlando Cordia Hall re [1085-1] Unopposed motion Of Attorney Witnesses Jeff Kearney and Michael Ware for leave to file and to extend time for government's deadline for filing response to allow attorney witnesses adequate time to prepare written response (6pg) (wrb) (Entered: 11/20/2002) |
| 11/27/2002 | 1087 | ORDER as to Orlando Cordia Hall denying [1079-1] motion for protective order to protect attorney-client privilege as to Orlando Cordia Hall (2) (Civil no. 4:00-cv-422-Y)cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) Modified on 11/27/2002 (Entered: 11/27/2002) |

| 11/27/2002 | 1088 | ORDER as to Orlando Cordia Hall granting in part [1085-1] motion for leave to file and to extend time for government's deadline for filing response to allow attorney witnesses adequate time to prepare written response as to Orlando Cordia Hall (2) ....any response shall be filed w/the crt nlt Jan 16, 2003, replies nlt 45 days after govt's response is filed (Civil 4:00-cv-422-Y) cc: all Page(s): 1 ( Signed by Judge Terry R. Means ) (wrb) (Entered: 11/27/2002) |
|---|---|---|
| 01/09/2003 | 1092 | MOTION by Orlando Cordia Hall for Release of Record by US District Clerk (3pg) (wrb) (Entered: 01/10/2003) |
| 01/16/2003 | 1093 | Government's RESPONSE in Opposition to the Second Amended Motion by Orlando Cordia Hall [1069-1] to vacate conviction and sentence and for new trial pursuant to 28 USC 2255 and Rule 33 of the FRCP (1 vol)(Civil 4:00-cv-422-Y) (wrb) (Entered: 01/17/2003) |
| 01/28/2003 | 1094 | ORDER as to Orlando Cordia Hall denying [1092-1] motion for Release of Record by US District Clerk as to Orlando Cordia Hall (2) cc: 1/28/03 Page(s): 1 ( Signed by Judge Terry R. Means ) (dld) (Entered: 01/28/2003) |
| 02/20/2003 | 1097 | Defendant's Unopposed MOTION for 17-Day Extension of Time to File Reply by Orlando Cordia Hall and Brief In Support. (Civil No. 4:00-cv-422-Y)(wrb, ) (Entered: 02/21/2003) |
| 02/27/2003 | 1098 | ORDER granting 1097 Motion for Extension of Time to File a Reply to the Government's Response to His Petition for Writ of Habeas Corpus as to Orlando Cordia Hall (2); Reply should be filed with the court no later than March 19, 2003; (Signed by Judge Terry R Means on 02/27/03) (dld, ) (Entered: 02/27/2003) |
| 02/27/2003 | | Set/Reset Deadlines as to Orlando Cordia Hall : Reply to Govt's Response to Petition for Writ of Habeas Corpus due by 3/19/2003. (dld, ) (Entered: 02/27/2003) |
| 03/19/2003 | 1101 | REPLY in Support Motion by Orlando Cordia Hall re [1069] Second Amd. Motion to Vacate (2255)Motion for New Trial (pdm, ) (Entered: 03/21/2003) |
| 03/19/2003 | 1102 | Appendix to Reply in Support of 2nd Amd. Motion to Vacate and for New Trial as to Orlando Cordia Hall (Under separate cover) (pdm, ) (Entered: 03/21/2003) |
| 04/18/2003 | 1103 | MOTION for Evidentiary Hearing by Orlando Cordia Hall with brief in support. (wrb, ) (Entered: 04/18/2003) |
| 04/18/2003 | 1104 | SECOND MOTION for Discovery by Orlando Cordia Hall with brief in support. (wrb, ) (Entered: 04/18/2003) |
| 04/18/2003 | 1105 | Appendix to 1104Defendant's Second MOTION for Discovery and brief in support (wrb, ) (Entered: 04/18/2003) |
| 04/28/2003 | 1106 | Government's RESPONSE in Opposition to Defendant Orlando Cordia Hall's 1103 MOTION for Evidentiary Hearing and brief in support thereof (wrb, ) Modified on 4/30/2003 (wrb, ). (Civil No. 4:00-cv-422-Y) (Entered: |

| | | 04/30/2003) |
|---|---|---|
| 04/28/2003 | 1107 | Government's RESPONSE in Opposition to Defendant Orlando Cordia Hall's 1104 MOTION for Discovery and brief in support thereof (wrb, ) Modified on 4/30/2003 (wrb, ). (Civil No. 4:00-cv-422-Y) (Entered: 04/30/2003) |
| 05/09/2003 | 1108 | NOTICE of Supplemental Authority as to Orlando Cordia Hall re [1069] Motion to Vacate (2255)Motion for Miscellaneous Relief (pdm, ) (Entered: 05/14/2003) |
| 05/09/2003 | 1109 | Supplemental Appendix by Orlando Cordia Hall as to 1104 MOTION for Discovery (pdm, ) (Entered: 05/14/2003) |
| 02/17/2004 | 1120 | ORDER SETTING EVIDENTIARY HEARING as to Orlando Cordia Hall : Evidentiary Hearing set for 3/5/2003 10:00 AM before Judge Terry R Means. (Signed by Judge Terry R Means on 2/17/04) (wrb, ) (Entered: 02/17/2004) |
| 02/23/2004 | 1121 | Defendant's Unopposed MOTION For Continuance of Evidentiary Hearing and Brief in Support by Orlando Cordia Hall (Civil No. 4:00-cv-422-Y) (wrb, ) (Entered: 02/23/2004) |
| 02/26/2004 | 1122 | ADVISORY TO COURT REGARDING DEFENDANT'S UNOPPOSED MOTION FOR CONTINUANCE OF EVIDENTIARY HEARING as to Orlando Cordia Hall (Civil No. 4:00-cv-422-Y) (wrb, ) (Entered: 02/27/2004) |
| 02/27/2004 | 1123 | ORDER granting 1121 Motion to Continue as to Orlando Cordia Hall (2) Evidentiary hearing cont'd to 2pm Jun 7 2004; further ordered that petitioner's cnsl shall subpoena juror Jacquiline Holmes' attandance at the hearing. (Signed by Judge Terry R Means on 2/27/04) (wrb, ) (Entered: 03/01/2004) |
| 04/19/2004 | | Mail Returned as Undeliverable. 1120 Order, Set Hearings received back from R. Neal Walker as Address unknown, Main Office Del. Unit, New Orleans. (wrb, ) (Entered: 04/19/2004) |
| 04/30/2004 | 1124 | Application for Writ of Habeas Corpus Ad Testificandum to Secure Presence of Defendant at Hearing and Brief in Support as to Orlando Cordia Hall : (wrb, ) (Entered: 05/03/2004) |
| 05/05/2004 | 1125 | Opposition by USA as to Orlando Cordia Hall re 1124 Application for Writ of Habeas Corpus Ad Testificanum to Secure Presence of Defendant at Hearing (dld, ) (Entered: 05/06/2004) |
| 05/11/2004 | 1126 | MOTION for Leave to File to Accompany Witness Subpeona With Letter and Brief in Support by Orlando Cordia Hall (wrb, ) (Entered: 05/12/2004) |
| 05/12/2004 | 1127 | Opposition by USA as to Orlando Cordia Hall re 1126 MOTION for Leave to File to Accompany Witness Subpeona With Letter and Brief in Support (dld, ) (Entered: 05/13/2004) |
| 05/20/2004 | 1128 | ORDER granting 1126 Motion for Leave to File to Accompany Witness Subpoena With Letter as to Orlando Cordia Hall (2) Hall's motion requesting permission to send this letter to Ms. Holmes is partially granted in that the letter proposed by Hall has been amended by the Court. A copy of the letter |

63

| | | that Hall is permitted to send to Ms. Holmes is attached to this order and entitled "Exhibit A". (Signed by Judge Terry R Means on 5/20/04) (wrb, Civil No. 4:00-cv-422-y) Modified on 5/21/2004 (wrb, ). (Entered: 05/21/2004) |
|---|---|---|
| 05/20/2004 | 1129 | ORDER DENYING PETITIONER'S MOTION TO SECURE THE PRESENCE OF PETITIONER AT THE EVIDENTIARY HEARING as to Orlando Cordia Hall : (Civil No. 4:00-cv-422-Y) (Signed by Judge Terry R Means on 5/20/04) (wrb, ) (Entered: 05/21/2004) |
| 05/28/2004 | 1130 | Subpoena in A Civil Case Returned Executed on 5/26/04. as to Orlando Cordia Hall (issued in 4:00-cv-422-Y) = addressed to Jacquelyn K. Holmes, served personally by process server. (wrb, ) (Entered: 06/02/2004) |
| 06/04/2004 | 1132 | MOTION to Quash the Subpoena Duces Tecum and Brief in Supportby USA as to Orlando Cordia Hall (wrb, ) (Entered: 06/08/2004) |
| 06/07/2004 | 1133 | Minute Entry for proceedings held before Judge Terry R Means : Hearing as to Orlando Cordia Hall held on 6/7/04. Reference juror: Jacqueline Holmes; deft's witness sworn. (Court Reporter Ana Warren.) (wrb, ) (Entered: 06/09/2004) |
| 06/14/2004 | 1134 | Defendant's Renewed MOTION for Discovery and brief in support by Orlando Cordia Hall (wrb, ) (Entered: 06/15/2004) |
| 06/14/2004 | 1135 | RESPONSE in Opposition by USA as to Orlando Cordia Hall re 1134 MOTION for Discovery (4:00-cv-422-Y) (wrb, ) (Entered: 06/16/2004) |
| 07/01/2004 | 1136 | ORDER granting 1132 Motion to Quash as to Orlando Cordia Hall (2) (4-00-cv-422) (Signed by Judge Terry R Means on 7/1/04) (pdm, ) Modified on 7/1/2004 (pdm, ). (Entered: 07/01/2004) |
| 07/06/2004 | 1137 | ORDER GRANTING GOVERNMENT'S MOTION TO QUASH as to Orlando Cordia Hall : (Signed by Judge Terry R Means on 7/6/04) (wrb, ) (4:00-cv-422-Y) Modified on 7/9/2004 (wrb, ). (Entered: 07/08/2004) |
| 07/12/2004 | 1138 | ORDER denying 1134 Motion for Discovery as to Orlando Cordia Hall (2) (Civil No. 4:00-cv-422-Y) (Signed by Judge Terry R Means on 07/12/04) (wrb, ) (Entered: 07/13/2004) |
| 08/24/2004 | 1139 | Memorandum Opinion and Order Denying Amended Motion to Vacate Conviction and Sentence...It is therefore ORDERED that Petitioner's motion to vacate his conviction and sentence under 28 U.S.C. Section 2255 be, and is hereby, DENIED. It is further ORDERED that the clerk of Court shall transmit a copy of this order to Petitioner by certified mail, return receipt requested. See order for specifics. (Signed by Judge Terry R Means on 8/24/2004) (4-00-cv-422-Y)(jmb, )copy to Orlando Hall BOP No 26176-077 at USP Terre Haute Hwy 63 South Terre Haute, Indiana 47808 via cmrr 70023150000536164544 (jmb, ) (Entered: 08/26/2004) |
| 08/24/2004 | 1140 | FINAL JUDGMENT...It is therefore ORDERED, ADJUDGED and DECREED that all relief requested be, and the same is, hereby DENIED. It is further ORDERED that the Clerk shall transmit a true copy of this Judgment |

| | | |
|---|---|---|
| 08/24/2004 | | ORDER denying [1069] Motion to Vacate (2255) as to Orlando Cordia Hall (2); denying [1069] Motion as to Orlando Cordia Hall (2); denying 1103 Motion for Hearing as to Orlando Cordia Hall (2) See order 1139 for specifics (Signed by Judge Terry R Means on 8/24/2004) (jmb, ) (Entered: 08/26/2004) |
| 09/03/2004 | 1141 | Certified Mail Executed on 8/30/04 as to Orlando Cordia Hall, signature illegible, re: 1139 Order, 1140 Judgment. (pdm, ) (Entered: 09/03/2004) |
| 09/03/2004 | 1142 | Certified Mail Executed on 8/30/04 as to Orlando Cordia Hall, addressed to atty. Marcia Widder and signed by Ursula Price, re: 1139 Order, 1140 Judgment. (pdm, ) (Entered: 09/03/2004) |
| 09/07/2004 | 1143 | MOTION to Alter and Amend Judgment 1140 Order, Pursuant to FRCP 59(e) by Orlando Cordia Hall with Brief in Support. (4:00-cv-422-Y)(mjw, ) (Entered: 09/08/2004) |
| 09/13/2004 | 1144 | ORDER denying 1143 Motion to Amend/Correct as to Orlando Cordia Hall (2) (4:00-cv-422-Y) (Signed by Judge Terry R Means on 9/13/04) (wrb, ) (Entered: 09/14/2004) |
| 11/09/2004 | 1145 | NOTICE OF APPEAL by Orlando Cordia Hall re 1144 Order on Motion to Amend/Correct, 1140 Order,filed by CJA Atty Robert Owen, TO given, Hrgs held; CR Ana Warren. Copy to Death Penalty Law Clerk Erica Britt. (csw, ) (4:00-CV-422Y) (Entered: 11/09/2004) |
| 11/09/2004 | | Transmission of Notice of Appeal and Docket Sheet as to Orlando Cordia Hall to US Court of Appeals re 1145 Notice of Appeal; along with a transmittal letter. (csw, ) (Entered: 11/09/2004) |
| 11/09/2004 | 1146 | MOTION/application for Certificate of Appealability by Orlando Cordia Hall (4:00-CV-422Y) (csw, ) (Entered: 11/09/2004) |
| 12/06/2004 | 1147 | ORDER: Party appealing is GRANTED in forma pauperis status on appeal and denying 1146 Motion for Certificate of Appealability as to Orlando Cordia Hall (2) (Signed by Judge Terry R Means on 12/6/2004) (4:00-CV-422Y (csw, ) (Entered: 12/07/2004) |
| 12/10/2004 | 1148 | TRANSCRIPT REQUEST as to Orlando Cordia Hall for proceedings held on 6/7/04 Evidentiary Hearing before Judge Terry R Means, re 1145 Notice of Appeal - Final Judgment. Court Reporter Ana Warren Transcript due by 1/12/2005. (csw, ) (Entered: 12/14/2004) |
| 12/14/2004 | | Document Number Reset To 1148 (csw, ) (Entered: 12/14/2004) |
| 02/10/2005 | 1149 | Received letter from David E Young, Chief Deputy Clerk, USCA5 re 60 day transcript discount period expired 1/20/05, therefore court reporter must discount CJA 24 voucher 10%..if transcript not filed by 2/9/05, USCA5 will implement 20% discount w/o further notice (pdm, ) Modified on 2/24/2005 (pdm, ). (Entered: 02/14/2005) |

| 02/14/2005 | 1150 | TRANSCRIPT of Proceedings as to Orlando Cordia Hall held on June 7, 2004 before Judge Means. Court Reporter: Ana Warren. Evidentiary Hearing. (4:00-cv-127-Y) (mjw, ) (Entered: 02/15/2005) |
|---|---|---|
| 03/04/2005 | 1154 | Certified and Transmitted Record on Appeal as to Orlando Cordia Hall to US Court of Appeals re 1145 Notice of Appeal re: USCA #04-70050 consisting of 7 vol 2255 case papers which includes a cert cy of docket entries, 7 volumes 2255 exhibits (criminal case papers), 1 copy PSR under seal, See attached listing of transcripts, sealed pleadings, pleadings unsealed per Order, exhibits and appendix documents. Exact listings too large for docket entry. (4:00-CV-422Y) All original documents mailed; to be returned to USDC. (csw, ) (Entered: 03/04/2005) |

ORIGINAL



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ORLANDO CORDIA HALL, | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:00-CV-422-Y |
| | § | (Criminal No. 4:94-CR-121-Y) |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER
## DENYING AMENDED MOTION TO VACATE CONVICTION AND SENTENCE

Petitioner Orlando Cordia Hall (Hall) is a federal prisoner under a death sentence who, having been being convicted of capital murder in this Court, has filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255. The government filed a brief opposing the motion and Hall replied. The Court denies Hall's motion.

I

### History of the Case

On October 31, 1995, because of Hall's involvement in the kidnapping and death of Lisa Rene, a sixteen-year-old high-school student, a jury convicted Hall of kidnapping in which a death occurred, conspiracy to commit kidnapping, traveling in interstate commerce to promote possession of marijuana with intent to distribute, and carrying a firearm during a crime of violence. After a subsequent punishment hearing, the jury, after finding certain aggravating and mitigating factors to be present, recommended, by a unanimous vote, that Hall receive the death penalty. This Court formally imposed

1



the death penalty on February 12, 1996. The case was appealed to the Fifth Circuit Court of Appeals, which affirmed Hall's conviction and sentence. *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), *cert. denied*, 526 U.S. 1117 (1999).

Hall filed an initial motion to vacate in May 2000. In June, this Court granted Hall's request to file a discovery motion, and Hall filed a motion for discovery in August and a supplemental motion for discovery in May 2001. In April 2002, this Court denied his motions for discovery. Hall then filed an amended motion to vacate in June and a second amended motion to vacate in September 2002. The government filed its response in January 2003, and Hall filed a reply in March. This Court conducted an evidentiary hearing on June 7, 2004, regarding Hall's third through fifth claims for relief.

The Fifth Circuit Court of Appeals recited the following factual background in its opinion on direct appeal:

> Orlando Cordia Hall, along with Bruce Webster and Marvin Holloway, ran a marijuana trafficking enterprise in Pine Bluff, Arkansas. They purchased marijuana in varying amounts in the Dallas/Fort Worth area with the assistance of Steven Beckley, who lived in Irving, Texas. The marijuana was transported, typically by Beckley, to Arkansas and stored in Holloway's house.
>
> On September 21, 1994, Holloway drove Hall from Pine Bluff to the airport in Little Rock, Arkansas, and Hall took a flight to Dallas, Texas to engage in a drug transaction. Beckley and Hall's brother, Demetrius Hall (D. Hall), picked up Hall at the airport. Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis and Neil Rene (N. Rene), at a car wash and gave them $4700 for the purchase of marijuana. Later that day, Beckley and D. Hall returned to the car wash to pick up the marijuana, but Vitalis and N. Rene never appeared. Later, when Hall got in touch with Vitalis and N. Rene by

(68)

telephone, they claimed they had been robbed of the $4700. Using the telephone number that Beckley had used to contact Vitalis and N. Rene, Hall procured an address at the Polo Run Apartments in Arlington, Texas from a friend who worked for the telephone company. Hall, D. Hall, and Beckley began conducting surveillance at the address and saw Vitalis and N. Rene exit an apartment and approach the same car that they had driven to the car wash, which they claimed was stolen from them along with Hall's $4700. Hall therefore deduced that Vitalis and N. Rene had lied to him about having been robbed.

On September 24, 1994, Hall contacted Holloway and had him drive Webster to the Little Rock Airport. From there, Webster flew to Dallas. That evening, Hall, D. Hall, Beckley, and Webster returned to the Polo Run Apartments in a Cadillac Eldorado owned by Cassandra Ross, Hall's sister. Hall and Webster were each armed with handguns, D. Hall carried a small souvenir baseball bat, and Beckley had duct tape and a jug of gasoline. The four men approached the apartment that they had previously seen Vitalis and N. Rene leave.

Webster and D. Hall went to the front door of the apartment and knocked. The occupant of the apartment, Lisa Rene, N. Rene's sixteen-year-old sister, refused to let them in and called her sister and 911. After Webster unsuccessfully attempted to kick in the door, he and D. Hall went around to a sliding glass door on the patio and saw that Lisa Rene was on the telephone. D. Hall shattered the glass door with his baseball bat, Webster entered the apartment, tackled Lisa Rene, and dragged her to the car.

Hall and Beckley had returned to the car when they heard the sound of breaking glass. Webster forced Lisa Rene onto the floorboard of the car, and the group drove to Ross's apartment in Irving, Texas. Once there, they exited the Cadillac and forced Lisa Rene into the backseat of Beckley's car. Hall got into the backseat as well. Beckley got in the driver's seat, and Webster got in the front passenger seat. The group then drove off again. During the drive, Hall raped Lisa Rene and forced her to perform oral sex on him. The group later returned to Ross's apartment.

From there, Beckley, D. Hall, and Webster drove Lisa Rene to Pine Bluff. Hall remained in Irving and flew back to Arkansas the next day. Once Beckley, D. Hall, and Webster reached Pine Bluff, they obtained money from Holloway to get a motel room. In the motel room, they tied Lisa Rene to a chair and raped her repeatedly.

3

69  151

Hall and Holloway arrived at the motel room on Sunday morning, September 25, 1994. They went into the bathroom with Lisa Rene for approximately fifteen to twenty minutes. When Hall and Holloway came out of the bathroom, Hall told Beckley, "She know too much." Hall, Holloway, and Webster then left the motel.

Later that afternoon, Hall and Webster went to Byrd Lake Park and dug a grave. That same evening, Hall, Webster, and Beckley took Lisa Rene to Byrd Lake Park, but could not find the grave site in the dark. They then returned to the motel room. In the early morning of Monday, September 26, 1994, Beckley and D. Hall moved Lisa Rene to another motel because they believed that the security guard at the first motel was growing suspicious.

Later the same morning, Webster, Hall, and Beckley again drove Lisa Rene to Byrd Lake Park. Lisa Rene's eyes were covered by a mask. Hall and Webster led the way to the grave site, with Beckley guiding Lisa Rene by the shoulders. At the grave site, Hall turned Lisa Rene's back toward the grave and placed a sheet over her head. He then hit her in the head with a shovel. Lisa Rene screamed and started running. Beckley grabbed her, and they both fell down. Beckley then hit Lisa Rene in the head twice with the shovel and handed it to Hall. Webster and Hall then began taking turns hitting her with the shovel. Webster then gagged Lisa Rene and dragged her into the grave. He covered her with gasoline and shoveled dirt back into the grave. Hall, Beckley, and Webster then returned to the motel and picked up D. Hall.

On September 29, 1994, an arrest warrant issued out of the City of Arlington for Hall, D. Hall, and Beckley for Lisa Rene's kidnapping. D. Hall, Beckley, and Webster were subsequently arrested. On September 30, 1994, Hall surrendered to Pine Bluff authorities in the presence of his attorney. On the advice of counsel, he did not give a statement at the time of his arrest, but indicated that he would talk with law enforcement agents after he was transported to Texas. On October 5, 1994, following his transfer to the Arlington County jail, Hall gave a written statement to FBI and Arlington County officials in which he substantially implicated himself in the kidnapping and murder.

*Hall*, 152 F.3d at 389-90.

4

70  1010

### *Standard of Review*

Title 28, U.S.C. § 2255 provides that a federal prisoner may move the convicting court to vacate, set aside, or correct a conviction or sentence based on its being imposed in violation of the Constitution or the laws of the United States. *See* 28 U.S.C. § 2255. A petition under § 2255 "may not do service for an appeal," and it is presumed that a defendant stands fairly and finally convicted. *United States v. Shaid*, 937 F.2d 228, 231-32 (5th Cir. 1991) (en banc), *citing United States v. Frady*, 456 U.S. 152, 164 (1982). Therefore a defendant may not raise even constitutional or jurisdictional issues for the first time on collateral appeal without establishing both cause for failing to raise the issue on direct appeal and actual prejudice resulting from the error. *Id.* A defendant must meet this cause-and-prejudice standard even where he alleges a fundamental constitutional error. *Id., citing Murray v. Carrier*, 477 U.S. 478, 493 (1986). Other types of error may be raised for the first time under § 2255 only if the defendant establishes that the error could not have been raised on direct appeal *and*, if the error were condoned, it would result in a complete miscarriage of justice. *United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992).

Moreover, claims that were also raised, and rejected, on direct appeal are also barred from federal habeas review. *United States v. Rocha*, 109 F.3d 225, 229 (5th Cir. 1997). A federal habeas petitioner

cannot, however, be expected to have raised a claim based on a Supreme Court case before that case was handed down. *Id.* Furthermore, ineffective assistance of counsel on appeal does satisfy the cause-and-prejudice standard. *Id.* And, finally, the Supreme Court has recently held that claims that counsel was ineffective at trial can be raised on habeas review under § 2255 regardless of whether or not the claims were previously raised on direct appeal. *United States v. Massaro*, 538 U.S. 500, 123 S.Ct. 1690, 1693-94, 155 L.Ed.2d 714 (2003).

## III

### *Issues Presented*

In his second amended motion to vacate his conviction and sentence, Hall raises the following nine issues in twelve claims for relief:

A. Hall's rights under the Fifth Amendment were violated because the indictment against him did not allege any aggravating factors that rendered Hall eligible for the death penalty (claim one).

B. Hall was denied his Sixth Amendment right to the effective assistance of counsel (claim two).

C. A juror's contact with the victim's family and other extraneous information that entered into the jury's deliberations violated Hall's rights under the Fifth, Sixth, and Eighth Amendments. (claims three through five).

D. The government violated Hall's rights under the Fifth and Sixth Amendments by failing to disclose exculpatory and mitigating information concerning government witness Larry Nichols (claim six).

6

E. Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated because of false testimony given by government witnesses Larry Nichols and Steven Beckley (claims seven and twelve).

F. The government violated Hall's Sixth Amendment rights by using jail inmate Larry Nichols to elicit information from Hall(claim eight).

G. Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated when the government provided a statement to the defense made by Alonso Airy that contained false information for the purpose of dissuading the defense from calling Airy to the stand(claim nine).

H. The government interfered with Hall's Sixth Amendment right to counsel when it advised his initial defense attorneys about information that Hall intended to kidnap the attorneys in an escape attempt (claim ten).

I. Hall's rights under the Fifth And Eighth Amendments were violated by the racially discriminatory effects of the federal capital sentence scheme (claim eleven).

Hall also requests an evidentiary hearing before this Court on all of his claims.

## IV

### *Procedural Bars*

In its response to Hall's petition, the government asserts procedural bars to this Court's consideration of many of the claims that Hall raises in his petition. The government asserts that Hall is procedurally barred from raising all but his second and part of his third through fifth claims for relief because the claims were

7

not raised on direct appeal and he has failed to allege any cause and prejudice for the procedural default.

In his reply, Hall asserts that these claims are not procedurally barred from this Court's review because the claims are based on new factual or legal bases. Hall further asserts that he can establish cause and prejudice to overcome any procedural bar because his counsel were ineffective on direct appeal. With respect to Hall's third through fifth, and ninth through eleventh claims for relief, this Court agrees that these claims are based on new facts not previously available to Hall, including affidavits obtained from various individuals during the habeas process. Specifically, Hall's eleventh claim, a selective-prosecution claim, is based on statistics that were not available at the time of his trial or appeal. Moreover, Hall's first claim for relief is based on cases decided by the Supreme Court after Hall's direct appeal was final. Accordingly, none of these claims are procedurally barred from habeas review. Furthermore, as noted earlier, Hall's second claim for relief, alleging numerous ineffective-assistance-of-counsel claims, is cognizable on habeas relief. Finally, in the interests of justice, this Court will address Hall's sixth, seventh, eighth, and twelfth claims, although they were not raised on direct appeal and are not based on new law or facts, as Hall has alleged that his appellate counsel was ineffective for not raising these claims.

8

*Discussion of Claims*

A.    Ring v. Arizona Claim

In his first claim for relief, Hall contends that his conviction and death sentence violate the Fifth Amendment. Specifically, Hall asserts that, under the Supreme Court's recent cases *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the indictment against him violated his Fifth Amendment rights because it did not allege the aggravating circumstances and the culpable mental state that made Hall eligible for the death penalty under the Federal Death Penalty Act (FDPA). The government responds that Supreme Court precedents do not require that these things be alleged in the indictment and that, in any event, this claim is unavailable to Hall at the habeas level because it is barred by *Teague v. Lane*, 489 U.S. 288, 310 (1989).

*Applicable Statutory Law*

Under 18 U.S.C. § 1201(a)(1), a person who unlawfully kidnaps a person and transports her to another state *shall* be punished by either life imprisonment or death where the death of any person results from the kidnapping. In order for a person found guilty of such a kidnapping to be sentenced to death, the government must prove beyond a reasonable doubt at a sentencing hearing that the defendant either intentionally killed the victim, intentionally inflicted serious bodily injury that resulted in the death of the victim,

9

(75) 1623

intentionally participated in an act that resulted in the victim's death where the defendant contemplated that a life would be taken, or intentionally engaged in an act of violence with reckless disregard for human life where the act caused the death of the victim. 18 U.S.C. § 3591(a)(2).

Furthermore, under 18 U.S.C. § 3593(a)(1), the government must provide timely notice of its intent to seek the death penalty in a case where the death penalty is a possible sentence. This notice must set forth the aggravating factor or factors that the government intends to prove at the sentencing hearing. *See* 18 U.S.C. § 3593(a)(2), (b). Several aggravating factors are set forth in 18 U.S.C. § 3592(c), but the jury may consider other non-statutory aggravating factors if notice has been given.[1] At the conclusion of the sentencing hearing, the jury must make special findings setting forth which aggravating and mitigating circumstances, if any, it finds. Any findings with respect to an aggravating circumstance must be unanimous. 18 U.S.C. § 3593(d). If the jury unanimously finds the existence of at least one aggravating factor under § 3592(c), the jury must weigh all aggravating factors with any mitigating factors and must by unanimous vote determine that the aggravating factors outweigh any mitigating factors in order for a defendant to be sentenced to death. 18 U.S.C. § 3593(e).

---

[1] The statute also sets forth a number of mitigating circumstances to be considered by the jury in determining whether a sentence of death should be imposed. 18 U.S.C. § 3592(a).

10

In *Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999), a federal case involving a defendant who was convicted of carjacking, the Supreme Court held that, under the Fifth And Sixth Amendments, any fact, other than a prior conviction, that increases the maximum penalty for a crime must be charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt. In *Apprendi v. New Jersey*, a case involving a defendant sentenced for shootings under a hate-crimes statute, the Supreme Court extended this rule to state convictions under the Due Process clause of the Fourteenth Amendment. *Apprendi*, 530 U.S. at 491. The Supreme Court noted in *Apprendi*, however, that Apprendi had not raised a constitutional claim that the Fifth Amendment required that any factor that might enhance his sentence had to be presented in an indictment. Rather, Apprendi had raised only a claim that he had a right to trial by jury under the Due Process clause of the Fourteenth Amendment. *Id*. at 477, n. 3. The Supreme Court has subsequently reiterated that, under *Jones* and *Apprendi*, any fact, other than a prior conviction, that increases the penalty of a federal crime beyond its statutory maximum must be charged in the indictment. *United States v. Cotton*, 535 U.S. 625, 627 (2002).

Subsequently, in *Ring v. Arizona*, the Supreme Court in effect extended the rule announced in *Apprendi*, holding that under the Sixth and Fourteenth Amendments capital murder defendants are entitled to

11

a jury determination on any fact that increases their maximum punishment, such as aggravating circumstances that make a capital defendant eligible for the death penalty. *Ring*, 536 U.S. at 589. Again, however, Ring had not argued before the Supreme Court that his indictment was constitutionally defective under the Fifth Amendment because it did not charge the aggravating circumstances which made him eligible for the death penalty, and the case was not decided on that basis. *Id.* at 597, n. 4; *see also United States v. Bernard*, 299 F.3d 467, 489 (5th Cir. 2002) ("*Ring* did not hold that indictments in capital cases must allege aggravating and mental state factors.")

Recently, in *United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004), a direct appeal by another criminal defendant who received the death penalty in this court, the Fifth Circuit held that, following *Ring v. Arizona*, the Fifth Amendment requires the federal government to charge, by indictment, the statutory aggravating factors it intends to prove in order to render a defendant eligible for the death penalty. *Id.*, slip op. at 4. The Fifth Circuit further held, however, that such *Apprendi* error is susceptible to a harmless error review because it is not a structural error. *Id.*, slip op. at 5-6. The Court then held that the error was harmless beyond a reasonable doubt under the harmless-error test set forth in *Chapman v. California*, 386 U.S. 18 (1967), because the government provided notice of the statutory aggravating factors it intended to prove at trial

four months prior to trial and because any rational grand jury would have found probable cause to charge Robinson with at least one of the aggravating factors that were omitted from his indictment. *Robinson*, slip op. at 8-9.

*Analysis*

At the punishment phase of Hall's trial, the jury found beyond a reasonable doubt that Hall intentionally engaged in conduct intending that Lisa Rene be killed or that lethal force be employed against her and her death was a result of this conduct, a mental state that made him eligible for the death penalty. (R. Nov. 6, 1995:5). Furthermore, the jury unanimously found the existence of two statutory aggravating factors and two non-statutory factors. Some jurors found the existence of four mitigating factors and, after weighing the aggravating and mitigating factors, the jury unanimously recommended the death penalty. (R. Nov. 6, 1995:5-7.)

Hall does not contend that his Sixth or Fourteenth Amendment rights were violated by the sentencing structure of the Federal Death Penalty Act. As required by *Apprendi* and *Ring*, the jury made the determination beyond a reasonable doubt that Hall had the requisite mental state that made him eligible for the death penalty, and the jury made the determinations regarding the aggravating factors, the existence of at least one being required in order for the death penalty to be imposed. Instead, Hall maintains that the indictment against him was "fatally flawed" under the Fifth Amendment because

13

79

it did not allege the mental state the government intended to prove under 18 U.S.C. § 3591(a)(2) and because the indictment did not allege what aggravating factors that the government intended to prove at sentencing pursuant to 18 U.S.C. § 3592(c). (Second Amended Petition at 25.)

As noted earlier, the Fifth Circuit has recently expanded the rulings in *Apprendi* and *Ring* to require not only that the jury make the findings regarding sentencing but also to require that the grand jury indictment set forth the mental state and aggravating factors intended to be proven by the government at sentencing. *See Robinson*, slip op. at 4. *Robinson*, however, was a direct-appeal case. The Fifth Circuit has specifically held that the rule announced in *Apprendi* is a new criminal procedural rule that is not retroactively applicable under the exceptions set forth in *Teague v. Lane*, 489 U.S. 288 (1989). *See United States v. Brown*, 305 F.3d 304, 309-10 (2002). Accordingly, *Apprendi* is not applicable to initial petitions under § 2255. *Id.* And the Supreme Court recently ruled that the rule in *Ring* is a new procedural rule that does not be apply retroactively to cases on habeas review. *Schirro v. Summerlin*, __ U.S. __, 124 S.Ct. 2519, 2526 (2004). If a federal habeas petitioner cannot apply retroactively the rulings in *Apprendi* nor *Ring* to a conviction that was final before these cases were handed down, under *Teague* the Fifth Circuit's ruling in *Robinson* is not applicable to Hall, whose conviction was final well before these cases were handed down by the

14

Supreme Court and the Fifth Circuit. Accordingly, this claim is *Teague*-barred.

With regard to Hall's substantive claim, the Fifth Circuit has held that *Apprendi* error, even on direct appeal, is subject to a harmless-error analysis. *See United States v. Matthews*, 312 F.3d 652, 665 (5ᵗʰ Cir. 2002); *United States v. Baptiste*, 309 F.3d 274, 278-79(5ᵗʰ Cir. 2002). In *Matthews*, the Fifth Circuit applied the *Chapman v. California*, 386 U.S. 18 (1967), harmless-error standard that is applicable on direct appeal and held *Apprendi* error to be harmless where, looking at the evidence presented at trial, it is clear that any rational jury would have charged the defendant with all of the elements of the crime. *Matthews*, 312 F.3d at 665-66. And, most recently, the Fifth Circuit applied the *Chapman v. California* harmless-error standard in *United States v. Robinson*.

Applying the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1992), which the Supreme Court established for use in federal habeas cases involving an allegation of constitutional error at trial, it was harmless not to include in the indictment against Hall the intent element or the statutory aggravating factors. Under this standard, in order to be entitled to habeas relief, a petitioner must prove that an error had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637-8. Hall has not shown a substantial and injurious effect or influence. He has not shown that, given the evidence presented to

15

the petit jury, the grand jury would have declined to include in the indictment the specific intent element or at least one statutory aggravating factor. After all, the jury that decided Hall's sentence unanimously found the existence of requisite intent beyond a reasonable doubt and unanimously found the existence of several aggravating factors. Moreover, Hall has not shown that he was harmed by a lack of notice on these issues. The government provided the required statutory notice to defense counsel, setting forth both the specific intent and the aggravating factors it intended to prove at trial. Hall is therefore not entitled to relief on this claim, and his first claim for relief is denied.

## B.  Ineffective-assistance Claims

In claim two, Hall asserts that his trial counsel were ineffective in numerous respects. Specifically, Hall contends that they were ineffective for: 1) failing to conduct a timely investigation into potential mitigating evidence, thereby emphasizing some evidence while not presenting more persuasive mitigating evidence through additional witnesses and presenting ill-prepared witnesses; 2) failing to present documentary evidence at the punishment phase of the trial to corroborate testimony; 3) failing to call available and known witnesses to testify at punishment; 4) failing to question government witnesses in order to present additional mitigating evidence; 5) failing to appropriately cross-examine government witness Larry Nichols at the punishment phase; 6) failing to re-interview

16

82

a potential defense witness after he appeared to have altered his testimony; 7) failing to make a closing argument at the guilt phase of the trial; 8) failing to argue effectively that Hall should have been allowed to make a statement in allocution; 9) making uninformed and unreasonable decisions regarding their choice and use of witnesses; 10) failing to adequately argue their motions for continuance; 11) making an ineffective closing argument at the punishment phase; and 12) failing to conduct an adequate *voir dire*.

### Standard of Review

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344-45 (1980). In order to obtain federal habeas relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the *Strickland* test, in order to prove that his counsel was ineffective, a defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. 466 U.S. at 687. Courts, however, should "indulge a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a defendant must overcome the presumption that an action is sound trial strategy. *Id.* at 689. *See also Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (habeas petitioner must show that trial result was unreliable or

17

(83)

proceeding fundamentally unfair due to deficient performance of counsel).

Recently, in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the Supreme Court applied the *Strickland* standard to a claim that counsel was ineffective by failing to investigate potentially mitigating evidence. In *Wiggins*, the Court stated that the appropriate inquiry is whether the investigation supporting counsel's decision not to present certain mitigating evidence was itself reasonable. *Wiggins*, 123 S.Ct. at 2536. This analysis is done by conducting an objective review of counsel's performance under the prevailing professional norms, in the context of counsel's perspective at the time of trial. *Id.*

*Analysis of Ineffectiveness Claims*

### 1. Failure to Investigate

Hall first contends that his trial counsel were ineffective for failing to conduct a timely investigation regarding potential mitigating evidence. Specifically, Hall faults counsel for not conducting adequate investigation on their own between the time they were appointed on March 21, 1995, and the beginning of Hall's trial, and for failing to seek the assistance of a mitigation expert until September 7, 1995, and not meeting with the appointed mitigation expert until September 15, 1995, when the voir-dire portion of Hall's trial began on October 1, 1995. Hall maintains that: because his trial counsel failed to timely investigate potential mitigating

18

(84)

evidence, they unreasonably made the decision to rely on the "equally-culpable-co-defendants" statutory mitigating factor, rather that investigating mitigating evidence about Hall's deprived background; the defense witnesses who did testify about Hall's background at the punishment phase of the trial were ill-prepared; and trial counsel failed to present testimony from numerous other witnesses.

With regard to a capital sentencing proceeding, defense counsel has the obligation to conduct a "reasonably substantial, independent investigation" into potential mitigating circumstances. *Lewis v. Dretke*, 355 F.3d 364, 367 (5th Cir. 2003), *citing Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002). If counsel has made an adequate investigation, any conscious and informed decision made based on trial tactics and strategy cannot be the basis for a claim of having received ineffective assistance of counsel unless the decision was so poorly chosen that it "permeates the entire trial with obvious unfairness." *United States v. Cotton*, 343 F.3d 746, 753(5th Cir. 2003), *cert. denied*, __ U.S. __, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004), *quoting United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002).

*Facts Applicable to First Ineffectiveness Claim:*
*Failure to Investigate*

As support for his assertions, Hall points to vouchers submitted by defense counsel, Michael Ware and Jeffrey Kearney; and the defense investigator, Danny LaRue; as well as affidavits from the mitigation specialist, Tena Francis; a defense attorney who assisted trial

19

counsel in this case, Kevin McNally; a well-known defense attorney, Michael Tigar; and a social worker, Jill Miller; this Court's orders appointing a mitigation specialist and authorizing a total of $7500.00 for that specialist's services; declarations from Betty Hall and Cassandra Ross, both defense witnesses at trial; and declarations from numerous persons outlining their potential testimony, had they been called as witnesses by the defense. (Hall's Exhibits #3, 5, 6-9, 12-19, 23, 25-30, 34-38; Hall's Reply Exhibits 2-5, 7-8, 10-11.) In response, the government has submitted affidavits from both Ware and Kearney. (Government Exhibits E & F.)

A review of these documents submitted by the parties, as well as the record of the trial reveals that, prior to Ware and Kearney's being appointed to represent Hall, Hall had been represented by prior counsel. He had interviewed Hall and had required him to complete a nineteen-page questionnaire entitled "Client Background Information," in which Hall answered numerous questions about his social, vocational, scholastic, and medical history. He also traveled to Hall's hometown of El Dorado, Arkansas, where he interviewed Hall's mother and other family members, a Reverend Hegler, Hall's adult probation officer from a prior criminal conviction, Hall's parole officer, and Hall's previous attorney. (Government Exhibit E at p. 2-3 and attached exhibit A.) Prior counsel turned over to Hall's trial counsel both his notes of these interviews and the questionnaire. Defense counsel filed a motion requesting the appointment of

20

86

various experts, including a psychiatrist, a psychologist, a jury consultant, a forensic pathologist, and a mitigation expert. In a hearing held on July 14, 1995, believing that a jury consultant was of greater importance than a mitigation specialist, defense counsel dropped their request for a mitigation specialist.[2] This Court authorized funds for defense counsel to hire a psychiatrist, a psychologist, and a pathologist, but denied counsel's request for a jury consultant. (Government Exhibit E at 5-7.)

In August of 1995, an attorney who specialized in death penalty cases, Kevin McNally, provided defense counsel with the name of a mitigation specialist, Tena Francis. She was officially appointed by this Court on September 14, 1995, and she first met with defense counsel on September 15, 2005. She and defense counsel also met with Hall that day. Prior to the meeting with Francis, defense counsel Ware had met and spoken with Hall's mother, Betty Hall, and his sister, Cassandra Ross, in his office; and he had also spoken with Hall's previous Arkansas attorney, James Bennett. (Government Exhibit E at pp. 12-13, 19; Hall's Exhibits 11, 13.) Later, Ware traveled to Arkansas and again conferred with Betty Hall. (Government Exhibit E at p. 20.)

---

[2] In his affidavit, defense counsel Ware explains that he had, prior to Hall's case, never used a mitigation specialist in any of the several capital cases he had tried before, choosing instead to use the services of private investigators, mental health experts, and paralegals, as well as his own labor in order to discover and develop mitigating evidence. (Government Exhibit E at p. 10.)

21

After being hired, and prior to the punishment phase of the trial, which began on November 1, 1995, Tena Francis submitted two investigative memoranda to Michael Ware, dated October 23 and October 25, 1995.  In the October 23rd memo, Francis outlines the substance of her interview with Tracy Hall, Hall's brother, who was at that time confined in a prison in Arkansas for aggravated assault. (Government Exhibit E, attached exhibit C.)  In her October 25th memo, Francis outlines information that, as she states in the body of the memo, was gleaned through "extensive interviews with members of [Hall's] family, his minister, officials at school, neighbors, and other significant persons from [Hall's] life (for example, girlfriends)."  This included information about Hall's: mother and father, A.J. Hall, including the violence in the home, their substance abuse, and their subsequent divorce; siblings Pamela, Scotty, Cassandra, Tracy, and Demetrius, as well as some half-siblings; birth and medical history; personality; relationship with his family; having four children by four different women; school history; limited work history; and criminal history, including parole from Arkansas state prison in 1993.  At the end of the October 25, 1995 memo, which was entitled "Client Social History," Francis expressed her belief that the report was incomplete because there was not enough time to locate other witnesses; several members of the family were hesitant in answering the questions; and several members of the family were

22

hesitant to speak because of their knowledge and participation in Hall's drug activities. (Hall's Reply Exhibit #13 at pp. 1-13.)

At the punishment phase of the trial, defense counsel presented testimony from: an FBI agent and a police detective who testified about Beckley's and Demetrius Hall's involvement in the crime (R. 18:52-60); a police lieutenant and a highway patrolman from Arkansas who testified about Bruce Webster's involvement in the crime and his extremely violent history (R. 18:80-97); an operations manager from the federal detention center where Hall was housed, who testified, among other things, that he had no record of any disciplinary problems with Hall (R. 18:98-102); an employee of Kroger's who testified about Beckley's prior discharge for dishonesty (R. 18:106-08); and Hall's mother and sister, who testified about A.J. Hall's severe physical abuse of Betty Hall, Hall's good relationship with and love for his children, his good behavior while in prison in Arkansas, and his remorse for the crime. (R. 18:111-147.)

During the punishment phase, defense counsel questioned several government witnesses at the punishment phase of the trial about the fact that they had previously spoken with either defense counsel or the defense investigator, including: LaTonya Anders, the mother of one of Hall's children (R. 17:97-8); Sylvia Henry, Bruce Webster's girlfriend (R. 17:130); David Butler, a prosecutor from Arkansas who testified to Hall's bad reputation (R. 17:166); and Carolyn Dikes,

23

a lieutenant in the El Dorado police department who also testified about Hall's bad reputation (R. 17:177.)

*Analysis of First Ineffectiveness Claim:*
*Failure to Investigate*

While Hall criticizes his attorneys for failing to conduct enough investigation on their own and for failing to hire a mitigation specialist earlier, the record before this Court reveals that defense counsel had done a substantial amount of investigation into mitigating evidence prior to trial, including interviewing government witnesses and members of Hall's family, and that the mitigation specialist had over six weeks between the time of her appointment and the punishment phase began to investigate and develop potential mitigating evidence. Indeed, her investigation included traveling to Arkansas and, according to her own memo to defense counsel, interviewing numerous people there. And, while Francis and the other experts who submitted affidavits in support of this claim contend that a far greater amount of investigation was needed in this case, this Court would have been unwilling at the time of trial to authorize an unlimited amount of funds with which to conduct further investigation, especially where that investigation would have involved contacting witnesses who had minimal contact with Hall. This Court instead concludes that Hall's counsel performed a reasonably substantial and independent investigation into potential mitigating circumstances and therefore did not provide ineffective assistance. *See Lewis v. Dretke*, 355 F.3d at 367.

24

90

Hall next contends that his trial counsel made an unreasonable decision to emphasize, in the punishment phase of the trial, the statutory mitigating circumstance of "equally culpable co-defendants" and that they failed to adequately prepare Betty Hall and Cassandra Ross prior to their giving testimony at trial. Under federal law, the fact that equally culpable co-defendants will not be punished by death is a mitigating factor that, if proven, *shall* be considered by the jury in determining whether a death sentence shall be imposed. *See* 18 U.S.C. § 3591(a)(4). Defense counsel believed that it was a good trial strategy to emphasize this mitigating factor because Hall's co-defendants, Demetrius Hall; Marvin Holloway; and most especially, Steven Beckley; were arguably equally culpable and had reached plea agreements with the government and would not be eligible for the death penalty. Defense counsel Michael Ware believed, based on his experience, that jurors disliked the government "striking deals" with co-defendants and that North Texas jurors in particular tend to be conservative jurors who might therefore be more open to the equally-culpable-co-defendants mitigating factor as opposed to "excuse defenses" in a case such as Hall's where the facts were particularly gruesome. (Government Exhibit E at pp. 14-5.)

The Supreme Court noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 2065. In

25

viewing counsel's decisions from their perspective at the time of trial, the strategy of heavy reliance on the statutory mitigating factor, "equally culpable co-defendants," was a reasonable one. From the bench it was clear that defense counsel were making the argument most likely to be persuasive to the jury--an appeal to its sense of fundamental fairness--and that the jury was attentive and responsive to it. Besides, other statutory mitigating factors, such as duress, minor participation, absence of a prior criminal record, victim's consent, and impaired capacity, were not available to Hall. (Government Exhibit E at pp. 16-18.) Also, it was a reasonable trial strategy for counsel to rely on their experience as criminal defense attorneys in reaching this decision. And, finally, counsel also submitted non-statutory mitigation factors to the jury, such as Hall's age, his remorse, and the circumstances of his upbringing, so that the defense did not rely on one mitigation factor to the exclusion of all others. (R. 20A:25.) Defense counsel were not ineffective in this regard.

Hall also contends that Betty Hall and Cassandra Ross were inadequately prepared as witnesses. As support, he points to the length of their testimony and their being effectively cross-examined on certain issues, and to affidavits from both women. (Hall's Exhibits #15, 16.) In their affidavits, Betty Hall and Cassandra Ross state that they had limited contact with the defense team, but also acknowledge that they met with defense attorney Michael Ware on more

26

92

than one occasion, met with mitigation specialist Tena Francis, and met with a psychiatrist who had been hired by defense counsel. They also state in their affidavits that they felt unprepared for giving their testimony, as they were not informed by Michael Ware until the same day as their testimony that they were going to testify about Hall's upbringing and the violence in the household. And, finally, they state in their affidavits that they would have given further information detailing the violence in the Hall household. (Hall's Exhibit #15 at pp. 1-3, 5-8; Hall's Exhibit #16 at p. 1-2, 4-6.)

The Fifth Circuit has cautioned that a reviewing court should be wary of claims that an attorney failed to present **enough** evidence of a certain type. *Smith v. Cockrell*, 311 F.3d 661, 669 (5th Cir. 2002), *citing Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000). While Betty Hall and Cassandra Ross criticize the time that they spent with defense counsel and maintain that they were ill-prepared, the record of the trial reveals that they testified to much of what is contained in their exhibits. Specifically, at trial, Betty Hall testified that: A.J. was abusive towards her during most of their marriage including when she was pregnant; that she had been beaten with the butt of a gun, by a two-by-four, and with fists; that her teeth were knocked out; that she was dragged out of bed and beaten and beaten after getting home from work or from a store; that this was all done in front of the children; that the children tried to intervene, but would get knocked around themselves; that the police

27

(93)

were called several times, but arrested A.J. on only one occasion; that Hall would physically protect her from her husband; and that she stayed with her husband because she had small children and had no place to go, but she left when Demetrius was old enough to look after himself. (R. 18:113-116.) Cassandra Ross testified that: there was a lot of physical and verbal abuse during her childhood; that A.J. would beat her mother with boards and anything else he could get his hands on; that all of the children tried to stop the abuse and would call the police, but their father would snatch the telephone away; that she left the home at age eighteen, married and moved to Texas; and that she had Hall come and live with her for a while and go to school in Texas at one point. (R. 18:137-40.) While the government did cross-examine both women about Hall's criminal history, his lack of an employment history, the fact that all of the children were fed, clothed, and sent to church, and the fact that Cassandra Ross had never been in trouble even though she was raised in the same household, this type of cross-examination was to be expected and would have occurred no matter how many times the women met with defense counsel. Hall's mother and sister gave substantial testimony about Hall's upbringing, and Hall has not shown that his trial counsel were ineffective for failing to elicit further, similar testimony from them or for failing to question them in a more effective manner.

Hall further argues that his trial counsel failed to develop and present mitigating evidence from Hall's father, A.J. Hall, his

28

94

two brothers, Scotty and Tracy, and his sister Pamela Palmer. (Second Amended Petition at 74-85.)[3] Defense counsel Michael Ware, however, explains in his affidavit that he made the strategic decision not to call these family members as witnesses. In particular, he decided not to call A.J. Hall as a witness because, although Ware had met with Hall's father, he was "absolutely opposed" to testifying and would not have likely made an effective witness, given Betty Hall's testimony about his violence towards her. (Government Exhibit E at p. 25.)  Ware made the decision not to call Tracy or Scotty Hall, two of Hall's brothers, based on interviews that Tena Francis conducted with them.  In particular, Tracy Hall, who at the time of the interview was in prison for firing a gun into a crowd and injuring nine people, was an admitted crack-cocaine dealer in El Dorado, Arkansas.  He told Francis that Hall had "taken him under his wing" in the drug-dealing business, that they had shared the drug-dealing business in El Dorado, and that Hall had taught him how to be smart about drug dealing. (Government Exhibit E at pp. 23-4, attached exhibit C at pp.1-2.)  Scotty Hall was also in prison for drug possession when he was interviewed by Francis, and Francis had learned that Scotty was a spouse batterer. (Hall's Exhibit 18 at p. 3, Hall's.

---

[3]

Hall has submitted declarations from these individuals and contends that A.J. could have testified about the problems in his marriage and his own bad behavior, and Tracy, Scotty, and Pamela could have testified about their upbringing and about how they were disciplined harshly by their father, witnessed the abuse of their mother, and were exposed to drug dealing and other criminal behavior while growing up. (Hall's Exhibits #17-9, 25).

29

95  154

eply Exhibit 13 at p. 5.) Ware made the decision not to call Pamela Palmer as a witness because she was very unwilling to speak at length to Francis, as she was very angry at the time at Hall for lying to her about his involvement in the crime and for involving Demetrius Hall in the crime. (Government Exhibit E at pp. 22-23, Hall's Reply Exhibit 13 at p. 5.) It was reasonable for trial counsel to opt not to call as witnesses a father who was opposed to testifying, two brothers who were imprisoned criminals themselves, and a sister who at the time remained hostile to her brother, notwithstanding what they now state they would have testified to at trial.

Hall also asserts that his trial counsel failed to develop and present mitigating testimony from: Cassandra Ross's in-laws, Reverend Jerry and Gracie Ross, who were neighbors of the Hall family and could have testified about the violence in the Hall household (Hall's Exhibit #26, 27); Betty Hall's co-workers, who saw her at work after being beaten (Second Amended Petition at 87); A.J.'s sister, who could have testified about the slave history of their family and the abuse she endured as a child, as well as Betty Hall's illnesses (Second Amended Petition at 87); one of Betty Hall's sisters, who could have testified about A.J.'s violence towards Betty and about Betty's abandonment of her children after she left A.J. (Second Amended Petition at 88); two additional women with whom Hall fathered children, who could have testified about Hall's love for his children and his financial support of his children (Hall's Exhibit #29, 30);

30

(96) 1042

and a teacher from the middle school Hall attended, who could have testified about his shock at hearing about the crime (Second Amended Petition at 92.) Much of this evidence would have been cumulative of the testimony given by Betty Hall and Cassandra Ross and merely would have been further evidence of A.J. Hall's abuse of Betty Hall, something that the government did not dispute. Some of this evidence, such as evidence about A.J. Hall's upbringing, would have been of little, if any, assistance to the jury in reaching its decision. And, with regard to some of this potential testimony, such as testimony from mothers of Hall's children and a middle school teacher about Hall's general good character, it is so attenuated that there is no reasonable probability that the outcome would have been affected by such testimony. *See Carter v. Johnson*, 131 F.3d 452, 465 (5th Cir. 1997) (holding that Carter was not prejudiced by counsel's failure to investigate, discover and present the testimony of character witnesses, as there was no reasonable probability that testimony that he was a "good and peaceful person" would have resulted in a life sentence, given that Carter had confessed to two murders). Hall has not established any prejudice as a result of his trial counsel's failure to discover and present this testimony.

Finally, Hall asserts that his trial counsel were ineffective for failing to investigate and present records from Hall's imprisonments in Arkansas and in federal prison and supporting testimony from prison guards and prison experts illustrating his good

31

97

behavior in prison in both the Arkansas state prison and federal prison. (Hall's Exhibit #34-38.) As noted earlier, defense counsel did present testimony from an officer at the federal detention center that there was no record of any disciplinary problems with Hall while he was housed there. Hall contends, however, that his trial counsel should have offered further evidence to support this, as well as testimony and evidence from Arkansas prison guards about his good conduct while incarcerated there. In his affidavit, Michael Ware explains that he was hesitant to present such testimony because such witnesses would have had to concede on cross-examination that, in his earlier incarceration in Arkansas, Hall had been eligible for early release for "good time." Moreover, Ware had been informed that Hall had actually continued his drug dealing business while in prison in Arkansas, and he was also aware that the government had rebuttal expert witnesses ready to testify about prison conditions and did not want to open the door to that testimony. Instead, defense counsel opted to argue at closing that Hall would not be a future danger to society because his records from both stints in prison revealed no disciplinary problems and because there is no parole in the federal prison system. (Government Exhibit E at pp. 25-6; R. 20A:53, 78.) Counsel exercised reasonable trial strategy in this regard, and Hall has not shown how further testimony on this subject would have resulted in a life sentence. Hall has failed to establish ineffective assistance of counsel under the *Strickland* standard based on his

32

(98) 154

contention that his counsel failed to conduct an adequate investigation into potential mitigating evidence.

## 2. Failure to Present Documentary Evidence

Hall also contends that his trial counsel were ineffective for failing to place certain documentary evidence into evidence at the punishment phase of the trial. Specifically, Hall asserts that trial counsel should have placed into evidence a hospital emergency-room record that documented injuries Hall's mother Betty Hall received in 1968 at the hands of his father, A.J. Hall, the record of his father's arrest in 1974 for assault and battery on Betty Hall, and a handwritten letter and a poem Hall sent to his daughter.

As noted earlier, trial counsel presented uncontested evidence, through the testimony of Betty Hall and Cassandra Ross, that Betty Hall was severely physically abused by her husband, that the police came to the house three times and A.J. Hall he was arrested once because of this abuse, and that Hall was a concerned and involved father. (R. 18:113-16, 119, 138-41.) Accordingly, the documentary evidence Hall contends should have been offered into evidence was cumulative of testimony that was given at trial. *See Brown v. Cain*, 104 F.3d 744, 751 (5th Cir. 1997) (holding that counsel was not ineffective for failing to locate and present additional evidence that would have been cumulative to the testimony of the defendant's mother and sister regarding his difficult past). Moreover, the government never contested the fact that Betty Hall was severely

33

physically abused by her husband, but instead argued that the abuse did not extend to Hall and that, even if it did, it did not excuse his actions. (R. 20A:92.) Accordingly, defense counsel were not ineffective for failing to present documentary evidence that was cumulative of testimony already presented at trial and on a topic that was never in dispute.

### 3. Failure to Call Available Witnesses

Hall complains further that his trial counsel were ineffective for failing to call as witnesses certain people who were known to counsel and were available to testify. Specifically, Hall argues that counsel should have called Reverend D.L. Hegler, who was the Hall family's pastor during Hall's childhood, and Reverend Willie Ray Norful and his wife, the couple into whose custody Hall was released when he was paroled from prison in Arkansas. All of these people were in attendance at Hall's trial. As support for this claim, Hall has submitted an affidavit from Reverend Hegler.

Hall contends that Norful and his wife could have testified that Norful gave Hall a job at his church so that he could be paroled from prison, the people in the church and the Norful family liked him, Hall kept Norful's son out of his drug trade when he began it again after being paroled, and that they believed that the crime was very out of character for Hall.[4] Hall further contends that Hegler could

---

[4] This Court does not find in the record any declarations that Norful and his wife provided to habeas counsel indicating their willingness to testify on Hall's

34

(100) 1540

have testified about the physical violence between Hall's parents as well as the alcohol abuse and infidelity; the poverty, drug trade, and racism in El Dorado, Arkansas; Hegler's surprise that Hall was involved in such a violent crime; and Hall's expressions of remorse to Hegler. (Hall's Exhibit #22.)

In his affidavit submitted as an exhibit with the government's response, defense counsel Michael Ware explains that he chose not to call Reverend Hegler as a witness for the defense because mitigation specialist Tena Francis interviewed Hegler on October 9, 1995, and in that interview Hegler stated, among other things, that: Hall was bright, but did not apply himself; Hall dropped out of school in order to pursue his drug dealing; Hall believed that he could beat the system and would therefore not get caught dealing drugs; Hall had a "lot of boys" selling cocaine for him in El Dorado; Hall was still dealing drugs while in an Arkansas state prison; the elderly people who lived near Hall's father were afraid of Hall; Hall's parents "went wrong" by always being there to bail him out of trouble; and Hegler felt that Hall used him to get released on parole when he had no intention of leading a legal life when he was released. (Government Exhibit E at pp. 21-2.) Notwithstanding what Reverend Hegler now says about Hall a number of years after Hall's trial, defense counsel exercised reasonable trial strategy not to call as

behalf and outlining their proposed testimony, and Hall does not refer to any such exhibits in his petition.

(101) 154.

a witness someone who had this many negative things to say about their client.  They were not ineffective in refusing to call Hegler as a witness and, had they done so and had the government performed competent cross-examination of Hegler, doubtless Hall would now be asserting counsel's incompetence for placing Hegler on the stand.

With regard to defense counsel's failure to call Reverend Norful or his wife as a witness, Hall has failed to establish either deficient representation or prejudice.  While Ware does not specify his reasons for not calling Norful or his wife as witnesses, the information that Hall alleges that these potential witnesses could have provided is not necessarily mitigating evidence.  For example, while Norful gave Hall a job at his church so that Hall could be paroled from Arkansas state prison, the record reveals that Hall in actuality returned to drug dealing.  And, while the Norful family and the people in the church might have liked Hall personally, Hall obviously took advantage of their kindness and continued to violate the law on several occasions. Additionally, regardless of what Norful and his wife believed about Hall's character, Hall was clearly quite capable of raping, physically attacking, and burying alive an innocent sixteen-year-old girl.  Their belief that he was not is immaterial. Thus, Hall has failed to show either prong of the *Strickland* standard with respect to his counsel's failure to call Reverend Norful or his wife as witnesses at trial.  This claim is without merit.

36

(102)  1540

<u>4.</u> · <u>Failure to Adequately Question Government Witnesses</u>

Hall also argues that his trial counsel were ineffective in their cross-examination of certain government witnesses. Specifically, Hall contends that his trial counsel could have elicited from Hall's brother, Demetrius Hall, testimony about their deprived childhood; could have elicited from LaTonya Anders, Hall's girlfriend, testimony about his concern for her, their daughter, and his other children; and could have elicited from Wendell Olden, an official from the school district where Hall attended school, testimony about the drug problem that pervaded El Dorado, Arkansas.

Demetrius Hall testified for the government at the guilt phase of the trial, while LaTonya Anders and Wendell Olden testified for the government at the punishment phase of the trial. Demetrius Hall testified about his involvement in the crime. On cross-examination, defense counsel elicited from Demetrius Hall testimony that Hall had turned himself in to the police, that Hall told Demetrius to tell the truth to the police, that the original plan was to get the money from the "Jamaicans" and no one knew that Webster was going to take the victim from her apartment, that Hall was not present when Webster, Beckley, and Demetrius sexually assaulted Lisa Rene, and that Demetrius believed that his brother was sorry for what he had done. (R. 13:230, 239-46.)

LaTonya Anders testified at punishment about a $13,500 cocaine purchase she attempted to make on Hall's behalf in Houston, after

103  1540

she had given birth to Hall's daughter, when Hall was not allowed to leave Arkansas because he was on parole. She also testified that she and another friend of Hall were robbed at gunpoint before they completed the transaction. She further testified that she transported crack cocaine from Houston three different times for Hall and later helped transport marijuana for him, as well. (R. 17:57-71.) Anders testified regarding her knowledge about the kidnapping. (R. 17:77-91.) On cross-examination, defense counsel elicited from Anders, among other things, that Hall was a good father to her child, that Hall had always been good to her other child that was not his, that Hall treated his other three children well, and that Hall treated her and the other mothers of his children well. (R. 17:100-101, 111.)

Finally, Wendell Holden testified that he was the assistant principal at Rogers Middle School in El Dorado, Arkansas, as well as a city-council member, that he had known Hall since he was in junior high school, and that he had heard people speak about Hall and that Hall had a bad reputation in the community. (R. 17:169-71.) Carolyn Dykes, a lieutenant with the El Dorado police department also testified at punishment that Hall had a bad reputation in the community. On cross-examination, Dykes acknowledged that she had known Hall's family for a long time and knew that Hall's father had been a crack dealer for a long time. (R. 17:175-78.)

Hall has established neither deficient representation nor prejudice from the failure to further question Demetrius Hall, LaTonya

38

(104)

Anders, and Wendell Holden in an effort to elicit more mitigating evidence. As noted above, Demetrius Hall and LaTonya Anders gave very damaging testimony about Hall. While Hall faults his trial counsel for failing to question them about Hall's upbringing and specific instances of care he showed his daughter, their testimony illustrated that Hall was willing to involve his younger brother and the mother of his child in his drug dealing, even where their lives were in danger. Thus, defense counsel's representation was not deficient, as both of these witnesses gave mitigating testimony on cross-examination about Hall's remorse, about his lack of original intent to kidnap the victim, and about his love for his children. *Prejean v. State*, 889 F.2d 1391, 1898-9 (5th Cir.), *cert. denied*, 494 U.S. 1090 (1990) (holding that, where defense counsel did place certain evidence before the jury, counsel was not ineffective for failing to present more of the same). And, Hall has not shown a reasonable probability that any further testimony would have resulted in a life, rather than a death sentence.

Moreover, while Hall criticizes defense counsel for failing to question Holden about the drug culture in El Dorado, defense counsel did elicit from another government witness the fact that Hall's father was also a drug dealer. In any event, Hall has not shown how further testimony on this issue would have been mitigating evidence. After all, Hall committed murder partly in retribution for one of his drug deals having gone bad. Hall has not shown a reasonable probability

39

(105)   153

that any testimony about the fact that other young men were drug dealers in Hall's hometown would have lessened Hall's culpability in the minds of the jurors. Hall has not established either prong of the *Strickland* standard with regard to this claim.

### 5. Failure to Adequately Cross-Examine Larry Nichols

Hall contends that his trial counsel, Jeff Kearney, was ineffective in his cross-examination of government witness Larry Nichols at the punishment phase of the trial. Specifically, Hall asserts that Kearney failed to impeach Nichols with his prior testimony from a trial of his co-defendants in a bank robbery in which he testified for the government. Hall asserts that counsel failed to impeach Nichols with his previous testimony that he learned tips in improving his situation from other inmates in federal prison, that he was a drug dealer, that he committed numerous robberies other than the bank robbery for which he was arrested, that he owned at least five guns, and that he passed fraudulent checks. Hall further asserts that his trial counsel was ineffective in failing to cross-examine Nichols about differences between the original statements he gave the FBI about Hall and his trial testimony.

At the punishment phase of Hall's trial, Nichols testified that he and Hall were fellow inmates in the Mansfield Correctional Center in the months leading up to Hall's trial. Nichols further testified that Hall bragged about raping Lisa Rene, spoke about being a drug dealer in Arkansas, talked about a man he attempted to rob in

40

(106)

Arkansas, and spoke about beating women. Nichols also testified that Hall told him that he would kill Steven Beckley if he ever got the chance and told him that he had a plan to escape from custody that involved taking either one of his lawyers or a female guard hostage and using one of the shanks that was hidden in the jail. (R. 17:220-27.)

On direct examination, Nichols acknowledged that he had been charged with the armed robbery of three banks and, in exchange for his testimony at the trial of his co-defendants, had pled guilty to two counts of using a weapon during a crime of violence. (R. 17:210-12.) Nichols also testified that, while the minimum sentence for the crimes for which he pled guilty was twenty-five years, there was a provision whereby his sentence could be lowered because of his cooperation in the case against his co-defendants. (R. 17:213-14.)

On cross-examination, Nichols further admitted that: his prior plea agreement also "settled up" five or six robberies he had committed in Louisiana; he had purchased the car used in the bank robberies from the proceeds of other robberies; he also had federal charges against him for transporting a stolen vehicle across state lines; in the robberies he carried either a .380 automatic or a Tech 9 assault rifle; he had also robbed fast-food places and convenience stores; and he had previously tried to convince one of his co-defendants in the robbery cases to sign a false affidavit stating that Nichols had nothing to do with the robberies. (R. 17:242-45,

41

(107)

248.) Nichols also admitted on cross-examination that, while the sentence for the two crimes he had pled guilty to was twenty-five years, he had not yet been sentenced. He further acknowledged that the government had already filed a motion with the judge presiding over his case for downward departure on his sentence due to his cooperation in that case and that he would like for the judge in his case to know about his cooperation with the government in Hall's case before he was officially sentenced. (R. 17:252, 256, 260-62, 268-69.)

In an affidavit submitted with the government's response, defense attorney Jeff Kearney explains that he had a copy of Nichols's testimony from the bank robbery trial, that he reviewed this testimony, Nichols's plea agreement, and the prosecution's file in that case, and that he questioned Nichols regarding several aspects of his testimony from that trial. He also states in his affidavit that, in furtherance of his cross-examination of Nichols, he toured the Mansfield prison facility where Nichols and Hall were housed together and interviewed the jailers who found the hidden shanks that Nichols told the government about. Finally, Kearney explains that, although Nichols denied some of his previous testimony, he admitted much of it, and Kearney made the decision not to "pin down" Nichols on all of his prior testimony because Kearney believed that the jury knew that Nichols was self-motivated and knew he was lying, and Kearney had determined that doing so would destroy the mood and tempo

42

108

of the cross-examination and would risk alienating the jury by "beating a dead horse." (Government Exhibit F.)

This Court finds that defense attorney Kearney made a reasonable strategic decision not to impeach Nichols on every difference between his prior testimony and his testimony at Hall's trial. This decision was made after fully reviewing Nichols's prior testimony and was therefore made with knowledge of inconsistencies in Nichols's testimony. The decision was also made in order to streamline cross-examination and therefore make it more effective. But counsel did elicit from Nichols his substantial criminal history, his previous attempt to have a co-defendant perjure himself in an affidavit, and his admitted desire to improve his own situation in life by testifying against Hall. Such a strategic choice, when it is made after a thorough investigation of the relevant facts, is virtually unchallengeable. *See Strickland v. Washington*, 466 U.S. at 690-91. Hall's trial counsel was not ineffective in his cross-examination of Larry Nichols.

6. Failure to Interview Alonzo Airy

Hall next asserts that his trial counsel were ineffective for failing to seek a continuance in order to re-interview inmate Alonzo Airy, a potential punishment witness for the defense, after defense counsel were informed that Airy had been interviewed by the government and had apparently changed his story about Hall's behavior while incarcerated in federal prison. Hall further asserts this his trial

43

counsel were ineffective for failing to conduct further investigation and thereby discover other federal inmates who could have presented testimony favorable to Hall.

Before the government had concluded its case-in-chief at the punishment phase of the trial, but after federal inmate Larry Nichols had concluded his testimony for the government, during which he testified about Hall's lack of remorse while in federal prison and Hall's plan to escape from prison, the government requested that it be permitted to amend its witness list to add Alonzo Airy. Assistant U.S. Attorney (AUSA) Richard Roper explained to this Court that Alonzo Airy had only recently been interviewed by the government because he was on the defense's witness list that had been filed with the Court on the first day of trial. (R. 18:4.) Roper further stated that he wished to call Airy as a witness for the government because he had corroborated Nichols' testimony when he spoke to FBI Agent Paul Shannon and AUSA Paul Macaluso a couple of days earlier. (R. 18:5-6; Hall's Exhibit #39.) Defense counsel objected to the government's attempt to amend its witness list because the testimony would be cumulative of Nichols's testimony, because Nichols had not been impeached regarding Alonzo Airy as of yet, and because the government could cross-examine Airy if and when he was called by the defense. (R. 18:8.) This Court denied the government's request to add Airy as a government witness (R. 18:14), and the defendant did not call him.

44

110

Airy had been listed as a defense witness because he had been interviewed by mitigation specialist Francis on October 22, 1995, when he told her that Hall had never discussed any escape plan and was extremely remorseful. Airy had also informed Francis that Nichols was constantly discussing his desire to have his sentence reduced and had stated that it was easy for an inmate to lie for the government in order to obtain a recommendation from the government that a sentence be lowered. (Hall's Exhibit 7.) Hall has included as an exhibit with his petition an affidavit signed by Airy on April 10, 2000, stating, in essence, that he never told Agent Shannon and Macaluso much of the information Agent Shannon included in an FBI-302 statement dated October 30, 1995.[5] Specifically, in his new affidavit, Airy asserts that, contrary to what is stated in the FBI statement, he never told the government representatives that Hall was cold or remorseless, never told them that Hall said that the others followed him, never said that Hall told him that he wanted to kill Beckley because he was a "snitch," never said that Hall spoke of the victim in disparaging language, and never told the agents that Hall spoke to him about an escape plan in which he would kidnap and/or kill his attorney. (Hall's Exhibit #40.)

In response, the government has submitted affidavits from Macaluso and Shannon. In Macaluso's affidavit, he states that he

---

[5]

Airy does not appear to dispute that he had a conversation with federal agents that day, but instead disputes what was said.

45

and Shannon interviewed Airy on October 30, 1994, because the defense had listed him as a possible witness. Macaluso further states that he recalls that Airy made very disparaging comments about Larry Nichols and viewed Nichols as someone who had taken advantage of his own co-defendants. However, Airy confirmed the accuracy of Nichols's comments regarding Hall and what Hall had told Nichols about the kidnapping and murder of Lisa Rene. Finally, Macaluso states in his affidavit that Shannon's statement that was prepared after the interview was accurate. (Government's Exhibit C.) Likewise, in his own affidavit, Shannon states that his previous statement outlining the interview with Airy on October 30, 1995, is correct. (Government's Exhibit D.)

Hall contends that defense counsel were ineffective for not requesting a continuance so Airy could be re-interviewed and a determination made on whether he would give testimony that would be helpful. Also, with a continuance, Hall thinks other inmates could have been interviewed who would have been able to give testimony corroborating Airy's testimony about Nichols.[6] Putting aside the question of whether this Court would have granted a mid-trial continuance for this reason when two other similar requests for continuance had been denied, Hall has failed to establish any

---

[6]    Hall has also submitted affidavits from two other inmates of the prison where Hall was housed prior to trial. These inmates state generally that Hall never spoke to them about any escape plans and never bragged to them about the crime, and that Nichols was known as a "snitch." (Hall's Exhibits #32, 33.)

46

112

prejudice as a result of defense counsel's failure to re-interview Airy and/or discover other federal inmates to testify for Hall. In this regard, even had the defense re-interviewed Airy and determined that Airy was willing to testify in a matter contrary to what was contained in the FBI statement, had he been called as a defense witness, the government would have, presumably, been able both to question Airy about the interview with Shannon and Macaluso and to call Shannon as a witness in order to impeach Airy. Hall has not shown that a credibility determination between Airy, a convicted federal felon, and Shannon, an FBI agent, would have been settled in Hall's favor.

Moreover, with regard to any other inmates who might have testified on Hall's behalf, Hall has failed to establish that, even had these inmates been located, their testimony would have so effectively impeached Nichols testimony that Hall would not have received the death penalty. First, as noted earlier, defense counsel already effectively impeached Nichols during cross-examination about his self-interested motivation. Second, these inmates could only testify about what Hall told them, not what Hall might or might not have said to Larry Nichols. Because Hall has not established the prejudice prong of the *Strickland* standard, this claim is without merit.

7. <u>Failure to Make a Closing Argument at the Guilt Phase</u>

47

(113)

Hall argues that his trial counsel were ineffective in their decision not to make a closing argument at the guilt phase of the trial. Hall contends that, had trial counsel made a closing at the guilt phase of the trial, they could have "built a bridge" between the guilt and the punishment phases of the trial. Thus, even though counsel were in effect conceding that Hall was guilty of the offenses for which he was charged, counsel could have raised questions in the closing argument about the veracity of the testimony given by Hall's co-defendants and could have begun to argue at closing that these co-defendants were equally culpable.

As support for this claim, Hall points to two affidavits submitted by defense attorney Michael Tigar, one with the amended petition and one with Hall's reply to the government's response. In these affidavits, Tigar opines that defense counsel were ineffective for failing to give a closing statement at the guilt phase of the trial. Specifically, Tigar states that trial counsel should have given a closing statement at the guilt phase of the trial, highlighting co-defendant Steven Beckley's plea agreement, as well as his previous lies to the police and the inconsistencies between his previous statements to the police and his trial testimony. Tigar further states that trial counsel's decision not to make a closing statement at the guilt phase of the trial left the jury with only the government's theory of the case and did not adequately emphasize the defense's argument that Beckley was an equally culpable defendant

48

(114)

who was not going to receive the death penalty. (Hall's Exhibit 12 at pp. 9-12.) And, Tigar states that, while the government would be expected to "land a few blows" in rebuttal, defense counsel were ineffective for not making a closing statement at the guilt phase in order to address those jurors not yet set on a death sentence for Hall. (Hall's Reply Exhibit 5 at pp. 19-20.)

In his affidavit, defense attorney Michael Ware states that he was aware of the concept of "building a bridge" between the guilt and punishment stages of the trial. He believed, however, that prosecutors are fully capable of doing the same and therefore he made a strategic decision not to make a closing statement at the guilt phase of the trial so that the government could not give another closing statement in rebuttal, which would have been the last argument the jury would have heard at the guilt phase. (Government Exhibit E at p. 28.) Instead, defense counsel made an opening statement at the punishment phase of the trial, before the government opened its case-in-chief, in which counsel emphasized that Hall accepted responsibility in his confession, that there were others who were equally culpable against whom the death penalty was not sought, that Hall had four young children and had been a good father, that Hall had witnessed the physical abuse of his mother by his father, that Hall grew up hard and dealt drugs, but that this was a case of a situation getting out of hand and the appropriate sentence was life

49

in prison without the possibility of release rather than death. (R. 17:8-11.)

This Court finds that Hall's trial counsel did not render ineffective assistance of counsel in deciding not to make a closing statement at the guilt phase of the trial. This decision was made by experienced criminal defense attorneys, was made because the defense was not contesting Hall's guilt but was instead concentrating on the punishment phase of the trial, and was made for the strategic purpose of not providing the government an opportunity to give a rebuttal argument which would be the final argument the jury heard at the guilt phase. Moreover, Hall's concern that, because of this decision, the defense did not establish the framework for the punishment phase of the trial is answered by the fact that defense counsel made an effective *opening* statement at the punishment phase of the trial. Defense counsel were not ineffective in this regard. Besides, Hall has also not established that he was prejudiced by this decision, as he has not shown a reasonable probability that, by relying primarily on an opening statement at the punishment phase to make the case for life over death rather than upon a closing statement at the guilt phase, Hall received a death rather than a life sentence.

8. <u>Failure to Effectively Argue Right to Allocution</u>

Hall contends that his trial counsel were ineffective for failing to effectively argue his alleged right to allocute before the jury.

50

Before the defense presented its witnesses at the punishment phase of Hall's trial, defense counsel argued to this Court that Hall had an absolute right to make a statement to the jury before the jury reached its decision on punishment under Rule 32(c) of the Federal Rules of Criminal Procedure. They also cited a Fifth Circuit case, albeit a non-death penalty case, as support for this argument. This Court denied defense counsel's request to allocute before the jury without being subjected to cross-examination on the basis that the federal death penalty statute did not provide for such a right and that Hall had no constitutional right to allocute. (R. 18:45-50.) On direct appeal, Hall argued that he had a right to make a statement of remorse to the jury under Rule 32(c) or, in the alternative, under common law. Furthermore, Hall contended on appeal that he had a constitutional right to allocute and that, even if such a constitu- tional right did not exist, this Court had violated Hall's due-process rights by allowing the government to present victim impact statements that were not subject to cross examination, but did not give Hall the same opportunity. *Hall*, 152 F.3d at 391. The Fifth Circuit denied each of these claims, holding that Hall did not have a federal statutory, common-law, or constitutional right of allocution and that this Court did not abuse its discretion in declining to permit the allocution. *Id.*, 152 F.3d at 391-98.

Hall now contends that his defense counsel were ineffective because, had counsel cited state death-penalty cases where the trial

51

(117) 1561

court permitted such an allocution, there is a reasonable probability that this Court would have exercised its discretion and allowed Hall to make a statement of remorse to the jury without being subject to cross-examination. Hall further contends that, had defense counsel presented the proposed statement to this Court at the time the point was argued, rather than waiting until after trial to place the statement into evidence, this Court would have been persuaded to allow Hall to make the brief statement of remorse.

Contrary to Hall's argument, regardless of what state case law defense counsel might have presented to the Court supporting his position that a court has the *discretion* to allow a defendant in a death penalty case to allocute before the jury, this Court would not have granted Hall's request to allocute before the jury, no matter the content of the statement, without subjecting himself to cross-examination by the government. And, more importantly, on direct appeal the Fifth Circuit held that it was not error for this Court to deny Hall's request. Counsel were not ineffective for failing to argue more strenuously a point that was without merit. *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (noting that the Fifth Circuit has consistently held that counsel is not ineffective for failing to make futile motions or objections).

9.   Unreasonable decisions regarding expert witnesses

Hall next argues that his trial counsel were ineffective in their request and use of experts with respect to the punishment phase of

52

118

the trial. Specifically, Hall contends that his trial counsel were ineffective in first requesting a psychiatrist and psychologist rather than a mitigation specialist, in requesting a mitigation specialist too late in the process, by not having him examined by a neuropsychologist, and by failing to have someone testify about the impact that Hall's upbringing had on his behavior.

On July 14, 1995, defense counsel sought, and obtained, funds from this Court with which to hire both a psychiatrist and a psychologist to examine Hall. Defense counsel also sought, but were denied, funds with which to hire a jury consultant, but were given funds to hire a forensic pathologist. (July 12, 1995, hearing at 10-13; Government Exhibit E at 5-6.) Defense counsel hired forensic psychiatrist Dr. Lisa Clayton and neuropsychologist Dr. Randy Price. Subsequent to this, in September of 1995, defense counsel sought, and obtained, funds with which to hire a mitigation specialist. Dr. Clayton examined Hall and was prepared to testify for the defense, but the defense opted not to have her testify because this Court had ordered that, were she to do so, the government had the right to have Hall examined by its own expert. (Government Exhibit E at 7-8.) Dr. Price examined numerous documents relating to Hall, but evidently did not examine Hall and was either unwilling to testify on Hall's behalf or felt that he was unable to give any testimony that would assist Hall. (Hall's Exhibits 7 & 13, Government Exhibit E at 8-9.)

53

(119)   1500

Hall contends that there was evidence before defense counsel that indicated that he should be examined by a neuropsychologist, based on the fact that the mitigation specialist had discovered that Hall's mother was beaten when she was pregnant with Hall and may have also been abusing alcohol; and that Hall performed poorly in school, had been diagnosed with hearing problems as a child, and had a poor memory. (Hall's Exhibit #7 at 18-20.) Defense counsel, however, did in fact hire a neuropsychologist so, in essence, Hall faults his counsel for not hiring another psychologist to examine him.

Hall also contends that an expert should have testified at trial regarding the effects that Hall's upbringing had on his personality and offers an affidavit from a social worker as support for this claim. (Hall's Exhibit 14.) An offer of proof made by defense counsel after the trial, however, illustrates that this was the type of evidence that Dr. Clayton was prepared to give, but that she was not called to the stand because defense counsel made the strategic decision not to allow Hall to be examined by an expert hired by the government. (November 21, 1995 hearing; Government Exhibit E at 7-8.) Thus, Hall faults his trial counsel for not hiring *another* expert to testify generally, without having examined Hall, about how a history of family abuse and poverty caused Hall to enter the illegal drug trade.

First, Hall has failed to establish that his trial counsel were ineffective in their use of experts. Defense counsel sought the

54

(120)  1566

assistance of more experts than this Court authorized. While Hall contends that the mitigation specialist was not hired in a timely matter, this Court concluded earlier in this opinion that counsel were able to utilize the mitigation specialist. And, while neither the psychologist nor the psychiatrist testified on behalf of Hall, this was not due to any ineffective assistance on the part of defense counsel. *See Lewis v. Dretke*, 355 F.3d 364, 366 (5th Cir. 2003) (holding that counsel was not ineffective in making a strategic, informed decision to forego a psychiatric evaluation of the defendant to forestall the testimony of the state's expert psychiatric witness).

Second, Hall has failed to establish that he was prejudiced by the decisions that defense counsel made with respect to the use of experts. As Michael Ware notes in his affidavit, defense counsel were not allowed an inexhaustible amount of money with which to hire experts to assist them in their defense of Hall. (Government Exhibit E at pp. 5.) In fact, this Court denied defense counsel's request for a jury consultant when the government pledged not to use one; and defense counsel were not permitted to hire expensive experts at will and without a benefits analysis. While defense counsel might have reasonably argued to this Court that they should be permitted to hire another psychologist because their psychologist was either unwilling or unable to testify on Hall's behalf, it is highly doubtful that this Court would have entertained a request to hire a social worker to testify about Hall's upbringing after having already given

55

(121)

defense counsel funds with which to hire both a psychologist and a psychiatrist.

Even had this Court permitted defense counsel to hire another neuropsychologist to examine him *and* a social worker to testify generally about the effect his upbringing had on his behavior, Hall has failed to establish a reasonable probability that these experts would have discovered and testified about information that would have mitigated against the imposition of the death penalty such that Hall would have received a life, rather than a death, sentence. Hall has submitted declarations from a neuropsychologist who examined him on April 13, 2001; and from a social worker who reviewed Hall's and his siblings' education records, records of Hall's parents' divorce, his mother's medical records, unemployment data from El Dorado, a summary of the testimony in the case, Hall's previous arrest and prison records, and the numerous declarations that Hall has submitted from Hall's friends and relatives.

In his declaration, the psychologist does not state that Hall suffers from any mental disorder or is mentally retarded. Instead, Dr. Michael Gelbort states that, due to "markers" that Hall exhibited, he believes that Hall suffers from "neuropsychological impairment." Gelbort bases his opinion on the fact that, in the testing performed on him, Hall scored in the fortieth percentile in verbal intellect and the twelfth percentile in non-verbal abilities. Because of this, Gelbort believes that Hall has a lesser ability to exercise judgment

56

(122) 1808

and to anticipate the consequences of his actions and would be someone who would benefit from supervision. (Hall's Exhibit #41 at pp. 3-4.)[7]

In her declaration, Jill Miller states that Hall was a victim of severe physical abuse at home and his mother suffered from health problems and depression; that Hall has learning disabilities; and that Hall was abandoned by his mother when she left his father and thus had responsibilities towards his younger siblings. She concludes, consequently, that these are some of the reasons why Hall began selling drugs. Miller also states in her affidavit that Hall was a good prisoner in Arkansas and that, at the time of Lisa Rene's murder, Hall had indicated that he wanted to leave the drug trade and obtain "gainful employment." (Hall's Exhibit #14 at pp. 15-16.) Miller also states that, because of his history of trauma, the lack of good role models during his upbringing, and the pervasiveness of the drug trade in his hometown of El Dorado, the lure of the drug trade was something that Hall could not resist. (Hall's Exhibit at pp. 24-25.)

Even had both of these experts testified at Hall's trial about the information contained in their declarations, there is no reasonable probability that the result would have been different. Quite simply, although this Court does not deny the claims that Hall

_____

[7]

There is a second declaration from Dr. Gelbort that was submitted as an exhibit with Hall's reply to the government's response. In this declaration, Gelbort explains why Hall's neurological impairment would not have been evident to defense counsel when speaking to Hall. (Hall's Reply Exhibit #15.)

57

is of below-average intelligence and that his upbringing was deprived, the facts of the crime and the witnesses who testified for the government at punishment belie the contentions that Hall was incapable of exercising judgment or that he only entered the drug trade to provide for his family and wanted to exit it as soon as possible. In fact, after Lisa Rene was abducted from her apartment, Hall was the one who directed that she be transported to Arkansas, oversaw her confinement in the motel rooms, helped to dig her grave, helped to kill her, gave Beckley and Demetrius Hall advice on how to avoid the police, and refused to tell the police about the location of Lisa Rene's grave. And he did all of this because money had been stolen from him during a *drug transaction*. And, with regard to Hall's criminal history, after previously being imprisoned in Arkansas on drug charges and being released into the care of a family friend, Hall returned to the drug trade, directing both the mother of his child and members of his family in the business. In short, explanations for why Hall entered into the drug trade nowhere near sufficiently mitigate against his abhorrent behavior while practicing his livelihood such that there is a reasonable probability that, had this testimony been placed before the jury, Hall would have received a life sentence. *See Kunkle v. Dretke*, 352 F.3d 980, 992-93 (5th Cir. 2003) (holding that trial counsel were not ineffective for failing to present sufficient evidence of the defendant's mental problems and his troubled home life given the limited weight the jury would

58

place on this evidence when compared to the defendant's history of criminal behavior and aggressiveness towards others). The Court concludes that this claim is without merit.

## 10. Failing to Adequately Argue Motions for Continuance

Hall asserts that his trial counsel were ineffective for failing to adequately argue the motions for continuance that they made to this Court. Specifically, Hall contends that counsel were ineffective with respect to a motion for continuance defense counsel made on August 2, 1995, approximately two months prior to trial, and two motions for continuance made during the punishment phase of the trial. This Court denied all three motions.

As the government notes in its response, Hall must show not only that his motions for continuance would have been granted had they been supported with greater evidence and argument, but he must also establish a reasonable probability that, had the motions been granted, counsel would have obtained a sufficient amount of additional mitigating evidence to have altered the death-penalty verdict. *McFadden v. Cabana*, 851 F.2d 784, 787-88 (5th Cir. 1988). This he has not done. First, this Court almost surely would not have granted these motions for continuance had they been argued and supported as Hall suggests.[8] Second, earlier in this opinion, this Court concluded

---

[8] Hall suggests that the first motion for continuance should have included defense attorney Michael Ware's professional schedule as support for the motion. However, Hall fails to present any evidence that Michael Ware's schedule prevented him from being ready for trial.

59

(125) 157

that Hall had failed to show a reasonable probability of a different outcome at sentencing had the additional mitigating evidence he now points to been admitted into evidence. Accordingly, Hall has failed to establish prejudice because his motions for continuance were denied, and Hall has therefore failed to establish ineffective assistance of counsel under the *Strickland* standard with regard to this claim.

11. Making an Ineffective Closing Argument at Punishment

Hall further argues that his trial counsel were ineffective in their closing statements at the punishment phase of the trial. Hall contends that the two closing statements given by Michael Ware and Jeff Kearney were ineffective because an inadequate amount of time was spent arguing positive reasons why Hall's life should have been spared, such as his upbringing, his prior good behavior in prison in Arkansas, and his children. Hall further argues that the fact that the jury deliberated for over ten hours at the punishment phase is evidence that, had Hall presented more mitigating evidence at trial and argued it more forcefully in their closing statements, there is a reasonable probability that he would have received a life, rather than a death, sentence.

In considering whether a closing statement constituted ineffective assistance of counsel, an appellate court should look at the closing statements in their entirety. *Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir. 1997). And counsel is not ineffective for

126

making the strategic decision to acknowledge a defendant's culpability and even concede that the death penalty would be justified in order to establish credibility with the jury. *Id.* In the case at hand, defense counsel made closing statements that lasted for one hour. In these closing statements, they expressed sympathy for the victim's family, reiterated that Hall was guilty of the offense he was convicted of, and suggested that Hall's abusive home life and the harm that a death sentence would give to his children and his mother were circumstances that mitigated against a death sentence. (R. 20A:52, 55-6.) Defense counsel also emphasized that, if given a life sentence, Hall would not be eligible for parole and would die in federal prison (R. 20A:53, 78.) And, defense counsel suggested that the only people who would benefit from Hall's receiving a death sentence were his co-defendants and government witness Larry Nichols, who all testified in order to lower their own prison sentences. (R. 20A:56-7.) Finally, defense counsel made an impassioned plea that the jury not accept the partnership that the government entered into with people who were criminals and liars in order to seek the death penalty against Hall. (R. 20A:60-82.)

While Hall disagrees with the overall trial strategy of defense counsel to emphasize the equal culpability of Hall's co-defendants, this Court has determined that this was a reasonable trial strategy. Defense counsel's closing statements helped support this trial strategy, as well as emphasizing other factors that the jury should

(127)    1573

consider in reaching its decision. Accordingly, defense counsel's closing statements were not, taken in their entirety, ineffective closing statements. Moreover, Hall has failed to establish prejudice. Hall points to the fact that the jury deliberated for over ten hours as evidence that, had defense counsel made more effective closing statements in which Hall's upbringing was emphasized in greater detail, there is a reasonable probability that he would not have been sentenced to death. However, the fact that the jury deliberated for a substantial period of time militates just as forcefully toward the conclusion that defense counsel's closing statements were very effective, thereby creating issues that necessitated extensive deliberation. Hall's defense counsel were not ineffective in this regard.

## 12. Failing to Conduct an Adequate Voir Dire

Finally, Hall asserts that his trial counsel rendered ineffective assistance of counsel by failing to conduct an adequate voir dire of prospective jurors. Hall, however, only argues generally that his trial counsel were ineffective during the voir-dire process because they failed to investigate in a timely manner certain mitigating evidence. Individual voir dire began on October 2, 1995. (R. 1.) As noted earlier, by that date defense counsel had met with Hall and members of his family several times and had the benefit of some investigation performed by Hall's previous attorneys. Thus, investigation into potential mitigating evidence had been conducted

(128)

prior to voir dire. But more importantly, Hall has failed to point to any particular act or omission committed by defense counsel during the voir-dire process that rendered their representation of him ineffective. (*See* Amended Petition at 143-45.) Without any support from the record for this claim, it is without merit.

### Summary as to Ineffective Assistance

In summary, Hall was represented by two experienced criminal defense attorneys who had, prior to representing Hall, a total of thirty-five years of experience between them in criminal law. Each had tried numerous criminal jury trials in both state and federal court. Prior to Hall's trial, each had tried two other death-penalty cases to conclusion and had been involved in other capital cases where there was a mistrial or where the government did not seek the death penalty. (Government Exhibit E at 1, Exhibit F at 1-2.) Hall's attorneys conducted reasonable investigations in all areas of the case; requested and were appointed experts to assist them; vigorously cross-examined government witnesses at both stages of the trial, thereby questioning and examining the government's case against Hall; ably argued all objections and points of law; and eloquently defended their client in their closing statements. Hall received constitutionally effective assistance of counsel at his trial, and his second claim for relief is therefore denied.

(129) 1575

## C.   Juror-Misconduct Claims

In his third through fifth claims for relief, Hall alleges various instances of juror misconduct.  In his third claim, Hall asserts that there was extraneous evidence or information introduced into the jury's punishment-phase deliberations.  In his fourth claim for relief, Hall contends that one of the jurors had *ex parte* contact with a member of the victim's family.  And in his fifth claim for relief, Hall asserts that there is an unacceptable risk that "at least one juror" voted for the death penalty based on sympathy for the victim and her family.  Hall contends that his rights under the Fifth, Sixth, and Eighth Amendments were violated by these acts.

*Law Applicable to Juror Misconduct*

The Supreme Court has stated that, with respect to claims that there was an impermissible outside influence on the jury, due process "means a jury capable and willing to decide a case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  The Supreme Court has further stated that, with such claims, the issue that must be decided is whether the intrusion affected the jury's deliberations and thereby its verdict. *United States v. Olano*, 507 U.S. 725, 739 (1993).  A defendant is entitled to a new trial when extrinsic evidence is introduced into the jury room unless these is no reasonable probability that the jury's verdict was influenced by the information. *United States v. Ruggiero*, 56 F.3d 647, 652(5th

64

130   1570

Cir. 1995); *United States v. Luffred*, 911 F.2d 1011, 1014 (5th Cir. 1990).

*Analysis*

Hall bases these claims on two incidents that allegedly occurred during the trial. First, Hall's sister, Cassandra Ross, has submitted an affidavit to this Court stating that she saw a television newscast during which one of the female jurors was interviewed. Ross claims that the juror told the reporter that, during the weekend break in punishment deliberations, she had a birthday party for her daughter and that she placed a candle on the cake in Lisa Rene's memory and she and the guests said a prayer for Lisa Rene. (Hall's Exhibit #42.) Second, Hall has submitted evidence, including copies of e-mails and letters, that one of the jurors at Hall's trial, Jacqueline Holmes, communicated with Hall by letter after his trial and told him that she had met the victim's mother in the hallway during the trial. (Hall's Exhibits #44-49.) Hall contends that this evidence establishes that there was extrinsic information placed before the jury and there is a reasonable probability that the jury's verdict was influenced by the information. Hall further contends that Jacqueline Holmes's statements in letters and e-mails written by her indicate that she based her decision at the penalty phase of the trial on sympathy for the victim.

This Court conducted a hearing on these issues on June 7, 2004. At this hearing, Jacqueline Holmes testified under oath. She

(131)

acknowledged that she had communicated with Hall in prison by mail after the trial ended. She also acknowledged that, in one of her letters to Hall, she stated that she met the victim's mother during the trial. She further testified, however, that this statement was not true, that she never met the victim's mother, and that she included this statement in her letter in an attempt to encourage Hall to confide in her and respond to her inquiries. Holmes further testified at the hearing that she did not host or attend a birthday party during the weekend break in deliberations at the penalty phase of Hall's trial, she was not aware of any other juror attending such a party, and she did not recall any discussions between the jurors about a birthday party. (*See* Record of June 7, 2004 hearing.)

With regard to Hall's allegation that a juror had *ex parte* communications with the victim's mother, the live, sworn testimony before this Court is that this communication did not occur, and this Court finds Holmes's testimony to be credible. Accordingly, Hall has not established that any inappropriate *ex parte* contact occurred. With regard to Hall's allegation that extrinsic evidence was introduced into the jury room, Hall has made a specific allegation that a juror lit a birthday candle in honor of a murder victim and said a prayer in her memory. Assuming that this allegation is indeed true, and a female juror other than Jacqueline Holmes attended the birthday party, it is not evidence that there was *any* outside influence on the jury. Instead Hall offers merely *speculation* that

66

there may have possibly been some unknown person at the party who said something to the juror that influenced her vote. Mere speculation that some discussion between a juror and an unknown person occurred does not establish that extrinsic evidence entered the jury deliberations, especially where Jacqueline Holmes's sworn testimony is that she does not recall any juror discussing a birthday party, much less any prayer offered on behalf of the victim. Hall has also failed to establish this claim.[9]

Finally, Hall contends that an "unacceptable risk" exists that Jacqueline Holmes's decision to recommend the death penalty for Hall was based on her sympathy for the victim and her family, rather than on the evidence. Hall bases this claim on statements that Holmes made in messages posted on a web site regarding the death penalty, and Hall has submitted these messages to this Court as exhibits. In particular, Holmes stated that she was the last person on the jury in Hall's case to vote in favor of sentencing Hall to death. She admits that she ultimately voted as she did because of the horror

---

[9]

Hall makes two further contentions. First, he asserts that he has been unable to locate evidence to support this claim because this Court has previously denied him discovery on this issue. As noted in its earlier order denying Hall's request for discovery, further discovery was denied on this issue because Hall had failed to assert a *prima-facie* claim of juror misconduct, because Hall's contention that someone might have communicated something to the unknown juror at the birthday party was, and remains, mere speculation. Second, Hall appears to assert a further claim that religion played an impermissible part in the jury's verdict at punishment, given the juror's prayer for the victim at the party and testimony given at trial at the punishment phase of the trial regarding attending and being active in church. (R. 32:18.) As the government notes in its response, it never advocated the death penalty for religious reasons. And, the constitution is not violated merely because testimony regarding the victim's church attendance was offered into evidence. *See United States v. Bernard*, 299 F.3d 467, 479-80 (5th Cir. 2002). These contentions are without merit.

67

(133)    1573

the victim suffered, Hall's attempts to hide the crime, and his lack of remorse. She discloses that she has struggled with her decision in the years since, that she will always remember the sadness of both the victim's and Hall's families, and that she stopped writing letters to Hall because she was "overwhelmed" by the emotions that the correspondence evoked. (Hall's Exhibits #44, 48.)

As support for this claim, Hall cites cases in which the trial court removed jurors from service due to their inability to serve because of mental illness, depression, or a nervous or emotional condition. These cases are not applicable in the instant case. In her web postings, Holmes spoke of struggling with her decision after the fact. This is not evidence that she voted in favor of the death penalty at the time of trial based on overwhelming sympathy for the victim and her family. Instead, she specifically stated that she ultimately voted to recommend the death penalty because of the horror Lisa Rene experienced in death and because Hall attempted to hide his crime rather than promptly expressing remorse. Her decision was therefore based on the circumstances of the crime and Hall's response to them. Hall has shown no constitutional violation based on Holmes's verdict. Hall's third through fifth claims for relief are without merit, and they are denied.

### D. Brady Claim

In his sixth claim for relief, Hall contends that the government violated its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), because

68

(134)

the government was in possession of mitigating and impeachment evidence but did not provide it to Hall. Specifically, Hall asserts that the government knew that one of its witnesses, Larry Nichols, had additional criminal conduct and more experience as a government witness than what it revealed at trial, but that it did not inform defense counsel. Hall further asserts that, contrary to Nichols's testimony, he had been placed in protective custody prior to the times he spoke with Hall at the Mansfield jail. Hall contends that all of this additional information could have been used by the defense to impeachment Nichols, thereby discrediting his testimony.

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the suppression of evidence favorable to the accused and material to either guilt or punishment by the state violates a defendant's due-process rights under the federal constitutional. And under *Brady*, the prosecution has the duty to turn over to the defense both exculpatory and impeachment evidence, whether or not it was requested by the defense. *United States v. Bagley*, 473 U.S. 667, 682, 685 (1985). Such evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. A reasonable probability of a different result is shown when the suppression of evidence undermines confidence in the verdict. *Bagley*, 473 U.S. at 678.

As noted earlier in this opinion, at the punishment phase of Hall's trial, Nichols testified that he and Hall were fellow inmates

69

135

in the Mansfield Correctional Center in the months leading up to Hall's trial. Nichols further testified about Hall's demeanor in prison and his statements that he would kill Steven Beckley if he ever got the chance and that he had a plan to escape from custody. (R. 17:220-27.)

On direct examination, Nichols acknowledged that he had approached an FBI agent with this information when he was in court regarding his own federal cases and that, after speaking about Hall to FBI agents and an AUSA on March 6, 1995, he was placed in protective custody when he returned to Mansfield because he was a "snitch." (R. 17:236-37.) He further acknowledged that he had been charged with the armed robbery of three banks and, in exchange for his testimony at the trial of his co-defendants, had pled guilty to two counts of using a weapon during a crime of violence. (R. 17:210-12.) Nichols also testified that there was a provision in his plea agreement with the government whereby the government could recommend that his sentence be reduced because of his cooperation in the case against his co-defendants. (R. 17:213-14.)

On cross-examination, Nichols acknowledged his numerous prior robberies, his ownership of guns, his purchase of a car with stolen money, and his attempt to convince a co-defendant to lie in an affidavit. (R. 17:242-45, 248.) Nichols also admitted on cross-examination that he had not yet been sentenced in his case. He further acknowledged that the government had already filed a motion

70

with the judge presiding over his case for a downward departure from his guideline sentence due to his cooperation in that case and that he would like for the judge in his case to know about his cooperation with the government in Hall's case before he is officially sentenced. (R. 17:252, 256, 260-62, 268-69.)

Hall contends that the government withheld the full extent of Nichols's prior criminal conduct from Hall's attorneys. Hall further contends that Nichols was in protective custody before, not after, he spoke to federal agents about Hall and that this information was withheld from Hall's attorneys. And Hall asserts that the government withheld information that Nichols was a "career informant" who had cooperated with the government in cases other than those of his two co-defendant bank robbers and Hall.

Hall asserts that the government knew about Nichols's other prior criminal conduct because Nichols disclosed it during his testimony at the trial of his co-defendants. In that regard, the record from Hall's trial reflects that Hall's attorney Jeff Kearney questioned and confronted Nichols with his testimony at his co-defendants' trial on more than one occasion. (R. 17:246-47, 257.) Furthermore, in an affidavit submitted with the government's response, Kearney states that he reviewed the transcript of Nichols' previous testimony and utilized this information in cross-examining Nichols. (Government Exhibit F.) Nichols's prior criminal conduct, as related by Nichols at the prior trial, was not withheld from the defense.

71

(137)

Hall contends that Nichols was in protective custody before he spoke to an FBI agent on February 28, 1995, about Hall. Hall bases this on the word "protect" which is in parentheses in the report FBI Agent Arthur Grovner filed regarding his conversation with Nichols that occurred in a federal courtroom. (Hall's Exhibit #1.) Hall has no other evidence of this allegedly withheld evidence, and Hall's supposition that this parenthetical notation indicates that Nichols was already in protective custody is belied by the text of the report, which states that Nichols informed Grovner that he was a cellmate with one of the Hall brothers. This allegation is without merit.

Finally, Hall contends that the government withheld information that Nichols was a career informant. Hall does not state where he learned this information and does not specify against whom Nichols cooperated as a government witness other than his co-defendants and Hall. Regardless, even were this allegation correct and even if the government knew that Nichols had acted as an informant in the past additionally to what he admitted on the stand, Hall has not shown that this information is material impeachment evidence. On cross-examination, Nichols was impeached by defense counsel Kearney not only with his extensive criminal history, but also his willingness to testify against others, including his previous associates, in order to improve his own situation. Hall has not shown a reasonable probability that, had the jury been provided even more evidence along

72

138

this vein, Hall would not have received the death penalty. Hall's sixth claim for relief is without merit and is therefore denied.

## E.  False-Testimony Claims

In his seventh and twelfth claims for relief, Hall argues that his constitutional rights were violated when the government presented false testimony from government witnesses Larry Nichols and Steven Beckley. Specifically, in his seventh claim, Hall contends that government witness Larry Nichols lied upon being cross-examined at the punishment phase of the trial when he testified that he never used any of the proceeds from his previous robberies to use drugs and was never told by other inmates about ways to help himself within the legal system. In his twelfth claim for relief, citing *Johnson v. Mississippi*, 486 U.S. 578 (1988), Hall contends that his death sentence violates the Eighth Amendment because it was based on false testimony given by government witnesses Larry Nichols and Steven Beckley.

The Supreme Court has held that the presentation of false evidence violates a criminal defendant's due-process rights. *See Mooney v. Holohan*, 294 U.S. 103, 112 (1935). The same result obtains when the prosecutor, although not soliciting false evidence, allows it to go uncorrected when it appears. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). And this is true whether the presentation was intentional or through negligence. *United States v. Antone*, 603 F.2d

73

139

566, 569 (5th Cir. 1979), *citing Giglio v. United States*, 405 U.S. 150, 154 (1972).

In order to prevail on this claim that his constitutional rights were violated by the presentation of false testimony, Hall must establish not only that the testimony was actually false, but also that it was material and that the prosecution knew it was false. *Napue v. Illinois*, 360 U.S. at 271. As evidence that Nichols lied at trial, Hall points to Nichols's testimony at the trial of his own co-defendants. (Hall's Exhibit #31.) As noted earlier, Nichols's prior testimony was available to defense counsel and was used in cross-examining him. But even if this Court were to consider the government's failure to correct Nichols's testimony on these points at Hall's trial an error under *Napue*, it was not material. Nichols's testimony at Hall's trial and the previous trial differed with respect to collateral matters that are not material to Hall's sentence. Regardless of whether Nichols used his illegal proceeds to purchase drugs, there was ample evidence of Nichols's prior criminal behavior placed into evidence, including numerous armed robberies, as well as the illegal possession of guns. And, regardless of whether someone counseled Nichols on how to avail himself of the system to improve his chances of lowering his sentence, there was ample evidence admitted of his willingness to initiate contact with the government in order to provide information against other defendants, as well as his willingness to testify against others with the express hope

74

140

of having his sentence reduced.  Indeed, in an affidavit submitted with this Court, defense counsel Kearney explains that, while he did have access to all of Nichols's testimony from his co-defendants' trial, he decided not to confront Nichols with all of the inconsistencies in his testimony at Hall's trial and the previous trial, no matter how minor, because Nichols had substantially admitted most of the impeaching information in his testimony at Hall's trial. (Government Exhibit F.)  Hall's seventh claim for relief is denied.

With respect to Hall's twelfth claim, the Supreme Court in *Johnson v. Mississippi*, 486 U.S 578 (1988), reversed a death penalty in a case where a prior felony conviction from another state was used to prove an aggravating circumstance at the sentencing phase of the trial and that prior conviction was later reversed.  Hall asserts that under this Supreme Court precedent, his death sentence is invalid because it is based on false testimony given by Larry Nichols at the punishment phase of the trial and by false testimony given by Steven Beckley at the guilt phase of the trial.  In addition to his assertions that Nichols lied, which are set forth in his seventh claim for relief, Hall asserts that Steven Beckley lied about the nature of Hall's involvement in the kidnapping and murder of Lisa Rene and that, while this testimony was given at the guilt phase of the trial, Hall's sentence was based in part on his allegedly false testimony.

(141)

As this Court noted earlier, all of the allegedly false testimony that Nichols gave at Hall's trial was not material to the sentencing phase of the trial. With respect to Beckley's testimony, Hall asserts, without any supporting proof, that Beckley testified falsely that Hall was the leader of the group who committed the kidnapping and murder. However, while Beckley did testify that Hall was one of the primary actors in the kidnapping who also, along with Beckley and Bruce Webster, participated in her murder, his testimony was corroborated to a large extent by the testimony of Hall's brother, Demetrius Hall, by the testimony of Marvin Holloway, and by Hall's confession to the police. (See R. 13:107-227; R. 14:45-57; R. 16:14-64.) Hall has not shown that his death sentence was based on false testimony. Accordingly, this Court denies relief with respect to these claims.

## F. Government-Agent Claim

In his eighth claim for relief, Hall asserts that his right to counsel under the Sixth Amendment was violated because the government used Larry Nichols as a government agent to elicit information from Hall to be used against him at trial. Specifically, Hall asserts that, either with the direction or the encouragement of FBI Agent Grovner, Nichols elicited information from Hall between February 28, 1995, the day that Nichols initially approached an FBI agent about Hall, and March 5, 1995, the date Nichols met with FBI agents and prosecutors and related his information about Hall.

(142) 1566

The Supreme Court has held that, after a criminal defendant's right to counsel has attached, the government cannot initiate any questioning of the defendant without the presence of his attorney, unless he has waived his right to have counsel present. *Brewer v. Williams*, 430 U.S. 387 (1977). This includes situations where the government uses a co-defendant who is cooperating with the government to elicit information after both have been indicted. *Maine v. Moulton*, 474 U.S. 159 (1985); *Massiah v. United States*, 377 U.S. 201 (1964).

Hall bases his contention that Larry Nichols was used as a government agent on "information and belief," but has consistently maintained that additional discovery is required to develop this claim. However, the government has submitted an affidavit from FBI Agent Grovner in which he states that he never encouraged or directed Nichols to elicit further information from Hall. Rather, Grovner states in his affidavit that Nichols related to him information that Nichols had already been given by Hall regarding the escape plan, and Nichols stated that he had more information that he wanted to tell the government. (Government Exhibit B.) And the statement made by Agent Grovner regarding his conversation with Nichols on February 28, 1995, reflects that Nichols told Grovner some, but not all, of the information he had gleaned from Hall. (Hall's Exhibit 1.) As Agent Grovner has specifically denied Hall's contention that he ever encouraged or directed Nichols to elicit information from Hall, and Hall has presented no evidence to the contrary, Hall's claim that

77

(143)  1560

the government violated his Sixth Amendment right to counsel by using Larry Nichols as a government agent is without merit. Hall's eighth claim for relief is denied.

## G.   False-Statement Claim

In his ninth claim for relief, Hall contends that his rights under the Fifth, Sixth, and Eighth Amendments were violated when, during his trial, the government gave defense counsel a false statement from FBI Agent Shannon regarding Hall's fellow inmate Alonzo Airy. Hall further asserts that the information contained in the false statement caused defense counsel to decide not to call Airy as an impeachment witness against Larry Nichols at the trial's punishment phase. Hall argues that his sentence should be reversed because, had Airy been called as a witness for the defense, he would have effectively impeached Nichols's testimony about Hall's behavior while he was at the Mansfield jail.

As noted earlier in this opinion, before the government had concluded its case-in-chief at the punishment phase of the trial, but after Larry Nichols had concluded his testimony for the government, the government requested from this Court that it be permitted to amend its witness list to add Airy to the list, who had recently been interviewed by the government. (R. 18:4.) The government wished to call Airy as a witness because he had corroborated Nichols's testimony when he spoke to government agents a couple of days earlier. (R. 18:5-6; Hall's Exhibit #39.) Defense

78

counsel objected to the government's attempt to amend its witness list (R. 18:8), and this Court denied the government's request to add Airy as a government witness. (R. 18:14.) Defense counsel did not call Airy as a witness.

Hall offers no case law as support for his assertion that his sentence should be reversed on the basis of this claim, but has included as an exhibit an affidavit, signed by Airy on April 10, 2000, stating, in essence, that he never told Agent Shannon and AUSA Macaluso much of the information Shannon included in an FBI-302 statement dated October 30, 1995. Specifically, in his new affidavit Airy asserts that, contrary to what is stated in the FBI statement, he never told the government representatives that Hall was cold or remorseless, never told them that Hall said that the others followed him, never said that Hall told him that he wanted to kill Beckley because he was a "snitch," never said that Hall spoke of the victim in disparaging language, and never told the agents that Hall spoke to him about an escape plan in which he would kidnap and/or kill his attorney. (Hall's Exhibit #40.)

In response, the government has submitted affidavits from Macaluso and Shannon. In his affidavit, Macaluso states that he and Shannon interviewed Airy on October 30, 1994, because the defense had listed him as a possible witness. Macaluso further states that he recalls that Airy made very disparaging comments about Larry Nichols and viewed Nichols as someone who had taken advantage of his

own co-defendants. However, Airy confirmed the accuracy of Nichols's comments regarding Hall and what Hall had told Nichols about the kidnapping and murder of Lisa Rene. Finally, Macaluso states in his affidavit that Shannon's statement that was prepared after the interview was accurate. (Government's Exhibit C.) Likewise, in his own affidavit, Shannon states that his previous statement outlining the interview with Airy on October 30, 1994, is correct. (Government's Exhibit D.)

Hall does not allege that the government knowingly presented false testimony, as Airy did not testify for the government. Instead, Hall appears to be making a general prosecutorial misconduct claim, alleging that the prosecution committed misconduct when the prosecutors presented an FBI statement in order to convince the defense attorneys not to call Airy as a defense witness. The Fifth Circuit has stated that prosecutorial misconduct is not a ground for relief unless it casts serious doubt on the jury's verdict. *Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001). And any alleged prosecutorial misconduct must be examined in the context of the trial in which it occurred. *United States v. Bermea*, 30 F.3d 1539, 1563 (5th Cir. 1994).

Hall alleges that the government's stated desire to call Airy as a witness improperly influenced defense counsel not to call Airy themselves. But to make a showing that the government infringed on his right to present a defense at the punishment phase of his trial,

80

Hall must show that the government's conduct substantially interfered with Airy's free choice to testify. *See United States v. Thompson*, 130 F.3d 676, 686 (5th Cir. 1997). And while the government cannot conceal exculpatory evidence from a defendant, the government is under no obligation to conduct the defendant's investigation for him. *United States v. Garza*, 165 F.3d 312, 315 (5th Cir. 1999); *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990).

Hall has not shown that any government action interfered with Airy's decision or choice to testify. First, it is difficult to conceive why the government attorneys would have argued forcefully for the right to call Airy as a government witness knowing that he would give testimony substantially different than what the FBI agent recounted in his statement. Second, and more importantly, even if the FBI statement was a complete fabrication, when this Court denied the government's request to call Airy as a witness, defense counsel were free to do so and were certainly free to speak to Airy again and determine what testimony he was actually willing to give. Defense counsel, not the government, decided not to call Airy as a witness.[10] Accordingly, no prosecutorial misconduct alleged by Hall casts serious doubt upon the jury's verdict at punishment. Accordingly, this claim is without merit and it is denied.

---

[10] As noted earlier in this opinion, the decision not to call Airy as a witness was an imminently reasonable one because, even if he contradicted everything in the FBI statement, the government was free to question him about the statement and call FBI Agent Shannon to impeach Airy's testimony. Surely, this would have undercut Hall's defense, not aided it.

## H.   Interference-with-Counsel Claim

In his tenth claim for relief, Hall asserts that the government "arbitrarily interfered" with his Sixth Amendment right to counsel when the government informed his original trial counsel, Mark Daniel and Michael Heiskell, that Larry Nichols had told the government that Hall had a plan to escape by taking one of his attorneys hostage. Hall maintains that Nichols was an unreliable witness and that, had Hall's original attorneys been aware of his unreliability, they would not have withdrawn from the case.  The government responds that there is no evidence that Nichols was an unreliable witness, that the government had an obligation to inform counsel about the information it had received about the escape plan, and that Hall had no constitutional right to be represented by any particular attorneys.

On October 28, 1994, Mark Daniel was appointed to represent Hall and on January 6, 1995, Michael Heiskell was appointed as co-counsel in the case.  On March 8, 1995, these attorneys filed a motion to withdraw from their representation of Hall.  On March 9, 1995, after conducting an *in camera* review of the issue, this Court issued an order granting the motion.   Jeff Kearney and Michael Ware were subsequently appointed as new counsel for Hall.   Hall's former attorneys requested to withdraw from the case when they were informed about an alleged plan by Hall to escape from custody by taking one of his attorneys hostage. (Government Exhibit E.)  This information was obtained from fellow inmate Larry Nichols, who first spoke briefly

82

with FBI Agent Arthur Grover about the alleged plot on February 28, 1995, and then spoke in greater detail with both FBI Agents and prosecutors on March 7, 1995. (Hall's Exhibits 1, 2.)

Hall contends that the statement made by Nichols to the government, as outlined in an FBI-302 statement dated March 7, 1995, in which Nichols is quoted to have stated that Hall had a plan to escape from prison by taking one of his attorneys hostage, was an unreliable statement by an unreliable witness. The only evidence that Hall has submitted to this Court in an attempt to establish that Nichols' statements to authorities about the escape was unreliable are sworn declarations from other fellow inmates Charles May, Javier Solis, and Alonzo Airy. May, Solis, and Airy all assert in their statements that they were inmates with Hall at the Mansfield Detention Center for unspecified time periods and that they never heard him speak about an escape plan and did not believe that he would have said this to anyone else. (Hall's Exhibits 32, 33, 40.) In his affidavit, Airy also states that Nichols had urged him to claim that Hall had spoken to him about an escape plan. (Hall's Exhibit 40.) All three of these affidavits were signed in 2000.

None of this evidence presented by Hall conclusively establishes that Nichols's statement to the authorities about the alleged escape plan was false, as all of the statements state only that Hall never spoke to them about any escape plan. More importantly, however, none of this evidence shows that the government had any specific reason

83

to disbelieve Nichols when he spoke to FBI agents and prosecutors on March 7, 1995. As noted by the government in its response, Hall's previous attorneys were informed immediately about the alleged plan because it had a direct bearing on their safety. As their motion to withdraw was filed with this Court on March 8, 1995, it is clear that Hall's prior attorneys acted immediately on the information provided to them. Any statement or declaration made in 2000 questioning the accuracy of Nichols's statements about Hall have no bearing on whether such an escape plan was a possibility in March of 1995.

Moreover, and most importantly, Hall has shown neither any constitutional violation in the government's reasonable action of informing defense counsel about possible dangers in their representation of Hall nor in defense counsel's request to withdraw from representing Hall. The Fifth Circuit has consistently held that a criminal defendant has no constitutional right to be represented by a particular attorney. *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993); *see also United States v. Breeland*, 53 F.3d 100, 106, n. 11 (5th Cir. 1995). Without any proof of a constitutional violation, this claim for relief must fail. Hall's tenth claim for relief is denied.

## I. Selective-Prosecution Claim

Finally, in his eleventh claim, Hall, in essence, makes a selective-prosecution claim. Specifically, Hall contends that the

(150) 1596

government violated his constitutional rights under the Fifth and Eighth Amendments because it has used ethnicity as a basis for seeking the death penalty against African-Americans like himself. Hall bases his claim on statistics that purport to show that the government has sought the death penalty against African-American defendants with disproportionate frequency as compared to defendants of other races.

*Applicable Law*

In *United States v. Armstrong*, 517 U.S. 456 (1996), the Supreme Court addressed the appropriate standard for establishing a selective-prosecution claim. In *Armstrong*, the Court first noted that, absent clear evidence to the contrary, there is a presumption that prosecutors have properly discharged their duties. The Court then went on to state that, in order to dispel this presumption and establish that he has been selectively prosecuted on the basis of his race, a criminal defendant must show that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. And, in order to establish a discriminatory effect, the defendant must show that similarly situated individuals of a different race were not prosecuted. *Id.* at 464-65.

*Analysis*

At trial, Hall made a pre-trial motion to dismiss the government's notice to seek the death penalty because of racial discrimination, along with a request for discovery of information

85

regarding the government's decision-making in death-penalty cases. In response, the government argued that there were an insufficient number of federal death-penalty cases to support either Hall's allegation of racial discrimination or the request for discovery. This Court denied the motion and Hall's discovery request.

In support of his contention that the federal government has used ethnicity as a factor in seeking the death penalty, Hall now on habeas review points to statistics maintained by the Federal Death Penalty Resource Center that purportedly indicate that the Department of Justice has authorized the death penalty in 199 cases, 76% of which had non-white defendants and 52% of which involved an African-American defendant. And, of these defendants, 47.5% of white defendants obtained a plea deal for a lesser sentence, while 27.2% of African-Americans obtained such plea deals. (Second Amended Petition at 192-93.)

This statistical evidence is insufficient to establish a *prima-facie* selective-prosecution case. In *United States v. Jones*, 287 F.3d 325, 333-35 (5th Cir.), *cert. denied*, 537 U.S. 1018 (2002), the Fifth Circuit was presented a Department of Justice Report, titled "Department of Justice, The Federal Death Penalty System: A Statistical Survey (1988-2000)," as support for a selective-prosecution claim and ruled that this evidence was not sufficient to establish a *prima-facie* case. This report reflected that, between 1995 and 2000, the Attorney General of the United States authorized

86

(152)

159 death-penalty prosecutions from 682 potential death-penalty cases. With respect to the race of the defendants, of those 159 cases, there were forty-four white defendants, seventy-one black defendants, thirty-two Hispanic defendants, and twelve "other" defendants. *Jones*, 287 F.3d at 333-34.

Moreover, on direct appeal in the case of Hall's co-defendant, Bruce Webster, the Fifth Circuit denied a similar claim, holding that Webster had failed to make a sufficient showing that he was selectively prosecuted, because he had not shown that other similarly situated individuals were not prosecuted for the death penalty, and he had failed to establish a discriminatory purpose on the part of the Department of Justice. The Fifth Circuit further held that Webster's statistical evidence, consisting of statistics showing that 66% of federal death penalty cases involved African-American defendants, did not rebut the presumption of good faith on the part of the prosecution. *United States v. Webster*, 162 F.3d 308, 333-35 (5th Cir. 1999).

Hall presents to this Court similar statistics to those that the Fifth Circuit has previously held to be insufficient to support a claim of selective prosecution. This Court is not at liberty to rule otherwise, so Hall's eleventh claim for relief is denied.[11]

---

[11]

Hall, conceding that his statistics are insufficient to demonstrate purposeful discrimination, further asserts that this Court should grant him the right to conduct discovery on this issue. But in both his previous motion for discovery and here, while Hall has arguably presented some statistical evidence to support his claim that there has been a disparate effect on African-Americans,

(153)   1696

## VI

### *Request for Evidentiary Hearing*

This Court held an evidentiary hearing on Hall's third, fourth, and fifth claims for relief on June 7, 2004. Hall also requests that this Court conduct an evidentiary hearing on the remaining claims he raises in his motion. Section 2255 does not automatically require a hearing to dispose of every motion made under its authority. *Coco v. United States*, 569 F.2d 367, 369 (5th Cir. 1976). But § 2255 does require a hearing unless the motion, files, and record of the case conclusively show that no relief is appropriate. *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992). Conclusive, rather than direct evidence, however, is required in order to deny relief without a hearing. *United States v. Drummond*, 910 F.2d 284, 285 (5th Cir. 1990). Bona-fide or contested fact issues must be resolved on the basis of an evidentiary hearing. *Booth v. United States*, 507 U.S. 243 (5th Cir. 1975); *Reagor v. United States*, 488 F.2d 515 (5th Cir. 1973).

The record before this Court, including the exhibits submitted by Hall with his motion, do not create any contested fact issues with

---

he has presented no evidence that there were *similarly situated* white defendants against whom the death penalty was not sought. Furthermore, Hall has failed to present any evidence, inferred or otherwise, that there has been any discriminatory intent when prosecutors have decided to ask for permission to seek the death penalty against African-American individuals or when the Department of Justice has authorized the death penalty in cases against African-American defendants. Accordingly, following the reasoning in *Armstrong*, Hall's statistical evidence is not sufficient to establish either the elements of his claim of selective prosecution or the "some evidence" standard necessary to establish good cause for discovery. *Armstrong*, 517 U.S. at 465, 468.

(154) 1696

regard to Hall's remaining claims that must be resolved in order to decide his case. To the contrary, many of Hall's claims are based on the record from the trial. And, with regard to the claims for which Hall has submitted additional evidence, the Court has decided these claims based on information that remains uncontested, by assuming that what Hall alleges is true, or based on legal, not factual, bases. Accordingly, because the record before this Court shows conclusively that Hall is not entitled to relief, his request for an evidentiary hearing on his remaining claims for relief is denied.

It is therefore ORDERED that Petitioner's motion to vacate his conviction and sentence under 28 U.S.C. § 2255 be, and is hereby, DENIED.

It is further ORDERED that the clerk of the Court shall transmit a copy of this order to Petitioner by certified mail, return receipt requested.

SIGNED August **24**, 2004.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/eb:be

89

3

URIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 2 4 2004

CLERK, U.S. DISTRICT COURT
BY _____
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ORLANDO CORDIA HALL,        §
    Petitioner,          §
VS.                         § CIVIL ACTION NO. 4:00-CV-422-Y
                            § (Criminal No. 4:94-CR-121-Y)
UNITED STATES OF AMERICA,    §
    Respondent.          §

## FINAL JUDGMENT

This action came on for consideration by the Court, and the issues having been duly considered and a decision duly rendered,

It is therefore **ORDERED, ADJUDGED and DECREED** that all relief requested be, and the same is, hereby **DENIED**.

It is further **ORDERED** that the Clerk shall transmit a true copy of this Judgment to the parties.

Signed August __24__, 2004.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/eb:be



NORTHERN DISTRICT OF TEXAS
FILED

SEP 13 2004

CLERK, U.S. DISTRICT COURT
BY _____
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ORLANDO CORDIA HALL, §
    Petitioner, §
VS. § CIVIL ACTION NO. 4:00-CV-422-Y
    § (Criminal No. 4:94-CR-121-Y)
UNITED STATES OF AMERICA, §
    Respondent. §

## ORDER DENYING MOTION TO ALTER OR AMEND JUDGMENT

Pending before this Court is Hall's motion to alter or amend the judgment of this Court filed by Hall on September 7, 2004. In this motion, Hall asks this Court to reconsider its opinion and judgment denying relief, issued on August 24, 2004. Specifically, Hall asserts that this Court was incorrect in several respects in its analysis of his claim that his constitutional rights were violated because the indictment against him did not charge him with the aggravating factors that made him eligible for the death penalty. The purpose of a motion to alter or amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure is to correct errors of law or present new evidence. *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989). In his motion, while Hall disagrees with both this Court's characterization of the claim and its analysis of the claim, this Court finds that Hall has neither pointed to a legal error nor presented new evidence. Accordingly, the Court is of the opinion that Hall's motion should be DENIED.

    It is so ORDERED.

    SIGNED September __13__, 2004.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/eb:be

1

162

1144
(157)

5



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2004 NOV -9 AM 9: 29

CLERK OF COURT

**ORLANDO CORDIA HALL**,
*Petitioner*,

vs.

**Civil No. 4:00-CV-422-Y**
(Criminal No. 4:94-CR-121-Y)

**UNITED STATES OF AMERICA**,
*Respondent*.

---

### NOTICE OF APPEAL

---

Notice is hereby given that Petitioner ORLANDO CORDIA HALL appeals to the United States Court of Appeals for the Fifth Circuit from the final judgment entered in this case on August 24, 2004 (Docket #1140), denying all relief requested in his second amended motion for relief from judgment under 28 U.S.C. § 2255, and from the order entered in this case on September 14, 2004 (Docket #1144), denying his Motion to Alter and Amend the Judgment pursuant to Fed. R. Civ. P. 59(e). Mr. Hall proceeds *in forma pauperis* pursuant to Rule 24(a) of the Federal Rules of Appellate Procedure.

Respectfully Submitted,

ROBERT C. OWEN
Texas Bar No. 15371950

Owen & Rountree, LLP
P.O. Box 40428
Austin, Texas 78704

Tel. 512-804-2661
Fax 512-804-2685

MARCIA A. WIDDER
636 Baronne St.
New Orleans, LA 70113
Tel. 504-558-9867
Fax. 504-558-0378

Counsel for Petitioner
ORLANDO CORDIA HALL

## CERTIFICATE OF SERVICE

This certifies that a true and correct copy of the foregoing Notice of Appeal has been served on counsel for the United States by placing the same into the United States Mail, first-class postage prepaid, addressed to:

AUSA Delonia Watson
Office of the U.S. Attorney
801 Cherry Street, Suite 1700
Fort Worth, TX 76102

this _____ day of November, 2004.

_____
Robert C. Owen



## DECLARATION OF MICHAEL E. TIGAR

Michael E. Tigar, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is Michael E. Tigar.

### Qualifications of Declarant

2. I am a lawyer. I have been continuously engaged in the practice of law, focusing on civil and criminal litigation, for more than thirty years.

3. In addition to practicing law, I am a Professor of Law at American University's Washington College of Law in Washington, D.C. I have been a member of that faculty since 1998. I currently teach Federal Courts, Criminal Procedure, Criminal Law, and International Human Rights. Prior to joining the law faculty at American, I taught for fourteen years at the University of Texas School of Law in Austin, Texas, where I held the Joseph D. Jamail Chair in Law.

4. I received my B.A. from the University of California at Berkeley in 1962, and my J.D. degree from the same school in 1966.

5. I am admitted to practice in the District of Columbia and in New York State, as well as most of the United States Courts of Appeals and the U.S. Supreme Court.

6. I was Editor-in-chief of the California Law Review. I am a recipient of the John Minor Wisdom Public Service Award and the Letelier-Moffitt Human Rights Award. From 1989 to 1990, I chaired the American Bar Association's 60,000-member Section of Litigation. When majority rule came to South Africa, I worked with the African National Congress in drafting the post-apartheid constitution for that nation.

7. I am the author of *Examining Witnesses*; *Persuasion: the Litigator's Art*; *Federal*

*Appeals: Jurisdiction and Practice*; and *Law and the Rise of Capitalism.* In addition to these books, I have written more than 50 scholarly articles, essays, and book reviews published in law reviews and legal journals.

8. I have extensive experience litigating both criminal and civil matters, in both state and federal courts. I have practiced in the state courts of at least six different states, as well as at least ten different United States District Courts. I have handled federal appeals in the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, District of Columbia, and Federal Circuits. I have served as counsel of record in at least twelve cases before the Supreme Court of the United States.

9. I have defended in many criminal cases tried to a verdict before a jury. I have also served as counsel in dozens of civil jury trials.

10. I have represented capital defendants at every stage of the process from trial to postconviction, and have appeared in capital cases at every level of the American court system from state trial courts to the Supreme Court of the United States.

11. I have been an expert witness on attorney duties in several prior federal cases, and appointed counsel as to such issues in other cases.

12. I have been asked to render an opinion whether, in the matter of *United States v. Orlando Hall*, No. 4:94-CR-121Y (N.D. Tex.), the defendant's attorneys provided effective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).

## Documents Reviewed

13. In preparing to render an opinion, I have reviewed the following materials: the superseding indictment; the Government's notice of intent to seek the death penalty; the

charge of the court, jury notes, and verdict at the guilt phase; the charge of the court, jury notes, and verdict from the punishment phase; the Statement of the Case from Hall's opening brief on appeal; excerpts from the Fifth Circuit's opinion affirming Hall's conviction and sentence; a summary of the guilt-phase testimony of Steven Beckley, Demetrius Hall, and Marvin Holloway; the Government's closing argument from the guilt phase; a summary of the penalty-phase testimony of all witnesses; portions of the trial transcript relating to the defense motion that Hall be allowed to make a statement in allocution; a summary of the time records submitted by the members of Hall's defense team; several statements by Orlando Hall; an affidavit of Tena Francis; the defense's offer of proof regarding its medical expert; declarations by the following persons: Jill Miller, M.S.S.W.; Betty Hall; Cassandra Ross; Rev. D.L. Hegler; Charles Chastain; Jerry and Gracie Ross; Alonzo Airy; Javier Solis; and portions of the testimony of Larry Nichols from *United States v. Miller and Reliford*, No. CR3-94-343G (N.D. Tex.) (Fish).

## Basis and Standards for Review

14. For all opinions set out below, I rely upon *Strickland v. Washington*, the Supreme Court's definitive teaching on the 6th Amendment right to the effective assistance of counsel. My opinion is also informed by the Court's most recent application of the *Strickland* test in *Williams v. Taylor*, ___ U.S.___, No. 98-8384 (U.S., April 18, 2000).

15. My opinions here pertain only to trial counsel's acts and omissions in this particular trial. Otherwise competent and skillful attorneys can, in a particular case, make mistakes which either alone or in combination are so serious that they render the representation constitutionally ineffective.

80

### Summary and Scope of Opinion

16. Upon reviewing the materials described above, and considering them in light of the Supreme Court's pronouncements in *Strickland* and *Williams*, it is my opinion that Mr. Hall did not receive effective assistance of counsel as guaranteed by the Sixth Amendment, based on the acts and omissions of counsel described in this declaration.

17. The instances of deficient performance and resulting prejudice set out below may not constitute a complete list of the Sixth Amendment violations in Hall's trial. I continue to review information provided by Hall's current counsel, and have not yet formed an opinion respecting whether other specific instances of attorney performance in this case constitute ineffective assistance under *Strickland*.

### Failure to Conduct Timely Investigation

18. Counsel performed deficiently in failing to undertake timely investigation of the case.

19. At the time they were formally appointed on March 21, 1995, counsel had access to investigator Danny LaRue, who had been appointed to assist Hall's original attorneys. Although Mr. LaRue possessed no special skills in investigating mitigation, and thus might not have been able to conduct appropriate investigation in any event, counsel neglected to take any advantage of Mr. LaRue's availability between the end of March and the beginning of jury selection on October 2. According to Mr. LaRue's time records, during that six-month span Mr. LaRue performed a total of 13.7 hours of work, barely more than 2 hours per month. Thus, between the day they were appointed and the week jury selection began, counsel directed their investigator to conduct a total of 13.7 hours of work.

20. Nor did counsel themselves conduct necessary penalty-phase investigation during the

8 1

(163)

same period. From the date of appointment to October 1, lead attorney Jeff Kearney spent approximately 110 hours of out-of-court time working on Hall's case. Approximately half of that time was devoted to reviewing discovery materials and transcripts provided by the Government. Thus, even if Mr. Kearney spent all his remaining time on factual investigation, he spent less than 10 hours per month for the six months prior to the beginning of jury selection. During the same time period (*i.e.*, from appointment through October 1), attorney Michael Ware appears to have spent about 140 hours of out-of-court time working on Hall's case. That figure likewise includes a substantial amount of time spent reviewing discovery materials and transcripts.

21. Equally striking is the fact that for the first four months counsel were on the case – April, May, June, and July – the total amount of out-of-court time spent on Hall's case by all three members of his defense team was less than 50 hours. In a case where this four-month interval represented two-thirds of the total time available for pre-trial investigation and preparation, this constitutes an objectively unreasonable failure to conduct a timely investigation. Indeed, waiting four full months to undertake any meaningful mitigation investigation in any capital case is, in my view, objectively unreasonable.

22. I find it remarkable that counsel failed to take advantage, in a timely way, of the statutory entitlement to resources for investigation and other reasonably necessary services. 21 U.S.C. § 848(q) gives defense counsel in capital cases access to many resources, by simply filing an *ex parte* motion. Failure to make timely and intelligent use of this resource is, in and of itself, a substantial departure from the standards that a federal capital defendant has the right to expect. 21 U.S.C. § 848(q) codifies many of the understandings about the scope of the right to counsel in capital cases that have been part

82  (164)

of federal law since 1790.

23. Counsel waited until June 30, 1995, three months into their representation, to move the Court *ex parte* for appointment of a mitigation specialist to conduct investigation into potential mitigating evidence. When their motion was heard in mid-July, however, counsel affirmatively decided not to pursue the motion further at that time. Counsel did not renew the request for a mitigation specialist until September 7, which motion was granted on September 12, less than three weeks before jury selection began.

24. This timetable demonstrates that counsel conducted the bulk of their mitigation investigation during the trial itself, while the jury was being selected and while the Government was presenting its case. For several reasons, I believe such a practice was objectively unreasonable.

25. First, acquiring a full understanding and appreciation of the events of the client's life requires counsel or their investigator to ask the client and important people in his life to talk about events and memories that are profoundly painful and difficult to recall. This takes time and cannot necessarily be compressed into a short period, even one in which counsel or the investigator spends substantial time with the client or witness. Developing the case for life requires counsel or her investigator to form relationships of trust with the most important individuals who will become penalty-phase witnesses for the defense. Such relationships may take repeated visits and long hours of conversation – or companionable silence – to develop. In addition, in order vividly and persuasively to convey the locations and events of the client's life for the jurors, counsel needs a genuine appreciation for those circumstances, and needs to consider thoughtfully how to communicate that information to the jury. These tasks all demand substantial,

83 (165)

*unpressured* time. They cannot be effectively pursued mid-trial.

26. Reasonably competent counsel, moreover, are obliged to prepare these individuals to testify at trial, and to prepare them for whatever cross-examination may reasonably be anticipated. Simply put, the decisions about what mitigating evidence to present, and how defense witnesses are to be examined, are too important to leave until trial is underway, when counsel's energy and attention are necessarily focused on (and drained by) the numerous demands of being in trial. Preparing such witnesses to testify, particularly when their testimony will cover subjects and events which are extraordinarily personal or painful, takes extensive time and emotional energy on the part of counsel and the witness alike. Simply because the witness has been able to acknowledge painful facts to counsel or his investigator does not mean the witness will be able, without patient and time-consuming preparation, to talk openly and expressively about the same events to a roomful of strangers in a formal, artificial setting. Waiting until mid-trial to begin those tasks usually ensures they will not be completed adequately.

27. Part of preparing defense witnesses for cross-examination is anticipating likely subjects of cross-examination by the Government. In 1995, reasonably effective counsel in a death penalty case would have anticipated that if the defense presented mitigating evidence to show that the defendant was raised in a turbulent home environment marked by violence, the prosecution would attempt to rebut this evidence, in part, by focusing on the lives of any siblings who had grown to adulthood without committing violent crimes. The Government pursued this line of questioning and argument with Hall's sister Cassandra Ross, who testified as a mitigation witness at punishment. Had Ms. Ross been properly prepared for cross-examination, she could have neutralized the effect of this

84

166

theme by pointing out that each of her siblings has led a troubled and unsuccessful life, and that she has succeeded in life only by going to great lengths to distance herself from her family and enjoyed, through her childhood and adolescent years, the love and support of the man who became her husband and his family. Those important facts went unpresented.

28. In much the same fashion, reasonably effective counsel defending a capital case in 1995 should have anticipated that the Government would focus on Hall's prior involvement in selling drugs and his failure, even after serving a prison term for a drug offense, to "go straight" on the outside and pursue a law-abiding job. This point was emphasized during the Government's cross-examination of Hall's mother at the penalty phase. Reasonably effective capital defense counsel representing a young African-American man in a drug-related homicide case in 1995 would have anticipated the need to provide jurors a *mitigating* explanation for why young men like Hall came to engage in such conduct. Counsel in this case failed to connect the circumstances of Hall's background with his subsequent criminal activity. Their failure to do so, in my view, is a result, at least in part, of their having waited until trial was already underway to pursue the investigation necessary to support such an explanation.

29. I also find it troubling that counsel failed to undertake any meaningful investigation into the facts surrounding Hall's alleged "escape plot" until October. Counsel were aware of these allegations, of course, from the time they entered the case. The allegations formed an important part of the Government's case for the death penalty and reasonably effective counsel would have initiated their investigation of these matters immediately upon being appointed to represent Hall. Indeed, without initiating an aggressive inquiry into the

85
(167)

Government's proof of the supposed "escape plot," it is difficult to imagine how counsel could have formed an effective attorney-client relationship with Hall, whom I understand consistently denied the allegations.

30. In addition, investigation must be substantially complete before trial to inform counsel's decisions during the formation of the jury. Defense counsel in this case plainly always expected the jury to convict Hall of a death-eligible offense. Thus, their primary goal in selecting the jury would be to look for jurors who might be persuaded not to impose the death penalty. If counsel has only a vague idea during jury selection what kind of information about the client's character and background the defense will present at sentencing, and, indeed, has no idea what witnesses will testify for the defense and what their manner and the content of their testimony will be, counsel will have a difficult time performing the essential task of attempting to seat jurors who might respond personally to those witnesses and their stories. At a minimum, counsel whose penalty-phase theory and investigation are barely underway during jury selection will be handicapped in exercising peremptory challenges to remove jurors who pose too great a risk of unfairness toward the defendant's case. Attempting to accomplish that task "in the dark," without a substantially completed mitigation investigation, was objectively unreasonable.

**Failure to Make Closing Argument at the Guilt Phase**

31. Counsel performed deficiently in failing to make a closing argument at the guilt phase of trial. While failure to make a closing argument is not *per se* deficient performance under *Strickland*, in the factual context of this case counsel's decision to waive closing was objectively unreasonable. In my opinion, counsel's failure to make a closing argument at guilt may not have been prejudicial with respect to Hall's conviction, but it

86

(168)

was manifestly prejudicial with respect to his sentence.

32. My opinion is based on several factors. First, this is a multiple-defendant case in which there were disputes of fact concerning who did what and the comparative legal and moral responsibility of the various participants. One key Government witness, Steven Beckley, made numerous concessions during his testimony which would have provided an evidentiary foundation for defense counsel to argue against the central inference urged by the Government in its closing – that Hall was the man who "made the decision that Lisa Rene was going to die," and the person ultimately responsible for her death. This claim regarding Hall's alleged leadership was argued based primarily on Beckley's testimony. Yet, Beckley, during his testimony, admitted having lied repeatedly throughout the prosecution's investigation of his involvement in Lisa Rene's kidnapping and murder. And, of course, the defense had elicited Beckley's powerful motivation to shape his testimony favorably to the Government – his plea agreement, pursuant to which the Government would decide, in its discretion, whether to move the district court to reduce Beckley's sentence in return for his "substantial assistance" against Hall. It was objectively unreasonable for defense counsel not to make a closing argument to develop these points, all of which were centrally relevant to the jury's eventual decision whether to condemn Hall to die.

33. In addition, another very important part of the Government's emotional demand for the death penalty was its insistence that Hall had been the first person to rape Lisa Rene, a claim included in the prosecution's guilt-phase summation and plainly intended to support the inference that Hall was the most culpable among the defendants. During defense counsel's cross-examination of Beckley, they had elicited the fact that his claim

87

(169)

to have seen Hall rape the victim first was inconsistent with every FBI report of the agents' first five interviews with Beckley, spanning two months. Those reports confirmed that Beckley had consistently admitted his own actions in raping the victim, but prior to December 1994 had never claimed to have seen Hall rape the victim. Counsel's failure to address these matters in summation effectively conceded the truth of Beckley's trial testimony on this vital question.

34. These instances do not comprise an exhaustive list of the compelling points which could have been made in reply to the Government's guilt-phase closing argument, but they illustrate that the material for an effective closing was readily available. Even in a case focused on punishment, reasonably effective counsel would not forego an opportunity to talk to the jurors at the close of the guilt phase about what weight the testimony of different witnesses deserved. This is especially true where the defense fully intends to contest at the penalty phase the Government's view of who was the most culpable defendant, and where so many facts crucial to resolving that dispute were brought before the jury through Government witnesses whose credibility could be challenged without counsel's losing their own. The fact that the defense apparently conceded Hall's guilt as a party to the offense did not require them to refrain from making any guilt-phase summation at all. On the contrary, since the outcome of the penalty phase might well turn on the jury's view of Hall's precise role in the events of the crime, it was objectively unreasonable not to make a closing argument directed to that issue.

35. Federal law prefers that the trial jury also be the sentencing jury in capital cases. Thus, in any federal capital case, counsel must always be alert to the need to build a bridge between the guilt and sentencing phases. In waiving closing argument at the guilt phase,

88

(170)

counsel left the jurors with only the Government's theory of the case to structure and shape their receipt and consideration of evidence at the sentencing phase.

**Failure Effectively To Cross-Examine Larry Nichols**

36. Counsel performed deficiently in cross-examining Government witness Larry Nichols at the penalty phase. Nichols was an important witness because he provided not only an evidentiary basis for the non-statutory future dangerousness aggravator, but also an extremely damaging portrait of Hall as boastful, unrepentant, and cruelly coarse toward the victim. Accordingly, destroying Nichols' credibility in the eyes of the jurors was vital. In counsel's attempts to accomplish this goal, he inexplicably failed to employ the best proof that Nichols was a liar – prior sworn testimony by Nichols that contradicted his testimony in Hall's trial. Counsel's cross-examination was deficient because counsel failed to impeach Nichols on important points after eliciting denials from the witness, with available prior inconsistent testimony that Nichols gave as a Government witness in the trial of his co-defendants.

37. For example, one apparent theme of counsel's cross was that Nichols was knowledgeable about how an offender might obtain a sentence reduction by cooperating with the Government. Pursuing that theme, counsel asked Nichols whether "some inmates out there at Mansfield" had "helped" Nichols to "know how to take certain steps to help yourself in the legal system." Nichols denied it. Counsel twice repeated the same inquiry, "in the trial you testified in in Dallas, did you say there was some inmates out there that helped you learn to take steps to help yourself?" Nichols repeated his denials. Counsel moved on, without impeaching Nichols on this point.

38. The transcript of Nichols' testimony from the Dallas trial would have permitted counsel

89

(171)

to demonstrate to the jurors that Nichols was lying. In his testimony in that case, Nichols admitted explicitly that in sending a letter to one of his co-defendants and asking him to sign a false affidavit exculpating Nichols, he was following "steps to go by" which were given him by other prisoners at Mansfield. Nichols also admitted in that trial that he had gone "to the law library" for information and was getting "advice from [his] fellow inmates" about how to "get out of this jam." Nichols repeated substantially the same admission seven different times during his testimony in the Dallas trial. Reasonably effective counsel would have impeached Nichols on this point with Nichols' own prior testimony.

39. Counsel also asked Nichols whether he had "used some of that money [from the robberies] to buy some drugs for resale." Nichols answered, "No." Counsel persisted, asking whether Nichols "ever told anyone that [he] used some of that money [obtained in the robberies] to buy drugs with to resell the drugs?" Nichols' answer: "No, I didn't." Counsel asked Nichols whether he was "sure about that," and Nichols answered, "Positive." Counsel moved on to a different subject without impeaching Nichols.

40. Reasonably effective counsel would have employed the transcript of Nichols' testimony from the Dallas trial to demonstrate to the jurors that Nichols was lying to them. In that trial, Nichols admitted that he purchased and re-sold drugs with his part of the proceeds from the robberies, and in fact that he did so "after every robbery."

41. More generally, Nichols attempted in answering counsel's questions to minimize his own involvement in the robberies that gave rise to his federal exposure, claiming that he never went inside any of the establishments that were robbed and only participated in two robberies in any event. Nichols also left the jury with the impression that he owned or

90

(172)

possessed only two firearms. Faced with these representations by Nichols, reasonably competent counsel would have used Nichols' own testimony from the Dallas trial to establish for the jurors that (1) prior to committing the robberies, Nichols was living on "drug proceeds," by "selling dope;" (2) that Nichols, after participating in the Louisiana robberies, accompanied his robbery cohorts on a trip to Florida with the intent to rob a bank there, but the plan went awry; (3) that Nichols and another man had stolen two Jet Ski watercraft, which they took across state lines from Louisiana to Florida in order to sell them; (4) that Nichols was involved in defrauding merchants by passing fraudulent checks, including writing a fraudulent check for $1700 to purchase a car, and that charges based on that conduct were foregone as part of his plea deal to testify against his co-defendants in the robbery case; (5) that Nichols owned or possessed no fewer than five firearms at various times: a .44 caliber Beretta, a 9mm Ruger, a .380 caliber Taurus, a 12-gauge Mossberg shotgun, and a 9mm Glock; (6) that Nichols acquired the Glock by trading illegal drugs for it; and (7) that Nichols had purchased at least one gun under a false name.

### Failure to Investigate, Develop, or Present *Skipper* Evidence

42. Counsel performed deficiently in failing to investigate, present and argue available, affirmative evidence of Hall's successful adjustment during prior incarceration. First, of course, the Supreme Court has recognized in *Skipper v. South Carolina*, 476 U.S. 1 (1986), that evidence tending to show that a defendant has lived peacefully and productively in a prison environment can persuade jurors to impose a sentence less than death. Reasonably competent capital defense counsel in 1995 would be aware of *Skipper* and would, as part of their investigation into mitigating evidence, have pursued

91

173

developing and presenting such evidence.

43. Although some of Hall's penitentiary records from Arkansas were placed in evidence by the Government, and one of Hall's attorneys referred briefly to those records in arguing at the penalty phase that Hall had shown no violence during that prior prison term, it was not reasonable for defense counsel to count on the jurors to be able to understand the full mitigating significance of the records without testimony from defense witnesses. For example, the records indicate that Hall was assigned as a "C-2 trusty" during his prior incarceration. A qualified witness with experience in Arkansas corrections could have explained to the jury that this classification indicates that Hall was in the category of offenders receiving the most good-time credit, and that he occupied a trusted status because "C-2" trusties were actually allowed outside the prison walls with an escort, in contrast to lower-grade trusties who were forbidden from leaving the prison grounds. In addition, such a witness could have testified that Hall achieved this trusty status more quickly than comparable inmates, demonstrating the prison authorities' confidence that he had a low propensity for violence and other misbehavior. Such a witness could also have pointed out that Hall's record of zero disciplinary infractions, a record to which defense counsel did not even specifically direct the jury's attention, indicates that he was an ideal inmate. In addition, Hall's incarceration record establishes that he was successful in obtaining release under "Act 814," an Arkansas law providing for certain inmates to be placed in the community on work-release status; an appropriately qualified witness could have emphasized to the jury that offenders were carefully scrutinized for this type of release and that no inmate obtained it unless the Department of Correction viewed his behavior as above reproach. Hall's counsel were aware of his early release

92

<span>(174)</span>

from the Arkansas DOC, which should have alerted them to the potential availability of such evidence.

44. Hall's Arkansas DOC records also offered other important opportunities to humanize their client, of which defense counsel failed to take advantage. The records show, for example, that on several occasions Hall made urgent requests to telephone home and check on his family when other family members underwent unexpected health crises. This information could have helped corroborate the views of other defense witnesses (whom counsel also failed to call) that Hall was capable of generosity and compassion.

45. In addition, relying on cold documents alone is unreasonable where there are available live witnesses to corroborate them and add credibility to the defendant's cause. Testimony from actual guards or correctional personnel who had observed Hall as a prisoner would have increased the persuasiveness of the documents themselves as well as providing independent mitigating evidence about his character. Counsel's argument concerning the negative inferences that could be drawn from the Government's failure to point to evidence of violent behavior by Hall during his earlier incarceration did nothing to develop positive evidence of Hall's productive adjustment to imprisonment.

46. While it is my opinion that counsel in any death penalty case is obliged to develop and present available "*Skipper* evidence," counsel's failure to develop and present such evidence in Hall's case is noteworthy for two reasons. First, the Government had given formal notice that it would ask the jury to sentence Hall to death based on the non-statutory aggravating factor of future dangerousness. The Supreme Court emphasized in *Skipper* that evidence of a defendant's successful adjustment to prison can powerfully rebut a prosecutorial claim of future dangerousness. Knowing that future dangerousness

C3

would form an important part of the Government's case for the death penalty, counsel were under a special obligation to develop and present available evidence that Hall had been a "model prisoner" in the past. Second, counsel knew that the Government intended to rely on specific allegations that Hall had plotted to escape from custody while awaiting trial on the present capital offense, and that he had planned to take his own attorneys hostage in order to do so. Reasonably effective counsel, anticipating this evidence from the Government, would have developed and presented the readily available "*Skipper* evidence" in order to bolster their argument that Hall's prior history was reason to disbelieve the Government's allegations.

47. Counsel's failure to investigate, develop, or present "*Skipper* evidence" points to a more general deficiency in the preparation for, and presentation of, the penalty phase. Namely, counsel appear to have focused almost exclusively on mitigating evidence relating to the circumstances of the offense, rather than also developing evidence about the character and background of their client. This dual nature of constitutionally mitigating evidence has been well described in the opinions of Justice O'Connor, who has emphasized since her concurring opinion in *California v. Brown*, 479 U.S. 538, 545 (1987) that punishment must constitute a "reasoned moral response" to a defendant's "personal moral culpability." *See also Penry v. Lynaugh*, 492 U.S. 302 (1989) (adopting this principle). In my view, reasonably competent capital defense counsel must attend to both types of mitigation in preparing for trial. The record of Hall's case strongly indicates that his attorneys virtually ignored his personal characteristics in favor of abstract arguments about the injustice of sentencing Hall to death when equally culpable co-defendants were not receiving such a harsh punishment. While relative culpability is a legitimate

94

mitigating circumstance, counsel fell substantially below the minimal standard of practice in limiting their punishment-phase investigation and presentation almost exclusively to that area.

**Failure to Argue Effectively for the Opportunity for Hall to Allocute**

48. Counsel performed deficiently in failing to argue effectively to persuade the trial court to allow Hall to make a statement in allocution before the jury retired to decide his fate. While the Court of Appeals concluded on direct review that Hall possessed no unconditional right to make such a statement (by which I mean an unsworn statement, not subject to cross-examination) prior to the jury's deliberations on penalty, it specifically declined to express any opinion as to whether a district court could properly exercise its discretion to allow a defendant to make a statement in allocution. In my view, the district court had the authority to make just such a decision (indeed, some district courts have done precisely that – *see, e,g., United States v. Nichols* (W.D. Okl. No. M-95-98-H) (Matsch); *United States v. Battle* (N.D. Ga. No.1:95-CR-528) (Evans); *United States v. Johnson* (N.D. Ill. No. 96-CR-379) (Conlon); *United States v. Beckford* (E.D. Va. 3:96-CR-66-01 (Payne)), and Hall's counsel failed to perform effectively in attempting to persuade the court to do so.

49. My conclusion follows from the premise that most of the decisions a trial judge makes in the course of a trial represent exercises of discretion, rather than legal mandates. Accordingly, reasonably professional representation must encompass making appropriate and timely efforts to persuade the presiding authority to exercise its discretion to the benefit of one's client. This duty includes the obligation to locate favorable case authority and urge the Court to consider it. During the colloquy at trial concerning Hall's

95   (177)

request to make a statement in allocution, the judge asked the attorneys, "Is there case law based on state experience where death penalties are assessed where the defendant is allowed to – to give his testimony without cross-examination before a jury passes sentence?" The Government's lawyer responded that he hadn't "found one," and that he didn't "think they [the defense] can provide any case law showing it." Id. The trial judge immediately agreed and denied Hall's request for allocution.

50. Reasonably effective defense counsel, in seeking to persuade the court to exercise its discretion in their client's favor on such a vitally important issue, would have taken two steps Hall's attorneys failed to take. First, reasonably effective counsel would have researched previously the question whether any state-court decisions from death penalty jurisdictions had endorsed the practice of allocution by a capital defendant, and would have had those favorable cases or citations available for the trial judge upon making the request. At a minimum, reasonably effective counsel would have made such inquiries after hearing the Court express its interest in knowing the answer before deciding, and would have moved the Court to delay its ruling until such support for the request could be provided. At a minimum, reasonably effective counsel would have obtained and provided the relevant caselaw, then moved the Court to reconsider its ruling. Cases illustrating that many death-penalty states permit allocution by capital defendants were readily at hand. *See, e.g., State v. McCall*, 770 P.2d 1165, 1171 (Ariz. 1989), *cert denied*, 497 U.S. 1031 (1990); *People v. Davis*, 794 P.2d 189, 191 (Colo. 1990), *cert. denied*, 498 U.S. 1018 (1991); *Harris v. State*, 509 A.2d 120 (Md. 1986); *Homick v. State*, 825 P.2d 600, 604 (Nev. 1992); *State v. Zola*, 548 A.2d 1022, 1046 (N.J. 1988), *cert. denied*, 489 U.S. 1022 (1989); *State v. Young*, 853 P.2d 327(Utah 1993); *State v.*

96

*Mak*, 718 P.2d 407, 429-30 (Wash.), *cert. denied*, 479 U.S. 995 (1986); *see also State v. Clark*, 772 P.2d 322, 339 (N.M.)(discussing capital defendant's allocution), *cert. denied*, 493 U.S. 923 (1989); *Tomlinson v. State*, 647 P.2d 415, 417 (N.M. 1982)(allocution statute "extends the common law doctrine of allocutus to non-capital felonies....").

51. Second, it was objectively unreasonable for defense counsel not to proffer, either orally or in writing, the contents of Hall's proposed statement in allocution at the time the trial court addressed their motion. Reasonably effective counsel would have anticipated the need to respond to a Government objection that allowing Hall to allocute might create unfair prejudice, confuse the issues, or mislead the jury. Indeed, during the colloquy the Government's attorney described what he opposed as permitting Hall "to stand up and give his – essentially his version of the whole offense in the sentencing phase" without being cross-examined.

52. However, according to the record, the defense never contemplated having Hall tell "his version of the whole offense." Instead, the anticipated statement in allocution was the following: "I want to apologize to my family and ask them to forgive me, and I hope somehow they can forgive me. I want to apologize to Lisa Rene's family and ask them to forgive me, even though I know that there is no possible way they can forgive me and I understand that. I want to ask God to forgive me, however, I question in my own mind whether even God can forgive me." There is a world of difference between these three spare sentences and the spectre raised by the Government's counsel, of a lengthy, fact-based recitation untested by cross-examination, and reasonably effective counsel was obliged to make that distinction clear for the trial court.

53. The record shows that the trial court was open to persuasion on the issue of whether Hall

should have been allowed to make a statement in allocution. However, because defense counsel apparently was not prepared to provide relevant legal authority from death-penalty jurisdictions in support of the request, or to discuss the contents of the proposed statement in allocution in order to rebut the Government's suggestion that Hall sought to tell his "version of the offense" without being subjected to cross-examination, the opportunity to persuade the trial court was lost. In my view, reasonably effective counsel would have done both.

**Failure to Include Possible Juror Misconduct in Motion for New Trial**

54. It appears that, sometime after the jury returned its verdict at the penalty phase on November 6, 1995, one of Hall's trial counsel was advised by Hall's sister Cassandra Ross that, shortly after the jury returned its sentencing verdict, an interview with one of the trial jurors had aired on a local news report. Counsel was advised that in that interview, the juror had stated that during the weekend that interrupted the penalty-phase deliberations (during which time the jury was not sequestered), the juror had held a birthday party for her own daughter. At the birthday party, the juror had placed an additional candle on the cake in memory of Lisa Rene. The guests at the birthday party had prayed for Lisa Rene.

55. Reasonably effective counsel would have viewed these allegations as raising a distinct concern that outside influences might have affected the jury's sentencing decision. In numerous capital cases, reviewing courts have found that third-party contact with jurors can taint their deliberations, especially as to the appropriate punishment in a particular case. *See, e.g., United States v. Maree*, 934 F.2d 196 (9th Cir. 1991); *Stockton v. Commonwealth of Virginia*, 852 F.2d 740 (4th Cir. 1988). If the juror and other persons

unknown prayed over Lisa Rene's fate during the birthday party, reasonable counsel would be concerned about whether and to what extent they had also discussed the case or the outcome of either phase of trial.

56. Hall's counsel later filed a motion for new trial which did not recite these allegations. Nor did counsel seek to subpoena any news footage from local television stations which might have included the referenced interview. Although counsel requested leave to interview the jurors concerning a separate and distinct issue, which had been resolved during trial, they never raised this specific ground as a basis for interviewing the jurors.

57. In my opinion, counsel performed deficiently in not including these allegations in Hall's motion for new trial and in not seeking to acquire proof of the alleged interview by means of subpoena. The privacy concerns which usually support not permitting the parties to interview jurors post-trial are less weighty where a juror has voluntarily taken part in a publicly broadcast interview concerning the events into which inquiry might be sought. Had counsel made the request and supported it with proof that such an interview took place and that the juror made the statements alleged, it is likelier that the trial court would have authorized at least limited juror interviews to explore the issue.

**Failure to Request Continuance After Being Surprised by Change in Testimony**

58. Counsel performed deficiently in failing to request a continuance when the Government suddenly proffered a previously undisclosed FBI 302 indicating that anticipated defense witness Alonzo Airy, who had been interviewed by the defense and who had provided extensive information to impeach and rebut the testimony of Larry Nichols, had changed his story and supposedly was now prepared to corroborate Nichols' testimony. Counsel were evidently surprised by this turn of events and managed to persuade the trial court

99

(181)

not to permit the Government to call Airy in its own case. However, simply keeping Airy off the stand did not assist counsel in undermining Nichols; it just avoided further immediate damage to Hall's case. Because convincing the jury that Nichols was a liar was so important to defeating the Government's case for the non-statutory future dangerousness aggravator, reasonably effective counsel would have requested a continuance in order to assess whether other witnesses were available to rebut Nichols, or to explore other options regarding Airy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _May 11, 2000_ (date).

MICHAEL E. TIGAR

100
182



## DECLARATION OF JILL MILLER

Jill Miller, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

### INTRODUCTION

1. My name is Jill Miller. I have previously provided three declarations in this case. The first was executed April 22, 2000, and is attached to this Declaration as Appendix A and incorporated here by reference. The second was executed May 22, 2000, and is attached to this Declaration as Appendix B and incorporated here by reference. The third was executed November 13, 2000, and is attached to this Declaration as Appendix C and incorporated here by reference. A copy of my current curriculum vitae is attached to this Declaration as Appendix D and incorporated here by reference.

### QUALIFICATIONS AND EXPERIENCE

2. I am a forensic social worker in private practice in Madison, Wisconsin. I have been in private practice since January, 1984. I received my Bachelor's of Science degree, with a major in Social Work, from the University of Wisconsin-Madison in 1967. I received my Master's of Science – Social Work degree from the University of Wisconsin-Madison in 1971. I am a Licensed Independent Clinical Social Worker, State of Wisconsin License Number 1662.

3. I am a member of the National Association of Sentencing Advocates, the National Legal Aid and Defender Association (NLADA), and the American Academy of Experts in Traumatic Stress. I am certified as a diplomate in forensic traumatology by the American Academy of Experts in Traumatic Stress.

4. I have testified in capital cases about thirty times, qualified as an expert in the field of forensic social work.

5. I have practiced as a social worker in legal settings for over thirty years. I was on the faculty of the University of Wisconsin-Madison School of Social Work from 1973 until 1985. My work in agency settings, as well as private practice, has primarily involved the preparation of sentencing reports in criminal cases, and the preparation of dispositional plans and reports in juvenile cases, as well as some work in mental health and

DECLARATION OF JILL MILLER -- 1

HO

(183)

family matters. Since 1986, my work has primarily involved preparation for the penalty phase of capital trials, review of the penalty phase of capital trials, and preparation for post-conviction proceedings in capital cases.

6. Since 1986, I have worked on about ninety capital murder cases in state, federal, and military courts, both at trial and in post-conviction proceedings, including federal habeas corpus proceedings. In those cases, I have conducted extensive social history investigations, prepared social history reports, conducted psycho-social assessments, and assisted attorneys in preparing for the penalty phase. I have also testified as a penalty-phase witness in some trials. I have worked on capital cases in Alaska, Colorado, Florida, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Montana, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, Texas, Vermont, Virginia, Washington, West Virginia, Wyoming, the U.S. Virgin Islands, and Korea.

7. I have conducted extensive training of attorneys, mitigation specialists, mental health professionals, and investigators regarding development and presentation of mitigation, and preparation for the penalty phase in capital cases. This training has included presentations at the American Bar Association Annual Meeting, the Annual Conference of the NLADA, the annual training seminar on the death penalty sponsored by the NLADA (at which I have served as an instructor every year since 1993), the annual capital punishment seminar sponsored by the NAACP Legal Defense and Educational Fund, capital punishment trainings sponsored by the National Association of Criminal Defense Lawyers (NACDL), the annual conference of the National Association of Sentencing Advocates, and the annual military death penalty training conducted at the Naval Justice School.

8. I have also addressed the annual death penalty seminar of the Illinois Appellate Public Defender Office on two occasions. I have been a training consultant for the Illinois Capital Resource Center, providing sixteen hours of training to mitigation staff in both 1990 and 1991, and led similar training for the Missouri State Public Defender in 1991. I was a consultant to the NLADA Mitigation Specialists Training Project and Mitigation Affidavit Project in 1990-91. In October, 1991, I was a faculty member for a two-day program titled "Mitigation Specialists Training" co-sponsored by the NLADA, the Missouri Capital Punishment Resource Center, and the Missouri Chapter of the National Association of Social Workers. I planned this program and prepared the materials which were distributed to those attending.

9. I was on the faculty of the Indiana death penalty seminar in 1993. I trained staff of the Defender Association of Philadelphia in 1993 on penalty phase preparation, and did mitigation training for the Nebraska Commission on Public Advocacy and the New Mexico State Public Defender Office in 1997. In 1998, I was on the faculty of death penalty training programs sponsored by the National Association of Criminal Defense Lawyers (NACDL) in Phoenix, Arizona; the Tennessee Association of Criminal Defense Lawyers in Nashville, Tennessee; and the Idaho Federal Public Defender.

10. I conducted training and case consultation with social workers, mitigation specialists, and attorneys at the Office of the Public Defender in Miami, Florida, and the Jefferson County Public Defender in Louisville, Kentucky in the fall of 1998. I was on the faculty of death penalty training programs for the NACDL in Boise, Idaho, and the Florida Public Defenders Association in 1999.

11. As a member of the Board of Directors and Defender Council of the NLADA, I participated in developing and approving the "Standards for the Appointment and Performance of Counsel in Death Penalty Cases," adopted by the NLADA in 1987, and later adopted as guidelines by the American Bar Association, as well as the "Performance Guidelines for Criminal Defense Representation" adopted and published in 1995. I am currently participating in updating and revising the American Bar Association's "Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases."

12. In 2000, I received the "Life in the Balance" Achievement Award, presented annually by the National Legal Aid & Defender Association to recognize outstanding contributions to the representation of defendants facing the death penalty. In 1999, I was recognized by the National Association of Sentencing Advocates for exemplary dedication in the advancement of sentencing advocacy.

13. I was first contacted by counsel representing Orlando Hall, a death-sentenced federal prisoner, in March 2000. His attorneys contacted me, in part, because of my extensive experience in federal capital prosecutions since the reintroduction of the federal death penalty in the late 1980's and early 1990's. Counsel advised me that the social history investigation in this case had been truncated by the mitigation investigator's late entry into the case. Counsel originally asked me to review information and estimate how much time would be necessary to complete an appropriate mitigation

112

(185)

investigation in Orlando's case, and what tasks such an investigation would include. As I normally do in post-conviction matters, I reviewed a number of documents from the trial record, analyzed the penalty phase presentation in this case, and advised counsel of the deficiencies I noted in the record, as well as the investigation that I believed needed to be performed at this stage of the proceedings. These findings are reflected in my declaration of April 22, 2000 (Exhibit A hereto).

### THE ROLE OF THE MITIGATION SPECIALIST AND THE NATURE AND SCOPE OF THE SOCIAL HISTORY INVESTIGATION REQUIRED IN A CAPITAL CASE

14. The role of the mitigation specialist in a capital murder case is to assist defense counsel by conducting a thorough social history investigation and psycho-social assessment; identifying factors in the client's background or circumstances that require expert evaluations; assisting in locating appropriate experts; providing background materials and information to experts to enable them to perform competent and reliable evaluations; consulting with the attorney(s) regarding the development of the theory of the case and case strategy, thereby assuring coordination of the strategy for the guilt-innocence phase with the strategy for the penalty phase; identifying potential penalty phase witnesses; and working with the client and his or her family while the case is pending. The mitigation specialist may be a witness in the penalty phase hearing, and may offer testimony regarding the results of the social history investigation and assessment.

15. The mitigation specialist must be retained and begin work on the case at the inception of the case or as soon afterward as possible. This is because the results of the social history investigation are necessary to enable defense counsel to make informed decisions regarding such matters as competency to proceed, the need for expert evaluations, medical treatment or other services while the case is pending, motion practice, and plea negotiations. It is vital that the mitigation specialist conduct sufficient social history investigation early in the process to assist counsel in determining the need for other expert assessments, including what type of assessments are indicated.

16. A minimum of six months to a year is generally necessary to adequately prepare for a capital murder trial, including the penalty phase. Factors affecting the length of time and number of hours necessary to prepare include, but are not limited to, the nature and complexity of the case; the age of the client; the prior history of the client including such things as

\\3

186

prior criminal history, prior incarcerations, history of significant physical or mental health problems, military history, lengthy employment history, or frequent changes in residence and schools; the extent of records and documentation that exist, and difficulties in locating and obtaining records; the number of collateral interviews that must be conducted; the existence of special conditions, factors or issues that must be researched and considered; the need to address victim impact evidence; conditions of confinement; the time necessary to obtain, schedule, and complete expert assessments; the extent of travel involved to investigate and interview the client and collateral sources; other professional commitments of the mitigation specialist; and specific jurisdictional procedures or practices. Cases in which a number of these factors exist will often require at least one year, and sometimes more, to prepare. Post-conviction cases often require a greater length of time to prepare, due to difficulties in locating records and witnesses, as well as the need to review the trial record.

17. A properly conducted social history investigation is also time-consuming because it inevitably involves eliciting personal information from the client and others, particularly information of a private and sensitive nature. The person conducting the investigation must have the training, knowledge, and skills to detect the presence of significant factors such as: neurological impairments; cognitive disabilities; physical, sexual, or psychological abuse; substance abuse; mental disorders; and other factors which influence the development of the client's personality and behavior. Equally important, factors such as denial, repression, shame, and a sense of privacy all inhibit the ability to fully disclose critically important information. Where present, these factors increase the amount of time necessary to complete the investigation, since the mitigation specialist cannot obtain such sensitive information without building a relationship of genuine trust with the persons who are providing information. Building such a relationship takes time; for example, where a source is also a victim of trauma, it may be necessary to conduct repeated interviews of the source, or even involve a consulting or treating expert to assist the source, in order that information about traumatic experiences may be obtained without overwhelming or retraumatizing the subject. These time demands cannot be artificially compressed to meet an external schedule. Consequently, it is essential that the investigation be undertaken as early as possible in the history of the case.

18. An adequate social history investigation is also time-consuming because it requires the mitigation specialist to gather and review many documentary records including but not limited to: charging documents, investigation reports relating to the offense; news media accounts of the offense; the

coroner's report or autopsy report; FBI, state, and local criminal history reports on the client; jail booking records; police reports and court files related to the client's prior arrests and convictions, as well as juvenile adjudications; medical records of all kinds; school records of all kinds; employment records of all kinds; social service agency records of all kinds; military records of all kinds; adult education records of all kinds; prior jail and prison records of all kinds; prior probation and/or parole records of all kinds; treatment records of all kinds; and jail records for the current incarceration. In addition, similar records must be obtained where appropriate for other significant persons in the client's life, including parents, siblings, grandparents, and so on.

19. In addition to gathering these documents, the mitigation specialist must also interview the client to obtain detailed and specific social history information, and to learn the identities of collateral sources of information. This information cannot be obtained in a few visits; numerous interviews are generally required to cover all necessary areas. Information that should be obtained from the client regarding childhood should include, but not be limited to: information regarding his or her birth (including any knowledge the client may have concerning the mother's pregnancy, the circumstances of the birth, any complications of delivery or birth trauma); early developmental history (including the age at which the client learned to walk and talk, and was toilet trained); makeup of the family unit (including background information on birth parents and other significant relatives, including date and place of birth, educational attainment, health history, date of marriage, ages at time of marriage, etc.), age and sex of siblings, prior marriages and other children of parents; early health of the client, including whether the client suffered any serious accidents, illnesses, or injuries; residential history of the family, including where they lived, for what periods of time, and under what conditions; employment history of parents; educational history, including activities in which the client participated, favorite subjects, and names of teachers that the client remembers; religious training, practices, and beliefs; discipline in the home, including the form of discipline, how administered, how often, by whom, and for what; family relationships, including the nature and quality of the client's relationship with each parent, siblings, and relatives or other significant persons, and the relationship between the parents; friends and leisure activities; other significant relationships; community activities, including such things as sports, scouting, music, and so on; jobs held as a youth, including lawn work, newspaper delivery, babysitting or other odd jobs; any significant childhood experiences, including such things as death or serious injury or illness of a family member or other significant person, divorce of parents, abandonment by parent; family violence; parental

115

(188)

alcohol or drug use; abuse of the client, including physical, sexual, or emotional abuse; and exposure to violence in the community; history of any alcohol or drug use; history of running away; and juvenile record. In addition, the client should be interviewed concerning how he or she perceived him/herself as a child, in terms of personality, behavior, feelings, responses to different events in life, and relationships with others.

20. Information that should be obtained from the client regarding the client's adult years, and experiences as an adult, should include the foregoing topics (where relevant), as well as, without limitation: residential history; employment history, including name of businesses or persons for whom the client worked, dates of employment, description of job and duties, pay, performance on the job, names of persons familiar with his or her work, reasons for leaving the job, and any significant job experiences; adult education; military history; health; significant relationships, including marriages, children, and the nature and quality of these relationships; exposure to violence in the community, including experiences of traumatic loss, being the subject of violent assault, and witnessing violence; sexual development, practices and relationships; names of friends; leisure activities; legal history, including arrests, convictions, circumstances surrounding prior legal involvement; experiences in prison or on parole or probation, and experiences with the police. In addition, the client should be interviewed regarding how he or she perceived of him/herself as an adult, in terms of personality, behavior, and feelings, and how they perceived their relationships with others.

21. Along with obtaining all relevant documents and spending long hours interviewing the client, the mitigation specialist must conduct collateral interviews with family members and others to supplement and corroborate the information obtained from the client. Persons who should be interviewed include, but are not limited to, the following: parents, siblings, spouses or significant others; children; other relatives such as grandparents, aunts, uncles, cousins; childhood and adult friends and neighbors; school personnel, including teachers, principals, counselors, social workers, psychologists, or coaches; ministers or other church personnel; employers, job supervisors and co-workers; social service and court personnel; physicians or medical personnel who have treated the client; jail or correctional institution staff; law enforcement personnel; mental health professionals who have assessed the client at any time in the past or for purposes of the present proceeding, or who have provided treatment to the client.

116 189

22. The mitigation specialist must maintain an ongoing consultation with defense counsel, to keep them informed of the results of the investigation, and to consult on the implications of the results for case strategy. Information obtained can affect considerations regarding competency to proceed or mental responsibility for the offense, plea negotiations, the manner in which the defense team relates to the client; decisions regarding jury selection; whether or not the client should testify, at either phase of trial; decisions regarding the need for expert evaluations, and selection of witnesses for the trial including penalty phase. The mitigation specialist should generally prepare a comprehensive social history report containing the information obtained in the investigation. This report is to be used by defense counsel in developing case strategy and determining who should be called as witnesses; and may be provided to experts performing evaluations so that they have adequate background information to conduct a competent evaluation.

23. Because all these steps are both necessary and time-consuming, the social history investigation must be initiated at the earliest possible time in the trial process for its results to be usefully employed to the client's maximum benefit.

### SOURCES OF INFORMATION RELIED UPON

24. I rely on the following sources of information for the assertions of fact and expressions of professional opinion contained in this Declaration. First, I have reviewed the following documents relevant to this case: medical records of Betty Hall; special education and high school records of Demetrius Hall; special education records of Te'Aushia Whiddon; special education records of Eric Hampton; military records of Scotty Hall; school records of Orlando Hall; medical records of Orlando Hall; social security earnings records for Orlando Hall; records concerning the divorce of A.J. and Geraldine Hall; statistical data on unemployment in El Dorado, Arkansas, in 1990, and nationwide in 1990 for black men ages 16-19; portions of the pleadings in *United States v. Hall*, including the indictment, the Government's notice of intent to seek the death penalty, defense counsel's requested penalty phase instructions regarding mitigating circumstances, defense counsel's motion for continuance and two *ex parte* motions for funds for mitigation investigation; portions of the trial transcript, including the guilt-phase closing argument by the Government, the charge of the Court, all punishment phase testimony, the jury's punishment verdict (including findings as to aggravating and mitigating factors), and the post-trial offer of proof regarding proposed defense witness Lisa Clayton, M.D.; a summary of the remainder of the guilt-phase

117 (190)

testimony; the opinion of the United States Court of Appeals for the Fifth Circuit affirming Orlando Hall's conviction and death sentence on direct appeal; declarations and draft declarations from Rev. D.L. Hegler, Jerry and Gracie Ross, Cassandra Ross, Betty Hall, Charles Chastain, Michael Tigar, Cleo Jamerson, Emmanuel Porchia, Jerline Hill, Betty Roberson, Veda Smith, Keith Hill, Tracy Hall, Scotty Hall, Pam Palmer, Stacey Dineen, A.J. Hall, and Eric Hampton; time records for defense investigator Danny LaRue; a letter and poem from Orlando Hall to his daughter Te'Aushia; letters from Orlando Hall to his brother Demetrius Hall and a portion of a letter from Orlando Hall to his sister Cassandra Ross, all written while he was incarcerated pretrial; two memoranda from Tena Francis to trial counsel (9/23/95 "Investigative Plan" and 11/9/95 "Investigator's Final Summary"); portions of Tena Francis' file on the case, including memoranda of witness interviews; Arkansas DOC, parole, and probation records of Orlando Hall; juvenile records of Orlando Hall; records regarding Orlando Hall's other offenses (both adjudicated and unadjudicated); the report of the autopsy performed on the victim, Lisa Rene; records of Orlando Hall's pretrial incarceration at Mansfield Jail; memoranda of witness interviews conducted by Tena Francis; arrest records of A.J. Hall from El Dorado Police Department; Orlando Hall's proposed statement in allocution; memoranda regarding witness interviews conducted by Orlando's current counsel, including interviews of Cassandra Ross, Rev. D.L. Hegler, Jerry and Gracie Ross, Orlando Hall, Pam Palmer, Betty Hall, Scotty Hall, and A.J. Hall; the victim impact documents (statements, etc.), disclosed by the Government in the course of pretrial discovery; statements by Orlando Hall (10/5/94; 10/5/94 (FBI-302); 9/30/94 (FBI-302)).

25. In addition, I have personally interviewed the following persons, several of them in depth and more than once: Orlando Hall, Betty Hall, A.J. Hall, Cassandra Ross, Pam Palmer, Scotty Hall, Tracy Hall, Cynthia Hampton Braggs, Eric Hampton, Jamie Whiddon Garrett, Veda Smith, Robbie Charles, Luella Crow, and Latonya Anders.

### Review And Critique Of The Penalty Phase Preparation And Presentation In Mr. Hall's Case

26. As a result of my professional experience and training, I am familiar with the generally accepted standards of performance in the criminal defense community for attorneys and mitigation specialists in capital cases, as those standards of performance have emerged and evolved since the mid-1970's. I base this statement on my familiarity with three primary sources: court decisions, written standards for performance (such as those developed by

118    191

the NLADA and the American Bar Association, as well as comparable organizations at the state level), and training programs and training materials from specialized attorney and mitigation specialist trainings conducted around the country since at least the early 1980's. It should be noted that, even prior to that period, there existed an extensive body of caselaw, standards, and training materials regarding sentencing in non-capital cases that provided substantive guidance for counsel.

27. The consensus reflected by those materials is that defense counsel in a capital case must undertake "the most extensive background investigation imaginable," in the words of one representative publication, including "look[ing] at every aspect of [the] client's life from birth to the present," and "talk[ing] to everyone . . . who has ever had any contact with [him]." By no later than 1985, the unanimous view of qualified capital defense attorneys across the nation was that the likely success of the penalty phase depended on conducting the most extensive pretrial social history investigation possible. The use of mitigation specialists -- social workers and other mental health professionals with special expertise in the areas of social history investigation – to accomplish this task was well-established by the mid-1980's.

28. Based on my education and professional experience and training, as well as my personal familiarity with the foregoing facts concerning the emergence of mitigation specialists and the recognition of their central role in capital defense from the late 1970's to the present, and my extensive experience training attorneys with respect to these matters, I can state with confidence that, in 1994-1995, the standard of practice for defending death penalty cases obliged counsel to make sure that a complete and thorough social history investigation, including but not limited to the investigative tasks described in the preceding paragraphs, was completed in a timely manner. In 1994-1995, the standard of practice also required counsel to obtain the assistance of such persons, appropriately qualified by training and experience, as might be necessary to accomplish this task.

29. In sum, in 1994-1995 it was well-established that counsel in a capital case was responsible for knowing the nature and scope of the investigation necessary to produce a reliable and appropriately detailed and corroborated social history and to identify other potential mitigating evidence; for seeking appropriate resources in a timely manner to carry out such an investigation, for monitoring and directing the investigation as it proceeded, and for preparing and presenting the available mitigating evidence in a manner calculated to maximize the benefit to the defendant. Measured by this standard, the investigation, preparation and presentation of penalty

phase evidence in Orlando's case was inadequate and deficient in many respects.

30. Orlando's attorneys failed to request and obtain the services of a mitigation specialist early enough in the case to enable her to conduct a thorough and competent social history investigation. Nor did the attorneys conduct the necessary investigation themselves. It should be noted that counsel were not qualified by education and training to conduct much of the investigation called for by the facts of Orlando's case. Investigating a family background marked by violence requires the involvement of a person with the training, knowledge, and skills necessary to elicit information about traumatic experiences without overwhelming or retraumatizing the subject. Untrained interviewers, even those sensitive to the delicate nature of the inquiry, are highly likely to expose trauma victims to psychological and physical harm by forcing the subject to confront deeply personal and painful memories without simultaneously providing methods with which to cope with the surge of emotions such memories bring forth. In addition, a person with such training, knowledge, and skills will likely be able to elicit more probative information concerning traumatic events than could an individual lacking that expertise.

31. Because counsel did not secure the services of a mitigation specialist until mid-September, 1995, recommendations for, and completion of, indicated expert assessments could not be accomplished in time to be put to use at the penalty phase. Given the evidence in this case, in light of the standard of practice for investigating and developing mitigating evidence in 1994-1995, Orlando's attorneys should have obtained the assistance of at least two experts: a neuropsychologist (as urged to counsel by Tena Francis, their mitigation investigator) and some person with expertise in trauma, including the significance of chronic trauma, exposure to violence in the home and community, and traumatic loss. To explain the full range of influences on Orlando's behavior and to place his other criminal activity in context, counsel should also have located a witness to explain the factors that drew young black men in El Dorado in the mid-1990's into the drug economy. Such a witness could very likely have been found in the community itself.

32. Because counsel waited until the eve of jury selection to secure the services of a mitigation specialist, she did not have time to complete a thorough social history investigation. It appears that counsel directed her to use some of her time investigating Orlando's co-defendants (*e.g.*, their other criminal conduct and their reputations). This work could and should have been delegated to counsel's other investigator, to free up the mitigation

DECLARATION OF JILL MILLER -- 11

120   193

specialist to work exclusively on developing Orlando's social history. In any event, six weeks -- the time between mid-September, when counsel first got their mitigation investigator on the case, and the start of the penalty phase on November 1 -- was simply not enough time to complete a minimally adequate social history investigation in this case, even if counsel's mitigation specialist could have devoted her time exclusively to that goal. In addition, as noted above, by the time the investigation was underway it was too late to achieve many of the purposes for conducting such an investigation in the first place -- to inform motion practice, to identify other appropriate experts, to inform jury selection, and so on.

33. Counsel's mitigation specialist lacked the qualifications to conduct a psycho-social assessment of Orlando or to explain the significance of the specific factors she uncovered to the jury, as she was not qualified to testify as an expert on these matters. Counsel had no other expert to explain the significance of Orlando's background of family violence and trauma or the consequences of those experiences for his development into, and behavior as, an adult.

34. As a result of improper interviewing techniques and counsel's failure to appreciate the long-term impact of trauma on potential witnesses from Orlando's family, counsel's penalty phase witnesses left demonstrably false and inaccurate impressions with the jury. For example, both Orlando's mother Betty Hall and his sister Cassandra Ross denied that the children in the family (as opposed to their mother) had been physically abused by Orlando's father A.J. Hall. Mrs. Hall also testified on cross-examination that Orlando had never lacked for supervision, guidance, or material support. Those impressions were grossly misleading and false, as set forth in greater detail below. These distortions resulted from failures in the methods of interviewing employed by counsel and failures in their handling generally of the family witnesses. Obtaining full, accurate, and detailed information is a function of how interviews are conducted, how critically important questions are worded, and how witnesses are worked with after information is obtained. The testimony at the penalty phase was factually unreliable and misleading because of defense counsel's failure to follow the standard of practice in developing and presenting such testimony.

35. Counsel's penalty phase presentation lacked a number of available elements which the standard of practice in 1994-1995 recognized as essential to an effective case for life, including but not limited to the following: In focusing on the co-defendants, counsel failed to tell Orlando's own story. They failed to combat the dehumanizing impact of the prosecution's case, or provide enough information about Orlando's life for the jury to

121

(194)

understand his development and behavior. At the time of Orlando's trial, it was understood among attorneys defending capital cases that an effective case in mitigation required that the jury hear at least some information about the defendant's positive acts and qualities. A great deal of such information was available about Orlando, including his having saved his nephew Syroid from drowning just months before the crime. Counsel failed to develop or present that evidence. Counsel failed to develop and present available evidence showing Orlando's successful adjustment to incarceration and his positive record as a prisoner (typically called "*Skipper* evidence," after *Skipper v. South Carolina*, 476 U.S. 1 (1986)). As a result of counsel's inaction, the jury had very little specific mitigating information about Orlando.

36. It appears that counsel did little to address the future dangerousness aggravator. In Orlando's case, where the only available non-death sentence was life without the possibility of release, counsel should have pointed out that his dangerousness had to be assessed in the context of a life sentence in federal prison. *Skipper* evidence is relevant to this inquiry. At least two law enforcement professionals who had actual contact with Orlando as an inmate in Arkansas (former Union County deputy Cleo Jamerson and former Department of Corrections officer Keith Hill) were available and willing to testify that Orlando was a model inmate who successfully adjusted to confinement and caused no trouble. Comparable testimony was available from those who had dealt with Orlando in Texas, such as psychiatrist Dr. Jim Womack of the Federal Medical Center, who similarly would have characterized Orlando as a "model detainee" who presented no problems to the correctional staff. The fact that both of Orlando's priors were drug offenses, the latter involving amounts of cocaine valued at $40 and $20 (for which he received a ten year sentence), was relevant evidence of his non-dangerousness in a prison setting, as was the fact that he pled guilty to both offenses. While this latter information was before the jury in the form of documents from Orlando's prior convictions, counsel should not have relied on the jury to pore over those documents and find the relevant information contained in them.

37. Although a need for neuropsychological testing was indicated by the information known about Orlando prior to trial, and counsel's investigator Tena Francis urged them to have such testing performed, such testing was never performed prior to trial. It is my understanding that post-conviction counsel have had such testing conducted and that the results reflect a strong likelihood that Orlando has mild neurocognitive abnormalities which affect his brain's executive functions. Had counsel developed this evidence, it could have supported an effective argument that Orlando's participation in

122
195

the events that led to Lisa Rene's death, and his failure to take actions to resist or stop that sequence of events, was influenced by his neurocognitive impairments, which undermined his judgment, problem-solving and decision-making ability.

38. Counsel submitted numerous mitigating factors to the court for inclusion in the penalty-phase jury charge which they had not presented evidence to support. Presumably, counsel should have been familiar with the Supreme Court's decision in *Delo v. Lashley*, 507 U.S. 272 (1993), under which a trial court need not instruct the jury on any mitigating factor concerning which the defendant has not presented any evidence.

39. Counsel failed to address the testimony of the two young women who testified that Orlando had sexual contact with each of them around the time of the crime. Presumably, the Government presented this evidence to portray Orlando as callous, remorseless, and unmoved by his participation in the crime. In addition, there was a substantial risk that this evidence might evoke from the jury offensive and highly prejudicial historical stereotypes about the uncontrollable sexual appetites of African-American men. A persuasive alternative explanation was available: Orlando's life experiences as the child of an alcoholic, abusive and womanizing father had a profound and destructive influence on his attitudes toward women and sex, and led him to engage in such conduct far more casually and with less emotional investment than a person raised with healthier attitudes. With one exception, Orlando's siblings, products of the same environment, have likewise had problems maintaining successful conventionally monogamous relationships. Simply put, given Orlando's background and upbringing, there is no reason to assume that his having engaged in sexual conduct with these women around the time of the crime reflects any lack of remorse for his involvement in the offense. Counsel's failure to develop a fully detailed psycho-social assessment of Orlando left them unable to defend against the damaging inferences urged by the Government.

### SUMMARY AND OVERVIEW OF AVAILABLE INFORMATION WHICH AN APPROPRIATE SOCIAL HISTORY INVESTIGATION WOULD HAVE UNCOVERED

40. The social history investigation undertaken by post-conviction counsel, which could have been accomplished by trial counsel and their investigator had they pursued it in a timely manner, reveals extensive and important mitigating information about Orlando Hall which the jury that sentenced him to death never heard and which would both have humanized Orlando and given the jury a more sympathetic explanation for his conduct than the

123

(196)

Government presented. Among the facts that have been uncovered in the post-conviction investigation (which are all discussed in greater detail below) are the following:

■ There is substantial evidence concerning the degree of violence in Orlando's home and its corrosive effect upon him and his family which was not adequately or even accurately brought out at his trial. Contrary to the image presented at trial, Orlando was himself a victim of serious physical abuse as a child at the hands of both of his parents. Moreover, he was a witness to much more extensive and traumatic abuse of his mother and his siblings than the trial testimony indicated. Orlando and his siblings all currently exhibit symptoms consistent with the trauma of being exposed to family violence from a young age.

■ Orlando additionally was exposed to additional violence as a child and young adult, and experienced traumatic loss in the deaths of relatives and the violent deaths of friends.

■ Orlando's mother Betty suffered from serious health problems and depression, which resulted in her being emotionally unavailable and dependent on medication – as well as gambling – as a way to escape the painful parts of her life.

■ Orlando suffers from neurocognitive impairments, with accompanying learning disabilities, which undermine his judgment and reasoning ability, especially when he is under stress, and which deprived him of important protective mechanisms for coping with the chaos and debilitating effects of his upbringing.

■ When Betty Hall eventually took her three youngest children, including Orlando, and left her abusive husband, she quickly abandoned Orlando and his younger brothers Tracy and Demetrius, leaving them to fend for themselves, with no parent in the home to supervise their behavior or to provide necessities, such as food, clothing or electricity.

■ As a result of his abandonment by his mother and the responsibilities towards his younger brothers that this placed on him, as well as Orlando's cognitive deficits and the

124  (197)

limitations they placed on his employability, and the lack of meaningful economic opportunities for an African-American teenager in El Dorado, Orlando turned to selling drugs to help his family survive.

■ When Orlando was inevitably arrested and imprisoned for selling drugs, he was a compliant and non-violent prisoner who adjusted successfully to confinement and posed no threat to other inmates or correctional staff.

■ At the time this crime occurred, Orlando had expressed his desire to leave the drug trade and was making efforts to do so, and to leave Arkansas and obtain gainful employment.

■ Despite having suffered a traumatic upbringing, Orlando nevertheless has positive qualities which are acknowledged by everyone who has come into contact with him: he is generous and warm; loves his children deeply; cares for his family and feels responsible for taking care of them; and is even capable of acts of heroism, as when he leapt from a second-floor balcony to rescue his nephew Syroid from drowning in a motel swimming pool.

41. Orlando apparently suffers from an undiagnosed learning disability, which would have had significantly harmful psychological, social and emotional consequences (including effects on judgment and decision-making, particularly under stress). Orlando's frustration with school likely resulted from the difficulty he had learning -- especially as he moved into the higher grades, where limitations on his ability to process and comprehend information increasingly impeded him. His placement in remedial classes and his early withdrawal from school are both consistent with this inference. Orlando may also suffer from Attention Deficit Disorder (ADD) in addition to a learning disability; that condition would also be consistent with much of the information presently known about his own background and that of his family (both in his parents' generation, in his own generation, and in his children's). If so, his use of marijuana may, at least in part, be attributed to self-medication for ADD.

42. While the physical abuse of Orlando's mother Betty by his father A.J. was described, to some extent, in the penalty phase testimony of Betty Hall and Cassandra Ross, both those witnesses denied that the children in the family were "abused." This left the jury free to conclude that because the children themselves were not "abused," they suffered no negative effects from the

125 (198)

experience and thus that it could not mitigate or help explain Orlando's involvement in the crime. First, this characterization -- that the Hall children were not "abused" -- was incorrect. The physical discipline imposed on the children in this family, by both parents, was unduly harsh and rose to the level of abuse. The children were whipped with switches and a belt, to the point that the beatings left welts on their skin. They were targeted for such punishment unpredictably, with the degree of punishment varying arbitrarily according to the temper of the parent imposing it. A.J. Hall has admitted that his abuse of alcohol led him on occasion to lose control and beat his children with unrestrained rage. A.J. and Betty's practice of "delaying" punishment, by letting the children knew they were going to be whipped but not telling them when the punishment would occur, exacerbated the children's feelings of helplessness and terror. Dreading such "delayed" punishment, Orlando often wet the bed, a physical response to terror which he could not control. When his parents whipped him for this involuntary action, it only worsened his fear and shame. When discipline produces physical injury, is unpredictable, is inflicted in response to behavior the child physically cannot control, and reflects the mood or condition of the person inflicting it rather than the severity of the child's misbehavior, then it constitutes abuse, not correction.

43. Because such treatment was all the Hall children knew, they understandably saw it as normal punishment, not "abuse." As Scotty Hall has put it, the children simply thought that was how black families were. The tendency to regard one's own childhood experience as "normal" is understandable, and is demonstrably familiar to professionals who work regularly with victims of family violence. It means, however, that the dynamics and effects of family violence cannot be uncovered simply by asking someone if she was "abused." Instead, one must inquire about the specific methods of discipline employed within the family, and the circumstances surrounding discipline. Counsel's examination of these witnesses reflects a failure to grasp this basic principle of social history investigation and witness preparation in a capital sentencing hearing.

44. At the same time, the true extent and severity of the physical beatings visited on Betty Hall, the unpredictability of A.J. Hall's outbursts toward her, and the far-reaching consequences for Betty's own physical and mental health and that of her children, were not communicated by the testimony actually presented at Orlando's penalty phase. A.J. Hall's abuse of Betty caused her to require medical attention at times and resulted in the police coming to intervene on several occasions, although A.J. apparently was charged only once. Interviews with Betty and the Hall children confirm that A.J.'s violence against Betty reached startling extremes -- he scarred

126 199

her face, he beat her eyes until the skin around them permanently darkened, he shoved her through a plate glass window, he climbed onto the hood of their car and beat at the windshield with his fists, he pummeled her until the police were called. The violence, though a constant feature of their life together, flared unexpectedly. Betty feared for her life, and yet compulsively attempted to placate A.J. to avoid further beatings. As a result of the stress and trauma, she sank into depression, which she attempted to remedy with prescription medications and a desperate fondness for gambling. As a consequence of all these factors, as her children grew older Betty was less and less emotionally available to them, and unable to give them appropriate care, supervision, and support.

45. It is highly significant that the Hall children regularly saw A.J. brutalizing Betty. The destructive effects of repeatedly witnessing physical violence can be as severe as the effects of being subjected to it. Chronic exposure to violence and trauma can have profound effects on a child's development. It undermines his sense of safety and security, and his ability to grow into an emotionally healthy adult. Parents cannot be viewed as providing safety for the child when they are also the inflictors of violence. A child, especially a son, who witnesses the abuse of his mother develops feelings of guilt, helplessness, powerless, and low self-esteem. To develop into an emotionally healthy adult, a child's basic physical and emotional needs must be met. Among these needs are predictability, stability, positive modeling, and opportunities to develop a positive sense of self. If that child is frequently exposed to his father's violent battery of his mother, the child will lack the safety, predictability, and consistency which are vital to healthy emotional development.

46. Traumatic events in Orlando's life include his having witnessed the violent abuse of his mother and having been the target of abusive physical discipline by both parents, both on a chronic basis. In addition, Orlando suffered the traumatic loss of his grandmother and aunt, who had served as sources of positive regard and emotional reinforcement. His grandmother died when he was young, at a time when the loss would have had greater traumatic impact. Orlando was also directly exposed to other traumatic deaths/losses. For example, he saw his father's first cousin, Harry J., burned to death inside his truck -- at "Anybody's Club," the rundown nightclub located immediately behind the Hall family home and run by Orlando's uncle, T.J. He was present when his friend Eric Steele was shot twelve times. Another friend, Corey Brown, was robbed and shot in the head near the Hall home after having stayed overnight with the Halls, and died from his injuries. Two other friends died of drug overdoses. In addition, Orlando's involvement in the illegal drug business for an

DECLARATION OF JILL MILLER -- 18

12-7

200

extended period was itself traumatic; Orlando's brother Tracy recalls that he and Orlando both lived in anxiety and fear as a result of seeing friends come to violent ends and knowing that they could be the target of violence; both thought they could die at any time. Their perception that El Dorado was a lethally violent place is consistent with newspaper accounts which state that major crimes in the city increased significantly from 1986 to 1993 (one police official indicated that the crime rate "quadrupled" in that interval).

47. Such traumatic losses affect a child's sense of security, safety and stability, as well as his sense of the future. Chronic trauma, especially that which begins at an early age and involves multiple types of trauma, can lead to feelings of hopelessness and futurelessness. All the male children in the Hall family have experienced these intense feelings of futurelessness. Children or adolescents who experience or witness violence/trauma can suffer from a variety of mental health symptoms, which can include depression and Post Traumatic Stress Disorder (PTSD) or trauma syndrome. Chronic exposure to violence can affect cognition, undermining learning, memory and school performance. Orlando's school records and his performance on recent tests of his academic ability reflect distinct problems consistent with chronic exposure to violence in the home. Chronic trauma also affects personality development and behavior, and can lead to decreased impulse control. The extent of the effects of chronic trauma is a function of the types of trauma, number of traumas, extent of exposure, and such factors as age, sex, cognitive competence, availability of support services, and the presence of other risk factors or protective factors (explained below). The impact of trauma on a child is compounded by an environment of poverty, family disruption, and community disintegration. While both A.J. and Betty Hall were employed full-time, their wages were not high and they had a house full of children to feed. In addition, it appears that A.J. Hall did not always contribute his earnings to supporting the household. The resulting economic pressure on the family, especially in the context of the persistent violence between the parents and the physical abuse visited on the children by the parents, is consistent with other evidence suggesting that the impact of the trauma on the Hall children was substantial.

48. Certain risk factors, if present, enhance the likelihood that a child who experiences trauma will suffer damaging mental health consequences. A number of such risk factors are present in Orlando's background, including severe marital distress, overcrowding in the home due to large family size (Orlando and his three brothers and two sisters shared two bedrooms in the family's small, three-bedroom home), and maternal psychiatric disorder

(his mother Betty's depression). A.J. Hall's alcoholism aggravated the risk factor of marital distress by introducing unpredictable violence into the home. In addition, low cognitive functioning and brain impairment (such as Orlando exhibits) enhance the likelihood of adverse effects.

49. Moreover, the timing and number of traumatic events in a person's childhood may dramatically impact the injurious effects of trauma on a child's intellectual and behavioral development. The age and development of the child has a significant effect on the debilitating effects of trauma. A child who, like Orlando, experiences his first trauma before age eleven is three times more likely to develop psychiatric symptoms than one who first suffers trauma at a later age, when an individual's coping mechanisms are more fully developed. Research indicates that as the number of risk factors or stressors in the child's life increases, performance on IQ tests deteriorates. According to one leading researcher, the extent of the effect on the child of chronic trauma or exposure to violence is a function of the types of trauma, the number of traumas, and the extent of exposure. There is a "dose-response" relationship – in other words, each added trauma has a multiplier effect so that the impact of successive traumas is far greater than the sum of each part. The accumulation of the risks and stressors in a child's life enhances the likelihood of adverse effects on the child.

50. The presence of protective or ameliorating factors can decrease the likelihood that destructive mental health consequences will result from chronic trauma. Unfortunately, few such factors existed in Orlando's case. Protective factors can include cognitive competence (Orlando's intelligence is in the low average range and his academic ability, even as an adult, is well below the norm); experiences that promote the child's positive sense of self (Orlando's environment provided few such opportunities); community support and encouragement (these were not available), and role models for active and constructive coping strategies (his parents did not provide such models). Orlando did have a stable emotional relationship with his mother, as well as positive early relationships with his grandmother and aunt. After the death of his grandmother, however, and due to his mother's increasing physical and emotional unavailability, Orlando did not have the continuous level of emotional support which would have helped him deal constructively with the experience of trauma. Resources were also markedly absent outside the family, other than, to some extent, Rev. Hegler. The experience of Orlando's sister Cassandra Ross provides a significant contrast. From an early age, Ms. Ross found refuge in the family of her boyfriend Jerry Ross, whom she later married and with whom she has had a stable and emotionally healthy long-term relationship. Ms. Ross' relationship with Jerry, in fact, dates back to her

childhood -- he was her elementary school sweetheart. Ms. Ross acknowledges the role of the Ross family in providing her with emotional and material resources, and it is plain that Jerry's parents provided positive models in a way that her own parents did not. At the same time, Ms. Ross's cognitive ability led to successes in school which Orlando lacked; her cognitive ability itself, and the positive regard it brought her in the school setting, were protective factors which reduced the impact of family trauma on Ms. Ross. Even so, it would be a mistake to assume that Ms. Ross has not suffered, and does not continue to suffer, from the trauma that characterized the Hall household.

51. Understanding the nature of risk factors and protective factors, and directing the social history investigation toward identifying them, is essential to explaining for a lay jury how one child in a family who is exposed to trauma may suffer grave long-term harm, and yet another child reared in the same environment may appear to overcome it. Research indicates, for example, that boys and girls react differently to the experience of witnessing trauma as children; as a result, a girl who grows up watching her mother daily assaulted by her father may suffer somewhat less psycho-social damage than a boy raised in the same environment and witnessing the same traumatic violence. Every child in a family suffers different consequences from the experience of trauma, even when all experience it at the same time. The extent to which each child in Orlando Hall's family, in growing to adulthood, experienced or avoided criminality, substance abuse, relationship problems, or the like, and the severity of those experiences, depends on the unique combination of protective factors and risk factors affecting him or her during childhood. In 1994-1995, it was well known in the capital defense community that preparing to explain this sort of differential impact of traumatic experience, and anticipating prosecutorial cross-examination and argument directed to these areas, was an essential part of preparing to tell the client's story of childhood trauma to the jury.

52. Betty Hall exhibits many symptoms of PTSD and could probably be diagnosed as suffering from it. All the children in this family exhibit multiple symptoms of trauma syndrome. While trauma syndrome is less pervasively disabling than "full-blown" PTSD, the presence of this extensive symptomatology nevertheless reflects and corroborates the traumatic experiences that Orlando and his siblings endured.

53. Trauma symptoms fall into three categories, and a subject must exhibit symptoms in all three areas before a diagnosis of PTSD may be made. The first category of symptoms is *re-experiencing*. Re-experiencing occurs through nightmares, flashbacks, or memories triggered by certain events,

130 (203)

words or experiences that are linked to the traumatic event. The person has recurrent or intrusive distressing recollections of the events, and acts or feels as if she is experiencing the trauma all over again. In response to these recollections, the person experiences intense feelings of distress such as terror or helplessness. Betty Hall and several of the Hall children reported suffering nightmares about their traumatic childhood experiences after being encouraged to talk about them.

54. The second category of symptoms is *persistent avoidance of stimuli associated with the trauma and general numbing of feelings*. These symptoms include the person's efforts to avoid thoughts, feelings, conversations, or activities associated with the trauma; inability to recall an important aspect of the trauma; feelings of detachment or estrangement from others; restricted range of affect (emotional expression); and a foreshortened sense of the future. Persons who experience these symptoms often manifest depression and turn to alcohol or drug use as a means of emotional escape. Orlando and each of his brothers exhibit the foreshortened sense of the future characteristic of this symptom group. All of the Hall children also report that they actively resist thinking or talking about the experiences of trauma in their family background. Orlando's brother Scotty and his sister Pam both appear to have suffered from depression and to have sought solace in alcohol or drugs, although Scotty's reliance on such substances has been much more pronounced and long-term in its destructive impact on his life. Orlando himself has used marijuana as a strategy to avoid thinking about or focusing on the painful experiences he endured as a child.

55. The third category of trauma symptoms is *persistent symptoms of increased arousal*. These symptoms may appear as, for example, difficulty falling or staying asleep; irritability or outbursts of anger; difficulty in concentrating; hypervigilance; and exaggerated startle response. Persons exhibiting these symptoms often say that, when in a room, they have to sit facing the door, with their back to the wall. They jump when they hear a loud noise. They are always looking over their shoulder, or scanning the horizon when out in public. All of the Hall children manifest one or more of these arousal symptoms.

56. Betty Hall exhibited, in her relationship to Orlando's father A.J., symptoms of co-dependency as it related to A.J.'s alcoholism. She tolerated his alcoholic and abusive behavior by working long hours to provide financial support for her family while A.J. "drank up" his own earnings or hid them (Orlando's brother Scotty reports that A.J. kept money in an out-of-town bank to which Betty apparently had no access). Betty also invested a great

131 (204)

deal of time and energy in monitoring A.J.'s moods and behavior, hoping to avoid provoking him into outbursts of physical violence toward her. Along with her work schedule and her own escapist activity (gambling), this constant focus on A.J. made her both unavailable to her children and unable to protect them. Often, people who grew up in an alcoholic and violent home say that it felt like "walking on eggshells." Several of the Hall children used precisely this phrase to describe their emotional response to their home environment.

57. All of the Hall children exhibit characteristics of adult children of alcoholics. Children of alcoholics are prone to a range of psychological problems, including learning disabilities, attention deficit disorder, depression, and anxiety. When alcohol abuse is combined with violence, as in the Hall home, the children grow up in an atmosphere of chaos, inconsistency, unpredictability, and fear. They can develop an inability to trust, an extreme need to control, excessive sense of responsibility, and denial or repression of feelings. This can lead to low self-esteem, depression, isolation, guilt, and difficulty establishing and maintaining satisfying and healthy relationships. These children have a need to please others; they seek approval and affirmation. They can be either overly dependent (a consequence of having had normal needs for dependency and nurturance go unmet) or prematurely adult (as a result of having been forced to surrender childhood to take on adult roles in family). Adult children of alcoholics can be immature and impulsive, and often have poor problem-solving skills. They exhibit an increased incidence of alcohol and/or drug abuse, and often marry or get involved with someone who abuses.

58. Among the roles which children in alcoholic families may assume are: the "responsible one"/parent figure, the placator or mediator, and the scapegoat. Orlando's sister Cassandra presents a classic example of a person with an extreme need for order and control in her life. His sister Pam, and indeed Orlando himself, went through periods of being prematurely adult and responsible -- Pam as a result of their parents' work schedule, and Orlando as a result of having been abandoned by their mother after she finally left A.J. Several of the children have abused alcohol and drugs. Several exhibit difficulty establishing and maintaining relationships of trust and intimacy. Sometimes, children in alcoholic families will act out to draw attention to themselves, disrupting the family but providing a distraction from the issue of alcoholism. At other times, they will try not to draw attention to themselves, and to simply "fade into the woodwork", especially if the alcoholic parent is also abusive. These children do poorly in school, abuse alcohol or drugs, and act out in other unacceptable ways.

132 (205)

59. Orlando's entry into the drug economy can best be understood as a function of several different influences acting upon him at once. One primary factor was that few economic opportunities existed for legitimate work in El Dorado in 1989; even five years later, when the national economy was booming, a deputy prosecuting attorney for a regional drug task force described the area as "economically depressed." Moreover, most positions available to young African-American men in 1989 were in menial labor or service sector jobs paying at most minimum wage. Significantly, Orlando attempted to hold such jobs for a time, working as a shelf stocker at the "Sav-Mor" grocery store and at the giant Con Agra chicken processing operation in El Dorado before abandoning those efforts at making ends meet through the legitimate economy. A second factor making it difficult for young African-American men to obtain stable, long-term employment work at a reasonable wage was (and is) racial discrimination in employment, as well as in economic development in El Dorado generally. Community leaders such as Rev. Hegler attest to the persistent and pervasive influence of racial discrimination in limiting the economic opportunities available to young African-American men in south central Arkansas. A third factor operating as a barrier to Orlando's finding appropriate employment was his lack of skills, in combination with his poor academic achievement and cognitive impairment, all of which made finding legitimate work far more difficult.

60. In addition, the very pervasiveness of the drug trade in poor black neighborhoods like El Dorado's "Thunderzone" -- described in a 1994 news article as "the hub of a thriving drug trade" in southern Arkansas -- creates a destructive cycle in which youngsters like Orlando grow up knowing they can make money easily. This perception is encouraged by the local big suppliers, who for their part view young black men as expendable resources, who can be swiftly replaced if they are jailed or killed. Deficiencies in the educational system in El Dorado, which longtime observers such as Rev. Hegler attribute in part to the legacy of racial discrimination, as well as the comparable history of employment discrimination stretching back for generations, would contribute to the problem.

61. As a result of his history of trauma, Orlando lacked the feelings of self-worth which develop in a child raised in a normally supportive and nurturing environment. This deficit of emotional well-being, too, apparently contributes to the attractiveness of selling drugs. Where young African-American men cannot see legitimate avenues for achieving success, they nevertheless need to possess outward symbols of success,

133 (206)

because such symbols (*e.g.*, cars, clothing, and the like) function to confirm that the person who possesses them is important and deserves respect. Those who don't have access to such symbolic possessions feel unworthy and alienated. By satisfying his need for respect, the money he earned selling drugs likely provided Orlando benefits that were as much emotional and psychological as material.

62. Another recognized consequence of the experience of trauma is a sense of futurelessness - the sense that there is no point in creating plans or expectations of satisfaction because trauma has shown that at any moment they could be destroyed. At the time Orlando became involved in the drug trade, precisely such a sense of futurelessness dominated his perceptions of his own life chances. Research indicates that young men raised in similar circumstances, seeing high rates of lethal violence and incarceration in their communities, do not expect to live long or remain on the streets. This lack of a belief in one's own future tends to undermine any motive to work toward long-term goals, financial or otherwise. Young black men like Orlando who see no future for themselves are believed to be especially vulnerable to the lure of easy money in the illegal drug economy, and unable to transcend their own immediate circumstances to appreciate the potential long-term disadvantages of such behavior.

63. Perhaps most important, family members agree that Orlando's original involvement in drug dealing was motivated by his desire to take care of his family, rather than by greed. Abandoned along with his two younger brothers when his mother left his father and took up with another man, Orlando faced an urgent need for money to survive -- to pay for food, clothing, and the electric bill. This immediate and uniquely personal motivation, in addition to the social and psychological factors described above, helps explain why Orlando gave up on the limited opportunities available in the legitimate economy to a young, uneducated African-American man in El Dorado and moved instead into the drug trade.

64. For all these reasons, a strong argument could have been made that the lure of easy money in the drug trade was more than Orlando -- frustrated with his inability to learn, limited by his academic and cognitive deficits, feeling responsible for his brothers and his own children, earning minimum wages in menial jobs, hungry for respect and self-esteem, and burdened by a sense of futurelessness -- could resist. Such circumstances would have helped the jury understand how Orlando was drawn into the drug business.

65. A great deal of powerful ethnographic research supports the view that the lure of the illegal drug economy is less about greed for money than about

134   207

the search for self-worth, the desire for dignity, and the hunger for respect. In 1994-1995, there was extensive information of this type available to provide a lay jury with this perspective on why Orlando ended up selling drugs rather than gainfully employed at a legitimate job. Further, it was understood in the capital defense community that it was essential to present such a perspective so that jurors would understand that economic, social, and political factors -- rather than simply greed -- contributed to the involvement of young black men like Orlando in the drug trade. This explanation would take on even greater mitigating force in Orlando's case because additional factors unique to his family circumstances -- *i.e.,* his sudden responsibility for providing for his younger brothers when they were abandoned by their mother -- acted in combination with these larger forces.

66. Several people corroborate that at the time of this crime (the kidnapping and murder of Lisa Rene), Orlando wanted to get out of the drug business and was taking steps to do so. His sister Cassandra, for example, reports that Orlando seemed increasingly anxious to relocate from Arkansas to Texas. His then-girlfriend LaTonya Anders likewise indicated that he planned to leave Arkansas. His brother Demetrius indicates that Orlando told him repeatedly that he wanted for them both to stop dealing drugs as soon as they had enough money to launch a legitimate business. This information would also have helped the jury place Orlando's involvement in the drug trade into proper perspective -- not as his ambition, but as an activity into which circumstances and the lack of other opportunities had propelled him, and from which he hoped to escape.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ~~June 12, 2002~~ (date).

_____

JILL MILLER

135 (208)



## DECLARATION OF MICHAEL E. TIGAR

Michael E. Tigar, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is Michael E. Tigar. I am a lawyer and Professor of Law at American University's Washington College of Law in Washington, D.C. I have previously given a declaration in this case, and incorporate here by reference my statements in that declaration concerning my qualifications and experience.

2. I have recently reviewed the Government's response to Orlando Hall's petition for post-conviction relief, including the affidavits filed by trial counsel Michael Ware and Jeffrey Kearney. Mr. Hall's present counsel have asked me to comment on certain statements in trial counsels' affidavits. For all opinions set out below, I rely upon *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court's definitive teaching on the 6th Amendment right to the effective assistance of counsel. My opinion is also informed by the Court's application of *Strickland* in *Williams v. Taylor*, 529 U.S. 362 (2000).

3. Mr. Ware suggests that his conversations with Mr. Hall's prior counsel, Mark G. Daniel and Michael Heiskell of Fort Worth, gave him no reason to suspect the existence of certain mitigating circumstances in Mr. Hall's background. In my opinion, on the facts of this case it was objectively unreasonable for Mr. Ware to rely on prior counsel's impressions of potential mitigation witnesses and/or the content of prior counsel's interviews with potential mitigation witnesses to conclude that further investigation was not warranted, for the following reasons.

4. First and foremost, it was objectively unreasonable for trial counsel to rely on any opinions which may have been proffered by prior counsel because, by the time Mr. Ware

209

134

and Mr. Kearney consulted with prior counsel, the court had adjudged a conflict of interest to exist between prior counsel and Mr. Hall. By definition and as a matter of law, the opinions of prior counsel were compromised by the actual conflict between their own interests and their duty to Mr. Hall. Whatever might be appropriate in a case where prior counsel bore full and undivided loyalty to Mr. Hall, the unique circumstances of this case – i.e., that prior counsel were allowed to withdraw in the first place only because Mr. Hall allegedly had planned to take one of his lawyers hostage in a desperate bid to escape from custody – foreclosed Mr. Ware and Mr. Kearney from relying on the opinions of conflicted prior counsel. By the time prior counsel communicated those opinions to trial counsel, their interests were adverse to Mr. Hall's own. For that reason, it was objectively unreasonable for trial counsel to rely on those opinions.

5. Second, notwithstanding the existence of a conflict of interest which should have precluded any reliance on prior counsel's impressions, it is evident that prior counsel's contact with prospective mitigation witnesses in this case, as reflected in the time records they submitted to the court, was necessarily very brief. Mr. Heiskell represented Mr. Hall from 01/06/95 to 03/22/95; I am informed that, according to his voucher, Mr. Heiskell performed zero hours of "witness interviews" during that period.[1] Thus, reasonable counsel could not have relied on information or impressions about prospective mitigation witnesses from Mr. Heiskell.

---

[1] Mr. Heiskell's time records (as submitted to the court) do reflect about forty-five minutes of contact with potential witnesses (a 0.3 hour meeting with "client's girlfriend" on 01/13/95 and a 0.3 hour phone call with "client's brother" on 02/23/95), but the fact that Mr. Heiskell did not characterize these contacts as "witness interviews" on his CJA voucher suggests they were for a purpose other than obtaining information about Mr. Hall's background.

135]

6. I am informed that Mr. Daniel's voucher represents that he provided professional services to Mr. Hall from 10/13/94 to 03/21/95. I am further informed that, again according to his voucher, Mr. Daniel performed a total of 7.6 hours of "witness interviews" during that approximately 5 ½ month period. These hours may be broken down into two categories -- interviews conducted while Mr. Daniel was in Texas ("the Texas interviews") and those conducted during a one-day trip to Arkansas on 11/22/94 ("the Arkansas interviews"). As detailed below, these apparently preliminary interviews fail to provide a strategically sound basis for Mr. Ware's conclusion that no further investigation into Mr. Hall's background and character was warranted.

7. I am informed that the amount of time Mr. Daniel spent on the Texas interviews was approximately 1.9 hours, attributed as follows:

- an in-person meeting with a prospective witness (Mr. Hall's girlfriend LaTonya Anders, according to Mr. Daniel's notes) on 11/08/94, lasting 1.1. hours;

- a conference with Mr. Hall's prior (Arkansas) attorney James Bennett on 11/21/94, lasting 0.3 hours;

- a conference with an unnamed witness on 12/02/94, lasting 0.1 hours;

- a conference with an unnamed "Arkansas witness" on 12/13/94, lasting 0.2 hours; and

- a conference with an unnamed witness on 12/19/94, lasting 0.2 hours.

8. Even if all the witness conferences reported by Mr. Daniel on these dates were with prospective mitigation witnesses and conducted in person, the amounts of time reported (less than twenty minutes in each case except Ms. Anders') are too brief to have permitted a meaningful assessment of whether the witness(es) might ultimately provide important information, or what kind of impression they might make on a jury. Moreover,

211

36

it is unlikely that some of these conferences touched on Mr. Hall's background at all. For example, I am informed that Mr. Daniel's notes of his interview with Ms. Anders suggest that the conversation on 11/08/94 focused on her knowledge of co-defendants Bruce Webster and Marvin Holloway. Similarly, while Arkansas attorney James Bennett was certainly an important witness to the events surrounding Mr. Hall's surrender to the authorities, there is no reason to believe that he possessed detailed or intimate knowledge of the circumstances of Mr. Hall's upbringing. Thus, the results of this portion of Mr. Daniel's 7.6 hours of witness interviews could not have informed a reasonable decision by Mr. Ware not to pursue the type of far-ranging investigation into Mr. Hall's background otherwise required by the prevailing national standard for defending capital cases in 1994-1995.

9. I am advised that Mr. Daniel's voucher indicates he spent approximately 5.7 hours with various witnesses during the Arkansas interviews on 11/22/94, and that 11/22/94 is the only other date for which Mr. Daniel billed any time for interviewing witnesses.[2] I am

---

[2] Documentation submitted by Mr. Daniel to the court reflects that he flew directly to El Dorado from Dallas on 11/22/94, leaving Dallas at 9:40 a.m. and arriving in Arkansas at approximately 10:50 a.m. He picked up his rental car at 10:55 a.m. and returned it at 5:20 p.m., after which he departed El Dorado at about 5:40 p.m. If this information is accurate, it appears that the maximum amount of time Mr. Daniel could have spent with witnesses in Arkansas on 11/22/94 is about 6½ hours (i.e., the time he was on the ground in that state). However, Mr. Daniel also spent time driving from El Dorado to Pine Bluff and back (his notes and CJA billing records show that in addition to talking to witnesses in El Dorado, he spoke with Mr. Hall's former parole officer in Pine Bluff and visited the motel and murder/burial sites there). Pine Bluff is about 80 miles from El Dorado. If Mr. Daniel spent about 3 hours making that 160-mile roundtrip (averaging 55 mph, the trip would take 2.9 hours), that leaves a total of about 4 hours, at most, that Mr. Daniel could have spent with witnesses in Arkansas on 11/22/94. In addition, it does not appear that anyone accompanied Mr. Daniel to Arkansas on 11/22/94. I am advised that investigator Danny LaRue's billing records do not reflect that he traveled with Mr. Daniel on that date, and that the only travel expenses reported to the court were Mr. Daniel's. Co-counsel Michael Heiskell, who entered the case on 01/06/95, had not yet been appointed. Thus, the interviews conducted by Mr. Daniel on that day appear to

advised that Mr. Daniel's voucher describes the time he spent in Arkansas on 11/22/94 as follows: "travel to Eldorado Ark. to confer with atty witness; parole officer; probation officer; family of defendant; police officers, travel to Pine Bluff Arkansas to view crime scenes; cf w/ parole officer and fact witnesses." I am informed that Mr. Daniel's notes dated 11/22/94, consistent with this summary, reflect interviews with adult probation officer Richard McKinnon in El Dorado and parole officer Greg Barber in Pine Bluff (a total of 6 pages of notes); Mr. Hall's cousin Robbie Charles in El Dorado (1 page of notes); Mr. Hall's family minister Reverend Hegler in El Dorado (1 page of notes); attorney James Bennett (6 pages of notes); and Mr. Hall's mother Betty Hall (2 pages of notes).

10. I have reviewed the notes from Mr. Daniel's interviews with Ms. Charles, Rev. Hegler, and Betty Hall. The character of each is very much what one might expect from an initial, brief contact between an out-of-town attorney and a "friendly" witness. In addition to the name, address, and phone number of each witness, they provide only the following facts:

- Rev. Hegler stated that he taught at El Dorado High School and had known Mr. Hall for 15 years; that Mr. Hall had few disciplinary problems in school; that Mr. Hall was very well liked by other students; that another student had wanted to "fight" him, but Mr. Hall "laughed it off."

- Ms. Charles stated that Mr. Hall was "very well mannered," "easy going," "respectful," "gets along with his dad" and had a "close family," and that she had never known him even to hit anyone.

- Betty Hall stated that her son had gone through the 11th grade in

---

constitute the entirety of the mitigation investigation (other than with Mr. Hall himself) undertaken prior to Mr. Ware's entry into the case.

school; that he had worked briefly at the ConAgra hatchery; that he had lived with Rev. Willie Norful after being released from prison; that he had been "no trouble at all" in school; that he was "very respectful," "talked a lot," and had a "gentle temperament" such that one couldn't "stay mad at him." She also provided the names and ages of Mr. Hall's children.

11. In my opinion, given the superficial nature and limited extent of the contacts between Mr. Daniel and these witnesses on 11/22/94, it was objectively unreasonable for Mr. Ware to rely on any impressions formed by Mr. Daniel in the course of those interviews rather than conducting a thorough investigation into Mr. Hall's background after being appointed to the case, as required by the prevailing national standard of practice for defending capital cases in 1994-1995.[3]

12. Even if Mr. Daniel had spent the entire 5.7 hours on 11/22/94 interviewing members of Mr. Hall's family and other persons intimately familiar with the Halls, rather than squeezing three brief get-acquainted conversations into a crowded interview schedule, it would not have been professionally reasonable for Mr. Ware to substitute Mr. Daniel's judgment for his own. No attorney adhering to the prevailing national standard of practice for defending capital cases in 1994-1995 would have expected an initial conversation with a prospective mitigation witness to reveal all the relevant information that witness might possess. Instead, the prevailing standard of practice required counsel or her representative (*e.g.*, an appropriately qualified and trained expert or investigator) to build relationships with such witnesses sufficiently in advance of trial to ensure the full development of relevant information over the course of repeated contacts, especially

---

[3] It is also worth noting one theme which appears to emerge from prior counsel's sketchy notes: that Mr. Hall's personality was compliant, *i.e.*, that he was someone who might "go along" with a design of someone else's making. Only time-consuming in-depth interviews, and early intense contact with

where members of the client's immediate family and other intimate acquaintances were concerned. Mr. Daniel's early contact with these important witnesses was at least arguably consistent with the applicable standard of practice. It was objectively unreasonable, however, for Mr. Ware to base decisions about, *e.g.*, the scope of the mitigation investigation to be undertaken after he became Mr. Hall's attorney, and what questions might deserve close attention in such an investigation, on the initial witness contacts made by Mr. Daniel months before Mr. Ware was appointed.

13. It was likewise objectively unreasonable for Mr. Ware to base such decisions on what he alleges to have been Mr. Daniel's recollection of his initial impressions of those witnesses. Mr. Ware states that he "was able ... to speak with prior counsel" shortly after being appointed to represent Mr. Hall, and that prior counsel expressed the opinion that "nothing of any real substance was revealed [in prior counsel's interviews on 11/22/94] that could likely be considered compelling mitigating factors in a case with facts such as [these]." For two reasons, Mr. Ware's affidavit does not respond to the deficiencies in investigation which I identified in my earlier declaration. First, as noted, initial brief contacts with prospective mitigation witnesses in capital cases often disclose little information "of real substance;" the applicable standard of practice obliged Mr. Ware to pursue building relationships with these potential witnesses to ensure the fullest possible opportunity to discover, over time, important and sensitive information which could constitute "compelling mitigating factors."

14. Second, I am informed that Mr. Ware's own time records reflect only two conversations with prior counsel, one on 03/23/95 (30 minutes) and one on 08/30/95 (30 minutes). If

---

a mental health professional, would permit exploration of this issue.

Mr. Daniel had managed to complete a thorough mitigation investigation, these conversations are too brief for him to have communicated its results to Mr. Ware; if Mr. Daniel did not complete a thorough investigation into potential mitigating circumstances (the conclusion supported by his own time records), then Mr. Ware was certainly not entitled to foreshorten his own efforts in reliance on an incomplete investigation by prior counsel, which comprised fewer than eight hours of witness interviews and was not even focused on potential mitigation witnesses.

15. In addition, reasonable counsel would not have relied on the handful of interviews conducted by prior counsel as a substitute for conducting his own investigation because Mr. Daniel conducted those interviews alone, in the absence of any third-party witness (*e.g.*, an investigator). Such one-on-one conversations may be important in building relationships between counsel and prospective mitigation witnesses, but they cannot suffice for purposes of preparing for litigation, simply because of the possibility that witnesses may become unavailable, or their accounts may change between the interview and the time of trial. Indeed, given the universally acknowledged importance of creating a reliable (usually written) record of what such witnesses say, the absence of a third party from these initial interviews leads me to expect that Mr. Daniel did not intend for them to have been his only contact with these witnesses.

16. Indeed, the results of prior counsel's initial hurried "interviews" in Arkansas, as well as Mr. Hall's own semi-literate responses on the "client background information" form provided to him by prior counsel, should have alerted Mr. Ware and Mr. Kearney that something was deeply wrong. If the behavior that the Government attributed to Mr. Hall was atypical, then counsel needed to search for the events and experiences which could

216

(41)

account for the change. On the other hand, perhaps the witnesses had not been fully forthcoming in an initial brief conversation with a lawyer in a hurry who was a stranger to them.

17. Simply put, the prevailing standard of reasonableness required Mr. Ware to acquire a sufficient factual basis for the exercise of his own professional judgment. It appears from Mr. Ware's affidavit that he relied on second-hand descriptions of brief, one-time, one-on-one conversations between prior counsel and three witnesses, rather than pursuing additional investigation in a timely manner after his appointment to Mr. Hall's case. In so doing, Mr. Ware's performance fell below the prevailing standard of reasonableness, which reflected the widespread recognition in the community of lawyers and other specialists defending capital cases that uncovering sensitive information requires substantial time and repeated contacts with prospective mitigation witnesses.

18. Mr. Ware states that nothing about the manner in which Mr. Hall presented himself gave Mr. Ware any reason to believe that Mr. Hall was not voluntarily sharing all important facts about his background, or that Mr. Hall might suffer from any type of cognitive problems such as neuropsychological impairment. In my opinion, one of the duties associated with providing reasonably effective assistance is to maintain a certain degree of skepticism about information obtained from the client, at least until that information can be measured against information readily available from other sources. In some circumstances, this simply reflects the dynamics of a relationship in which the client did not freely choose the lawyer. But in all cases, it reflects a cautionary recognition that the client, despite an apparently forthcoming attitude, may not have reached the point at which he trusts counsel enough to make full disclosure of embarrassing or painful facts.

217

√42

19. More important, it is amply documented that clients with impairments – be they emotional, cognitive, or whatever – learn to cope with those problems in part by "masking" them, whether consciously or unconsciously. This phenomenon, and its implications for developing the case in mitigation, has been discussed at every capital case seminar I have ever attended. No reasonable attorney, faced with the allegations in this case, would take the client's words at face value, or assume that because the client had no visible "tics" it was unnecessary to explore the possibility of mental health mitigation such as neuropsychological impairment. Nothing that we as lawyers learn in our own professional training qualifies us to make those kinds of judgments. That is precisely why 21 U.S.C. § 848 guarantees that appropriately qualified expert assistance of any reasonably necessary sort will be available to counsel when the stakes are highest, *i.e.,* when the client faces execution if convicted. Even if our clients look perfectly "normal;" their past behavior (as in this case) may depart strikingly from the norm. The prevailing standard of practice in 1994-1995 obliged counsel to attempt to explain such departures from normal behavior, where possible, by reference to the client's unique human frailties, which might not be obvious to the untrained eye. Even relatively minor departures from the "normal," properly documented, can persuade jurors that life imprisonment without the possibility of release is the appropriate sentence.

20. Mr. Ware's affidavit suggests that he likewise took Mr. Hall's written responses on the "client background information" form, apparently given to Mr. Hall by prior counsel Mr. Daniel, as not indicating any particular need for inquiry or further development of facts about Mr. Hall's background. Given the nature of Mr. Hall's responses, that was not an objectively reasonable judgment. The answers are semi-literate; they show a lack of

(218)

[43]

academic achievement and a poverty of expression that should have alerted counsel that everything was not "normal" with Mr. Hall. A reasonable attorney reviewing Mr. Hall's answers to the items on the form would have recognized immediately that he would face serious problems communicating with Mr. Hall about complex ideas, including not just the events of the crime but the nature of Mr. Hall's emotional responses to the other people and experiences in his life. To my mind, it is inconceivable that a reasonably effective lawyer in a capital case in 1994-1995 would have viewed Mr. Hall's responses as suggesting that no further inquiry into all the important areas covered by the form was called for. On the contrary: Mr. Hall's responses should have sent up warning signals; they dictated a thorough investigation, assisted by appropriately qualified experts.

21. Mr. Ware's affidavit states that he and his co-counsel wanted to obtain funds for a jury consultant in hopes of "get[ting] at least one person, preferably more than one person, on the jury who was highly unlikely to vote for a death sentence under any circumstances, but who might not come across as the sort of person who would be an obvious defense juror or an obvious strike by the government." It is true that a closet abolitionist can sometimes make it onto a capital jury notwithstanding the fact that "death-qualification" almost always targets them for removal by the court or the prosecution. The generally accepted view among attorneys regularly defending death penalty cases, however, is that defense counsel's most important task at *voir dire* is not to find a "closet abolitionist," but to take advantage of the core concept of juror sovereignty that underlies the federal death penalty statute.

22. As I explained in my earlier declaration, the federal death penalty statute gives wide latitude in formulating and presenting mitigating factors. Its breadth is given power by

the concept of juror sovereignty; each juror, in the exercise of that right, may give any mitigating factor as much weight as that juror wishes. Therefore, trial counsel's task was to take maximum advantage of this statute by conducting a *voir dire* designed to educate each prospective juror about her individual duty to consider mitigation in determining sentence, no matter how highly aggravated the crime, and her individual power to assign that evidence as much mitigating weight as she saw fit.

23. Such a *voir dire* must also aim to ensure, to the greatest extent possible, that jurors will be "open" to considering the mitigating circumstances counsel actually expects to present and argue if the case reaches a penalty phase. That goal cannot be intelligently pursued unless counsel has already substantially completed, by the beginning of *voir dire*, the investigation into, and development of, the mitigating evidence to be presented. The early and effective use of a person specially skilled and trained in the development of mitigating evidence, by whatever name, is essential. Given Mr. Ware's admission that he only began to investigate potential mitigating circumstances in Mr. Hall's background starting in mid-September, 1995 ("46 days before the Government began its punishment phase presentation"), it appears highly unlikely that counsel's jury selection strategy could have been informed by the results of their mitigation investigation, as required by the prevailing national standard of practice for defending capital cases in 1995.

24. Mr. Ware states that, prior to Mr. Hall's case, he had not used "mitigation specialists" for purposes of investigating matters relevant to the sentencing phase, and notes that he obtained a life verdict in a 2000 capital case in state court without the assistance of a "mitigation specialist." I wish to be clear on this point: I am not saying that the defense team in every capital case must include a person who identifies her profession as

V45

"mitigation specialist." As I stated above, the label is unimportant; the *function*, however, is indispensable. The defense team in every capital case must include some person or persons who are specially skilled and appropriately trained and qualified to seek out and obtain comprehensive information regarding the client's background and character and all the circumstances of the offense which may constitute part of a compelling case for sparing his life. That does not appear to have been the case here until Mr. Ware obtained the services of Tena Francis just six weeks before the beginning of the punishment phase.

25. Mr. Ware states that in other capital cases, he has used "professionals such as licensed private investigators, psychiatrists, psychologists, [and] paralegals," as well as his own efforts, to investigate and develop potential mitigating factors. If in those cases some of those persons had the special training and skills to perform the function I have described, then in my view counsel's performance with respect to this issue in those cases may have been consistent with the prevailing standard of practice. In this case, however, counsel's licensed private investigator, Danny LaRue, has signed a sworn declaration indicating that his "work on the Hall case did not involve investigating Mr. Hall's family background or social history," and that he was "not responsible for developing mitigating evidence and never interviewed any members of Mr. Hall's family." It is my understanding that neither the psychiatrist nor the psychologist associated with the defense team had any active role in developing potential mitigating evidence by building relationships with potential witnesses through repeated contacts and interviews, in the manner required by the prevailing standard of practice in order to maximize the likelihood that all relevant information will be disclosed in time to put it to use in court.

221
√46]

Simply put, what was unreasonable about counsel's performance was not that he failed to add a self-described "mitigation specialist" to the defense team until the eve of trial, but that *no one* on the defense team was doing the necessary investigation.

26. It is my understanding that the defense secured the services of neuropsychologist Randy Price, Ph.D., for the purposes of evaluating Mr. Hall in advance of trial. Mr. Ware states that he "spoke with Dr. Price by telephone on several occasions" and sent him, in August 1995, some documents regarding the case (including the offense report of the Arlington Police Department, Mr. Hall's confession, records concerning Mr. Hall's prior incarceration, and FBI-302's). Mr. Ware further states that "the first [he] heard that [Dr. Price] had decided against working on the case was when Kevin McNally ... called him from my office and concluded that [he] had gotten cold feet." Mr. Ware does not recount that he spoke directly to Dr. Price; instead, he states that he "took Dr. Price's actions as a strong indication that he believed that he would not be able to truthfully testify [favorably] to the defense," an assumption shared by co-counsel Mr. Kearney.

27. I have been studying and using mental health evidence, and the insights of qualified experts, throughout my legal career, since my law school work with Dr. Bernard Diamond, a leading figure in forensic psychiatry. It is objectively unreasonable to "retain" an expert, send him or her a few papers, and then wait for a response. Counsel must meet the expert, and then quickly arrange for him or her to visit the client and spend a lot of time in diagnosis. In my experience, the expert's initial contact with the client inevitably suggests the need for further interviews of family members and friends, and perhaps others, and this process will also take a great deal of lawyer and investigator time.

222

47

28. With this standard in mind, it is evident that trial counsel performed deficiently in regard to Dr. Price. Mr. Ware does not dispute Kevin McNally's recollection that his phone conversation with Dr. Price took place "around the time jury selection began, on October 2, 1995." If that is correct, Mr. Ware failed to maintain appropriately regular and substantial contact with Dr. Price prior to the eve of trial. Had he done so, he would have learned earlier that, for whatever reason, Dr. Price had not moved ahead on the work counsel were relying on him to perform.

29. My book *Examining Witnesses* cautions trial lawyers against failing to monitor the performance of their experts; at one CLE program described therein, an expert in attendance "pleaded with the lawyers to treat their witnesses with consideration," pointing out that too often experts are "ignored while cases [are] prepared and then [asked] to drop everything to prepare to testify." The prevailing standard of practice obliged Mr. Hall's trial counsel to integrate expertise into their trial plan from the beginning of the representation. That challenge that could not be met without regular and substantial interaction with experts like Dr. Price. Counsel had a duty to make sure their expert was fully and continuously informed of the results of ongoing investigation, and to involve the expert, where appropriate, in the fine-tuning of the defense theory and trial preparation. This is the only way to ensure that the defense effort benefits from the expert's specialized knowledge, and has the added advantage of increasing the expert's credibility in front of the jury if counsel chooses to present her as a testifying witness. The more substantial and extensive the expert's contact with the client, the likelier the jury will take seriously the expert's conclusions about the client's condition. Moreover, my own experience as a trial lawyer confirms that an expert who is fully and

223

148

continuously involved in the preparation of the defense can lead trial counsel to discover lay witnesses whose credibility with the jury exceeds even the expert's own.

30. If Dr. Price never performed the contemplated neuropsychological evaluation of Mr. Hall, trial counsel should have known that fact long before October 2, 1995. If trial counsel assumed that Dr. Price's reluctance to participate had any bearing on the question of whether another appropriately qualified expert who *had* actually evaluated Mr. Hall might be able to provide truthful, supportive testimony to the defense, that assumption was objectively unreasonable on the facts of this case. A reasonably effective lawyer would have maintained sufficient contact with Dr. Price to discover his "cold feet" early enough to secure the assistance of another qualified expert.

31. Mr. Ware disputes the statement by Tena Francis that, prior to her entry into the case, Mr. Ware had conducted "no meaningful investigation" into mitigating circumstances. He identifies a number of tasks which he had performed, including but not limited to reviewing grand jury testimony, inspecting the physical evidence, reviewing the reports of testing on that evidence by Government experts, reviewing the crime scene photographs, reviewing the autopsy report and photographs, consulting with a forensic pathologist for the defense, reviewing the transcripts of the detention hearings for all the defendants, and interviewing and examining in court the officials and law officers involved in Mr. Hall's arrest, waivers, and statements.

32. Every task identified by Mr. Ware in his response to Ms. Francis's characterization is necessary for the preparation of the defense in a capital case, and there can be no doubt that trial counsel were under a professional duty to complete them. At the same time, measured against counsel's equally weighty duty to prepare for the punishment phase and

(224)

(49)

in light of the ready availability of expert and other assistance under 21 U.S.C. § 848, Mr. Ware's response appears to miss the point. Many of the tasks Mr. Ware identifies simply bear no relation to the investigation and development of mitigation evidence. In my original declaration, I expressed the opinion that, in light of the prevailing standard of practice, counsel did not ensure the timely completion of their mitigation investigation. Mr. Ware's catalogue of other essential tasks he had performed before Ms. Francis entered the case does not alter my opinion that trial counsel, given the extraordinary demands of defending a capital case, were obliged by the Sixth Amendment to start sooner and proceed more diligently in this regard. As illustrated by the life verdicts in federal capital cases since 1994, counsel must create the longest possible list of mitigating factors, each one based on evidence, for the jury to consider.

33. There is yet another reason why early and intense investigation, multiplying mitigating factors, is necessary. It is objectively unreasonable to have a defense strategy focused exclusively on getting a few jurors who will vote against death. Capital cases, particularly those arising under the federal statutes, are subjected to intense judicial review on appeal and in the post-conviction process. The existence of a strong waiver doctrine obliges trial counsel to raise and preserve every colorable issue for post-trial scrutiny in the event of a death verdict. This includes issues relating to adequate funding, in the event the trial court denied resources which were reasonably necessary to an effective defense, as well as the obligation to "multiply" (both quantitatively and qualitatively) the mitigating factors at trial in order to increase the likelihood of a reversal if legal error was thereafter found to have occurred in the punishment phase.

34. Mr. Ware dismisses the potential *Skipper* evidence that could have been presented on Mr.

Hall's behalf, stating that (1) his experience with respect to "future dangerousness" issues "in general" has been that jurors care more about the possibility of release than the defendant's behavior in custody; (2) he was concerned that any witness called to illuminate Mr. Hall's prior records would have to concede the "damaging fact" that in those prior incarcerations, Mr. Hall had an incentive to behave well (*i.e.*, the chance at parole or early relase) which would be absent if he were sentenced to life imprisonment without the possibility of release, because he would have "nothing to lose;" and (3) that they had "some information" Mr. Hall had "continued to run his drug business from the Arkansas penitentiary."

35. In my view, on the specific facts of this case, counsel's claimed justifications for this decision were objectively unreasonable. The most important fact in this regard is that counsel already knew that the Government was going to present testimony that Mr. Hall had schemed to escape from custody while awaiting trial, that he had manufactured deadly weapons in jail and been willing to threaten to injure or kill his own lawyers and/or the trial judge to accomplish his flight. The presentation of this evidence was not some hypothetical possibility: this evidence was going before the jury; indeed, the existence of the "escape plot" was the entire reason that Mr. Ware and Mr. Kearney were in the case at all.

36. I am informed that trial counsel took certain steps which appear to have been calculated to rebut the Government's "escape plot" allegation. For example, counsel directed Tena Francis to locate and interview other prisoners from the same "tank" who might have challenged the Government's claim (such as Alonzo Airy). In addition, notwithstanding Mr. Ware's implication that trial counsel attached no significance to evidence of Mr.

(226)

[SI]

Hall's good behavior in custody, the defense questioned witness Gary Cardinale (whom they called primarily to describe the layout of the Mansfield jail and the access other inmates enjoyed to the areas where the weapons ascribed to Mr. Hall were found) about Mr. Hall's good behavior as an inmate. These actions are consistent with the recognition that the "escape plot" allegation could be pivotally important in the jury's choice between death and life imprisonment for Mr. Hall, and that *Skipper* evidence could sway them toward the latter. In my view, under such circumstances no reasonable lawyer could decline to investigate and present the other powerful *Skipper* evidence readily available on Mr. Hall's behalf.

37. Mr. Ware defends trial counsel's decision not to deliver a closing argument at the guilt phase on the basis that doing so would have presented the Government with an opportunity to make a ringing argument in rebuttal. In my view, this judgment was inconsistent with the prevailing standard of defense practice at the time of Mr. Hall's trial. Experienced defense counsel expect to have the Government land a few blows in rebuttal, but that is not an expectation around which a reasonable defense attorney builds a strategy, especially in a capital case. The fact that the Government will speak last means that defense counsel must anticipate that fact and talk to the jury about it. In other words, the order of argument may shape the form of defense counsel's closing argument, but it hardly dictates whether defense counsel should make a closing argument at all. I believe that trial counsel must treat jurors as taking their obligations and their instructions seriously, not as cattle to be stampeded by the eloquence of opposing counsel. Reasonably effective defense counsel would have appreciated the necessity of empowering the jury (or that subset of jurors whose minds are not yet set on a death

227

52

sentence) by giving them a structure within which to place the evidence and still vote for

life – and that structure needed to be in place before the punishment phase began.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _Feb 26, 2003_ (date).

_MICHAEL E. TIGAR_

(228)

(53)

## DECLARATION OF JILL MILLER

Jill Miller, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

### INTRODUCTION

1. My name is Jill Miller. I have previously provided four declarations in this case. The first was executed on April 22, 2000; the second on May 22, 2000; the third on November 13, 2000; and the fourth on June 8, 2002. I incorporate the contents of each of those declarations here by reference. A copy of my current curriculum vitae is attached to this Declaration as Appendix A and incorporated here by reference.

2. I have consulted as an expert with Orlando Hall's post-conviction counsel since March 2000. My earlier declarations in this case identify the specific tasks I have undertaken and materials I have reviewed. I have recently reviewed the Government's response to Mr. Hall's second amended petition for post-conviction relief, including the affidavits of his trial attorneys. In those affidavits, Mr. Hall's trial attorneys describe their actions in investigating and presenting the sentencing-phase case on Mr. Hall's behalf. Mr. Hall's post-conviction counsel have asked me to comment on counsels' affidavits as they relate to the nature and scope of the social history investigation required in a capital case by the prevailing national standard of practice in 1994-1995.

3. Mr. Ware suggests he placed great reliance on the "client background information" form appended to his affidavit, and that decisions regarding potentially mitigating circumstances to investigate were based on Mr. Hall's written responses to this form. If that is correct, counsel's performance fell below the nationally prevailing standard of practice for defending capital cases in 1994-1995, for at least two reasons.

4. First and foremost, according to the generally accepted view of appropriately qualified specialists in capital defense in 1994-1995 (both attorneys and non-attorneys), it was (and remains) unacceptable to rely on such a form as the primary means for obtaining sensitive and personal information from the client because of the likelihood that the client will be unable to fully disclose all relevant information by filling in answers to such a list of questions. This unanimous view, which I describe in greater detail below, is reflected in all specialized capital defense training materials, etc., from the same period. Second, Mr.

229

22

Hall's responses on the "client background information" form itself – despite the fact that the form was plainly not intended for use in the manner in which counsel employed it here -- should have alerted counsel to the need for further investigation.

5. By 1995, it was universally accepted by professionals in the field of capital defense that the process of obtaining sensitive personal information from the client – and almost all the circumstances which can help account for a client's involvement in a violent crime fall into the category of "sensitive information" – has to begin with the creation of a *relationship of trust* between the client and the members of the defense team who will be probing for such information. In the absence of such trust, which almost never arises spontaneously, attempts to elicit such information are unlikely to overcome the client's resistance to the disclosure of sensitive information – a resistance which may have become ingrained through years of trauma and its attendant feelings of shame, guilt, and pain. In addition, it was understood by 1995 that the existence of a trusting relationship between the client and counsel is essential to help the client deal with the emotional turbulence that often accompanies bringing to the surface and disclosing memories of long-buried experiences.

6. The client's difficulty talking about traumatic life events, which is a predicable consequence of the psychodynamics of such experiences, must be distinguished from willful non-cooperation or misrepresentation. A client may fail to disclose an important fact for any of a number of different reasons, *e.g.*, he may lack knowledge of the fact, he may have no context for describing it, he may find it painful to admit, etc. It is to be expected that one will meet initial resistance in attempting to obtain sensitive information from a client about matters which might put the client in a "bad light." Simply put, people try to present themselves in the best light possible. They tend to conceal or minimize past experiences that were painful, awkward, embarrassing, shameful, or socially disapproved. In addition, it was understood by 1995 that the experience of describing traumatic life events can *itself* be damaging to the client and to the prospects for full disclosure if not pursued with careful application of specialized techniques for reducing the trauma that may result from "re-living" the events through telling about them. It does not appear that Mr. Hall's trial counsel possessed specialized training and experience of this type.

7. By 1995, the prevailing national standard for defending capital cases demanded that counsel be aware of these fundamental principles of

(230)

[23]

human behavior and allocate time and effort in the preparation of the defense accordingly, by undertaking to build (or to have another member of the defense team build) a trusting relationship with the client from the very earliest point in the case possible. I have been advised that Mr. Ware's affidavit and his time records together indicate that he met in person with Mr. Hall for 30 minutes ("0.50" hours) on March 21, 1995, and did not meet with him again in person until June 6, 1995 (when they apparently met for 2.5 hours). I have been further advised that it does not appear that any other person from the defense team had in-person contact with Mr. Hall during this two-and-a-half-month interval, despite the fact that trial was looming in the fall of the same year. I have been further advised that from Mr. Ware's time records, it appears that neither he nor any other member of the defense team met with Mr. Hall again (following this June, 1995 meeting) until August 29-31, when he met with him for a total of 6 hours over three days immediately prior to the September 1, 1995 suppression hearing regarding Mr. Hall's written confession. If this information is correct, it appears that, prior to securing Tena Francis's assistance for purposes of investigating mitigation, Mr. Ware met with Mr. Hall for a total of nine hours over a period of five months and ten days. Without in-person meetings with the client, it is nearly impossible in my experience to develop the kind of trusting relationship that facilitates meaningful disclosure of sensitive information. Regardless of how superficially pleasant those early, brief interactions between Mr. Ware and Mr. Hall may have been, if it is correct that members of the defense team visited Mr. Hall for a total of nine hours over a period of nearly half a year, that constituted a failure to maintain in-person contact with the client which fell below the prevailing national standard of practice for defending capital cases in 1995.

8. Mr. Hall's trial attorneys appear to have assumed that they would easily elicit information by asking a few questions, and that Mr. Hall would volunteer any sensitive personal information which might be important to the preparation of his penalty-phase defense. In the absence of a firmly established relationship of trust, however, simply repeating the request for highly personal information does not increase the likelihood of meaningful disclosures by the client. Mr. Ware states that when he and mitigation investigator Tena Francis first spoke to Mr. Hall together, only six weeks before the beginning of the penalty phase, Mr. Hall did not "say anything extraordinary, or reveal anything extraordinary or new about his family background ...." Counsel's expectation that the client might volunteer something "extraordinary ... about his family background" to a person with whom he has not

231

24

developed a trusting relationship reveals a profound failure to appreciate the interpersonal dynamics of such relationships. Such a lack of understanding on counsel's part is inconsistent with the prevailing national standard of practice in defending capital cases both in 1995 and today.

9. Mr. Ware's emphasis on the fact that he did not "notice anything unusual" about Mr. Hall, and did not "pick up on" any mistrust, hostility, or emotional problems during their interactions, suggests a basic misunderstanding on Mr. Ware's part. Clients learn to "mask" their disabilities, both cognitive and emotional, as a part of surviving in the world. No one with appropriate training or experience in 1995 would have expected counsel to "pick up on" such disabilities through visual cues alone, or even through brief casual interactions. Mr. Ware's statement that he sensed no "mistrust" or "hostility" on Mr. Hall's part suggests that he would expect Mr. Hall to be consciously aware of his own resistance to talking about the painful details of his personal history. In fact, such reluctance is often so reflexive that it would not manifest itself as overt "mistrust" or "hostility" at all.

10. In much the same manner, Mr. Ware's statement that the members of Mr. Hall's family did not act as if they would "withhold important information" suggests the same mistaken expectation. The prospective witnesses are not consciously "withholding" the information, but are simply not capable of disclosing it because counsel has not built a relationship of trust which would permit such disclosures.

11. The foregoing observations about the predictable difficulty in obtaining sensitive information from the client apply as well to other prospective mitigation witnesses, to the extent that they have experienced the same (or the same type of) traumas as the client. In 1995, reasonably effective counsel would have understood that it was necessary to spend extensive time with, e.g., Mr. Hall's mother Betty and his sisters Cassandra or Pam, in order to obtain detailed information about the family, and to prepare them to share those painful details in their testimony at trial. In light of this fact, counsel's delay in securing the assistance of a mitigation investigator until "46 days before" the beginning of the penalty phase effectively doomed their efforts to failure. My own experience interviewing family members in this case demonstrates that if counsel had started work in a timely fashion, they or Tena Francis could have built a relationship with helpful witnesses – Pam Palmer, for example – who were ultimately unavailable to trial counsel because their mitigation investigation began too late.

232

25

12. My central point is that a great deal of essential mitigation investigation cannot be accomplished by simply asking questions of prospective witnesses. Instead, one must build *relationships* with potential witnesses; experience teaches that disclosures of information flow from such relationships.

13. It also appears from trial counsel's affidavit that they assumed, based on how Mr. Hall presented himself (that he "had no ticks [sic]," had a normal "appearance, demeanor, and mannerisms," "seemed intelligent," "had social skills," and "had a wit"), that he did not suffer from any cognitive deficits or impaired brain function. Particularly where subtle neuropsychological impairments are concerned, however, a reliable determination of the client's condition can only be made by a qualified expert, after taking a thorough history and administering appropriate tests. Trial counsel's claim that nothing about Mr. Hall suggested the possibility of such impairments strongly suggests that they lacked the specialized training and expertise necessary to recognize markers which indicate the possibility of neuropsychological problems and call for an evaluation. Such markers – including, but not limited to, substandard academic achievement, indicia of cognitive problems, and a history of head trauma – were present in Mr. Hall's case and, under the prevailing national standard of practice for capital defense in 1995, should have prompted counsel to obtain a neuropsychological evaluation of their client. Trial counsels' comments further suggest that they failed to appreciate the potential mitigating value of neuropsychological impairment in explaining the events of the client's life even if the degree of the client's impairment is not manifestly obvious to the casual observer.

14. As I indicated above, even if one concludes, contrary to the prevailing national standard of capital defense practice in 1994-1995, that it was reasonable for trial counsel to rely primarily on Mr. Hall's written responses on an "information form" to guide and structure their investigation into potential mitigating circumstances, counsel both used the form inappropriately and then compounded that error by ignoring responses from Mr. Hall which should have prompted further inquiry.

15. It should have been evident to trial counsel that the "client background information" form appended to Mr. Ware's affidavit was not intended to be completed by the client himself. For one thing, it consistently uses the word "client" in the third person ("Has *the client* ever received medication for a mental illness or disorder?"), rather than addressing

itself to the person completing it (*e.g.,* "Have *you* ever received medication ..."). In addition, numerous items on the form employ specialized vocabulary drawn from fields such as social work, human services, and mental health. For example, the following terms appear in various questions: "toxemia;" "jaundice;" "early developmental tasks;" "culture-appropriate discipline;" "aberrant sexual modeling;" "sexual reactions (voluntary or coerced);" "manipulation of parental authority to the benefit or detriment of other siblings;" "proceedings were instituted;" "neuropsychological;" "Magnetic Resonance Imagery;" "deemed incompetent;" "underemployed;" "avocational pursuits;" "ingested;" "perceptual experiences and self-perceptions;" "olfactory;" "déjà vu;" "macropsia;" "micropsia;" "persecution;" "grandiose;" "paranoid;" "incurred;" and "dysfunction." The use of this specialized vocabulary demonstrates that this form was never intended for use by a client in "self-reporting" the facts about his background. More important, anyone who has had more than casual contact with Mr. Hall would not expect him to understand most, if not all, of these terms.

16. The form also employs "loaded" language which reduces the likelihood of obtaining accurate and detailed responses about intimate matters that the client might be reluctant to disclose, or which suggests a "socially acceptable" answer. For example, Item 9 asks whether there was "adequate food in the house." This phrase ("adequate food") is a conclusion that can only be drawn from underlying real data – *i.e.*, what foods did the client eat? How often each day? Were there any times when the client skipped meals? Why? Only by obtaining the answers to such *factual* questions can one draw an inference about the "adequacy" of the client's diet as a child. In fact, investigation has revealed that during some periods of Mr. Hall's childhood, potatoes were all the children had to eat. No one would characterize that diet as "adequate." Yet, asking Mr. Hall whether there was "adequate food" in the house invited a "yes" response, because most people – even those who have suffered real material privation as children – want to characterize their own background as "normal." In much the same fashion, asking whether the client has "*suffered* mental illness or disorder" (Item 29) highlights the negative associations with such conditions. To any appropriately qualified expert in 1995, the use of such language would have been a clear indication that the form was inappropriate for the client to complete on his own.

17. In its use of such "loaded" language, the form actually recalls trial counsel's direct examination, at the penalty phase of Mr. Hall's trial, of Mr. Hall's mother Betty and his sister Cassandra Ross. Questioning

234

√27

Betty Hall, trial counsel repeatedly characterized the treatment Mrs. Hall experienced at the hands of her ex-husband A.J. as "abuse" or "abusive" ("[D]id A.J. Hall ... become physically abusive towards you?" "[A]t what point ... did he become ... physically abusive towards you?" "Did he begin to become abusive ...?" "[T]his was still going on, this physical abuse?" "Can you give the jury an example of the kinds of physical abuse that was [sic] going on?" "[D]id the physical abuse by your ex-husband ... continue?" "As Orlando got older, did he try to do something about it, the physical abuse?"). He used the same language in examining Cassandra Ross ("[D]o you have any memories of physical abuse that your father perpetrated on your mother?" "[H]ow old [were you] when you remember this physical abuse ...?" "What do you remember about the physical abuse that your father perpetrated on your mother?"). The use of these questions before the jury at least suggests that trial counsel may have used the same kind of characterizations in interviewing the witnesses and preparing them to testify; if so, counsel fell below the prevailing national standards for defending capital cases in 1995.

18. The same principle can help explain why trial counsel failed to obtain full and accurate information from, *e.g.*, the Hall children concerning whether they were subjected to excessive physical pain in the guise of "discipline." If counsel used the term "abuse" in asking the children about how their parents treated them, that term likely interfered with the process of obtaining full disclosure. Because such treatment (described in my earlier declaration) was all the Hall children knew, they understandably saw it as normal punishment, not "abuse." The tendency to regard one's own childhood experience as "normal" is understandable, and is, in itself, a normal response with which professionals who work regularly with victims of family violence are familiar. It means, however, that the dynamics and effects of family violence cannot be uncovered simply by asking someone if she was "abused." Instead, one must inquire about the specific methods of discipline employed within the family, and the circumstances surrounding discipline. The statements in trial counsel's affidavit reflect a failure to grasp this basic principle of social history investigation and witness preparation in a capital sentencing hearing.

19. The form also presumes detailed knowledge by the client of events associated with the client's birth and infancy, which there is no reason to assume the client would possess. For example, Item 1 inquires about "known complications" with the mother's pregnancy, and Item 2 about "complications at birth." While some people may become aware of such

235

28

circumstances (concerning their own births) later in life, many do not. In 1995, it was well-understood among professionals defending capital cases that information about the client's birth and early childhood could only be obtained reliably from people (*e.g.*, the client's mother) who would have been old enough to remember those events, and from contemporaneous documentary sources (*e.g.*, hospital records). Similarly, Item 3 asks whether the client had "[a]ny perceived difficulty in achieving early developmental tasks." The phrasing begs the question, "perceived by whom?" The client himself may well not have "perceived" any difficulty in achieving such tasks (if indeed he has any idea what they are), but the whole point of the inquiry is that the client himself is in no position to compare his developmental progress with that of other children; the client's own answer to such a question is meaningless.

20. For all these reasons, it is evident that the "client background information" form is a template for a mitigation specialist or investigator – not a "self-reporting" instrument to be given to the client for him to complete. Any attorney or non-attorney expert with appropriate training and experience would have recognized it as such in 1995, and would not have used the form or relied upon it in the manner in which Mr. Hall's attorneys apparently did.

21. More important, Mr. Hall's responses to the items on the "client background information" form themselves would have prompted reasonably competent counsel in 1994-1995 to conduct further investigation.

22. Mr. Hall misspelled many simple words in his responses, confirming that his reading and comprehension skills were not only unequal to the task of understanding the form's complex specialized vocabulary, but substantially below normal. Equally important, his non-responsive answers to certain questions suggest he did not understand the point of the question. To take one minor example, Mr. Hall did not follow the instructions on some items (*e.g.*, he failed to provide ages and addresses for family members as directed by Item 5). More significant, his answers to other questions were incomplete or even, standing alone, incoherent. For example, responding to directions to "describe how these [physical] conditions [of the Hall family home] compared to the conditions under which neighbors and/or nearby relatives lived," he simply listed items -- "two car, dog, fenched [sic] yard, TV, Radio." These non-responsive answers make one wonder what Mr. Ware means by his assertion that Mr. Hall "confirmed the accuracy of the interview

236

f 79]

questionnaire" in an in-person interview, and call into question how carefully counsel reviewed Mr. Hall's responses.

23. Other examples similarly suggest that Mr. Hall did not or could not provide full and detailed information in response to items on the form. For example, Item 12(d) seeks any examples of the "infliction of physical harm ... that was apparently *not* associated with culture-appropriate discipline" (emphasis added). In other words, this item asks whether there was *in*appropriate physical harm inflicted on the children in the family in the guise of "discipline." If Mr. Hall understood the form, and if (as Mr. Ware appears to contend) there were no such problems in the household, one would expect Mr. Hall not to have made any entry at all. Thus, either Mr. Hall meant to indicate that the "whippings" he got (this part of the form is faint and hard to read) were inappropriately excessive, or he did not understand the question being asked. Either interpretation would demand further investigation, under the prevailing national standard of practice for capital defense in 1994-1995.

24. Item 21(d) asks whether the client "demonstrate[d] any behavioral difficulties" in school. Mr. Hall's answer is "No," which fails to acknowledge a significant fact -- the alleged robbery Mr. Hall committed *at school* at age 14. His response to Item 22(a), "was the client ever charged as a juvenile?," likewise omits reference to this incident. To Item 21(b), which asked whether "the client progress[ed] from one grade to the next without being held back," Mr. Hall wrote, "No grades. was not up to standers." This response, on its own, is impossible to decipher (in addition to being, itself, evidence of substandard academic ability). More important, Mr. Hall's school records reflect that he was in remedial classes, such that his performance was demonstrably not "up to standards," regardless of what he meant by his answer to Item 21(b). Although counsel eventually obtained Mr. Hall's school records, they did so too late to put them to use effectively.

25. Item 25 inquires about "client's prior access to medical and mental health care," which seems to ask whether the client and/or his family had, *e.g.*, sufficient money or insurance to ensure proper health care. Mr. Hall's answer is "none," which is either an important fact for further development (the family had no access to health care, which could have significant consequences for Mr. Hall's development) or reflects his inability to understand the question. Item 37 asks whether the client was "underemployed;" Mr. Hall's answer is non-responsive as

DECLARATION OF JILL MILLER -- 9

(237)

(30)

well as awkwardly worded ("Yes I word for the St. Paul AME church were I got a job to be released on parole"). Mr. Hall's answers to Items 41 and 42 are contradictory; he states he has never "ingested quantities of alcohol or drugs in such a way as to suggest substance abuse," but then acknowledges that he was "treated for alcohol or drug abuse" in prison.

26. Throughout the form, Mr. Hall misspells even basic words. For example: "Man'sfield" for "Mansfield;" "famaly" for "family;" "promblem's" for "problems;" "dirvoce" for "divorce;" "fenched" for "fenced," "two car" for "two cars;" "Congra" for "ConAgra;" "conspircy" for "conspiracy;" "cocain" for "cocaine;" "sell" for "selling;" "behavier" for "behavior;" "alway's" for "always;" "togeather" for "together;" "thing's" for "things;" "becouse" for "because;" "with out" for "without;" "standers" for "standards;" "parent's" for "parents;" "their" for "there;" "every one" for "everyone;" "neighorhood" for "neighborhood;" "mean" for "means;" "Roger's" for "Rogers;" "other's" for "others;" "prsion" for "prison;" "day's" for "days;" "word" for "worked;" "were" for "where." His answers also reflect poor grammar ("My sister Pam, ran the house when my parent's was not their"). Counsel should have recognized these errors as evidence warranting further inquiry to determine whether Mr. Hall suffered from neuropsychological impairment, cognitive impairment, or the like. The same data should have alerted counsel in 1995 that their client might suffer from an undiagnosed learning disability, which could have had significantly harmful psychological, social and emotional consequences (including effects on judgment and decision-making, particularly under stress). In addition, Mr. Hall's notation in response to Item 4(e) that he walked as early as "10 months," if true, is a marker for Attention Deficit Disorder (ADD).

27. Further, Mr. Hall's frequent misspellings of short, familiar words and his struggle to express simple thoughts clearly and grammatically belie the view that Mr. Hall did poorly in school only because he was not motivated to succeed. In much the same fashion, Mr. Hall's response to Item 21(f) that the highest "level of school [he] completed" was "11th or 10th" indicated the need for further inquiry, because it reflected a lack of academic achievement which can be a marker for other disabilities.

28. In addition, despite counsel's characterization of Mr. Hall's responses as indicating no areas for investigation, Mr. Hall acknowledged in answering Item 6 that the family had its "promblems" but that they were happy "*until* my parent's got a dirvoce" (emphasis added); competent

238

defense counsel in 1995 would have recognized both those answers as calling for further development.

29. One key deficiency of the "client background information" form is that it fails to ask about good character evidence – acts of kindness, religious devotion, love for one's family, etc. – which exists in almost every case and is essential to show the jury that the client is not just a bundle of impairments with no positive human qualities. By relying almost exclusively on the form, trial counsel missed the opportunity to discover these important facts about Mr. Hall. Mr. Hall's answers, even though incomplete, point toward the existence of this type of mitigating evidence; an adequate investigation would have identified witnesses who would confirm Mr. Hall's description of himself as a "family man" who tried to "make sure that those around me [did] not go with out," and "spen[t] a lot of time with [his] kidds [sic]." Indeed, Vada Smith could have testified that Mr. Hall risked injury to save his nephew Syroid from drowning, a fact of great significance and of which trial counsel, apparently, was completely unaware.

30. Although Mr. Ware describes the testimony of Betty Hall as powerful and effective, in my view trial counsel's presentation of this part of the case fell below the prevailing national standard of practice for defending capital cases in 1994-1995. Defense counsel should have recognized that it was not enough simply to tell the jury that the client had experienced trauma in childhood and adolescence, whether as a target of abuse or a witness to the abuse of another. It was widely understood by the time of Mr. Hall's trial that jurors need assistance in appreciating how those traumatic experiences distort the client's development and maturation, and that counsel could not rely on the jury to understand on its own how the client's traumatic experience might affect his moral culpability in a way relevant to the appropriate punishment for the crime. As a result, the testimony of an appropriately qualified expert was essential to the effective presentation of such evidence. This is particularly true where, as here, much of the client's traumatic experience involved being a witness to the abuse of another person. It was unreasonable for counsel to expect the jurors in this case intuitively to grasp why that experience was traumatic to Mr. Hall and his siblings as well as to their mother Betty, the immediate target of A.J.'s abuse.

31. In sum, nothing in trial counsel's affidavit changes my original opinion in this case that six weeks – the time between mid-September, when counsel first got their mitigation investigator on the case, and the start of the penalty phase on November 1 – was simply not enough time to

239

complete a minimally adequate social history investigation in this case, even if counsel's mitigation specialist could have devoted her time exclusively to that goal. Equally important, six weeks was not enough time, even if the mitigation investigation had somehow been completed in the interim, for the results of that investigation to be put to use by the defense's experts to produce competent and valid mental health assessments of the client. Because the building of trust relationships with the client and prospective family witnesses is a prerequisite to obtaining full disclosure of sensitive information, counsel's delay in undertaking this essential process left them at the mercy of the clock, which ran out before they could have any chance of presenting the richly detailed life story Mr. Hall's post-conviction counsel have developed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on Feb. 18, 2003 (date).

_____
JILL MILLER

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

NO. 04-70050

---

ORLANDO CORDIA HALL,
Defendant-Appellant

VERSUS

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

---

**CERTIFICATE OF SERVICE**

---

This certifies that a true and correct copy of the foregoing motion has been

served on counsel for the Government by placing the same into the United States

Mail, first-class postage prepaid, addressed to:

AUSA Delonia Watson
Office of the U.S. Attorney
801 Cherry Street, Suite 1700
Fort Worth, TX 76102

this 17th day of June, 2005

Marcia A. Widder