UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA, )
*Plaintiff-Appellee* )
)
)
v. ) NO. 04-70050
)
ORLANDO CORDIA HALL, )
*Defendant-Appellant* )

## APPLICATION FOR CERTIFICATE OF APPEALABILITY ("COA")

Orlando Cordia Hall ("Hall") moves this Court to issue a COA to address (1)

whether the District Court erred in:

a. limiting the evidentiary hearing solely to Hall's juror misconduct claims;

b. denying all discovery;

c. denying reasonably necessary funds;

d. denying each claim on the merits; and

(2) whether on remand, assignment of a new judge is necessary.

## JURISDICTION

The District Court entered judgment on 8/24/04, denying Hall's timely Rule

59(e) motion on 9/13/04. R. 42:1606, 1627.[1] Hall noticed his appeal on 11/9/04. R.

---

[1] Citation forms:

Record on Appeal: "R. [Vol. #]:[Page #]"

Record Excerpts: "R.E. [page #].

Exhibits to Hall's Second Amended 2255 Motion: "2255 Exh. [page #]"

Exhibits to Hall' Reply: "Reply Exh. [page #]."

42:1631-32. Jurisdiction lies under 28 U.S.C. §§ 1291 and 2253, and 18 U.S.C. § 3595.

## STATEMENT OF THE CASE

On October 31, 1995, Hall was convicted of violating 18 U.S.C. §§ 1201(a)(1) and §2 (kidnapping resulting in death), and various noncapital charges. R. 1:37-45; 6:1332-33. Jurors heard penalty-phase evidence and argument from November 1-3, returning a death verdict on November 6. R. 6:1377-1389.[2] This Court affirmed. United States v. Hall, 152 F. 3d 381 (5th Cir. 1998).

Hall timely sought relief under 28 U.S.C. § 2255 and Fed. R. Crim. P. 33, twice amending his motion. R. 36:1-138; R. 37:453 - 38:646; R. 38:661 - 39:858.

In proceedings below, all requested discovery was denied; funds for factual development were severely curtailed. See R. 7:184; 37:349-65; 37:365-84; 37:421-22; 37:440-41; 42:1507-09. A hearing limited to Hall's juror misconduct claims (Claims III-V) was conducted. See R. 41:1408; see also 35:2-10 (transcript). All relief was denied. R.E. 67-156, 157; R. 1666.

## B.    STATEMENT OF THE FACTS

Guilt/Innocence Phase: Hall and his co-defendants kidnapped, raped and murdered Lisa Rene after her brothers stole money from them in a drug deal. See

---

[2] Co-defendant Webster, tried separately, was convicted and death-sentenced. Death was not sought against any other defendant.

2

Hall, 152 F. 3d at 389-90. The primary evidence against Hall was his statement admitting involvement in the kidnapping and murder, and the testimony of cooperating co-defendants Demetrius Hall, Beckley and Holloway.

Penalty Phase: The Government presented evidence regarding required mental state elements (18 U.S.C. § 3591(a)) and six aggravating factors.[3] Larry Nichols, its key witness who claimed to have conversed with Hall while they were incarcerated pending Hall's trial,[4] testified, *inter alia*, that Hall threatened Beckley, discussed assaulting women, and disclosed a plan to escape by taking his lawyers, a guard or the judge hostage using a "shank" or homemade knife. R. 32:215-35.[5]

Of eight defense witnesses, only two mentioned Hall's upbringing and character. R. 33:111-21; 136-42.

The jury was charged on six mitigating factors: that equally culpable co-defendants would escape death, 18 U.S.C. § 3592(a)(4); and Hall's age, acceptance of responsibility, remorse, the "circumstances surrounding [his] upbringing," and any other fact calling for a non-death sentence. The jury found the killing occurred

---

[3] The statutory factors were (1) death occurred during a kidnapping; (2) the offense was especially heinous, cruel, or depraved; (3) substantial planning and premeditation; (4) the victim was particularly vulnerable due to age. *See* 18 U.S.C. § 3592(c). The nonstatutory factors were (1) Hall's future dangerousness and (2) "the effect of [the] offense on Lisa Rene's family."

[4] The prosecution later praised Nichols' "very substantial assistance" against Hall, in giving "pivotal" testimony that "certainly aided the jury [in] returning a sentence of death." Reply Exh. 1-2.

[5] In an empty cell accessible to numerous inmates, two shanks were found; nothing linked them to Hall. R. 33:18-19, 27, 102.

during a kidnapping and was especially heinous, but expressly did *not* find that Hall "intentionally killed" Lisa Rene or intentionally inflicted serious bodily injury resulting in death. It found the nonstatutory aggravating factors of future dangerousness and the "effect" on the victim's family. *See* R. 6:1377-89.

Respecting mitigation, nine jurors found that equally culpable defendants would not receive death; the mitigating factors of Hall's age, upbringing, and "any other aspect of [his] character or background . . . " received one juror's support. No juror found acceptance of responsibility or remorse. Id.

## **STANDARD OF REVIEW**

The District Court's denial of a hearing on most claims was error unless Hall's motion, and the files and records of the case, conclusively preclude relief. United States v. Martinez, 181 F.3d 627, 628 (5th Cir. 1999).

The blanket denial of discovery is reviewed for abuse of discretion. East v. Scott, 55 F.3d 996, 1001 (5th Cir. 1995).

Rulings resolving purely legal issues and mixed fact/law questions are reviewed *de novo*. Garcia v. Dretke, 388 F.3d 496, 500 (5th Cir. 2004).

COA should issue if Hall can make a "substantial showing" of a constitutional violation in the proceedings underlying his conviction and sentence, *i.e.*, that reasonable jurists could find the District Court's rulings *debatable*. 28 U.S.C. § 2253(c)(2); Tennard v. Dretke, 542 U.S. 274 (2004); Slack v. McDaniel, 529 U.S.

4

473, 484 (2000) (same standard governs procedural rulings).

COA should be denied only if Hall's claims are "squarely foreclosed by statute, rule, or authoritative court decision, or [lack] any factual basis...." Barefoot v. Estelle, 463 U.S. 880, 894 (1983). COA's are not reserved for claims that will ultimately prevail. Miller-El v. Cockrell, 537 U.S. 322, 331 (2003); *see also, e.g.,* Reid v. Angelone, 369 F.3d 363, 369 (4th Cir. 2004) (purpose is to "winnow out frivolous appeals"). At the COA stage, this Court conducts only "a threshold inquiry into the underlying merit of [the] claims." Cardenas v. Dretke, 405 F.3d 244, 248 (5th Cir. 2005).

The Court should consider the severity and finality of Hall's sentence and resolve in his favor any doubts about granting COA. Barefoot, *supra*, 463 U.S., at 893; Ogan v. Cockrell, 297 F.3d 349, 355 (5th Cir. 2002); Miller v. Dretke, 404 F.3d 908, 913 (5th Cir. 2005).

## ARGUMENT

### I. Denial of Evidentiary Hearing

Reasonable jurists could dispute whether the District Court erred in hearing evidence only on Claims III-V (juror misconduct), because Hall's other claims could not be properly decided on a paper record.

A § 2255 motion "can be denied without a hearing only if the motion, files, and records ... conclusively show that the prisoner is entitled to no relief." United States

v. Bartholomew, 974 F.2d 39, 41 (5th Cir. 1992). To determine whether a hearing is required, a District Court must assess (1) whether the record *conclusively* negates the petitioner's factual allegations and, if not, (2) whether the petitioner would be entitled to relief if his allegations were true. Friedman v. United States, 588 F.2d 1010, 1015 (5th Cir. 1979).

The petitioner's burden to secure a hearing is "relatively light." Smith v. United States, 348 F.2d 545, 551 (6th Cir. 2003); *see also* United States v. Rodrigues, 347 F.3d 818, 824 (9th Cir. 2003) (same). "If he would be entitled to relief, then the district court must conduct a hearing to ascertain the validity of [his] factual assertions." United States v. Alanis, 88 Fed. Appx. 15, 19 (5th Cir. 2004) (Exhibit 1 hereto).

Contested factual issues in a § 2255 case may not be resolved through affidavits alone. United States v. Hughes, 635 F.2d 449, 451 (5th Cir. Unit B 1981) (quoted in United States v. McMillen, 96 Fed. Appx. 219, 221 (5th Cir. 2004) (Exhibit 2 hereto)); Alanis, 88 Fed. Appx. at 19-20 (where affidavit and trial testimony diverge, hearing is "required to determine who is telling the truth," because evidentiary conflicts on material issues cannot be resolved on affidavits) (quoting Friedman, 588 F.2d at 1015); United States v. Stokes, 112 Fed. Appx. 905, 906 (4th Cir. 2004) (Exhibit 3 hereto) (hearing required because "conflicting statements in the affidavits ... create a factual dispute" which "cannot be [resolved] on affidavits

6

alone"); <u>United States v. Arguellas</u>, 78 Fed. Appx. 984, 986-87 (5th Cir. 2003) (Exhibit 4 hereto) ("where the record does not conclusively [preclude] relief, contested issues may not be decided on affidavits alone.") (citing <u>Owens v. United States</u>, 551 F.2d 1053, 1054 (5th Cir. 1977)); <u>Koskela v. United States</u>, 235 F.3d 1148, 1149 (8th Cir. 2001) ("sharply conflicting evidence" made hearing mandatory).

Extensive evidence, including lay and expert witness declarations, supports Hall's claims, particularly his claim of ineffective assistance of counsel ("IAC claim"). The Government submitted affidavits, many of them at odds with the record, disputing some (but not all) of Hall's detailed allegations.[6]

Given Hall's colorable claims and numerous disputed issues of fact, a COA should issue regarding whether the District Court erred in denying an evidentiary hearing on Hall's other claims.[7] *See, e.g.*, <u>McMillen</u>, *supra*, 96 Fed. Appx. 219 (remanding for evidentiary hearing to address IAC claim); <u>Alanis</u>, *supra*, 888 Fed. Appx. 15 (same); <u>Arguellas</u>, *supra*, 78 Fed. Appx. 984 (same); *see also* <u>Bruce v. United States</u>, 256 F.3d 592 (7th Cir. 2001) (same).

---

[6] For instance, Hall's trial attorney, Michael Ware, claims he decided not to call Rev. D.L. Hegler as a mitigation witness based on an interview memorandum Ware received on 10/22/95, suggesting Hegler had made "damaging" statements about Hall. R. 40:1108-10. Ware's own trial notes rebut this claim. *See* R. 41:1313-17. Accepting Ware's claims without a hearing was error. *See* <u>United States v. Levy</u>, 377 F.3d 259, 265 (2nd Cir. 2004) (attorney affidavits are not "completely unbiased" because counsel accused of IAC have a strong interest in not being found ineffective).

[7] Moreover, the District Court abused its discretion in selectively considering the record and failing to draw upon the existing record to support its conclusions. <u>Pham v. United States</u>, 317 F.3d 178, 184 (2nd Cir. 2003).

## II. Blanket Denial of Discovery Was Error

Reasonable jurists could dispute the District Court's blanket denial of discovery. *See* R. 7:1662-74; 7:1684; 36:195-217; 37:341-44; 37:365-84; 41:1484-92; 42:1507-09. Discovery in a § 2255 proceeding should be authorized for "good cause," *i.e.*, "where specific allegations ... show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate [he] is entitled to relief." Bracy v. Gramley, 520 U.S. 899, 908-909 (1997). Making specific allegations warranting relief, showing why the requested information is essential to developing his claims, and demonstrating that the information is likely in the hands of the party from whom discovery is sought and cannot be otherwise obtained, establishes "good cause." Murphy v. Johnson, 205 F.3d 809, 813-814 (5th Cir. 2000); East, *supra*, 55 F.3d at 1001 (blanket denial of discovery is abuse of discretion if discovery is "indispensable to a fair, rounded, development of the material facts.").

Hall made specific factual allegations, offering many sworn statements by witnesses with personal knowledge. Further, he explained why the information sought was essential to fully developing the material facts, and that the parties from whom it was sought likely had it. COA should issue regarding the District Court's blanket denial of discovery because reasonable jurists could conclude *some* discovery was necessary in these circumstances, and because this issue is intertwined with Hall's other challenges to the denial of essential fact development.

## III. Denial of Adequate Funds to Develop Supporting Evidence

Reasonable jurists could disagree with the District Court's denial of funds to develop evidence. *See* R. 37:349-65; 37:421-22.

First, the District Court concluded that any additional evidence would be cumulative of the proof presented at trial or submitted with Hall's original § 2255 Motion. *See* R. 37:362-65. Reasonable jurists would dispute that characterization.[8] Moreover, Hall's jury never heard other available mitigating evidence which, being *unrelated to* the deprivations Hall suffered as a child, logically could not have been "cumulative" of such evidence.

Reasonable jurists could also find approximately 257.6 hours of post-conviction investigation insufficient, as other higher totals have been found "reasonably necessary." *See* R. 42:1656; *cf.* Olive v. Maas, 811 So. 2d 644 (Fla. 2002) (approving 375-hour minimum); TIME AND EXPENSE ANALYSIS OF POST-CONVICTION CAPITAL CASES IN FLORIDA (1998) (report prepared for the Florida Supreme Court and Legislature) (3,300 lawyer hours typically required for effective capital post-conviction representation). This is particularly true where, as here, the original trial was defended "on the cheap."[9]

---

[8] *See, e.g.*, Jermyn v. Horn, 266 F.3d 257, 304-308 (3rd Cir. 2001) (additional evidence, including "first-hand accounts of instances of mental and physical abuse" and corroborating documents, not "cumulative"); Collier v. Turpin, 177 F.3d 1184, 1200-1201 (11th Cir. 1999) (evidence not "cumulative" where it fleshed out the "hollow shell" of defendant's life story offered at trial).

[9] The authoritative 1998 report of the Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS

Traditional interpretations of 21 U.S.C. § 848(q) also supported additional funding. Under that statute, "reasonably necessary" expert and investigative services are those which relate to developing *colorable* claims for relief. Wright v. Angelone, 151 F.3d 151, 163 (4th Cir. 1998).[10] Hall's IAC claim is certainly "colorable."

## IV. Reasonable Jurists Could Dispute the Denial of Hall's Claims, Which Rests on Faulty Legal Analysis And Erroneous Factual Findings.

### A. IAC claim

The centerpiece of this case is Hall's penalty-phase IAC claim. Hall prevails if (1) counsels' performance was objectively unreasonable and (2) counsels' errors undermine confidence in the sentencing verdict. Wiggins v. Smith, 539 U.S. 510 (2003); Williams v. Taylor, 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668 (1984).

**Factual overview:** The deficiencies of counsels' penalty-phase presentation are highlighted by contrasting the mitigation case actually presented with the one properly performing counsel would have developed.

---

CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION ("FDPR"), found the average total cost per representation for all defense services in federal capital trials through 1997 was $269,139 (versus about $139,800 here), plus $53,143 for non-attorney compensation (versus about $25,000 here). *See* FDPR at 22. The average amount of time spent by defense counsel was 1,889 hours (409 hours in-court; 1,480 hours out-of-court), versus about 1,106 hours here (about 229 hours in-court and 877 hours out-of-court). Id. at Chart C-7.

[10] *See also, e.g.,* Cardwell v. Netherland, 971 F. Supp. 997, 1008 (E.D. Va. 1997) (without knowing the substance of expert testimony, court cannot evaluate whether its absence prejudiced the defense).

Eight defense witnesses testified. Six described bad qualities of co-defendants Webster and Beckley,[11] and Hall's lack of disciplinary problems in jail before Nichols came forward alleging that Hall planned a shank-wielding escape. Only two, Hall's mother Betty and sister Cassandra Ross, described Hall's upbringing and character.

In eleven pages of direct testimony, Betty explained that she had been divorced for about nine years, identified her children; said that her ex-husband A.J. was the father of all the children but Pamela, the oldest; and stated that she had worked at an Arkansas poultry plant for the past thirty-one years and was then a payroll supervisor. R. 33:111-112. Betty briefly attested to her ex-husband's abusive behavior, beginning about three years into their marriage and continuing until she left with the children when Hall was in his mid-teens.[12] Id. at 113-17. Hall divided his time between his parents after they separated, went to prison for drugs around age twenty, and was later paroled. Id. at 117-18. Hall had been a good father to his children. Betty described testifying against the death penalty for her own brother's killer. Id. at 119-20. Asked what she was "asking this jury to do," she said she was asking them not to take her child's life because it would not bring the victim back and was wrong.

---

[11] The direct examinations of these witnesses occupy about 25 pages; their testimony includes: Beckley's admission he raped Lisa Rene, R. 33:53-54, 60; Webster's dominant personality and violent tendencies and behavior, id. at 79-86, 92-95; and Beckley's being fired for dishonesty, id. at 106-08.

[12] Betty described her relationship with A.J. as "bad, a lot of abusive, a lot of fighting, a lot of beating;" testified that A.J. beat her with weapons; and told how anything might set him off. She also testified that the children tried unsuccessfully to intervene. Id. at 114-16.

11

The prosecutor's objection to this testimony was sustained. Id. at 121. She concluded by discussing the Bible. Id.[13]

Cassandra Ross, whose direct testimony occupies just over six pages, identified herself as Hall's older sister, briefly described A.J.'s physical abuse of Betty, the children's futile attempts to intervene, how her mother left A.J. when Hall was about fifteen and how Hall shuttled between his parents thereafter. She told how Hall lived briefly with her and her husband in Texas, but returned to Arkansas at his mother's request. She testified that Hall's four children loved him. She tried to say Hall was remorseful for Lisa Rene's death, but the Government's objection was sustained. She concluded by calling Hall a caring and a loving father, saying she was shocked to learn of his involvement in the crime, and asking the jury to sentence him to life imprisonment because he was remorseful and taking his life was just as wrong as his own actions. R. 33:136-43.[14]

Only one juror found the "circumstances surrounding [Hall's] upbringing" mitigating. R. 6:1382. This Court agreed that Hall's evidence was insubstantial and

_____

[13] On cross-examination, the government elicited that Hall's parents did their best to raise their children, ensuring they were sheltered and fed and went to school and church, that Hall had gone through the eleventh grade but quit for some reason, that Hall then worked at the poultry plant for less than a year before being arrested on drug charges and that, although A.J. beat Betty for years, he *did not* abuse the Hall children, including Orlando. R. 33:122-35. There was no re-direct.

[14] On cross, the Government elicited that the violence in her family left Cassandra especially sensitive to women being abused by men; that the Hall children were not physically abused; that her parents made sure she was fed and sheltered, went to church and school and knew right from wrong; that she did the same for Hall when he lived with her; and that she had no criminal history. R.33:142-48. The defense attempted re-direct but rested after a flurry of sustained objections. Id. at 148-50.

extensively undercut by cross-examination indicating that "Hall was not himself the object of his father's abuse and ... attended school and church and was properly housed, fed, and clothed." Hall, 152 F.3d at 413.

Had counsel undertaken a timely, comprehensive investigation into available mitigating evidence, as required by prevailing standards, jurors would have heard that Hall

- *was* himself "the object of his father's abuse;"

- suffers from neuropsychological deficits that undermine his judgment;

- has many positive personality traits and once saved his nephew's life;

- was a "model prisoner" everywhere he was ever confined; and

- originally became involved in the illegal drug economy in part because, as a teenager, he had no other way to support his younger brothers when his mother abandoned the children.

***Hall grew up in a home marked by violence directed at his mother, himself and his siblings.*** Effective counsel would have given jurors a full view of the physical and mental torment that defined the Hall home. In contrast to the summary description of A.J.'s assaults on Betty, jurors would have learned how explosive and arbitrary those attacks were – triggered by trivial perceived slights, innocent comments, or nothing at all. *See, e.g.*, 2255 Exh. 175-77, 183-85, 191, 195, 241-42, 247, 249-50, 253. A.J.'s beatings left Betty physically and psychologically debilitated (with permanent black rings around her eyes and scar tissue on her head

13

and nose), destroyed her lovely singing voice, and left her depressed, withdrawn and unavailable. Id. at 177, 191, 196, 200, 211-12, 253. A.J. not only beat Betty but raped her – attacks the Hall children could hear. Id. at 178, 191. The Hall children were constantly exposed to violence and shaken by their inability to stop it. Id. at 177, 183-84, 191, 195, 211-12.

Contrary to the trial testimony, the violence was *not* directed solely at Betty. Both parents beat the Hall boys brutally with switches and belts. Id. at 185-86, 191-92, 196, 199, 242. A.J. sometimes threatened his victim, "I brought you into this world; I can take you out." Id. at 186. Long and arbitrary delays before punishments were inflicted left the children waiting, terrified, for the coming attack; sometimes Hall wet his bed from fear. Id. at 196, 199, 242. In short, the violence in the home and its corrosive effect on Hall and his family were inadequately and inaccurately presented at trial. Hall was "a victim of serious physical abuse [at] the hands of both … parents" and saw "much more extensive and traumatic abuse of his mother [and] siblings than the trial testimony indicated." 2255 Exh. 124.

***Neuropsychological deficits undermine Hall's ability to make rational decisions.*** Counsel arranged for a neuropsychological examination, but failed to follow through after the expert became unavailable. Reasonable counsel would have secured the evaluation, thereby obtaining evidence of Hall's neuropsychological impairments (and accompanying learning disabilities). *See* 2255 Exh. 564-75; Reply

14

Exh. 129-31.[15] These impairments – which undermine Hall's "judgment, problem-solving and decision-making ability," particularly under stress – would have helped explain Hall's failure to resist or stop the chain of events that led to Lisa Rene's death. R.E. 195-96.

*Hall has numerous positive attributes.* Numerous witnesses describe Hall as warm and generous – someone who cares for his family, feels responsible for them, and adores his children. *See, e.g.,* 2255 Exh. 188, 192, 201-02, 213-14, 220, 247-48, 256-57, 260-61. Hall heroically saved the life of his three-year-old nephew – leaping from a second-floor balcony to rescue the child from drowning in a swimming pool. Id. at 192-93, 220, 229. Hall also felt deep remorse for his involvement in Lisa Rene's death.[16] *See, e.g.,* id. at 188, 217-18.

*Exemplary conduct during previous incarcerations.*[17] Arkansas DOC records show Hall quickly reached the highest-level trusty status. Id. at 527-28. As an Arkansas inmate, Hall *did not commit a single disciplinary infraction* – proving him, in the words of a corrections expert, an "ideal inmate." Id. at 528, 528-43. Witnesses could have attested to Hall's positive record and good conduct in both the Arkansas

---

[15] Evidence that Hall struggled in school and may suffer from Attention Deficit Disorder corroborates these findings. R.E. 198; 2255 Exh. 200, 241. Several of Hall's children exhibit similar disabilities. Id. at 257, 262.

[16] No juror found that Hall had accepted responsibility for his crime or had remorse. R. 6:1382.

[17] Counsel tried to elicit testimony on this subject from Betty Hall, unqualified to provide it. The prosecutor's objection to counsel's leading question was sustained. R. 33:118.

and federal systems. Id. at 545-55.[18]

***Hall's entry into the illegal drug trade was influenced by the circumstances in which he was placed when his mother abandoned the youngest Hall children, and the limited economic options for young black men in his hometown.*** Contrary to the prosecutor's claim that Hall's parents provided him basic necessities, *see, e.g.,* R. 33:122-24, 144-46, Hall was left to care for his two younger brothers when Betty separated from A.J. and left the boys for a man in another town. 2255 Exh. 102. At times, the boys had neither electricity nor food. Id.; *see also* id. at 187-88, 200, 243. Hall tried to make ends meet by working legitimate low-wage jobs, but ultimately was lured into the drug trade. Id. at 188, 192, 197, 200-01, 257. Rev. D.L. Hegler (summoned to trial by Hall's attorneys but never called to testify) calls it "unrealistic to condemn the drug trade without recognizing that [those] drawn into it [are] not totally responsible for their own involvement;" "[t]heir decisions are influenced by the lack of opportunities available to young African-Americans to build meaningful lives and futures in El Dorado, and by the absence of positive parental role models and daily adult supervision to provide discipline and structure during their most vulnerable years." Id. at 215-216. *See also* R.E. 206-97; 2255 Exh. 253. Several witnesses could have testified that around the time of this offense, Hall wanted – and was trying – to escape his criminal life. Id. at 188, 201, 212-13.

---

[18] Evidence of Hall's exemplary behavior in prison would not only have provided positive mitigation, but would have rebutted the Government's claim that Hall constituted a future danger and undermined the credibility of Nichols' testimony.

**Overview of decision below:** Analyzing Hall's IAC claim, the District Court failed (1) to judge counsels' performance by prevailing professional norms, and (2) to assess prejudice by weighing the *cumulative* impact of counsels' errors and omissions. Combined with its selective – and often incorrect – consideration of the record, these aspects of the District Court's order require a COA on Hall's IAC claim. Hall submitted extensive *undisputed* evidence establishing the relevant professional norms. R.E. 160-240; 2255 Exh. 101-08, Reply Exh. 17-21.[19] The District Court neither acknowledged this evidence nor confronted its implications – *e.g.*, by identifying what duties prevailing professional norms *actually imposed* on trial counsel, or assessing counsels' performance against those standards. Absent such essential context, counsels' acts and omissions cannot be called "strategic."

The District Court also assessed piecemeal, rather than collectively, the likely impact of the mitigating evidence trial counsel failed to develop or present. *See infra.* Under Strickland, however, the "prejudice" inquiry does not focus on whether any *particular* piece of evidence or mistake by counsel would have "tipped the scales," but whether the *cumulative* effect of *all* mitigating evidence (both presented at trial and developed afterward), in light of any other errors or omissions, undermines

---

[19] These included declarations from prominent defense attorney Michael Tigar; mitigation specialist Jill Miller, M.S.S.W., veteran of more than ninety capital murder cases in both state and federal court, who regularly trains attorneys; and Federal Resource Counsel attorney Kevin McNally, who consulted with trial counsel. Relevant standards also include, *e.g.*, the AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES ("ABA Guidelines"). We cite the ABA Guidelines as published at 31 HOFSTRA L. REV. 913 (2003).

confidence in the sentencing verdict. <u>Williams</u>, 529 U.S at 397-398; <u>Wiggins</u>, 539 U.S. at 534 (court must "re-weigh the evidence in aggravation against the totality of the available mitigating evidence"); <u>Moore v. Johnson</u>, 194 F.3d 586, 619 (5th Cir. 1999) (same); <u>Cargle v. Mullin</u>, 317 F.3d 1196, 1212 (10th Cir. 2003) (same).

We examine Hall's IAC claim in greater detail.

### 1. *Inadequate investigation*

Mitigation investigation started about two weeks before trial, despite counsels' having been appointed six months earlier. The District Court nevertheless found counsels' investigation adequate, for three reasons. First, they'd obtained from *prior* counsel a nineteen-page questionnaire completed by Hall, plus notes of prior counsels' interviews from a trip to Hall's hometown. R.E. 86. Second, counsel spoke to Hall's mother and one sister at least once before investigator Tena Francis began work. R.E. 87. Third, counsel possessed the results of Francis' six-week investigation (conducted between mid-September 1995 and the sentencing verdict).[20] R.E. 88.

Jurists could debate whether counsels' mitigation investigation was minimally adequate. First, the relevant question is not whether counsels' investigation seems "substantial" in the abstract, but whether it conformed to prevailing standards as reflected in, *e.g.*, the ABA Guidelines.[21] Second, calling trial counsels' investigation

---

[20] Francis considered that investigation grossly incomplete. 2255 Exh. at 40-46.

[21] *See* <u>Rompilla v. Beard</u>, 125 S. Ct. 2456, 2465-66 (2005); <u>Wiggins</u>, 539 U.S., at 524 (ABA Guidelines establish what is "reasonable"); <u>Hamblin v. Mitchell</u>, 354 F.3d 482, 486, 487 (6th Cir.

"substantial" is clearly erroneous.

***Scope and timing of investigation.*** Counsel must endeavor "to discover *all reasonably available mitigating evidence* and *evidence to rebut any aggravating evidence* that may be introduced by the prosecutor." Wiggins, 539 U.S. at 524 (emphasis added)). Penalty phase preparation, seeking "anything [that] might militate against the appropriateness of the death penalty for [the] defendant," requires "extensive ... investigation into ... personal and family history." 31 HOFSTRA L. REV. at 1022.[22]

Mitigation investigation *"must begin immediately [upon] entry into the case."* Id. at 925 (emphasis added). Counsel must *"promptly* obtain the investigative resources necessary to prepare for both phases, including at minimum the assistance of a professional investigator *and a mitigation specialist ...."* Id. (emphasis added). *See also, e.g.,* id. at 1023 ("mitigation investigation should begin as quickly as possible," because it may affect many other decisions about the case); id. (investigation must begin when counsel enters the case); R.E. 165-66 (adequate

---

2003) (same); Canaan v. McBride, 395 F.3d 376, 384 (7th Cir. 2005) (same); Allen v. Woodford, 395 F.3d 979, 1001 (9th Cir. 2005) (same).

[22] Counsel must undertake "the most extensive background investigation imaginable," "completed in a timely manner," using "the assistance of such persons, appropriately qualified by training and experience, as might be necessary to accomplish this task." R.E. 192 (emphasis added). Prevailing standards required counsel to find and interview *all* potential witnesses, obtain and examine *all* relevant documents and other tangible evidence, and visit locations associated with the client's life. R.E. 191-96. The Guidelines illustrate how broad an investigation prevailing standards demanded. 31 HOFSTRA L. REV. at 1022-23.

mitigation investigation "cannot necessarily be compressed into a short [time] period," and so must begin as early as possible); R.E. 187 (developing trust relationships with sources victimized by trauma takes substantial time).[23]

The District Court gave no reason *not* to credit Hall's experts, nor acknowledged that counsels' performance was plainly substandard under the ABA Guidelines. Instead, it focused on the few things counsel *did* rather than the many duties they ignored. *See* R.E. 86-88, 90. Reasonable jurists could find trial counsel should have known that a hasty and superficial eleventh-hour investigation would not develop all available mitigating evidence. Reasonable jurists could conclude that even six weeks of work by a mitigation specialist could not undo the damage from counsels' six months of indifference.[24]

***The record shows that the investigation was inadequate.*** Any claim that counsel performed "substantial" mitigation investigation is clearly erroneous.

**The questionnaire.** The District Court excused counsels' failure to investigate because they possessed a nineteen-page "client background information"

---

[23] *See also* 31 HOFSTRA L. REV. at 1024-25 (corroborating information and overcoming barriers to obtaining intimate information are "time-consuming task[s]"). *See also* R.E. 230-31 (prevailing standards in 1995 required counsel to grasp these principles and "allocate time and effort in the preparation of the defense accordingly ....").

[24] The time actually spent on factual investigation by all three members of Hall's defense team (attorneys Ware and Kearney and investigator LaRue) prior to trial fell below prevailing standards. *See* R. 38:692-94. From March to June, Hall's *entire defense team* collectively performed *fewer than sixty (60) hours* of out-of-court work (*i.e.,* all hours out-of-court except those spent on "legal research and writing"). R. 38:694. Given the October 2 trial date, this four-month interval represented *two-thirds* of the total time available for preparing the defense, and counsel wasted it.

questionnaire prior counsel had Hall complete. R.E. 86.[25]

Relying on such a questionnaire to rule out potential investigation was *itself* deficient. R.E. 229 (prevailing practice forbade relying on such a form to obtain "sensitive and personal information," because client's responses would likely not disclose all relevant information; "all specialized capital defense training materials, etc., from the same period" reflect this view). *See also* Reply Exh. 20 (same).[26]

Moreover, the questionnaire consistently refers to the client in the third person, employs highly specialized vocabulary,[27] uses "loaded" language, and presumes detailed knowledge of events associated with the client's birth and infancy. Id. at 233-36. It is manifestly "a template for a mitigation specialist or investigator," not the client, and competent counsel would have recognized that. Id. at 236; *see also* Reply Exh. 5.

For all these reasons, reasonable jurists could disagree that this questionnaire reasonably guided counsels' investigation decisions.[28]

---

[25] Hall disputes that counsel ever *read* this questionnaire, much less relied on it. Neither Tena Francis nor Kevin McNally was made aware of its existence; neither ever heard trial counsel say its contents foreclosed any potential areas for investigation, and McNally would have vigorously discouraged any such reliance. *See* Reply Exh. 4-5, 20. A hearing is necessary to test the credibility of counsels' claim to have relied on this questionnaire in making investigative decisions.

[26] *See, e.g.*, Mason v. Mitchell, 320 F.3d 604, 620 (6th Cir. 2003) (counsel cannot rely on defendant to "volunteer" information about potential mitigation).

[27] *E.g.*, "toxemia;" "culture-appropriate discipline;" "aberrant sexual modeling;" "neuropsychological;" "Magnetic Resonance Imagery;" "avocational pursuits;" "olfactory;" "déjà vu;" "macropsia;" "micropsia."

[28] Hall's responses "sent up warning signals." R.E. 218-19; *see also* R.E. at 236-30 (detailed description of "red flags"); Reply Exh. 130-31 (responses showed need for neuropsychological

21

**Prior counsels' investigation was itself inadequate.** Hall's prior counsel performed no substantial investigation and trial counsel should not have relied on their work.[29]

Prior counsel's "investigation" (primarily four hours of interviews in Hall's hometown) was inadequate. *See* R.E. 86, 210-13; R. 41:1253-54. Counsel's notes reflect only "initial, brief contact[s]," "superficial" and "limited." R.E. 213-14. Making final investigative judgments based on such interviews was objectively unreasonable. R.E. 214.[30]

Prior counsels' preliminary investigation does not excuse trial counsels' dereliction. Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002) (ineffective to rely on preliminary interview by prior counsel's expert to rule out mental health defenses); Ragsdale v. State, 798 So.2d 713 (Fla. 2001) (ineffective to rely entirely on discovery

---

examination); *see also, e.g.*, Stewart v. Gramley, 74 F.3d 132, 135 (7th Cir. 1996); Smith v. Stewart, 140 F.3d 1263, 1269 (9th Cir. 1998); Douglas v. Woodford, 316 F.3d 1079, 1086 (9th Cir. 2003); In re Lucas, 94 P.3d 477, 504-05 (Cal. 2004); *cf.* Rompilla, 125 S. Ct., at 2468, n.8 (counsel "could not reasonably have ignored mitigation evidence or red flags" in records they were obligated to examine).

[29] Hall disputes the claim that counsels' efforts were informed by prior counsels' work. Trial counsel never told their own mitigation investigator that prior counsel had conducted any mitigation investigation. Reply Exh. 3. They shared no notes from that "investigation" nor impressions gained from discussions with prior counsel, nor suggested that their own judgments about what should be investigated were informed thereby. Id. A hearing remains necessary to resolve this dispute.

[30] Moreover, prior counsel conducted these interviews alone. "Such one-on-one conversations may be important in building relationships" but "cannot suffice for purposes of preparing for litigation" because "witnesses may become unavailable, or their accounts may change [by] the time of trial." R.E. 216. The absence of a third party from these initial contacts indicates prior counsel did not intend them to be his only conversations with these witnesses. Id.

by prior counsel).

The District Court claims it would not have "authorize[d] an unlimited amount of funds [for] further investigation." R.E. 90. But additional trips to El Dorado would not have required "unlimited funds." The evidence developed in post-conviction shows how much could have been accomplished if counsel had simply begun their investigation in *March* instead of squandering their time until *mid-September*.

Moreover, relying on this speculative comment by the District Court would violate <u>Strickland</u>, which forbids assessing prejudice by reference to a particular decision-maker's idiosyncratic view of the facts. <u>Strickland</u>, 466 U.S. at 695 (prejudice assessment "should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncrasies of the particular decisionmaker."); 700 (characterizing as "irrelevant to the prejudice inquiry" state trial judge's testimony about how his view of the case might have been affected if counsel had performed differently); *see also, e.g.,* <u>Smith v. Freeman</u>, 892 F.2d 331, 336 n.9 (3rd Cir. 1989) (same). This Court must assume that if trial counsel had shown that additional funds were reasonably necessary for investigation under prevailing standards, those funds would have been forthcoming. <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985); 21 U.S.C. § 848.

23

Finally, *prior counsel withdrew due to a conflict of interest.* After learning of Hall's alleged plot to take one of them hostage, Hall's original attorneys avowed they could no longer advocate for Hall due to the evident conflict and were allowed to withdraw. The opinion of Hall's expert – that under such circumstances, successor counsel could not rely upon prior counsels' work – was undisputed below. *See* R.E. 209-10.

### 2. Unreasonable decision to focus on "equally culpable co-defendants" factor

Trial counsel decided at the outset to emphasize the statutory mitigating circumstance that "equally culpable co-defendants" would not face the death penalty. R. 38:703-06. The District Court attributed this "strategic" decision to the purported hostility of "North Texas jurors" to "excuse defenses" in cases with "particularly gruesome" facts. R.E. 91.[31] It also opined that no other statutory mitigators were available and noted that counsel *did* offer evidence of some other non-statutory mitigating circumstances. Id.

But counsel chose to emphasize the "equally culpable co-defendants" factor *without having performed the necessary investigation beforehand* – contrary to the ABA Guidelines. *See* 31 HOFSTRA L. REV. at 1021 (counsel "cannot make informed decisions [without] first conduct[ing] a thorough investigation."). A thorough

---

[31] In its opinion, the District Court did not mention that, during *voir dire*, it expressed the view that at least "in the abstract," "equally culpable defendants would strike some people as not a very strong mitigating factor." R. 20:59.

24

investigation is a precondition to crediting decisions as "strategic." <u>Wiggins</u>, 539 U.S. at 527; <u>Lewis</u>, 355 F.3d at 368 ("It is axiomatic – particularly since <u>Wiggins</u> – that such a decision [not to present particular mitigating evidence] cannot be credited [as] strategy unless it is grounded in sufficient facts, resulting ... from an investigation that is ... adequate for that purpose.").

Moreover, counsel called Hall's mother and his sister to testify about turbulence in the Hall home, which counsel repeatedly called "abuse." *See, e.g.*, R. 33:113 (twice), 33:113-114, 33:114 (twice), 33:115, 33:116; R. 33:138 (three times). Thus, counsel presented *precisely* the type of evidence they later claimed not to have believed would resonate with "conservative North Texas jurors." Counsel must have realized, after Tena Francis' investigation began, that they should present some information about Hall's background. But they waited *too late* to conduct the type of investigation necessary to present such evidence thoroughly and persuasively. Counsels' problem was not "conservative North Texas jurors," but their own deficient investigation.[32]

With a reasonable investigation, other statutory mitigating factors might have been proven. Hall's neuropsychological impairment, *see* 2255 Exh. 564-75, Reply

---

[32] Since Hall's trial, Ware has relied on precisely this type of mitigating evidence to persuade conservative North Texas jurors. *See* Vaughn, "Man Who Killed Pool Hall Manager Given Life Sentence: Attorneys Argued He Didn't Deserve To Die Because Of Mitigating Circumstances," FORT WORTH STAR-TELEGRAM, December 12, 2000 (Ware presented mitigating evidence that defendant was "raised on the streets" in a dangerous neighborhood, with "a very dysfunctional family life" including a drug-addicted mother and absent father).

traumatic events affected Hall's development. *See, e.g.,* R.E. 199; 2255 Exh. 199.

Ware claims there were no "indications of severe physical abuse" in Hall's background. R. 40:1091, 40:1107. The record demonstrates otherwise. Such evidence was uncovered in early interviews and communicated to Ware on 10/6/95. Reply Exh. 113.[34] The record likewise belies the Government's claim that trial counsel "were never told" Hall and his two younger brothers were abandoned. R. 40:1034. Ware was advised of these facts via a memo on 10/25/95. Reply Exh. 118.

The statements of Betty Hall and Cassandra Ross that they were essentially unprepared to testify and had minimal substantive contact with trial counsel are undisputed. 2255 Exh. at 171-74, 181-83.

Hall's claim is not that trial counsel did not present "enough evidence of a certain type," *contra* R.E. 93, but that had counsel followed prevailing standards, the jury would have heard not just "more" evidence but substantively *different* testimony (including, *e.g.,* that Hall himself was physically mistreated as a child). Absent such testimony, the prosecution could downplay the significance of Hall's "turbulent background" by arguing that whatever else may have happened, Hall was not materially deprived or targeted for abuse. That was false. Similarly, prevailing

---

[34] Ware was advised that fully developing this information would necessarily take additional time. Id. If Ware himself failed to develop those facts, it was because he employed objectively unreasonable interview techniques. Appropriately conducted interviews would have confirmed that, although the Hall children perceived their treatment as "normal," the treatment constituted abuse. R.E. 198-99.

standards required trial counsel to anticipate the likely cross-examination of mitigation witnesses and prepare them accordingly. *See* R.E. 166-67. Counsels' deficient performance resulted in the jury's hearing a *distorted* version of the facts.

**4.    Failure to develop and present testimony from available witnesses**

Counsel failed to develop and present testimony from other family members. R. 38:733-44; 2255 Exh. 190-202, 237-45. The District Court apparently accepted Ware's claim that Hall's father was "absolutely opposed" to testifying and would not have made an effective witness because he was being accused of domestic violence; that Hall's brothers were criminals; and that Pam was "very angry [at] Hall." R.E. 95-96.

Reasonable jurists could debate the correctness of this ruling, which excuses as strategic" an outcome dictated by counsels' deficient performance. Had counsel undertaken a timely and thorough investigation, they would have overcome these barriers. R.E. 165-66, 187; Reply Exh. 12-13.

Indeed, the District Court acknowledged this evidence but ignored its significance. *See* R.E. 95 ("A.J. could have testified about the problems in his marriage and his own bad behavior, and Tracy, Scotty, and Pamela could have testified about their upbringing and how they were disciplined harshly by their father, witnessed the abuse of their mother, and were exposed to drug dealing and other criminal behavior while growing up."). Additional evidence was available, had

defense counsel complied with prevailing standards. <u>Wiggins</u> forbids crediting as "strategy" the *post hoc* rationalizations of a lawyer who never performed a meaningful investigation in the first place.

**5.    Failure to discover and present other evidence**

Counsel failed to develop and present other mitigating evidence. R. 38:744 - 39:752; 2255 Exh. 219-62. The District Court concluded that testimony detailing the violent relationship between Hall's parents was "cumulative" to testimony presented at trial; it found that other evidence (*e.g.* about A.J. Hall's own upbringing) was "of little, if any, assistance to the jury;" and that evidence of "Hall's general good character" was too "attenuated" to have affected the outcome. R.E. 96-97.

It is effectively undisputed that counsel were unaware of this evidence. The District Court's ruling on this aspect of Hall's claim rests solely on its "no prejudice" finding, which reasonable jurists could dispute.

***The evidence is not "cumulative."*** Additional testimony, describing in detail the terrible circumstances of Hall's upbringing, is not "cumulative" of the meager evidence presented at trial. <u>Lewis v. Dretke</u>, 355 F.3d 364, 368 (5th Cir. 2003) (counsel ineffective for presenting only "skeletal testimony concerning the abuse [of the defendant]," which was "wholly inadequate to present [the] true picture"); <u>Jermyn v. Horn</u>, 266 F.3d 257 (3rd Cir. 2001) (it is "largely beside the point" that counsel "presented some mitigating evidence of a different nature and quality," given "the

significance of the evidence omitted," which included "first-hand accounts of instances of mental and physical abuse" of defendant, documentary evidence that would have corroborated that testimony, and expert testimony "explaining how [his] development was thwarted by the [abuse] he suffered as a child"); Collier v. Turpin, 177 F.3d 1184, 1199-1201 (11th Cir. 1999) (counsel's "minimal" examination of mitigation witnesses elicited "very little relevant evidence about [defendant's] character;" appropriate examination could have elicited information about his deprived childhood, gentle disposition, strong work ethic, devotion to his family, and heroic effort to save the life of a motorist trapped in a car in creek).[35] Since only one juror found Hall's upbringing mitigating, *see* R. 1382, additional evidence could not have been cumulative. Hall v. Washington, 106 F.3d 742, 752 (7th Cir. 1997) (where judge had previously found no mitigating factors, it is "logically impossible" for new mitigating evidence to be "cumulative").

***Evidence about other family members was relevant.*** Evidence about, *e.g.*, A.J. Hall's own upbringing is relevant because it tends to corroborate A.J.'s mistreatment of his own children. Tennard, *supra* (broadly defining relevant mitigation). The ABA Guidelines oblige counsel to investigate the lives of the defendant's parents and other close relatives. *See* 31 HOFSTRA L. REV. at 1025; *see*

---

[35] *See also, e.g.*, Mayfield v. Woodford, 270 F.3d 915, 929 (9th Cir. 2001) (*en banc*); Hutchison v. State, 150 S.W.3d 292, 304-08 (Mo. 2004) (additional mitigating evidence was not "cumulative," because it "could have demonstrated [defendant's problems] growing up … far more effectively than the rudimentary information actually presented").

*also* id. at 1061 (counsel must develop a "multi-generational history").

***Good character evidence is strongly mitigating.*** Hall's positive traits and acts of kindness – particularly his heroic rescue of his three-year-old nephew from drowning, *see* 2255 Exh. 192-93, 220, 229 – are indispensable to deciding whether to spare his life.[36] Hall, 106 F.3d at 752 (counsel should have discovered and presented defendant's life-saving actions).[37] Such evidence "humanize[s] the client," "providing examples of his capacity to behave in a caring, positive way, such [as] trying to be a good parent and provider." 31 HOFSTRA L. REV. at 1062. It is not offered to offset the gravity of the crime, but to show the defendant as "a flawed but real individual rather than a generic evildoer, [with] a constricted but worthwhile future." Id. Counsel were obliged to develop and present such evidence because the prosecution's case depended on the contrary inference – that Hall was a depraved monster (as illustrated by, *e.g.*, his having had sex with a girlfriend shortly after the crime). Id. at 1064 (defense counsel must thoroughly investigate evidence to rebut or undercut the prosecution's aggravating proof); *see also* Rompilla, 125 S. Ct., at 2464-65 (recognizing counsel's duty to investigate prosecution's aggravating evidence to mitigate its effect).

---

[36] Hall's parole records – which were in trial counsel's file – corroborated the rescue. Reply Exh. 163-64.

[37] *See also, e.g.,* Douglas v. Woodford, 316 F.3d 1079, 1086 (9th Cir. 2003) (counsel should have presented defendant's life-saving efforts); Collier v. Turpin, 177 F.3d 1184, 1200 n. 20 (11th Cir. 1999) (same); Schofield v. Gulley, __ S.E.2d __, 2005 WL 1320185 (Ga. 2005) (vacating death sentence – despite "extremely heinous" crime – because counsel presented weak testimony about defendant's life-saving actions, rather than available persuasive evidence about the same events).

31

### 6. Failure to present evidence of prior successful adjustment to incarceration

Counsel ignored evidence of Hall's prior successful adjustment to incarceration, eliciting a single witness' admission that Hall had no record of disciplinary problems pre-trial. R. 39:762-70. The District Court found that choice "strategic," crediting trial counsels' claim that they did not want to open the door to damaging testimony. R.E. 97-99.

Hall disputes Ware's claims regarding why he did not fully develop this evidence. Ware's notes indicate he intended to question witness "Baker," Hall's Arkansas parole officer, about "Act 814," under which Hall obtained early release. R. 32:205-07; Reply Exh., 162; 2255 Exh. 528. That reference proves Ware was not "hesitant" to focus attention on Hall's good conduct in prison and had not already made a contrary "strategic" choice. R.E. 98. Moreover, Ware attempted to elicit from Betty Hall that Hall "got along okay" in prison. *See* R. 33:118-19. Ware performed deficiently in attempting to introduce through an unqualified witness information he belatedly recognized as important – but had never bothered to investigate or develop.

Prevailing standards obliged counsel to investigate Hall's prior behavior in custody *before* deciding what to present. Jurors should hear that a defendant has lived peacefully and productively in prison. R.E. 91-92; *see* ABA Guidelines, 31 HOFSTRA L. REV. at 1023 (counsel must investigate client's "prior juvenile and adult correctional experience"), 1062 ("Evidence that the client has adapted well to prison

[and] had few disciplinary problems can allay jurors' fears and reinforce other positive mitigating evidence").

Counsel also performed deficiently respecting the documentary evidence itself. The prosecution offered some pages from Hall's Arkansas penitentiary records, *see* Government Exhibit 100, and Ware briefly referenced them in argument. Supp. R. Vol. 20-A at 54. Jurors received no guidance in understanding them, however. *See* R.E. 174 (unreasonable to assume jurors could "understand the full mitigating significance of the [DOC] records without testimony from defense witnesses.").[38]

Moreover, Ware wrongly suggested the only significance of Hall's prison record was the *absence* of misbehavior. *See* Supp. R. Vol. 20-A at 54. Hall's prison records *affirmatively* established Hall had spent his prison time constructively and productively. For example, Hall earned the post of "C-2 trusty;" a qualified witness could have explained that this classification represented great confidence in Hall's good behavior because "C-2" trusties were allowed outside the prison walls. 2255 Exh. 527-28. Hall achieved this status more quickly than other inmates, and Hall's record of **zero** disciplinary infractions – to which trial counsel did not even specifically point – made him "an ideal inmate." Id. Hall's records also show that he urgently asked to telephone home when family members experienced health crises

---

[38] *See* Jermyn, 266 F.3d at 311 (deficient to offer "lengthy V.A. records," mostly "handwritten and difficult to decipher," without highlighting the mitigating information they contained); Turpin v. Lipham, 510 S.E.2d 32, 42 (Ga. 1998) (counsel should have presented testimony to help jury understand medical records).

– corroborating other evidence of Hall's generosity and compassion. 2255 Exh. 534-35, 537-42; *see* R.E. 175.

Favorable testimony was available from guards, officers, and correctional personnel; they call Hall a "model inmate" and provide detail about his positive, non-violent conduct and constructive attitude. *See* 2255 Exh. 544-51.[39]

The absence of this evidence prejudiced Hall. <u>Williams v. Taylor</u>, 529 U.S. 362, 395 (2000); <u>Moore v. Johnson</u>, 194 F.3d 586, 614 (5th Cir. 1999) (counsel should have presented evidence to help jurors understand defendant's penitentiary records), 618 (counsel should have "argue[d] Moore's early release from prison as a factor mitigating against [a finding] of future dangerousness").[40]

Knowing the prosecution intended to argue Hall's "future dangerousness," counsel had a case-specific duty to combat that inference. *See* R.E. 175-76. Successful adjustment to prison can powerfully rebut a claim of future dangerousness. *See* <u>Skipper v. South Carolina</u>, 476 U.S. 1 (1986); <u>Moore</u>, 194 F.3d at 614, 618.[41]

---

[39] Also, Dr. Jim Womack, a psychiatrist at the FMC where Hall was incarcerated from March 1995 through trial, would have testified that Hall was "model detainee" who posed no problems and that the Bureau of Prisons would have no problems managing Hall in the future. 2255 Exh. 553-54. FMC Jail Administrator Toni Corbett could have testified that she had daily contact with the inmates, and that Hall was non-violent, committed no serious rule violations and caused no problems. *See* Presentence Report at 11, ¶ 52. Numerous other prison officials would have attested to Hall's non-violent and compliant nature as an inmate. *See* R. 39:767-68.

[40] *See also, e.g.*, <u>Horton v. Zant</u>, 941 F.2d 1449, 1463 (11th Cir. 1991); *Ex parte* <u>Land</u>, 775 So.2d 847, 854 (Ala. 2000).

[41] The prosecution argued Hall would be a "future danger" while in prison because he "had nothing to lose," suggesting his prior good behavior was solely aimed at earning release. R. 20A:94-95. Prevailing norms required defense counsel to respond by presenting evidence to show that Hall's positive adjustment to prison life was not conditioned on his prospects for release, but reflected his

Counsel knew the prosecution would present specific allegations from inmate Nichols that Hall had plotted a violent escape. Counsel belittled Nichols' "cock and bull story," R. 34:53, but never developed contrary evidence that would have undercut it. R.E. 176; R.E. 225-27 (same); 31 HOFSTRA L. REV. at 1062 (counsel should pursue "[e]vidence that the client has adapted well to prison and has had few disciplinary problems," which "can allay jurors' fears and reinforce other positive mitigating evidence").

### 7. Failure to corroborate testimony

Counsel failed to offer documents corroborating the testimony of Betty Hall and Cassandra Ross. R. 38:724-26, 2255 Exh. 203-08. Reasonable jurists could dispute the view, R.E. 100, that such evidence was merely cumulative. *See, e.g.* Hart v. Gomez, 174 F.3d 1067, 1070-71 (9th Cir. 1999) (counsel should have presented documents to corroborate witness's testimony); Cunningham v. Zant, 928 F.2d 1006, 1018 (11th Cir. 1991) (counsel should have introduced medical records to substantiate existence and effects of head injury); *see also* 31 HOFSTRA L. REV. at 1024-25 (documents are essential to "corroborat[e] witnesses' recollections" and make testimony more persuasive).

### 8. Failure to call available witnesses

Counsel failed to call other readily available witnesses, including Rev. Hegler. R. 38:726-33. Ware claimed he'd received an investigative memorandum on

normally compliant character in that setting.

10/22/95 suggesting Hegler might possess damaging information. R.E. 100-01.

If Ware's claim were true, Rev. Hegler's name would not appear in counsels' trial notes and other documents, nor would they have contacted him after approximately 10/22/95. The record shows otherwise. *See, e.g.,* Reply Exh. 168 (notes dated 10/27/95 include "Rev. Hegler" in list of anticipated witnesses); *id.* at 167 (notes listing "Rev. Hegler" among anticipated witnesses); *id.* at 162 (notes from 11/1/95, listing "Rev. Hegler" among defense witnesses). Moreover, counsels' outline for examining Hall references Rev. Hegler, *id.* at 169; Ware's telephone records showing a call to Rev. Hegler's home on the evening of 11/1/95, Reply Exh. 178-79, corroborate Rev. Hegler's sworn statement that he was told to come to Fort Worth to testify at punishment, *see* 2255 Exh. 217.

### 9. Failure effectively to meet Nichols' testimony

Counsel failed effectively to attack Nichols' testimony that Hall had planned a violent escape. *See* R. 39:753-62. The District Court credited counsel's claim that he chose not to impeach Nichols because the jury "knew Nichols was self-motivated [and] lying," and to avoid "destroy[ing] the mood and tempo" of the examination and alienating the jury by "beating a dead horse." R.E. 108.

The District Court erred by not measuring counsels' performance against *prevailing norms*. Given the importance of Nichols' testimony, counsel were bound to impeach Nichols on every relevant point with his prior sworn testimony rather than

letting his denials go unchallenged. R.E. 171-73.[42]

While admitting a few crimes, Nichols repeatedly *denied* being savvy about cooperating with the prosecution, a matter of greater importance to his credibility. Counsel asked *three times* whether other inmates had advised Nichols "how to take certain steps to help [himself] in the legal system," and Nichols thrice denied it. R. 32:257. Counsel moved on without impeaching Nichols, despite having proof that Nichols was lying.[43] Similarly, counsel thrice pressed Nichols about whether he had bought drugs for resale using robbery proceeds, and Nichols thrice denied it. R. 31:252. Counsel moved on without impeaching Nichols with his contrary prior testimony.[44]

At Hall's trial, Nichols painted himself as a wayward youth who had played a minor role in two robberies and was now going straight. *See, e.g.*, R. 31 at 243. Nichols implied he had owned or possessed only two firearms. R. 31:257.

---

[42] Failing to impeach a witness can constitute IAC. Tucker v. Prelesnik, 181 F.3d 747, 757 (11th Cir. 1999) (counsel ineffective for not impeaching victim with medical records reflecting faulty memory); Driscoll v. Delo, 71 F.3d 701, 711 (8th Cir. 1995) (counsel ineffective for not impeaching witness with prior inconsistent statements); Smith v. Wainwright, 799 F.2d 1442 (11th Cir. 1986) (same); Sparman v. Edwards, 26 F.Supp.2d 450 (E.D. N.Y. 1997) (same), *aff'd* 154 F.3d 51 (2nd Cir. 1998); *see also* Rompilla, 125 S. Ct., at 2464-65 (counsel must counter government's aggravating evidence).

[43] In prior testimony, Nichols admitted that, in asking a co-defendant to sign a false affidavit exculpating Nichols, he was following guidance from other prisoners, 2255 Exh. 265-520, and substantially admitted *seven different times* that other inmates had advised him how to reduce his own exposure. *See* R. 39:756.

[44] Nichols had previously testified that "after every robbery," he purchased and re-sold illegal drugs with his proceeds. 2255 Exh. 327-28.

37

Reasonably competent counsel would have dynamited these false impressions.[45]

Counsel performed deficiently in not showing that Nichols' testimony embellished the version he originally told federal agents (when Nichols assured them he had provided "all the information he could").[46] 2255 Exh. 5-11. Counsel should have highlighted how Nichols embroidered his allegations against Hall, calling the agents if necessary.[47]

Counsel failed to investigate Nichols' "escape plot" story by interviewing other inmates. R. 39:760-62. The District Court found the inmates' testimony "would [not] have so effectively impeached Nichols' testimony that Hall would not have

---

[45] According to Nichols' testimony in Dallas, (1) prior to the robberies, Nichols made his living "selling dope," 2255 Exh. 269; (2) after the Louisiana robberies, Nichols and his cohorts went to Florida intending to rob a bank there, id. at 284; (3) Nichols stole two Jet Ski watercraft and took them across state lines to sell them, id. at 413-14; (4) Nichols passed fraudulent checks, including one for $1700 to purchase a car, and no charges were pursued because he cooperated, id. at 421-22, 470; (5) Nichols owned or possessed five firearms at various times: a .44 caliber, a .380 caliber, a 12-gauge shotgun, and two different 9 mm. handguns, id. at 428-29; (6) Nichols traded illegal drugs for a gun, id. at 430; and (7) Nichols used aliases and bought a gun under a false name, id. at 477. Competent counsel would have revealed Nichols as a versatile, manipulative and deceptive offender with a sophisticated appreciation of how to turn the system to his own advantage.

[46] Nichols failed to mention (1) two of the three "shanks" he later described in his trial testimony; (2) any statements by Hall about stabbing the judge; or (3) the claim that Hall bragged of using "100 rubbers" assaulting the victim. Because Nichols was already in protective custody and segregated from Hall by 3/7/95, Nichols could not have claimed he had other, subsequent conversations with Hall.

[47] The District Court implies that Nichols' credibility was significantly damaged on cross-examination. R.E. 113. This conclusion is doubtful, given the prosecution's statements calling Nichols' testimony "pivotal." See Reply Exh. 1-2. Moreover, the prosecution admitted below that "Nichols was clearly an important witness" at penalty. R. 39:985, n.10. Beyond alleging that Hall was planning a violent escape, Nichols painted a lethal portrait of Hall as boastful, unrepentant, and cruelly coarse toward the victim and other women, and homicidal toward one of his co-defendants. R. 31: 219-22 (Hall bragged he "used 100 rubbers" raping Lisa Rene, and was "macho and proud about it"); 222-23 (Hall called the mother of one of his children a "bitch," and talked about "beating up" other girls).

38

received the death penalty." This view gives too little weight to the substantial additional evidence counsel failed to develop. It is irrelevant that none of these inmates could have testified about "what Hall might or might not have said [to] Nichols." R.E. 113. Their testimony that Nichols was looking to reduce his own sentence, and that Hall was not boastful but quiet and remorseful, would have undercut Nichols' account. *See* 2255 Exh. 521-25.

**10. Failure to Make a Guilt-Phase Closing Argument**

The District Court's conclusion that counsel "strategically" decided to forego closing argument at the guilt phase is debatable because it collides with prevailing professional norms. R.E. 113-16, 168-71.

**11. Failure Effectively to Seek Allocution**

Counsel abandoned efforts to persuade the court to let Hall briefly allocute. R. 39:778-82. The District Court found no prejudice because it would have refused counsels' request no matter what, and noted the absence of an enforceable *right* to allocute. R.E. 118.

This Court must take the record at face value and assume that the District Court was not simply trying to entrap Hall's trial counsel into wasting their time on research by pretending to be open-minded on the issue.[48] *See* R. 32:50 (District Court asks

---

[48] Ware's *post hoc* claim (which the District Court ignored) that the defense never actually wanted to have Hall allocute, *see* R. 40:1115, is conclusively refuted by all other available evidence. *See* R. 41:1321-23.

trial counsel for state cases permitting allocution).

The District Court's emphasis on this Court's disposition of Hall's direct appeal misinterprets Hall's IAC claim, which does not depend on a "right" to allocution. Federal courts in capital trials around the country have *exercised their discretion* to permit allocution. Counsel, performing effectively, might well have obtained the same result – particularly since Hall's proposed statement was simply an expression of remorse and request for forgiveness. In any event, this Court must ignore the District Court's speculation about how it would have ruled. Strickland, 466 U.S. at 695.[49]

### 12. Failure to secure the assistance of appropriate experts

Counsel failed to secure the assistance of appropriate experts. R. 39:782-94. The District Court found counsel performed adequately because they "did in fact hire a neuropsychologist," and "were able to utilize" their mitigation specialist in conducting some limited investigation. R.E. 120. It also apparently attributed the absence of *any* defense expert testimony to counsels' decision to forego the testimony of psychiatrist Dr. Clayton. Id. It found "no prejudice" because counsel were not

---

[49] Hall's expression of remorse, in conjunction with the other mitigating evidence which reasonably effective counsel would have developed and presented (including specifically other evidence of Hall's remorse and the fact that he voluntarily surrendered to authorities and confessed his involvement) would have persuaded the jury to impose life. *See, e.g.,* 2255 Exh. 217-18; *see also, e.g.,* Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty,* 83 CORNELL L. REV. 1557, 1584 (September 1998) (many jurors who vote for life credit defendant's expression of remorse); Eisenberg, Garvey, and Wells, *But Was He Sorry? The Role of Remorse in Capital Sentencing,* 83 CORNELL L. REV. 1599 (September 1998) (jurors' perception that defendant is remorseful increases likelihood of a life sentence).

allowed "inexhaustible [funds for] experts" and the Court likely would not "have entertained a request to hire a social worker to testify about Hall's upbringing after having already given [funds for] a psychologist and a psychiatrist." R.E. 121-22. It dismissed the evidence of neuropsychological impairment because Hall exhibits no "mental disorder" and is not "mentally retarded." R.E. 122.

The fact that counsel "did in fact hire" an appropriate expert is unavailing, since they *failed to have that expert evaluate Hall.* R. 39:785-89; 41:1271-74; R.E. 222-24 (Ware should have "maintain[ed] appropriately regular and substantial contact" with Dr. Price, and thereby "learned [that] for whatever reason, [he] had not moved ahead on the work counsel were relying on him to perform," and secured the assistance of "another appropriately qualified expert" to evaluate Hall). Counsel must monitor their experts' performance. Id.[50]

Prevailing standards required counsel to complete a comprehensive social history investigation *before* deciding what experts to seek. *See* R.E. 193; 2255 Exh. 103-04; *see also, e.g.,* 31 HOFSTRA L. REV. at 1023 (thorough investigation must precede choice of experts). Seeking funds for a psychiatrist was unreasonable because counsel at that time had no way to exercise informed judgment about what kind of expert they needed (*e.g.,* a forensic social worker as opposed to a

---

[50] Trial counsels' decision to retain a neuropsychologist moots the Government's argument that nothing would have alerted reasonable counsel to the need for such an evaluation. In any event, the proof to the contrary is overwhelming. *See* R. 41: 1274-82.

psychiatrist).[51]

The District Court apparently concluded that counsel would have had Dr. Clayton "testify generally about the effect [Hall's] upbringing had on his behavior," but for its ruling that presenting such testimony would trigger a government examination of Hall. *See* R.E. 120, 122. Nothing in trial counsels' affidavits supports that conclusion.[52] Moreover, reasonably effective counsel in 1995 would have realized that they did not face such a Hobson's choice. An expert could have explained in general terms the impact of domestic violence on a young boy's development, the risk factors for adult criminality created by such an environment, and why some siblings may escape the same environment with less damage. Such testimony could have been presented on the basis of general information about the dynamics of Hall's family and the community, *without any need to evaluate Hall.* *See* R.E. 198-208. The use of such experts, sometimes called "teaching witnesses," in capital sentencing hearings was well-established by 1995, and would have avoided the perceived problems associated with Dr. Clayton's testimony while providing mitigating context for Hall's life history. Competent counsel would have at least

---

[51] Counsel apparently wanted a psychiatrist in part to conduct mitigation investigation, but then waited until the eve of trial (September 23) to have their psychiatrist actually interview Hall. Both aspects of this approach (choosing an expert without appropriate qualifications and waiting until the last minute to attempt to investigate) fell below prevailing standards.

[52] Moreover, Dr. Clayton's post-trial proffer shows that her testimony would have focused on Hall's remorse and his lack of future dangerousness, rather than his background. Thus, Dr. Clayton's proposed testimony was hardly "the [same] type of evidence," R.E. 120, as Hall presented in the present proceeding.

explored that option.

Counsel thus selected Dr. Clayton to provide a service (developing mitigating evidence) for which she was unqualified, and had her interview Hall without the benefit of any meaningful background information.[53] Once court rulings apparently foreclosed calling Dr. Clayton, counsel failed to recognize that they had alternatives – other than simply abandoning any hope of presenting expert testimony – to help the jury appreciate the significance of Hall's background and development. This was not a "strategic" judgment, but an uninformed and haphazard reaction to counsels' own departure from prevailing standards.

Similarly, saying that "inexhaustible" funds were not available for additional experts, R.E. 121, misses the point. Prevailing standards required counsel to investigate first and choose experts later. Had counsel done so, it is likely they would never have sought funds for a psychiatrist, mooting any speculative budgetary concerns.[54]

Reasonable jurists could also dispute the "no prejudice" finding, which places unwarranted weight on the absence of evidence that Hall has a "mental disorder" or is "mentally retarded." R.E. 122. The mitigating significance of the type of

---

[53] Although Tena Francis attempted to provide Dr. Clayton the information she was developing, as a practical matter investigation had barely begun when Dr. Clayton interviewed Hall on 9/23/95 (eight days after Francis first met with counsel). Moreover, although Francis repeatedly pressed Ware to have Dr. Clayton interview other Hall family members, counsel failed to arrange such an opportunity until two days before the punishment phase began.

[54] <u>Strickland</u> in any event precludes reliance on the District Court's speculation. *See supra.*

neuropsychological impairment that Hall suffers is widely recognized. *See, e.g.*, Collier, 177 F.3d at 1196 (counsel ineffective for not presenting expert testimony about defendant's "diffuse organic brain damage."); People v. Ruiz, 686 N.E.2d 574, 580 (Ill. 1997) (counsel ineffective for not presenting expert evidence that defendant "had cognitive dysfunction, dysfunction in the left central hemisphere of the brain, diffuse misfunction of the frontal lobe and several other problems 'peppered throughout the brain.'"); *cf.* ABA Guidelines, 31 HOFSTRA L. REV. 1061 ("neurology and psychology ... often have important implications for understanding clients' behavior").

The District Court unfairly minimized the significance of this evidence, conceding only that Hall "has a lesser ability to exercise judgment [and] anticipate the consequences of his actions and would ... benefit from supervision." R.E. 122-23. But such a condition can be a key part of a fully developed case in mitigation, which cumulatively could have persuaded a reasonable juror that death was inappropriate. The District Court dismissed Hall's impairment as insufficiently severe by contrast to "mental disorder[s]" or "mental retardation." R.E. 122. Reasonable jurists, however, could find that Hall's impairment *diminishes his moral culpability*, making him less responsible for his actions than an adult with a normally functioning brain. *See* Bigby v. Dretke, 402 F.3d 551, 571 (5th Cir. 2005) (defendant's impairment can

44

affect jury's perception of his moral responsibility).[55]

***Summary.*** Overall, the District Court's analysis of Hall's IAC claim is debatable because it rests on counsels' version of factual matters that remain hotly disputed, have never been subject to adversarial testing and, often, are contradicted by counsels' contemporaneous records. Further, the District Court labeled counsels' decisions "strategic" despite extensive evidence demonstrating that counsel did not comply with prevailing standards by laying the necessary groundwork for exercising informed judgment. And, the District Court's opinion is pervaded by ruminations, impermissible under Strickland, about how it would have responded if trial counsel had taken certain actions.

The District Court's focus on the aggravated facts of the crime appears to have convinced it that a death sentence was inevitable. That focus blinded the District Court to seeing the powerful cumulative case in mitigation counsel would have assembled by complying with prevailing norms. Its conclusion of "no prejudice" erroneously rests on a piecemeal, rather than a cumulative, assessment of the likely effect of counsels' errors and omissions. Moreover, the District Court ignored the fact that the Supreme Court has found Strickland prejudice from counsels' failure to present mitigating evidence even in cases involving highly aggravated murders and

---

[55] Hall identified additional instances of deficient performance. *See* R. 39:752-53, 770-73, 794-804. The District Court's treatment of those issues is marred by the same pervasive errors that characterize its treatment of the issues already discussed. COA should issue to examine all challenged aspects of counsels' performance.

45

highly dangerous defendants. *See, e.g.*, Rompilla, 125 S. Ct., at 2469 (evidence about defendant's deprived childhood and mental capacity might well have influenced jurors' appraisal of his culpability, even though he repeatedly stabbed victim before setting him on fire and had committed prior violent acts, including rape); Williams, *supra*, 529 U.S. 362. The District Court's "no prejudice" holding ignores the simple fact that in many of the "worst" federal capital cases, mitigation has persuaded at least one juror to vote against death.[56] The District Court itself acknowledged that penalty-phase jury deliberations were significantly long. R.E. 128. Thus, the prosecution did not have an open-and-shut case for death even given the weak case in mitigation actually presented. Finally, the District Court's "no prejudice" assessment was unfairly premature because Hall has never been given a hearing to fully develop the facts.

---

[56] *See, e.g.*, Gates, "Laurel Man Gets Life In Prison In Federal Death Penalty Case," (Jackson, MS) CLARION LEDGER, February 11, 2005 (life imprisonment for double homicide where victims' bodies were burned and hands hacked off to avoid identification; defendant "had been a good person and family man before his 17-year addiction to crack cocaine"); Libow, "Killer Spared Death Penalty," HARTFORD COURANT, July 7, 2004 (life sentence for contract killing of rival drug dealer; defendant was "a model prisoner and [had] forged a positive relationship with his son"); Casale, "Jury Spares Simmons," (Harrisonburg, VA) DAILY NEWS – RECORD, February 17, 2005 (life sentence for murdering two college students; mitigating evidence "focused on [defendant's] good behavior during incarceration")); Touhy, "Tension Thick As Killer Learns His Fate," HARTFORD COURANT, October 27, 2004 (life sentence; although jury rejected proposed mitigating factors related to defendant's mental condition, "several jurors ... were clearly moved – at least two to tears – by a videotaped interview of [his] two sons and a stepson, ages 6 to 10"); Associated Press, "Two Killers Avoid Uncommon Penalty: Death," May 5, 2005 (life sentence for murdering security guard during armored truck robbery; evidence described defendant's "troubled childhood," including that his "father was an alcoholic who beat his wife and children"); Gibson, "Death Penalty Rejected In Drug Gang Murders," BALTIMORE SUN, April 29, 2004 (life sentences for "a string of brutal homicides," including a witness killing; jurors "heard mitigating evidence that spotlighted the cycle of poverty, neglect, violence and addiction that over the last four decades eroded Baltimore's inner city").

**B.** **Reasonable jurists could disagree with the limitations the District Court imposed on development of the facts regarding Hall's claims of extraneous influence on the jury (Claims III-V)**

COA should issue on the limited fact development authorized by the District Court respecting Claims III-V (*see* R. 39:821-28). Those claims alleged as follows:

During the weekend break in penalty-phase deliberations, one juror – despite strenuous warnings from the Court to avoid such situations – attended an event, possibly a birthday party, at which attendees prayed for Lisa Rene and memorialized her loss. *See* 2255 Exh. 64, 583, 585; Supp. R. (Trial Transcript Vol. 20-A) at 98, 111-112; R. 34:4. Hall's counsel knew of this incident and intended to (but never did) seek permission to interview the jurors. 2255 Exh. at 64.

Hall's 2255 Motion alleged extraneous influences on the jury, and ineffectiveness of trial counsel in not pursuing the matter. *See* R. 36:113-17; 41:1342-44; R.E. 180-81. Requests to conduct relevant discovery (*e.g.*, subpoena local TV news videotapes of post-trial juror interviews, and/or interview jurors) were denied. *See* R. 7:1662-74, 1684; 36:198-99; 37:369-70, 1053-54.

In 2001, juror Jacqueline Holmes wrote to Hall that she had contact with Lisa Rene's mother during the trial.[57] Hall added claims based on Holmes' correspondence. R. 39:832-35.

In response, the District Court ordered a hearing, but permitted no discovery beforehand and refused Hall permission to contact any jurors, including Holmes, to

---

[57] *See* R. 39:825-28; 2255 Exh. 586-602, 590.

47

prepare. *See* R. 41:1428.

Holmes testified that (1) she had not met Lisa Rene's mother in the courthouse, (2) *she* attended no party during the weekend break, and (3) no juror mentioned anything during deliberations about praying for Lisa Rene. R. 35:5, 7-8. Holmes confirmed that post-verdict interviews with her and "several" other jurors were broadcast locally. R. 35:8-9. Hall renewed his request to subpoena these videotapes. R. 41:1484-92. Leave was denied. R. 42:1507-09.

Reasonable jurists could debate the District Court's approach to resolving this claim – conducting a single-witness evidentiary hearing with no discovery and no opportunity for Hall to develop the facts, including evidence that might impeach the sole juror who testified. The District Court recognized that substantial evidence supporting Hall's allegations, *see generally* R. 39:821-36; 41:1340-49, thereby requiring the court to authorize fact-development procedures adequate to fully resolve the questions raised. *See* Bracy v. Gramley, 520 U.S. 899, 908-909 (1997). The procedure it chose – a single-witness evidentiary hearing, with no discovery before or afterward, and no opportunity for Hall to speak with any jurors other than his in-court examination of Holmes – was insufficient.

The District Court apparently assumed Holmes was the only juror who might have violated its orders during the weekend break, such that her testimony conclusively resolved the matter against Hall. But her testimony indicated that

48

interviews with "several" jurors aired; thus, the juror who admitted attending the weekend event may have been someone else. Moreover, Holmes' own televised interview may well impeach her testimony; Holmes admitted having corresponded with Hall under a false name and making false statements to manipulate Hall. The circumstances as a whole raise concerns about Holmes' candor – concerns that could be easily resolved by letting Hall subpoena the broadcast footage.[58] Reasonable jurists could disagree with the decision to allow only a single-witness hearing with no opportunity for Hall to prepare to meet Holmes' testimony or offer other proof.[59]

## C.    Indictment Clause claim

Hall argued that the grand jury should have made findings necessary to expose him to a death sentence. R. 38:685-91. Reasonable jurists could dispute the District Court's view that any such rule would not be retroactive and any error was harmless.

The grand jury's role in *independently* checking the government assumes special importance in capital cases. Vasquez v. Hillery, 474 U.S. 254, 263 (1986) (grand jury determines not just probable cause, but whether to charge greater or lesser offense, one or multiple counts, "and perhaps most significant of all, a capital [or] a

---

[58] Because the interviews *aired*, the stations need not provide "raw footage." Instead, Hall seeks only what a private citizen could have been obtained in 1995 using a VCR.

[59] Hall alleged the same facts in support of his claim of ineffective assistance of counsel. *See* R.E. 180-81; R. 41:1342-44. An expert opined that "reasonably effective counsel would have viewed these [circumstances] as raising a distinct concern that outside influences ... affected the [jury]," id., and that trial counsel performed deficiently by not pursuing the matter. The District Court's orders made it impossible for Hall to substantiate this part of his ineffectiveness claim.

noncapital offense – all on [the] same facts"). COA should issue to address whether the Indictment Clause requires grand jurors to allege the facts which, if proven, will authorize a death sentence, and whether such error can be harmless.[60] The District Court's non-retroactivity holding is debatable as well. *See* <u>Jones v. United States</u>, 526 U.S. 227 (1999) (recognizing relevant Fifth Amendment rule).

**D. Prosecutorial misconduct claims (Claims VI-X)**

Rulings denying discovery and a hearing prevented appropriate development of the facts supporting these claims (*e.g.*, tolerating perjury by Nichols, *see* R. 39:839-42, violating Hall's right to counsel, R. 39:842-44, and concealing Nichols' full criminal history, R. 39:835-39). Both the denial of fact development and the merits of the claims warrant COA.

- Nichols' denials at Hall's trial that he'd (1) learned from other inmates how to "game" the legal system and (2) bought drugs with robbery proceeds, directly contradicted his earlier testimony in his own case. R. 32:252, 257; 39:839-42. The Government either knew or should have known of the conflict. 2255 Exh. 310, 313, 315, 317, 327-28, 455, 457, 494.[61]

- In his own case, Nichols admitted many crimes (drug dealing; stealing personal watercraft; weapons offenses; transporting stolen goods, including vehicles, interstate; fencing stolen goods; check fraud; robbery). Nichols' plea required him to disclose all prior criminal

---

[60] Hall acknowledges the contrary authority of <u>United States v. Robinson</u>, 367 F.3d 278 (5th Cir. 2004), but seeks COA to preserve this issue for further review.

[61] The fact that Nichols indisputably changed his sworn testimony from one trial to the next justified granting at least some discovery (*e.g.*, what criminal conduct Nichols admitted to the Government in debriefing, whether Nichols failed the polygraph his plea agreement required, and whether Nichols was polygraphed regarding his allegations against Hall).

activity, and nothing indicates the Government ever disclosed what Nichols revealed. *See generally* R. 39:836-39.[62]

- The initial FBI report about Nichols labels him "LARRY DONNEL NICHOLS (protect)," suggesting Nichols was *already* in protective custody as of that date, contrary to his testimony. *See* R. 39:838, 31:236-237. The Government never disclosed this fact or its implications.[63]

Reasonable jurists could conclude Nichols' false testimony at Hall's punishment trial materially violated due process.[64] United States v. Agurs, 427 U.S. 97, 103 (1976); *see also* R. 39:985 (n.10) (Government concedes Nichols was important witness).

Hall alleged that the Government, through Nichols, elicited information from Hall outside counsels' presence, violating the Sixth Amendment. R. 39:842-44. Only discovery or a hearing can resolve whether Nichols, *e.g.,* had contact with the Government between his original conversation with the FBI and his subsequent debriefing. The Government denied Nichols was encouraged to obtain information from Hall. R. 39:993-95; 40:1082. Reasonable jurists could dispute the denial of any

---

[62] Nichols' co-defendant Miller, attempting to cooperate, was debriefed by federal agents, during which he may have revealed additional impeaching information about Nichols which the Government never disclosed. *See* R. 39:838.

[63] Below, the Government *did not dispute* the inference that Nichols was in protective custody before he testified he was, but argued that it was "insufficient" to prove Hall's claim. R. 39:987. The facts remain unresolved.

[64] Napue v. Illinois, 360 U.S. 264 (1959); Hayes v. Brown, 399 F.3d 972, 978-981 (9th Cir. 2005) (*en banc*). This Court has indicated the Government need not correct false testimony elicited by defense counsel on cross. United States v. O'Keefe, 128 F.3d 885, 894 (5th Cir. 1997). Any such holding would conflict with, *e.g.,* United States v. Bantowski, 865 F.2d 129, 133-134 (7th Cir. 1989), and Hayes, *supra,* as well as with Giglio v. United States, 405 U.S. 150, 151-52 (1972), warranting COA.

fact development respecting this claim.

### E. Racially discriminatory federal death penalty (Claim XI)

The District Court conceded Hall's evidence arguably showed "similarly situated white federal defendants have not been subject to the death penalty while black defendants have," R. 37:382, but denied discovery because of the purported lack of proof that prosecutors possessed discriminatory intent in seeking death against African-American defendants. Id. Hall unsuccessfully renewed his request for discovery, proffering additional data significantly strengthening the inference of discriminatory intent. *See* Appendix A and Supplemental Appendix to Defendant's Second Motion for Discovery and Brief in Support (docket nos. 1105 and 1109). *See* R. 41:1381. Reasonable jurists could conclude the District Court erred in denying Hall the opportunity to develop and prove this claim.

### V. Reassignment is necessary on remand

Whether this case should be reassigned on remand is governed by two tests.[65] *See* In re Daimler Chrysler Corp., 294 F.3d 697, 700-01 (5th Cir. 2002)). The first weighs three factors: whether (1) the judge would reasonably be expected to have substantial difficulty putting aside previously expressed views or findings determined to be erroneous, (2) reassignment is advisable to preserve the appearance of justice,

---

[65] The question of reassignment on remand arguably requires no COA, but we make the request to foreclose any claim of waiver. If possible reassignment becomes relevant only once an appeal is authorized, resolution of this issue should be deferred.

and (3) reassignment would entail waste and duplication disproportionate to any gain in preserving apparent fairness. The second test permits reassignment "when the facts might reasonably cause an objective observer to question [the judge's] impartiality." Daimler Chrysler, 294 F.3d at 701.

Either test counsels reassignment here. The District Court will face "substantial difficulty putting aside [its] previously expressed views or findings" regarding, *e.g.*, trial counsels' performance and the absence of any prejudice. It credited claims by trial counsel that were utterly at odds with the record. It found counsels' every act and omission "strategic" and deliberate – even though *no evidence* supported that characterization. "The appearance of justice" will gravely suffer if the case is not reassigned.

Similarly, the District Court apparently has decided a death sentence was inevitable, which would lead an objective observer reasonably to question its impartiality. The same inference arises from the District Court's refusal to permit reasonable fact development, and its denial of COA on Hall's IAC claim despite the extensive evidence supporting it. Both communicate to the public that the District Court has rejected any *possibility* that mitigating evidence, competently developed and presented, could have resulted in a life sentence.

Thus, a COA should issue respecting reassignment on remand.

## CONCLUSION

A COA should issue on each question addressed above.

Respectfully submitted,

ROBERT C. OWEN
Texas Bar No. 15371950
Owen & Rountree, LLP
P.O. Box 40428
Austin, Texas 78704
Tel. 512-804-2661
Fax 512-804-2685

MARCIA A. WIDDER
Louisiana Bar No. 23367
636 Baronne St.
New Orleans, LA 70113
Tel. 504-558-9867
Fax. 504-558-0378

Counsel for Orlando Hall

# CERTIFICATE OF SERVICE

This certifies that a true and correct copy of the foregoing motion has been served on counsel for the Government by placing the same into the United States Mail, first-class postage prepaid, addressed to:

> AUSA Delonia Watson
> Office of the U.S. Attorney
> 801 Cherry Street, Suite 1700
> Fort Worth, TX 76102

this 18th day of July, 2005

_____
Marcia A. Widder

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies:

1.  This Application for Certificate of Appealability complies with the type-volume limitations of Fed.R.App. 32(a)(7)(B) because it contains 13,998 words (excluding this certificate and the certificate of service).

2.  This COA Application complies with the typeface requirements of Fed.R.App. P. 32(a)(5) and the type styles requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a Word Perfect document in a proportionally spaced typeface using Times New Roman in 14-point font, except for the footnotes, which are in 12-point font.

Dated: _7/18/05_

_Marcia A. Widder_
Marcia A. Widder
Attorney for Defendant-Appellant
Orlando Hall

LEXSEE 88 FED. APPX. 15

**UNITED STATES OF AMERICA, Plaintiff - Appellee v. SERGIO ALANIS, also known as Sergio Alaniz, also known as La Paca, Defendant - Appellant**

**No. 02-21135**

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

*88 Fed. Appx. 15; 2004 U.S. App. LEXIS 2149*

**February 10, 2004, Filed**

**NOTICE:** [**1] RULES OF THE FIFTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Southern District of Texas, Houston. No. H-97-CR-153-9. *United States v. Alanis, 234 F.3d 705, 2000 U.S. App. LEXIS 27103 (5th Cir. Tex., 2000)*

**DISPOSITION:** Affirmed in part, vacated and remanded in part.

**LexisNexis(R) Headnotes**

**JUDGES:** Before KING, Chief Judge, and JONES and SMITH, Circuit Judges.

**OPINION:** [*16] PER CURIAM: *

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Sergio Alanis, a federal prisoner, appeals the district court's dismissal of his § 2255 motion. He attacks his convictions and sentences on several grounds, including ineffective assistance of counsel, prosecutorial misconduct, and violations of *Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000)*.

We affirm in part, vacate in part, and remand to the district court for further factual [**2] development on Alanis's ineffective-assistance-of-trial-counsel claim.

**I. Background**

In February 1999, a federal jury convicted Sergio Alanis of (1) conducting a continuing criminal enterprise ("CCE"), (2) two counts of aiding and abetting possession with intent to distribute marijuana, (3) money laundering, and (4) conspiracy to launder money. Later that spring, the district court sentenced him to, inter alia, 240 months in prison on each count and ordered that the sentences be served concurrently. In September 2001, after unsuccessfully appealing his convictions, Alanis filed a motion to vacate, set aside, or correct his sentence under *28 U.S.C. § 2255*. The district court denied Alanis's § 2255 motion without holding a hearing on any of his claims.

Following the district court's refusal to grant Alanis a certificate of appealability (a "COA"), we granted Alanis a COA regarding the following issues: (1) whether his trial counsel rendered ineffective assistance by failing to file a motion to suppress the evidence obtained during the warrantless search of Alanis's house in light of David Pena-Garcia's affidavit regarding that search; (2) whether [**3] his trial counsel's alleged ineffectiveness concerning the *Fourth Amendment* claim suffices to overcome Alanis's procedural default on that claim; (3) whether the sworn affidavit from Jose Garcia is newly discovered evidence that proves that the prosecution knowingly used perjured testimony at Alanis's trial; (4) whether the district court should have conducted an evidentiary hearing to consider whether the prosecution knowingly used perjured testimony at Alanis's trial; (5) whether Alanis's convictions for aiding and abetting

possession with intent to distribute marijuana are invalid under Apprendi because a drug quantity was not alleged in the indictment or submitted to the jury; and (6) whether his appellate counsel was ineffective for failing to raise the Apprendi issue on direct appeal.

## II. Standard of Review

When considering a district court's denial of a § 2255 motion, we review factual [*17] findings for clear error and conclusions of law de novo. See *United States v. Stricklin, 290 F.3d 748, 750 (5th Cir. 2002)*. A district court's conclusions regarding a claim of ineffective assistance of counsel involve mixed questions of law and fact, which we [**4] review de novo. See *United States v. Bass, 310 F.3d 321, 325 (5th Cir. 2002)*. Further, we review for abuse of discretion the district court's decision not to hold a hearing. See *United States v. Bartholomew, 974 F.2d 39, 41 (5th Cir. 1992)*.

## III. Discussion

### A. Trial Counsel's Failure to Pursue the *Fourth Amendment* Claim

We granted a COA regarding whether Alanis's trial counsel rendered ineffective assistance by failing to file a motion to suppress the evidence obtained during the warrantless search of Alanis's house in light of David Pena-Garcia's affidavit regarding that search. n1 To obtain relief on his ineffective-assistance-of-counsel claim, Alanis must show both that his counsel's performance was deficient (i.e., that it "fell below an objective standard of reasonableness") and that he was prejudiced by his counsel's deficient performance. See *Strickland v. Washington, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)*. Regarding the first prong, we must be "highly deferential" when evaluating counsel's performance; a strong presumption exists that the representation was reasonable. *Id. at 689.* "The [**5] defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (citation and internal quotation marks omitted). If Alanis shows that his counsel's performance was deficient, he then must demonstrate prejudice. See *id. at 691, 693-94.* To do so, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id. at 694.* Further, the Supreme Court has refined the prejudice inquiry in the context of ineffective-assistance claims based on counsel's failure to file a motion to suppress:

Where defense counsel's failure to litigate a *Fourth Amendment* claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his *Fourth Amendment* claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.

*Kimmelman v. Morrison, 477 U.S. 365, 375, 91 L. Ed. 2d 305, 106 S. Ct. 2574 (1986).* [**6]

n1 Alanis contended on direct appeal that his trial counsel rendered constitutionally ineffective assistance. We declined to consider the claim, citing the general rule "that a claim of ineffective assistance of counsel cannot be resolved on direct appeal when the claim has not been raised before the district court since no opportunity existed to develop the record on the merits of the allegations." *United States v. Alanis, 234 F.3d 705, slip op. at 4 (5th Cir. 2000)* (per curiam) (citing *United States v. Navejar, 963 F.2d 732, 735 (5th Cir. 1992)*); cf. *Massaro v. United States, 538 U.S. 500, 123 S. Ct. 1690, 1696, 155 L. Ed. 2d 714 (2003)* (holding "that failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255").

At trial, a police officer testified that Pena-Garcia, Alanis's father-in-law, informed the officer that he was in control of Alanis's residence [**7] and verbally consented to a search of the premises, during which officers seized $ 40,970 in currency. But, when Alanis filed his § 2255 motion in the [*18] district court, Alanis submitted a sworn, post-conviction affidavit from Pena-Garcia stating that he neither consented to the search nor informed the officer that he was in control of the premises. Alanis contends that his trial counsel rendered ineffective assistance because the lawyer failed to file a motion to suppress the evidence obtained during the warrantless search of Alanis's house. He further asserts that his trial counsel was ineffective for failing to investigate the validity of that warrantless search.

"A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would

have altered the outcome of the trial." *United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989).* Although Alanis fails to allege specifically that Pena-Garcia was willing to testify on behalf of Alanis during a suppression hearing, we liberally construe the pleadings of those who proceed pro se. See *Haines v. Kerner, 404 U.S. 519, 520-21, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972).* [**8] Alanis's brief does assert that his trial counsel's decision not to file a suppression motion could not have been the product of either a considered trial strategy or a reasonable investigation. According to Alanis, a nondeficient lawyer would have explored the circumstances surrounding the search, since it was conducted without a warrant and the individual who allegedly consented to the search (Pena-Garcia) refused to sign a written consent form. Moreover, both Alanis and Pena-Garcia allege that the search of Alanis's house was conducted without consent, and the record does not indicate that Pena-Garcia would have testified otherwise if called for a suppression hearing.

The district court concluded, however, that Alanis had not satisfied either prong of the Strickland test. First, defense counsel's performance was not deficient, according to the district court, since--considering the officer's testimony that Pena-Garcia consented to the search and the substantial evidence of money laundering--the decision not to file a motion to suppress "can reasonably be attributed to trial strategy." Second, the court, assuming for the sake of argument that counsel's performance fell below [**9] an objective standard of reasonableness, also concluded that Alanis had not shown that counsel's failure to move to suppress the currency prejudiced his defense. In the district court's view, Alanis failed to prove that he would have been found not guilty of money laundering, since the government introduced substantial evidence at trial regarding the money-laundering count. n2 The [*19] district court's opinion does not explicitly consider whether Alanis is entitled to a hearing on this *Sixth Amendment* claim.

n2 But the district court failed to consider that the count of money laundering with which Alanis was charged and convicted accused him of laundering the very currency found during the now-disputed search. Specifically, count nine of the second superceding indictment states the following:

On or about January 26, 1994, in the Southern District of Texas and elsewhere, and within the jurisdiction of this Court,

**SERGIO ALANI[S], a/k/a Sergio Alaniz and La Paca,** defendant herein . . . did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, the transfer, delivery or other disposition of U.S. Currency, which involved the proceeds of a specified unlawful activity, namely, a violation of Title *21, United States Code, Sections 841, 846 and 848*, with the intent to promote the carrying on of said specified unlawful activity and knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the specified unlawful activity, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, that is, funds, amounting to approximately $ 40,970.00, represented the proceeds of some form of unlawful activity.

In violation of Title *18, United States Code, Sections 2, 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i)*

(emphasis added).

[**10]

A *§ 2255* motion "can be denied without a hearing only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief." *Bartholomew, 974 F.2d at 41*; accord *Friedman v. United States, 588 F.2d 1010, 1014-15 (5th Cir. 1979)*; see also *28 U.S.C. § 2255 (2000)*. See generally *Machibroda v. United States, 368 U.S. 487, 494-96, 7 L. Ed. 2d 473, 82 S. Ct. 510 (1962)*. The determination of whether to conduct a hearing on a *§ 2255* motion involves two steps. See *Friedman, 588 F.2d at 1015*. First, the court examines whether the record conclusively negates the factual predicates asserted in support of the motion. *Id.* If not, the court next determines whether the

movant would be entitled to relief if his factual allegations are true. *Id.* If he would be entitled to relief, then the district court must conduct a hearing to ascertain the validity of the movant's factual assertions. On the state of this record, we conclude that further factual development is required (which may include a hearing) regarding Alanis's ineffective-assistance-of-trial-counsel claim.

Regarding [**11] the first step in the Friedman analysis, we find that the record does not conclusively negate Alanis's allegation that his counsel's decision not to file a motion to suppress was the product of the lawyer's failure to conduct a reasonable investigation into the circumstances surrounding the search. While "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland, 466 U.S. at 690-91.* In rejecting Alanis's claim, the district court determined that defense counsel's failure to file a motion to suppress was based on sound trial strategy. But the basis for this conclusion is not readily apparent from the record. If the testimony of the officer conducting the search were uncontroverted, the district court's conclusion would certainly be warranted. But the district court failed to address (1) the conflict between Pena-Garcia's affidavit and the officer's testimony, (2) whether that conflict existed before [**12] trial, or (3) whether trial counsel was aware of, or should have been aware of, the existence of that conflict. Thus, we know little about what, if any, investigation Alanis's trial counsel took before deciding not to file a motion to suppress the seized currency, and thus, we cannot say that the record conclusively negates Alanis's factual allegations.

Additionally, the record does not conclusively negate Pena-Garcia's allegation that he did not consent to the search. The affidavit conflicts with the officer's trial testimony. Consequently, further factual development is required to determine who is telling the truth. See *Friedman, 588 F.2d at 1015* (stating "that contested fact issues in § 2255 cases cannot be resolved on the basis of affidavits"); see also *Taylor v. United States, 287 F.3d 658, 660 (7th Cir. 2002)* (stating, in the context of a § 2255 motion, that "if the record contains an evidentiary conflict on a material issue [*20] of fact, a judge must hold an evidentiary hearing to decide who is telling the truth"). The resolution of this factual question will determine the validity of Alanis's *Fourth Amendment* claim, which is an element of the [**13] Strickland prejudice inquiry in these circumstances.

We now turn to the second step of the Friedman analysis--whether Alanis's factual allegations would entitle him to relief if true. The government relies on *United States v. Chavez-Valencia, 116 F.3d 127, 134 (5th Cir. 1997),* to support the district court's assertion that Alanis's claim is facially invalid because he "fails to demonstrate that [his lawyer's] election not to file a motion to suppress was not based on a conscious or informed trial tactic." But the defendant in Chavez-Valencia attempted to raise his ineffective-assistance-of-counsel claim on direct appeal. See *id. at 128.* Because the record was not sufficiently developed to allow us to review the claim, we denied it without prejudice to collateral review, stating that "without knowing the reason for failing to file a pretrial motion, this court is not positioned to review the competency of representation Chavez received." *Id. at 134.* We are in a similar position here. While we recognize "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy," *Strickland, 466 U.S. at 689* [**14] (internal quotation marks omitted), we also note that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," *id. at 691.* Again, at this stage, we do not know what investigation Alanis's trial counsel conducted regarding whether to file a motion to suppress the currency. Thus, we cannot, without the benefit of further factual development, agree that the attorney's performance was not deficient.

In addition, Alanis's attack on his conviction for money laundering cannot be rejected on the prejudice prong of Strickland. If it is determined that Pena-Garcia did not consent to the search, exclusion of the currency would be appropriate, since the officers who searched Alanis's residence did not obtain a warrant. Further, Alanis was convicted of laundering the very currency found during the now-disputed search of his residence. n3 A reasonable probability therefore exists that the suppression of that currency would have prevented Alanis's conviction for laundering it. n4 Consequently, if Alanis's assertion that his trial counsel failed to conduct a reasonable investigation before deciding [**15] not to file a motion to suppress the currency proves true, he will be entitled to relief.

n3 See supra note 2.

n4 Alanis also contends that the admission of the currency significantly influenced the results concerning his other counts of conviction. The district court did not explicitly find that Alanis had failed to satisfy Strickland's prejudice

requirement regarding his convictions on the other counts. Nevertheless, our review of the record reveals that substantial evidence, besides the seized currency, supports the other counts of conviction. Accordingly, we affirm the district court's rejection of Alanis's *Sixth Amendment* claim insofar as it relates to his other counts of conviction.

Considering Pena-Garcia's affidavit, we cannot conclude that Alanis's " *§ 2255* motion, together with the files and records of the case, conclusively show that under no circumstances would [Alanis] be entitled to relief" from his conviction for money laundering. *Friedman, 588 F.2d at 1017.* As [**16] we stated in Friedman,

> We do not, of course, pretend to prejudge this . . . issue . . . . Nor do we predict or intimate the legal consequences of any findings or holdings on the matter[] remanded for further hearing. [*21] The point is that we do not know, nor does the District Court know, whether [Defendant]'s allegations are indeed true and whether, as a consequence, he was unconstitutionally deprived of . . . effective assistance of counsel when he was convicted and sentenced.

Id. Accordingly, we remand for further factual development on this claim.

## B. Unconstitutional Search and Seizure

In his *§ 2255* motion, Alanis contends that his conviction was obtained through the use of evidence (namely, the currency discussed above) seized during an unconstitutional search. Because Alanis raised this claim for the first time in his *§ 2255* motion, his claim is procedurally barred unless he can show "both 'cause' for his procedural default, and 'actual prejudice' resulting from the error." *United States v. Shaid, 937 F.2d 228, 232 (5th Cir. 1991)* (en banc). "Absent unusual circumstances, ineffective assistance of counsel, if shown, is sufficient [**17] to establish the cause and prejudice necessary to overcome a procedural default." *United States v. Walker, 68 F.3d 931, 934 (5th Cir. 1995).* Thus, we granted a COA concerning whether Alanis's trial counsel's alleged ineffectiveness constitutes both cause for Alanis's failure to challenge the search and seizure during his criminal proceedings and actual

prejudice due to counsel's alleged error.

Even if he can show ineffective assistance and thereby overcome the procedural bar, Alanis's *Fourth Amendment* claim probably is not cognizable in this *§ 2255* proceeding. The Supreme Court held in *Stone v. Powell, 428 U.S. 465, 494-95, 49 L. Ed. 2d 1067, 96 S. Ct. 3037 & n.37 (1976),* that state prisoners collaterally attacking their convictions under *§ 2254* cannot obtain relief for violations of the *Fourth Amendment* exclusionary rule when the prisoner was provided a full and fair opportunity to litigate the *Fourth Amendment* issue in the state courts. Interpreting the "full-and-fair-opportunity" requirement in the *§ 2254* context, we have stated that when a defendant fails to raise his *Fourth Amendment* claim at trial (as occurred here), then Stone precludes habeas relief [**18] on *Fourth Amendment* grounds, even though no state hearing was held on the claim. See *Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978)* ("An 'opportunity for full and fair litigation' means just that: an opportunity. If a state provides the processes whereby a defendant can obtain full and fair litigation of a *fourth amendment* claim, Stone v. Powell bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes."). n5 We have also held that the Stone rule can be raised by a court sua sponte. See *Davis v. Blackburn, 803 F.2d 1371, 1372-73 (5th Cir. 1986)* ("We are obliged to apply Stone as a prudential limitation on the exercise of our jurisdiction . . ., even if it must be raised sua sponte."). Thus, it would appear that the government's failure to assert the Stone bar does not prevent us from applying it to Alanis's claim. But the applicability of Stone in *§ 2255* proceedings is somewhat unclear. While the Supreme Court has not definitively resolved the question, dicta in *United States v. Johnson, 457 U.S. 537, 562 n.20, 73 L. Ed. 2d 202, 102 S. Ct. 2579 (1982),* indicates that the [**19] doctrine does apply here. n6

> n5 Alanis fails to allege that the district court would not have provided a full and fair opportunity for him to litigate his *Fourth Amendment* claim had he raised it.

> n6 Regardless whether the rule precludes his *Fourth Amendment* claim, Stone does not bar Alanis's *Sixth Amendment* claim that his trial counsel's failure to file a motion to suppress the currency amounted to constitutionally ineffective assistance. See *Kimmelman, 477 U.S. at 382-83.*

In light of our disposition of the ineffective-assistance-of-trial-counsel claim, however, [*22] we do

not need either to consider the merits of Alanis's *Fourth Amendment* claim or to decide whether Stone would preclude it. If the district court determines that Alanis's trial counsel rendered constitutionally ineffective assistance due to the lawyer's failure to file a motion to suppress, Alanis will have satisfied the cause-and-prejudice standard, see *Walker, 68 F.3d at 934,* which would allow him to [**20] pursue his *Fourth Amendment* claim. In other words, Alanis's *Fourth Amendment* claim is procedurally barred unless he first succeeds on his *Sixth Amendment* claim. Further, if he succeeds on his *Sixth Amendment* claim, he will have established the validity of his *Fourth Amendment* claim because the merits of his *Fourth Amendment* claim are an element of his ineffective-assistance-of-trial-counsel claim. See *Kimmelman, 477 U.S. at 375, 382.* n7 Finally, the relief sought in Alanis's *Fourth Amendment* claim is identical to the relief sought in his ineffective-assistance-of-trial-counsel claim. Accordingly, since (1) Alanis cannot pursue his *Fourth Amendment* claim unless he prevails on his *Sixth Amendment* claim n8 and (2) if he prevails on his *Sixth Amendment* claim he will be entitled to all relief that would be available to him if he succeeded on his *Fourth Amendment* claim, we need not concern ourselves further with Alanis's *Fourth Amendment* claim.

N7 Note also that if Alanis can show--as required by Strickland--that there is a reasonable probability that, but for counsel's failure to file a motion to suppress, he would not have been convicted on one or more of the counts, he will have conclusively shown that the admission of the currency was not harmless regarding such count(s). See *Kyles v. Whitley, 514 U.S. 419, 435-36, 131 L. Ed. 2d 490, 115 S. Ct. 1555 (1995).* [**21]

n8 Even then, Stone probably precludes Alanis from litigating his *Fourth Amendment* exclusionary-rule claim in this § 2255 proceeding.

## C. Prosecutorial Misconduct

Alanis contends that the government prosecutor knowingly elicited false trial testimony from government witness Jose Garcia. He attached to his § 2255 motion a sworn, postconviction affidavit from Jose Garcia supporting his assertion. Due process is violated when the prosecution knowingly offers false testimony to obtain a conviction and fails to correct such testimony. *Tucker v. Johnson, 242 F.3d 617, 625-26 (5th Cir. 2001);* see also *Burton v. United States, 237 F.3d 490, 493 (5th Cir. 2000).* To obtain relief, Alanis must prove (1) that the statements in question are false; (2) that the government knew of their falsity; and (3) that the statements were material. *Tucker, 242 F.3d at 626.*

Because Alanis failed to raise this contention either at trial or on direct appeal, he must first show "both 'cause' for his procedural default, and 'actual prejudice' resulting from [**22] the error." *Shaid, 937 F.2d at 232.* If Garcia's affidavit was not available to Alanis until after his direct appeal was decided, this would establish cause for his failure to raise this claim earlier. See *Murray v. Carrier, 477 U.S. 478, 488, 91 L. Ed. 2d 397, 106 S. Ct. 2639 (1986)* (stating "that a showing that the factual or legal basis for a claim was not reasonably available to counsel" satisfies the cause requirement for overcoming a procedural default). Whether Alanis can establish actual prejudice will depend on the validity of his prosecutorial-misconduct claim, for the Supreme Court has treated the materiality element of such a claim "as coterminous with the 'prejudice' prong of the procedural default doctrine." 2 RANDY [*23] HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 26.3c, at 1221-22 (4th ed. 2001) (citing cases).

Alanis's assertion that the government knowingly elicited false testimony was one of several allegations of government misconduct presented in his § 2255 motion. In its opinion, the district court did not mention the affidavit from Garcia. Nevertheless, the court rejected Alanis's government-misconduct claim in its entirety, [**23] stating that the claim was unsupported and procedurally barred. Thus, it implicitly concluded that each of Alanis's allegations of misconduct lacks merit. We affirm the district court's ruling on this issue because we find that, even if Alanis's allegations concerning the Garcia affidavit are true, Alanis would not be entitled to relief. This is because, as the government shows in its brief, Garcia's testimony was not material.

Garcia's testimony was relevant to the CCE count and one of the counts for aiding and abetting possession with intent to distribute marijuana (i.e., the count charging Alanis with aiding and abetting the possession with intent to distribute marijuana on or about November 14, 1996, which was one of the predicate acts that formed the basis of his CCE conviction). On November 14, 1996, Texas state troopers arrested Garcia, who was driving a truck loaded with 597 pounds of marijuana. Garcia testified at trial that Alanis hired him to drive the

truck containing the marijuana. In his subsequent affidavit, however, Garcia stated that, when he testified at trial, he knew nothing about Alanis's involvement with the shipment of marijuana. Instead, Garcia asserted in [**24] the affidavit that the prosecutor instructed him to implicate Alanis and that Garcia did so in return for leniency.

Perjured testimony is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Creel v. Johnson, 162 F.3d 385, 391 (5th Cir. 1998)* (citations and internal quotation marks omitted). Garcia's allegedly false trial testimony concerning Alanis's involvement with the November 1996 shipment of marijuana is not material because at trial the government introduced substantial additional evidence connecting Alanis both to the shipment and to Garcia. For example, at trial, an FBI agent testified about several electronically intercepted telephone conversations between Garcia and Alanis during which the two men discussed the November 1996 shipment of drugs. Moreover, in his closing argument, the prosecutor did not once mention Garcia's testimony in connection with the November 1996 aiding and abetting possession with intent to distribute count. n9 Accordingly, because Garcia's allegedly false testimony was not material to the jury's verdicts, we affirm the district court's judgment regarding Alanis's [**25] prosecutorial misconduct claim. n10

n9 And he only referenced Garcia's testimony twice, briefly, in discussing the CCE count.

n10 As we find that Alanis's prosecutorial misconduct allegation is without merit, we consequently reject Alanis's contention that he should be allowed an evidentiary hearing on this issue.

## D. Apprendi Violation and Ineffective Assistance of Counsel on Appeal

We also granted a COA regarding Alanis's contention that his convictions for aiding and abetting possession with intent to distribute marijuana are invalid under *Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000)*, because a drug quantity was not alleged in [*24] the indictment or submitted to the jury. n11 Because Apprendi was issued approximately three months before Alanis's direct appeal was decided, the decision was applicable to Alanis's judgment of conviction. See *Griffith v. Kentucky, 479 U.S. 314, 328, 93 L. Ed. 2d 649, 107 S. Ct. 708 (1987)*

(holding that new rules are retroactively [**26] applicable to cases "pending on direct review or not yet final"). But, as this issue is raised for the first time in his § 2255 motion, Alanis is required to show both cause and prejudice for failing to raise this contention on direct appeal. See *Shaid, 937 F.2d at 232*. Although the government's brief to this court does not mention Alanis's procedural default regarding the Apprendi issue, we can raise the issue sua sponte because Alanis was given a reasonable opportunity to argue against imposition of the bar in district court. n12 See *United States v. Willis, 273 F.3d 592, 596-97 (5th Cir. 2001)*.

n11 In Apprendi, the Supreme Court held that due process requires that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *530 U.S. at 490*.

n12 In its motion to dismiss, the government asserted that Alanis had defaulted on his Apprendi claim.

[**27]

Alanis contended in district court that his appellate counsel was ineffective for failing to raise the Apprendi issue on direct appeal and that such ineffectiveness overcomes the procedural bar. n13 The Strickland standard also applies to the effectiveness of appellate counsel. See *Teague v. Scott, 60 F.3d 1167, 1173-74 (5th Cir. 1995)*. Alanis was sentenced on the CCE count to a concurrent sentence of equal length to the sentences challenged under Apprendi, and we have rejected each of Alanis's attacks on his CCE conviction and sentence. Consequently, he cannot show prejudice under Strickland. See *United States v. Tolliver, 61 F.3d 1189, 1223 & n.54 (5th Cir. 1995)* (holding that "dual sentencing is of no real consequence," and thus is not prejudicial under Strickland, when a defendant is serving a life sentence on an unchallenged count of conviction), vacated on other grounds sub. nom., *Sterling v. United States, 516 U.S. 1105, 133 L. Ed. 2d 834, 116 S. Ct. 900 (1996)*. Alanis's claim of ineffective-assistance-of-appellate-counsel therefore fails, and thus, his Apprendi challenge is procedurally barred.

n13 Thus, we granted him a COA on this issue as well.

[**28]

**IV. Conclusion**

Accordingly, we VACATE the district court's judgment insofar as it denied relief on Alanis's claim of ineffective assistance of trial counsel regarding counsel's alleged failure to investigate and to challenge the warrantless search and REMAND this case to the district court for further factual development concerning that claim. The district court's judgment regarding Alanis's remaining claims is AFFIRMED.

AFFIRMED IN PART; VACATED and REMANDED IN PART.

96 Fed. Appx. 219, *; 2004 U.S. App. LEXIS 8325, **

LEXSEE 96 FED. APPX. 219

**UNITED STATES OF AMERICA, Plaintiff-Appellee, versus WALTER WAYNE MCMILLEN, Defendant-Appellant.**

**No. 03-11051 Summary Calendar**

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

*96 Fed. Appx. 219; 2004 U.S. App. LEXIS 8325*

**April 28, 2004, Filed**

**NOTICE:** [**1] RULES OF THE FIFTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Magistrate's recommendation at *United States v. McMillen, 2005 U.S. Dist. LEXIS 1754 (N.D. Tex., Feb. 7, 2005)*

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of Texas USDC Nos. 3:02-CV-2078-G 3:01-CR-139-ALL-G. *McMillen v. United States, 2003 U.S. Dist. LEXIS 13340 (N.D. Tex., July 28, 2003)*

**DISPOSITION:** Certificate of Appealability granted in part, denied in part; vacated and remanded.

**LexisNexis(R) Headnotes**

**JUDGES:** Before SMITH, DeMOSS, and STEWART, Circuit Judges.

**OPINION:** [*220] PER CURIAM: *

    * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Walter Wayne McMillen ("McMillen"), federal prisoner # 26819-177, moves this court for a certificate of appealability ("COA") to appeal the district court's denial of his *28 U.S.C. § 2255* motion to vacate, set aside, or correct his sentence. Construing his motion liberally, McMillen argues that the waiver in his plea agreement did not [**2] bar his *28 U.S.C. § 2255* motion and that the district court should have held an evidentiary hearing on his claims that he would not have pleaded guilty but for his counsel's ineffectiveness and that his counsel was ineffective for failing to file a notice of appeal. McMillen's further argument that the district court erred by failing to consider the combined affect of his ineffective assistance of counsel claims is refuted by the record. McMillen additionally states that all of the claims he raised in the district court were meritorious, but because he does not explain why his remaining claims were meritorious, he has failed to adequately brief these claims and they are deemed waived. See *Yohey v. Collins, 985 F.2d 222, 224-25 (5th Cir. 1993)*.

To obtain a COA, McMillen must make "a substantial showing of the denial of a constitutional right." *28 U.S.C. § 2253(c)(2)*. As McMillen's *28 U.S.C. § 2255* motion was denied both on procedural [*221] grounds and on its merits, he "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" [**3] and "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel, 529 U.S. 473, 484, 146 L. Ed. 2d 542, 120 S. Ct. 1595 (2000)*.

The claims that McMillen raises in this court are

ineffective assistance of counsel claims. Although some ineffective assistance of counsel claims may be waived,

see *United States v. White, 307 F.3d 336, 343-44 (5th Cir. 2002)*, in this case the waiver specifically excepted ineffective assistance of counsel claims. Accordingly, McMillen's waiver did not bar these claims and McMillen has shown that the district court's procedural ruling was debatable or wrong. See *Slack, 529 U.S. at 484*.

The district court denied McMillen's relevant ineffective assistance of counsel claims without conducting an evidentiary hearing because the affidavit of McMillen's counsel contradicted McMillen's allegations, because it found that no evidence supported McMillen's claim that he had a viable public authority defense, and because it found that any appeal McMillen could have filed would have been meritless. McMillen's affidavit, however, set forth facts that, **[**4]** if true, showed that his counsel failed to file a notice of appeal after McMillen requested that he do so, that his counsel lied to him during plea negotiations, that he was working as a confidential informant at the time of his arrest, and that he asked his counsel to investigate and present a public authority defense but that his counsel refused to do so.

A district court may deny a *28 U.S.C. § 2255* motion without holding an evidentiary hearing "only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief." *United States v. Bartholomew, 974 F.2d 39, 41 (5th Cir. 1992)*. We review a district court's denial of a *28 U.S.C. § 2255* motion without holding an evidentiary hearing for an abuse of discretion. *United States v. Cervantes, 132 F.3d 1106, 1110 (5th Cir. 1998)*. "Contested fact issues [in a *28 U.S.C. § 2255* case] ordinarily may not be decided on affidavits alone, unless the affidavits are supported by other evidence in the record." *United States v. Hughes, 635 F.2d 449, 451 (5th Cir. Unit B 1981)*.

The record **[**5]** does not conclusively show that McMillen is not entitled to relief on his ineffective assistance of counsel claims. See *Hughes, 635 F.2d at 451*. McMillen presented facially valid claims that he would not have pleaded guilty but for his counsel's ineffectiveness and that his counsel was ineffective for failing to file a notice of appeal. See , *Hill v. Lockhart 474 U.S. 52, 59, 88 L. Ed. 2d 203, 106 S. Ct. 366 (1985)*; *Strickland v. Washington, 466 U.S. 668, 688-92, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)*; *Roe v. Flores-Ortega, 528 U.S. 470, 477, 145 L. Ed. 2d 985, 120 S. Ct. 1029 (2000)*. The district court's finding that any direct appeal filed by McMillen would have been without merit does not change this analysis because the failure to file a notice of appeal upon request is ineffective assistance of counsel without a showing that the appeal would have merit. See *Flores-Ortega, 528 U.S. at 477*. Accordingly, we GRANT McMillen a COA on his claims that he would not have pleaded guilty but for his counsel's ineffectiveness and that his counsel was ineffective for failing to file a notice of appeal, VACATE the district court's denial of *28 U.S.C. § 2255* **[**6]** relief, and REMAND to the district court for an evidentiary hearing regarding these issues. See *Dickinson v. Wainwright, 626 F.2d 1184, 1186 (5th Cir. 1980)*.

COA is DENIED on any remaining issues. **[*222]** COA GRANTED IN PART, DENIED IN PART; VACATED AND REMANDED.

112 Fed. Appx. 905, *; 2004 U.S. App. LEXIS 22758, **

LEXSEE 112 FED. APPX. 905

**UNITED STATES OF AMERICA, Plaintiff - Appellee, versus PAUL ANDREW STOKES, JR., Defendant - Appellant.**

**No. 03-7912**

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

*112 Fed. Appx. 905; 2004 U.S. App. LEXIS 22758*

**October 1, 2004, Submitted**
**November 2, 2004, Decided**

**NOTICE:** [**1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of Virginia, at Newport News. Henry Coke Morgan, Jr., District Judge. CR-98-145-3; CA-03-296-2.

*United States v. Stokes, 261 F.3d 496, 2001 U.S. App. LEXIS 18570 (4th Cir. Va., 2001)*

**DISPOSITION:** Vacated and remanded.

**LexisNexis(R) Headnotes**

**COUNSEL:** Paul Andrew Stokes, Jr., Appellant Pro se.

Janet S. Reincke, Assistant United States Attorney, Newport News, Virginia, for Appellee.

**JUDGES:** Before NIEMEYER, KING, and SHEDD, Circuit Judges.

**OPINION:** [*905] PER CURIAM:

Paul Andrew Stokes, Jr., appeals from the district court's order denying relief on his motion filed under *28 U.S.C. § 2255 (2000)*. We previously issued an order granting a certificate of appealability as to Stokes' claim that his attorney provided ineffective assistance, resulting in Stokes being denied the right to testify in his defense.*

After receiving additional briefing [*906] on this issue, we now vacate the district court's order and remand for further proceedings.

* *We denied a certificate of appealability and dismissed Stokes' appeal as to his remaining issues.

[**2]

"[A] criminal defendant has a constitutional right to testify on his own behalf at trial." *United States v. Midgett, 342 F.3d 321, 325 (4th Cir. 2003)* (citing *Rock v. Arkansas, 483 U.S. 44, 51, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987))*. This right may be waived, as long as the waiver is made knowingly and voluntarily. *United States v. Mullins, 315 F.3d 449, 452, 454-55 (5th Cir. 2002)*.

In his *§ 2255* motion, Stokes claimed that he received ineffective assistance of counsel when counsel failed to advise him of his right to testify and further refused to let him testify. He asserted that, had he been properly advised and allowed to testify, he would have been able to refute the government's evidence. Stokes submitted a sworn affidavit to this effect and also attested that counsel threatened to withdraw from the case and tell the court that Stokes was a liar if he chose to testify. Stokes' affidavit also includes his sworn statements that he informed his attorney that he wished to testify on his behalf and that he requested to testify after his attorney presented the testimony of three witnesses on his behalf.

Counsel filed an affidavit stating that [**3] he asked Stokes numerous times whether he wanted to testify. He submitted a copy of a page from his trial notes on which

he wrote to Stokes during the trial proceedings, inquiring if Stokes wanted to testify, and Stokes responded, "I don't plan to." Counsel stated that his trial notes also reflected that, after the last defense witness was dismissed, he asked Stokes if he wished to testify and Stokes "declined to exercise that right."

Unless it is clear from the pleadings, files, and records that the prisoner is not entitled to relief, § 2255 makes an evidentiary hearing mandatory. *28 U.S.C. § 2255; Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).* The district court may expand the record to include letters, documents and affidavits. *Raines, 423 F.2d at 529-30.* A district court's decision of whether a hearing is mandatory under § 2255 and whether petitioner's presence is required at the hearing is reviewed for abuse of discretion. *Id. at 530* (citing *Machibroda v. United States, 368 U.S. 487, 7 L. Ed. 2d 473, 82 S. Ct. 510 (1962)).* Notwithstanding the court's ability to expand the record and its [**4] wide discretion in the matter, "[t] here will remain, however, a category of petitions, usually involving credibility, that will require an evidentiary hearing in open court." Id. "When the issue is one of credibility, resolution on the basis of affidavits can rarely be conclusive ...." Id.

In denying § 2255 relief on this issue, the district court stated that there was no evidence in the record to support Stokes' claim and, in fact, all of the evidence was contrary to Stokes' claim. However, we find that the conflicting statements in the affidavits submitted by Stokes and counsel create a factual dispute requiring an evidentiary hearing. Resolution of this credibility dispute cannot be made on affidavits alone. See *Raines, 423 F.2d at 530.*

Accordingly, we vacate the district court's order as to this issue and remand for further proceedings consistent with this opinion. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

VACATED AND REMANDED

LEXSEE 78 FED. APPX. 984

**UNITED STATES OF AMERICA, Plaintiff-Appellee, v. JOSE R. ARGUELLAS,
also known as Jose R. Arguelles, also known as Brazil, also known as Raul,
Defendant-Appellant.**

No. 02-20867

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

*78 Fed. Appx. 984; 2003 U.S. App. LEXIS 21945*

**October 27, 2003, Filed**

**NOTICE:** [**1] RULES OF THE FIFTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court For the Southern District of Texas, Houston Division. (H-98-CV-2526), (H-95-CR-112-10).

**DISPOSITION:** Vacated and remanded.

**LexisNexis(R) Headnotes**

**JUDGES:** Before DEMOSS, DENNIS, and PRADO, Circuit Judges.

**OPINION:** [*984] PER CURIAM: *

* Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Defendant-Appellant Jose R. Arguellas ("Arguellas"), federal prisoner # 42425-004, appeals the denial of his *28 U.S.C. § 2255* motion, in which he challenged his 1996 conviction on the ground that his [*985] trial attorney rendered ineffective assistance of counsel by failing to inform him of a plea bargain offered by the Government. In conducting a paper hearing on Arguellas' claims, the district court relied heavily on the affidavit [**2] of the Assistant United States Attorney ("AUSA") who prosecuted Arguellas as well as the court's personal knowledge of that AUSA's credibility and competence. We granted a certificate of appealability ("COA") on the issue whether the district court abused its discretion in not granting a live evidentiary hearing before denying Arguellas' *28 U.S.C. § 2255* motion. See United States v. Arguellas, No. 02-20867 (5th Cir. Feb. 19, 2003)(unpublished). Because the record before the district court and the affidavit submitted by the AUSA do not conclusively negate Arguellas' allegations, and because the district court did not have personal knowledge of the conversations between Arguellas and his counsel or an opportunity during trial to observe Arguellas' credibility, we find that the district court's decision based on a paper evidentiary hearing was an abuse of discretion. Therefore, we vacate the district court's dismissal of Arguellas' *28 U.S.C. § 2255* motion and remand it for a live evidentiary hearing.

**I. BACKGROUND**

Arguellas was convicted of conspiracy to possess with the intent to distribute five kilograms or more of cocaine [**3] in the United States District Court for the Southern District of Texas after an eight-day jury trial. He was sentenced at the top of the available guideline range to 365 months in prison. This court affirmed the conviction on direct appeal. See United States v. Ramirez, No. 96-20596 (5th Cir. Aug. 27, 1997)(unpublished). Arguellas filed this *28 U.S.C. § 2255* motion raising numerous claims, including the claim that his now deceased trial counsel was ineffective for failing to communicate a Government plea offer. In support of this contention, Arguellas filed his own affidavit. This affidavit averred that after his trial counsel

died, Arguellas' wife obtained the legal file pertaining to Arguellas' case. In that file was a draft plea agreement, dated January 4, 1996, and under the terms of that agreement, Arguellas would have received a three-level adjustment in his base offense level in return for pleading guilty. In addition, the agreement contained a promise on behalf of the Government that it would recommend Arguellas be sentenced at the bottom of the applicable guideline range. Had Arguellas' accepted the Government's offer and pled guilty, the applicable [**4] guideline range would be 210 to 260 months of imprisonment. Thus, had the district court followed the Government's recommendation, Arguellas would have received a sentence of 210 months, which would be approximately 155 months less than the sentence that Arguellas ultimately received.

Arguellas contends that had he known of the Government's proposed plea offer, he would have accepted it. It is well-recognized that a defense counsel has an ethical duty to keep his client informed, and this court has held that a failure to inform a defendant of a plea offer may amount to ineffective assistance of counsel. n2 Noting that the record is unlikely to indicate the content of all conversations between Arguellas and his trial counsel, and the conflict in the facts alleged by Arguellas and the Government in response to the *28 U.S.C. § 2255* motion, the magistrate judge recommended that the district court judge hold an evidentiary hearing on this ineffective assistance of counsel claim. n3 Finding deficiencies in Arguellas' affidavit and that [*986] the Government response to Arguellas' motion was drafted by an individual other than the AUSA who prosecuted Arguellas, the district [**5] court ordered Arguellas to correct those deficiencies and invited the prosecuting AUSA to respond to Arguellas' allegations. After receiving Arguellas' corrected and supplemental filings, the district court elected to conduct a paper hearing on Arguellas' ineffective assistance of counsel claim.

n2 See *Teague v. Scott, 60 F.3d 1167, 1170 (5th Cir. 1995)*.

n3 All of the other claims raised by Arguellas in his *28 U.S.C. § 2255* motion were properly dismissed by the district court and are not considered as part of this appeal.

As part of the paper hearing by the district court, the record in this case was expanded to include: (1) a revised affidavit by Arguellas; (2) a supporting affidavit by Arguellas' wife; (3) a letter from Arguellas' deceased trial counsel's former law partner; (4) an affidavit from the AUSA who prosecuted Arguellas; and (5) a copy of the purported plea agreement. The district court noted that there was nothing in the record to support Arguellas' contention [**6] other than his own self-serving affidavit testimony. The district court also noted that several facts regarding the plea negotiations alleged by the AUSA in his affidavit were supported by contemporaneous record documents. Thus, the district court denied Arguellas' *28 U.S.C. § 2255* motion, relying on the detailed affidavit submitted by the AUSA, which was often supported by other documents in the record, the court's personal knowledge of the AUSA's general professionalism and credibility, as well as case law that discounts self-serving post-conviction testimony that an inmate would have accepted a plea. n4

n4 See Mem. Op. and Order, R. 391 (citing *Paters v. United States, 159 F.3d 1043, 1047 (7th Cir. 1998); United States v. Gordon, 156 F.3d 376, 381 (2d Cir. 1998))*.

On appeal, Arguellas argues that the district court erred in relying on the AUSA's affidavit because the AUSA only states his belief that Arguellas' trial counsel told Arguellas about [**7] the plea offer. Moreover, Arguellas points out that the AUSA specifically admits that he did not overhear Arguellas' counsel tell Arguellas about the offer. Thus, Arguellas argues that it was improper for the district court to rule based on the AUSA's beliefs, despite the AUSA's perceived credibility, in light of Arguellas' direct assertion that his trial counsel never told him about the plea offer.

## II. ANALYSIS AND CONCLUSION

In this case, it is undisputed that a trial counsel's failure to advise a criminal defendant of a Government plea offer could amount to ineffective assistance of counsel. See *Teague, 60 F.3d 1167, 1170*. The issue is whether the district court abused its discretion in resolving a disputed fact without a live evidentiary hearing in denying Arguellas' *28 U.S.C. § 2255* motion.

A district court may deny a *28 U.S.C. § 2255* motion without conducting any type of evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." See *28 U.S.C. § 2255; United States v. Bartholomew, 974 F.2d 39, 41 (5th Cir. 1992)*. [**8] Additionally, there is no requirement in the language of *28 U.S.C. § 2255* that the district court conduct a live hearing with the prisoner present when an evidentiary

hearing is required to rule on *28 U.S.C. § 2255* motion. See *28 U.S.C. § 2255* ("A court may entertain and determine such motion without requiring the production of the prisoner at the hearing."); *Machibroda v. United States, 368 U.S. 487, 495-96, 82 S. Ct. 510, 7 L. Ed. 2d 473 (1962)*; *Sanders v. United States, 373 U.S. 1, 20-21, 83 S. Ct. 1068, 10 L. Ed. 2d 148 (1963)*. In those cases, however, where the record does not conclusively negate a prisoner's entitlement to relief, [*987] contested fact issues may not be decided on affidavits alone. See *Owens v. United States, 551 F.2d 1053, 1054* (internal citations omitted).

In this case, the district court relied heavily on the content of the AUSA's affidavit and its personal knowledge of the AUSA's general credibility in making the determination that Arguellas was not entitled to relief. While it is true that many of the facts alleged by the AUSA in his [**9] detailed affidavit are supported by documents in the record, Arguellas' assertion that he was not informed by his counsel about the plea offer is neither conclusively rebutted by the AUSA's rendition of the facts nor negated by the record. The AUSA admits that he never overheard Arguellas' counsel discuss the plea agreement with Arguellas. Moreover, the AUSA stated during a pretrial conference on January 12, 1996 that Arguellas' counsel had not yet discussed with Arguellas the terms of the January 4, 1996 plea agreement when the AUSA asked for a continuance of the trial. n5 Because the content of the discussions between counsel and Arguellas were not in the record before the district court and the district court had no occasion to observe Arguellas' credibility during trial or otherwise, a live evidentiary hearing is necessary to dispose of Arguellas' *28 U.S.C. § 2255* motion where there is a disputed fact as to the content of those conversations. See *Owens, 551 F.2d at 1054*. We therefore vacate the district court's judgment denying relief under *28 U.S.C. § 2255* and remand for a live evidentiary hearing.

n5 See Tr. at pgs. 8-10, R. 186. The record does not reflect whether Arguellas was present at this hearing.

[**10]

VACATED AND REMANDED

# CERTIFICATE OF SERVICE

This certifies that a true and correct copy of the foregoing motion has been served on counsel for the Government by placing the same into the United States Mail, first-class postage prepaid, addressed to:

> AUSA Delonia Watson
> Office of the U.S. Attorney
> 801 Cherry Street, Suite 1700
> Fort Worth, TX 76102

this 17th day of June, 2005

_Marcia A. Widder_
Marcia A. Widder

# CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies:

1. This Application for Certificate of Appealability does not comply with the type-volume limitations of Fed.R.App. 32(a)(7)(B) because it contains 30,212 words excluding this certificate; however, the COA Application does comply with the 30,250 words requested in Mr. Hall's *Motion for Leave to File Application for Certificate of Appealability in Excess of Presumptive Limits set by Fed. R. App. P. 32(a)(7)(B) or, in the Alternative, for an Additional Thirty Days in which to File the COA Application*, which was filed in this Court on June 10, 2005.

2. This COA Application complies with the typeface requirements of Fed.R.App. P. 32(a)(5) and the type styles requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a Word Perfect document in a proportionally spaced typeface using Times New Roman in 14-point font, except for the footnotes, which are in 12-point font.

Dated: 6/17/05

Marcia A. Widder
Attorney for Defendant-Appellant
Orlando Hall