ORIGINAL     **04-70050**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH JUDICIAL CIRCUIT

**UNITED STATES OF AMERICA,**

Respondent-Appellee,

v.

# ORLANDO CORDIA HALL,

Petitioner-Appellant.

On Appeal from the United States District Court
for the Northern District of Texas
Fort Worth Division
District Court Number 4:00-CV-422-Y (4:94-CR-121-Y)

**GOVERNMENT'S OPPOSITION TO APPELLANT'S
APPLICATION FOR CERTIFICATE OF APPEALABILITY**

U.S. COURT OF APPEALS
**F I L E D**

NOV 1 4 2005

CHARLES R. FULBRUGE III
CLERK

The United States of America, by and through the United States Attorney

for the Northern District of Texas, opposes Orlando Cordia Hall's "Application for

Certificate of Appealability" (COA). Hall has failed to make a substantial

showing that he was denied constitutional rights. Thus, he is not entitled to

further review of his claims by this Court.

I.

**Proceedings Below**. In late 1995, Hall was convicted in the United States

District Court for the Northern District of Texas of kidnapping resulting in the

death of Lisa Rene. After the punishment hearing, the jury recommended that Hall

be sentenced to death. In connection with the kidnapping and Rene's death, Hall

was also convicted, and sentenced as indicated, of conspiring to commit

kidnapping (18 U.S.C. § 1201(c)) (life imprisonment), traveling in interstate

commerce with the intent to promote drug trafficking (18 U.S.C. § 1952) (60

months imprisonment), and using and carrying a firearm during a crime of

violence in violation of (18 U.S.C. § 924(c)) (60 months imprisonment to be

served consecutively to all other terms of imprisonment).

Hall's convictions and sentence were affirmed by this Court on August 28,

1998. *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998). His petition for writ of

certiorari was denied by the United States Supreme Court on May 17, 1999. *Hall*

*v. United States*, 526 U.S. 1117 (1999).

Hall filed his initial motion for relief pursuant to 28 U.S.C. § 2255 on May

16, 2000. On June 14, 2002, and September 25, 2002, Hall filed amended motions

for post-conviction relief, which focused on twelve major areas:

1. the indictment's failure to allege aggravating circumstances;

2. the constitutionality of the Federal Death Penalty Act (FDPA);

3. ineffective assistance (IA) of trial counsel;

4. jury exposure to extraneous information and *ex parte* contact;

5. that at least one of the jurors was so emotionally overwhelmed that she voted for the death penalty out of sympathy for the victim and her family;

6. the government's failure to disclose exculpatory and mitigating evidence regarding Larry Nichols, a penalty-phase government witness;

7. the government's failure to correct Nichols' false testimony;

8. the violation of Hall's Sixth Amendment rights through the government's use of Nichols as a government agent while Hall was represented by counsel;

9. the government's proffer of false information to Hall's defense counsel, which interfered with the presentation of defense evidence from Alonzo Airy;

10. the government's interference with Hall's right to counsel by advising his counsel of his escape plans, which included the possibility of taking defense counsel hostage;

11. that the FDPA, as administered by the government violated the Fifth and Eighth Amendments, because it was applied in a racially biased manner; and

12. that Hall's sentence was based on materially false and inaccurate information.

On August 24, 2004, after reviewing the amended section 2255 motions, the

government's response, and Hall's reply, and conducting an evidentiary hearing

on Hall's juror misconduct claims, the district court denied the section 2255 motion. *See* Order Denying Amended Motion to Vacate Conviction and Sentence (Order) (a copy of which is in the Record Excerpts filed by Hall). Hall filed a notice of appeal from the denial of the section 2255 motion on November 9, 2004, which was timely as a result of Hall's motion to alter or amend judgment. The district court denied his COA application on December 6, 2004. On July 18, 2005, Hall filed his application for COA with this Court.

## II.

**Standard of Review.** Section 2253 provides that an appeal may not be taken from the final order in a proceeding under section 2255 unless either a circuit justice or judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1); *see also United States v. Garza*, 165 F.3d 312, 313-314 (5th Cir. 1999). In determining whether to issue a COA, this Court looks to the standard set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. §§ 2241 *et seq.*; *Miller-El v. Cockrell*, 572 U.S. 322, 326 (2003); *Garza*, 165 F.3d at 314. Section 2253(c)(2) provides that "[a] certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2).

Hall need not establish that he will win on the merits in order to obtain a COA. *Garza*, 165 F.3d at 314. To make a substantial showing of the denial of a constitutional right, he instead must demonstrate that the question is debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further. *Miller-El*, 572 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *United States v. Jones*, 287 F.3d 325, 329 (5th Cir. 2002); *Moore v. Johnson*, 225 F.3d 495, 500 (5th Cir. 2000); *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001). "[A] claim can be debatable even though every jurist of reason might agree, after the COA had been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El*, 572 U.S. at 338.

The Court should limit its examination to a threshold inquiry into the underlying merit of a petitioner's claims. *Miller-El*, 572 U.S. at 327, citing *Slack v. McDaniel*, 529 U.S. at 481. "This threshold inquiry does not require full consideration of the factual and legal bases adduced in support of the claims." *Miller-El*, 572 U.S. at 336. A COA determination is based on "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.*

Although "a court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to

relief, this "should not be misconstrued as directing that a COA always must issue." *Miller-El*, 572 U.S. at 337. "A prisoner seeking a COA must prove 'something more than the absence of frivolity' or the existence of mere 'good faith' on his or her part." *Id.*, at 338, citing *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983).

The fact that this is a death penalty case in no way lightens Hall's burden. This Court in *Garza* denied a COA to a defendant sentenced to death after his convictions on three counts of killing in furtherance of a continuing criminal enterprise. *Garza*, 165 F.3d at 314. This Court also denied COA in *Jones*, another death penalty case, because the defendant failed to shoulder the burden required under section 2253. *Jones*, 287 F.3d at 328. In *Webster*, this Court denied a COA request from Hall's co-defendant for additional issues beyond the two granted by the district court. *United States v. Webster*, 392 F.3d 787, 790 (5th Cir. 2004). Because this case involves the death penalty, however, "any doubts as to whether a COA should issue must be resolved in [the petitioner's] favor." *Jones*, 287 F.3d at 329, quoting *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000); *see also Webster*, 392 F.3d at 791.

## III.

Hall contends that a COA should issue so that this Court may review the following:

> 1. whether the district court improperly limited the evidentiary hearing on Hall's juror misconduct claims, and otherwise denied Hall a hearing on his claims;
>
> 2. whether the district court improperly denied requested discovery;
>
> 3. whether the district court improperly denied funds for investigative and expert assistance;
>
> 4. whether the district court erred in its denial of Hall's claims on the merits; and
>
> 5. whether on remand, if necessary, this case should be transferred to another district court to preserve the appearance and substance of fairness.

The government's responses to Hall's claims that he is entitled to a COA because the district court erred in its denial of section 2255 relief on the merits should also make pellucid why no COA should issue on Hall's remaining claims. Therefore, the government will first address the propriety of the court's determinations of the merits of Hall's claims.

# IV.

## The district court's response to Hall's claims on the merits was proper.[1]

<u>Ineffective Assistance of Counsel</u> (Application, pp. 20-90.)

Hall made multiple substantive claims of ineffective assistance (IA) of counsel, and one claim of cumulative ineffective assistance. Specifically, Hall contended that defense counsel was ineffective for:

1. failing to conduct a timely investigation into potential mitigating evidence, thereby emphasizing some evidence while not presenting more persuasive mitigating evidence through additional witnesses and presenting ill-prepared witnesses;

2. failing to present documentary evidence at the punishment phase of the trial to corroborate testimony;

3. failing to call available and known witnesses to testify at punishment;

4. failing to question government witnesses in order to present additional mitigating evidence;

5. failing to effectively cross-examine government witness Larry Nichols at the punishment phase;

6. failing to re-interview a potential defense witness after he appeared to have altered his testimony;

---

[1] The government raised a number of procedural bars to the issues raised by Hall. (Order, pp. 7-8.) Notwithstanding, the district court elected, in the interests of justice, to review all of Hall's contentions. (Order, p. 8.) The government is not abandoning any of those procedural bars. In the event this Court elects to grant COA on any issue, the government will rely on those procedural bars in its response.

7. failing to make a closing argument at the guilt phase of the trial;

8. failing to argue effectively that Hall should have been allowed to make a statement in allocution;

9. making uninformed and unreasonable decisions regarding their choice and use of experts;

10. failing to adequately argue their motions for continuance;

11. making an ineffective closing argument at the punishment phase; and

12. failing to conduct an adequate *voir dire*.

(Order, pp. 15-16.)

In denying relief on these grounds, the district court found that Hall had failed to meet the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 686 (1984), on each of his IA claims. (Order, pp. 16-63.) The record demonstrates that the court conducted an exhaustive review of each of Hall's claims, and properly denied relief. No COA should issue because no court would resolve Hall's issues in a different manner.

Much of the focus of Hall's request for COA on these issues centers on his contention that the district court failed to consider counsels' performance in light of the prevailing professional norms at the time of trial, and failed to consider the cumulative impact of effectiveness of assistance in assessing prejudice. The problem with Hall's analysis is his dependence on what he posits to be the

prevailing professional norms, that is, his reliance on declarations from his

"experts," *i.e.*, two defense attorneys and a social worker, who equate what they

believe should have been done by defense counsel with prevailing professional

norms.[2] His contention assumes that the district court had little to no experience

or understanding of what amounted to effective assistance in death penalty cases

to which to compare defense counsels' efforts on Hall's behalf. Moreover, much

of his COA application faults defense counsel for failing to present <u>more</u> evidence

of a certain type, rather than pointing to a dearth of evidence on a particular

mitigating factor. *See Smith v. Cockrell*, 311 F.3d 661, 669 (5th Cir. 2002)

(reviewing court should be wary of such claims); *Kitchens v. Johnson*, 190 F.3d

698, 703 (5th Cir. 1999) (same).

Finally, Hall ignores the reality that the horrific nature and senselessness of

the offense combined with his undeniable direct and supervisory participation in it

would not have been eclipsed by the "qualities" of his character and the

deficiencies in his judgment that he now contends defense counsel could and

should have uncovered, and presented in mitigation. Hall is dissatisfied with his

---

[2] For example, for the social worker, that meant defense counsel was deficient for failing to secure the services of a mitigation specialist until mid-September of 1995. Declaration of Jill Miller, p. 11. But, because a "mitigation specialist" is not indispensable to the gathering of mitigating evidence, the fact that the services of the mitigation specialist were not engaged until mid-September is not sufficient alone to show deficient assistance. Instead, the focus is on the reasonableness of efforts expended by defense counsel to uncover mitigating evidence.

representation because the jury nevertheless imposed the death penalty, but such dissatisfaction does not equate to ineffectiveness.

When defense counsel's performance is analyzed by conducting an objective review of counsel's performance under the prevailing professional norms, in the context of counsel's perspective at the time of trial, as the district court did here, there is simply no merit to Hall's contention that he should be granted COA on his ineffective assistance claims. As noted by the court, "Hall was represented by two experienced criminal defense attorneys who had, prior to representing Hall, a total of thirty-five years of experience between them in criminal law. Each had tried numerous criminal jury trials in both state and federal courts. Prior to Hall's trial, each had tried two other death-penalty cases to conclusion and had been involved in other capital cases where there was a mistrial or where the government did not seek the death penalty." (Order, p. 63.) The court found that "Hall's attorneys conducted reasonable investigations in all areas of the case; requested and were appointed experts to assist them; vigorously cross-examined government witnesses at both stages of the trial, thereby questioning and examining the government's case against Hall; ably argued all objections and points of law; and eloquently defended their client in their closing statements." *Id.*

The reality is that defense counsel faced a daunting set of circumstances in this case. Hall, Bruce Webster, Steven Beckley, and Demetrius Hall, in retaliation for being cheated in a drug deal, kidnapped Lisa Rene, a 16-year-old girl, from her home in Arlington, Texas, on a Saturday evening as she sat doing her homework. Taken across state lines to Pine Bluff, Arkansas, the victim was held from Saturday night until Monday morning, and was sexually assaulted on numerous occasions by Hall and his co-defendants. At some point, the decision was made that she would have to die.

On Sunday afternoon, Hall and Bruce Webster dug a grave in a park in which to bury her after murdering her. Lisa Rene was twice taken to the park by Hall, Webster, and Steven Beckley. The first time – on Sunday evening – the men were unable to locate the grave because of darkness. They returned on the following morning. Taking turns, Hall, Webster, and Beckley used a shovel to bludgeon Rene into unconsciousness, stripped her of her clothing, threw her into the four-foot deep grave, and then filled it. The evidence showed that the victim died from multiple blunt force injuries combined with asphyxia. She suffered from as many as 14 blunt force contusions, and had hemorrhaging in the vaginal orifice. The medical report also supported a finding that Rene, though unconscious, was still breathing when she was buried, and that she may have

regained consciousness before she died. Hall and several of his co-defendants gave statements outlining at least a portion of their participation in the offense. Three of Hall's co-defendants, including his brother, had also agreed to cooperate and testify at Hall's trial.

Hall's involvement in every aggravating aspect of the case was direct and supervisory. He participated in the drug deal that motivated the kidnaping. He participated in the events that led to the kidnapping and the execution of the kidnapping. Hall sexually assaulted the victim. He directly participated in the planning and execution of the murder, and the attempts to hide or destroy the evidence. In addition to a prior criminal history which involved penitentiary time, Hall was a self-admitted drug dealer whose employment record was spotty.

Based on their familiarity with North Texas jurors and the results of the investigation that was conducted, defense counsel chose to focus on the statutory mitigating factor that other defendants would not receive the death penalty because the factor had a strong basis in fact, which was not true of other statutory mitigating factors. (Ware Affidavit, p. 14) (submitted with the government's response). As a statutory mitigating factor grounded in fact, the equally-culpable factor was one the jury was necessarily required to give consideration. Defense counsel believed that the inherent unfairness of equally culpable co-defendants

being punished with sentences less than death would be particularly compelling. *Id.* The defense also wanted to focus on the government "deals" with Hall's codefendants, which they believed, based on their experience, would be distasteful to jurors when weighing the mitigating and aggravating factors. (Ware Affidavit, p. 15). It was counsels' opinion that the conservative jury Hall would pull in North Texas was less likely to believe or accept "excuse defenses," particularly when the facts were as heinous as those in this case. (Ware Affidavit, p. 14).

Apparently, defense counsel met with some success in their strategy. In addition to garnering a ten-hour deliberation, defense counsel also convinced the jury to make several favorable findings for Hall. For example, the jury did not find that Hall had intentionally killed Lisa Rene or that he had intentionally inflicted serious bodily injury which resulted in her death, despite the fact that Beckley testified that Hall also hit the victim. The jury rejected as statutory aggravating factors that Hall had committed the killing of Lisa Rene after substantial planning and premeditation to cause the death of Lisa Rene, and that Lisa Rene was particularly vulnerable due to her age. As far as mitigating factors, nine jurors found that an equally culpable defendant would not receive the death penalty. One juror found that Hall's age at the time of the offense was a mitigating factor, as were the circumstances surrounding his upbringing. One

juror also found mitigating "[a]ny other aspect of the defendant's character or background."

Noting defense counsel's considerable experience, and outlining defense counsel's investigative efforts, the court concluded that "Hall's counsel performed a reasonably substantial and independent investigation into potential mitigating circumstances and therefore did not provide ineffective assistance of counsel."[3] (Order, p. 24.)[4] First, Hall's counsel had the benefit of the investigative efforts expended by the attorney initially appointed by the court to represent Hall. (Order, p. 20.) Prior counsel had interviewed Hall, including having him complete a 19-page questionnaire, in which Hall answered numerous questions about his social, vocational, scholastic, and medical history. *Id.* Prior counsel also traveled to Hall's hometown where he conducted interviews of Hall's mother and other family members, a Reverend Hegler, Hall's adult probation officer from a prior criminal conviction, Hall's parole officer, and Hall's previous attorney. *Id.*

---

[3] In making its determination, the district court relied on *Wiggins v. Smith*, 539 U.S. 510 (2003), in which the Supreme Court applied the *Strickland* standard to a claim that counsel was ineffective for failing to investigate potentially mitigating evidence. The Court stated that the proper inquiry is whether the investigation supporting counsel's decision not to present certain mitigating evidence was itself reasonable. *Wiggins*, 539 U.S. at 522. This analysis is done by conducting an objective review of counsel's performance under the prevailing professional norms, in the context of counsel's perspective at the time of trial. *Id.*

[4] The court's recitation of defense counsel's efforts belies Hall's claim that his defense counsel did not start investigating mitigation until approximately two weeks before trial began. (Application, p. 31.)

Second, after appointment, Hall's new counsel also conducted a substantial amount of investigation into mitigating evidence prior to trial. (Order, p. 24.) Defense counsel interviewed Hall several times, discussing his background, the facts of the case, his confession, his criminal history, and the written statements of the other defendants. Counsel talked with Hall's mother, on at least two occasions, and with his sister. He also interviewed James Bennett, the Arkansas counsel who had accompanied Hall when he turned himself into the police. (Ware Affidavit, p. 12.) Defense counsel's efforts were corroborated, in part, by testimony from several government witnesses that they had previously spoken with either defense counsel or the defense investigator, including Latonya Anders, the mother of one of Hall's children; Sylvia Henry, Bruce Webster's girlfriend; David Butler, a prosecutor from Arkansas who testified about Hall's bad reputation; and Carolyn Dikes, a police lieutenant from Hall's hometown who also testified about Hall's bad reputation. (Order, pp. 23-24.) In addition, defense counsel had the benefit of six weeks of work by Tena Francis, the mitigation specialist appointed by the court.[5] (Order, p. 24.)[6]

---

[5] Francis provided two memos to defense counsel in which she outlined the substance of her interviews with several members of Hall's family, his minister, officials at school, neighbors, and other significant persons from Hall's life. (Order, p. 22.) "This included information about Hall's mother and father, A.J. Hall, including the violence in the home, their substance abuse, and their subsequent divorce; siblings Pamela, Scotty, Cassandra, Tracy, and Demetrius, as well as some half-siblings; birth and medical history; personality; relationship with his family; having four children by four different women; school history; limited work history; and criminal history, including parole from Arkansas state prison in

Third, pursuant to the district court's scheduling order, defense counsel filed timely motions for the appointment of experts and other professionals they believed would benefit the defense team, including a psychiatrist, a psychologist, a jury consultant, a forensic pathologist, and a mitigation expert. (Order, p. 21.)[7]

---

1993." *Id.* Admittedly, Francis also expressed her belief that further investigation was needed. (Order, p. 22-23.

[6] As for Hall's contention that far greater investigation should have been conducted, the court explained that it "would have been unwilling at the time of trial to authorize an unlimited amount of funds with which to conduct further investigation, especially where that investigation would have involved contacting witness who had minimal contact with Hall." (Order, p. 24.) A review of the declarations from Hall's experts shows that much of the further investigation suggested by Hall would have garnered little evidence directly connected to Hall and evidence mitigating against imposition of the death penalty. For example, evidence about the confluence of societal, cultural, educational, and economic forces which pushed Hall into drug trafficking would have little to no appreciable mitigating value because such evidence would have little to no relevance to Lisa Rene's murder or Hall's involvement in such murder.

[7] By July 14, 1995, defense counsel had moved for the appointment of a jury consultant in an *ex parte* motion. Because of the gruesomeness of the facts, defense counsel believed one of their best chances for a life sentence was to get jurists who were highly unlikely to vote for a death sentence under any circumstances, but who did not seem obviously opposed to the death penalty. (Ware Affidavit, p. 5.) Defense counsel did not believe that the Court would approve both a jury selection expert and a mitigation specialist, so a jury selection expert was requested to enhance the chance of getting one. (Ware Affidavit, p. 6).

Defense counsel asked for a forensic pathologist to counter possible testimony from the medical examiner that Lisa Rene was not only still alive when she was buried by Hall, Beckley and Webster, but that she was conscious and probably aware of what was happening to her, notwithstanding the fact that Hall had beaten her severely with a shovel.

Defense counsel also asked for a psychiatrist and a psychologist. (Ware Affidavit, p. 6.) Although they had seen no indication of neurological dysfunction or any cognitive problems, they initially believed that it would be prudent to have Hall examined by a psychiatrist, a psychologist, or both. (Ware Affidavit, p. 6.) The main purpose was to use one or both to testify to positive aspects of Hall's personality and emotional makeup as well as ameliorate the less favorable aspects. The defense also wanted to be prepared to rebut any government expert who would testify adversely as to Hall. (Ware Affidavit, p. 6.) Several experts were discussed, including Dr. Randy Price and Dr. James Grigson – both of whom had been used by defense counsel. (Ware Affidavit, p. 7.) Although Dr. Grigson was controversial, defense counsel was of the opinion, as were other attorneys whose judgment they respected, that Dr. Grigson was extremely effective when he testified for the defense. In addition, since he had frequently testified for the prosecution, the government would have had a difficult time

The court authorized funds for defense counsel to hire a psychiatrist, a psychologist, and a pathologist. *Id.*

The court also concluded that Hall's complaints about his counsel's trial decisions were meritless because such decisions were reasonable. *See Cotton v. Cockrell*, 343 F.3d 746, 753 (5th Cir. 2003), *cert. denied*, 540 U.S. 1186 (2004) ("If counsel has made an adequate investigation, any conscious and informed decision made based on trial tactics and strategy cannot be the basis for a claim of having received ineffective assistance of counsel unless the decision was so poorly chosen that it 'permeates the entire trial with obvious fairness.'"); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002). For example, the court concluded that defense counsel's decision to focus on statutory equally culpable co-defendant mitigation factor was a reasonable trial strategy because Hall had three co-

_____

challenging his credentials. (Ware Affidavit, p. 6-7.) In any event, Dr. Grigson was not available but he highly recommended another experienced forensic psychiatrist, Lisa Clayton, who agreed to the appointment. Dr. Clayton was well-qualified and, like Dr. Grigson, had testified for the prosecution often enough (although not exclusively), that defense counsel believed the government would have a difficult time challenging her credentials. (Ware Affidavit, p. 7.)

Ware began communication with Dr. Clayton by telephone long before trial. (Ware Affidavit, p. 7.) Dr. Clayton familiarized herself with the case with information provided by the defense and met with Hall on at least one occasion before the beginning of trial. She also met with and interviewed Hall's family. Dr. Clayton was prepared to testify on Hall's behalf at the punishment stage.

defendants who had plea agreements foreclosing the death penalty, in particular, Beckley, who had directly participated in the murder.  (Order, pp. 25-26.)[8]

Other strategic decisions made by Hall's defense counsel, such as electing not to use Alonzo Airy as a witness, and electing not to make a closing argument at the guilt phase were reasonable.  Re-interviewing Airy would have been wasted effort after the government provided information to defense counsel that Airy had made highly damaging statements about Hall to an Assistant United States Attorney and an FBI agent – statements that were as damaging or worse than the statements testified to by Larry Nichols that Hall claims Airy could have rebutted. Given such statements, Airy was a liability as a witness.  In fact, the government requested, but was denied, permission to use Airy as a government witness.

To avoid the risk of alienating and losing jurors with weak arguments during the guilt/innocence phase of the trial and to prevent the government from giving a rebuttal closing argument, defense counsel, with Hall's concurrence, elected to forego making a closing statement at the end of the guilt/innocence phase.  (Ware Affidavit, p. 27.)  Defense counsel's informed strategic decision, with which Hall agreed, does not amount to ineffective assistance of counsel. *Compare United States v. Jones*, 287 F.3d 325, 329-331 (5th Cir. 2002) (no

---

[8]    Although other statutory mitigation factors were not available to Hall, defense counsel submitted non-statutory mitigation factors.  (Order, p. 26.)

finding of IA where counsel's admission of defendant's responsibility for victim's death during opening statement was an informed strategic decision which took into account strength of the evidence and was approved by the defendant).

Moreover, Hall failed to show prejudice. The evidence supporting his guilt in the kidnapping of Lisa Rene was overwhelming, and included his confession. The "bridge" which Hall contends defense counsel failed to build at the end of the first phase of the trial was, instead, built at the beginning of the penalty phase when defense counsel "emphasized that Hall accepted responsibility in his confession, that there were others who were equally culpable against whom the death penalty was not sought, that Hall had four young children and had been a good father, that Hall had witnessed the physical abuse of his mother by his father, that Hall grew up hard and dealt drugs, but that this was a case of a situation getting out of hand and the appropriate sentence was life in prison without the possibility of parole." (Order, pp. 49-50.)

Likewise, the court found that Hall's defense counsel was not ineffective in their use of experts. Defense counsel consulted with several experts, and for strategic reasons, elected not to go forward with testimony from forensic psychiatrist Dr. Lisa Clayton and neuropsychologist Dr. Randy Price.[9] The court

---

[9] Prior to Dr. Clayton's testimony, the government filed a motion to have their own expert examine Hall. Defense counsel opposed the motion and the district court ruled, in essence, that unless

noted that, even if there was evidence before defense counsel which indicated that

Hall should be examined by neuropsychologist – a claim that the government

disputes[10] – defense counsel did hire a neuropsychologist, but Hall essentially

Hall was examined by the government expert, Dr. Clayton would not be permitted to testify in front of the jury. Defense counsel made a tactical decision that the best strategy in light of the court's ruling was to continue to oppose Hall's examination by a government expert and to raise the issue on appeal. Defense counsel did not want to have opposing experts testify in front of the jury because of the concern that the jury would ultimately draw the conclusion that Hall was simply a sociopath, which would hurt more than help the defense's case. (Ware Affidavit, p. 8.) Defense counsel explained their strategy to their client and he agreed. (Ware Affidavit, p. 7-8.) They also consulted with Kevin McNally, with the National Death Penalty Counsel Project and Resource Project, on the issue and he agreed. (Ware Affidavit, p. 8.) Thereafter, Dr. Clayton testified outside the presence of the jury in an offer of proof and the exclusion of her testimony became a point for the appeal as planned.

Although Dr. Price had agreed to work as a defense expert on the case, defense counsel believed that the doctor was skeptical as to whether he could be of any help to the defense. (Ware Affidavit, p. 7.) Ware spoke with Dr. Price by telephone on several occasions. (Ware Affidavit, p. 9.) In August of 1995, Ware sent him, among other things, a copy of the lengthy Arlington Police Offense report, Hall's Arkansas Department of Corrections records, FBI 302's, Hall's confession, and Hall's parole file. Defense counsel first heard that Dr. Price had decided against working on the case when McNally, who originally recommended him, called the doctor from Ware's office and concluded that Dr. Price had gotten cold feet. Defense counsel interpreted Dr. Price's actions as a strong indication that he believed that he would not be able to truthfully testify in a way favorable to the defense. Dr. Clayton, nevertheless, remained on the case, and completed her investigation and analysis.

[10] Defense counsel observed no obvious signs of neurological dysfunction in Hall. He had no ticks. His appearance, demeanor, and mannerisms were normal, he seemed intelligent, he had social skills and he had a wit. Nothing in his history indicated that anyone had ever suspected such a dysfunction. He had ear infections that had been successfully treated with tubes. His nose had been broken twice playing football. Reverend Hegler, who taught Hall reading in school and who had known him all of his life, referred to Hall as a very "bright student" who simply did not apply himself. According to an interview with Reverend Hegler conducted by Tena Francis on October 9, 1995, Mr. Hall was in remedial classes in school not because he was "slow," but because he did not apply himself. Reverend Hegler believed that Mr. Hall could have been an honor student if he had wanted, but quit school simply because he did not want to finish, and because school kept him from working at his budding business of drug dealing. Reverend Hegler also noted that the defendant was charismatic and could get anyone to do anything he asked. (Ware Affidavit, p. 8-9.) There was absolutely nothing which would have suggested to defense counsel that Hall suffered from any mental disorder or condition justifying further investigation or examination. Defense counsel's observations were confirmed by Hall's prior counsel, Private Detective LaRue, Tena Francis, and Hall's responses on the questionnaire.

At no time in the investigatory process did Hall or any of his family members provide any information justifying further investigation into childhood "deprivation" or "abuse" directed at Hall. As

faults his counsel for not hiring another psychologist to examine him. (Order, p. 54.) As for Dr. Clayton, defense counsel made a strategic decision to forego testimony from her because it would have meant that Hall be examined by a government expert. The court further explained that Hall also failed to demonstrate the requisite *Strickland* prejudice because, even if both Dr. Michael Gelbort and Jill Miller – experts who provided declarations in support of Hall's post-conviction writ – had testified at trial about the information contained in their declarations,

> there is no reasonable probability that the result would have been different. Quite simply, although this Court does not deny the claims that Hall is of below-average intelligence and that his upbringing was deprived, the facts of the crime and the witnesses who testified for the government at punishment belie the contentions that Hall was incapable of exercising judgment or that he only entered the drug trade to provide for his family and wanted to exit it as soon as possible. In fact, after Lisa Rene was abducted from her apartment, Hall was the one who directed that she be transported to Arkansas, oversaw her confinement in the motel rooms, helped to dig her grave, helped to kill her, gave Beckley and Demetrius Hall advice on how to avoid the police, and refused to tell the police about the location of Lisa Rene's grave. And he did all of this because money had been stolen from him during a *drug transaction*. And, with regard to Hall's criminal history, after having previously being imprisoned in Arkansas on drug charges and being released into the care of a family

---

a matter of fact, Hall and his family affirmatively and consistently held firm to the position that, with the exception of the abuse directed at Hall's mother, he had had a fairly normal childhood. When Ware traveled to Arkansas and again interviewed Betty Hall, she still did not indicate anything of much additional significance on those topics despite being asked again after being told, once again, the significance of such information. (Ware Affidavit, p. 20.)

friend, Hall returned to the drug trade, directing both the mother of his child and members of his family in the business. In short, explanations for why Hall entered the drug trade nowhere near sufficiently mitigate against his abhorrent behavior while practicing his livelihood such that there is reasonable probability that, had this testimony been placed before the jury, Hall would have received a life sentence.

(Order, pp. 57-58) (emphasis in the original).[11]

As for his ineffectiveness claims regarding defense counsel's failure to adequately prepare defense witnesses (*e.g.*, Betty Hall and Cassandra Ross), the court explained that it rejected Hall's claims because the record belied claims that defense counsel had not prepared the two, and the information contained in their affidavits was largely repetitive of their testimony at trial. (Order, pp. 26-28.) As the record demonstrates and the district court notes, "Hall's mother and sister gave substantial testimony about Hall's upbringing, and Hall has not show that his trial counsel were ineffective for failing to elicit further, similar testimony from them or for failing to question them in a more effective manner." (Order, p. 28.)

As for Hall's claim that defense counsel failed to develop and present mitigating evidence from other witnesses, *e.g.*, Hall's father (A.J. Hall), two of his

---

[11] To establish prejudice from ineffective assistance in the sentencing phase, the petitioner must establish a "reasonable probability" that the jury would not have imposed the death sentence in the absence of errors by counsel. *Strickland*, 466 U.S. at 695; *Moore v. Johnson*, 194 F.3d 586, 592 (5th Cir. 1999). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

brothers (Scotty and Tracy), and another sister (Pamela), the court found that "[i]t was reasonable for trial counsel to opt not to call as witnesses a father who was opposed to testifying, two brothers who were imprisoned criminals themselves, and a sister who at the time remained hostile to her brother, notwithstanding what they now state they would have testified to at trial." (Order, p. 30.) Moreover, the other individuals who Hall contends should have been called to testify by defense counsel would have only offered testimony similar to that already given, or was "so attenuated that there is no reasonable probability that the outcome would have been affected by such testimony." (Order, p. 31.)

In much of his remaining IA claims, Hall urges issuance of COA based on contentions that defense counsel should have been more effective, e.g., counsel failed to effectively cross-examine Larry Nichols[12], failed to effectively argue that

---

[12] Hall lists a number of inconsistencies upon which defense counsel could have attacked Nichols, but the record shows that counsel mounted a strenuous attack on Nichols' credibility, including eliciting admissions from Nichols that "his prior plea agreement also 'settled up' five or six robberies he had committed in Louisiana; he had purchased the car used in the bank robberies from the proceeds of other robberies; he also had federal charges against him for transporting a stolen vehicle across state lines; in the robberies he carried either a .380 automatic or a Tech 9 assault rifle; he had also robbed fast-food places and convenience stores; and he had previously tried to convince one of his co-defendants in the robbery cases to sign a false affidavit stating that Nichols had nothing to do with the robberies." (Order, p. 41.) In addition, Nichols acknowledged that the government had filed a motion for downward departure on his behalf, and that he wanted the judge presiding over his case to know about his cooperation in the Hall matter before he was officially sentenced. (Order, p. 42.) The strategic decision not to pin Nichols down on every single inconsistency, after a through investigation of the relevant facts, in order to streamline cross-examination was not ineffective, especially where defense counsel successfully elicited "from Nichols his substantial criminal history, his previous attempt to have a co-defendant perjure himself in an affidavit, and his admitted desire to improve his own situation in life by testifying against Hall." (Order, p. 43.)

Hall should be allowed to allocute[13], failed to effectively argue motions for

continuance[14], failed to effectively conduct *voir dire*[15], failed to effectively argue

during closing argument at the punishment phase[16], failed to effectively present

evidence showing that he had adjusted well to previous incarcerations[17], and failed

to offer documentary evidence that would have supported testimony[18]. No COA

should issue on any of these issues. *See Kitchens v. Johnson*, 190 F.3d 698, 703

---

[13] In denying relief on this point, the court pointed out that it would have denied Hall's request to allocute, no matter the content of the statement, without subjecting himself to cross-examination by the government, regardless of what state case law defense counsel might have presented supporting his position that the court had discretion to allow a defendant in a death penalty case to allocute before a jury. (Order, p. 52.)

[14] The court found that Hall failed to establish the requisite prejudice where the court "almost surely would not have granted these motions for continuance had they been argued and supported as Hall suggests," (Order, p. 59); and where Hall "failed to show a reasonable probability of a different outcome at sentencing had the additional mitigating evidence he now points to been admitted into evidence," (Order, p. 60).

[15] The court denied relief on this claim, in part, because Hall "failed to point to any particular act or omission committed by defense counsel during the voir-dire process that rendered their representation of him ineffective." (Order, p. 63.)

[16] Hall's contention is rebutted by the record. After deliberating for ten hours, the jury made several favorable findings for Hall, including rejecting two of the statutory *mens rea* factors and two statutory aggravating factors, and finding the presence of several mitigating factors.

[17] Defense counsel presented testimony from an officer at the federal detention center that there were no records of any disciplinary problems with Hall while he was housed there, (Order, p. 32), and argued "at closing that Hall would not be a future danger to society because his records from both stints in prison revealed no disciplinary problems and because there is no parole in the federal prison system, (Order, p. 32). Hall again argues COA should be granted because defense counsel failed to offer more evidence.

[18] Documentary proof would have added nothing more to what was already before the jury, and never contested by the government, that Hall's mother suffered great physical and emotional abuse at the hands of Hall's father, and that such abuse was witnessed by Hall over a number of years beginning when he was a small child.

(5th Cir. 1999) (questions of degree of effectiveness, *i.e.*, whether there was enough investigation or enough mitigating evidence, "are even less susceptible to judicial second-guessing"); *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000) (same); *Smith v. Cockrell*, 311 F.3d 661, 669 (5th Cir. 2002) (same). Hall confuses the effectiveness of counsel with the <u>results</u> of defense counsel's efforts, but that is not the standard for finding ineffective assistance. No reasonable jurist would find the effectiveness of counsel debatable on any of these contentions simply because Hall is dissatisfied with the results of defense counsel's efforts.

Hall also contends that he is entitled to a COA because the district court failed to consider the cumulative effect of the ineffective assistance he received. But, because the district court found that Hall could not satisfy *Strickland*'s test for ineffective assistance on any of his claims – there was nothing to "accumulate," and, thus, no COA should be granted on this issue. *Miller v. Johnson*, 200 F.3d 274, 286 (5th Cir. 2000) (where a defendant has not demonstrated error by his trial counsel, he cannot, by definition, demonstrate that cumulative error of counsel deprived him of a fair trial); *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993) (explaining that because certain errors were not of constitutional dimension and others were meritless, petitioner "has presented nothing to cumulate").

There is no merit to Hall's contention that a COA should issue as a result of the district court imposing too severe a limitation on his development of facts relating to his claims of extraneous influence on the jury (Application, pp. 90-95.)

Hall made several claims of improper extraneous influence on the jury, which he contended violated his rights under the Fifth, Sixth, and Eighth Amendments. In particular, he asserted that the jury's deliberative process may have been influenced by extraneous influences where one of the jurors, during a weekend break in the sentencing phase, supposedly placed a candle on her daughter's birthday cake in memory of Lisa Rene, and guests at the birthday party prayed for the victim. He further contended that Jacquelyn Holmes, one of the jurors, had indicated in post-trial communications with Hall that she had contact with the victim's mother during the trial. Hall also complained that Juror Holmes was so overwhelmed by emotion that she voted for the death penalty out of sympathy for Lisa Rene and her family.

Hall argues that he is entitled to a COA because the district court unfairly limited his ability to develop the facts supporting his claim. In fact, the record and relevant law indisputably refute his claims.

The court conducted a post-conviction evidentiary hearing on the issue of whether Juror Holmes had contact with the victim's mother during the trial as alleged by Hall. Juror Holmes was the sole witness called to testify. She admitted

that she started a "pen-pal relationship" with Hall, after his incarceration on death row. She also acknowledged that, in one letter, she told Hall that she had met the victim's mother in the hallway of the courthouse during the trial in an attempt to encourage Hall to confide in her and respond to her inquiries. (Order, p. 66.) Holmes testified, at the hearing, however, that she had falsely claimed to have met the victim's mother in her letter. She also testified "that she did not host or attend a birthday party during the weekend break in deliberations at the penalty phase of Hall's trial, she was not aware of any other juror attending such a party, and she did not recall any discussions between the jurors about a birthday party." (Order, p. 66.) The court found Holmes' testimony to be credible and found that no contact occurred between Holmes and Lisa Rene's mother. (Order, p. 66.)

By holding the evidentiary hearing, the court provided Hall with sufficient opportunity to investigate his contention, backed up by evidence in the form of copies of e-mails and letters, that Holmes had had an *ex parte* communication with the victim's mother. Hall was not entitled to further discovery on this issue, once the court held the evidentiary hearing and determined that no such contact had occurred.

As for Hall's claim that Holmes may have been so overwhelmed by emotion that she voted for the death penalty out of sympathy for Lisa Rene and her family,

the court found that, although Holmes had spoken of struggling with her decision after the fact, "she specifically stated that she ultimately voted to recommend the death penalty because of the horror Lisa Rene experienced in death and because Hall attempted to hide his crime rather than promptly expressing remorse. Her decision was therefore based on the circumstances of the crime and Hall's response to them." (Order, p. 68.) Given those facts, Hall can go no further because he is statutorily barred from an investigation into Holmes' deliberative process.

Rule 606(b) of the Federal Rules of Evidence severely limits juror testimony going to the deliberative process. FED.R.CRIM.P. 606(b). The rule "bars juror testimony regarding at least four topics: (1) the method or arguments of the jury's deliberations; (2) the effect of any particular thing upon an outcome in the deliberations; (3) the mindset or emotions of any juror during deliberations; and (4) the testifying juror's own mental process during deliberations." *See United States v. Ruggiero*, 56 F.3d 647, 652 (5th Cir. 1995).[19]

Pursuant to Rule 606, the questions to Juror Holmes at the evidentiary hearing were properly limited to questions concerning contact, if any, between she

---

[19] Rule 606(b)'s prohibition is not diminished in death penalty cases. *See, e.g., Dobbs v. Zant*, 963 F.2d 1403, 1411-1412 (11th Cir. 1991); *Silagy v. Peters*, 905 F.2d 986, 1008-1009 (7th Cir. 1990); *McDowell v. Calderon*, 107 F.3d 1351, 1367-1368 (9th Cir. 1997).

and the victim's mother and questions about the "birthday party." *Ruggiero*, 56

F.3d at 652 ("Post-verdict inquiries into the existence of impermissible extraneous

influences on a jury's deliberations are allowed under appropriate circumstances

so that a jury-man may testify to any facts bearing upon the question of the

existence of any extraneous influence, although not as to how far that influence

operated upon his mind."). Once Holmes testified that she had had no

involvement with the birthday party at issue, Hall was not entitled to any further

investigation into this matter.[20] In particular, Rule 606(b) barred delving into

Holmes' deliberative process.

The record demonstrates that the district court considered, and denied,

several requests from Hall to investigate his speculation that an outside influence

may have influenced the jury in its deliberation because one of the female jurors

purportedly placed a candle on her daughter's birthday cake in Lisa Rene's

memory and prayed for Rene with the guests. Hall based this claim on an affidavit

from his sister that she had seen a television newscast during which one of the

female jurors was interviewed. (Order, p. 65.) The juror allegedly told the

---

[20] In his application, Hall notes that the district court "appears to have assumed that Holmes must have been the juror whose interview Hall's sister Ross saw on television and that, as a result, any additional fact development would be futile." (Application, p. 94.) In fact, it was Hall who initially posited to the court that the mysterious juror at the birthday party was Jacqueline Holmes in his "Defendant's Renewed Motion for Leave to Contact Jurors."

reporter that, during the weekend break in punishment deliberations, she had a birthday party for her daughter, that she placed a candle on the cake in Lisa Rene's memory, and that she and the guests said a prayer for Lisa Rene. *Id.*

Assuming that this incident occurred, it would not amount to an extraneous influence on the jury. Nothing about Hall's allegation demonstrates that any extraneous evidence was introduced into the jury's deliberations, or that any juror violated the court's instructions to forego discussion about the case outside of the deliberation process, especially given the testimony from Holmes. Securing a copy of the broadcast and identifying the juror would bring Hall no closer to showing an illegal or prejudicial intrusion into the jury process. *See United States v. Riley*, 544 F.2d 237, 242 (5th Cir. 1976); *United States v. Varela-Andujo*, 746 F.2d 1046, 1048 (5th Cir. 1984); *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (defendant must do more than speculate to justify a post-trial hearing involving the trial's jurors; he must show clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred).

Instead, Hall speculated that it would be a natural reaction for people moved to pray for Lisa Rene to also speak about the events leading to her death, to express the community's outrage and grief over her fate, or to muse over the

appropriate punishment for the man convicted of taking part in her death. But, a defendant must do more than speculate to justify a post-trial hearing on the issue of extraneous influences; he must show clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred. *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989).

Although courts generally construe section 2255 petitions liberally because the petitioner usually files it himself without aid of counsel, "mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue." *United States v. Pineda*, 988 F.2d 22, 23 (5th Cir. 1993), quoting *United States v. Woods*, 870 F.2d 285, 288 n. 3 (5th Cir. 1989). If a petitioner fails to properly raise a claim, including sufficient factual allegations or proof, a district court's denial and dismissal of the petition is proper. *United States v. Jones*, 614 F.2d 80, 82 (5th Cir. 1980); *Iacovetti v. United States*, 534 F.2d 1189, 1190 (5th Cir. 1976). Because Hall fails to do more than offer speculation, no COA should issue on his claim, and no further discovery should be permitted.

No COA should issue on Hall's *Ring* Indictment Clause contention (Application, pp. 95-97)

Relying on *Ring v. Arizona*, 542 U.S. 348 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), Hall contended that the indictment's failure to allege the statutory aggravating factors and culpable mental state requisite to making him

death penalty-eligible rendered it constitutionally invalid. The district court denied relief on this basis, concluding that *Apprendi* and *Ring* are not retroactively applicable to cases on habeas review, and, notwithstanding, any error was harmless. No COA should issue on this claim because no jurist would find debatable that *Apprendi* and *Ring* are not retroactively applicable to cases on habeas review, and that Hall was not prejudiced even if they were applicable.

Recent Supreme Court and circuit precedent make clear that "the government is required to charge, by indictment, the statutory aggravating factors it intends to prove to render a defendant eligible for the death penalty, and its failure to do so ... is constitutional error." *United States v. Robinson*, 367 F.3d 278, 284 (5th Cir. 2004) (defendant challenged his conviction and death sentence on grounds that he was deprived of the Fifth Amendment right to stand trial only on crimes set forth in an indictment issued by a grand jury); *see also Ring*, 536 U.S. at 609; *Apprendi*, 530 U.S. at 494 n.19; *United States v. Cotton*, 535 U.S. 625, 627 (2002); *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999). Although *Ring*'s holding was predicated on a Sixth Amendment claim, the holding applies with equal force in the context of a Fifth Amendment Indictment Clause challenge, despite no extant Supreme Court case so holding. *Robinson*, 367 F.3d at 284.

Even so, Hall's COA request on this issue should be denied because no jurist would find debatable that *Apprendi* and its progeny, such as *Ring*, may not be applied retroactively to cases pending on federal collateral review. In *Teague v. Lane*, 489 U.S. 288, 310 (1989), the Supreme Court held that, "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced" – meaning most new rules are inapplicable on collateral attack. *Teague* provides that a new constitutional rule can apply retroactively on federal collateral review only if the new rule (1) puts certain kinds of primary, private conduct beyond the power of the criminal law-making authority to proscribe or (2) is a rule of procedure that is implicit in the concept of ordered liberty." *Fisher v. Texas*, 169 F.3d 295, 306 (5th Cir. 1999). The second *Teague* exception "is reserved for watershed rules of criminal procedure that implicate the fundamental fairness and accuracy of the proceeding." *Fisher*, 169 F.3d at 306.

The Fifth Circuit in *United States v. Brown*, 305 F.3d 304 (5th Cir. 2002), held that the new rule of criminal procedure announced in *Apprendi* does not apply retroactively on initial collateral review. Other courts of appeals have likewise held that *Apprendi* is not retroactively applicable to cases pending on federal collateral review. *See, e.g., Goode v. United States*, 305 F.3d 378 (6th Cir.

2002); *Curtis v. United States*, 294 F.3d 841, 842 (7th Cir. 2002); *United States v. Mora*, 293 F.3d 1213, 1218-1219 (10th Cir. 2002) (2002); *United States v. Sanchez-Cervantes*, 282 F.3d 664, 666-671 (9th Cir. 2002); *McCoy v. United States*, 266 F.3d 1245, 1254-1258 (11th Cir. 2001); *United States v. Moss*, 252 F.3d 993, 997-1001 (8th Cir. 2001); *United States v. Sanders*, 247 F.3d 139, 146-151 (4th Cir. 2001).

Just as the new rule in *Apprendi* is unavailable to federal prisoners on collateral review, *Ring*'s extension of that procedural rule to the capital sentencing context should be unavailable to federal capital prisoners on collateral review.

In *Schriro v. Summerlin*, 542 U.S. 348 (2004), the Supreme Court held that *Ring*, which extended application of *Apprendi* to facts increasing a defendant's sentence from life imprisonment to death, does not apply retroactively to cases on collateral review. The district court relied on the Supreme Court's holding in making its ruling. (Order, pp. 14-15.) Hall contends that he is entitled to COA because *Summerlin* addressed the Sixth Amendment right to trial by jury while his claims rests on the Fifth Amendment. But, regardless of whether Hall relies on the Fifth or Sixth Amendment, it still remains that application of *Ring* is barred by *Teague* because whether a grand jury passes on the sufficiency of evidence

justifying an indictment – a lower standard of probable cause at that – is a procedural rule.

Moreover, error, if any, was not prejudicial because of the requirements of the FDPA. In *Robinson*, this Court held that "the failure of an indictment specifically to charge aggravating factors regarded as elements because they increase the maximum available punishment" is susceptible to harmless error review. *Robinson*, 367 F.3d at 285-286. Therefore, even if *Apprendi* and *Ring* are applicable, there is no question but that the indictment's failure to include the aggravating factors and the culpable mental state did not prejudice Hall, where, under the FDPA, he was provided with sufficient notice, and the petite jury "unanimously found the existence of requisite intent beyond a reasonable doubt and unanimously found the existence of several aggravating factors." (Order, p. 16.)

Moreover, in *Robinson*, this Court determined that the relevant question, in a harmless error analysis, was "whether, on the basis of the evidence that would have been available to the grand jury, any rational grand jury presented with a proper indictment would have charged that [the defendant] committed the offense in question." *Robinson*, 367 F.3d at 288. Here, any rational grand jury would have found probable cause to charge Hall with at least one of the statutory

aggravating factors. In fact, the grand jury here <u>found</u> such probable cause when it indicted Hall for kidnapping resulting in a death. One statutory aggravating factor – death during the commission of another felony – was alleged in the Hall indictment. *See* 18 U.S.C. § 3591(c)(1).

The indictment did not allege any of the four culpable mental states set forth in 18 U.S.C. § 3591(a)(2) – the finding of at least one being necessary to satisfy the Eighth Amendment. *See Enmund v. Florida*, 458 U.S. 782 (1982); *Tison v. Arizona*, 481 U.S. 137 (1987). The evidence was sufficient, however, to indict Hall on at least one of the culpable mental states. There was evidence that Hall intentionally committed acts resulting in Lisa Rene's death, *i.e.*, he hit her in the head with a shovel.[21] Thus, no reasonable jurist would find this issue debatable.

<u>Reasonable jurists would not debate whether the district court properly resolved Hall's claims of prosecutorial misconduct</u> (Application, pp. 97-101.)

Hall set forth a series of prosecutorial misconduct claims in his second amended motion, which revolved around Larry Nichols, who provided damaging

---

[21]    A defendant convicted of an offense for which a sentence of death is statutorily provided may be punished by death if the government proves that the defendant: (A) intentionally killed the victim; (B) intentionally inflicted serious bodily injury that resulted in the death of the victim; (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act. *See* 18 U.S.C. § 3591(a)(2).

testimony against Hall in the punishment phase of the trial.[22] Among those was

Hall's contention that the government failed to disclose exculpatory and

mitigating information regarding Nichols. In particular, Hall asserted, "upon

information and belief," that the government failed to disclose the true extent of

Nichols' extensive prior criminal history, and that the information that was

disclosed was not timely such that defense counsel could make meaningful use of

it in cross-examining Nichols. Hall also complained that the government

presented false testimony from Nichols. He further contended that the government

failed to reveal that Nichols was in protective custody prior to the time that he

became an informant against Hall, such that any interchange between he and Hall

violated Hall's right to counsel. The district court denied relief on each of these

claims.

---

[22] Nichols, one of Hall's fellow inmates at the facility where Hall was held prior to trial, testified that Hall joked and bragged about raping Lisa Rene and forcing her to orally copulate him. Hall told Nichols that, given the opportunity, he would kill Steven Beckley because, were it not for Beckley's assistance, the government would have had no case against him. Hall talked about beating up women, and was verbally abusive in describing LaTonya Anders, the mother of one of his children, because he thought she was being unfaithful and might be cooperating with the authorities. Additionally, Nichols testified that Hall informed him of his plans to attempt to escape while being taken from the courtroom to the car, and to escape from the Mansfield facility by taking his lawyers hostage using a homemade knife called a "shank," or a pen or pencil as a weapon. Hall talked to Nichols and Alonzo Airy about using one of the female guards as a hostage. Hall had also made the statement, that if he were found guilty, he would hold his lawyers and the judge as hostages and would attempt to stab the judge. Nichols testified about several shanks that were secreted in an air vent in one of the empty cells in the Mansfield facility, and a razor blade that was kept above the door entrance. Nichols observed Hall using one of the shanks in an attempt to dig through the wall to the females' tank at the Mansfield facility. He also testified that he saw Hall sharpening one of the shanks by rubbing it against the concrete ceiling.

Hall contends that he is entitled to COA on these claims because his contentions are factually supported and not precluded by existing law. (Application, p. 97.) In fact, Hall is not entitled to COA because his contentions are not factually supported and are precluded by existing law.

The court found that Nichols' prior criminal conduct, as related by Nichols at the trial of his co-defendants, was not withheld from the defense. (Order, p. 71.) In reaching that conclusion, the court relied on the following: (1) the record, which showed that one of Hall's attorneys questioned Nichols extensively with his testimony at his co-defendants' trial; and (2) an affidavit from the attorney, submitted with the government's response, in which he stated that he had reviewed the transcript of Nichols' previous testimony and utilized this

information in cross-examining Nichols.[23]  *Id.*  No reasonable jurist would debate

the district court's conclusion here, which was supported by the record.[24]

Hall contended that the government allowed false testimony from Nichols

on cross-examination in violation of its duty to point out that the testimony was

false.  Specifically, he claimed that Nichols lied during cross-examination when he

testified that he never used any of the proceeds from his previous robberies to buy

drugs and that he was never told by fellow inmates about ways to help himself

within the legal system.

Even where unsolicited by the government, a conviction obtained through

the use of false evidence, known to be such by representatives of the government,

may result in a reversal.  *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir.

---

[23]  Clearly, there was no merit to Hall's claim that the government's disclosure was so tardy that his counsel could not make use of it.  The record shows that defense counsel relied heavily on the information Hall claims was not disclosed or was disclosed late.  Defense counsel asked Nichols "in the trial you testified in in Dallas, did you say there was some inmates out there that helped you learn to take steps to help yourself?" (Emphasis added.)  (T17:257.)  Defense counsel questioned him about several unadjudicated offenses, including five or six bank robberies in Louisiana (T17:242-243); carrying firearms in those robberies (T17:244); using an assault rifle in the robberies (T17:244); a conspiracy to commit those robberies (T17:243); robberies, burglaries, and theft involving vehicles (T17:244); robberies of fast food restaurants and convenience stores (T17:245); and federal charges for bringing a stolen vehicle across state lines (T17:244).  The additional offenses listed by Hall as unknown to his trial counsel, *e.g.*, fraud by check, drug trafficking, theft of personal watercraft, are relatively minor compared to the offenses Nichols admitted committing during defense counsel's cross-examination.

[24]  Not satisfied with that, Hall now contends that "Nichols was debriefed by Government agents and obliged to advise them of all prior criminal activity.  There is no record the Government ever disclosed what Nichols revealed in that debriefing, although any incidents were relevant to Nichols' bias and motive even if no convictions resulted." (Application, p. 99.0  This is an example of Hall's reliance on speculation to support his contentions.

1997); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Even where the testimony affects only the credibility of a witness, it may fall within *Napue*'s ambit. *See Napue*, 360 U.S. at 269-270; *O'Keefe*, 128 F.3d at 893. Relief based upon a *Napue* violation is proper only if (1) the statements in question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements were material. *O'Keefe*, 128 F.3d at 893.

In its response to the section 2255 motion, the government argued that Hall had failed to show that the statements were false or that the prosecution knew that they were false, and, most importantly, that Hall could not show that the statements were material. The district court agreed that the alleged falsehoods were immaterial because

> [r]egardless of whether Nichols used his illegal proceeds to purchase drugs, there was ample evidence of Nichols's prior criminal behavior placed into evidence, including numerous armed robberies, as well as the illegal possession of guns. And, regardless of whether someone counseled Nichols on how to avail himself of the system to improve his chances of lowing his sentence, there was ample evidence admitted of his willingness to initiate contact with the government in order to provide information against other defendants, as well as his willingness to testify against others with the express hope of having his sentence reduced.

(Order, pp. 74-75.) There is no question that these "false" statements were "unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record." *Yates v. Evatt*, 500 U.S. 391, 403 (1991).

Thus, no reasonable juror would debate the court's determination that Hall was entitled to no relief on this claim.[25]

Hall claims that Nichols was operating as an agent of the government when Nichols elicited information from him in violation of his Sixth Amendment, where Hall was represented by counsel at the time of the contact. He based this claim on his contention that Nichols was placed in protective custody prior to the time that he became an informant against Hall, but he pointed to nothing substantiating his claim other than the word "protect" in a parenthetical in a FBI-302. (Hall Second Amended Motion, p. 179.) Nichols testified that he was not placed in protective custody until *after* he met with the agents and the prosecutors. (T17:236.)

The court denied relief on this contention because of the paucity of support offered by Hall, and because the text of the report relied on by Hall belied his contention. (Order, p. 72.) The report stated that Nichols had informed the agent to whom he first talked that he was a cellmate with one of the Hall brothers. *Id.* Because the record refuted Hall's position, the court properly determined that Hall was not entitled to relief on this issue. For the same reason, this Court should find that Hall is not entitled to COA.

---

[25] Moreover, the defense itself elicited the alleged perjury on cross-examination, which pursuant to case law, means that no material falsehood has occurred. *O'Keefe*, 128 F.3d at 894 (when the defense elicits the alleged perjury on cross-examination, no material falsehood has occurred because the government has not itself knowingly presented false testimony).

<u>Reasonable jurists would not find debatable that Hall failed to substantiate his</u> <u>claim that the Federal Death Penalty, as administered by the government, violates</u> <u>the Fifth and Eighth Amendments</u>. (Application, pp. 101-104)

Citing to statistics maintained by the Federal Death Penalty Resource Counsel (FDPRC), Hall argued that the authorization process used by the Department of Justice to select those defendants who will face the death penalty and those who will be permitted to plead to a sentence less than death is impermissibly influenced by the defendant's race. The district court found that the statistics proffered by Hall fell short in establishing a *prima-facie* selective-prosecution case under *United States v. Armstrong*, 517 U.S. 456, 463 (1996) (defendant must show that federal prosecutorial policy had both a discriminatory effect and a discriminatory intent in order to prevail on a selective prosecution claim; the latter is shown by proof that similarly situated individuals of a different race were not similarly prosecuted).

The court explained that, moreover, Hall's statistics were similar to ones already held by this Court to be insufficient to support a claim of selective prosecution. (Order, p. 87.) *See United States v. Jones*, 287 F.3d 325, 333-335 (5th Cir. 2002); *United States v. Webster*, 162 F.3d 308, 333-335 (5th Cir. 1999); *see also United States v. Webster*, 392 F.3d 787 (5th Cir. 2004). Therefore, the district court denied Hall's claim. (Order, p. 87.) No reasonable jurist would find

the district court's conclusion debatable, even without Hall having an "opportunity to develop and prove his case." (Application, p. 104.) The court was bound by this Court's previous holding.

Furthermore, as noted by the district court, the statistical evidence presented by Hall wholly failed to establish that the government has declined to subject similarly situated defendants of a different race to death penalty prosecutions. (Order, pp. 87-88, n.11.) He offers statistics that demonstrate the breakdown in race of defendants against whom the government has sought the death penalty, but identifies no similarly situated defendants of a different race who were not so prosecuted. In fact, his statistics demonstrate that the government has sought the death penalty against defendants of a different race than that of Hall. Likewise, the statistics on the racial background of the defendants who were able to bypass the death penalty because of a plea bargain are insufficient to establish the requisite prima facie case, where Hall fails to demonstrate that plea offers were not made to black defendants.

Hall "failed to present any evidence, inferred or otherwise, that there has been any discriminatory intent when prosecutors have decided to ask for permission to seek the death penalty against African-American individuals or when the Department of Justice has authorized the death penalty in cases against

African-American defendants." *Id.* Hall was not entitled to discovery because his statistical evidence was not sufficient to meet the "some evidence" standard necessary to establish good cause for discovery. *Id. See also Armstong*, 517 U.S. at 465, 468. Again, no reasonable jurist would find the court's conclusion debatable.

No reasonable jurists would find any merit to Hall's claim that his sentence was based on materially false or inaccurate information in violation of the Eighth Amendment. (Application, p. 104)

Hall contends that his death sentence violates the Eighth Amendment because it is based, *inter alia*, on materially false or inaccurate testimony given by Larry Nichols, and mistaken assumptions about Hall's background. He argues that reasonable jurists could dispute the district court's rejection of his claims because it wrongly concluded Nichols' falsehoods were immaterial, and failed to address the Eighth Amendment implications of trial counsels' materially inaccurate and grossly underdeveloped mitigation presentation.

Because Hall failed to show that Nichols testified falsely or that the statements of which he complains were material, Hall's Eighth Amendment claim necessarily is without merit. *Hafdahl v. Johnson*, 251 F.3d 528, 534 (5th Cir. 2001). No reasonable jurist would debate that conclusion. Moreover, no reasonable jurist would find debatable that Hall's death sentence did not result

from "mistaken assumptions about Hall's own background (*e.g.*, that he was not himself a victim of childhood physical abuse or material deprivation)." (Application, p. 104.) As argued by the government herein, more evidence about Hall's background would not have changed the outcome in this case.

Hall's argument actually amounts to an attack on the sufficiency of the evidence. *See generally United States v. Drobny*, 955 F.2d 990, 997 (5th Cir. 1995) ("What Drobny has actually raised by this argument, in the guise of a jurisdictional challenge, is a claim that the evidence was insufficient and that the jury was improperly charged"). Sufficiency issues are not cognizable on a collateral motion under section 2255. *Forrester v. United States*, 456 F.2d 905, 907 (5th Cir. 1972).

**No COA should issue on Hall's claims that the district court improperly limited the evidentiary hearing, denied discovery, and denied funds to Hall for investigation and expert assistance.** (Application, pp. 11-19.)

Hall contends that this Court should issue COA on his contentions that the district court improperly limited the evidentiary hearing, denied discovery, and denied funds for investigative and expert assistance. There is no merit to any of Hall's contentions.[26] In addition to specific responses to Hall's claims about

---

[26] The government submits that Hall's remaining contentions are not cognizable in an application for COA, which asks whether a defendant can make a substantial showing that he was denied constitutional rights. *See* 18 U.S.C. § 2253. A defendant does not have a constitutional right to an evidentiary hearing, to discovery, or to funds to investigate post-conviction contentions.

discovery and the need for an evidentiary hearing scattered throughout the response to the substantive issues, the government submits the following.

**Limitation on Evidentiary Hearing.** Hall is not entitled to a COA on his contention that the district court restricted too severely the topics covered in his evidentiary hearing. The court properly limited the issues covered at the evidentiary hearing.

Unless the motion, files, or record of the case show conclusively that no relief is appropriate, an evidentiary hearing is required in 28 U.S.C. § 2255 proceedings. *United States v. Santora*, 711 F.2d 41, 42 (5th Cir. 1983); *United States v. Guerra*, 588 F.2d 519, 520-521 (5th Cir. 1979) (petitioner does not establish his right to a hearing by simple expedient of filing a petition; no hearing is required on patently frivolous claims or on those based upon unsupported generalizations); *but see Machibroda v. United States*, 368 U.S. 487, 494-495 (1962) (hearing was necessary because "[t]he factual allegations contained in the petitioner's motion and affidavit, and put in issue by the affidavit filed with the Government's response, related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light").

The court addressed only Hall's claims going to the improper juror influence claims in the evidentiary hearing. The court declined holding a hearing on the remaining issues because

> "[t]he record before this Court, including the exhibits submitted by Hall with his motion, do not create any contested fact issues with regard to Hall's remaining claims that must be resolved in order to decide his case. To the contrary, many of Hall's claims are based on the record from the trial. And, with regard to the claims for which Hall has submitted additional evidence, the Court has decided those claims based on information that remains uncontested, by assuming that what Hall alleges is true, or based on legal, not factual, bases. Accordingly, because the record before this Court shows conclusively that Hall is not entitled to relief, his request for an evidentiary hearing on his remaining claims for relief is denied."

(Order, p. 89.) Given the court's determination and the assumptions it employed in reaching its findings and conclusions, its decision to limit the evidentiary hearing to issues that did not fall within those categories, such as the juror misconduct allegations, was not error.

**Denial of discovery.** A habeas petitioner is not entitled to discovery as a matter of ordinary course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). In *Harris v. Nelson*, 394 U.S. 286, 300 (1969), a seminal case leading to the promulgation of rules governing discovery in habeas corpus cases, the Supreme Court noted that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ...

entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry." *See also Bracy*, 520 U.S. at 908-909 (habeas corpus discovery procedure was intended to follow *Harris* precedent); *Gibbs v. Johnson*, 154 F.3d 253, 258 (5th Cir. 1998) ("*Harris* led to the adoption of Rule 6 and the rule was meant to be consistent with it").

Rule 6(a) of the "Rules Governing Section 2255 Cases in the United States District Courts" provides that: "A party may invoke the processes of discovery available under the Federal Rules of Criminal Procedure or the Federal Rules of Civil Procedure or elsewhere in the usages and principles of law if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."[27] Fed.R. 6(a) Governing 28 U.S.C. § 2255 Cases. In order to be entitled to limited discovery and an evidentiary hearing under Rule 6(a), a defendant must tender some specific, verified basis or evidence, beyond his mere naked assertion or belief. *United States v. Acklen*, 47 F.3d 739, 744 (5th Cir. 1995); *Hill v. Johnson*, 210 F.3d 481, 487 (5th Cir. 2000) (in case construing similar discovery rule in 28 U.S.C. § 2254 petitions, the court reiterated that a petitioner's factual allegations must be specific, as opposed to merely

---

[27] Discovery rulings in a habeas case are reviewed for abuse of discretion only. *See* Fed.R. 6(a) Governing 28 U.S.C. § 2255 Cases; *see also Bracy v. Gramley*, 520 U.S. at 909; *Clark v. Johnson*, 202 F.3d 760, 765-766 (5th Cir. 2000).

speculative or conclusory, to justify discovery); *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) (federal habeas court must allow discovery and an evidentiary hearing only where a factual dispute, if resolved in the petitioner's favor, would entitle him to relief and the state has not afforded the petitioner a full and fair evidentiary hearing).

Conclusory allegations are not enough to warrant discovery; instead, a petitioner must set forth specific allegations of fact. *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994). The discovery mechanisms for habeas corpus proceedings were not intended, however, to authorize fishing expeditions. *Id.*

The denial of Hall's discovery request "*in toto*" is significantly different from a blanket denial of discovery. The record shows that the district court considered each of Hall's multiple motions for discovery carefully before concluding that Hall had failed to show an entitlement to discovery because he offered nothing more than conclusory allegations or speculation, or because the record refuted his assertion.

**Funding for investigative and expert assistance.** There is no merit to Hall's contention that he is entitled to a COA on his claim that the district court severely curtailed funding necessary for investigative and evaluative services. According to counsel, Jill Miller, M.S.S.W., Dr. Michael Gelbort, and Attorney

Michael Tigar provided declarations and evaluations despite a lack of what Hall contends was sufficient funding. (Application, p. 5, n.5-6.) Furthermore, in order to present a colorable need for more funds to conduct more post-conviction investigation, Hall should be required to identify areas beyond those already offered as mitigation by his defense counsel; otherwise, he is seeking funding which will result in only cumulative evidence.

**Whether, if remanded, the case should be assigned to another court.**
(Application, pp. 104-107)

Obviously, it is the government's belief that remand will not be necessary because, even if COA is granted, Hall cannot establish that he merits relief under section 2255. In any event, there is no merit to Hall's claim that the district court will face substantial difficulty putting aside previously expressed views or findings determined to be erroneous. The court, as it was required, made findings based on the record before it. If this Court were to determine that any of those factual findings were clearly erroneous, the district court, which has demonstrated unparalleled fairness and thoroughness throughout the entire process[28], would have no difficulty setting those factual findings aside, and considering Hall's section 225 claims in light of the Court's decision.

---

[28] In the face of procedural bars, the court, nevertheless, addressed Hall's sixth, seventh, eighth and twelfth claims, although they were not raised on direct appeal and were not based on new law or facts. (Order, p. 8.)

In conclusion, this Court should deny Hall's application for COA because he has failed to make a substantial showing that his constitutional rights were violated.

Respectfully submitted,

RICHARD B. ROPER
United States Attorney

DELONIA A. WATSON
Assistant United States Attorney
Texas State Bar Number 20937500
Burnett Plaza, Suite 1700
801 Cherry Street, Unit #4
Fort Worth, Texas 76102-6882
Telephone:  817.252.5200
Facsimile:   817.978.3094

# CERTIFICATE OF SERVICE

I hereby certify that, on the 10th day of November, 2005, the original and six copies of the foregoing opposition to COA application, and a computer diskette containing same, were sent via the United States mail to the Clerk of the United States Court of Appeals for the Fifth Circuit, and two copies of the opposition and one computer diskette containing the opposition were likewise served on counsel for Hall:

Mr. Robert C. Owen
Attorney at Law
Owen & Rountree, LLP
P.O. Box 40428
Austin, Texas 78704

Ms. Marcia A. Widder
Attorney at Law
Capital Appeals Project
636 Baronne Street
New Orleans, Louisiana 70113


DELONIA A. WATSON
Assistant United States Attorney

briefs2005\hallresponsecoa.wpd

# CERTIFICATE OF COMPLIANCE

Pursuant to 5th CIR. R. 32.2.7(c), the undersigned certifies the government's opposition complies with the type-volume limitations of 5th CIR. R. 32.2.7(b).

1. EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5th CIR. R. 32.2.7(b)(3), THE OPPOSITION CONTAINS:

13735 words

2. THE OPPOSITION HAS BEEN PREPARED:

in proportionally spaced typeface (WORDPERFECT, Version 9) using Times New Roman in 14 point.

3. THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESENTATION IN COMPETING THIS CERTIFICATE, OR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN 5th CIR. R. 32.2.7, MAY RESULT IN THE COURT'S STRIKING THIS DOCUMENT AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING IT.

DELONIA A. WATSON
Assistant United States Attorney